## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HAGGEN HOLDINGS, LLC, *et al.,*[1] | ) | Case No. 15-11874 (KG) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS:
## (I) AUTHORIZING THE DEBTORS TO ASSUME THE DISPOSITION
## AGREEMENT; (II) AUTHORIZING AND APPROVING THE CONDUCT
## OF STORE CLOSING OR SIMILAR THEMED SALES, WITH SUCH SALES
## TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS AND
## ENCUMBRANCES; AND (III) GRANTING RELATED RELIEF

Haggen Holdings, LLC and its above-captioned affiliated debtors and debtors in possession (each a "**Debtor**," and collectively, the "**Debtors**") hereby submit this motion (the "**Motion**") pursuant to sections 105, 363, 365 and 554 of title 11 of the Bankruptcy Code and Rules 2002, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for the entry of (1) an interim order in the form attached hereto as <u>Exhibit A</u> (the "**Interim Order**"): (i) authorizing Haggen Opco North, LLC, Haggen Opco South, LLC and Haggen, Inc. (collectively, the "**Operating Debtors**") to continue store closing or similar themed sales in accordance with the Letter Agreement Governing Inventory Disposition (the "**Agreement**"), by and between each of the Operating Debtors and Hilco Merchant Resources, LLC (the "**Agent**"), a copy of which is attached as <u>Exhibit 1</u> to the Interim Order; (ii) authorizing the Operating Debtors to continue store closing or similar themed sales in accordance with the terms of the store closing sale guidelines (the "**Sale Guidelines**") attached as <u>Exhibit 2</u> to the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Haggen Holdings, LLC (7558), Haggen Operations Holdings, LLC (6341), Haggen Opco South, LLC (7257), Haggen Opco North, LLC (5028), Haggen Acquisition, LLC (7687), and Haggen, Inc. (4583).  The mailing address for each of the Debtors is 2211 Rimland Drive, Bellingham, WA 98226.

Interim Order, with such sales to be free and clear of all liens, claims and encumbrances; and (iii) granting certain related relief, on an interim basis (collectively, the "**Store Closing Relief**"), and (2) following service of this motion and after an opportunity to be heard at a final hearing (the "**Final Hearing**"), a final order (the "**Final Order**"),[2] granting the Store Closing Relief and on a final basis and authorizing the assumption of the Agreement.  In support of this Motion, the Debtors incorporate by reference the *Declaration of Blake Barnett In Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"),[3] and further respectfully state as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "**Amended Standing Order**").  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 363, 365 and 554 of the Bankruptcy Code and Bankruptcy Rules 2002, 6003 and 6004.

---

[2]  A proposed form of the Final Order will be filed with the Court prior to the Final Hearing.

[3]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

# BACKGROUND

## A.    General

2.     On September 8, 2015 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Concurrently with this Motion, the Debtors have also filed certain other motions and applications seeking certain "first day" relief.

3.     The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.     No request has been made for the appointment of a trustee or examiner and no official committee has been established in these chapter 11 cases.

5.     Additional information about the Debtors' business and the events leading up to the Petition Date can be found in the First Day Declaration, which is incorporated herein by reference.

## B.    The Debtors' Stores

6.     As set forth in further detail in the First Day Declaration, Haggen Holdings, LLC owns directly or indirectly each of the Debtors (collectively, "**Haggen**").  Prior to the Petition Date, Haggen owned and operated 164 grocery stores through three operating companies: Haggen, Inc. ("**Haggen, Inc.**"), Haggen Opco North, LLC ("**Haggen North**"), and Haggen Opco South, LLC ("**Haggen South**").

7.     Pursuant to an Asset Purchase Agreement between the Haggen Holdings, LLC and Albertson's LLC, Haggen purchased 146 of its stores in December 2014 and hired 8,300 employees in connection therewith.  Following the purchase, Haggen operated stores across five states, with Haggen, Inc. operating 18 stores located in Washington and Oregon,

Haggen North operating 46 stores located in Washington and Oregon, and Haggen South operating 100 stores located in Arizona, California and Nevada.

**C.      The Proposed Store Closing Sales and Pre-Petition Marketing Efforts**

8.      Thereafter, the Debtors experienced an unanticipated drop off in sales, and continued to experience negative store-level operating results, at stores operated by Haggen North and Haggen South .

9.      In light of the Debtors' financial difficulties, prior to the Petition Date, the Debtors' management, in consultation with their advisors, including Alvarez & Marsal ("**A&M**"), performed a comprehensive analysis of the Debtors' financial performance, which included an in-depth review of the performance of each store and the market in which the Debtors operate.

10.      As a result of such financial analysis, the Debtors identified two categories of stores: (a) "non-core" stores, which are losing money and are located in non-strategic locations and, thus, provide limited benefit to the Debtors, and (b) "core" stores, which are relatively successful and located in strategic locations.  The Debtors concluded that it was in the best interests of the Debtors and their stakeholders to restructure around its core stores, and to maximize the value of its non-core stores (each, a "**Closing Store**" and, collectively, the "**Closing Stores**") through sale or other disposition (the "**Store Closing Sales**").

11.      Accordingly, in August, 2015, the Debtors and their advisors began contacting certain nationally-recognized potential liquidators (the only parties that can effectuate a transaction of this magnitude) to solicit interest in bidding on the right to conduct the Store Closing Sales.  The Debtors discussed the Store Closing Sales with such nationally-recognized liquidator firms, and the Debtors' advisors solicited both equity and fee-based bids, to allow

them to identify the highest and best bid.  The Debtors engaged extensively with the potential

bidders and, among other things, provided significant data on the stores included in the Store

Closing Sales.

12.      After extensive negotiations, with the assistance of A&M, the Debtors

have selected the Agent to conduct the Store Closing Sales, and have determined to close and

liquidate the merchandise (the "**Merchandise**") and furniture, fixtures, and equipment (other

than "Excluded FF&E" as defined in the Agreement, the "**FF&E**") of up to 27 of the Closing

Stores in accordance with the terms of the Agreement (the material terms of which are set forth

below) and the Sale Guidelines.  The Store Closing Sales commenced on or about August 26,

2015.[4]

**D.      The Agreement**

13.      Under the terms of the Agreement, subject to this Court's approval of the

attached Interim Order and Final Order, the Agent will serve as the exclusive agent to the

Debtors for the purpose of conducting a sale of certain Merchandise and FF&E at the Closing

Stores using the procedures outlined in the Sale Guidelines.  The Debtors seek to assume the

Agreement so that they may leverage the experience and resources of the Agent in performing

large-scale liquidations while retaining control over the sale process, which the Debtors believe

will provide the maximum benefit to the estates.

14.      The material terms of the Agreement are described in the summary chart

below.[5]

---

[4]  Prior to the Petition Date, the Debtors also engaged Sagent Advisors, LLC as its investment banker to market for sale certain of the non-core stores operated by Haggen North and Haggen South.  As a result of these efforts, several third parties have expressed interest in acquiring a number of such store locations.

[5]  Capitalized terms used but not otherwise defined in this summary chart shall have the meanings ascribed to them in the Agreement.  To the extent that this summary differs in any way from the terms set forth in the Agreement, the terms of the Agreement shall control.

01:17658215.1

| Provision | Description |
|---|---|
| Sale Term | On or about August 26, 2015 to September 30, 2015 |
| Agent's Undertakings | (a)    provide qualified supervisors (the "**Supervisors**") engaged by Agent to oversee the management of the Stores; <br><br> (b)    determine appropriate point-of-sale and external advertising for the Stores, approved in advance by Merchant; <br><br> (c)    determine appropriate discounts of Merchandise, staffing levels for the Stores, approved in advance by Merchant, and appropriate bonus and incentive programs, if any, for the Stores' employees, approved in advance by Merchant; <br><br> (d)    oversee display of Merchandise for the Stores; <br><br> (e)    to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; <br><br> (f)    maintain the confidentiality of all proprietary or nonpublic information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; <br><br> (g)    assist Merchant in connection with managing and controlling loss prevention; <br><br> (h)    provide recommendations to the Merchant with respect to DSD Merchandise and replenishment thereof; <br><br> (i)    assist Merchant with developing a customer transition program to Merchant's other retail stores; and <br><br> (j)    provide such other related services deemed necessary or appropriate by Merchant and Agent. |
| Merchant's Undertakings | (a)    be the employer of the Stores' employees, other than the Supervisors; <br><br> (b)    pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees and other representatives of Merchant; <br><br> (c)    prepare and process all tax forms and other documentation; <br><br> (d)    collect all sales taxes and pay them to the appropriate taxing authorities for the Stores; <br><br> (e)    use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; <br><br> (f)    execute all agreements determined by the Merchant and Agent to be |

|  | necessary or desirable for the operation of the Stores during the Sale; |
|  | (g)    arrange for the ordinary maintenance of all point-of-sale equipment required for the Stores; |
|  | (h)    to the extent included in the Sale, make arrangements for and provide for the shipment of DSD Merchandise to the Stores; |
|  | (i)    provide Agent with weekly reporting; and |
|  | (j)    ensure that Agent has quiet use and enjoyment of the Stores for the Sale Term in order to perform its obligations under this Agreement. |
| Agent Fee and Expenses | Provided the Gross Cost Recovery is no less than eighty-seven percent (87%) (the "**Base Fee Threshold**"), Agent shall earn a fee equal to one and one half percent (1.5%) of the aggregate Gross Proceeds of Merchandise sold at the Stores. <br><br> If the Gross Cost Recovery is less than the Base Fee Threshold, Agent shall not earn any fee for services. <br><br> If the Gross Cost Recovery is equal or greater than ninety-seven percent (97%), Agent's fee shall be increased by one half of one percent (0.5%) for a total Agent's fee of two percent (2.0%) of the aggregate Gross Proceeds of Merchandise sold at the Stores. |
| FF&E | Other than Excluded FF&E (if any), during the Sale Term and continuing until a mutually acceptable date no later than four weeks after the Sale Termination Date (as defined in the Agreement) at each Closing Store, Agent shall sell the FF&E in the Closing Stores from the Closing Stores themselves. |

## **RELIEF REQUESTED**

15.    By this Motion, the Debtors seek the entry of (a) the Interim Order authorizing (i) the continuation of the Store Closing Sales in accordance with the Agreement and the Sale Guidelines, and (ii) granting the related Store Closing Relief; and (b) the Final Order granting the Store Closing Relief on a final basis and authorizing the assumption of the Agreement.

## BASIS FOR RELIEF REQUESTED

### A.    Assumption of the Agreement is Authorized Under Section 363(a)

16.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The United States Court of Appeals for the Second Circuit has stated that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'"  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

17.    The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard.  See In re AbitibiBowater Inc., 418 BR 815 (unpaginated) (Bankr. D. Del. Oct. 27, 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice).  "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'"  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  Indeed, "the sole issue is whether the rejection benefits the estate."  In re HQ Global, 290 B.R. at 511.

01:17658215.1

18.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing.  See In re Integrated Res., 147 B.R. at 656; see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attached to a debtor's management decisions.").  Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease.  See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate."); see also N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Control Data Corp. v. Zelman (In re Minges), 602 F.2d 38, 42-43 (2d Cir. 1979); In re Riodizio, Inc., 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997); In re G Survivor Corp., 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

19.     Here, the Operating Debtors have exercised their sound business judgment in determining that assumption of the Agreement is in the best interests of the Operating Debtors and their estates, and, accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code.  See, e.g., Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").  If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or

rejection of an executory contract or unexpired lease.  See, e.g., In re Philadelphia Newspapers, LLC, 424 BR 178, 182-83 (Bankr. E.D. Penn. Jan. 13, 2010).

20.     As a key component of the Debtors' continuing efforts to preserve and maximize estate value, to reduce administrative expenses, to rationalize their cost structure moving forward, and to successfully reorganize though these chapter 11 proceedings, the Operating Debtors have concluded, in their business judgment, that the assumption of the Agreement is beneficial to the Operating Debtors' estates.  In consultation with A&M, the Debtors determined that the Closing Stores are incredibly burdensome to their current cost structure and, thus, that the Merchandise and FF&E should be liquidated for the benefit of the Operating Debtors' estates and their creditors.  Furthermore, after engaging in extensive, arms'-length negotiations with certain nationally-recognized liquidators regarding the Store Closing Sales and conducting reasonable diligence, the Operating Debtors determined that entering into the Agreement would provide the greatest return to the Operating Debtors' estates for the Merchandise and FF&E.  Additionally, the Operating Debtors believe that the terms set forth in the Agreement are fair and equitable and present the best path forward with respect to the Closing Stores.

21.     In particular, the Agent's extensive expertise in conducting liquidation sales allow it to oversee and implement the Store Closing Sales, with the assistance of the Operating Debtors' management, in an efficient and cost effective manner.  Assumption of the Agreement and the continuation of the Store Closing Sales at their current momentum will present tremendous cost savings that will certainly inure to the benefit of the Operating Debtors' estates and all stakeholders.  Accordingly, the Operating Debtors have already dedicated substantial resources toward the Store Closing Sales.

01:17658215.1

22.     If the Store Closing Sales are not permitted to go forward on an interim basis, and the Agreement is not ultimately assumed, the Operating Debtors' estates would lose the benefit of the efforts that have already been expended by the Agent in commencing the Store Closing Sales.  Any delay in conducting the Store Closing Sales would result in loss of value achieved and increased administrative expenses.  The administrative expenses associated with maintaining such Closing Stores in operation amounts to approximately $5.2 million per month.

23.     Therefore, the Debtors request that this Court authorize the assumption of the Agreement.

**B.      Sufficient  Business Justification Exists for the Store Closing Sales Under Section 363(b)**

24.     Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor.  See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070–71 (2d Cir. 1983); In re Abbotts Dairies, Inc., 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp.); In re Delaware &  Hudson Ry. Co., 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in Abbotts Dairies); Dai-Icho Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999) (same).

25.    As set forth above, the demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., 147 B.R. at 656.

26.    Accordingly, similar store closing or liquidation sales are routinely approved by Courts in this district in chapter 11 cases involving retail debtors. See, e.g., Ames Dept. Stores, 136 B.R. at 359 (stating that liquidation sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"); see also In re RadioShack Corp., Case No. 15-15-10197 (KJC) (Bankr. D. Del. Feb. 6, 2015); In re Coldwater Creek, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014); In re Anchor Blue Holding Corp., Case No. 11-10110 (PJW) (Bankr. D. Del. Jan. 13, 2011); In re Samsonite Co. Stores, LLC, Case No. 09-13102 (PJW) (Bankr. D. Del. Sept. 10, 2009); In re Sportsman's Warehouse, Inc., Case No. 09-10990 (CSS) (Bankr. D. Del. Mar. 23, 2009); In re Goody's, LLC, Case No. 09-10124 (CSS) (Bankr. D. Del. Jan. 21, 2009).

27.    The Operating Debtors' decision to conduct the Store Closing Sales represents the best path forward to maximizing recoveries to the Operating Debtors' estates with respect to the Merchandise and FF&E, is based upon their sound business judgment and, therefore, should be approved under section 363(b) of the Bankruptcy Code. The Agent, as a nationally-recognized liquidation firm, has the experience necessary to assist the Debtors in monetizing the Merchandise and FF&E, through an efficient and orderly process, and any interruption in the Store Closing Sales would harm the Operating Debtors' ability to successfully monetize of the Merchandise and FF&E. Moreover, the Closing Stores continuously suffer negative sale levels, thereby presenting a significant drain on the Operating Debtors' liquidity.

Indeed, upon the sale of the Merchandise and FF&E and the termination of operations at the Closing Stores, the Operating Debtors expect to realize an immediate benefit in terms of financial liquidity.

28.     For the foregoing reasons, the Debtors request that this Court approve the Operating Debtors' continuation of the Store Closing Sales in accordance with the terms of the Agreement and the Sale Guidelines.

**C.     The Sale of the Merchandise and FF&E Free and Clear of All Liens, Encumbrances and Other Interests Is Authorized Under Bankruptcy Code Section 363(f)**

29.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

30.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets and commencement of the Sales "free and clear" of liens and interests.  See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); In re Bygaph, Inc., 56

B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).    Furthermore, a debtor possesses broad

authority to sell assets free and clear of liens.    See In re TWA Inc., 322 F.3d 283, 289 (3d Cir.

2003).

31.    The Operating Debtors submit that it is appropriate to sell the

Merchandise and FF&E on a final "as is" basis, free and clear of any and all liens, claims and

encumbrances in accordance with section 363(f) of the Bankruptcy Code because one or more of

the tests of section 363(f) are satisfied with respect to the sale of the Merchandise and FF&E.    In

particular, the Operating Debtors believe that at least section 363(f)(2) of the Bankruptcy Code

will be met because the Debtors' pre-petition secured lenders are secured by, among other things,

the Merchandise and have consented to its sale.    Moreover, with respect to any other party

asserting a lien, claim, or encumbrance against the Merchandise and FF&E, the Operating

Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in

section 363(f).    Furthermore, the Operating Debtors propose that any liens, claims, and

encumbrances asserted against the Merchandise and FF&E be transferred to and attach to the

amounts earned by the Operating Debtors under the Store Closing Sales.

32.    Accordingly, the Debtors propose that section 363(f) authorizes the

transfer and conveyance of the Merchandise and FF&E free and clear of any such claims,

interests, liabilities or liens.

**D.**    **The Court Should Approve the Proposed Sale Guidelines**

33.    As set forth in greater detail below, many Liquidation Laws (as defined

below) require special and cumbersome licenses, waiting periods, time limits and other

procedures for store closing and liquidation sales.    Therefore, although the Operating Debtors

intend to comply fully with applicable state and local health and safety and consumer protection

laws in connection with the Store Closing Sales, the Operating Debtors seek a waiver of

compliance with the Liquidation Laws and instead request the authority to conduct such sales in accordance with the Sale Guidelines.

34.    The Operating Debtors developed the Sale Guidelines with the intent to provide a means of controlling the administrative burdens on their estates that are associated with complying with the Liquidation Laws, while at the same time protecting the interests of their landlords and the applicable governmental agencies enforcing such laws.  Accordingly, the Operating Debtors submit that the Sale Guidelines adequately address any concerns that their landlords or the governmental agencies may raise with respect to the Store Closing Sales, and therefore, the requested relief below seeking the waiver of Liquidation Laws  should be approved.

**E.    Strict Compliance with the Liquidation Laws Should Be Waived**

35.    Certain states in which the Closing Stores are located have or may have licensing and other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including (but not limited to) state and local laws, statutes, rules, regulations, and ordinances related to store closing and liquidation sales, establishing licensing, permitting, or bonding requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations that would otherwise apply to the Sales, or consumer fraud laws, with the exception of deceptive advertising laws (the "**Liquidation Laws**").  Typical statutes and regulations provide that if a liquidation or bankruptcy sale is court-authorized, however, then a company need not comply with these Liquidation Laws.

36.    The Operating Debtors, therefore, request that the Court authorize the Operating Debtors to conduct the Store Closing Sales without the necessity of, and the delay associated with, complying with the Liquidation Laws.  Because the Operating Debtors and their assets are subject to this Court's jurisdiction, see 28 U.S.C. § 1334, this Court will be able to supervise the Store Closing Sales.  The Store Closing Sales are legitimate methods by which the

Operating Debtors can maximize the return from the sale of the Merchandise and FF&E for the benefit of their estates and creditors.  Moreover, creditors and the public interest are adequately protected by the jurisdiction and supervision of this Court.

37.    Even if a state or local law does not expressly except bankruptcy sales from its ambit, the Operating Debtors submit that, to the extent that such state or local law conflicts with federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution.  To hold otherwise would severely impair the relief otherwise available under section 363 of the Bankruptcy Code.  In concert with this premise, bankruptcy courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.  See, e.g., Aloe v. Shenango Inc. (In re Shenango Group, Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . . [A] state statute [ ]cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code.").

38.    While preemption of state law is not always appropriate, as when the protection of public health and safety is involved, see Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker &Drake, Inc.), 35 F.3d 1348, 1353-54 (9th Cir. 1994) (finding no preemption when state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is appropriate when, as here, the only state laws involved concern economic regulation.  Id. at 1353 (finding that "federal bankruptcy preemption is more likely. . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").  Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has the authority to permit the Sales to proceed notwithstanding contrary Liquidation Laws.  See 11

01:17658215.1

U.S.C. § 105(a).

39.     Here, section 363 of the Bankruptcy Code, which requires the Debtors to operate their businesses in a way that maximizes recoveries for creditors, will be undermined if the Court does not provide for the waiver of the Liquidation Laws because the Liquidation Laws constrain the Operating Debtors' ability to marshal and maximize assets for the benefit of creditors.  Similar relief has been granted in this and other bankruptcy cases in other jurisdictions. See, e.g., In re RadioShack Corp., Case No. Case No. 15-10197 (KJC) (Bankr. D. Del. Feb. 6, 2015) (ordering that that the debtors were authorized to conduct store closing sales in accordance with the order "without the necessity of further showing compliance" with liquidation laws); In re Coldwater Creek, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (ordering that that the debtor was authorized to conduct store closing sales pursuant to the order and sale guidelines "without the necessity of further showing compliance" with liquidation laws); In re Boscov's, Case No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (ordering that "[g]overnmental units shall not fine, assess or otherwise penalize Debtors or Agent (or any of the landlords of the Closing Stores) for conducting or advertising the Store Closing Sales in a manner inconsistent with Liquidation Sales Laws, provided that the Store Closing Sales are conducted and advertised in compliance with this Order"); In re Goody's Family Clothing, Inc., Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (ordering that the "Store Closing Sales at the Closing Stores shall be conducted by the Debtors and the Store Closing Agent without the necessity of compliance with any federal, state or local statute or ordinance, lease provision or licensing requirement affecting store closing, 'going out of business', liquidation or auction sales, or affecting advertising, including signs, banners, and posting of signage, other than Safety Laws and General Laws").

40.     Importantly, given the supervision of this Court, the requested waiver will not unduly undermine state and local requirements that would otherwise apply to the Store Closing Sales.  The Debtors only request that this Court authorize the Operating Debtors to conduct the Store Closing Sales without the necessity of, and the delay associated with, obtaining various state licenses or permits, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising, conducting the Store Closing Sales as store closings or similar type sales.  The Operating Debtors fully intend to be bound by and comply with remaining statutes and regulations, such as health and safety laws.

41.     The Debtors also request that no other person or entity, including (but not limited to) any lessor or federal, state, or local agency, department, or governmental authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales, or the advertising and promotion (including through the posting of signs) of Store Closing Sales, in the manner set forth in the proposed orders.

**F.      The Court Should Waive Compliance with Any Restriction in the Leases**

42.     Certain of the Operating Debtors' leases governing the premises of the stores subject to any Store Closing Sales may contain provisions purporting to restrict or prohibit the Operating Debtors from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code.  Ames Dep't Stores, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); In re R. H. Macy and Co., Inc., 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor

had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store.); In re Tobago Bay Trading Co., 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); In re Lisbon Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

43.    In addition, this Court has held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable.  See, e.g., In re RadioShack Corporation, Case No. 15-10197 (KJC) (Bankr. D. Del. Feb. 6, 2015) (ordering that sale of merchandise be conducted notwithstanding any restrictive lease provisions); In re Coldwater Creek, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (ordering that store closing sales be conducted without the further need for compliance with, among other things, lease provisions); In re Boscov's, Case No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (same); In re Goody's Family Clothing, Inc., Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same);  In re Linens Holding Co., Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same).  Thus, as a result of the above and to the extent that such provisions or restrictions exist in any of the leases of the stores subject to the Store Closing Sales, the Debtors request that the Court authorize the Operating Debtors and/or the Agent to conduct any liquidation sales without interference by any landlords or other persons affected, directly or indirectly, by the liquidation sales.

01:17658215.1

**G.    The Abandonment of Certain Property In Connection With**
        **The Store Closure Sales Is Justified**

44.    Section 554(a) of the Bankruptcy Code provides that after notice and a

hearing, a debtor-in-possession "may abandon any property of the estate that is burdensome to

the estate or that is of inconsequential value and benefit to the estate."  See Hanover Ins. Co. v.

Tyco Indus., Inc., 500 F.2d 654, 657 (3d Cir. 1974) (stating that a debtor "may abandon his claim

to any asset, including a cause of action, he deems less valuable than the cost of asserting that

claim"); In re Grossinger's Assoc., 184 B.R. 429, 432 (Bankr. S.D.N.Y. 1995); see also

Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection, 474 U.S. 494, 507, n.9 (1986)

("[A] trustee [in bankruptcy] may not abandon property in contravention of a state statute or

regulation that is reasonably designed to protect the public health or safety from identified

hazards . . . .  This exception to the abandonment power. . . is a narrow one."); In re Bryson, 53

B.R. 3, 4-5 (Bankr. M.D. Tenn. 1985) ("The effect of the abandonment is to remove the asset

from the jurisdiction of the bankruptcy court.").

45.    The Operating Debtors intend to sell all Merchandise and FF&E

remaining in the Closing Stores.  However, in the event that the Operating Debtors are unable to

sell or dispose of any Merchandise or FF&E following the Store Closing Sales, or determine that

the costs associated with holding or selling certain Merchandise or FF&E exceeds the proceeds

that will be realized upon its sale or that such Merchandise or FF&E is not sellable at all, it

would be costly and burdensome to the Operating Debtors' estates to retain such Merchandise or

FF&E.  Thus, to the extent that the Agent does not sell any Merchandise or FF&E, the Operating

Debtors request that they be authorized upon the conclusion of the Store Closing Sales to

abandon the same without incurring liability to any person or entity in order to maximize the

value of the Operating Debtors' assets and to minimize the costs to the estates.

01:17658215.1

20

46.     Notwithstanding the foregoing, the Operating Debtors and the Agent will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Operating Debtors' hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

H.     **The Store Closing Sales Should Be Exempt From Any "Fast Pay" Laws**

47.     Many states in which the Operating Debtors operate have laws and regulations that require the Operating Debtors to pay an employee substantially contemporaneously with his or her termination (the "**Fast Pay Laws**").   In many cases, these laws require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated.   The sweeping nature of the Store Closing Sales contemplated by this Motion will result in a substantial numbers of employees being terminated during the Store Closing Sales.  The Operating Debtors' payroll systems will simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with these state laws and regulations.

48.     As set forth above, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies.  Preemption is appropriate where, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety.

49.     Under ordinary circumstances, the Operating Debtors were often able to pay individual store-level employees from the register at a store location upon termination and reconcile the payment amount after-the-fact.  However, given the number of employees that will be terminated during the Sales, this will be impossible.  Thus, it will be necessary to have the

Operating Debtors' payroll department calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check and then prepare each such check for mailing. With employee terminations on the scale necessitated by the Store Closing Sales, this process could easily take several days.

50.    To be clear, the Operating Debtors intend to pay their terminated employees as expeditiously as possible and under normal payment procedures. However, the requirements imposed by these state laws and regulations are unworkable in these extraordinary circumstances. If the Operating Debtors are required to comply with these state laws and regulations, their efforts to wind down their operations and stem unnecessary payroll costs will be hampered tremendously. Indeed, if forced to comply, the Operating Debtors will face the choice of (a) having to incur the costs of keeping employees "employed" after the conclusion of a Sale while payroll is prepared or (b) staging terminations to the detriment of the Operating Debtors' estates. Both of these choices will provide no benefit to the Operating Debtors' estates and will only increase the administrative costs of conducting the Store Closing Sales.

51.    Accordingly, the Operating Debtors respectfully submit that in this instance, the Fast Pay Laws are at odds with the underlying policies of the Bankruptcy Code and as such, the Operating Debtors should be granted relief from their requirements. See, e.g., Coldwater Creek Inc., Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (waiving "fast pay" laws and regulations in connection with approval of store closing sales); Filene's Basement, LLC, Case No. 11-13511(KJC) (Bankr. D. Del. Nov. 2, 2011) (same); In re Linens Holding Co., Case No. 08-10832 (Bankr. D. Del. Oct. 28, 2008) (same); see also In re Borders Grp., Inc., Case No. 11-10614 (MG) (Bankr. S.D.N.Y. Feb. 18, 2011) (waiving "fast pay" laws and regulations in

connection with approval of store closing sales); In re Linens Holding Co., Case No. 08-10832 (Bankr. D. Del. Oct. 28, 2008) (same).

## I.        Appointment of a Consumer Privacy Ombudsman

52.        Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or release personally identifiable information about individuals unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.  The Operating Debtors will not be selling or releasing personally identifiable information in the course of the Store Closing Sales.  Therefore, appointment of a consumer privacy ombudsman is unnecessary.

## SATISFACTION OF BANKRUPTCY RULE 6003(b)

53.        Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code within twenty-one days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm."  There is no question that the Debtors' failure to continue to conduct the Store Closing Sales without interruption would likely result in immediate and irreparable harm to the Debtors' estates by detracting from, and potentially derailing, the Debtors' chapter 11 efforts.

54.        For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

55.        Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth

throughout this Motion, any delay in the Debtors' ability to continue to conduct the Store Closing Sales without interruption would be detrimental to the Debtors, their creditors and estates, and would impair the Debtors' ability to optimize their business performance at this critical time as they begin the chapter 11 process.

56.    For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Order.

## NOTICE

57.    Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Debtors' thirty (30) largest unsecured creditors; and (v) counsel to the Debtors' pre-petition and post-petition lenders. Notice of this Motion and any order entered hereon will be served in accordance with Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

58.    The Debtors have not previously sought the relief requested herein from this or any other Court.

*Remainder of page intentionally left blank*

01:17658215.1

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Interim Order, substantially in the form attached hereto as Exhibit A, granting, on an interim basis, (a) the Store Closing Relief, and (b) such other and further relief to the Debtors as the Court may deem proper, (ii) set a date for a Final Hearing on the Store Closing Relief sought in this Motion, (iii) establish objection and reply deadline for the Final Hearing and (iv) grant such other relief as the Court deems just and proper.

Dated: September 9, 2015
      Wilmington, Delaware

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert F. Poppiti, Jr.*

Matthew B. Lunn (No. 4119)
Robert F. Poppiti, Jr. (No. 5052)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1256

-and-

STROOCK & STROOCK & LAVAN LLP
Frank A. Merola (*pro hac vice* pending)
Sayan Bhattacharyya (*pro hac vice* pending)
Matthew G. Garofalo (*pro hac vice* pending)
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*PROPOSED COUNSEL TO THE DEBTORS
AND DEBTORS-IN-POSSESSION*

# **EXHIBIT A**

Proposed Interim Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HAGGEN HOLDINGS, LLC, *et al.,*[1] | ) | Case No. 15-11874 (KG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Ref. Docket No. _____** |

## INTERIM ORDER: (I) AUTHORIZING AND APPROVING THE CONDUCT OF STORE CLOSING OR SIMILAR THEMED SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; AND (II) GRANTING RELATED RELIEF

Upon consideration of the motion (the "**Motion**")[2] of the Debtors for the entry of an interim order (the "**Interim Order**"), pursuant to Bankruptcy Code sections 105, 363, 365 and 554 and Bankruptcy Rules 2002, 6003 and 6004: (a) authorizing Haggen Opco North, LLC, Haggen Opco South, LLC and Haggen, Inc. (collectively, the "**Operating Debtors**") to continue store closing or similar themed sales in accordance with the Letter Agreement Governing Inventory Disposition (the "**Agreement**"), by and between each of the Operating Debtors and Hilco Merchant Resources, LLC (the "**Agent**"), a copy of which is attached as Exhibit 1 to this Interim Order; (b) authorizing the Operating Debtors to continue store closing or similar themed sales in accordance with the terms of the store closing sale guidelines (the "**Sale Guidelines**") attached as Exhibit 2 to this Interim Order, with such sales to be free and clear of all liens, claims, interests and encumbrances ("**Encumbrances**"); and (c) granting certain related relief, on an interim basis (collectively, the "**Store Closing Relief**"); and the Court having reviewed the

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Haggen Holdings, LLC (7558), Haggen Operations Holdings, LLC (6341), Haggen Opco South, LLC (7257), Haggen Opco North, LLC (5028), Haggen Acquisition, LLC (7687), and Haggen, Inc. (4583). The mailing address for each of the Debtors is 2211 Rimland Drive, Bellingham, WA 98226.

[2]  Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

Motion and the First Day Declaration and having considered the statements of counsel and the evidence adduced with respect to the Motion at the hearing before the Court (the "**Hearing**"); the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, (ii) venue is proper in this District pursuant to 28 U.S.C. § 1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iv) the notice of the Motion and the Hearing was sufficient under the circumstances, and (v) there is good cause to waive the stay of Bankruptcy Rule 6004(h); after due deliberation determined that the relief requested in the Motion is necessary on an interim basis and essential for the Debtors' reorganization and such relief is in the best interests of the Operating Debtors, their estates and their creditors; and upon the record herein; and after due deliberation thereon; and good and sufficient cause have been shown; it is hereby:

FOUND AND DETERMINED THAT:[3]

A.     The Debtors have advanced sound business reasons for entering into the Agreement, on an interim basis subject to the Final Hearing, as set forth in the Motion and at the Hearing, and entering into the Agreement is a reasonable exercise of the Operating Debtors' business judgment and in the best interests of the Operating Debtors and their estates.

B.     The conduct of the Store Closing Sales (as defined in the Motion) will provide an efficient means for the Operating Debtors to maximize recoveries of their estates with respect to the Merchandise and/or the FF&E (each as defined in the Agreement).

C.     The Agreement was negotiated, proposed, and entered into by the Agent and the Operating Debtors without collusion, in good faith and from arm's length bargaining positions.

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.  See Fed. R. Bankr. P. 7052.

D.      The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

E.      The Store Closing Sales are in the best interest of the Operating Debtors' estates.

F.      The Operating Debtors have represented that they are neither selling nor leasing personally identifiable information pursuant to the Motion, although the Agent will be authorized to distribute emails and promotional materials to the Debtors' customers.

G.      The entry of this Interim Order is in the best interest of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is hereby.

**ORDERED THAT:**

1.      The Motion is GRANTED, on an interim basis, as provided herein.

2.      On _____, 2015, at ____:_____ ___.m. (prevailing Eastern Time), a hearing (the "**Final Hearing**") will be held before this Court to consider the Store Closing Relief requested in the Motion, on a final basis.  All objections, if any, to the Motion shall be in writing and filed with this Court and served on counsel for the Debtors, any duly appointed committee, and the Agent, as to be received on or before _____, 2015, at ____:_____ ___.m. (prevailing Eastern Time).  The Debtors shall file any reply(s) to such objections on or before _____, 2015, at ____:_____ ___.m. (prevailing Eastern Time) and serve such replies on the objecting parties, any duly appointed committee and the Agent.

3.      The Debtors are authorized and empowered to take any and all further actions as may be reasonably necessary or appropriate to give effect to this Interim Order.  The

failure to include specifically any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agreement and all of its provisions, payments and transactions, be authorized and approved as and to the extent provided for in this Interim Order.

4.      To the extent of any conflict between this Interim Order, the Sale Guidelines, and the Agreement, the terms of this Interim Order shall control over all other documents and the Sale Guidelines shall control over the Agreement.

5.      Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall take effect immediately upon its entry.

6.      The Agreement, a copy of which is attached to this Interim Order as Exhibit 1, is operative and effective on an interim basis during the interim period.  The Operating Debtors are authorized to act and perform in accordance with the terms of the Agreement, including, making payments required by the Agreement to the Agent without the need for any application of the Agent or a further order of the Court.

7.      Subject to the restrictions set forth in this Interim Order and the Sale Guidelines, the Operating Debtors and the Agent hereby are authorized to take any and all actions as may be necessary or desirable to implement the Agreement and the Store Closing Sales; and each of the transactions contemplated by the Agreement, and any actions taken by the Operating Debtors and the Agent necessary or desirable to implement the Agreement and/or the Store Closing Sales prior to the date of this Interim Order, hereby are approved and ratified.

A.      **Authority To Engage in Store Closing Sales**

8.      The Operating Debtors are authorized, on an interim basis pending the Final Hearing, pursuant to 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately continue and conduct Store Closing Sales at the Closing Stores in accordance with this Interim

Order, the Sale Guidelines and the Agreement.

9.      The Sale Guidelines are approved in their entirety on an interim basis.

10.      The Operating Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Interim Order and the Sale Guidelines.

11.      All entities that are presently in possession of some or all of the Merchandise or FF&E in which the Debtors hold an interest that are or may be subject to the Agreement or this Interim hereby are directed to surrender possession of such Merchandise or FF&E to the Debtors or the Agent.

12.      Subject to the provisions herein in paragraphs 14, 15, 17, and 27, neither the Operating Debtors nor the Agent nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined in Bankruptcy Code section 101(27)) or landlord, to conduct the Store Closing Sales and to take the related actions authorized herein.

**B.      Conduct of the Store Closing Sales**

13.      All newspapers and other advertising media in which the Store Closing Sales may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Operating Debtors and the Agent to conduct the Store Closing Sales and the sale of Merchandise and FF&E pursuant to the Agreement, including, without limitation, to conduct and advertise the sale of the Merchandise and FF&E in the manner contemplated by and in accordance with this Interim Order, the Sale Guidelines, and the Agreement.

14.      Nothing in this Interim Order or the Agreement releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief)

that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order. Nothing contained in this Interim Order or in the Agreement shall in any way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish the obligations of the Operating Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code. Nothing herein shall be construed to be a determination that the Agent is an operator with respect to any environmental law or regulation. Moreover, the sale of the Merchandise and FF&E shall not be exempt from, and the Agent shall be required to comply with, laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "**General Laws**"). Nothing in this Interim Order shall alter or affect the Debtors' and Agent's obligations to comply with all applicable federal safety laws and regulations. Nothing in this Interim Order shall be deemed to bar any Governmental Unit from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' or the Agent's right to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Interim Order, or otherwise, pursuant to Paragraph 27 hereunder. Notwithstanding any other provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

15.    Except to the extent of the reserved rights of Governmental Units expressly granted elsewhere in this Interim Order, during the interim sale period, the Operating Debtors and Agent are hereby authorized to take such actions as may be necessary and appropriate to implement the Agreement and to conduct the sale without necessity of further order of this Court as provided in the Agreement or the Sale Guidelines, including, but not limited to, advertising the sale as a "store closing sale", "sale on everything", "everything must go", or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall Closing Stores, and at enclosed mall Closing Stores to the extent the applicable Closing Store entrance does not require entry into the enclosed mall common area), use of sign-walkers and street signage.

16.    Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise and FF&E, to the extent that, prior to the Final Hearing, disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners or other advertising and the Operating Debtors and the Agent are unable to resolve the matter consensually with a Governmental Unit, any party may request an immediate telephonic hearing with this Court pursuant to these provisions.  Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (i) the Final Hearing or (ii) within two (2) business days of such request.  This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

17.    Except as expressly provided in the Agreement, the sale of the Merchandise and FF&E shall be conducted by the Operating Debtors and the Agent notwithstanding any restrictive provision of any lease, sublease or other agreement relative to

occupancy affecting or purporting to restrict the conduct of the Store Closing Sales, the rejection of leases, abandonment of assets, or "going dark" provisions.  The Agent and landlords of the Closing Stores are authorized to enter into agreements ("**Side Letters**") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Agent and any such landlords, provided that nothing in such Side Letters affects the provisions of Paragraphs 16, 17 and 27 of this Interim Order.  In the event of any conflict between the Sale Guidelines and any Side Letter, the terms of such Side Letter shall control.

18.    Except as expressly provided for herein or in the Sale Guidelines, and except with respect to any Governmental Unit (as to which Paragraphs 14, 16, 17 and 27 of this Interim Order shall apply), no person or entity, including, but not limited to, any landlord, licensor, service providers, utilities, and creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales or the sale of Merchandise or FF&E, or the advertising and promotion (including the posting of signs and exterior banners or the use of sign-walkers) of such sales, and all such parties and persons of every nature and description, including, but  not limited to, any landlord, licensor, service providers, utilities, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Store Closing Sales and/or (ii) instituting any action or proceeding in any court (other than in the Bankruptcy Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Agent, or the landlords at the Closing Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Store Closing Sales or sale of the Merchandise or FF&E or other liquidation sales at the

Closing Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

19.     In accordance with and subject to the terms and conditions of the Agreement, the Agent shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment and other assets of the Operating Debtors for the purpose of conducting the Store Closing Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines and this Interim Order and subject to Paragraphs 14, 16, 17 and 27 of this Interim Order.

20.     The Agent shall accept the Debtors' validly-issued gift certificates and gift cards that were issued by the Debtors prior to the Sale Commencement Date (as defined in the Agreement) in accordance with the Debtors' gift certificate and gift card policies and procedures as they existed on the Petition Date, and accept returns of merchandise sold by the Debtors prior to the Sale Commencement Date, provided that such return is otherwise in compliance with the Debtors' return policies in effect as of the date such item was purchased.

21.     All sales of Merchandise or FF&E shall be "as is" and final.  However, as to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."  Further, as to the Closing Stores only, the Operating Debtors and/or the Agent shall accept return of any goods purchased during the Store Closing Sales that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within seven days of purchase, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect.  Signs stating that "Refunds may be made only

01:17658240.1

for merchandise having a latent defect, when returned with a receipt within 7 days of purchase."

will be posted at the cash register areas of the Closing Stores.  Returns, if permitted, related to

the purchase of Merchandise and FF&E shall not be accepted at stores that are not participating

in the Store Closing Sales, except in the situation where a customer experiences a latent defect

and returns the Merchandise and FF&E within the seven day time period and provides

information that the point of purchase store has closed in the meantime.  Information on stores

remaining open will be maintained on the Debtors' website through the end of the Store Closing

Sales.  Information on stores remaining open will be maintained on the Debtors' website through

the end of the Store Closing Sales.

22.     The Agent shall not be liable for sales taxes except as expressly provided

in the Agreement and the payment of any and all sales taxes is the responsibility of the Debtors.

The Debtors are directed to remit all taxes arising from the Store Closing Sales to the applicable

Governmental Units as and when due, provided that in the case of a bona fide dispute the

Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent

that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of

doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor

or any other party, other than the applicable Governmental Unit for which the sales taxes are

collected.  The Agent shall collect, remit to the Debtors and account for sales taxes as and to the

extent provided in the Agreement.  This Interim Order does not enjoin, suspend or restrain the

assessment, levy or collection of any tax under state law, and does not constitute a declaratory

judgment with respect to any party's liability for taxes under state law.

23.     Pursuant to section 363(f) of the Bankruptcy Code, the Agent, on behalf of

the Operating Debtors, is authorized to sell and all sales of Merchandise or FF&E pursuant to the

Store Closing Sales, whether by the Agent or the Operating Debtors, shall be free and clear of any and all Encumbrances; _provided_, _however_, that any such Encumbrances shall attach to the proceeds of the Store Closing Sales with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Merchandise and FF&E, subject to any claims and defenses that the Debtors may possess with respect thereto and the Agent's fees and expenses (as provided in the Agreement).

24.     To the extent that the Operating Debtors propose to sell or abandon FF&E which may contain personal and/or confidential information about the Debtors' employees and/or customers (the "**Confidential Information**"), the Operating Debtors shall remove the Confidential Information from such items of FF&E before such sale or abandonment.

25.     The Debtors and/or the Agent (as the case may be) are authorized and empowered to transfer Merchandise and FF&E among the Closing Stores.  The Agent is authorized to sell the Debtors' FF&E and abandon the same, in each case, as provided for and in accordance with the terms of the Agreement

C.     **Dispute Resolution Procedures With Governmental Units**

26.     To the extent that the sale of Merchandise or FF&E is subject to any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws (each a "**GOB Law**," and collectively, the "**GOB Laws**"), including laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale of the Merchandise or FF&E in the interim sale period (collectively, the "**Liquidation Laws**"), the dispute resolution procedures in this section shall apply.

01:17658240.1

- 11 -

27.     Provided that the Store Closing Sales and the sale of Merchandise and FF&E are conducted in accordance with the terms of this Interim Order, the Agreement and the Sale Guidelines, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors shall be presumed to be in compliance with any GOB Laws and Liquidation Laws and, subject to Paragraphs 14, 16, 17 and 26 herein, are authorized to conduct the Store Closing Sales in accordance with the terms of this Order and the Sale Guidelines without the necessity of further showing compliance with any such GOB Laws and Liquidation Laws.

28.     Within three business days of entry of this Interim Order, the Debtors shall serve copies of this Interim Order, the Agreement and the Sale Guidelines via e-mail, facsimile or regular mail, on:  (i) the Attorney General's office for each state where the Store Closing Sales are being held, (ii)  the county consumer protection agency or similar agency for each county where the Store Closing Sales are being held, (iii) the division of consumer protection for each state where the Store Closing Sales are being held; (iv) the chief legal counsel for the local jurisdiction; and (v) the Debtors' landlords of the Closing Stores.

29.     To the extent that during between the Petition Date and the date of the Final Hearing there is a dispute arising from or relating to the Store Closing Sales, this Interim Order, the Agreement, or the Sale Guidelines, which dispute relates to any GOB Laws or Liquidation Laws (a "**Reserved Dispute**"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute which such Reserved Dispute will be heard at the Final Hearing, absent a party obtaining expedited relief.  Nothing in this Interim Order shall constitute a ruling with respect to any issues to be raised with respect to a Reserved Dispute.   Any Governmental Unit may assert a Reserved Dispute by sending a notice (the "**Dispute Notice**") explaining the nature

of the dispute to:  (i) Stroock & Stroock & Lavan LLP, 2029 Century Park East, Suite 1600, Los

Angeles, CA 90067 (Attn. Frank Merola, Esq.) and 180 Maiden Lane, Suite 36120, New York,

NY 10038 (Attn. Matthew Garofalo, Esq.), and Young Conaway Stargatt & Taylor, LLP,

Rodney Square, 1000 North King Street, Wilmington, DE 19801 (Attn. Matthew Lunn, Esq.).

**D.     Other Provisions.**

30.     The Agent shall not be liable for any claims against the Operating Debtors,

and the Operating Debtors shall not be liable for any claims against Agent, in each case, other

than as expressly provided for in the Agreement.

31.     Except with respect to any Governmental Unit (as to which the provisions

of Paragraphs 14, 16, 17 and 27 of this Interim Order shall apply), this Court shall retain

exclusive jurisdiction with regard to all issues or disputes relating to this Interim Order or the

Agreement, including, but not limited to, (i) any claim or issue relating to any efforts by any

party or person to prohibit, restrict or in any way limit banner and sign-walker advertising,

including with respect to any allegations that such advertising is not being conducted in a safe,

professional and non-deceptive manner, (ii) any claim of the Debtors, the landlords and/or the

Agent for protection from interference with the Store Closing Sales, (iii) any other disputes

related to the Store Closing Sales, and (iv) to protect the Debtors and/or the Agent against any

assertions of Encumbrances.  No such parties or person shall take any action against the Debtors,

the Agent, the landlords or the Store Closing Sales until this Court has resolved such dispute.

This Court shall hear the request of such parties or persons with respect to any such disputes on

an expedited basis, as may be appropriate under the circumstances.

Dated:     September 10, 2015
           Wilmington, Delaware          _____
                                         KEVIN GROSS
                                         UNITED STATES BANKRUPTCY JUDGE

01:17658240.1

## **EXHIBIT 1**

AGREEMENT



August 24, 2015

**VIA EMAIL**

| Bill Shaner, CEO<br>HAGGEN, INC.<br>Email: bshaner@haggen.com | Blake Barnett, CFO<br>HAGGEN, INC.<br>Email: blakeb@haggen.com |
| --- | --- |
| John Turley, Corporate Senior Vice President<br>HAGGEN, INC.<br>Email: JohnT@haggen.com | Matthew Henry, Senior Director<br>ALVAREZ & MARSAL \<br>Email: mhenry@alvarezandmarsal.com |

Re:   **Letter Agreement Governing Inventory Disposition**

Gentlemen:

By executing below, this letter shall serve as an agreement ("Agreement") between Hilco Merchant Resources, LLC, on the one hand ( "Agent" or a "Party"), and HAGGEN, INC., a Washington corporation ("Haggen"), HAGGEN OPCO NORTH, LLC, a Delaware limited liability company ("Haggen Opco North"), and HAGGEN OPCO SOUTH, LLC, a Delaware limited liability company ("Haggen Opco South" and, together with Haggen Opco North and Haggen, collectively, the "Merchant" or a "Party"), on the other hand (and collectively, with the Agent, the "Parties"), under which Agent shall act as the exclusive agent for the purpose of conducting a sale of certain Merchandise (as defined below) at the Merchant's stores set forth on Exhibit A (each a "Store" and collectively, the "Stores") through a "Store Closing", "Everything Must Go", "Everything on Sale" or similar themed sale (the "Sale").

A.   **Merchandise**

For purposes of this Agreement, the following terms shall have the following meanings:

"Merchandise" shall mean (i) all goods, saleable in the ordinary course, located in the Stores on the Sale Commencement Date (defined below), (ii) DSD Merchandise (defined below) and (iii) Other Merchandise (as defined below); provided, however, Agent shall have the right to designate the Other Merchandise for return to Merchant and/or Merchant's vendors if the discounts being offered by Agent may result in a sale of item(s) of Other Merchandise below Cost (as defined below). "Merchandise" does not mean and shall not include: (1) goods that belong to sublessees, licensees or concessionaires of Merchant or held on consignment; (2) owned furnishings, trade fixtures, equipment and improvements to real property that are located in the Stores (collectively, "FF&E"); (3) damaged or defective merchandise that cannot be sold; or (4) pharmacy prescriptions and goods that must be sold behind the pharmacy counter, propane, ice, rug doctor items, MoneyGram, lottery tickets, and vending products.

"DSD Merchandise" shall mean "direct store delivery" goods.

"Other Merchandise" shall mean books, magazines, greeting cards, tobacco, beer, wine, and other alcoholic products.

**B.**    **Sale Term**

For each Store, the Sale shall commence on or about August 26, 2015 (the "Sale Commencement Date") and terminate no later than September 30, 2015 (the "Sale Termination Date"); provided, however, that the Parties may mutually agree in writing to extend or terminate the Sale at any Store prior to the original Sale Termination Date.   The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "Sale Term."  At the conclusion of the Sale, Agent shall surrender the premises for each Store to Merchant in broom clean condition and, unless otherwise requested by the Merchant, in accordance with the lease requirements for such premises; provided, however, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the lease requirements for such premises according to a budget mutually agreed to between the Agent and Merchant.   At the conclusion of the Sale at each Store, Agent shall photographically document the condition of each such Store, and provide same to the Merchant within 10 business days

**C.**    **Project Management**

(i)    Agent's Undertakings

During the Sale Term, Agent shall, in collaboration with Merchant, (a) provide qualified supervisors (the "Supervisors") engaged by Agent to oversee the management of the Stores; (b) determine appropriate point-of-sale and external advertising for the Stores, approved in advance by Merchant; (c) determine appropriate discounts of Merchandise, staffing levels for the Stores, approved in advance by Merchant, and appropriate bonus and incentive programs, if any, for the Stores' employees, approved in advance by Merchant; (d) oversee display of Merchandise for the Stores; (e) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (f) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (g) assist Merchant in connection with managing and controlling loss prevention; (h) provide recommendations to the Merchant with respect to DSD Merchandise and replenishment thereof; (i) assist Merchant with developing a customer transition program to Merchant's other retail stores; and (j) provide such other related services deemed necessary or appropriate by Merchant and Agent.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Agent's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

(ii)    Merchant's Undertakings

During the Sale Term, Merchant shall (a) be the employer of the Stores' employees, other than the Supervisors; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; (f) execute all agreements determined by the Merchant and Agent to be necessary or desirable for the operation of the Stores during the Sale;

2

(g) arrange for the ordinary maintenance of all point-of-sale equipment required for the Stores; (h) to the extent included in the Sale, make arrangements for and provide for the shipment of DSD Merchandise to the Stores; (i) provide Agent with weekly reporting (collectively, the "Reports") similar to the report named "Wk 24 F16 Haggen Purch Rpt by Store.xlsx" (the "Sample Report"), which Sample Report was provided to Agent as part of the due diligence process; and (j) ensure that Agent has quiet use and enjoyment of the Stores for the Sale Term in order to perform its obligations under this Agreement.

Merchant shall provide throughout the Sale Term central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, all at no cost to Agent.

The Parties expressly acknowledge and agree that Agent shall have no liability to Merchant's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Agent.

## D.     The Sale

All sales of Merchandise shall be made on behalf of Merchant.  Agent does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, gift card, gift certificate, merchandise credit, manufacturer's coupons, government subsidy programs, WIC, food stamps, and similar currencies, or credit or debit cards and, at Merchant's discretion, by check or otherwise in accordance with Merchant's policies, and shall be "final" with no returns accepted or allowed, unless otherwise directed by Merchant.

## E.     Agent Fee and Expenses in Connection with the Sale

For purposes of this Agreement, the following terms shall have the following meanings:

"Cost" means, with respect to the each item of Merchandise, the cost each such item determined in accordance with Merchant's historical and customary practices and procedures, which have historically been reflected in reports similar to the Sample Report for twenty-six of the Stores and shall be reflected throughout the Sale Term in the Reports for such Stores.

"Gross Cost Recovery" means the product, expressed as a percentage, of (i) the aggregate Selling Price of all Merchandise sold during the Sale Term calculated using the Gross Rings method divided by (ii) the aggregate Cost of all Merchandise sold during the Sale Term calculated using the Gross Rings method.

"Gross Proceeds" means gross receipts, net of applicable sales taxes.

"Estimated Retail Price" means, with respect to items of Merchandise, the estimated price at which each item was available for sale as of the Sale Commencement Date before applying markdowns or discounts, if any, specifically granted by Agent in connection with the Sale or manufacturers' coupons or other non-Agent granted discounts.

3

"Selling Price" means, with respect to each item of Merchandise, the actual price at which Merchant's customer buys such item after applying markdowns or discounts, if any, specifically granted by Agent in connection with the Sale, but exclusive of manufacturers' coupons or other non-Agent granted discounts.

In consideration of its services hereunder, provided the Gross Cost Recovery is no less than eighty-seven percent (87%) (the "Base Fee Threshold"), Agent shall earn a fee equal to one and one half percent (1.5%) ("Agent's Fee") of the aggregate Gross Proceeds of Merchandise sold at the Stores. If the Gross Cost Recovery is less than the Base Fee Threshold, Agent shall not earn any fee for services. If the Gross Cost Recovery is equal or greater than ninety-seven percent (97%) (the "Incentive Fee Threshold"), Agent's fee shall be increased from by one half of one percent (0.5%) for a total Agent's Fee of two percent (2.0%) of the aggregate Gross Proceeds of Merchandise sold at the Stores.

The Parties hereby acknowledge and agree that the Base Fee Threshold and the Incentive Fee Threshold have been established based upon the assumption that aggregate Cost of the Merchandise to be sold during the Sale Term as a percentage of Estimated Retail Price of such Merchandise (the "Cost Factor") is not greater than 69.5% (the "Aggregate Cost Factor"). If the Agent does not satisfy the Base Fee Threshold and/or the Incentive Fee Threshold, the Parties shall work together to determine whether the Cost Factor for the Merchandise actually sold during the Sale Term (the "Sale Cost Factor") is a greater percentage than the Aggregate Cost Factor. If the Sale Cost Factor is a greater percentage than the Aggregate Cost Factor, the Parties shall mutually agree upon reductions to the Base Fee Threshold and the Incentive Fee Threshold, with each Party acting reasonably and in good faith. If the Sale Cost Factor is a percentage equal to or less than the Aggregate Cost Factor, there shall be no reductions to the Base Fee Threshold or Incentive Fee Threshold.

To assist the Parties in determining the Sale Cost Factor, the Parties have prepared Exhibit C, which reflects departments of Merchandise (each a "Department" and collectively, the "Departments") and Cost Factors by Department. Using the Cost Factors on Exhibit C and applying them to the Cost of Merchandise sold during the Sale Term by Department, the Parties shall calculate the Estimated Retail Price of such Merchandise.

At each Store, for the period from the Sale Commencement Date until the Sale Termination Date for each such Store, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts (exclusive of any markdown or discount, if any, specifically granted by Agent) less applicable sales taxes ("Gross Rings"), and (ii) cash reports of sales within such Store. Register receipts shall show for each item sold the Selling Price for each item sold and the markdown or discount, if any, specifically granted by Agent in connection with such Sale. All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.

Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Agent's other reasonable, documented out of pocket expenses. To control expenses of the Sale, Merchant and Agent have established a budget (the "Expense Budget") of certain delineated expenses, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation) and advertising

costs.  The Expense Budget for the Sale is attached hereto as <u>Exhibit B</u>.  The Expense Budget may only be modified by mutual agreement of Agent and Merchant.  The costs of Supervisors set forth on <u>Exhibits B</u> include, among other things, industry standard deferred compensation.

All accounting matters (including, without limitation, all fees, expenses, or other amounts reimbursable or payable to Agent) shall be reconciled on every Wednesday for the prior week and shall be paid within seven (7) days after each such weekly reconciliation.  The Parties shall complete a final reconciliation and settlement of all amounts payable to Agent and contemplated by this Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) no later than forty five (45) days following the Sale Termination Date for the last Store.

## F.    <u>Indemnification</u>

### (i)    <u>Merchant's Indemnification</u>

Merchant shall indemnify, defend, and hold Agent and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors,  principals, affiliates, and Supervisors (collectively, "<u>Agent Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Store employees (under a collective bargaining agreement or otherwise), or any other person (excluding Agent Indemnified Parties) against Agent or an Agent Indemnified Party, except claims arising from Agent's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortuous or otherwise actionable treatment of Agent's Indemnified Parties or Merchant's customers by Merchant or Merchant's Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

### (ii)    <u>Agent's Indemnification</u>

Agent shall indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors,  principals, and affiliates (other than the Agent or the Agent Indemnified Parties) (collectively, "<u>Merchant Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Agent or the Agent Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Agent; (c) any liability or other claims made by Agent's Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortuous or otherwise actionable treatment of Merchant Indemnified Parties, or Merchant's customers by Agent or any of the Agent Indemnified Parties and (e) any claims made by any party engaged by Agent as an employee, agent, representative or independent contractor arising out of such engagement.

G.  **Insurance**

(i)  Merchant's Insurance Obligations

Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall cause Agent to be named an additional insured with respect to all such policies. At Agent's request, Merchant shall provide Agent with a certificate or certificates evidencing the insurance coverage required hereunder and that Agent is an additional insured thereunder. In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

(ii)  Agent's Insurance Obligations

As an expense of the Sale, Agent shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Agent's provision of services at the Stores. Agent shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder. In addition, Agent shall maintain throughout the Sale Term, workers compensation insurance compliance with all statutory requirements. Further, should Agent employ or engage third parties to perform any of Agent's undertakings with regard to this Agreement, Agent will ensure that such third parties are covered by Agent's insurance or maintain all of the same insurance as Agent is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

H.  **Representations, Warranties, Covenants and Agreements**

(i)  Merchant warrants, represents, covenants and agrees that (a) Merchant is a company duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and maintains its principal executive office at the address set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein, (c) all ticketing of Merchandise at the Stores has been and will be done in accordance with Merchant's customary ticketing practices; (d) all normal course hard markdowns on the Merchandise have been, and will be, taken consistent with customary Merchant's practices, and (e) the Stores will be operated in the ordinary course of business in all respects, other than those expressly agreed to by Merchant and Agent.

6

(ii)    Agent warrants, represents, covenants and agrees that (a) Agent is a company duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform the Agent's obligations hereunder, and maintains its principal executive office at the addresses set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Agent and this Agreement constitutes a valid and binding obligation of Agent enforceable against Agent in accordance with its terms and conditions, and the consent of no other entity or person is required for Agent to fully perform all of its obligations herein, (c) Agent shall comply with and act in accordance with any and all applicable state and local laws, rules, and regulations, and other legal obligations of all governmental authorities, (d) no non-emergency repairs or maintenance in the Stores will be conducted without Merchant's prior written consent, and (e) Agent will not take any disciplinary action against any employee of Merchant.

## I.    **Furniture, Fixtures and Equipment**

No later than 5:00 pm Pacific Time on August 28, 2015, Merchant may exclude certain FF&E from the Sale such as but not limited to bailers, compactors, and refrigeration (the "Excluded FF&E"), and dispose of such Excluded FF&E through means other than through the Sale conducted by Agent; provided, however, that Agent shall have the right to use and utilize the Excluded FF&E throughout the Sale Term; provided, however, further, that Merchant's disposition of the Excluded FF&E shall not interfere with the Sale or Agent's use and utilization of the Excluded FF&E.

Other than Excluded FF&E (if any), during the Sale Term and continuing until a mutually acceptable date no later than four weeks after the Sale Termination Date at each Store, Agent shall sell the FF&E in the Stores from the Stores themselves.  Merchant shall be responsible for all reasonable costs and expenses incurred by Agent in connection with the sale of FF&E, which costs and expenses shall be incurred pursuant to a budget or budgets to be established from time to time by mutual agreement of the Parties.  Agent shall have the right to abandon at the Stores any unsold FF&E.

In consideration for providing the services set forth in this section I, Agent shall be entitled to a commission from the sale of the FF&E equal to fifteen percent (15%) of the Gross Proceeds of the sale of the FF&E.

Agent shall remit to Merchant all Gross Proceeds from the sale of FF&E.  During each weekly reconciliation described in section E above, Agent's FF&E fee shall be calculated, and Agent's calculated FF&E fee and all FF&E costs and expenses then incurred shall paid within seven (7) days after each such weekly reconciliation.

Merchant and Agent shall have the option to provide Merchant with a guaranteed recovery on the FF&E in which case Merchant and Agent shall mutually agree upon the guaranteed/purchase amount on account of the sale of the owned FF&E.  Under a guaranteed recovery, Agent shall be authorized to sell the owned FF&E and retain all proceeds (net of applicable sales taxes) from the sale of all owned FF&E for Agent's sole and exclusive benefit, and Agent shall be responsible for the payment of all costs and expenses associated with the disposition of owned FF&E.

7

J.    **Termination**

The following shall constitute "Termination Events" hereunder:

(a)    Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting Party;

(b)    Any representation or warranty made by Merchant or Agent is untrue in any material respect as of the date made or at any time and throughout the Sale Term; or

(c)    the Sale is terminated or materially interrupted or impaired for any reason other than an event of default by Agent or Merchant.

If a Termination Event occurs, the non-defaulting Party (in the case of an event of default) or either Party (if the Sale is otherwise terminated or materially interrupted or impaired) may, in its discretion, elect to terminate this Agreement by providing seven (7) business days' written notice thereof to the other Party and, in the case of an event of default, in addition to terminating this Agreement, pursue any and all rights and remedies and damages resulting from such default. If this Agreement is terminated, Merchant shall be obligated to pay Agent all amounts due under this Agreement through and including the termination date.

K.    **Notices**

All notices, certificates, approvals, and payments provided for herein shall be sent by email or by recognized overnight delivery service as follows: (a) To Merchant: 49 Discovery, Irvine, CA, 92618, Email: blakeb@haggen.com, Attn: Blake Barnett; (b) To Agent: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax: 847- 897-0859, Attn: Ian S. Fredericks; or (c) such other address as may be designated in writing by Merchant or Agent.

L.    **Independent Consultant**

Agent's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect. No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement. Merchant shall have no control over the hours that Agent or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Agent is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

M.    **Non-Assignment; Amendment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns.

No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party. The Parties hereby agree that the list of Stores attached as Exhibit A may be supplemented from time to time by written amendment to this Agreement executed in accordance with the foregoing in which case any store added to Exhibit A shall be deemed a "Store" for all purposes under this Agreement and the Parties shall mutually agree upon any modifications to the Sale Term, Agent Fee structure and expense budget that may be necessary or appropriate in light of the additional Stores.

**N.**    **Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**O.**    **Governing Law, Venue, Jurisdiction and Jury Waiver**

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of Illinois (without reference to the conflicts of laws provisions therein). Merchant and Agent waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Agent against Merchant or Merchant against Agent on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Agent, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect.

**P.**    **Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof. No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement. All prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**Q.**    **Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof

and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

\*          \*          \*

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned.  Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By: Ian S. Fredricks
Its: VP & Assistant General Counsel, Managing Member

**AGREED AND ACCEPTED as of the ___ day of August, 2015:**

HAGGEN, INC.

By:
Its:

HAGGEN OPCO NORTH, LLC

By:
Its:

HAGGEN OPCO SOUTH, LLC

By:
Its:

**<u>EXHIBIT 2</u>**

SALE GUIDELINES

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HAGGEN HOLDINGS, LLC, *et al.,*[1] | ) | Case No. 15-11874 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## SALE GUIDELINES

The following procedures shall apply to the Sale[2] to be held at the locations subject to the Agreement (the "Closing Stores"):

1.    The Sale shall be conducted so that the Closing Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Closing Stores.

2.    The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Closing Store on a Sunday.

3.    On "shopping center" property, the Merchant or the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Closing Store's premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Closing Store is located; provided that the Merchant and the Agent may solicit customers in the Closing Stores themselves.  On "shopping center" property, the Merchant and the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.    At the conclusion of the Sale, the Merchant shall vacate the Closing Stores in broom clean condition, and shall leave the Closing Stores in the same condition as on the Sale Commencement Date, ordinary wear and tear excepted, provided, however, that the Agent and the Merchant hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Closing Store.

5.    Subject to the entry of the Final Approval Order:  (i) the Agent and the

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Haggen Holdings, LLC (7558), Haggen Operations Holdings, LLC (6341), Haggen Opco South, LLC (7257), Haggen Opco North, LLC (5028), Haggen Acquisition, LLC (7687), and Haggen, Inc. (4583).  The mailing address for each of the Debtors is 2211 Rimland Drive, Bellingham, WA 98226.

[2]   Capitalized terms not otherwise defined herein shall have the meanings given to them in the Agreement.

Merchant may abandon any FF&E and Merchandise not sold in the Sale at the Closing Stores at the earlier of the conclusion of the Sale or the applicable Sale Termination Date; (ii) any abandoned FF&E and Merchandise left in a Closing Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant.

6.     The Agent and the Merchant may advertise the sale as a "sale on everything", "everything must go", or similar themed sale.  The Agent and the Merchant may also advertise the sale as a "store closing" and have a "countdown to closing" sign prominently displayed in a manner consistent with these Sale Guidelines.

7.     Agent and the Merchant shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  The Agent and the Merchant shall not use neon or day-glo on its display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Agent and the Merchant shall be permitted to utilize exterior banners at (i) non-enclosed mall Closing Stores and (ii) enclosed mall Closing Stores to the extent the entrance to the applicable Closing Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Closing Store, and shall not be wider than the storefront of the Closing Store.  In addition, the Agent and the Merchant shall be permitted to utilize sign walkers in a safe and professional manner.  Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Agent and the Merchant any additional restrictions not contained in the applicable lease agreement.

8.     Conspicuous signs shall be posted in the cash register areas of each of the affected Closing Stores to effect that "all sales are final."

9.     Except with respect to the hanging of exterior banners, the Agent and the Merchant shall not make any alterations to the storefront or exterior walls of any Closing Stores.

10.     The Agent and the Merchant shall not make any alterations to interior or exterior Closing Store lighting.  No property of the landlord of a Closing Store shall be removed or sold during the Sale.  The hanging of exterior banners or signage or banners in a Closing Store shall not constitute an alteration to a Closing Store.

11.     The Agent and the Merchant shall keep Closing Store premises and surrounding areas clean and orderly consistent with present practices.

12.     Subject to the provisions of the Agreement, the Agent and the Merchant shall have the right to sell all FF&E.  The Agent and the Merchant may advertise the sale of the FF&E in a manner consistent with these guidelines at the Closing Stores.  The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Closing Store business hours.

13.    At the conclusion of the Sale at each Closing Store, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Store's premises as set forth in the applicable leases.  The Agent, the Merchant and their agents and representatives shall continue to have exclusive and unfettered access to the Closing Stores until the respective Closing Stores are turned back to the landlord in a manner consistent with the lease rejection procedures approved by the Court.

14.    Postpetition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.

15.    The rights of landlords against Merchant for any damages to a Closing Store shall be reserved in accordance with the provisions of the applicable lease.

16.    If and to the extent that the landlord of any Closing Store affected hereby contends that the Agent or the Merchant are in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant' counsel and the Agent's counsel as follows: (i) Stroock & Stroock & Lavan LLP, 2029 Century Park East, Suite 1600, Los Angeles, CA 90067 (Attn. Frank Merola, Esq.), fmerola@stroock.com, and 180 Maiden Lane, Suite 36120, New York, NY 10038 (Attn. Matthew Garofalo, Esq.), mgarofalo@stroock.com, and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street , Wilmington, DE 19801 (Attn. Matthew Lunn, Esq.), mlunn@ycst.com.; and (ii) Hilco Merchant Resources, LLC, 5 Revere Drive, Suite 206, Northbrook, IL 60062 (Attn: Ian Fredericks), ifredericks@hilcoglobal.com.