## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HAGGEN HOLDINGS, LLC, *et al.,*[1] | ) | Case No. 15-11874 (KG) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I)
AUTHORIZING THE DEBTOR LOAN PARTIES TO (A) OBTAIN POSTPETITION
FINANCING AND (B) UTILIZE CASH COLLATERAL OF PRE-PETITION SECURED
PARTIES, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING THE
AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF, PURSUANT TO 11
U.S.C. SECTIONS 105, 361, 362, 363(C), (D) &(E), 364(C), 364(D)(1), 364(E) AND 507(B)**

The above captioned debtors and debtors-in-possession (each a "**Debtor**," and collectively, the "**Debtors**") hereby submit this motion (the "**DIP Motion**") for the entry of an interim order substantially in the form attached hereto as <u>Exhibit A</u> and a final order (the "**Interim Order**" and the "**Final Order**", respectively),[2] pursuant to sections 105, 361, 363 (c), (d) and (e), 364 (c), (d)(1) and (e) and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, <u>et seq.</u> (the "**Bankruptcy Code**"), authorizing and approving a secured post-petition Debtor Loan Party-in-possession financing facility (the "**Post-Petition Financing**"), authorizing use of cash collateral (the "**Cash Collateral**"), modifying the automatic stay and granting related relief. In support of the DIP Motion, the Debtors rely upon the Declaration of Blake Barnett in Support of the Debtors Chapter 11 Petitions and First-Day Motions and Applications (the "**Barnett Declaration**") and the declaration of Jon Goulding in support of the DIP Motion (the "**Goulding**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Haggen Holdings, LLC (7558), Haggen Operations Holdings, LLC (6341), Haggen Opco South, LLC (7257), Haggen Opco North, LLC (5028), Haggen Acquisition, LLC (7687), and Haggen, Inc. (4583). The mailing address for each of the Debtors is 2211 Rimland Drive, Bellingham, WA 98226.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Interim Order.

**Declaration**"), filed contemporaneously herewith.  In further support of this DIP Motion, the Debtors respectfully state as follows:

<u>JURISDICTION AND VENUE</u>

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (D) and (M), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief sought herein are sections 105(a), 361, 362, 363 (c), (d) and (e), 364(c), (d)(1) and (e), and 507(b) of the Bankruptcy Code, Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1, 4001-2, and 6004-1 of the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

<u>PRELIMINARY STATEMENT</u>

3.      The Debtors historical operations are comprised of 17 grocery stores operated by Haggen, Inc. ("**Haggen**").  These stores are profitable, earning approximately $25 million in annual EBITDA, and enjoy a strong brand reputation in the Pacific Northwest.  The Debtors believe that the stores operated by Haggen, augmented by some of the Debtors recently acquired stores, will ultimately form a set of successful core stores (the "**Core Stores**") that is among their most valuable assets.  The Debtors intend to reorganize around, or sell as a going concern, the

2.          01:17

Core Stores for the benefit of their creditors.  The proposed DIP Facility will give the Debtor

Loan Parties[3] the liquidity necessary to achieve such a value-maximizing transaction.

4.	Lenders to Haggen, Haggen South and Haggen North (collectively, the

"**Prepetition Borrowers**") have offered the Debtor Loan Parties a postpetition credit facility that

will provide the Debtor Loan Parties with the needed liquidity to identify and document certain

value-maximizing transactions.  Such transactions include, among others, sales of portions of the

Debtor Loan Parties' prescription business and sales of a group or groups of their non-Core

Stores to competitors (the "**Identified Transactions**").   If the Debtor Loan Parties are able to

execute on such Identified Transactions, the DIP Facility (defined below) will provide additional

liquidity to allow the Debtor Loan Parties to consummate the Identified Transactions.

Additionally, the DIP Facility will provide the Debtor Loan Parties with sufficient liquidity to

maximize the value of their remaining assets.

5.	The Debtor Loan Parties submit the terms of the proposed DIP Facility are fair

and reasonable and entry into the DIP Facility is in the best interest of the Debtor Loan Parties'

and their estates.  Accordingly, and for the reasons set forth herein, the Debtor Loan Parties

request the Court grant the relief sought in the DIP Motion.

## BACKGROUND

**A.	Procedural Background**

6.	On September 8, 2015 (the "**Petition Date**"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  Concurrently

with this Motion, the Debtors have also filed certain other motions and applications seeking

certain "first day" relief.

---

[3]  For the purposes of this Motion, the Debtor Loan Parties shall mean: Haggen, Inc. ("**Haggen**"), Haggen Opco South, LLC ("**Haggen South**"), Haggen Opco North, LLC ("**Haggen North**"), Haggen Operations Holdings, LLC ("**Operations Holdings**"), and Haggen Acquisition, LLC ("**Acquisition Holdings**").

7.      The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      No request has been made for the appointment of a trustee or examiner and no official committee has been established in these Chapter 11 Cases.

9.      Additional information about the Debtors' business and the events leading up to the Petition Date can be found in the Barnett Declaration, which is incorporated herein by reference.

**B.      The Debtor Loan Parties' Prepetition Indebtedness**

10.     On February 12, 2015, the Pre-Petition Borrowers entered into a financing arrangement with PNC Bank, National Association as agent (the "**Pre-Petition Agent**") and the lenders thereunder (collectively, the "**Pre-Petition Lenders**" and, together with the Pre-Petition Borrowers and the Pre-Petition Agent, the "**Revolving Loan Parties**") under which Pre-Petition Lenders provided a revolving line of credit facility to finance the Debtor Loan Parties' operations (the "**Credit Facility**").  The terms and conditions of the Credit Facility are in part evidenced by a Revolving Credit and Security Agreement (the "**Pre-Petition Revolving Credit Agreement**") pursuant to which the Pre-Petition Lenders agreed to provide the Borrowers a revolving line of credit facility in the amount of $180,000,000 (which included a "Swing Loan" subfacility of up to $20,000,000).  In connection with the Credit Facility, the Pre-Petition Borrowers executed two notes, both dated February 12, 2015, in the original principal amounts of $180,000,000 (the "**Revolving Note**") and $20,000,000 (the "**Swing Loan Note**").  As of September 7, 2015, the outstanding balance on the Revolving Note was approximately $154,067,263 and the outstanding balance on the Swing Loan Note was $0, plus undrawn letters of credit in the approximate amount of $10,100,000, plus all accrued and unpaid interest, fees and costs and expenses (together, the "**PNC Obligations**").

2.      01:17

11.     The PNC Obligations and all other amounts owed under the Credit Facility are secured by a first-position security interest (the "**PNC Prepetition Liens**") in substantially all of the Pre-Petition Borrowers' personal property, assets, including accounts receivable, equipment and fixtures, general intangibles, inventory, deposit accounts, contract rights and other rights to payment, and the proceeds and products thereof (the "**PNC Prepetition Collateral**" and the beneficiaries thereof, the "**Prepetition Secured Parties**").  Additionally, on February 12, 2015, the Pre-Petition Borrowers executed an intellectual property security agreement pursuant to which they granted to the Pre-Petition Agent a security interest in certain trademarks to secure their obligations under the Credit Facility.

12.     On February 12, 2015, Operations Holdings and Acquisition Holdings (collectively, the "**PNC Guarantors**") executed a guaranty and suretyship agreement pursuant to which the PNC Guarantors guaranteed the payment and performance of all obligations of the Pre-Petition Borrowers to the Pre-Petition Lenders under the Credit Facility (the "**PNC Guaranty**").  To secure their obligations under the PNC Guaranty, the PNC Guarantors executed a guarantor security agreement, dated February 12, 2015, in favor of the Pre-Petition Agent pursuant to which they granted to the Pre-Petition Agent a security interest in substantially all of their personal property.   In addition, Operations Holdings also executed a collateral pledge agreement in favor of the Pre-Petition Agent in which it pledged its equity interests in Haggen North, Haggen South and Acquisition Holdings to secure its guaranty obligations.  Acquisition Holdings also executed a collateral pledge agreement in favor of the Pre-Petition Agent in which it pledged its equity interests in Haggen to secure its guaranty obligations.

13.     On August 21, 2015, the Pre-Petition Borrowers entered into a subordinated loan agreement (the "**Subordinated Loan Agreement**") with Haggen Property North, LLC

2.        01:17

("**Haggen Property North**") and Haggen Property South, LLC ("**Haggen Property South**" and, together with Haggen Property North, the "**Propco Lenders**") pursuant to which the Pre-Petition Borrowers obtained a subordinated loan in the original principal amount of $25,000,000 (the "**Subordinated Loan**").  The obligations owed by the Pre-Petition Borrowers to the Propco Lenders under the Subordinated Loan Agreement are secured by a subordinated second lien on the Pre-Petition Borrowers' personal property, subject to the Intercreditor Agreement (defined below).  As of the Petition Date, the amount of the obligations owed by the Pre-Petition Borrowers under the Subordinated Loan Agreement is $25,000,000.

14.     The Pre-Petition Borrowers, the Pre-Petition Agent and the Propco Lenders are parties to that certain intercreditor agreement dated as of August 21, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "**Intercreditor Agreement**"), which governs the respective rights, obligations and priorities of the Pre-Petition Loan Parties and Propco Lenders with respect to the matters referred to therein.  The liens and security interests granted to the Propco Lenders in the PNC Prepetition Collateral are governed by and subject to the Intercreditor Agreement and are junior to the liens and security interests granted to the Pre-Petition Loan Parties.

15.     In addition, the PNC Obligations are also supported and secured by certain limited guarantees and liens on certain assets given by certain non-Debtor affiliates of the Debtor Loan Parties.

**C.     Immediate Need for Cash**

16.     The Debtor Loan Parties have an immediate need for cash.  The Debtor Loan Parties do not have sufficient available sources of working capital to operate their businesses in the ordinary course without the Post-Petition Financing and the ability to use Cash Collateral. The Debtor Loan Parties' ability to maintain business relationships with their vendors, suppliers,

2.     01:17

landlords and customers, to pay their employees and to otherwise fund their operations is

essential to the Debtor Loan Parties' continued viability.  The ability of the Debtor Loan Parties

to obtain sufficient working capital and liquidity through the proposed Post-Petition Financing

and the use of Cash Collateral on the terms set forth in the DIP Financing Documents (as defined

below) is vital to the preservation and maximization of the value of the Debtor Loan Parties'

currently operating businesses pending a sale of the assets of the Debtor Loan Parties.

Accordingly, the Debtor Loan Parties have an immediate need to obtain authorization to use

Cash Collateral and to obtain Post-Petition Financing in order to, among other things, permit the

orderly continuation of the operation of their operating businesses, preserve jobs for employees,

maintain vendor support and minimize the disruption of their business operations, and manage

and preserve the assets of the Debtor Loan Parties' bankruptcy estates in order to maximize

recoveries to the creditors of the estates.

## **RELIEF REQUESTED**

17.     By this DIP Motion, the Debtor Loan Parties seek entry of the Interim Order and

Final Order that provide, among other things:

   a)   authorization and approval for Haggen, Haggen South, and Haggen North as
        borrowers (collectively, the "**Borrowers**") to obtain the Post-Petition Financing
        from PNC Bank, National Association, in its capacity as agent (in such capacity,
        the "**DIP Agent**") for itself and the other financial institutions from time to time
        party to the DIP Credit Agreement (as defined below) as lenders (collectively, the
        "**DIP Lenders**"), to obtain financing under or in connection with the debtor-in-
        possession revolving credit facility (the "**DIP Facility**") in an maximum
        aggregate amount up to $215,000,000 and otherwise in accordance with the
        Interim Order and the Final Order, and to enter into that certain the Debtor-In-
        Possession Revolving Credit and Security Agreement with the DIP Agent and the
        DIP Lenders, substantially in the form attached hereto as <u>Exhibit B</u> (the "**DIP
        Credit Agreement**" and together with the Interim Order and the Final Order,
        together with all other agreements, documents and instruments to be executed or
        delivered in connection therewith, collectively, the "**DIP Financing
        Documents**") and to pledge and grant Liens on all of their personal property

assets and real property assets to secure all Obligations under the DIP Credit Agreement (including both the obligations incurred under the DIP Facility and the pre-petition PNC Obligations).  The DIP Facility shall be used in part for working capital and upon entry of the Final Order to refinance, in whole or in part at the DIP Agent's option, the outstanding principal balance of the revolving loans and obligations under the Pre-Petition Revolving Credit Agreement by and among the Revolving Loan Parties, and which shall indefeasibly satisfy in whole or in part the outstanding obligations under the Pre-Petition Financing Documents (as defined below).  The Pre-Petition Credit Agreement and all other agreements, documents and instruments executed or delivered with, to, or in favor of the Pre-Petition Agent and the Pre-Petition Lenders, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection with the Pre-Petition Credit Agreement or related thereto, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated or replaced at any time prior to the Petition Date, are collectively referred to herein as  the "**Pre-Petition Financing Documents**";

b)  authorization for Operations Holdings and Acquisition Holdings as guarantors (collectively, the "**Debtor Guarantors**") to enter into the DIP Credit Agreement pursuant to which each Debtor Guarantor (i) guarantees all Obligations  arising under the DIP Credit Agreement, and (ii) pledges and grants a Lien on all of its personal property assets and real property assets to secure all Obligations under the DIP Credit Agreement  (including both the obligations incurred under the DIP Facility and the pre-petition PNC Obligations);

c)  granting (a) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, priming liens, security interest and pledges (collectively, "**Liens**") on all of the DIP Collateral (as defined in the Interim Order) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, which Liens shall be senior to all Liens, except that such Liens shall be junior solely to (i) the Carve-Out (as defined below), (ii) any valid, enforceable and non-avoidable Liens that are (I) in existence on the Petition Date, and (II) senior in priority to the PNC Prepetition Liens (all such Liens, collectively, the "**Permitted Liens**"), and (iii) any valid, enforceable and non-avoidable Liens that are either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (b) to the DIP Agent, for the benefit of itself and the other DIP Lenders, of superpriority administrative claim status pursuant to Sections 364(c)(1) and 507(b) of the Bankruptcy Code in accordance with the terms of the Interim and Final Orders;

d)  authorizing the Debtor Loan Parties' use of Cash Collateral which term shall include, without limitation, all cash and cash equivalents of the Debtor Loan Parties, whenever or wherever acquired, and the proceeds of all DIP Collateral (defined below) pledged to the Secured Parties (defined below) and the Propco

2.      01:17

Lenders, as contemplated by section 363 of the Bankruptcy Code in accordance with the terms set forth herein;

e) granting adequate protection to each Pre-Petition Lender and Issuer (as defined in the Pre-Petition Credit Agreement) (the "Pre-Petition Issuer," together with the Pre-Petition Agent and Pre-Petition Lenders, the "Pre-Petition Secured Parties," together with the DIP Agent and DIP Lenders, the "Secured Parties") under and in connection with the Pre-Petition Financing Documents in accordance with the terms set forth herein;

f) granting adequate protection to the Propco Lenders in connection with that those certain subordinated promissory notes dated August 21, 2015 and that certain Subordinated Loan Agreement dated August 21, 2015 (collectively, the "Subordinated Loan Agreement"), pursuant to which Borrowers obtained the Subordinated Loan in the original principal amount of $25,000,000 to the extent that Propco Lenders hold valid, perfected, enforceable and unavoidable liens as of the Petition Date solely to the extent that Propco Lenders are entitled to same pursuant to and in accordance with the Intercreditor Agreement.

g) Authorizing Haggen Holdings, LLC to grant releases, covenants not to sue, and other accommodations as provided in the Interim Order and Final Order and to reaffirm certain prepetition guaranties;

h) modification of the automatic stay to the extent set forth in the Interim Order and Final Order and waiving the fourteen (14) day stay provisions of Federal Rule of Bankruptcy Procedure 4001(a)(3) and 6004(h); and

i) the setting of a final hearing on the Motion (the "Final Hearing") for entry of the Final Order.

2.        01:17

A.    **The Debtor Loan Parties' Proposed DIP Facility**

18.    Pursuant to Bankruptcy Rule 4001, the Debtor Loan Parties set forth the significant elements of the DIP Facility, as follows:[4]

| Term | Summary |
|---|---|
| **Borrowers:** | Haggen,  Haggen North and Haggen South |
| **Debtor Guarantors:** | Operations Holdings and Acquisition Holdings |
| **Propco Guarantors:** | Haggen Property Holdings, LLC, Haggen Holdings, LLC, Haggen Property South, LLC and Haggen Property North, LLC |
| **DIP Lender(s):** | The Prepetition Lenders |
| **DIP Agent**: | PNC Bank, National Association |
| **DIP Facility:** | The DIP Lenders will provide to the Debtor Loan Parties a senior secured, superpriority revolving loan facility in the aggregate commitment amount not to exceed the Maximum Revolving Advance Amount defined below, subject to decrease from time to time upon certain conditions, and subject to a borrowing base substantially consistent with the borrowing base to be mutually agreed upon less reserves including for the Carve-Out plus the Permitted Overadvance as further described below.  The DIP Facility may be used only to repay the Obligations under the Pre-Petition Credit Agreement and for working capital purposes of the Debtor Loan Parties, to pay current interest and fees under the DIP Facility, to provide for the issuance of letters of credit and the allowed administrative costs and expenses of the Cases of the Debtor Loan Parties, in each case, solely in accordance with the Approved Budget and the Financing Orders (each as defined below) incorporating the terms hereof.  As further described below in the descriptions of the Interim Order and the Final Order, the DIP Facility is structured as a discretionary "creeping" roll-up.<br><br>"**Maximum Revolving Advance Amount**" shall mean the amount equal to (A) as applicable, (i) from and after entry of the Interim Order and continuing unless and until the occurrence of a Line Increase Event, $200,000,000 minus the outstanding amount of all Pre-Petition Obligations, and (y) from and after the occurrence of a Line Increase Event, $215,000,000 minus the outstanding amount of all Pre-Petition Obligations, minus (B) the amount equal to 75% of the Aggregate Liquidity Pharmacy Proceeds received by Debtor Loan Parties |

---

[4]  The terms and conditions of the DIP Facility set forth in this DIP Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such.  For a complete description of the terms and conditions of the DIP Facility, reference should be made to the DIP Loan Documents, including the Final Order and the commitment letter.  The summary herein is qualified in its entirety by reference to such documents and such order.  Interested parties are strongly encouraged to read the DIP Loan Documents.  In the event there is a conflict or inconsistency between this DIP Motion and the DIP Loan Documents, the DIP Loan Documents shall control in all respects.  Defined terms used in this section but not otherwise defined shall have the meanings ascribed to such terms in the DIP Loan Documents. Capitalized terms used in this summary of the DIP Facility not otherwise defined in this DIP Motion shall have the meanings given thereto in the DIP Loan Documents.

2.       01:17

and applied to the Obligations in accordance with the DIP Credit Agreement and the Interim Order and Final Order, minus (C) the amount equal to 75% of the Aggregate Liquidity 363 Proceeds received by Debtor Loan Parties and applied to the Obligations in accordance with the DIP Credit Agreement and the Interim Order and Final Order.  The Letter of Credit Sublimit shall be $13,000,000 and the Swingline Sublimit shall be 10% of the Maximum Revolving Advance Amount in effect from time to time.

"**Line Increase Event**" shall mean shall mean delivery by Debtor Loan Parties to DIP Agent and DIP Lenders of copies of one or more final, executed asset purchase agreements (or similar instrument of transfer or assignment) entered into by one or more of the Debtor Loan Parties (subject to approval of the Bankruptcy Court and other conditions customary for contracts entered into by Debtor Loan Parties in possession) with one or more purchasers with respect to one or more sale(s) outside of the ordinary course of business of the assets of such Debtor Loan Parties, including any such sale(s) outside the ordinary course of business of one or more Non-Core Leasehold Interests and any sales of Prescription Lists (but excluding any "going out of business sales" or Core Stores Sale (or other sale of any leasehold interests, Inventory or other assets used in the operation of the Core Stores business)), which such sale(s) and such asset purchase agreements or other instruments shall be on terms and conditions and in form and substance acceptable to DIP Agent and Required DIP Lenders and shall provide for net cash proceeds payable to Debtor Loan Parties upon consummation and closing of such sales equal to at least $50,000,000.

"**Permitted Overadvance**" shall mean (a) from the Closing Date through the date (the "**Liquidity Reduction Date**") that Aggregate Liquidity 363 Proceeds in the amount of at least $30,000,000 are applied to the Obligations in accordance with this Agreement and the Interim Order and the Final Order, $20,000,000, and (b) at all times and under all circumstances after the Liquidity Reduction Date, $15,000,000; provided that, upon the occurrence of any Line Increase Event, then from the date of the Line Increase Event through the Liquidity Reduction Date, the amount of the Permitted Overadvance shall be $40,000,000.

The DIP Facility will be made available if (and only if) all conditions under the DIP Facility have been satisfied or waived, including the entry of the Interim Order. Subject to the terms and conditions of the DIP Loan Documents (as defined below), the loans under the DIP Facility will be made available following delivery by the Debtor Loan Parties of a loan request which shall include a certification in the form set forth in the DIP Credit Agreement that (i) no default or Event of Default has occurred and is continuing under the DIP Credit Agreement, (ii) all representations and warranties shall be true and correct as of the date of the loan request and (iii) the loans being requested shall be used in accordance with the Approved Budget.  The DIP Facility loans, subject to the foregoing conditions and consistent with past ordinary course processing procedures, will be funded on the same Business Day if requested by 2:00 p.m. Eastern time, or on the next Business Day if requested after 2:00 p.m. Eastern time.

| | |
|---|---|
| **Interest Rate and Fees:** | DIP Interest Rate = Alternate Base Rate + 3.00%. |

| | |
|---|---|
| | Default Interest Rate = + 2.00%.

Unused Commitment Fee = 0.50%.

Closing Fee = $1,525,000, with $987,5000 due and payable upon the Closing Date, and $537,500 due and payable on the earlier of (x) the Termination Date, or (y) any earlier accelerations of the Post-Petition Obligations in accordance with the terms of the DIP Credit Agreement.

Collateral Monitoring Fee = $3,500/month payable solely to DIP Agent (PNC). |
| **Use of Proceeds:** | The DIP Facility may be used only (i) to repay the Obligations under the Pre-Petition Credit Agreement; (ii) for working capital purposes of the Debtor Loan Parties, (iii) to pay current interest and fees under the DIP Facility, and (iv) to provide for the issuance of letters of credit and the allowed administrative costs and expenses of the Cases of the Debtor Loan Parties, in each case solely in accordance with the Approved Budget and the Financing Orders (each as defined below). |
| **Maturity/Termination Date:** | The DIP Facility shall automatically terminate without further notice or court proceedings on the earliest of: (a) February 5, 2016; (b) the effective date or substantial consummation of a Reorganization Plan that has been confirmed by an order of the Bankruptcy Court; (c) the closing of the Approved Core Stores Sale; (d) the date of the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code; (e) the date of the dismissal of the Case; and (f) the 22nd day after the Petition Date if the Final Order has not been entered as of such date (the "**Termination Date**"), unless extended, as to the DIP Facility, with the prior written consent of the DIP Agent and DIP Lenders. |
| **Priority and Security:** | All obligations of the Debtor Loan Parties under the DIP Facility (the "DIP Obligations") shall be:
(i) entitled to superpriority claim status under Section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims and unsecured claims now existing or hereafter arising under the Bankruptcy Code, subject to the Carve-Out. The superpriority claims of the DIP Lenders may be repaid from any cash of the Debtor Loan Parties and any proceeds from Avoidance Actions (as defined below);
(ii) secured, pursuant to Section 364(d)(1) of the Bankruptcy Code, by valid, enforceable first priority, fully perfected security interests in and liens upon all of the Debtor Loan Parties' rights in property of the Debtor Loan Parties' estates whether real or personal, including without limitation all leaseholds and fee interests as of the Petition Date (including such property securing the Debtor Loan Parties' obligations under the Pre-Petition Loan Documents) and all of the Debtor Loan Parties' rights in property acquired post-petition (including, without limitation, pursuant to (and subject to the entry of) the Final Order, estate causes of action under Section 544, 547 and 548 of the Bankruptcy Code, together with the proceeds thereof and property received thereby (the "**Avoidance Actions**")), whether now existing or hereafter acquired or arising (collectively, the "**Debtor Loan Party Collateral**"), subject and subordinate only to those liens approved by the DIP Agent that, under applicable law, are senior to, and have not been subordinated to, the liens of the Pre-Petition Agent and the Pre-Petition Senior Lenders under the Pre-Petition Senior Loan Documents, but only to the extent that such liens are valid, enforceable and nonavoidable liens as of the Petition Date (collectively, "**Permitted Priority Liens**"); |

| | |
|---|---|
| | (iii)  secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a first priority, perfected lien on all of the Debtor Loan Parties' rights in property of the Debtor Loan Parties' estates as of the Petition Date that, as of the Petition Date, were unencumbered; |
| | (iv)  secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by a second priority, perfected lien on all of the Debtor Loan Parties' rights in property of the Debtor Loan Parties' estates as of the Petition Date that, as of the Petition Date, were subject to a Permitted Priority Lien that was perfected prior to the Petition Date; |
| | (v) guaranteed by the Debtor Guarantors, which guarantees shall be secured, as applicable, by (A) a first priority, perfected lien on all assets of the Debtor Guarantors and (B) superpriority claim status under Section 364(c)(1), (2) and (3) of the Bankruptcy Code with priority over all administrative expense claims and unsecured claims now existing or hereafter arising under the Bankruptcy Code, subject to the Carve-Out (collectively, the "Debtor Guarantors' Collateral"; with the Debtor Loan Party Collateral, the "DIP Collateral"); |
| | (vi) guaranteed by the Propco Guarantors (non-Debtor affiliates of the Debtor Loan Parties) on a limited basis not to exceed $25,000,000, which limited guarantees shall be secured, as applicable, by a pledge of Haggen Property Holdings, LLC's equity interests in Haggen Property South, LLC and Haggen Property North, LLC together with an agreement to deliver mortgages on selected parcels of real estate (and until the DIP Lenders have completed their regulatory diligence and appraisals and, prior to that date, the DIP Agent and DIP Lenders shall have liens on the proceeds of all real property) (collectively, the "**Propco Guarantors' Collateral**"), all in accordance with the requirements set forth in the existing Propco Guaranty, provided, that upon delivery and recording of all the above-referenced mortgages, the pledge on the equity interests in Haggen Property South, LLC and Haggen Property North LLC shall be released. |
| | The DIP Collateral shall also include without limitation all real and personal property including any and all leases, rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Agent or the DIP Lenders in order to claim or perfect such leases, rents, issues, products, offspring, proceeds and/or profits; provided, however, that the liens described above shall not attach to any Avoidance Actions until entry of the Final Order. |
| **Carve-Out:** | "**Carve-Out**" means the following expenses related only to the Cases of the Debtor Loan Parties and not any such expenses related to the Case of any other Debtor specifically including Haggen, Inc.:  (i) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. §§ 1930(a)(6) with respect to the Borrowers (the "**Statutory Fees**"); and (ii) the reasonable fees, costs, and expenses actually incurred on or after the Petition Date and prior to the Trigger Date (defined below), and that are allowed and payable by order of the Court under Sections 328, 330, or 331 of the Bankruptcy Code, and any interim compensation procedures order, as applicable (collectively, the "**Allowed Professional Fees**"), by Debtor Loan Parties' bankruptcy counsel, Young Conaway Stargatt and Taylor, LLP and Stroock & Stroock & Lavan LLP, (collectively, "**Debtor Loan Parties' Bankruptcy Counsel**"), Debtor Loan Parties' corporate counsel, Ackerman LLP, and Debtor Loan Parties' financial advisors, Alvarez and Marsal North America, LLC ("**A&M**"), retained under Section 327 of the Bankruptcy Code, professionals retained by any official |

<table>
<tr>
<td></td>
<td>

committee of unsecured creditors (the "**Committee**") appointed for the Debtor Loan Parties in the Cases under Section 1103(a) of the Bankruptcy Code, and any court-appointed claims administrator (collectively, the "**Professionals**"), in a cumulative, aggregate sum of (i) for the period prior to the occurrence of the Trigger Date, not to exceed the lesser of (A) the weekly amounts budgeted to be funded for each such Professional in accordance with the Budget, exclusive of the Permitted Variance, for the time period preceding the Trigger Date (to the extent the Trigger Date occurs mid-week, pro-rated for such week) and (B) the actual allowed amount of such Professional Fees incurred on or after the Petition Date up through and including the Trigger Date, and (ii) for the time period following a Trigger Date, an amount not to exceed $150,000 for (x) Debtors' Bankruptcy Counsel (collectively) and (y) A&M (collectively, the "**Carve-Out Cap**").   The "**Trigger Date**" shall mean the date of an Event of Default under the DIP Credit Agreement and delivery of a written notice (the "**Carve-Out Notice**") by the DIP Agent to (i) the U.S. Trustee, (ii) the Debtor Loan Parties and the Debtor Loan Parties' counsel, (iii) counsel for the Committee, and (iv) the Haggen Propco Lenders.

The Debtor Loan Parties shall maintain an escrow account for the payment of Allowed Professional Fees (the "**Carve-Out Reserve Account**") which account shall be funded by or on behalf of the Debtor Loan Parties in accordance with the Budget on a weekly basis until the occurrence of the Trigger Date provided there is availability under the DIP Credit Agreement. After the Trigger Date, the Carve-Out Reserve Account shall continue to be funded up to the Carve-Out Cap.

Any payment into the Carve-Out Reserve Account or payments of fees and expenses made directly to the Professionals shall permanently reduce the pre-Trigger Date Carve-Out (for fees and expenses incurred before the Trigger Date) or the post-Trigger Date Carve-Out (for fees and expenses incurred on or after the Trigger Date), as applicable, on a dollar-for-dollar basis.

The Carve-Out shall be senior to all liens securing the DIP Loans as well as any adequate protection liens and claims described above.

Neither the Carve-Out nor the DIP Facility may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to the DIP Facility or the security interests and liens securing the DIP Obligations with respect thereto, or to fund prosecution or assertion of any claims, or to otherwise litigate against the DIP Agent or the DIP Lenders, provided that up to $25,000 shall be made available to a Committee for investigation costs in respect of the stipulations contemplated below

Additionally, the Carve-Out shall not be used to challenge the Propco Lenders' subordinated indebtedness or liens..

</td>
</tr>
<tr>
<td>

**Adequate Protection:**

</td>
<td>

<u>First Lien Adequate Protection Liens</u>.  The Pre-Petition Agent, for the benefit of itself and the other Pre-Petition Lenders and Pre-Petition Issuer, is hereby granted valid and perfected replacement and additional security interests in, and liens (the "**First Lien Adequate Protection Liens**") on the DIP Collateral to the extent of the Adequate Protection Obligations, which shall be junior in all respect to the DIP Liens, the Permitted Liens and the Carve Out.

<u>First Lien Adequate Protection Claims</u>.  As further adequate protection, the

</td>
</tr>
</table>

Pre-Petition Agent, for the benefit of the Pre-Petition Secured Parties, is hereby granted an allowed administrative claim (the "**First Lien Adequate Protection Claim**") against the Debtor Loan Parties' estates under sections 503 and 507(b) of the Bankruptcy Code to the extent that the First Lien Adequate Protection Liens do not adequately protect against the diminution in the value of the liens and security interests of the Pre-Petition Secured Parties in the Pre-Petition Collateral, which First Lien Adequate Protection Claim shall be subject and subordinate only to the DIP Superpriority Claim and the Carve Out and shall have priority over all other administrative expense claims and unsecured claims against the Debtor Loan Parties or their estates, which are now existing, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code.

Prepetition First Lien Interest. As further adequate protection, the Pre-Petition Agent, for the benefit of the Pre-Petition Secured Parties, shall be entitled to interest on account of the outstanding Pre-Petition Obligation, which shall be accrued and payable and paid in accordance with the Pre-Petition Financing Documents.

Payment of Fees and Expenses. As further adequate protection, and without limiting any rights of the Pre-Petition Agent, for the benefit of the Pre-Petition Secured Parties, under section 506(b) of the Bankruptcy Code which are hereby preserved, and in consideration, and as a requirement, for the Adequate Protection Obligations, the Debtor Loan Parties shall pay or reimburse the Pre-Petition Agent for any and all of its accrued and payable reasonable fees, costs, expenses and charges payable under the Pre-Petition Financing Documents, including, without limitation, the fees and expenses of the Pre-Petition Agent as provided in, inter alia, Section 16.9 of the Pre-Petition Credit Agreement, whether accrued pre-petition or post-petition, all without further notice, motion or application to, order of, or hearing before, this Court; provided that DIP Agent shall be permitted to add such amounts to the Obligations following submission of a redacted summary invoice to the Debtor Loan Parties, the United States Trustee and, if appointed, the Committee or its counsel, of a written invoice (subject in all respects to applicable privilege or work product doctrines) provided no objection has been raised within ten (10) days, and to the extent there is an objection, the Court may resolve the objection. Such written invoices shall include (i) Blank Rome LLP, counsel to the Pre-Petition Agent, (ii) FTI Consulting, consultant to the Pre-Petition Agent; (iii) and any other professional, advisor or agent reasonably retained by the Pre-Petition Agent or its counsel in connection with the Pre-Petition Financing Documents pursuant to the Cases; provided that none of such fees and expenses as adequate protection payments hereunder shall be subject to approval by the Court or the United States Trustee Guidelines. No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court.

Propco Lenders' Adequate Protection. In consideration for and on account of the Adequate Protection Obligations, without conceding any entitlement thereto and solely to the extent that Propco Lenders have not waived its right to seek or request it under the Intercreditor Agreement and solely to the extent the Pre-Petition Propco Lenders Collateral held by Propco Lenders was subject to valid, perfected, enforceable and unavoidable liens and that it is

| | |
|---|---|
| | ultimately determined that Propco Lenders are entitled to such adequate protection, Propco Lenders are being provided with adequate protection (the "Second Lien Adequate Protection" and, together with the First Lien Adequate Protection, the "Adequate Protection"). |
| | Second Lien Adequate Protection Liens.  To the extent of the diminution in the value of the Propco Lenders' interests in the Pre-Petition Haggen Lender Collateral, the Propco Lenders are hereby granted valid and perfected replacement security interests in, and liens on all of the Debtor Loan Parties' right, title and interest in, and to the same items and types of DIP Collateral (the "**Second Lien Adequate Protection Liens**," and together with the First Lien Adequate Protection Liens, the "**Adequate Protection Liens**"), which liens are valid, binding enforceable and fully perfected as of the Petition Date and which liens are subordinate and subject to (i) the DIP Liens, (ii) the First Lien Adequate Protection Liens, (iii) the Permitted Liens and (iv) the Carve Out. |
| | Second Lien Adequate Protection Claims.  As further adequate protection, to the extent it is determined that Propco Lenders are entitled thereto and to the extent that the Second Lien Adequate Protection Liens do not adequately protect against the diminution in value of the Propco Lenders' interest in the Pre-Petition Propco Lenders Collateral, provided that such liens were valid perfected, enforceable and unavoidable, Propco Lenders are hereby granted an allowed administrative claim (the "**Second Lien Adequate Protection Claim**", and together with the First Lien Adequate Protection Claim, the "**Adequate Protection Claims**") against the Debtor Loan Parties' Estates under sections 503 and 507(b) of the Bankruptcy Code, provided, however, that the Second Lien Adequate Protection Claim shall be subject and subordinate to the (i) DIP Superpriority Claim, (ii) First Lien Adequate Protection Claim and (iii) Carve Out, until all Obligations are indefeasibly paid and satisfied in full. |
| **Sale Process Covenants/Defaults:** | The Debtor Loan Parties shall take the following actions (or obtain the following approvals, as applicable) as soon as possible, but not later than the following (collectively, the "**Sale Process Covenants**"):<br>(i) obtain all necessary Bankruptcy Court orders(s) (each such order to be on terms and conditions and in form and substance acceptable to DIP Agent) (collectively, the "GOB Liquidator Retention Order") to allow Debtor Loan Parties to retain a liquidator for the purpose of conducting "going out of business sales" and/or liquidations of Inventory and other assets with respect to retail store locations of Debtor Loan Parties, other than the Core Stores and/or shall fail to enter into a definitive agreement on terms and conditions and in form and substance acceptable to DIP Agent and Required DIP Lenders with such a liquidator reasonably acceptable to DIP Agent and Required DIP Lenders in accordance with the terms of such GOB Liquidator Retention Order (any such liquidator, the "GOB Liquidator", and any such agreement, the "Planned GOB Stores Liquidator Agreement"), in either case prior to September 18, 2015;<br>(ii) file a motion on or before September 22, 2015 requesting approval to conduct, through the GOB Liquidator, "going out of business sales" with respect to and/or liquidate the Inventory and other property and assets located at an identified list of retail stores (which list shall in number and content be acceptable to and approved by DIP Agent and Required DIP Lenders) (such retail stores as approved by DIP Agent and Required DIP Lenders, the |

"Planned GOB Stores"; and such "going out of business sales" with respect thereto, the "Planned GOB Sales");

(iii) obtain an order of the Bankruptcy Court on terms and conditions and in form and substance reasonably acceptable to DIP Agent approving the Planned GOB Sales (the "Planned GOB Sales Order") or before October 13, 2015;

(iv) cause the GOB Liquidator to commence the "going out of business sales" at substantially all of the Planned GOB Stores in accordance with the Planned GOB Stores Liquidator Agreement on or before October 14, 2015;

(v) on or before October 28, 2015, pay over to DIP Agent for application to the Obligations in accordance with the DIP Credit Agreement and the Interim Order and Final Order net cash proceeds from the purchase price and all other cash consideration payable to Debtor Loan Parties in connection with one or more Approved Prescription List Sales (not including any sales of Pharmacy Lists pursuant to any asset purchase agreement or similar instrument of transfer or assignment entered into by any Debtor Loan Parties prior to the Petition Date), each of which sales shall have been approved by appropriate orders of the Bankruptcy Court under Section 363 of the Bankruptcy Code and which orders shall be on terms and conditions and in form and substance reasonably satisfactory to the DIP Agent, in a minimum aggregate amount for all such sales of not less than $30,000,000 (the Approved Prescription List Sales satisfying this clause (v), the "**Liquidity Pharmacy Sales**", and the total aggregate amount of net cash proceeds paid to Debtor Loan Parties in connection with such Liquidity Pharmacy Sales and applied to the Obligations in accordance with the DIP Credit Agreement and the Interim Order and the Final Order, including any and all Allocated Combined Pharmacy Proceeds, the "**Aggregate Liquidity Pharmacy Proceeds**") provided, however, in the event that Debtor Loan Parties enter into any one or more sales of assets (other than Approved GOB Sales or an Approved Core Stores Sale (or other sale of any leasehold interests, Inventory or other assets used in the operation of the Core Stores business)) pursuant to Section 363 of the Bankruptcy Code consisting of both Pharmacy Lists and Non-Core Leasehold Interests (and which may include other assets incidental thereto), each of which such sales shall have been approved by appropriate orders of the Bankruptcy Court under Section 363 of the Bankruptcy Code and which orders shall be on terms and conditions and in form and substance reasonably satisfactory to the DIP Agent (each a "**Combined Sale**"), the Debtor Loan Parties and the DIP Agent (subject to approval from the Required DIP Lenders) shall work together in good faith to allocate the net cash proceeds of such Combined Sale appropriately between the portion thereof attributable to the Pharmacy Lists sold as part of such Combined Sale and the portion thereof attributable to the Non-Core Leasehold Interests and other assets sold as part of such Combined Sale, and upon any such allocation agreed to by the Debtor Loan Parties and the DIP Agent (subject to approval from the Required DIP Lenders), the amount of the net cash proceeds of such Combined Sale allocated to the Pharmacy Lists (to the extent actually applied to the Obligations in accordance with the DIP Credit Agreement and the Interim Order and the Final Order) (any such net cash proceeds, "**Allocated Combined Pharmacy Proceeds**") shall be deemed to be Aggregate Liquidity Pharmacy Proceeds for purposes of determining compliance with this clause (v) and all other purposes under this Agreement and the amount of the net cash proceeds of such Combined Sale allocated to the Non-Core Leasehold Interests and other assets (to the extent actually applied to the Obligations in accordance with the DIP Credit Agreement and the Interim Order and the Final Order) (any such net cash proceeds, "**Allocated Combined 363 Proceeds**") shall be deemed to be

| | |
|---|---|
| | Aggregate Liquidity 363 Proceeds for purposes of determining compliance with the following clause (vi) and all other purposes under this Agreement.<br><br>(vi) on or before November 20, 2015, receive and pay over to DIP Agent for application to the Obligations in accordance with the DIP Credit Agreement and the Interim Order and Final Order net cash proceeds from the purchase price and all other cash consideration payable to Debtor Loan Parties in connection with one or more Approved 363 Sales of Non-Core Leasehold Interests or other assets sales (other than Approved GOB Sales, an Approved Core Stores Sale (or other sale of any leasehold interests, Inventory or other assets used in the operation of the Core Stores business) or Approved Prescription List Sales), each of which sales shall have been approved by appropriate orders of the Bankruptcy Court under Section 363 of the Bankruptcy Code and which orders shall be on terms and conditions and in form and substance reasonably satisfactory to the DIP Agent, in an aggregate amount for all such sales of not less than $50,000,000, (the Approved 363 Sales satisfying this clause (vi), the "Liquidity 363 Sales", and the total aggregate amount of net cash proceeds paid to Debtor Loan Parties in connection with such Liquidity 363 Sales and applied to the Obligations in accordance with the DIP Credit Agreement and the Interim Order and the Final Order including any and all Allocated Combined 363 Proceeds, the "Aggregate Liquidity 363 Proceeds");<br><br>(vii) finalize and commence distribution of an offering memorandum/marketing memorandum prepared by the Investment Bank to market and solicit bids for a Core Stores Sale (in one or more transactions/in lot or in whole) on or before September 30, 2015;<br><br>(viii) file a motion under section 363 of the Bankruptcy Code seeking authority for a Core Stores Sale, together with bidding procedures (the "Core Stores Bidding Procedures"), in each case on terms and conditions and in form and substance reasonably satisfactory to the DIP Agent and the Required DIP Lenders, on or before October 22, 2015;<br><br>(ix) obtain an order of the Bankruptcy Court approving the Core Stores Bidding Procedures (the "Core Stores Bidding Procedures Order") on or before November 13, 2015, such Core Stores Bidding Procedures Order to on terms and conditions and in form and substance acceptable to the DIP Agent (and shall at a minimum be substantially consistent with the form of order requested in the motion approved by DIP Agent and Required DIP Lenders referenced in clause (viii) above), including providing the Secured Parties with the right, in their sole discretion, to credit bid all or any portion of the Obligations with respect to any sale of any of Core Stores;<br><br>(x) conduct an auction in accordance with the Core Stores Bidding Procedures (the "Core Stores Auction") on or before January 15, 2016;<br><br>(xi) obtain a court order for the Approved Core Stores Sale (the "Core Stores Sale Order") to the successful bidder(s) on or before January 18, 2016, such Core Stores Sale Order to be on terms and conditions and in form and substance acceptable to the DIP Agent; and<br><br>(xii)     cause the Approved Core Stores Sale to be consummated on or before February 5, 2016. |
| **Variance Covenant:** | The Debtor Loan Parties shall comply with the following (collectively, the "Variance Covenant"):<br><br>Commencing with first weekly period reflected in the Approved Budget delivered as of the Closing Date, cause Debtor Loan Parties' disbursements to be not more than one hundred ten percent (110%) of forecasted disbursements set forth in the Approved Budget, such covenant to be tested on a rolling four week period provided that for the initial three weekly tests such covenant shall |

2.          01:17

| | |
|---|---|
| | be tested against the Approved Budget as follows: (i) for the first week, based on one week forecast and three weeks actual; (ii) for the second week based on two weeks forecast and two weeks actual; and (iii) for the third week based on three weeks forecast and one week actual, in each case, on a cumulative basis; provided, however, that for any such testing period, the Debtor Loan Parties may increase disbursements by an amount equal to seventy percent (70%) of receipts of the Debtor Loan Parties of the type included in the Approved Budget line items titled "Haggen, Inc. Sales Receipts", "Opco Sales Receipts" and "Other Sales Receipts" in excess of the amount of such receipts set forth in the Approved Budget for the applicable testing period. |
| | Commencing with the first weekly period reflected in the Approved Budget delivered as of the Closing Date, cause Debtor Loan Parties' receipts to be at least eighty give percent (85%) of forecasted receipts as set forth in the Budget, such covenant to be tested on a rolling 4-week basis; provided that for the initial three weekly tests such covenant shall be tested against the Approved Budget as follows: (i) for the first week, based on one week forecast and three weeks actual; (ii) for the second week based on two weeks forecast and two weeks actual; and (iii) for the third week based on three weeks forecast and one week actual, in each case, on a cumulative basis; and further provided to the extent that the receipts are less than required receipts percentage as set forth in the Approved Budget during any 4-week period, but are above required receipts percentage as set forth in the Approved Budget on a cumulative basis for the entire period from the Petition Date through the end of such 4-week period, Debtor Loan Parties shall be deemed to be in compliance with this covenant.  Notwithstanding anything to the contrary provided for in the foregoing, upon completion of the Planned GOB Sales with respect to substantially all of the Planned GOB Stores, the required receipts percentage shall be reduced to 80%. |
| **Affirmative and Negative Covenants:** | (i)   The DIP Loan Documents will contain the affirmative and negative covenants made by the Debtor Loan Parties under the Pre-Petition Credit Agreement and the other Pre-Petition Senior Loan Documents, and such other affirmative and negative covenants as the DIP Agent and the DIP Lenders shall require.  Certain covenant exceptions that were available under the Pre-Petition Credit Agreement and the other Pre-Petition Senior Loan Documents under the Loan Documents shall no longer be available; and <br> (ii)  In addition, except in connection with sales approved by the DIP Agent and the Bankruptcy Court (including anticipated GOB sales, leasehold sales, pharmacy sales and core stores sales so approved by the DIP Agent and Bankruptcy Court), absent the advance consent of the DIP Agent and DIP Lenders, the Debtor Loan Parties and Guarantors shall not sell, lease, transfer or otherwise dispose of any collateral out of the ordinary course of business.  In the event of any sale of the assets of the Debtor Loan Parties consented to by the DIP Agent and DIP Lenders, the Bankruptcy Court order authorizing any sale (including a sale under the Bidding Procedures) shall provide that any and all proceeds of such sale shall be paid upon consummation of such sale, to the DIP Agent, on behalf of the DIP Lenders, to be applied against the Obligations under the Pre-Petition Credit Agreement or the Obligations under the DIP Credit Agreement (which shall include for such purposes any and all amounts remaining outstanding under the Pre-Petition Senior Loan Documents) to be elected by the DIP Agent subject to and in accordance with the DIP Credit Agreement. |
| **Events of Default:** | "Events of Default" will be consistent with the events of default under the Pre- |

2.        01:17

| | |
|---|---|
| | Petition Credit Agreement (subject to removal of events of default that are no longer relevant and reduction of certain threshold amounts) and will include customary bankruptcy defaults consistent with the transactions set forth herein.<br><br>Upon the occurrence and during the continuance of any Event of Default (it being understood and agreed that certain defaults will be subject to cure periods), at the option of the DIP Agent or at the direction of the DIP Lenders, the DIP Agent shall accelerate the DIP Obligations and, thereafter, may take all or any of the following actions without further order of or application to the Bankruptcy Court, provided that in the case of the enforcement of liens or other remedies with respect to collateral pursuant to clause (2) below, the DIP Agent shall provide the Debtor Loan Parties (with a copy to any counsel for the Committee appointed in the Cases and to the United States Trustee) with five (5) days' prior written notice during which time any such party must file a pleading seeking an emergency hearing in opposition to the DIP Agent's exercise of its rights and remedies and provided further, that in any hearing following such notice, the only issue that may be raised by any party in opposition to the actions proposed or available to be taken by the DIP Agent shall be whether, in fact, an Event of Default has occurred and is continuing:<br><br>(1)  declare the principal of and accrued interest on the outstanding borrowings to be immediately due and payable and terminate, as applicable, any further commitments under the DIP Facility and charge the default rate of interest under the DIP Facility; and<br><br>(2)  take any other action or exercise any other right or remedy (including without limitation, with respect to the liens in favor of the DIP Agent on behalf of the DIP Lenders) permitted under the DIP Loan Documents or applicable law. |
| **Expenses:** | The documented fees, costs and expenses incurred or accrued by the DIP Agent (the foregoing to include all unpaid prepetition fees, costs and expenses incurred by the DIP Agent in connection with the DIP Facility) in connection with any and all aspects of the Debtor Loan Parties' Cases, including, without limitation, the fees and expenses of legal counsel (including Blank Rome LLP and FTI Consulting, Inc.) and other professionals, hired by or on behalf of the DIP Agent, shall be payable by the Debtor Loan Parties under the DIP Facility on a monthly basis, promptly upon submission by such professional of a summary invoice setting forth such fees, costs and expenses subject only to 10 days prior notice of such invoice to the Debtors and counsel to the Creditors Committee. |
| **Section 506(c) Waiver:** | The DIP Agent and the DIP Lenders shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the DIP Collateral under Section 552(b) of the Bankruptcy Code.  The Debtor Loan Parties may not raise or assert an "equities of the case" exception under Section 552(b)(1) of the Bankruptcy Code. |
| **No Marshalling:** | The DIP Lenders shall not be required to marshall assets |
| **Section 552(b):** | The DIP Agent and the DIP Lenders shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or |

2.          01:17

| | |
|---|---|
| | profits from any of the DIP Collateral under Section 552(b) of the Bankruptcy Code.  The Debtor Loan Parties may not raise or assert an "equities of the case" exception under Section 552(b)(1) of the Bankruptcy Code. |
| **Indemnification:** | Debtor Loan Parties shall agree to indemnify and hold harmless the DIP Agent and the DIP Lenders and each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors and representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct.  In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Debtor Loan Parties, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. |
| **Acknowledgements/Stipulations:** | The Debtor Loan Parties shall stipulate to and acknowledge (i) the amount, validity, priority and enforceability of the Obligations under the Pre-Petition Senior Loan Documents and (ii) that the Pre-Petition Agent for the benefit of the Pre-Petition Senior Lenders has a valid, enforceable and fully perfected first priority lien in all of the prepetition Collateral. The Debtor Loan Parties shall provide a full release to the Pre-Petition Agent and the Pre-Petition Senior Lenders, which would not bind the Committee or other party in interest until the expiration of a challenge period. |
| **Conditions Precedent:** | The closing of the DIP Facility will be subject to the satisfaction of all conditions precedent deemed necessary or appropriate by the DIP Agent, including but not limited to:<br>(i)    Satisfactory completion of legal and collateral due diligence and transaction structuring, including due diligence concerning the Cases and the receipt of all required court approvals of the DIP Facility;<br>(ii)  the DIP Agent shall have received sufficient commitments for the DIP Facility from the DIP Lenders;<br>(iii) the DIP Agent shall have received a 13-week rolling cash forecast, setting forth projected cash flows, together with detailed information as to projected disbursements and receipts as well as projected loan outstandings, including all updates and supplements thereto, to be in form and substance acceptable to the DIP Agent and the DIP Lenders (the "Approved Budget");<br>(iv)  an interim debtor-in-possession financing order, in form and substance acceptable to the DIP Agent and the DIP Lenders, incorporating the terms hereof and containing such other provisions as the DIP Agent and DIP Lenders may require, including without limitation (a) a prohibition on the right to use cash collateral, shall have been entered by the Bankruptcy Court and shall not have been stayed, modified or appealed, and (b) DIP Agent with the ability to apply all payments, proceeds of collateral and other amounts received to either the Obligations under the Pre-Petition Credit Agreement or the Obligations under the DIP Credit Agreement, as the DIP Agent may elect in its discretion time from time to time (the "**Interim Order**"). Notwithstanding anything to the contrary contained herein, funding of new money Advances under the DIP Facility shall be subject to entry of the Interim |

| | |
|---|---|
| | Order<br>(v)  approval in advance by the DIP Agent of all "first day" motions and orders, including, without limitation, the cash management orders and entry of first day orders in form and substance acceptable to DIP Agent;<br>(vi) a motion seeking the continued retention of Alvarez & Marsal as financial consultants to Debtor Loan Parties and a motion seeking retention of an investment banker reasonably acceptable to DIP Agent and the DIP Lenders as advisors to the Debtor Loan Parties' for their 363 processes (it being understood that Sagent Advisors is reasonably acceptable to DIP Agent and the DIP Lenders);<br>(vii)  the execution and delivery, in form and substance acceptable to the DIP Agent and the DIP Lenders, of the definitive DIP Credit Agreement, related security agreement(s), guarantees, pledge agreements, mortgages, and other agreements, opinions, instruments and documents required by the DIP Agent and the DIP Lenders (collectively, the "DIP Loan Documents"); and<br>(x)  such other deliverables as the DIP Agent may require. |
| **Releases:** | In consideration of and as a condition to the DIP Agent and the DIP Lenders making Advances and providing other credit and financial accommodations to the Borrowers pursuant to the provisions of this Interim Order and the DIP Financing Documents, each Debtor, on behalf of itself, each estate, and other legal representatives (collectively, the "**Releasors**"), subject to Section 5.1 of the Interim Order with respect to all applicable parties other than the Debtors, hereby absolutely releases, forever discharges and acquits each Pre-Petition Secured Party and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Pre-Petition Agent, each Pre-Petition Lender and all such other parties being hereinafter referred to collectively as "**Releasees**") of and from any and all claims, demands, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all other claims, counterclaims, defenses rights of set-off, demands and liabilities whatsoever (individually, a "**Pre-Petition Released Claim**" and collectively, the "**Pre-Petition Released Claims**") of every kind, name, nature and description, known or unknown, suspected or unsuspected, both at law and in equity, which, including, without limitation, any so-called "lender liability" claims or defenses, that any Releasor may now or hereafter own, hold, have or claim to have against Releasees, or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the date of this Interim Order, in respect to the Debtors, the Pre-Petition Obligations, the Pre-Petition Financing Documents and any Advances, Letters of Credit or other financial accommodations made by the Pre-Petition Secured Parties to the Debtors pursuant to the Pre-Petition Financing Documents; provided that such release shall not be effective with respect to the Debtors until entry of the Final Order, and with respect to the Debtors' Estates, until the expiration of the Challenge Period.  In addition, upon the indefeasible payment in full of all Obligations owed to the DIP Agent and the DIP Lenders by the Debtors and termination of the rights and obligations arising under this Interim Order and the DIP Financing Documents (which payment and termination shall be on terms and conditions acceptable to the DIP Agent), the DIP Agent and the DIP Lenders shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the DIP Financing Documents or this Interim Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, |

| | |
|---|---|
| | due or not due, primary or secondary, liquidated or unliquidated)), on terms and conditions acceptable to the DIP Agent.<br><br>Upon the entry of the Final Order, subject to Section 5.1 of the Interim Order with respect to all applicable parties other than the Debtors, each Releasor hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released and discharged by each Releasor pursuant to Section 5.4.1 of the Interim Order.  If any Releasor violates the forgoing covenant, Debtors agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation. |
| **Final Order:** | No later than 22 days after the Petition Date, Debtors shall obtain entry of the Final Order (together with the Interim Order, the "**Financing Orders**") which shall provide (a) DIP Agent with the ability to repay in cash in whole or part, from time to time in DIP Agent's discretion, any or all Obligations remaining outstanding under the Pre-Petition Credit Agreement, and reimbursement in full in cash of all professional fees, costs and expenses of the Pre-Petition Agent and the Pre-Petition Senior Lenders with the proceed of new money Advances made under the DIP Credit Agreement, and (b) DIP Agent with the ability to apply all payments, proceeds of collateral and other amounts received to either the Obligations under the Pre-Petition Credit Agreement or the Obligations under the DIP Credit Agreement, as the DIP Agent may elect in its discretion time from time to time. |
| **Representations and Warranties:** | The DIP Loan Documents will contain the representations and warranties made by the Debtor Loan Parties under the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents, modified as necessary to reflect the filing of the Cases and the Debtor Loan Parties' financial condition, and such other representations and warranties as the DIP Agent may require. |
| **Reporting and Information:** | The DIP Loan Documents will contain the reporting and information covenants made by the Debtor Loan Parties under the Pre-Petition Credit Agreement and the other Pre-Petition Senior Loan Documents, and such other reporting and information covenants as the DIP Agent may require.  Without limiting the generality of the foregoing, the Debtor Loan Parties shall (i) deliver to the DIP Agent and the DIP Lenders, no later than Wednesday of each week for the previous week, a variance report, in form and detail acceptable to the DIP Agent, showing actual performance against the Approved Budget, (ii) on each fourth week following the closing deliver to DIP Agent an update to the Approved Budget and (iii) provide such other information (including access to the Debtor Loan Parties' books, records, personnel and advisors) as the DIP Agent may reasonably request including updates to the Approved Budget. |

## <u>LOCAL RULE 4001-2(a)(i) DISCLOSURES</u>

19.    Local Rule 4001-2(a)(i) requires the disclosure of certain provisions that are contained in post-petition financing motions and proposed orders or in the loan documents

2.        01:17

underlying those pleadings.  The Debtor Loan Parties hereby disclose the below provisions in accordance with Local Rule 4001-2(a)(i).

a)  **Local Rule 4001-2(a)(i)(A) — *Cross-Collateralization Protection.*** The DIP Order does provide for cross-collateralization protection.  Interim Order at ¶2.1.

b)  **Local Rule 4001-2(a)(i)(B) — *Challenge Period.*** The Challenge Period under the DIP Facility for any party interest is the period that terminates upon the earlier of (i) 75 days from the Petition Date or (ii) 60 days from the date of the formation of the Committee (the "**Initial Challenge Period**") provided that the Challenge Period shall be extended for a chapter 7 trustee for an additional 60 days if the case is converted prior to the expiration of the Initial Challenge Period.  Interim Order at ¶5.1.

c)  **Local Rule 4001-2(a)(i)(C) — *506(c) Waiver.*** Subject to entry of the Final DIP Order that provides such relief, the DIP Collateral shall not be subject to surcharge pursuant to section 506(c) of the Bankruptcy Code. Interim Order at ¶5.3.

d)  **Local Rule 4001-2(a)(i)(D) — *Liens on Avoidance Actions.*** Upon entry of the Final DIP Order that provides such relief, avoidance actions and proceeds of avoidance actions will constitute a portion of the DIP Collateral. Interim Order at ¶2.1.1.

e)  **Local Rule 4001-2(a)(i)(E) — *Repayment Features.*** The DIP Financing Documents provide that the DIP Agent and the DIP Lenders shall apply the proceeds of the DIP Collateral and any other payments received in respect of the Pre-Petition Obligations and the Post-Petition Obligations, in such order and manner determined by the DIP Agent, including applying all payments, proceeds and other amounts to either to the Pre-Petition Obligations or to the Post-Petition Obligations in the DIP Agent's and Pre-Petition Agents sole and absolute discretion. Interim Order at ¶1.5.

f)  **Local Rule 4001-2(a)(i)(F) — *Disparate Carve-Out Treatment.*** Unless and until a Carve Out Trigger Notice is delivered by the DIP Lenders, the DIP Order provides a line item treatment for Debtor Loan Parties' professionals and the professionals of any Committee. Interim Order at ¶2.3.

g)  **Local Rule 4001-2(a)(i)(G) — *Nonconsensual Priming.*** The DIP Financing Documents will provide the DIP Lenders with *consensual* priming liens on the collateral currently secured by the existing liens of the Pre-Petition Agent, on behalf of the Pre-Petition Secured Parties and the Propco Lenders.  Interim Order at ¶2.1.1.(C).

2.      01:17

h)      **Local Rule 4001-2(a)(i)(H) — *Section 552(b)(1)*.**  The proposed waiver of "equities of the case" claims under section 552(b)(1) of the Bankruptcy Code will only be effective after entry of the Final Order providing for such relief.  Interim Order at ¶5.3.

20.      The provisions of the DIP Loan Documents requiring disclosure pursuant to Local Rule 4001-2(a)(i) are justified under the circumstances of these Chapter 11 Cases.  The DIP Lenders have indicated to the Debtor Loan Parties that they would not agree to make the DIP Facility available to the Debtor Loan Parties and would not agree to the Debtor Loan Parties' priming of their prepetition liens without the inclusion of such terms.  Because of the unavailability of financing alternatives and for the reasons set forth more fully below, the Debtor Loan Parties determined, in the exercise of their sound business judgment, that agreeing to the terms of the DIP Facility is appropriate under the circumstances.

## BASIS FOR RELIEF

21.      For the following reasons, the Debtor Loan Parties respectfully submit that they have satisfied the standards applicable for the Court's approval of the DIP Facility and entry of the Interim Order.

**D.      The Debtor Loan Parties Satisfy the Requirements for Entering into the DIP Facility Under Section 364(c) of the Bankruptcy Code**

22.      The Debtor Loan Parties propose to obtain post-petition financing under the terms and conditions of the DIP Facility by providing security interests and other liens, as described herein and provided for in the DIP Loan Documents, pursuant to sections 364(c) and (d) of the Bankruptcy Code.  The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]."  11 U.S.C. § 364(c).

2.        01:17

23.     Furthermore, section 364(c) financing is appropriate when the debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. See In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code); In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing.") (internal citations omitted); In re Ames Dep't Stores Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (holding that debtor must show it made reasonable effort to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).

24.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c).  Under this test, courts look to whether:

a.     the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;

b.     the credit transaction is necessary to preserve the assets of the estate; and

c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

See Crouse Grp., Inc., 71 B.R. at 549; Ames Dep't Stores, 115 B.R. at 37-39.

25.     To fund their operations, the Debtor Loan Parties need both the use of Cash Collateral and the incremental liquidity provided by the DIP Facility.  After assessing their financial condition, their capital structure and the absence of any unencumbered assets, the Debtor Loan Parties determined that adequate financing on an unsecured or junior priority basis to the existing prepetition liens was simply not available.  The Prepetition Secured Parties, in their capacity as the DIP Lenders, are the only parties that offered to provide the Debtor Loan

2.     01:17

Parties with post-petition financing and were only willing to lend to the Debtor Loan Parties on a senior secured basis.

26.    Without adequate post-petition financing and continued access to Cash Collateral, the Debtor Loan Parties will be unable to administer their Chapter 11 Cases, which would significantly impair their ability to preserve the value of their estates.  The DIP Facility ensures that the Debtor Loan Parties have continued access to Cash Collateral and capital to fund these cases.  Additionally, as set forth below, the terms of the DIP Facility are fair, reasonable and adequate given the facts and circumstances.

**E.    The Debtor Loan Parties Satisfy the Requirements for a Priming Lien Under Section 364(d) of the Bankruptcy Code**

27.    If a debtor is unable to obtain credit solely pursuant to section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien (a "**Priming Lien**").  See 11 U.S.C. § 364(d).  Pursuant to section 364(d)(1) of the Bankruptcy Code, a court may, after notice and a hearing, authorize a debtor to incur superpriority senior secured Priming Liens only if: (a) the debtor is unable to obtain credit otherwise; and (b) the interests of the secured creditors whose liens are being primed by the post-petition financing are adequately protected.  See 11 U.S.C. § 364(d); see also In re Levitt & Sons, LLC, 384 B.R. 630, 640-41 (Bankr. S.D. Fla. 2008) ("In the event the debtor is unable to obtain credit under the provisions of §364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly called a 'priming lien.'") (internal citations omitted).

28.    Although the Bankruptcy Code does not explicitly define "adequate protection," section 361 provides three nonexclusive examples of what may constitute "adequate protection" of an interest of an entity in property under sections 362, 363 or 364 of the Bankruptcy Code:

a.      requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the . . . use . . . under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

b.      providing to such entity an additional or replacement lien to the extent that such . . . use . . . or grant results in a decrease in the value of such entity's interest in such property; or

c.      granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

See 11 U.S.C. § 361.  Furthermore, the determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  See In re Stoney Creek Techs., LLC, 364 B.R. 882, 890 (Bankr. E.D. Pa. 2007) (stating that section 364(d)(3) of the Bankruptcy Code serves as a catch-all that "allows the bankruptcy court discretion to fashion adequate protection on a case by case basis[.]"); In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  The "application [of adequate protection] is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." Id. at 289 (citing In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

29.     Similarly, the Bankruptcy Code does not expressly define the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under sections 361, 363 and 364 of the Bankruptcy Code.  However, the Bankruptcy Code contemplates that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property."  See 11 U.S.C. § 361.  As such, courts have repeatedly held that the purpose of adequate protection "is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."  In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (internal citations omitted);  See Mosello, 195 B.R. at 288 (same); Bank of New England v. BWL, Inc., 121 B.R. 413, 418 (D. Me. 1990) (same); Beker Indus.

2.      01:17

Corp., 58 B.R. at 736 (stating that the focus of adequate protection "is protection of the secured

creditor from diminution in the value of its collateral during the reorganization process.").

30.     Here, the Debtor Loan Parties do not need to establish adequate protection of the

interests of the Prepetition Secured Parties because such parties have consented to the priming of

the PNC Prepetition Liens in favor of the DIP Facility.   See Anchor Sav. Bank FSB v. Sky

Valley, Inc., 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien,

those [undersecured] creditors relieved the debtor of having to demonstrate that they were

adequately protected."); see also In re Sun Healthcare Grp., Inc., 245 B.R. 779, 781 n.5 (Bankr.

D. Del. 2000) ("Their consent (to the use of their cash collateral and priming of their liens) was

given in exchange for certain payments . . . as adequate protection[.]"); In re El Paso Refinery, L

P, 171 F.3d 249, 252 (5th Cir. 1999) (stating that priming lien given to a post-petition lender by

"agreement was given a priority over the preexisting first lien of a group of Term Lenders"); In

re Outboard Marine Corp., 2002 WL 571661, at *1 (Bankr. N.D. Ill. 2002) ("[T]he DIP Lenders

committed to provide certain financing to the Debtor Loan Parties . . . pursuant to which the

Prepetition Lenders consented to the imposition of priming liens upon the Prepetition Collateral

and in favor of the DIP Lenders[.]"), aff'd, Bank of Am., N.A. v. Moglia, 330 F.3d 942 (7th Cir.

2003).  With respect to other liens on the Debtor Loan Parties' assets, the , the DIP Liens will be

junior to, and therefore will not prime such liens.  Accordingly, pursuant to section 364(d) of the

Bankruptcy Code and consistent with the purposes underlying the provision of adequate

protection, the Court should authorize the Debtor Loan Parties to grant Priming Liens to the DIP

Lenders to secure the Debtor Loan Parties' obligations under the DIP Facility.

**F.     No Adequate Alternative to the DIP Facility is Currently Available**

31.     To obtain a post-petition financing facility, a debtor need only demonstrate "by a

good faith effort that credit was not available without" the protections afforded to potential

2.   01:17

lenders by sections 364(c) and (d) of the Bankruptcy Code.  See YL West 87th Holdings I LLC,

423 B.R. at 441 ("Courts have generally deferred to a debtor's business judgment in granting

section 364 financing."); In re Gen. Growth Props., Inc., 412 B.R. 122, 125 (Bankr. S.D.N.Y.

2009) (stating that debtor has an obligation only to make "reasonable efforts, under the

circumstances . . . to obtain [unsecured financing], in the ordinary course of business or

otherwise" ); In re Harborwalk, LP, No. 10-80043-G3-11 (LZP) (Bankr. S.D. Tex. Jan. 29, 2010)

[Docket No. 28] ("Section 364(d)(1) does not require that a debtor seek credit from every

possible source, but a debtor must show that it made a reasonable effort to obtain post-petition

financing from other potential lenders on less onerous terms and that such financing was

unavailable.") (internal citations omitted).

  32. As described above, all of the Debtor Loan Parties' assets are subject to the PNC

Prepetition Liens held by the DIP Lenders in their capacity as the Prepetition Secured Parties.

Given the substantial amount of the PNC Obligations, procuring the necessary post-petition

financing as unsecured debt or as debt secured by liens junior to the liens of the Prepetition

Secured Parties was not a viable alternative.  Accordingly, the Debtor Loan Parties have

determined that, under the circumstances, the DIP Facility is the best post-petition financing

option available to them and their estates.

  33. As a result, the Debtor Loan Parties have shown, in satisfaction of the

requirements of sections 364(c) and (d) of the Bankruptcy Code, that alternative credit on more

favorable terms was unavailable to them.

## G. The Repayment Features of the DIP Facility Are Appropriate

  34. Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease

property, other than in the ordinary course of business, with court approval.  Such transactions

should be approved when they are supported by a sound business purpose.  See In re Abbots

2. 01:17

*Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) should be approved if the debtor can demonstrate a sound business justification for the proposed transaction). The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

35.     The repayment function of the Credit Facility is a sound exercise of the Debtor Loan Parties' business judgment. The Credit Facility is structured as an asset-based revolving credit facility, such that the Debtor Loan Parties' cash receipts are swept on a daily basis to pay down outstanding loans under Credit Facility or the DIP Facility (as elected by DIP Agent in its discretion from time to time), and the Debtor Loan Parties are able to re-borrow loans, subject to (x) the lesser of the maximum amount of the line of credit under the DIP Facility minus remaining outstandings under the Credit Facility or (y) an amount determined by borrowing base limitations under the DIP Facility. Continuing this prepetition practice, the DIP Facility contemplates applying proceeds from cash collected by the Debtor Loan Parties in the ordinary course of their operations, or cash generated from the Postpetition Revolving Loan Collateral (as defined in the Interim Order for the DIP Facility), to pay down outstanding loans under Credit Facility or the DIP Facility (as elected by DIP Agent in its discretion from time to time), and then issuing new borrowings under the DIP Facility. Upon entry of a Final Order, DIP Agent will be granted ability to repay in cash in whole or part, from time to time in DIP Agent's discretion, any or all loans and other obligations remaining outstanding under the Credit Facility, and reimbursement in full in cash of all professional fees, costs and expenses of the Pre-Petition

2.      01:17

Agent and the Pre-Petition Senior Lenders, with the proceed of new money advances made under the DIP Facility. This structure allows the Credit Facility to be gradually "rolled-up" into the DIP Facility over time both prior to and following the entry of a Final Order.

36.     The Pre-Petition Lenders, in their capacity as the Pre-Petition DIP Lenders, have agreed to continue extending credit under the DIP Facility, even though they could not be compelled to do so on a postpetition basis, and, therefore, it is reasonable to allow the DIP Facility to continue to function in the same manner as the Credit Facility—paying down past loans with cash proceeds, and issuing new loans. Additionally, courts in this jurisdiction have approved similar DIP features on the first day of the case. *See, e.g.*, *EveryWare Global, Inc.*, No. 15-10743 (LSS) (Bankr. D. Del. April 10, 2015) (authorizing ABL DIP Facility providing for collection and payment related to ABL Collateral be first applied to pay down prepetition ABL Facility); *In re Tactical Intermediate Holdings, Inc.*, No. 14-11659 (KG) (authorizing $2.8 million DIP that included full roll-up of bridge loan in the approximate amount of $1 million pursuant to interim order); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included roll-up of approximately $144 million prepetition debt pursuant to interim order); *In re Furniture Brands Int'l, Inc.*, No. 13-12329 (CSS) (Bankr. D. Del. Sept. 11, 2013) (authorizing approximately $140 million DIP that included roll-up of approximately $91 million prepetition debt pursuant to interim order). Accordingly, the Debtor Loan Parties' submit that the gradual roll-up of the Credit Facility is justified under the circumstances.

**H.     The DIP Facility Terms are Fair, Reasonable and Appropriate
Under the Circumstances of the Cases**

37.     Whether the terms of a debtor's proposed post-petition financing arrangement are fair and reasonable is determined by the relative circumstances of the debtor and the potential

lender.  See In re Farmland Indus., Inc., 294 B.R. 855, 885-89 (Bankr. W.D. Mo. 2003) (holding that terms of proposed post-petition financing were fair and reasonable when viewed in the context of the relative circumstances of the parties).

38.    The proposed terms of the DIP Loan Documents are fair, reasonable, and appropriate under the circumstances of these Chapter 11 Cases.  As described above, the DIP Facility is an essential component of the Debtor Loan Parties' strategy and provides the Debtor Loan Parties with the liquidity they need to operate in chapter 11.  The Debtor Loan Parties and their professionals thoroughly evaluated the proposed financing offered by the DIP Lenders, and the Debtor Loan Parties believe that the DIP Loan Documents are the product of extensive, arms' length negotiations with the DIP Lenders and their professionals.  Accordingly, the Debtor Loan Parties, in the exercise of their sound business judgment consistent with their fiduciary duties, determined that entering into the DIP Facility would be in the best interests of the Debtor Loan Parties, their estates and their various stakeholders.

39.    Furthermore, the DIP Lenders would not have agreed to provide the DIP Facility without the inclusion of all terms set forth in the DIP Loan Documents.  Further, the Debtor Loan Parties believe that the terms of the DIP Facility are supported by reasonably equivalent value and fair consideration.  In addition, the DIP Loan Documents and the Final Order provide that the security interests and administrative expense claims granted to the DIP Lenders are subject to the Carve-Out.  See Ames Dep't Stores, 115 B.R. at 38-40 (finding that such "carve-outs" are not only reasonable, but are necessary to ensure that official creditors' committees and the debtor's estate will be assured of the assistance of counsel); Gen. Growth Props., Inc., 412 B.R. at 125-26.

2.        01:17

40.    For all the foregoing reasons, the terms of the DIP Facility are fair, reasonable and appropriate, and the DIP Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of the DIP Facility.

## I.    The Debtor Loan Parties' Use of Cash Collateral Is Appropriate

41.    The Debtor Loan Parties' use of property of their estates, including Cash Collateral, is governed by section 363 of the Bankruptcy Code.[5]  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

42.    The Debtor Loan Parties' cash is encumbered by the liens of the Prepetition Secured Parties.  In connection with entry into the DIP Facility, the Prepetition Secured Parties have agreed to permit the Debtor Loan Parties to use Cash Collateral until the maturity of the DIP Facility, on the terms and conditions set forth in the Interim  Order.  The Debtor Loan Parties' use of Cash Collateral is critical to the Debtor Loan Parties' ability to finance the on-going working capital and other general corporate purposes of the Debtor Loan Parties and finance the costs of administration of these Chapter 11 Cases.  As set forth herein, the Interim Order is the product of arms' length negotiations with the Prepetition Secured Parties.  Based

---

[5]    The Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

2.        01:17

upon the foregoing, the Debtor Loan Parties request that the Court authorize the Debtor Loan Parties' continued use of Cash Collateral in accordance with the terms of the Interim Order.

## MODIFICATION OF AUTOMATIC STAY

43.      The DIP Facility contemplates a modification of the automatic stay to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Final Order.  Specifically, the Debtor Loan Parties propose that any automatic stay otherwise applicable to the DIP Secured Parties will be modified to the extent set forth in the Interim Order and the Final Order, without requiring prior notice to or authorization of this Court, among other things to the extent necessary to permit the DIP Agent, to exercise certain rights and remedies upon the occurrence and during the continuance of any Event of Default and following a 5 day period after the delivery of written notice (the "**Remedies Notice Period**") by the DIP Agent to the Debtor Loan Parties, Debtor Loan Parties' counsel, counsel to any Committee and the United States Trustee for the District of Delaware (the "**U.S. Trustee**") of the occurrence of an Event of Default. The Debtor Loan Parties and/or the Committee will be allowed to seek an emergency hearing with the Court for the sole purpose of determining whether an Event of Default actually occurred.

44.      Because the Debtor Loan Parties have consented to these stay modifications in an exercise of their business judgment, and such consent is necessary to obtain access to the Cash Collateral and the DIP Facility, the Debtor Loan Parties submit that cause exists to modify the automatic stay to the extent contemplated by the DIP Loan Documents, including the Final Order.

## IMMEDIATE AND IRREPARABLE HARM

45.      Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to

2.      01:17

section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

46.     The Debtor Loan Parties request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtor Loan Parties from and after entry of the Interim Order until the Final Hearing to use the Cash Collateral and to withdraw and borrow funds under the DIP Facility.  The Debtor Loan Parties require access to these funds prior to the Final Hearing and entry of the Final Order to be able to continue to operate and pay their administrative expenses.  This relief will enable the Debtor Loan Parties to operate their business in a manner that will permit them to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### REQUEST FOR A FINAL HEARING

47.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor Loan Parties request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### WAIVER OF BANKRUPTCY RULE 4001 (A)(3),6003 (B), 6004(A) AND 6004(H)

48.     To implement the foregoing successfully, the Debtor Loan Parties seek a waiver of the 21 day provision of Bankruptcy Rule 6003 (b), notice requirements under Bankruptcy Rule 6004(a) and the 14-day stays under Bankruptcy Rule Bankruptcy Rules 4001 (a) (3) and 6004(h).

2.      01:17

## NOTICE

49.    Notice of this Motion has been provided to:  (i) the U.S. Trustee; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Debtors' thirty (30) largest unsecured creditors; (v) counsel to the DIP Agent and the DIP Lenders and the Pre-Petition Secured Parties; (vi) the Propco; (vii) all parties known to the Debtors who hold any liens or security interest in the Debtors' assets who have filed UCC-1 financing statements against the Debtors, or who, to the Debtors' knowledge, have asserted any liens on any of the Debtors' assets; (viii) all landlords and warehouseman of the Debtors; and (x) all creditors known to the Debtors to be holding a judgment against the Debtors.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

50.    The Debtor Loan Parties have not previously sought the relief requested herein from this or any other Court.

### *Remainder of Page Intentionally Left Blank*

## CONCLUSION

WHEREFORE, the Debtors request entry of the Interim Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated: September 9, 2015               Respectfully submitted,
       Wilmington, Delaware

                              YOUNG CONAWAY STARGATT & TAYLOR, LLP

                              */s/ Robert F. Poppiti, Jr.*
                              Matthew B. Lunn (No. 4119)
                              Robert F. Poppiti, Jr. (No. 5052)
                              Rodney Square
                              1000 North King Street
                              Wilmington, DE 19801
                              Telephone: (302) 571-6600
                              Facsimile: (302) 571-1256

                              -and-

                              STROOCK & STROOCK & LAVAN LLP
                              Frank A. Merola (*pro hac vice* pending)
                              Sayan Bhattacharyya (*pro hac vice* pending)
                              Matthew G. Garofalo (*pro hac vice* pending)
                              180 Maiden Lane
                              New York, New York 10038
                              Telephone: (212) 806-5400
                              Facsimile: (212) 806-6006

                              *PROPOSED COUNSEL TO THE DEBTOR LOAN PARTIES AND DEBTOR LOAN PARTIES-IN-POSSESSION*

# **EXHIBIT A**

Proposed Interim Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HAGGEN HOLDINGS, LLC, *et al.*,[1] | ) Case No. 15-11874 (KG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Ref. Docket No. _____** |

**ORDER (I) AUTHORIZING THE DEBTOR LOAN PARTIES TO (A) OBTAIN
POSTPETITION FINANCING ON AN INTERIM BASIS AND (B) UTILIZE CASH
COLLATERAL OF PRE-PETITION SECURED PARTIES ON AN INTERIM BASIS,
(II) AUTHORIZING DEBTOR HAGGEN HOLDINGS, LLC TO ENTER INTO
CERTAIN RELATED  TRANSACTIONS, (III) GRANTING ADEQUATE
PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, (V) GRANTING
RELATED RELIEF, PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363(C), (D) &
(E), 364(C), 364(D)(1), 364(E) AND 507(B), AND (VI) SCHEDULING A FINAL
HEARING AUTHORIZING FINANCING ON A FINAL BASIS PURSUANT TO
BANKRUPTCY RULE 4001**

Upon the motion (the "**Motion**"), dated September 9, 2015, of Haggen, Inc. ("**Haggen**"),

Haggen Opco South, LLC ("**OPCO South**"), Haggen Opco North, LLC ("**OPCO North**",

together with OPCO South and Haggen, collectively the "**Borrowers**" and each individually a

"**Borrower**"), Haggen Acquisition, LLC ("**Acquisition Holdings**"), and Haggen Operations

Holdings, LLC ("**Operations Holdings**", together with Acquisition Holdings, collectively the

"**Guarantors**" and each individually a "**Guarantor**"; the Guarantors, together with the

Borrowers, are referred to collectively as the "**Debtor Loan Parties**" and each individually as a

"**Debtor Loan Party**"; and with Haggen Holdings, LLC, the "**Debtors**"), on behalf of the debtor

parties to the DIP Financing Documents (as defined below), each as a Debtor and Debtor-in-

Possession in the above-captioned Chapter 11 cases (collectively, the "**Cases**"), pursuant to

Sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 507(b) of Title 11 of the

United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") and Rules 2002, 4001,

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Haggen Holdings, LLC (7558), Haggen Operations Holdings, LLC (6341), Haggen Opco South, LLC (7257), Haggen Opco North, LLC (5028), Haggen Acquisition, LLC (7687), and Haggen, Inc. (4583).  The mailing address for each of the Debtors is 2211 Rimland Drive, Bellingham, WA 98226.

6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"),

seeking, among other things:

(1)     authorization and approval for the Borrowers to obtain post-petition loans, advances and other financial accommodations (the "**Post-Petition Financing**") on an interim basis for a period through and including the date of the Final Hearing (as defined below) from PNC Bank, National Association, in its capacity as agent (in such capacity, the "**DIP Agent**") for itself and the other financial institutions from time to time party to the DIP Credit Agreement (as defined below) as lenders (collectively, the "**DIP Lenders**"), under or in connection with the debtor-in-possession revolving credit facility (the "**DIP Facility**") in an interim aggregate amount up to $[_____] and on a final basis in an aggregate amount up to $[_____] and otherwise in accordance with this Interim Order and the Final Order (defined below), and to enter into that certain the Debtor-In-Possession Revolving Credit and Security Agreement with the DIP Agent and the DIP Lenders, substantially in the form attached hereto as **Exhibit 2** (the "**DIP Credit Agreement**"), which shall reflect in all material respects the terms and conditions set forth in this Order (the DIP Credit Agreement, this Interim Order and the Final Order (as defined below) together with all other agreements, documents and instruments to be executed or delivered in connection therewith, collectively, the "**DIP Financing Documents**").  The DIP Facility shall be used in part for working capital and upon entry of the Final Order to refinance, in whole or in part at the DIP Agent's option, the outstanding principal balance of the revolving loans and obligations under the Revolving Credit and Security Agreement dated as of February 12, 2015 (as amended, supplemented, extended or otherwise modified from time to time, the "**Pre-Petition Revolving Credit Agreement**"), by and among Haggen, OPCO South, and OPCO North, (collectively, the "**Pre-Petition Borrowers**") and PNC Bank, National Association as Agent (the "**Pre-Petition Agent**") and the financial institutions party thereto from time to time (collectively, the "**Pre-Petition Lenders**"), and which shall indefeasibly satisfy in full the outstanding obligations under the Pre-Petition Financing Documents (as defined below).  The Pre-Petition Credit Agreement and all other agreements, documents and instruments executed or delivered with, to, or in favor of the Pre-Petition Agent and the Pre-Petition Lenders, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection with the Pre-Petition Credit Agreement or related thereto, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated or replaced at any time prior to the Petition Date, are collectively referred to herein as   the "**Pre-Petition Financing Documents**";

(2)     authorization for the Guarantors to enter into the DIP Credit Agreement pursuant to which each Guarantor (i) guarantees all Obligations[2] arising under the DIP Credit Agreement, and (ii) pledges and grants a Lien on all of its assets;

(3)     the grant to the DIP Agent, for the benefit of itself and the other DIP Lenders, of superpriority administrative claim status pursuant to Sections 364(c)(1) and 507(b) of the Bankruptcy Code in accordance with the terms of this Order;

---

[2]  Capitalized terms used but not otherwise defined in this Order shall have the respective meanings ascribed thereto in the DIP Credit Agreement.

(4)    to grant to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, priming liens, security interest and pledges on all of the DIP Collateral (defined below) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, which liens shall be senior to all liens, except that such liens shall be junior solely to (i) the Carve-Out (as defined below) and (ii) Permitted Liens (as defined below);

(5)    authorizing the Debtor Loan Parties' use of "cash collateral" (the "**Cash Collateral**") which term shall include, without limitation, all cash and cash equivalents of the Debtor Loan Parties, whenever or wherever acquired, and the proceeds of all DIP Collateral (defined below) pledged to the Secured Parties (defined below), Haggen Property North (defined below), and Haggen Property South, LLC (defined below), as contemplated by section 363 of the Bankruptcy Code in accordance with the terms set forth herein;

(6)    granting adequate protection to each Pre-Petition Lender and Issuer (as defined in the Pre-Petition Credit Agreement) (the "**Pre-Petition Issuer**," together with the Pre-Petition Agent and Pre-Petition Lenders, the "**Pre-Petition Secured Parties**," together with the DIP Agent and DIP Lenders, the "**Secured Parties**") under and in connection with the Pre-Petition Financing Documents in accordance with the terms set forth herein;

(7)    granting adequate protection to Haggen Property North, LLC ("**Haggen Property North**") and Haggen Property South, LLC ("**Haggen Property South**," together with Haggen Property North, the "**Propco Lenders**") in connection with that those certain subordinated promissory notes dated August 21, 2015 and that certain Subordinated Loan Agreement dated August 21, 2015 (collectively, the "**Subordinated Loan Agreement**"), pursuant to which Borrowers obtained a subordinated loan in the original principal amount of $25,000,000 (the "**Subordinated Loan**") to the extent that Propco Lenders hold valid, perfected, enforceable and unavoidable liens as of the Petition Date solely to the extent that Propco Lenders are entitled to same pursuant to and in accordance with the Intercreditor Agreement (defined below).

(8)    authorizing Haggen Holdings, LLC to grant releases, covenants not to sue, and other accommodations as provided in this Interim Order and the Final Order and reaffirm certain prepetition guaranties;

(9)    modification of the automatic stay to the extent hereinafter set forth and waiving the fourteen (14) day stay provisions of Federal Rule of Bankruptcy Procedure 4001(a)(3) and 6004(h); and

(10)    the setting of a final hearing on the Motion (the "**Final Hearing**") for entry of an order authorizing the financing and use of cash collateral on a final basis (the "**Final Order**").

Notice of the Motion, the relief requested therein, and the Interim Hearing (as defined below) (the "**Notice**") having been served by the Debtor Loan Parties in accordance with Rule 4001(c) on: (i) the United States Trustee for the District of Delaware (the "**U.S. Trustee**"); (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue

Service; (iv) the Debtor Loan Parties' thirty (30) largest unsecured creditors; (v) counsel to the DIP Agent and the DIP Lenders and the Pre-Petition Secured Parties; (vi) the Propco Lenders; (vii) all parties known to the Debtor Loan Parties who hold any liens or security interest in the Debtor Loan Parties' assets who have filed UCC-1 financing statements against the Debtor Loan Parties, or who, to the Debtor Loan Parties' knowledge, have asserted any liens on any of the Debtor Loan Parties' assets; (viii) all landlords and warehouseman of the Debtor Loan Parties; and (ix) all creditors known to the Debtor Loan Parties to be holding a judgment against the Debtor Loan Parties.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  (collectively, the "**Noticed Parties**").

The initial hearing on the Motion having been held by this Court on September 10, 2015 (the "**Interim Hearing**").

Upon the record made by the Debtor Loan Parties at the Interim Hearing, including the Motion, and the filings and pleadings in the Cases, and good and sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW[3]:

    A.    Petition.  On September 8, 2015 (the "**Petition Date**"), each Debtor filed a voluntary petition (the "**Petition**") under Chapter 11 of the Bankruptcy Code.  The Debtor Loan Parties continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

    B.    Jurisdiction and Venue.  The Court has jurisdiction of this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  The Motion

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact pursuant to Fed. R. Bankr. P. 7052.  Any statements of the Court from the bench at the Emergency Interim Hearing shall constitute additional findings of fact and conclusions of law as appropriate and are expressly incorporated by reference into this Interim order to the extent non inconsistent herewith.

is a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M).  Venue of the

Cases and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

        C.    <u>Notice</u>.  Under the circumstances, the Notice given by the Debtor Loan

Parties of the Motion, the Interim Hearing and the relief sought herein has been given to Noticed

Parties pursuant to Fed. R. Bankr. P. 4001(c)(2).

        D.    <u>Debtor Loan Parties' Acknowledgments and Agreements</u>.  Without

prejudice to the rights of any other party (but subject to the limitations contained in paragraph

5.1 below), the Debtor Loan Parties admit, stipulate, acknowledge and agree that:

        (i)    <u>Pre-Petition Financing Documents</u>.  Prior to the commencement

of the Cases, the Pre-Petition Secured Parties made loans, advances and provided other financial

accommodations pursuant to the Pre-Petition Financing Documents to the Pre-Petition

Borrowers.  Haggen Acquisition and Operations Holdings (collectively, the "**<u>Pre-Petition</u>**

**<u>Guarantors</u>**") guaranteed the obligations of the Pre-Petition Borrowers under the Pre-Petition

Revolving Credit Agreement pursuant to those certain Guaranty Agreements executed by each

of the Pre-Petition Guarantors.

        (ii)    <u>Pre-Petition Obligations Amount</u>.  As of September

__, the aggregate amount of all Obligations (as defined in the Pre-Petition Revolving Credit

Agreement) owing by the Pre-Petition Borrowers to the Pre-Petition Secured Parties under and

in connection with the Pre-Petition Financing Documents was not less than

$_____, consisting of Revolving Advances outstanding under (and as defined in)

the Pre-Petition Revolving Credit Agreement, plus interest accrued and accruing thereon,

together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other

charges accrued, accruing or chargeable with respect thereto under the Pre-Petition Credit

Agreement, (collectively, the "**<u>Pre-Petition Obligations</u>**").  The Pre-Petition Obligations

constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the Pre-

Petition Borrowers and Pre-Petition Guarantors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors do not possess and shall not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, priority, enforceability and nonavoidability of any of the Pre-Petition Obligations.

(iii)    <u>Pre-Petition Collateral</u>.  As of the Petition Date, the Pre-Petition Obligations were secured pursuant to the Pre-Petition Financing Documents by valid, perfected, enforceable and non-avoidable first priority security interests and liens granted by Debtor Loan Parties to the Pre-Petition Agent, for the benefit of itself and the other Pre-Petition Secured Parties, upon the Collateral (as defined in the Pre-Petition Credit Agreement, hereafter the "**<u>Pre-Petition Collateral</u>**"), subject to other valid, perfected and unavoidable lien or security interest otherwise existing as of the Petition Date that is senior to the security interest of the Pre-Petition Secured Parties, but only to the extent valid, perfected and unavoidable liens or security interests existing as of the Petition Date and otherwise senior to the lien of Pre-Petition Lenders as of the Petition Date (collectively, the "**<u>Permitted Liens</u>**" and each a "**<u>Permitted Lien</u>**").  The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, priority, enforceability and non-avoidability of any of the Pre-Petition Secured Parties' liens, claims or security interests in the Pre-Petition Collateral.

(iv)    <u>Propco Lenders Obligations</u>.  Prior to the commencement of the Cases, Borrowers obtained the Subordinated Loan from Propco Lenders pursuant to the Subordinated Loan Agreement.  Propco Lenders assert that the obligations owing by Borrowers to Propco Lenders under the Subordinated Loan Agreement are secured by a second subordinated lien on the Pre-Petition Collateral (the "**<u>Pre-Petition Propco Lenders Collateral</u>**"), subject to the Intercreditor Agreement (defined below).  As of the Petition Date,

the obligations owing by Debtor Loan Parties under the Subordinated Loan Agreement is $25,000,000 ("**Propco Lenders Subordinated Indebtedness**").

      (v)    Intercreditor Agreement.  Borrowers, the Pre-Petition Agent and the Propco Lenders are parties to that certain Intercreditor Agreement dated as of August 21, 2015 (as amended, restated, supplemented, reaffirmed or otherwise modified from time to time, the "**Intercreditor Agreement**"), which governs the respective rights, obligations and priorities of the Secured Parties and Propco Lenders with respect to the matters referred to therein, including, without limitation, the use of Cash Collateral and the DIP Facility.  The liens and security interests granted to Propco Lenders in the Pre-Petition Propco Lenders Collateral are governed by and subject to the Intercreditor Agreement and are junior in all respects to the liens and security interests granted to the Pre-Petition Secured Parties, in the Pre-Petition Collateral and Secured Parties in the DIP Collateral.  See Paragraphs 2, 3, 4 and 6 of the Intercreditor Agreement.

      E.    Adequate Protection.

      (i)    Adequate Protection Obligations.  The Debtor Loan Parties acknowledge and agree that:

      a.    the Pre-Petition Secured Parties are entitled to adequate protection resulting from the (1) provisions of this Interim Order granting first priority and/or priming liens on the Pre-Petition Collateral to the DIP Agent, for the benefit of the DIP Lenders, with respect to the DIP Facility, (2) use of the Cash Collateral, (3) use, sale, lease, or depreciation or other diminution in value of the Pre-Petition Collateral, and/or (4) the imposition of the automatic stay under section 362(a) of the Bankruptcy Code or otherwise pursuant to sections 361(a), 363(c), 364(c) and 364(d)(1) of the Bankruptcy Code; and

      b.    for the Pre-Petition Propco Lenders Collateral in which Propco Lenders held valid, perfected, enforceable and unavoidable liens on the Petition Date,

Propco Lenders are being provided with adequate protection to the extent it is otherwise entitled, resulting from the (1) provisions of this Interim Order granting first priority and/or priming liens on the Pre-Petition Propco Lenders Collateral to the DIP Agent, for the benefit of the DIP Lenders, with respect to the DIP Facility, (2) use of the Cash Collateral, (3) use, sale, lease, or depreciation or other diminution in value of the Pre-Petition Propco Lenders Collateral, and/or (4) the imposition of the automatic stay under Bankruptcy Code section 362(a) or otherwise pursuant to Bankruptcy Code sections 362(a), 363(c), 364(c) and 364(d)(1).

Which as to (i) a. and b. the amount by which any such stay, use, sale, lease or grant results in any decrease in value of (x) the Pre-Petition Secured Parties interests in the Pre-Petition Collateral and (y) the Propco Lenders' interest in the Pre-Petition Propco Lenders Collateral collectively shall be referred to hereafter as the "**Adequate Protection Obligations**".

(ii)    First Lien/Second Lien Adequate Protection. Pursuant to sections 361, 363 and 507(b) of the Bankruptcy Code, as adequate protection for the Adequate Protection Obligations, the Debtor Loan Parties have agreed to provide the Pre-Petition Secured Parties with First Lien Adequate Protection, and Propco Lenders with the Second Lien Adequate Protection (each as defined below), it being understood that the Second Lien Adequate Protection is being provided solely to the extent it is determined that Propco Lenders are entitled thereto.

(iii)    Necessity for Adequate Protection. The adequate protection and other treatment proposed to be provided by the Debtor Loan Parties pursuant to this Interim Order are consistent with, *inter alia*, the Intercreditor Agreement, and authorized by the Bankruptcy Code, will minimize disputes and litigation over use of the Cash Collateral, and facilitate the Debtor Loan Parties' ability to continue their business operations because of the need for a DIP Facility.

F.    <u>Adequate Protection for Financing/Cash Collateral/Non-Impairment</u>.  The security interests and liens granted hereunder to (a) the DIP Agent, for the benefit of the DIP Lenders, under section 364(c) and (d) of the Bankruptcy Code, and (b) to the Pre-Petition Agent, for the benefit of the Pre-Petition Secured Parties, under sections 105, 361 and 363 of the Bankruptcy Code, are appropriate because, among other things: (a) the Pre-Petition Secured Parties do not object to the entry of this Interim Order; (b) by virtue of paragraphs 2, 3, 4 and 6 and the other provisions of the Intercreditor Agreement, Propco Lenders have consented to the security interests and priming liens granted to the DIP Agent for the use of Cash Collateral for the benefit of the DIP Lenders and the First Lien Adequate Protection pursuant to this Interim Order and the Use of Cash Collateral, and (c) the holders of Permitted Liens, to the extent they are legal, valid, binding, continuing, enforceable and fully perfected, are not being impaired by this Interim Order.

G.    <u>Preliminary Findings Regarding the Postpetition Financing</u>.

(i)    <u>Postpetition Financing</u>.    Borrowers and the Guarantors have requested from the DIP Agent and the DIP Lenders, and the DIP Agent and the DIP Lenders are willing to extend, certain loans, advances and other financial accommodations, as more particularly described, and on the terms and conditions set forth, in this Interim Order and the DIP Financing Documents.  Notwithstanding the Secured Parties' willingness to extend such financial accommodations, the Pre-Petition Obligations shall be deemed to have been automatically accelerated on the Petition Date as a result of the commencement of the Cases in accordance with the terms of the Pre-Petition Financing Documents.

(ii)    <u>Reserved.</u>

(iii)    <u>Fair and Reasonable</u>. Based on the record presented to the Court by the Debtor Loan Parties, it appears that the terms of the DIP Credit Agreement, the DIP Financing Documents and the DIP Facility are fair and reasonable and reflect Borrowers' and

Guarantors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(iv)     Need for Post-Petition Financing.  The Debtor Loan Parties do not have sufficient available sources of working capital to operate their businesses in the ordinary course without the Post-Petition Financing and the ability to use Cash Collateral as described in this Interim Order.   The Debtor Loan Parties' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations is essential to the Debtor Loan Parties' continued viability.  The ability of the Debtor Loan Parties to obtain sufficient working capital and liquidity through the proposed Post-Petition Financing and the use of Cash Collateral on the terms set forth in the DIP Financing Documents and this Interim Order is vital to the preservation and maximization of the value of the Debtor Loan Parties' currently operating businesses pending a sale of the assets of the Debtor Loan Parties.   Accordingly, the Debtor Loan Parties have an immediate need to obtain authorization to use Cash Collateral for the limited purpose set forth herein and obtain the Post-Petition Financing in order to, among other things, permit the orderly continuation of the operation of their operating businesses, preserve jobs for employees, maintain vendor support and minimize the disruption of their business operations, manage and preserve the assets of the Debtor Loan Parties' bankruptcy estates (as defined under Section 541 of the Bankruptcy Code, the "**Estates**") in order to maximize the recoveries to creditors of the Estates.

(v)     No Credit Available on More Favorable Terms.  The Debtor Loan Parties are unable to procure financing, under existing circumstances, on more favorable terms and conditions than from the DIP Agent and the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Financing Documents, including, without limitation, that they are unable to obtain credit in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code, as an administrative expense, and they are also unable to obtain credit

allowable under Sections 364(c)(1) or (c)(2) of the Bankruptcy Code, without the grant to the

DIP Agent and the DIP Lenders, subject to the Carve-Out, of the DIP Liens and the DIP

Superpriority Claim (each as defined herein) pursuant to Sections 346(c) and (d) of the

Bankruptcy Code, in each case on the terms and conditions set forth in the DIP Financing

Documents and this Interim Order.

(vi)    Budget. Based on the record presented to the Court by the Debtor

Loan Parties, it appears that the Debtor Loan Parties have prepared and delivered to the DIP

Agent and the DIP Lenders the Initial Budget (as defined in the DIP Credit Agreement and as

updated with the written consent of the DIP Agent and Required Lenders in accordance with the

DIP Credit Agreement).   A copy of the Initial Budget is annexed hereto as **Exhibit 1**.   The

Initial Budget has been thoroughly reviewed by the Debtor Loan Parties and their management

and sets forth, among other things, the projected cash receipts and disbursements for the periods

covered thereby.   The Debtor Loan Parties believe in good faith that the Initial Budget, subject

to Permitted Variances (as defined in the DIP Credit Agreement) is achievable and will allow

the Debtor Loan Parties to operate in Chapter 11 without the accrual of unpaid post-petition

administrative expenses during the term of the Budget (as defined in the DIP Credit

Agreement).   The DIP Agent and the DIP Lenders are relying upon the Debtor Loan Parties'

compliance with the Budget, subject to Permitted Variances, in determining to consent to the

use of Cash Collateral for the limited purposes expressly set forth herein and to enter into the

Post-Petition Financing provided for herein.

(vii)    Business Judgment and Good Faith Pursuant to Section 364(e)

and Section 363 (m).   Based on the record presented to the Court by the Debtor Loan Parties, it

appears that the terms of the DIP Financing Documents and this Interim Order are fair, just,

reasonable and appropriate under the circumstances, reflect the Debtor Loan Parties' exercise of

their prudent business judgment consistent with their fiduciary duties, and are supported by

reasonably equivalent value and fair consideration.  Based on the record before this Court, it appears (and the Debtor Loan Parties have stipulated) that the Debtor Loan Parties and each of the Secured Parties have negotiated at arms' length and in good faith regarding the terms of the DIP Financing Documents, the DIP Facility and the Debtor Loan Parties' use of Cash Collateral, respectively, all subject to the terms of this Interim Order.  Any credit extended under the terms of this Interim Order shall be deemed to have been extended in "good faith" by the Secured Parties as that term is used in Section 364(e) and 363(m) of the Bankruptcy Code.

    (viii) <u>No Objection/Propco Lenders Consent</u>.   Pre-Petition Secured Parties' have no objection to the DIP Facility and the use of Cash Collateral solely on the terms and conditions set forth in this Interim Order, Propco Lenders consented to the terms of financing and use of cash collateral by virtue of the Intercreditor Agreement, *inter alia*, paragraphs 2, 3, 4 and 6.   Nothing in this Interim Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the Pre-Petition Secured Parties are or will be adequately protected with respect to any additional financing, or any non-consensual use of Cash Collateral. The DIP Agent and the DIP Lenders have indicated a willingness to provide the DIP Facility, but solely on the terms and conditions set forth in this Interim Order and in the DIP Financing Documents.

    (ix) <u>Reserved.</u>

    (x) <u>Good Cause</u>.  The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtor Loan Parties and their Estates, as its implementation will, among other things, provide the Borrowers with the necessary liquidity to (a) minimize disruption to the Borrowers on-going businesses and on-going operations and to permit the Debtor Loan Parties to sell their assets, (b) preserve and

maximize the value of the Borrowers' Estates, and (c) avoid immediate and irreparable harm to the Borrowers, their businesses, their employees and their assets.

(xi)    <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(c)(2).  No party appearing in the Cases has filed or made an objection to the relief sought in the Motion or the entry of this Interim Order, or any objections that were made (to the extent such objections have not been withdrawn) are hereby overruled.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:

Section 1.    <u>Authorization and Conditions to Financing</u>.

1.1    <u>Motion Granted</u>.  The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Order.  This Order shall be referred to herein as the "**<u>Interim Order</u>**."

1.2    <u>Authorization to Borrow and Use of Loan Proceeds</u>.  The Borrowers are hereby authorized and empowered to immediately borrow and obtain Advances (and, at the discretion of the DIP Agent and the DIP Lenders, Letters of Credit) and the Borrowers and Guarantors are hereby authorized and empowered to incur indebtedness and obligations owing to the DIP Agent and the DIP Lenders on the terms and subject to the conditions set forth in the DIP Financing Documents and this Interim Order, during the period commencing on the date of this Interim Order through and including the date of the Final Hearing as set forth in Section 7 of this Interim Order (the "**<u>Interim Financing Period</u>**") up to the amount of $[_____] during such period and up to the maximum amount of $[_____] upon entry of the Final Order; in such amounts as may be made available to the Borrowers by DIP Lenders in accordance with all of the lending formulae, sublimits, terms and conditions set forth in the DIP Financing

Documents.  The Borrowers may only use the proceeds of the Advances and any other credit accommodations provided to the Borrowers pursuant to the terms and conditions of the DIP Financing Documents and this Interim Order; provided, however, that upon entry of the Final Order, Advances may be used to refinance, in whole or in part, the outstanding principal balance of amounts owing under the Pre-Petition Financing Documents as elected by the DIP Agent in its sole and absolute discretion from time to time. All rights to the discretionary roll-up to be approved upon entry of the Final Order are subject to the rights reserved in Section 5.1 herein.

      1.3    Financing Documents.

      1.3.1  Authorization.  The Debtor Loan Parties are hereby authorized to enter into, execute, deliver, perform, and comply with all of the terms, conditions and covenants of the DIP Financing Documents, including without limitation, the DIP Credit Agreement. Debtor Haggen Holdings, LLC is authorized to reaffirm its obligations under its pre-petition limited guaranty and provide any other accommodations as provided herein.

      1.3.2  Approval.  The DIP Financing Documents and each term set forth therein are approved to the extent necessary to implement the terms and provisions of this Interim Order.

      1.3.3  Amendment of DIP Financing Documents.  The Debtor Loan Parties, the DIP Agent, and the DIP Lenders are hereby authorized to implement, in accordance with the terms of the DIP Financing Documents, any non-material modification of the DIP Financing Documents without further order of this Court or any other modification to the DIP Financing Documents; provided however, that notice of any material modification or amendment to the DIP Financing Documents shall be provided to counsel to any Committee and the U.S. Trustee, each of whom shall have five (5) business days from the date of such notice within which to object in writing to such modification or amendment unless the Committee agrees in writing to a shorter period.  If any Committee or the U.S. Trustee timely

objects to any material modification or amendment to the DIP Financing Documents, such modification or amendment shall only be permitted pursuant to an order of this Court.

        1.4    <u>Payment of Prepetition Debt</u>.  The Debtor Loan Parties are authorized to pay the Pre-Petition Obligations to the Pre-Petition Secured Parties in accordance with Sections 1.5 and 1.6 of this Interim Order.

        1.5    <u>Payments and Application of Payments</u>.  The Debtor Loan Parties are authorized and shall make all payments and transfers of Debtor Loan Parties' Estate property to the DIP Agent and the DIP Lenders as provided, permitted and/or required under the DIP Financing Documents, which payments and transfers, subject to Section 5.1 herein, shall not be avoidable or recoverable from the DIP Lenders under Section 547, 548, 550, 553 or any other section of the Bankruptcy Code or subject to any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law or otherwise.  The DIP Agent and the DIP Lenders shall apply the proceeds of the DIP Collateral (as defined below), and any other amounts or payments received by the DIP Agent in respect of the Pre-Petition Obligations and the Post-Petition Obligations (as defined in the DIP Financing Documents) (collectively, the "**<u>Obligations</u>**") in accordance with the DIP Financing Documents and this Interim Order, in such order and manner determined by the DIP Agent, including, without limitation, applying all payments, proceeds and other amounts either to the Pre-Petition Obligations or to the Post-Petition Obligations in the DIP Agent's and Pre-Petition Agent's sole and absolute discretion. Without limiting the generality of the foregoing, the Debtor Loan Parties are authorized and shall, without further order of this Court, pay or reimburse the DIP Agent and the DIP Lenders, in accordance with, *inter alia*, Section 16.9 of the DIP Credit Agreement and the provisions of the other DIP Financing Documents, for all present and future costs and expenses, including, without limitation, all professional fees, consultant fees, appraisal fees, and legal fees and expenses paid or incurred by the DIP Agent and the DIP Lenders in connection with the

financing transactions as provided in the DIP Financing Documents and this Interim Order, all of which shall be and are included as part of the principal amount of the Obligations and secured by the DIP Collateral (as defined below); provided that DIP Agent shall send a redacted summary invoice (subject in all respects to applicable privilege or work product doctrines) to Debtor Loan Parties, the United States Trustee and, if appointed, the Committee or its counsel and no objection has been raised within ten (10) days, and to the extent there is an objection, the Court may resolve the objection.

      1.6    <u>Interest and Fees</u>.  The rate of interest to be charged for the Advances under the Post-Petition Obligations pursuant to the DIP Credit Agreement shall be the rates set forth in the DIP Credit Agreement and shall be payable at the times set forth in the DIP Credit Agreement.  The fees charged under the DIP Facility shall be those set forth in the DIP Credit Agreement and shall be payable at the times set forth in the DIP Credit Agreement, including without limitation the Commitment Fee, which is fully earned upon execution of the DIP Credit Agreement and payable in two installments as follows: $987,500 due and payable upon the Closing Date (as defined in the DIP Credit Agreement), and $537,500 due and payable on the earlier of (x) the Termination Date (as defined in the DIP Credit Agreement), or (y) any earlier accelerations of the Post-Petition Obligations (as defined in the DIP Credit Agreement) in accordance with the terms of the DIP Credit Agreement.  The rate of interest to be charged on the Pre-Petition Obligations shall be the rates set forth in the Pre-Petition Financing Documents and shall accrue and be payable at the times and in the manner set forth in the Pre-Petition Financing Documents.  Any and all fees charged under the Pre-Petition Financing Documents shall be as set forth in the Pre-Petition Financings Documents and shall be payable at the times set forth in the Pre-Petition Financing Documents.

      1.7    <u>Continuation of Prepetition Procedures</u>.  All pre-petition practices and procedures for the payment and collection of proceeds of the Collateral, the turnover of cash, the

delivery of property to the DIP Agent and the DIP Lenders and the funding pursuant to the Pre-Petition Credit Agreement, including any lockbox and/or blocked depository bank account arrangements, will be the same under the DIP Financing Documents and are hereby approved and shall continue without interruption after the commencement of the Cases, provided that the practices and procedures are otherwise consistent with the terms of the *Order, Pursuant to Sections 105(a), 345, 363 and 503(b) of the Bankruptcy Code, Bankruptcy Rule 2015 and Local Rule 2015-2 (A) Authorizing and Approving (I) Continued Use of Cash management System and (II) Use of Prepetition Bank Accounts and Business Forms, (B) Authorizing Banks Participating in the Cash Management System to Honor Certain Transfers and Charge Certain Amounts, (C) Waiving the Requirements of Section 345(b) on an Interim Basis, (D) Granting Administrative Expense Status to Post-Petition Intercompany Claims and (E) Granting Related Relief.*

Section 2.    Cross-Collateralization, Adequate Protection and Superpriority Administrative Claim Status.

2.1    Cross-Collateralization.

2.1.1    DIP Lien Grant.  To secure the prompt payment and performance of any and all Post-Petition Obligations (and upon entry of the Final Order, any and all Obligations, including without limitation, all Pre-Petition Obligations and Post-Petition Obligations) of the Borrowers and Guarantors to the DIP Agent and the DIP Lenders of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the  DIP Agent, for the benefit of itself and the other DIP Lenders, shall have and is hereby granted, effective as of the Petition Date, valid and perfected first priority (subject to the Permitted Liens and the Carve-Out), security interests and liens in and upon (such security interests and liens collectively, the "**DIP Liens**") all present and after acquired property of the Debtor Loan Parties of any nature whatsoever, including without limitation, all accounts receivable, inventory, general intangibles, chattel paper, real property and leaseholds and

proceeds thereof (*provided, however*, that to the extent that any lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold interest, then in such event the Prepetition Agent shall be granted a lien only on the economic value of, proceeds of sale or other disposition of, and any other proceeds and products of such leasehold interests), fixtures, machinery, equipment, commercial tort claims, deposit accounts, cash and cash equivalents, investments, patents, trademarks, trade names, copyrights, rights under license agreements and other intellectual property, inter-company notes or receivables due to each Debtor, all of the Collateral (as defined in the Pre-Petition Revolving Credit Agreement and the DIP Credit Agreement), and all causes of action whether pursuant to federal or state law, and upon entry of the Final Order all claims and causes of action under Section 544, 547 and 548 of the Bankruptcy Code, and the proceeds thereof and property received thereby whether by judgment, settlement, or otherwise, whether pursuant to federal law or applicable state law (collectively, "**Avoidance Actions**") of the Debtor Loan Parties or their Estates, and as to all of the foregoing, all rents, issues, products, proceeds and profits generated by any of the foregoing (being sometimes collectively referred to in this Interim Order as the "**DIP Collateral**").    The Obligations shall also include all indemnification obligations of Debtor Loan Parties to the Pre-Petition Secured Parties arising under the Pre-Petition Financing Documents, including without limitation the obligations arising under Sections 2.2(f), 2.2(g), 3.10, 6.4, 15.1(b), and 16.5 of the Pre-Petition Revolving Credit Agreement which survive payment in full of the Pre-Petition Obligations.  Further, as consideration to Pre-Petition Secured Parties for their agreement to the terms hereof and as replacement collateral for the Pre-Petition Collateral used, consumed or sold by the Borrowers and/or Guarantors in the Cases, to the extent of any diminution in value of the Pre-Petition Collateral, the DIP Collateral shall also secure the Pre-Petition Obligations. Subject to the provisions of Section 2.3.1, the DIP Liens, subject to the Carve-Out, shall be:

(A) <u>Liens on Unencumbered Assets.</u> Pursuant to Section 364(c)(2) of the Bankruptcy Code, continuing valid, perfected, enforceable, first priority, fully perfected liens on and security interests in all of the Debtor Loan Parties' right, title, and interest in and to and under all DIP Collateral that is not otherwise encumbered by a valid, perfected security interest on or lien on the Petition Date or a security interest that constitutes a valid and effective lien perfected after the Petition Date that is not avoidable under Section 546(b) of the Bankruptcy Code (the "**Unencumbered Property**").

(B) <u>Liens on Encumbered Assets.</u> Pursuant to Section 364(c)(3) of the Bankruptcy Code, a continuing valid, enforceable, second priority and fully perfected lien on and security interest (other than as set forth in clause (C) below) in all of the Debtor Loan Parties' right, title, and interest, in and to and under all DIP Collateral which is subject to, as of the Petition Date, a Permitted Lien that was perfected prior to the Petition Date or that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

(C) <u>Priming Liens on Encumbered Assets.</u> Subject to Permitted Liens and any security interest that constitutes a valid and effective lien perfected after the Petition Date that is not avoidable under Section 546(b) of the Bankruptcy Code and that are senior to the security interests and liens held by the Pre-Petition Agent, on behalf of the Pre-Petition Secured Parties, pursuant to section 364(d) of the Bankruptcy Code, valid, enforceable, fully perfected first priority senior priming security interests in and senior priming liens upon all of the Debtor Loan

Parties' right, title and interest in, to and under all DIP Collateral, including, without limitation, priming security interests and priming liens which are senior to (i) the security interests and liens held by the Pre-Petition Agent, on behalf of the Pre-Petition Secured Parties; (ii) the security interests and liens held by Propco Lenders; and (iii) the Adequate Protection Liens (as defined below).

(D) <u>Liens Senior to Certain Other Liens.</u>  Notwithstanding anything to the contrary contained in this Interim Order, the DIP Liens and the First Lien Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided or preserved for the benefit of the Debtor Loan Parties or their estates under section 551 of the Bankruptcy Code or (ii) any intercompany or affiliate liens of the Debtor Loan Parties.

2.1.2  <u>Post-Petition Lien Perfection</u>.    This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, leasehold mortgages, recording or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including without limitation, control agreements with any financial institution(s) holding any deposit account of any Borrower or any Guarantor (a "**Perfection Act**").  Notwithstanding the foregoing, if the DIP Agent and/or the Pre-Petition Agent shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, each of the DIP Agent and the Pre-Petition Agent is authorized to perform such act, and the Debtor Loan Parties are authorized to perform such act to the extent necessary or required by the DIP Agent and/or the Pre-Petition Agent, which act or acts shall be

deemed to have been accomplished as of the Petition Date notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. The DIP Agent and/or the Pre-Petition Agent may choose to file, record or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law. Should the DIP Agent and/or Pre-Petition Agent so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Order.

2.1.3  <u>Reserved</u>.

2.1.4  <u>Intercreditor Agreement</u>.  Notwithstanding anything to the contrary contained herein, the liens and security interests granted to the Secured Parties to secure the Obligations shall have priority over any and all liens and security interests granted to Propco Lenders to secure obligations of any of the Debtor Loan Parties owing to Propco Lenders and the rights of the parties with respect to such liens and security interests shall be governed by the Intercreditor Agreement.  So long as any Obligations are outstanding under the Pre-Petition Financing Documents, the DIP Financing Documents or DIP Lenders' commitment to make Advances under the DIP Credit Agreement has not been terminated, Propco Lenders shall (i) take no action to foreclose upon or otherwise exercise remedies against any DIP Collateral, (ii) be deemed to have consented to any release of DIP Collateral in connection with any disposition of any DIP Collateral authorized under the Pre-Petition Financing Documents or the DIP Financing Documents and, effective upon such release, be deemed to release its liens therein, and (iii) not file any financing statement, trademark filings, copyright filings, patent

filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect its security interests in the DIP Collateral.

2.2    <u>Superpriority Administrative Expense</u>.  For all Post-Petition Obligations (and upon entry of the Final Order, for all Obligations, including without limitation, all Pre-Petition Obligations and the Post-Petition Obligations) now existing or hereafter arising and for diminution in value of any Pre-Petition Collateral used by the Debtor Loan Parties pursuant to this Interim Order, the DIP Financing Documents or otherwise, the DIP Agent, for the benefit of itself and the other DIP Lenders, is granted an allowed superpriority administrative claim in the Borrowers' and Guarantors' Estates pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of any of such Debtor Loan Parties, whether now in existence or hereafter incurred by any of such Debtor Loan Parties, and over any and all administrative expenses, adequate protection claims or priority claims of the kind specified in, or ordered pursuant to the Bankruptcy Code, including without limitation, inter alia, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (upon entry of the Final Order), 507, 364(c)(1), 546(c), 726 or 1114 of the Bankruptcy Code (the "**DIP Superpriority Claim**"), subject only to the Carve Out.

2.3    <u>Carve Out</u>.

2.3.1  <u>Carve Out</u>.  The DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Adequate Protection Claims shall be subject only to the right of payment of the following expenses (collectively, the "**Carve-Out**"):

a.    statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. §§ 1930(a)(6) with respect to the Borrowers (the "**Statutory Fees**"); and

b.    the reasonable fees, costs, and expenses actually incurred on or after the Petition Date and prior to the Trigger Date (defined below), and that are allowed and payable by order of the Court under Sections 328, 330, or 331 of the Bankruptcy Code, and any

interim compensation procedures order, as applicable (collectively, the "**Allowed Professional Fees**"), by Debtors' bankruptcy counsel, Young Conaway Stargatt and Taylor, LLP and Stroock & Stroock & Lavan LLP, (collectively, "**Debtors' Bankruptcy Counsel**"), Debtors' corporate counsel, Ackerman LLP, and Debtors' financial advisors, Alvarez and Marsal North America, LLC ("**A&M**"), retained under Section 327 of the Bankruptcy Code, professionals retained by any Committee(s) appointed for the Debtors in the Cases under Section 1103(a) of the Bankruptcy Code, and any court-appointed claims administrator (collectively, the "**Professionals**"), in a cumulative, aggregate sum of (i) for the period prior to the occurrence of the Trigger Date, not to exceed the lesser of (A) the weekly amounts budgeted to be funded for each such Professional in accordance with the Budget, exclusive of the Permitted Variance, for the time period preceding the Trigger Date (to the extent the Trigger Date occurs mid-week, pro-rated for such week) and (B) the actual allowed amount of such Professional Fees incurred on or after the Petition Date up through and including the Trigger Date, and (ii) for the time period following a Trigger Date, an amount not to exceed $150,000 for (x) Debtors' Bankruptcy Counsel (collectively) and (y) A&M (collectively, the "**Carve-Out Cap**").

c.       The "**Trigger Date**" shall mean the date of an Event of Default under the DIP Credit Agreement and delivery of a written notice (the "**Carve-Out Notice**") by the DIP Agent to (i) the U.S. Trustee, (ii) the Debtors and the Debtors' counsel, (iii) counsel for the Committee, and (iv) the Haggen Propco Lenders.

d.       Subject to the terms of this Interim Order, the Carve-Out Cap shall be allocated on a Professional by Professional basis based on the amounts budgeted to be funded for each Professional pursuant to the Budget, exclusive of the Permitted Variance; provided however, that with respect to the Debtors' counsel the allocated amounts shall be as set forth in a schedule consistent with the Budget acceptable to DIP Agent.

2.4    <u>Excluded Professional Fees</u>.  Notwithstanding anything to the contrary in this Interim Order, neither the Carve-Out, nor the proceeds of any Advances, Letters of Credit or DIP Collateral shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following:  (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief:  (i) challenging the legality, validity, priority, perfection, or enforceability of the Obligations (whether Pre-Petition Obligations or Post-Petition Obligations) or the Secured Parties' liens on and security interests in the Collateral, or any similar action against the Propco Lenders in respect of the Propco Lenders Subordinated Indebtedness, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations (whether Pre-Petition Obligations or Post-Petition Obligations) or the Secured Parties' liens on and security interests in the pre-petition Collateral or the DIP Collateral, or any similar action against the Propco Lenders in respect of the Propco Lenders Subordinated Indebtedness, or (iii) preventing, hindering or delaying the Secured Parties' or Propco Lenders' assertion or enforcement of any lien, claim, right or security interest or realization upon any in accordance with the terms and conditions of this Interim Order, (b) a request to use the Cash Collateral without the prior written consent of the Secured Parties, except to the extent expressly permitted herein, (c) a request for authorization to obtain Debtor-in-Possession financing or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, other than from the DIP Agent and the DIP Lenders, without the prior written consent of the DIP Agent, (d) the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against the Secured Parties, or any of them, or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from the Secured Parties, or any of them, under Chapter 5 of the Bankruptcy Code; provided, however,

that, inclusive within the Carve Out Cap, an amount not to exceed $25,000 in the aggregate of the indebtedness incurred pursuant to the DIP Facility may be used to pay Allowed Professional Fees of the Committee to investigate (but not prosecute) claims against and objections with respect to the Pre-Petition Obligations and pre-petition liens and security interests of the Pre-Petition Secured Parties (including, without limitation, issues regarding validity, perfection, priority, or enforceability of the secured claims of the Pre-Petition Secured Parties).

2.5    Carve Out Reserve.  At the DIP Agent's sole discretion, the DIP Agent may at any time establish (and adjust) a reserve against the amount of Advances or other credit accommodations that would otherwise be made available to the Borrowers pursuant to the lending formulae contained in the DIP Credit Agreement in respect of the Carve-Out.  Nothing contained herein shall limit, modify or restrict in any way the DIP Agent's rights to establish (and adjust) any other reserves in accordance with the DIP Financing Documents.

2.6    Payment of Carve Out.

2.6.1 The Debtors shall maintain an escrow account with _____ for the payment of Allowed Professional Fees (the "**Carve-Out Reserve Account**") which account shall be funded by or on behalf of the Debtors in accordance with the Budget on a weekly basis until the occurrence of the Trigger Date provided there is availability under the DIP Credit Agreement. After the Trigger Date, the Carve-Out Reserve Account shall continue to be funded up to the Carve-Out Cap.  From funds in the Carve-Out Reserve Account, _____ shall pay the Professionals the Allowed Professional Fees in connection with the Carve-Out compensation and reimbursement of expenses that accrue following the Petition Date in compliance with and subject to the Carve-Out provisions of Section 2.3 as the same may be due and payable; provided however, that to the extent that Allowed Professional Fees that have accrued from the Petition Date through and including the Trigger Date are less than the amounts funded into the Carve Out Reserve Account, the excess amounts in the Carve

Out Reserve Account shall be remitted to the DIP Agent to apply to reduce the Pre-Petition Obligations and/or the Post-Petition Obligations at Agent's sole discretion.  For the avoidance of doubt, (a) in making payments from the Carve-Out Reserve Account, _____ shall be entitled to rely upon written certifications of each Professional as to the amount such Professional is due and owing from the Carve-Out Reserve Account; and (b) in no circumstances shall _____ be obligated to pay any Professional other than from funds held, from time to time, in the Carve-Out Reserve Account.  Funds held in the Carve Out Reserve Account shall be applied to the Allowed Professional Fees that have been incurred following the Petition Date in the manner set forth in this Interim Order in accordance with the procedures established in the Cases with the excess, if any, to be remitted to the DIP Agent as set forth in the preceding sentence.    Provided that the amounts DIP Agent is obligated to allocate to Professionals as required in Section 2.3 has been funded, all obligations of the DIP Agent and DIP Lenders and Pre-Petition Agent and Pre-Petition Lenders with respect to the Carve-Out shall be terminated.

   2.6.2  Any payment into the Carve-Out Reserve Account or payments of fees and expenses made directly to the Professionals shall permanently reduce the pre-Trigger Date Carve-Out (for fees and expenses incurred before the Trigger Date) or the post-Trigger Date Carve-Out (for fees and expenses incurred on or after the Trigger Date), as applicable, on a dollar-for-dollar basis.

   2.6.3  Payment of any amounts on account of the Carve-Out, whether by or on behalf of the DIP Agent or any DIP Lender, shall not and shall not be deemed to reduce the Obligations, and shall not and shall not be deemed to subordinate any of the DIP Agent's and the DIP Lenders' liens and security interests in the DIP Collateral or their DIP Superpriority Claim to any junior pre- or post-petition lien, interest or claim in favor of any other party.  The DIP Agent and the DIP Lenders shall not, under any circumstance, be responsible for the direct

payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Case under any chapter of the Bankruptcy Code, and nothing in <u>Section 2.3</u>, <u>2.4</u>, <u>2.5</u> or <u>2.6</u> of this Interim Order shall be construed to obligate the DIP Agent or any DIP Lender in any way, to pay compensation to or to reimburse expenses of any Professional, or to ensure that the Debtors have sufficient funds to pay such compensation or reimbursement. Notwithstanding anything to the contrary in this Interim Order, if the Carve-Out is used at any time to pay the Professional Fees, either prior to or after the Termination Date (as defined in the DIP Credit Agreement) as set forth herein, and if subsequently unencumbered assets become available or any of the Prepetition Liens are avoided as a preference or otherwise, then the Prepetition Agent shall be reimbursed from such unencumbered or recovered assets or proceeds thereof.

Section 3.    <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order, pursuant to sections 363(c)(2) of the Bankruptcy Code, the Debtor Loan Parties are authorized to use Cash Collateral in accordance with the DIP Financing Documents.  Absent entry of the Final Order by the Court, the Debtor Loan Parties shall no longer be authorized to use Cash Collateral at the expiration of the Interim Period.  Nothing in this Interim Order shall be deemed to authorize the use, sale, lease, encumbrance, or disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor Loan Parties' use of any Cash Collateral or other proceeds resulting therefrom, except as provided for herein.

3.1    <u>Pre-Petition Agent's Adequate Protection</u>.  As adequate protection for the interests of the Pre-Petition Agent, for the benefit of the Pre-Petition Lenders and Pre-Petition Issuer, on account of the Adequate Protection Obligations, the Pre-Petition Agent is being provided with adequate protection (collectively, the "**First Lien Adequate Protection**").

3.1.1  <u>First Lien Adequate Protection Liens</u>.  The Pre-Petition Agent, for the benefit of itself and the other Pre-Petition Lenders and Pre-Petition Issuer, is hereby granted

valid and perfected replacement and additional security interests in, and liens (the "**First Lien Adequate Protection Liens**") on the DIP Collateral to the extent of the Adequate Protection Obligations, which shall be junior in all respect to the DIP Liens, the Permitted Liens and the Carve Out.

a.       The First Lien Adequate Protection Liens shall be deemed to be valid, binding, enforceable and fully perfected as of the Petition Date and, subject to Section 5.1, not subject to subordination or avoidance, for all purposes in the Cases and subject only to the DIP Liens, the Permitted Liens and the Carve Out.

b.       Except for the DIP Liens, the Permitted Liens and the Carve Out, the First Lien Adequate Protection Liens shall not be made subject to or pari passu with any lien or security interest by any court order heretofore or hereafter entered in the Cases (unless with the consent of the Pre-Petition Agent and the Pre-Petition Lenders).  The First Lien Adequate Protection Liens shall not be subject to sections 506(c) (upon entry of the Final Order), 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made pari passu with or senior to the First Lien Adequate Protection Liens.

3.2     First Lien Adequate Protection Claims.  As further adequate protection, the Pre-Petition Agent, for the benefit of the Pre-Petition Secured Parties, is hereby granted an allowed administrative claim (the "**First Lien Adequate Protection Claim**") against the Debtor Loan Parties' estates under sections 503 and 507(b) of the Bankruptcy Code to the extent that the First Lien Adequate Protection Liens do not adequately protect the diminution in the value of the liens and security interests of the Pre-Petition Secured Parties in the Pre-Petition Collateral, which First Lien Adequate Protection Claim shall be subject and subordinate only to the DIP Superpriority Claim and the Carve Out and shall have priority over all other administrative expense claims and unsecured claims against the Debtor Loan Parties or their estates, which are

now existing, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code.

3.2.1  Interest.  As further adequate protection, the Pre-Petition Agent, for the benefit of the Pre-Petition Secured Parties, shall be entitled to interest on account of the outstanding Pre-Petition Obligation, which shall be accrued and payable and paid in accordance with the Pre-Petition Financing Documents.

3.2.2  Additional Adequate Protection.  As further adequate protection, and without limiting any rights of the Pre-Petition Agent, for the benefit of the Pre-Petition Secured Parties, under section 506(b) of the Bankruptcy Code which are hereby preserved, and in consideration, and as a requirement, for the Adequate Protection Obligations, the Debtor Loan Parties shall pay or reimburse the Pre-Petition Agent for any and all of its accrued and payable reasonable fees, costs, expenses and charges payable under the Pre-Petition Financing Documents, including, without limitation, the fees and expenses of the Pre-Petition Agent as provided in, *inter alia,* Section 16.9 of the Pre-Petition Credit Agreement, whether accrued pre-petition or post-petition, all without further notice, motion or application to, order of, or hearing before, this Court; provided that DIP Agent shall be permitted to add such amounts to the Obligations following submission of a redacted summary invoice to the Debtor Loan Parties, the United States Trustee and, if appointed, the Committee or its counsel, of a written invoice (subject in all respects to applicable privilege or work product doctrines) provided no objection has been raised within ten (10) days, and to the extent there is an objection, the Court may resolve the objection.  Such written invoices shall include (i) Blank Rome LLP, counsel to the Pre-Petition Agent, (ii) FTI Consulting, consultant to the Pre-Petition Agent; (iii) and any other professional, advisor or agent reasonably retained by the Pre-Petition Agent or its counsel in

connection with the Pre-Petition Financing Documents pursuant to the Cases; provided that none of such fees and expenses as adequate protection payments hereunder shall be subject to approval by the Court or the United States Trustee Guidelines. No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court.

        3.3    <u>Right to Credit Bid</u>.  In connection with any sale of assets by any Debtor outside of the ordinary course of business, the Pre-Petition Agent on behalf of the Pre-Petition Lenders, and the DIP Agent on behalf of the DIP Lenders, as the case may be, shall be entitled to credit bid all or any part of the outstanding amount of the Obligations, as applicable, in respect of any such sale.

        3.4    <u>Propco Lenders' Adequate Protection</u>.  In consideration for and on account of the Adequate Protection Obligations, without conceding any entitlement thereto and solely to the extent that Propco Lenders have not waived its right to seek or request it under the Intercreditor Agreement and solely to the extent the Pre-Petition Propco Lenders Collateral held by Propco Lenders was subject to valid, perfected, enforceable and unavoidable liens and that it is ultimately determined that Propco Lenders are entitled to such adequate protection, Propco Lenders are being provided with adequate protection  (the "**<u>Second Lien Adequate Protection</u>**" and, together with the First Lien Adequate Protection, the "**<u>Adequate Protection</u>**").

        3.4.1 <u>Second Lien Adequate Protection Liens</u>.  To the extent of the diminution in value of the Propco Lenders' interests in the Pre-Petition Haggen Lender Collateral, the Propco Lenders are hereby granted valid and perfected replacement security interests in, and liens on all of the Debtor Loan Parties' right, title and interest in, and to the same items and types of DIP Collateral (the "**<u>Second Lien Adequate Protection Liens</u>**," and together with the First Lien Adequate Protection Liens, the "**<u>Adequate Protection Liens</u>**"), which liens are valid, binding enforceable and fully perfected as of the Petition Date and which

liens are subordinate and subject to (i) the DIP Liens, (ii) the First Lien Adequate Protection Liens, (iii) the Permitted Liens and (iv) the Carve Out.

3.4.2  <u>Second Lien Adequate Protection Claims</u>.  As further adequate protection, to the extent it is determined that Propco Lenders are entitled thereto and to the extent that the Second Lien Adequate Protection Liens do not adequately protect the diminution in the value of Propco Lenders' interest in the Pre-Petition Propco Lenders Collateral, provided that such liens were valid perfected, enforceable and unavoidable, Propco Lenders are hereby granted an allowed administrative claim (the "**<u>Second Lien Adequate Protection Claim</u>**", and together with the First Lien Adequate Protection Claim, the "**<u>Adequate Protection Claims</u>**") against the Debtor Loan Parties' Estates under sections 503 and 507(b) of the Bankruptcy Code, provided, however, that the Second Lien Adequate Protection Claim shall be subject and subordinate to the (i) DIP Superpriority Claim, (ii) First Lien Adequate Protection Claim and (iii) Carve Out, until all Obligations are indefeasibly paid and satisfied in full.

Section 4.    <u>Default; Rights and Remedies; Relief from Stay</u>.

4.1    <u>Events of Default</u>.  The occurrence of any Event of Default as defined under the DIP Credit Agreement shall constitute an "**<u>Event of Default</u>**" under this Interim Order.

4.2    <u>Rights and Remedies Upon Event of Default/Relief from Stay</u>.

4.2.1  Upon the occurrence of and during the continuance of an Event of Default and during the Remedies Notice Period (defined below) (except to the extent that the Secured Parties must protect perishable collateral in which case no notice is required), and without the necessity of seeking relief from the automatic stay or any further Order of the Bankruptcy Court (i) the DIP Agent and DIP Lenders may immediately terminate their obligation to make any advances under the DIP Facility; (ii) all amounts outstanding under the DIP Financing Documents and Pre-Petition Financing Documents shall be automatically accelerated; (iii) the DIP Agent and the Pre-Petition Agent shall be entitled to immediately

terminate the Debtor Loan Parties' right to use Cash Collateral, without further application or order of this Court; (iv) the Debtor Loan Parties shall be bound by all restrictions, prohibitions and other terms as provided in this Interim Order, the DIP Credit Agreement and the other DIP Financing Documents and the Pre-Petition Financing Documents; (v) the DIP Agent and the Pre-Petition Agent shall be entitled to charge the default rate of interest under the DIP Facility and under the Pre-Petition Financing Documents; and (vi) the DIP Agent and the Pre-Petition Agent shall be authorized to continue to collect all proceeds of the DIP Collateral or Pre-Petition Collateral and apply them to the Obligations and Pre-Petition Obligations, as applicable.

4.2.2  Upon expiration of the Remedies Notice Period (except to the extent that the Secured Parties must protect perishable collateral in which case no notice is required), without further notice, application or order of this Court: (i) both the DIP Agent for the benefit of itself and the DIP Lenders, and the Pre-Petition Agent, for the benefit of itself and the other Pre-Petition Secured Parties, shall be entitled to take any act or exercise any other right or remedy as provided in this Interim Order, the DIP Financing Documents, the Pre-Petition Financing Documents or applicable law as the DIP Agent or the Pre-Petition Agent may deem appropriate in their sole discretion, including, without limitation, (x) setting off any Obligations or Pre-Petition Obligations with DIP Collateral or Pre-Petition Collateral or proceeds in any Secured Parties' possession, and enforcing any and all rights with respect to the DIP Collateral or Pre-Petition Collateral, and (y) proceed against and realize upon the DIP Collateral or Pre-Petition Collateral or any other assets or properties of the Debtor Loan Parties' Estates upon which the DIP Agent, for the benefit of itself and the DIP Lenders and the Pre-Petition Agent, for the benefit of itself and the other Pre-Petition Secured Parties, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible payment of all the Obligations including the Pre-Petition Obligations.  Notwithstanding the foregoing, DIP

Agent may continue to apply proceeds received into the lockbox or collection account to reduce the Obligations during the Remedies Notice Period. During the Remedies Notice Period, the Debtor Loan Parties and/or the Committee shall be entitled to seek an emergency hearing with the Court, at which the only issue the Debtor Loan Parties and/or the Committee shall be allowed to assert is whether an Event of Default actually occurred.

Additionally, upon the occurrence and during the continuance of an Event of Default and the exercise by the DIP Agent or the Pre-Petition Agent of their respective rights and remedies under this Interim Order, the DIP Financing Documents or Pre-Petition Financing Documents, and provided that the Debtor Loan Parties and the DIP Agent agree upon an acceptable wind down budget with agreed upon carve-out amounts for Debtors' Bankruptcy Counsel, the Debtor Loan Parties shall assist the DIP Agent and the Pre-Petition Agent in effecting any sale or other disposition of the DIP Collateral or Pre-Petition Collateral required by the DIP Agent and Pre-Petition Agent, including any sale of DIP Collateral or Pre-Petition Collateral pursuant to section 363 of the Bankruptcy Code or assumption and assignment of DIP Collateral or Pre-Petition Collateral consisting of contracts and leases pursuant to section 365 of the Bankruptcy Code, in each case, upon such terms that are designed to maximize the proceeds obtainable from such sale or other disposition that are  otherwise acceptable to the DIP Agent and the Pre-Petition Agent, and the Debtor Loan Parties shall fully cooperate with the Secured Parties in their exercise of rights and remedies.  All such actions taken by Debtor Loan Parties in connection with this paragraph shall be consistent with their fiduciary duties.

4.2.3 "**Remedies Notice Period**" shall mean the five (5) day period commencing on the delivery of written notice by the DIP Agent of the occurrence of an Event of Default to: (i) Debtor Loan Parties, (ii) Debtors' Bankruptcy Counsel, (iii) counsel for the Committee, and (iv) the U.S. Trustee.

4.2.4   Upon and after the occurrence of an Event of Default, and upon the expiration of the Remedies Notice Period, in connection with a liquidation of any of the DIP Collateral, the DIP Agent (or any of its employees, agents, consultants, contractors or other professionals) shall have the right, at the sole cost and expense of the Debtor Loan Parties, to: (i) upon the entry of the Final Order, enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests or warehouse arrangements owned or leased by the Debtor Loan Parties; provided that prior to entry of the Final Order, the DIP Agent may be permitted to do so in accordance with their pre-petition landlord's waivers, and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents or any other similar assets of the Debtor Loan Parties, which are owned by or subject to a lien of any third party and which are used by the Debtor Loan Parties in their businesses.  The DIP Agent and the DIP Lenders will be responsible for the payment of any applicable fees, rentals, royalties or other amounts due such lessor, licensor or owner of such property (other than the Debtor Loan Parties) for the period of time that the DIP Agent actually uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals or other amounts due for any period prior to the date that the DIP Agent actually occupies or uses such assets or properties).

4.2.5   The rights and remedies of the Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the Secured Parties may have under the DIP Financing Documents, Pre-Petition Financing Documents or otherwise.  The fourteen day stay provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 4001(a)(3) are hereby waived.

4.3   <u>Expiration of Commitment/Relief from Stay</u>.  Upon the expiration of the Borrowers' authority to borrow and obtain other credit accommodations from the DIP Agent and the DIP Lenders pursuant to the terms of this Interim Order (except if such authority shall be extended with the prior written consent of the DIP Agent, which consent shall not be implied or

construed from any action, inaction or acquiescence by the DIP Agent or any DIP Lender) or upon the Termination Date (as defined in the DIP Credit Agreement), unless an Event of Default occurs sooner and the automatic stay has been lifted or modified as provided herein, all of the Obligations shall immediately become due and payable and the Secured Parties shall be automatically and completely relieved from the effect of any stay under Section 362 of the Bankruptcy Code, any other restriction on the enforcement of their liens upon and security interests in the DIP Collateral or any other rights granted to the Secured Parties pursuant to the terms and conditions of the DIP Financing Documents or this Interim Order, and the DIP Agent, acting on behalf of itself and the other DIP Lenders, shall be and is hereby authorized, in its sole discretion, to take any and all actions and remedies provided to it in this Interim Order, the DIP Financing Documents or applicable law which the DIP Agent may deem appropriate and to proceed against and realize upon the DIP Collateral or any other property of the Borrowers' and Guarantors' Estates.

4.4    <u>Landlord Waiver Agreements</u>.    Upon entry of the Final Order unless otherwise permitted in any landlord waiver or Waiver (as defined in the Pre-Petition Credit Agreement), all rights and remedies granted in any landlord waiver and/or Waiver executed and delivered in connection with the Pre-Petition Obligations and Pre-Petition Credit Agreement, and all rights granted to the Secured Parties therein, including the right to access any premises leased by Debtor Loan Parties and access the Pre-Petition Collateral, shall be deemed to be continuing, enforceable and applicable to and binding upon the landlords and other parties to such waiver agreements with respect to the DIP Collateral and Obligations.

Section 5.    <u>Representations; Covenants; and Waivers</u>.

5.1    <u>Objections to Pre-Petition Obligations</u>.    The extent, legality, validity, perfection, enforceability and other matters noted in this Interim Order with respect to the Pre-Petition Financing Documents and Secured Parties' liens in the Pre-Petition Collateral and in the

DIP Collateral as security for the Pre-Petition Obligations and the Adequate Protection Obligations, are for all purposes subject only to the rights of any party in interest with requisite standing other than the Debtors (including any Chapter 7 trustee appointed during the Challenge Period) (as defined below)) for a period of the earlier of (i) 75 days from the Petition Date or (ii) 60 days from the date of the formation of the Committee (such period hereafter referred to as the "**Initial Challenge Period**"); provided that the Challenge Period shall be extended for a Chapter 7 trustee for an additional sixty (60) days if the Case is converted prior to the expiration of the Initial Challenge Period (the "**Extended Challenge Period**", together with the Initial Challenge Period, the "**Challenge Period**"): to seek to (a) challenge in any manner the Pre-Petition Obligations, and/or assert claims or causes of action of any nature in any way arising out of, relating to, or in connection with, the Pre-Petition Obligations or the Pre-Petition Financing Documents, or (b) assert or allege any other matters in any way arising out of, relating to, or in connection with, the Pre-Petition Obligations or the Pre-Petition Financing Documents, or (c) challenge the extent, legality, validity, perfection and/or enforceability of any Secured Party's pre-petition liens upon and security interests in the Pre-Petition Collateral pursuant to the Bankruptcy Code (the actions described in clause (a), (b) and/or (c) above, collectively referred to herein as an "**Objection**").  If an Objection is not timely filed within such Challenge Period (I) the Pre-Petition Obligations shall be deemed allowed in full and the Secured Parties' security interests in and liens upon the Pre-Petition Collateral shall be recognized and allowable as legal, valid, binding, in full force and effect, non avoidable, perfected and senior to all other liens (subject only to Permitted Liens to the extent such liens are valid, perfected and unavoidable) upon and claims against the Pre-Petition Collateral with respect to all parties in these Cases and not be subject to any counterclaims, setoff, recoupment, deduction, or claim of any kind or any defenses, or any further objection or challenge by any party at any time, and (II) the Pre-Petition Secured Parties and each their respective agents, officers, directors, employees, attorneys,

professionals, successors, and assigns shall be deemed released and discharged from all claims and causes of action arising out of or in any way relating to the Pre-Petition Financing Documents entered into with Borrowers and/or Guarantors prior to the entry of this Interim Order and shall not be subject to any further objection or challenge by any party at any time. Nothing in this Interim Order shall be deemed to confer standing to commence any action or proceeding on either the Committee, or any other party-in-interest. After expiration of the Challenge Period, the release set forth in Section 5.4 with no Objection having been interposed on behalf of the Debtors' Estates, shall be binding on the Debtors' Estates, including any subsequently appointed trustee, case fiduciary or successors and assigns.  To the extent that the Committee with appropriate standing timely files an Objection on behalf of any of the Estates against any Secured Party the releases set forth in Section 5.4 shall not be binding with respect to specific matters asserted in the Objection. Notwithstanding anything to the contrary contained in this Interim Order, this Court expressly reserves the right to unwind the discretionary roll-up of the Pre-Petition Obligations into Post-Petition Obligations that is contemplated to be approved upon entry of the Final Order or to order other appropriate relief against the Pre-Petition Agent and the Pre-Petition Lenders (including reallocation of payments) in the event there is a timely (in accordance with Section 5.1 hereof) and successful Objection to the validity, enforceability, extent, perfection or priority of the Pre-Petition Agent's liens in the Pre-Petition Collateral, or to the amount, validity, enforceability of the Pre-Petition Obligations.

       5.2    <u>Debtors' Waivers</u>.  At all times during the Cases, and whether or not an Event of Default has occurred, unless otherwise consented to by the DIP Agent in writing in advance (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent or any DIP Lender), the Debtors irrevocably waive any right that they may have to seek authority: (i) to use Cash Collateral of the Secured Parties under Section 363 of the Bankruptcy Code except to the extent expressly permitted in this Interim Order; (ii) until all

Obligations are indefeasibly paid and satisfied in full, to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, other than from the DIP Agent and the DIP Lenders; (iii) upon entry of the Final Order, to challenge the application of any payments authorized by this Interim Order as pursuant to Section 506(b) of the Bankruptcy Code, or to assert that the value of the Pre-Petition Collateral is less than the Pre-Petition Obligations; (iv) to propose or support a plan of reorganization that does not provide for the indefeasible payment in full and satisfaction of all Obligations on the effective date of such plan; or (v) to seek relief under the Bankruptcy Code, including without limitation, under Section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of the DIP Agent and the DIP Lenders as provided in this Interim Order or the DIP Financing Documents or the DIP Agent's and the DIP Lenders' exercise of such rights or remedies.

      5.3    <u>Section 506(c) Claims</u>.  Effective upon the entry of a Final Order approving the Motion, subject to the Carve-Out, no costs or expenses of administration which have or may be incurred in the Cases at any time shall be charged against the Pre-Petition Agent or any Pre-Petition Lender, the DIP Agent or any DIP Lender, their respective claims or the Pre-Petition Collateral or the  DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior written consent of the Pre-Petition Agent or DIP Agent, as applicable (and no such consent shall be implied from any other action, inaction or acquiescence by the Pre-Petition Agent or any Pre-Petition Lender and the DIP Agent or any DIP Lender).  Upon entry of a Final Order, the Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the Secured Parties with respect to proceeds, product, offspring or profits of any of the Pre-Petition Collateral or DIP Collateral.

      5.4    <u>Release</u>.

5.4.1  In consideration of and as a condition to the DIP Agent and the DIP Lenders making Advances and providing other credit and financial accommodations to the Borrowers pursuant to the provisions of this Interim Order and the DIP Financing Documents, each Debtor, on behalf of itself, each estate, and other legal representatives (collectively, the "**Releasors**"), subject to Section 5.1 with respect to all applicable parties other than the Debtors, hereby absolutely releases, forever discharges and acquits each Pre-Petition Secured Party and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Pre-Petition Agent, each Pre-Petition Lender and all such other parties being hereinafter referred to collectively as "**Releasees**") of and from any and all claims, demands, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all other claims, counterclaims, defenses rights of set-off, demands and liabilities whatsoever (individually, a "**Pre-Petition Released Claim**" and collectively, the "**Pre-Petition Released Claims**") of every kind, name, nature and description, known or unknown, suspected or unsuspected, both at law and in equity, which, including, without limitation, any so-called "lender liability" claims or defenses, that any Releasor may now or hereafter own, hold, have or claim to have against Releasees, or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the date of this Interim Order, in respect to the Debtors, the Pre-Petition Obligations, the Pre-Petition Financing Documents and any Advances, Letters of Credit or other financial accommodations made by the Pre-Petition Secured Parties to the Debtor Loan Parties pursuant to the Pre-Petition Financing Documents; provided that such release shall not be effective with respect to the Debtors until entry of the Final Order, and with respect to the Debtors' Estates, until the expiration of the Challenge Period.  In addition, upon the indefeasible payment in full of all Obligations owed to the DIP Agent and the DIP Lenders by the Debtor

Loan Parties and termination of the rights and obligations arising under this Interim Order and the DIP Financing Documents (which payment and termination shall be on terms and conditions acceptable to the DIP Agent), the DIP Agent and the DIP Lenders shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the DIP Financing Documents or this Interim Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated)), on terms and conditions acceptable to the DIP Agent.

5.4.2  Upon the entry of the Final Order, subject to Section 5.1 with respect to all applicable parties other than the Debtors, each Releasor hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released and discharged by each Releasor pursuant to <u>Section 5.4.1</u> above.  If any Releasor violates the forgoing covenant, Debtors agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

Section 6.        <u>Other Rights and Obligations</u>.

6.1        <u>No Modification or Stay of this Interim Order</u>.  Based upon the record presented to the Court by the Debtor Loan Parties, notwithstanding (i) any stay, modification, amendment, supplement, vacating, revocation or reversal of this Interim Order, the DIP Financing Documents or any term hereunder or thereunder, (ii) the failure to obtain a Final Order pursuant to Bankruptcy Rule 400l(c)(2), or (iii) the dismissal or conversion of one or more of the Cases, the DIP Agent and the DIP Lenders shall be entitled to all of the rights, remedies, privileges, and benefits in favor of the DIP Agent and the DIP Lenders pursuant to Section 364(e) of the Bankruptcy Code and the Interim Order and DIP Financing Documents.

6.2    <u>Power to Waive Rights; Duties to Third Parties</u>.  The Secured Parties shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order in respect of the Secured Parties (the "**<u>Lender Rights</u>**"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Lender Right(s).  Any waiver by any Secured Party of any Lender Rights shall not be or constitute a continuing waiver.  Any delay in or failure to exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtor Loan Parties to any Secured Party.

6.3    <u>Disposition of Collateral</u>  The Debtor Loan Parties shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral without an order of this Court and the consent of the DIP Agent, except for sales of the Borrowers' Inventory in the ordinary course of their business or as otherwise permitted in the DIP Credit Agreement.  Unless otherwise agreed to by the DIP Agent in writing and except as expressly provided herein or in the DIP Credit Agreement, all proceeds of any sale or other disposition of the Collateral shall be paid over to the DIP Agent on behalf of the DIP Lenders to the extent required by this Interim Order.

6.4    <u>Inventory</u>.  The Debtor Loan Parties shall not, without the prior written consent of the DIP Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent or any DIP Lender), (a) enter into any agreement to return any inventory to any of their creditors for application against any pre-petition indebtedness under any applicable provision of Section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant to Section 553(b)(l) of the Bankruptcy Code or otherwise**.**

6.5    <u>Reservation of Rights</u>.    The terms, conditions and provisions of this Interim Order are in addition to and without prejudice to the rights of the Secured Parties to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Financing Documents, the Pre-Petition Financing Documents or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the DIP Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estates.

6.6    <u>Modification of the Automatic Stay</u>.    The automatic stay under Section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order and the DIP Financing Documents, including without limitation the application of collections, authorization to make payments, granting of liens and perfection of liens.

6.7    <u>Binding Effect</u>.

6.7.1 The provisions of this Interim Order, the DIP Financing Documents, the Obligations, the DIP Superpriority Claim, First Lien Adequate Protection Liens, First Lien Adequate Protection Claims and any and all rights, remedies, privileges and benefits in favor of the  DIP Agent and the DIP Lenders, Pre-Petition Secured Parties provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Interim Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall survive entry of any such other order, including without limitation any order which may be entered confirming any plan of reorganization,

converting one or more of the Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Cases.

6.7.2    Any order dismissing one or more of the Cases under Section 1112 or otherwise shall be deemed to provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (a) the DIP Agent's and the DIP Lenders' and the Pre-Petition Secured Parties liens on and security interests in the DIP Collateral shall continue in full force and effect notwithstanding such dismissal until the Obligations are indefeasibly paid and satisfied in full, and (b) this Court shall retain jurisdiction, to the extent permissible under applicable law, notwithstanding such dismissal, for the purposes of enforcing the DIP Superiority Claim and DIP Liens and First Lien Adequate Protection Liens and First Lien Adequate Protection Claims of the DIP Agent and the DIP Lenders in the DIP Collateral.

6.7.3    In the event this Court modifies any of the provisions of this Interim Order or the DIP Financing Documents following a Final Hearing; (a) the Final Order shall provide such modifications shall not affect the rights or priorities of any portion of the Obligations which arises or is incurred or is advanced prior to such modifications; and (b) this Interim Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

6.7.4    This Interim Order shall be binding upon the Debtors, their Estates, all parties in interest in the Cases and their respective successors and assigns, including any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtors and shall inure to the benefit of the Secured Parties, the Debtors and their respective successors and assigns, subject to the rights of any Chapter 11 or Chapter 7 trustee pursuant to Section 5.1 above.

6.8    <u>Marshalling</u>.    In no event shall the Secured Parties be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral.

6.9    <u>Proofs of Claim</u>. Notwithstanding the entry of an order establishing a bar date in any of these Cases, the Pre-Petition Secured Parties shall not be required to file proofs of claim in any of the Cases with respect to any of the Pre-Petition Obligations or any other claims or liens granted hereunder or created hereby. The Pre-Petition Agent, for the benefit of the Pre-Petition Secured Parties, is hereby authorized and entitled, in its sole and absolute discretion, but in no event is required, to file (and amend and/or supplement, as it sees fit) aggregate proofs of claim in each of the Cases on behalf of all of the Pre-Petition Secured Parties in respect of the Pre-Petition Obligations.  Any proof of claim so filed shall be deemed to be in addition and not in lieu of any other proof of claim that may be filed by any of the Pre-Petition Secured Parties. Any order entered by the Bankruptcy Court in relation to the establishment of a bar date in any of the Cases will so provide.

6.10    <u>Waiver of Bankruptcy Rule 4001(a)(3), 6003(b), 6004(a) and 6004(h)</u>. The 21 day provision of Bankruptcy Rule 6003(b), the notice requirements of Bankruptcy Rule 6004(a) and the 14 day stay of 4001(a)(3) and 6004(h) are hereby waived.

6.11    <u>Order Controls</u>.  Unless this Interim Order specifically provides otherwise, in the event of a conflict between (a) the terms and provisions of the DIP Financing Documents and/or the Pre-Petition Financing Documents or (b) the terms and provisions of this Interim Order, then in each case the terms and provisions of this Interim Order shall govern.

6.12    <u>Objections Overruled</u>.  All objections to the entry of this Interim Order are, to the extent not withdrawn, hereby overruled.

6.13    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

6.14    <u>PACA claims</u>.  Notwithstanding anything to the contrary contained herein, nothing in this Order shall impair or impact any valid trust claims under the Perishable

Agricultural Commodities Act, 7 U.S.C. §§ 499a-499t ("PACA"), and all such claims may be paid by the Borrowers in the ordinary course of business.

Section 7.    Final Hearing and Response Dates.

The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for _____, 2015 at __:__ a.m./p.m. before this Court.  The Debtors shall promptly mail copies of this Interim Order to the Noticed Parties, and to any other party that has filed a request for notices with this court and to any Committee after same has been appointed, or Committee counsel, if same shall have filed a request for notice.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) the Debtors, c/o Haggen, Inc., 221 Rimland Drive, Billingham, Washington 98228; Attn: Blake Barnett; (b) counsel for the Debtors, Young Conaway Stargatt and Taylor, LLP, One Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Matthew B. Lunn, Esq., Fax: (302) 576-3312 and Stroock & Stroock & Lavan LLP, 2029 Century Park East, #1600, Los Angeles, California, 90067-3086; Attn: Frank A. Merola, Esq., Fax: (310) 556-5800; (b) counsel for the Agent, Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801; Attn: Regina Stango Kelbon, Esq., Fax: (302) 425-6424 and Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174, Attn: Lawrence F. Flick, II, Esq., Fax: (215) 832-5556; (c) counsel to any Committee; and (d) the U.S. Trustee; and shall be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, in each case, to allow actual receipt of the foregoing no later than _____ ___, 2015, by 4:00 p.m. prevailing Eastern time.

Dated:  September 10, 2015
          Wilmington, Delaware

_____
HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1**

**BUDGET**

**Haggen Operations Holding LLC and Subsidiaries**
**DIP Budget**

*($ in 000's)*

| Week Ending ==> | 11-Sep Forecast | 18-Sep Forecast | 25-Sep Forecast | 02-Oct Forecast | 09-Oct Forecast | 16-Oct Forecast | 23-Oct Forecast | 30-Oct Forecast | 06-Nov Forecast | 13-Nov Forecast | 20-Nov Forecast | 27-Nov Forecast | 04-Dec Forecast | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Receipts** | $ 46,114 | $ 42,802 | $ 41,602 | $ 43,788 | $ 41,630 | $ 47,867 | $ 49,121 | $ 45,529 | $ 42,704 | $ 14,926 | $ 15,389 | $ 13,390 | $ 13,390 | $ 458,252 |
| | | | | | | | | | | | | | | |
| Grocery & Other | $ 25,498 | $ 25,109 | $ 18,618 | $ 24,689 | $ 24,583 | $ 8,630 | $ 7,520 | $ 8,798 | $ 8,064 | $ 6,626 | $ 6,988 | $ 7,216 | $ 7,242 | 179,581 |
| Payroll & Benefits | 7,041 | 6,333 | 14,014 | 8,033 | 6,741 | 8,137 | 12,964 | 5,643 | 3,523 | 2,481 | 1,105 | 10,288 | 1,110 | 87,411 |
| Rent | 41 | 2,768 | 2,768 | 8,549 | - | - | - | - | 8,549 | 2,013 | - | - | 2,003 | 26,690 |
| Taxes and Other Pass-Throughs | 3,533 | 2,771 | 10,125 | 582 | 582 | 1,882 | 8,199 | 582 | 582 | 582 | 1,182 | 5,098 | 1,630 | 37,332 |
| Freight, GCs, Corporate & Other | 8,255 | 4,202 | 4,536 | 4,585 | 4,541 | 3,544 | 3,513 | 3,282 | 2,534 | 1,829 | 1,690 | 1,146 | 1,810 | 45,466 |
| Professional fees [1] | 1,793 | 1,346 | 1,296 | 1,457 | 1,457 | 1,353 | 1,353 | 1,378 | 1,378 | 828 | 828 | 828 | 828 | 16,124 |
| Restructuring items [2] | 4,968 | 4,785 | 5,877 | (6,100) | 2,235 | 2,235 | (29,398) | 6,723 | 617 | (37,765) | 1,032 | - | - | (44,792) |
| **Total Disbursements** | $ 51,128 | $ 47,314 | $ 57,235 | $ 41,795 | $ 40,138 | $ 25,781 | $ 4,150 | $ 26,407 | $ 25,248 | $ (23,406) | $ 12,825 | $ 24,576 | $ 14,622 | $ 347,813 |
| | | | | | | | | | | | | | | |
| **Total Cash Flow** | $ (5,015) | $ (4,512) | $ (15,633) | $ 1,993 | $ 1,492 | $ 22,086 | $ 44,971 | $ 19,122 | $ 17,456 | $ 38,332 | $ 2,564 | $ (11,186) | $ (1,232) | $ 110,439 |
| | | | | | | | | | | | | | | |
| **Beginning Bank Cash Balance** | $ 272 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 272 |
| +/- Cash Flow | (5,015) | (4,512) | (15,633) | 1,993 | 1,492 | 22,086 | 44,971 | 19,122 | 17,456 | 38,332 | 2,564 | (11,186) | (1,232) | 110,439 |
| +/- DIP Facility Draw / (Repayment) | 5,742 | 4,512 | 15,633 | (1,993) | (1,492) | (22,086) | (44,971) | (19,122) | (17,456) | (38,332) | (2,564) | 11,186 | 1,232 | (109,711) |
| **Ending Bank Cash Balance** | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 |
| | | | | | | | | | | | | | | |
| **Beginning DIP Facility** | $ 164,466 | $ 170,455 | $ 174,967 | $ 190,600 | $ 188,607 | $ 188,253 | $ 166,167 | $ 121,196 | $ 102,074 | $ 85,537 | $ 47,205 | $ 44,641 | $ 55,827 | $ 164,466 |
| +/- DIP Facility Draw / (Repayment) | 5,742 | 4,512 | 15,633 | (1,993) | (1,492) | (22,086) | (44,971) | (19,122) | (17,456) | (38,332) | (2,564) | 11,186 | 1,232 | (109,711) |
| +/- Fees and Interest | 246 | | | | 1,138 | | | | | 920 | | | 489 | 2,793 |
| **Ending DIP Facility Balance (excluding LCs)** | $ 170,455 | $ 174,967 | $ 190,600 | $ 188,607 | $ 188,253 | $ 166,167 | $ 121,196 | $ 102,074 | $ 85,537 | $ 47,205 | $ 44,641 | $ 55,827 | $ 57,548 | $ 57,548 |

[1] Per schedule identifying amounts for Debtor professionals, DIP Lender professionals and Committee & Other professionals
[2] Negative amounts indicate certain transactions subject to Court approval. Not intended for covenant measurement purposes.

**EXHIBIT 2**

**DIP CREDIT AGREEMENT**

# **EXHIBIT B**

DIP Credit Agreement

**SUBJECT TO REVIEW AND APPROVAL IN ALL RESPECTS BY AGENT AND LENDERS AND LENDERS' INDIVIDUAL CREDIT APPROVALS**

**DEBTOR-IN-POSSESSION REVOLVING CREDIT AND SECURITY AGREEMENT**

**PNC BANK, NATIONAL ASSOCIATION**

**(AS AGENT)**

**PNC BANK, NATIONAL ASSOCIATION**

**AND THE OTHER FINANCIAL INSTITUTIONS PARTY HERETO**

**(AS LENDERS)**

**WITH**

**HAGGEN, INC.**
**HAGGEN OPCO NORTH, LLC**
**HAGGEN OPCO SOUTH, LLC**

**AND**

**EACH PERSON JOINED HERETO AS A BORROWER FROM TIME TO TIME**

**(COLLECTIVELY, THE BORROWERS)**

**September [___], 2015**

# TABLE OF CONTENTS

Page

I.  DEFINITIONS..................................................................................................................2
    1.1.  Accounting Terms.................................................................................................2
    1.2.  General Terms.......................................................................................................2
    1.3.  Uniform Commercial Code Terms ......................................................................45
    1.4.  Certain Matters of Construction..........................................................................46

II. ADVANCES, PAYMENTS. ...........................................................................................49
    2.1.  Revolving Advances. ...........................................................................................49
    2.2.  Procedures for Requesting Revolving Advances; Procedures for Selection
          of Applicable Interest Rates for All Advances. ...................................................51
    2.3.  Reserved...............................................................................................................54
    2.4.  Swing Loans.........................................................................................................54
    2.5.  Disbursement of Advance Proceeds ....................................................................55
    2.6.  Making and Settlement of Advances. ..................................................................55
    2.7.  Maximum Advances .............................................................................................57
    2.8.  Manner and Repayment of Advances. .................................................................57
    2.9.  Repayment of Excess Advances ..........................................................................58
    2.10. Statement of Account...........................................................................................58
    2.11. Letters of Credit. ..................................................................................................59
    2.12. Issuance of Letters of Credit. ..............................................................................60
    2.13. Requirements For Issuance of Letters of Credit. ................................................60
    2.14. Disbursements, Reimbursement. .........................................................................61
    2.15. Repayment of Participation Advances..................................................................62
    2.16. Documentation .....................................................................................................63
    2.17. Determination to Honor Drawing Request ..........................................................63
    2.18. Nature of Participation and Reimbursement Obligations ....................................63
    2.19. Liability for Acts and Omissions. ........................................................................65
    2.20. Mandatory Prepayments. .....................................................................................66
    2.21. Use of Proceeds....................................................................................................67
    2.22. Defaulting Lender. ...............................................................................................68
    2.23. Payment of Obligations........................................................................................70
    2.24. Increase in Maximum Revolving Advance Amount.**Error! Bookmark not defined.**

III. INTEREST AND FEES...................................................................................................71
    3.1.  Interest..................................................................................................................71
    3.2.  Letter of Credit Fees. ...........................................................................................71
    3.3.  Facility Fee...........................................................................................................73
    3.4.  Fee Letter and Appraisal Fees..............................................................................73
    3.5.  Computation of Interest and Fees ........................................................................74
    3.6.  Maximum Charges ...............................................................................................74
    3.7.  Increased Costs ....................................................................................................74
    3.8.  Basis For Determining Interest Rate Inadequate or Unfair .................................75
    3.9.  Capital Adequacy.................................................................................................76

074658.14086/101390412v.6

3.10.  Taxes. ....................................................................................................76
3.11.  Replacement of Lenders .....................................................................79

IV.  COLLATERAL:  GENERAL TERMS ...........................................................80

4.1.  Security Interest in the Collateral .....................................................80
4.2.  Perfection of Security Interest ..........................................................80
4.3.  Preservation of Collateral .................................................................81
4.4.  Ownership and Location of Collateral...............................................81
4.5.  Defense of Agent's and Lenders' Interests........................................82
4.6.  Inspection of Premises ......................................................................82
4.7.  Appraisals ..........................................................................................82
4.8.  Receivables; Deposit Accounts and Securities Accounts. .................83
4.9.  Inventory ...........................................................................................86
4.10.  Maintenance of Equipment ...............................................................87
4.11.  Exculpation of Liability .....................................................................87
4.12.  Financing Statements .........................................................................87

V.  REPRESENTATIONS AND WARRANTIES....................................................87

5.1.  Authority ............................................................................................87
5.2.  Formation and Qualification. .............................................................88
5.3.  Survival of Representations and Warranties......................................88
5.4.  Tax Returns ........................................................................................88
5.5.  Financial Statements. ...................................**Error! Bookmark not defined.**
5.6.  Entity Names......................................................................................89
5.7.  O.S.H.A. Environmental Compliance; Flood Insurance.....................89
5.8.  Solvency; No Litigation, Violation, Indebtedness or Default; ERISA
Compliance. .......................................................................................90
5.9.  Patents, Trademarks, Copyrights and Licenses ................................91
5.10.  Licenses and Permits.........................................................................91
5.11.  Default of Indebtedness ....................................................................91
5.12.  No Default. .........................................................................................91
5.13.  No Burdensome Restrictions ..............................................................92
5.14.  No Labor Disputes .............................................................................92
5.15.  Margin Regulations ...........................................................................92
5.16.  Investment Company Act ...................................................................92
5.17.  Disclosure ..........................................................................................92
5.18.  Sale / Leaseback Transaction................................**Error! Bookmark not defined.**
5.19.  Delivery of Acquisition Agreement and Sale / Leaseback Documents.................92
5.20.  Swaps .................................................................................................92
5.21.  Business and Property of Borrowers...................................................92
5.22.  Ineligible Securities ...........................................................................93
5.23.  Federal Securities Laws ....................................................................93
5.24.  Equity Interests ..................................................................................93
5.25.  Commercial Tort Claims.....................................................................93
5.26.  Letter of Credit Rights ...........................................**Error! Bookmark not defined.**
5.27.  Material Contracts.................................................**Error! Bookmark not defined.**
5.28.  Credit Card Agreements ....................................................................93

|        | 5.29.  | Sellers' Lien Laws ................................................................94 |
|        | 5.30.  | HIPAA Compliance. ...........................................................94 |
|        | 5.31.  | Compliance with Health Care Laws .....................................95 |
|        | 5.32.  | Health Care Law Compliance. ..............................................96 |
|        | 5.33.  | Prescription Lists ...............................................................97 |

| VI.    | **AFFIRMATIVE COVENANTS.** ...............................................97 |
|        | 6.1.   | Compliance with Laws .......................................................97 |
|        | 6.2.   | Conduct of Business and Maintenance of Existence and Assets ...........97 |
|        | 6.3.   | Books and Records .............................................................98 |
|        | 6.4.   | Payment of Taxes ..............................................................98 |
|        | 6.5.   | Fixed Charge Coverage Ratio. ................................**Error! Bookmark not defined.** |
|        | 6.6.   | Insurance. ..........................................................................99 |
|        | 6.7.   | Payment of Obligations......................................................100 |
|        | 6.8.   | Environmental Matters.......................................................101 |
|        | 6.9.   | Standards of Financial Statements ......................................102 |
|        | 6.10.  | Federal Securities Laws .....................................................102 |
|        | 6.11.  | Execution of Supplemental Instruments .............................102 |
|        | 6.12.  | Exercise of Rights .............................................................102 |
|        | 6.13.  | Government Receivables ....................................................102 |
|        | 6.14.  | Healthcare Covenants ........................................................102 |
|        | 6.15.  | Keepwell ...........................................................................103 |
|        | 6.16.  | Farm Products. ..................................................................103 |
|        | 6.17.  | Prescription Lists ..............................................................104 |
|        | 6.18.  | Post Closing Covenants ........................................**Error! Bookmark not defined.** |

| VII.   | **NEGATIVE COVENANTS.** .....................................................105 |
|        | 7.1.   | Merger, Consolidation, Acquisition and Sale of Assets. ....................105 |
|        | 7.2.   | Creation of Liens...............................................................105 |
|        | 7.3.   | Guarantees. .......................................................................105 |
|        | 7.4.   | Investments ......................................................................105 |
|        | 7.5.   | Loans.................................................................................105 |
|        | 7.6.   | Capital Expenditures .........................................................105 |
|        | 7.7.   | Dividends ..........................................................................105 |
|        | 7.8.   | Indebtedness .....................................................................106 |
|        | 7.9.   | Nature of Business ............................................................106 |
|        | 7.10.  | Transactions with Affiliates ..............................................106 |
|        | 7.11.  | Real Property ....................................................................106 |
|        | 7.12.  | Subsidiaries. .....................................................................106 |
|        | 7.13.  | Fiscal Year and Accounting Changes .................................106 |
|        | 7.14.  | Pledge of Credit ................................................................106 |
|        | 7.15.  | Amendment of Organizational Documents .........................107 |
|        | 7.16.  | Compliance with ERISA....................................................107 |
|        | 7.17.  | Prepayment of Indebtedness ..............................................107 |
|        | 7.18.  | Pharmacy Scripts ..............................................................107 |
|        | 7.19.  | Membership / Partnership Interests ...................................108 |
|        | 7.20.  | Credit Card Arrangements .................................................108 |

iii

| | 7.21. | Consents | 108 |
| | 7.22. | Sale/Leaseback and Equity Interest Proceeds | 108 |
| | 7.23. | Other Agreements | 108 |
| VIII. | | CONDITIONS PRECEDENT. | 109 |
| | 8.1. | Conditions to Effectiveness | 109 |
| | 8.2. | Conditions to Each Advance | 112 |
| IX. | | INFORMATION AS TO BORROWERS. | 113 |
| | 9.1. | Disclosure of Material Matters. | 113 |
| | 9.2. | Schedules. | 113 |
| | 9.3. | Environmental Reports. | 114 |
| | 9.4. | Litigation | 115 |
| | 9.5. | Material Occurrences | 115 |
| | 9.6. | Government Receivables | 115 |
| | 9.7. | Annual Financial Statements | 115 |
| | 9.8. | Reserved. | 115 |
| | 9.9. | Monthly Financial Statements | 115 |
| | 9.10. | Other Reports | 116 |
| | 9.11. | Additional Information | 116 |
| | 9.12. | Projected Operating Budget | **Error! Bookmark not defined.** |
| | 9.13. | Variances From Operating Budget | 116 |
| | 9.14. | Notice of Suits, Adverse Events | 116 |
| | 9.15. | ERISA Notices and Requests | 117 |
| | 9.16. | [Reserved]. | 118 |
| | 9.17. | Updates to Certain Schedules | 118 |
| | 9.18. | Financial Disclosure | 118 |
| X. | | EVENTS OF DEFAULT. | 119 |
| | 10.1. | Nonpayment | 119 |
| | 10.2. | Breach of Representation | 119 |
| | 10.3. | Financial Information | 119 |
| | 10.4. | Judicial Actions | 119 |
| | 10.5. | Noncompliance | 119 |
| | 10.6. | Judgments | 119 |
| | 10.7. | Bankruptcy | 120 |
| | 10.8. | Reserved; | 125 |
| | 10.9. | Lien Priority | 126 |
| | 10.10. | Deposit Account Assignment Agreement | 126 |
| | 10.11. | Cross Default | 126 |
| | 10.12. | Breach of Guaranty or Pledge Agreement | 126 |
| | 10.13. | Change of Control | 126 |
| | 10.14. | Invalidity | 126 |
| | 10.15. | Seizures | 126 |
| | 10.16. | Credit Cards | 126 |
| | 10.17. | Pension Plans | 126 |
| | 10.18. | Anti-Terrorism Laws | 127 |

iv

10.19. Deposit Account Instructions ................................................................127

XI.    LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT. ......................................127

    11.1.  Rights and Remedies..............................................................................127
    11.2.  Agent's Discretion ................................................................................129
    11.3.  Setoff....................................................................................................129
    11.4.  Rights and Remedies not Exclusive.....................................................129
    11.5.  Allocation of Payments After Event of Default...................................129

XII.   WAIVERS AND JUDICIAL PROCEEDINGS. ........................................................131

    12.1.  Waiver of Notice...................................................................................131
    12.2.  Delay ....................................................................................................131
    12.3.  Jury Waiver ..........................................................................................131

XIII.  EFFECTIVE DATE AND TERMINATION. ...........................................................131

    13.1.  Term......................................................................................................131
    13.2.  Termination...........................................................................................132

XIV.   REGARDING AGENT. .......................................................................................133

    14.1.  Appointment .........................................................................................133
    14.2.  Nature of Duties....................................................................................133
    14.3.  Lack of Reliance on Agent ...................................................................134
    14.4.  Resignation of Agent; Successor Agent ...............................................134
    14.5.  Certain Rights of Agent ........................................................................135
    14.6.  Reliance.................................................................................................135
    14.7.  Notice of Default...................................................................................135
    14.8.  Indemnification .....................................................................................135
    14.9.  Agent in its Individual Capacity ...........................................................135
    14.10. Delivery of Documents .........................................................................136
    14.11. Borrowers' Undertaking to Agent ........................................................136
    14.12. No Reliance on Agent's Customer Identification Program ...................136
    14.13. Other Agreements .................................................................................136

XV.    BORROWING AGENCY. ....................................................................................136

    15.1.  Borrowing Agency Provisions..............................................................136
    15.2.  Waiver of Subrogation ..........................................................................137

XVI.   MISCELLANEOUS. ...........................................................................................138

    16.1.  Governing Law .....................................................................................138
    16.2.  Entire Understanding. ...........................................................................138
    16.3.  Successors and Assigns; Participations; New Lenders.........................142
    16.4.  Application of Payments .......................................................................144
    16.5.  Indemnity ..............................................................................................145
    16.6.  Notice....................................................................................................146
    16.7.  Survival.................................................................................................148
    16.8.  Severability ...........................................................................................148
    16.9.  Expenses ...............................................................................................148

v

16.10.  Injunctive Relief.................................................................................................149

16.11.  Consequential Damages.....................................................................................149

16.12.  Captions ............................................................................................................150

16.13.  Counterparts; Facsimile Signatures ................................................................150

16.14.  Construction......................................................................................................150

16.15.  Confidentiality; Sharing Information...............................................................150

16.16.  Publicity ...........................................................................................................150

16.17.  Certifications From Banks and Participants; USA PATRIOT Act.....................151

16.18.  Anti-Terrorism Laws. ......................................................................................151

vi

LIST OF EXHIBITS AND SCHEDULES

<u>Exhibits</u>

| | |
|---|---|
| Exhibit A | Budget |
| Exhibit B | Interim Order |
| Exhibit C | Budget Variance Report |
| Exhibit 1.2(a) | Borrowing Base Certificate |
| Exhibit 1.2(b) | Compliance Certificate |
| Exhibit 2.1(a) | Revolving Credit Note |
| Exhibit 2.4(a) | Swing Loan Note |
| Exhibit 4.8(e) | Processor Letter |
| Exhibit 5.5(b) | Financial Projections |
| Exhibit 8.1(e) | Financial Condition Certificate |
| Exhibit 16.3 | Commitment Transfer Supplement |

<u>Schedules</u>

| | |
|---|---|
| Schedule 1.1(a) | Commitments |
| Schedule 1.2(a) | Permitted Encumbrances |
| Schedule 4.4 | Equipment and Inventory Locations; Place of Business, Chief Executive Office, Real Property |
| Schedule 4.8(l) | Deposit and Investment Accounts |
| Schedule 5.1 | Consents |
| Schedule 5.2(a) | States of Qualification and Good Standing |
| Schedule 5.2(b) | Subsidiaries |
| Schedule 5.4 | Federal Tax Identification Number |
| Schedule 5.5(c) | Financial Statements |
| Schedule 5.6 | Prior Names, Mergers and Consolidations |
| Schedule 5.7(c) | Environmental |
| Schedule 5.8(b)(i) | Litigation |
| Schedule 5.8(b)(ii) | Indebtedness |
| Schedule 5.8(d) | Plans |
| Schedule 5.9 | Intellectual Property, Source Code Escrow Agreements |
| Schedule 5.10 | Licenses and Permits |
| Schedule 5.14 | Labor Disputes |
| Schedule 5.24 | Equity Interests |
| Schedule 5.27 | Material Contracts |
| Schedule 5.28 | Credit Card Processors |
| Schedule 5.30(d) | Business Associates |
| Schedule 7.10 | Transactions with Affiliates |

074658.14086/101390412v.6

# DEBTOR-IN-POSSESSION REVOLVING CREDIT

## AND

## SECURITY AGREEMENT

Pursuant to Sections 364(c) and (d) of the Bankruptcy Code, this Debtor-in-Possession Revolving Credit and Security Agreement is entered into as of September [____], 2015 among **HAGGEN, INC.,** a Washington corporation ("Haggen"), **HAGGEN OPCO NORTH, LLC,** a Delaware limited liability company ("Haggen Opco North"), **HAGGEN OPCO SOUTH, LLC**, a Delaware limited liability company ("Haggen Opco South" and, together with Haggen Opco North, Haggen, and each Person joined hereto as a borrower from time to time, collectively, the "Borrowers", and each a "Borrower"), Haggen Acquisition, LLC, a Delaware limited liability company ("Haggen Acquisition"), Haggen Operations Holdings, LLC, a Delaware limited liability company ("Operations Holdings", and together with Haggen Acquisition and and each Person joined hereto as a "debtor guarantor" from time to time, collectively, the "Debtor Guarantors", and each a "Debtor Guarantors") the financial institutions which are now or which hereafter become a party hereto (collectively, the "Lenders" and each individually a "Lender"), and **PNC BANK, NATIONAL ASSOCIATION** ("PNC"), as agent for Lenders (PNC, in such capacity, the "Agent").

## RECITALS

A.     On September [____], 2015 (the "Petition Date"), Haggen, Haggen Opco North and Haggen Opco South, as well as Haggen Acquisition and Operations Holdings (collectively, the "Debtors"), filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, which petition is identified as Bankruptcy Case Nos. [_____] and [_____] (collectively, the "Case") before the United States Bankruptcy Court for the District of Delaware (together any other court having jurisdiction over the Case, the "Bankruptcy Court"). Debtors remain in possession of their assets and are operating their businesses as a debtors-in-possession under Chapter 11 of the Bankruptcy Code.

B.     Pursuant to that certain Revolving Credit and Security Agreement, dated February 12, 2015 (as amended, supplemented and modified from time to time, the "Pre-Petition Credit Agreement"), by and among the Borrowers, the financial institutions party thereto as of the Petition Date (collectively, each in such capacity, the "Pre-Petition Lenders") and PNC, as agent for Pre-Petition Lenders (in such capacity, "Pre-Petition Agent"), Pre-Petition Agent and Pre-Petition Lenders made certain credit facilities and advances of credit available to Borrowers prior to the Petition Date on the terms and conditions set forth therein, which credit facilities and advances of credit and all other  Pre-Petition Obligations (as defined below) thereunder are unconditionally guaranteed by the Debtor Guarantors and secured by Liens on substantially all the assets of the Borrowers and the Debtor Guarantors.

C.     Borrowers and Debtor Guarantors have requested that during the Case, Agent and the Lenders make advances and other financial accommodations available to Borrowers of up to Maximum Revolving Advance Amount specified herein on a senior secured, superpriority basis, pursuant to, inter alia, Section 364(c) and (d) of the Bankruptcy Code.

D.     Agent and the Lenders are willing to provide advances and other financial accommodations to Borrowers on a senior secured, superpriority basis on the terms and subject

to the conditions of this Agreement, so long as such post-petition credit obligations are (i) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of the Loan Parties, whether now owned or hereafter acquired, which liens (other than the Permitted Liens (as defined in the Interim Order) and the Carve-Out) are superior to all other Liens pursuant to Sections 364(c) and (d) of the Bankruptcy Code; (ii) given priority over any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, under Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code, subject, as to priority, only to the Carve-Out, as provided in the Interim Order; (iii) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of each Guarantor, whether now owned or hereafter acquired, which Liens are superior to all other Liens; and (iv) guaranteed by each Guarantor pursuant to a guaranty agreement in favor of Agent, for its own benefit and the benefit of the Lenders.

IN CONSIDERATION of the foregoing recitals, which are incorporated herein by this reference, the mutual covenants and undertakings herein contained, the Debtors (acting for themselves and as debtors-in-possession), the Lenders and Agent hereby agree as follows:

I.    DEFINITIONS.

1.1.    Accounting Terms.    As used in this Agreement, the Other Documents or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined in Section 1.2 or elsewhere in this Agreement and accounting terms partly defined in Section 1.2 to the extent not defined shall have the respective meanings given to them under GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in this Agreement or any Other Document, and Borrowing Agent, Agent or the Required Lenders shall so request, Agent, Lenders and Borrowers shall negotiate in good faith to agree to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP and this Agreement prior to such change therein and herein, and (ii) Borrowers shall provide to Agent and the Lenders, financial statements, Compliance Certificates and other documents required under this Agreement or any Other Document or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.  Any reference in this Agreement to a "fiscal month" shall mean any of the monthly accounting periods of Borrowers ending on the dates specified in Borrowers' reporting calendar (which is based on a 13 period cycle) as in effect on the Second Amendment Date.  Any reference in this Agreement to a "fiscal year" shall mean any of the annual accounting periods of Borrowers ending on the dates specified in Borrowers' reporting calendar (which is based on a 13 period cycle) as in effect on the Second Amendment Date.

1.2.    General Terms.    For purposes of this Agreement the following terms shall have the following meanings:

"Accreditation Organization" shall mean, as of any date, the organization with which a Borrower is accredited to sell and dispense DMEPOS, diabetes or Medicare Part B supplies and services.

2

"Acquisition Agreement" shall mean collectively, the Asset Purchase Agreement, dated as of December 10, 2014, by and among Albertson's LLC and Albertson's Holdings LLC, collectively, as sellers, and Holdings, as buyer, as partially assigned by Holdings to Haggen OpCo North and Haggen OpCo South, as such Asset Purchase Agreement may be amended or modified and in effect from time to time in accordance with the terms hereof, and any material documents delivered in connection therewith.

"Advance Rates" shall have the meaning set forth in Section 2.1(a)(y)(vi) hereof.

"Advances" shall mean and include the Revolving Advances, Letters of Credit, and the Swing Loans.

"Affected Lender" shall have the meaning set forth in Section 3.11 hereof.

"Affiliate" of any Person shall mean (a) any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director, manager, member, managing member, general partner or executive officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above.  For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote 10% or more of the Equity Interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for any such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by ownership of Equity Interests, contract or otherwise.

"Agent" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"Aggregate Liquidity 363 Proceeds" shall have the meaning set forth in Section 10.7(q) hereof.

"Aggregate Liquidity Pharmacy Proceeds" shall have the meaning set forth in Section 10.7(p) hereof.

"Agreement" shall mean this Debtor-in-Possession Revolving Credit and Security Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Albertson's Commercial Tort Claims" shall mean all commercial tort claims (as defined under the Uniform Commercial Code) of any Loan Party and/or Affiliate of any Loan Party arising out of, related to or in connection with the Acquisition Agreement or any transactions related thereto including (i) counterclaims asserted or to be asserted in Case Number BC 588598 filed in the Superior Court of the State of California for the County of Los Angeles, and (ii) claims asserted or to be asserted in Case Number [_____] filed in the U.S. District Court for the District of Delaware.

"Allocated Combined 363 Proceeds" shall have the meaning set forth in Section 10.7(p) hereof.

"Allocated Combined Pharmacy Proceeds" shall have the meaning set forth in Section 10.7(p) hereof.

"Allowed Professional Fees" shall have the meaning given to the term "Allowed Professional Fees" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

3

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the highest of (a) the Base Rate in effect on such day, (b) the sum of the Federal Funds Open Rate in effect on such day plus one half of one percent (0.5%), and (c) the sum of the Daily LIBOR Rate in effect on such day plus one percent (1.0%), so long as a Daily LIBOR Rate is offered, ascertainable and not unlawful.

"Alternate Source" shall have the meaning set forth in the definition of Federal Funds Open Rate.

"Anti-Terrorism Laws" shall mean any Laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering or bribery, and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, all as amended, supplemented or replaced from time to time.

"Applicable Law" shall mean all laws, rules and regulations applicable to the Person, conduct, transaction, covenant, Other Document or contract in question, including all applicable common law and equitable principles, all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations, treaties, directives and orders of any Governmental Body, and all orders, judgments and decrees of all courts and arbitrators.

"Applicable Margin" shall mean for Revolving Advances and Swing Loans as of the Closing Date and through and including the date immediately prior to the first Adjustment Date (as defined below), the applicable percentage specified below: three percent (3.00%)

"Application Date" shall have the meaning set forth in Section 2.8(b) hereof.

"Approvals" shall have the meaning set forth in Section 5.7(b) hereof.

"Approved 363 Sale" shall mean any sale of any Loan Party's assets or business pursuant to Section 363 of the Bankruptcy Code approved by the Agent pursuant to appropriate orders of the Bankruptcy Court that are approved by and acceptable to Agent, but shall not include (i) any Approved Going Out of Business Sale, (ii) any Approved Core Stores Sale or (iii) any Approved Prescription List Sale.

"Approved Bankruptcy Sale" shall mean, collectively, the Approved 363 Sales, Approved Core Stores Sale and Approved Going Out of Business Sales.

"Approved Core Stores Sale" shall mean a Core Stores Sale approved by the Agent conducted pursuant to the Cores Stores Bidding Procedures Order and approved by the Core Stores Sale Order.

"Approved Electronic Communication" shall mean each notice, demand, communication, information, document and other material transmitted, posted or otherwise made or communicated by e-mail, E-Fax, the StuckyNet System©, or any other equivalent electronic service agreed to by Agent, whether owned, operated or hosted by Agent, any Lender, any of their Affiliates or any other Person, that any party is obligated to, or otherwise chooses to, provide to Agent pursuant to this Agreement or any Other Document, including any financial statement, financial and other report, notice, request, certificate and other information material; provided that Approved Electronic Communications shall not include any notice, demand, communication, information, document or other material that Agent specifically instructs a Person to deliver in physical form.

4

"Approved Going Out of Business Sale" shall mean each and any of the following: (a) the Planned GOB Sales, and (y) any other similar "going out of business" sale as to any store location(s) of any Loan Party pursuant to Section 363 of the Bankruptcy Code approved by Agent pursuant to appropriate orders of the Bankruptcy Court that are approved by and acceptable to Agent.

"Approved Prescription List Sale" shall mean any sale of any Loan Party's Prescription List(s) pursuant to Section 363 of the Bankruptcy Code approved by the Agent pursuant to appropriate orders of the Bankruptcy Court that are approved by and acceptable to Agent.

"Average Usage" shall have the meaning set forth in Section 3.3 hereof.

"Avoidance Actions" means all actions of the Debtors or their estates under 11 U.S.C. 544, 547, and 548, and all proceeds thereof.

"Bankruptcy Code" shall mean Title 11 of the United States Code entitled "Bankruptcy" (11 U.S.C. § 101, et seq.).

"Bankruptcy Court" shall have the meaning set forth in the recitals hereto.

"Base Rate" shall mean the base commercial lending rate of PNC as publicly announced to be in effect from time to time, such rate to be adjusted automatically, without notice, on the effective date of any change in such rate. This rate of interest is determined from time to time by PNC as a means of pricing some loans to its customers and is neither tied to any external rate of interest or index nor does it necessarily reflect the lowest rate of interest actually charged by PNC to any particular class or category of customers of PNC.

"Benefited Lender" shall have the meaning set forth in Section 2.6(e) hereof.

"Blocked Account Bank" shall have the meaning set forth in Section 4.8(i) hereof.

"Blocked Accounts" shall have the meaning set forth in Section 4.8(i) hereof.

"Board of Directors" of any Person shall mean the board of directors, board of managers, managing members or other comparable committee or governing body authorized to act on behalf of such Person pursuant to such Person's Governing Documents.

"Borrower" or "Borrowers" shall have the meaning set forth in the preamble to this Agreement and shall extend to all permitted successors and assigns of such Persons.

"Borrowers' Account" shall have the meaning set forth in Section 2.10 hereof.

"Borrowing Agent" shall mean Haggen OpCo North.

"Borrowing Base Certificate" shall mean a certificate in substantially the form of Exhibit 1.2(a) hereto duly executed by the President, Chief Financial Officer, Controller or other officer performing similar duties of the Borrowing Agent and delivered to the Agent, appropriately completed, by which such officer shall certify to Agent the Formula Amount and calculation thereof as of the date of such certificate.

"Budget" shall mean the thirteen-week budget for the Loan Parties delivered to and approved by Agent and Lenders on or before the Closing Date and attached hereto as Exhibit A, (the "Initial Budget") setting forth Loan Parties' cash flow forecast with line item detail approved by Agent and Lenders on or before the Closing Date, including receipts, and

disbursements, as well as projected borrowings hereunder for the thirteen-week period commencing with the week in which the Closing Date shall occur, as such budget shall be updated from time to time in accordance with and subject to approval of Agent and Required Lenders as set forth in Section 9.12 hereof.

"Business Day" shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in East Brunswick, New Jersey and, if the applicable Business Day relates to any LIBOR Rate Loans, such day must also be a day on which dealings are carried on in the London interbank market.

"Capital Expenditures" shall mean expenditures made or liabilities incurred for the acquisition of any fixed assets or improvements, replacements, substitutions or additions thereto which have a useful life of more than one year, including the total principal portion of Capitalized Lease Obligations, which, in accordance with GAAP, would be classified as capital expenditures; provided however that Capital Expenditures shall not include any expenditures (a) made directly with the proceeds of issuances of Equity Interests of any Borrower, or (b) made in connection with the acquisition of any fixed assets, improvements, replacements, substitutions or additions that would constitute a capital expenditure if such acquisition is otherwise consented to by Agent in writing.

"Capitalized Lease Obligation" shall mean any Indebtedness of any Borrower represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve-Out" shall have the meaning given to the term "Carve-Out" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"Carve-Out Reserve" shall have the meaning set forth in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"Carve-Out Reserve Account" shall mean have the meaning set forth in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"Case" shall have the meaning set forth in the recitals hereto.

"Cash Management Order" shall have the meaning set forth in Section 8.1(u) hereof.

"Cash Management Products and Services" shall mean agreements or other arrangements under which Agent or any Lender or any Affiliate of Agent or a Lender provides any of the following products or services to any Borrower:  (a) credit cards; (b) credit card processing services; (c) debit cards and stored value cards; (d) commercial cards; (e) ACH transactions; and (f) cash management and treasury management services and products, including without limitation controlled disbursement accounts or services, lockboxes, automated clearinghouse transactions, overdrafts, interstate depository network services.  The indebtedness, obligations and liabilities of any Borrower to the provider of any Cash Management Products and Services (including all obligations and liabilities owing to such provider in respect of any returned items deposited with such provider) (the "Cash Management Liabilities") shall be "Obligations" hereunder, guaranteed obligations under the Guaranty and secured obligations under any Guarantor Security Agreement, as applicable,  and otherwise treated as Obligations for purposes of each of the Other Documents.  The Liens securing the Cash Management Products and Services shall be pari passu with the Liens securing all other Obligations under this Agreement and the Other Documents, subject to the express provisions of Section 11.5.

6

"Cash Management Liabilities" shall have the meaning provided in the definition of "Cash Management Products and Services."

"CEA" shall mean the Commodity Exchange Act (7 U.S.C.§1 et seq.), as amended from time to time, and any successor statute.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§9601 et seq.

"Certified Medicare Provider" shall mean a provider or supplier, including without limitation a pharmacy, that has in effect an agreement or enrollment with the Centers for Medicare and Medicaid Services to participate in Medicare.

"Certified Medicaid Provider" shall mean any provider or supplier, including without limitation a pharmacy, that has in effect an agreement with a Governmental Body of a State to participate in Medicaid.

"CFTC" shall mean the Commodity Futures Trading Commission.

"Change in Law" shall mean the occurrence of any of the following events: (a) the adoption or taking effect of any Applicable Law; (b) any change in any Applicable Law or in the administration, implementation, interpretation or application thereof by any Governmental Body; or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Body; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, regulations, guidelines, interpretations or directives thereunder or issued in connection therewith (whether or not having the force of Applicable Law) and (y) all requests, rules, regulations, guidelines, interpretations or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities (whether or not having the force of law), in each case pursuant to Basel III, shall in each case be deemed to be a Change in Law regardless of the date enacted, adopted, issued, promulgated or implemented.

"Change of Control" shall mean: (a) the occurrence of any event (whether in one or more transactions) which results in Sponsor failing to, directly or indirectly, control each Borrower; (b) the occurrence of any event (whether in one or more transactions) which results in Holdings failing, directly or indirectly, to own one hundred percent (100%) of the Equity Interests issued by each Borrower; (c) the occurrence of any event (whether in one or more transactions) which results in Operations Holdings failing, directly or indirectly, to own one hundred percent (100%) of the Equity Interests issued by each Borrower; or (d) except as otherwise permitted in this Agreement and the Other Documents, any merger or consolidation of or with any Borrower or any Guarantor.  For purposes of this definition, "control" of any Person  shall mean the power, direct or indirect (x) to vote 50% or more of the Equity Interests having ordinary voting power for the election of directors (or the individuals performing similar functions) of such Person, as the case may be, or (y) to direct or cause the direction of the management and policies of such Person, as the case may be, by contract or otherwise.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom

duties, fees, assessments, liens, claims and charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other authority, domestic or foreign (including the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon the Collateral or any Loan Party.

"CIP Regulations" shall have the meaning set forth in Section 14.12 hereof.

"Closing Date" shall mean September [____], 2015, or such other date as may be agreed to in writing by the parties hereto.

"Code" shall mean the Internal Revenue Code of 1986, as the same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

"Combined Sales" shall have the meaning set forth in Section 10.7(p) hereof

"Collateral" shall mean and include all right, title and interest of each Loan Party in all of the following property and assets of such Loan Party, in each case whether now existing or hereafter arising or created and whether now owned or hereafter acquired and wherever located:

     (a)    all Receivables (including Credit Card Receivables) and all supporting obligations relating thereto;

     (b)    all equipment and fixtures;

     (c)    all general intangibles (including all payment intangibles and all software) and all supporting obligations related thereto;

     (d)    all Inventory;

     (e)    all Subsidiary Stock, securities, investment property, and financial assets; provided that with respect to any Foreign Subsidiary such security interest shall be limited to 65% of such Subsidiary Stock of each first-tier Foreign Subsidiary;

     (f)    upon (and subject to) entry of the Final Order, all Avoidance Actions;

     (g)    all leasehold interests in real property;

     (h)    all contract rights, rights of payment which have been earned under a contract right, chattel paper (including electronic chattel paper and tangible chattel paper), commercial tort claims (whether now existing or hereafter arising), including without limitation Albertson's Commercial Tort Claims, and all supporting obligations; documents (including all warehouse receipts and bills of lading), deposit accounts, goods, instruments (including promissory notes), letters of credit (whether or not the respective letter of credit is evidenced by a writing) and letter-of-credit rights, cash, certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), security agreements, eminent domain proceeds, condemnation proceeds, tort claim proceeds and all supporting obligations, and property and assets of the Debtors described in the Final Order, or, prior to the entry of the Final Order, the Interim Order, and also the Carve-Out Reserve Account and all funds on deposit in the Carve-Out Reserve Account;

(i)    all ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by any Loan Party or in which it has an interest), computer programs, tapes, disks and documents, including all of such property relating to the property described in clauses (a) through and including (h) of this definition;

(j)    all proceeds and products of the property described in clauses (a) through and including (i) of this definition, in whatever form.  It is the intention of the parties that if Agent shall fail to have a perfected Lien in any particular property or assets of any Loan Party for any reason whatsoever, but the provisions of this Agreement and/or of the Other Documents, together with all financing statements and other public filings relating to Liens filed or recorded by Agent against Loan Parties, would be sufficient to create a perfected Lien in any property or assets that such Loan Party may receive upon the sale, lease, license, exchange, transfer or disposition of such particular property or assets, then all such "proceeds" of such particular property or assets shall be included in the Collateral as original collateral that is the subject of a direct and original grant of a security interest as provided for herein and in the Other Documents (and not merely as proceeds (as defined in Article 9 of the Uniform Commercial Code) in which a security interest is created or arises solely pursuant to Section 9-315 of the Uniform Commercial Code; and

(k)    without limitation of any of the foregoing, all of the Pre-Petition Collateral that is owned by a Loan Party.

"Commitment Transfer Supplement" shall mean a document in the form of Exhibit 16.3 hereto, properly completed and otherwise in form and substance satisfactory to Agent by which the Purchasing Lender purchases and assumes a portion of the obligation of Lenders to make Advances under this Agreement.

"Compliance Certificate" shall mean a compliance certificate substantially in the form of Exhibit 1.2(b) hereto to be signed by the Chief Executive Officer, President, Chief Financial Officer of Borrowing Agent or other authorized officer (acceptable to Agent) of the Borrowing Agent.

"Consents" shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications, accreditations and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on any Borrower's business or necessary (including to avoid a conflict or breach under any agreement, instrument, other document, license, permit or other authorization) for the execution, delivery or performance of this Agreement, the Other Documents, or the Acquisition Agreement, including any Consents required under all applicable federal, state or other Applicable Law.

"Consigned Inventory" shall mean Inventory of any Borrower that is in the possession of another Person on a consignment, sale or return, or other basis that does not constitute a final sale and acceptance of such Inventory.

"Contract Rate" shall have the meaning set forth in Section 3.1 hereof.

"Controlled Group" shall mean, at any time, each Borrower and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control and all other entities which, together with any Borrower, are treated as a single employer under Section 414 of the Code.

9

"Core Stores" shall mean an identified list of retail stores of Loan Parties provided by Loan Parties to Agent and Lenders, and accepted and approved by Agent and Required Lenders in their sole discretion in all respects, including as to number and identity of such stores, in each case prior to the distribution of the Core Stores Offering Memorandum, as such list may be updated upon written request of Loan Parties with the consent of Agent and Required Lenders (granted in their sole discretion) by addition and/or deletion of retail stores of Loan Parties at any time prior to the filing of the Core Stores Bidding Procedures Motion.

"Core Stores Sale" shall mean a sale as a going concern of the Core Stores, including in each case all Inventory and leasehold real estate interests associated with such Core Stores, whether to one or more purchasers, in lot or in whole.

"Core Stores Auction" has the meaning set forth in Section 10.7(u) hereof.

"Core Stores Bidding Procedures" shall have the meaning set forth in Section 10.7(s) hereof.

Core Stores Offering Memorandum" shall have the meaning set forth in Section 10.7(r) hereof.

"Core Stores Bidding Procedures Motion" shall have the meaning set forth in Section 10.7(t) hereof.

"Core Stores Bidding Procedures Order" shall have the meaning set forth in Section 10.7(t) hereof.

"Core Stores Sale Order" shall have the meaning set forth in Section 10.7(v) hereof.

"Covered Entity" shall mean (a) each Borrower, each of Borrower's Subsidiaries, all Guarantors and all pledgors of Collateral and (b) each Person that, directly or indirectly, is in control of a Person described in clause (a) above.  For purposes of this definition, control of a Person shall mean the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

"Credit Card Agreements" shall mean all agreements now or hereafter entered into by any Borrower with any Credit Card Issuer or any Credit Card Processor (in each case, in such capacity), or with any other Person for the processing and/or payment of the proceeds of any Credit Card Receivables, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Credit Card Issuer" means any Person (other than a Borrower) who issues or whose members issue credit cards or debit cards, including without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc., or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc. or Discover Financial Services, Inc.

"Credit Card Processor" means any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization,

10

billing transfer and/or payment procedures with respect to any Borrowers' sales transactions involving credit card or debt card purchases by Customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Receivables" shall mean each "Account" (as defined in the UCC) and each "payment intangible" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Borrower resulting from charges by a Customer of a Borrower on credit or debit cards issued by a Credit Card Issuer in connection with the sale of goods or the performance of services by a Borrower in the Ordinary Course of Business.

"Credit Card Receivables Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(ii) hereof.

"Creditors' Committee" means the official unsecured creditors' committee appointed in the Case.

"Cure Amount" shall have the meaning set forth in Section 6.5(b) hereof.

"Customer" shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with any Borrower, pursuant to which such Borrower is to deliver any personal property or perform any services.

"Customs" shall have the meaning set forth in Section 2.13(b) hereof.

"Daily LIBOR Rate" shall mean, for any day, the rate per annum determined by the Agent by dividing (x) the Published Rate by (y) a number equal to 1.00 minus the Reserve Percentage.

"Damage Lawsuit" shall have the meaning set forth in Section 4.13(i) hereof.

"Debtor Guarantor" or "Debtor Guarantors" shall have the meaning set forth in the preamble to this Agreement and shall extend to all permitted successors and assigns of such Persons.

"Debtors" shall have the meaning set forth in the recitals hereto.

"Default" shall mean an event, circumstance or condition which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning set forth in Section 3.1 hereof.

"Defaulting Lender" shall mean any Lender that: (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Revolving Commitment Percentage of Advances, (ii) if applicable, fund any portion of its Participation Commitment in Letters of Credit or Swing Loans or (iii) pay over to Agent, Issuer, Swing Loan Lender or any Lender any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including a particular Default or Event of Default, if any) has not been satisfied; (b) has notified Borrowers or Agent in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless

11

such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including a particular Default or Event of Default, if any) to funding a loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit; (c) has failed, within two (2) Business Days after request by Agent, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Advances and, if applicable, participations in then outstanding Letters of Credit and Swing Loans under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon Agent's receipt of such certification in form and substance satisfactory to the Agent; (d) has become the subject of an Insolvency Event; or (e) has failed at any time to comply with the provisions of Section 2.6(e) with respect to purchasing participations from the other Lenders, whereby such Lender's share of any payment received, whether by setoff or otherwise, is in excess of its pro rata share of such payments due and payable to all of the Lenders.

"Depository Accounts" shall have the meaning set forth in Section 4.8(i) hereof.

"Designated Lender" shall have the meaning set forth in Section 16.2(d) hereof.

"DMEPOS" shall mean durable medical equipment, prosthetics/orthotics and goods or supplies as defined under any Medicare, Medicaid or any other Third Party Payor program, as applicable.

"Document" shall have the meaning given to the term "document" in the Uniform Commercial Code.

"Dollar" and the sign "$" shall mean lawful money of the United States of America.

"Domestic Rate Loan" shall mean any Advance that bears interest based upon the Alternate Base Rate.

"Drawing Date" shall have the meaning set forth in Section 2.14(b) hereof.

"Effective Date" means the date indicated in a document or agreement to be the date on which such document or agreement becomes effective, or, if there is no such indication, the date of execution of such document or agreement.

"Eligible Contract Participant" shall mean an "eligible contract participant" as defined in the CEA and regulations thereunder.

"Eligibility Date" shall mean, with respect to each Borrower and Guarantor and each Swap, the date on which this Agreement or any Other Document becomes effective with respect to such Swap (for the avoidance of doubt, the Eligibility Date shall be the Effective Date of such Swap if this Agreement or any Other Document is then in effect with respect to such Borrower or Guarantor, and otherwise it shall be the Effective Date of this Agreement and/or such Other Document(s) to which such Borrower or Guarantor is a party).

"Eligible Credit Card Receivables" shall mean and include with respect to Borrowers, each Credit Card Receivable of Borrowers arising in the Ordinary Course of Business and which Agent, in its Permitted Discretion, shall deem to be an Eligible Credit Card Receivable, based on such considerations as Agent may from time to time deem appropriate. A Credit Card Receivable shall not be deemed an Eligible Credit Card Receivable unless such Credit Card Receivable is subject to Agent's first priority perfected security interest and no other Lien (other than

12

Permitted Encumbrances). In addition, no Credit Card Receivable shall be an Eligible Credit Card Receivable if:

(a)     such Credit Card Receivable is outstanding for more than five (5) days from the date of sale;

(b)     the applicable Borrower does not have good and valid title, free and clear of any Lien (other than Permitted Encumbrances) with respect to such Credit Card Receivable;

(c)     such Credit Card Receivable is in dispute, is with recourse to the applicable Borrower, or subject to a claim, counterclaim, offset or chargeback (other than offsets for fees and chargebacks of the applicable Credit Card Issuers or Credit Card Processors in the Ordinary Course of Business), in each case, to the extent of such claim, counterclaim, offset or chargeback;

(d)     such Credit Card Receivable is subject to a repurchase obligation by the applicable Borrower in favor of the Credit Card Processor or Credit Card Issuer;

(e)     such Credit Card Receivable is due from a Credit Card Issuer or Credit Card Processor of the applicable credit card which is the subject of any bankruptcy or insolvency proceedings;

(f)     such Credit Card Receivable is not a valid, legally enforceable obligation of the applicable issuer with respect thereto;

(g)     such Credit Card Receivable does not conform to all representations, warranties or other provisions herein or in the Other Documents relating to Credit Card Receivables;

(h)     such Credit Card Receivable is evidenced by "chattel paper" or an "instrument" of any kind unless such "chattel paper" or "instrument" is in the possession of the Agent, and to the extent necessary or appropriate, endorsed to the Agent;

(i)     subject to the time period set forth in Section 6.18(a), the Credit Card Processor with respect to such Credit Card Receivable is not obligated to remit the proceeds of such Credit Card Receivable to an account maintained at Agent pursuant to a Processor Letter which is in full force and effect;

(j)     such Credit Card Receivable or the underlying contract contravenes any laws or regulations applicable thereto;

(k)     the Credit Card Issuer or Credit Card Processor with respect to such Credit Card Receivable has sent a notice of default and/or notice of its intention to cease or suspend payment to such Borrower in respect of such Credit Card Receivable;

(l)     with respect to such Credit Card Receivable, the applicable Borrower have failed to submit all sales slips, drafts, charges or other reports or materials required by the Credit

Card Issuer or Credit Card Processor obligated in respect of such Credit Card Receivable in order for such Borrower to be entitled to payment in respect thereof; or

(m)     Agent has determined in its Permitted Discretion that such Credit Card Receivable is uncertain of collection; provided however that Agent shall provide Borrowers with three (3) days prior written notice of its intention to make a Credit Card Receivable ineligible under this clause (m).

"Eligible Inventory" shall mean and include Inventory owned by a Borrower (other than raw materials and work in process), valued at the lower of cost or market value (in accordance with GAAP), determined on a first-in-first-out basis, which is not, in Agent's Permitted Discretion, obsolete, slow moving or unmerchantable and which Agent, in its Permitted Discretion (and applying consistent criteria to make such determinations), shall not deem ineligible Inventory, based on such considerations as Agent may from time to time deem appropriate including whether the Inventory is subject to a perfected, first priority security interest in favor of Agent and no other Lien (other than a Permitted Encumbrance). In addition, Inventory shall not be Eligible Inventory if it:

(a)     does not conform to all Applicable Laws imposed by any Governmental Body which has regulatory authority over such goods or the use or sale thereof;

(b)     is in-transit;

(c)     is located outside the continental United States;

(d)     is located at a distribution center or warehouse leased by a Borrower, or at a location leased from an Affiliate, and Agent or Pre-Petition Agent shall not have received a Lien Waiver Agreement, in form and substance reasonably satisfactory to Agent or Pre-Petition Agent, as applicable, from the owner and lessor with respect to such location;

(e)     is past the expiration date thereof;

(f)     is comprised of goods that are (i) damaged, defective, "seconds" or otherwise unmerchantable, (ii) to be returned to the vendor, or (iii) seasonable in nature and which have been packed away for sale in subsequent seasons;

(g)     it has been discontinued or is otherwise of a type (SKU) not currently offered for sale by such Borrower, except for Eligible Pharmacy Inventory;

(h)     it consists of Eligible Pharmacy Inventory;

(i)     it consists of (i) tobacco unless all applicable local, state and federal tax stamps are included, the applicable Borrower is duly licensed to sell such tobacco and the applicable Borrower is complying with such duly issued license with respect to such products or (ii) alcohol unless the applicable Borrower is duly licensed to sell such alcohol and the applicable Borrower is complying with such duly issued license with respect to such products;

(j)     it constitutes Consigned Inventory;

14

(k)    it consists of promotional, packaging or shipping materials;

(l)    it consists of Albertsons' private label Inventory unless Borrowers are able to separately track such Inventory in their perpetual inventory system on a store-by-store basis;

(m)    it is the subject of an Intellectual Property Claim; or

(n)    it is subject to a license agreement that limits, conditions or restricts the Agent's right to sell or otherwise dispose of such Inventory, but only to the extent of such limit, condition or restriction unless Agent is a party to a Licensor/Agent Agreement with the licensor under such license agreement (or Agent shall agree otherwise in its sole discretion after establishing reserves against availability with respect thereto as Agent shall deem appropriate in its Permitted Discretion).

"Eligible Medicare Receivable or Eligible Medicaid Receivable" shall mean, with respect to Borrowers, a Medicare Receivable or Medicaid Receivable of a Borrower arising in the Ordinary Course of Business and which Agent, in its Permitted Discretion, shall deem to be an Eligible Medicare Receivable or an Eligible Medicaid Receivable, based on such considerations as Agent may from time to time deem appropriate in its Permitted Discretion. A Medicare Receivable or Medicaid Receivable shall not be deemed an Eligible Medicare Receivable or an Eligible Medicaid Receivable unless such Medicare Receivable or Medicaid Receivable is subject to Agent's first priority perfected security interest and no other Lien (other than Permitted Encumbrances). In addition, no Medicare Receivable or Medicaid Receivable shall be an Eligible Medicare Receivable or Eligible Medicaid Receivable if:

(a)    such Medicare Receivable or Medicaid Receivable or any portion of the receivable is payable by a Person other than a Medicare/Medicaid Administrative Contractor making payments under the Medicare or Medicaid programs or by the United States of America acting under the Medicaid or Medicare program;

(b)    it is outstanding for more than ninety (90) days after the electronic transaction posting date for such receivable;

(c)    fifty percent (50%) or more of the Medicaid Receivables or Medicare Receivables from the applicable Medicare/Medicaid Administrative Contractor are deemed ineligible under clause (b) above;

(d)    any covenant, representation or warranty contained in this Agreement with respect to such receivable has been breached;

(e)    the applicable Medicare/Medicaid Administrative Contractor shall (i) apply for, suffer, or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property or call a meeting of its creditors, (ii) admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary case or proceeding under any state or federal bankruptcy laws (as now or hereafter in effect), (v) be adjudicated a bankrupt or insolvent, (vi) file a petition seeking to take advantage of any other law providing for the relief of

debtors, (vii) acquiesce to, or fail to have dismissed, any petition which is filed against it in any involuntary case under such bankruptcy laws, or (viii) take any action for the purpose of effecting any of the foregoing;

(f)     it is subject to any offset, recoupment, deduction, defense, dispute, or counterclaim (to the extent of such offset, deduction, defense or counterclaim) or it is contingent in any respect or for any reason (other than the payment related thereto);

(g)     it is not payable to a Borrower;

(h)     the claim for reimbursement related to such Medicare Receivable or Medicaid Receivable has not been submitted to the appropriate Medicare/Medicaid Administrative Contractor or a third party administrator who is responsible for submitting the claim to the Medicare/Medicaid Administrative Contractor, in accordance with the applicable regulations under Medicare or Medicaid, as applicable, within thirty (30) days from the date the related goods were sold or services rendered, or within thirty (30) days of receiving the provider identification number (so long as the applicable Borrower has delivered evidence, in form and substance satisfactory to Agent in Permitted Discretion that it has received such identification number);

(i)     the Person to whom the goods were sold or for whom services were rendered is not an eligible Medicare beneficiary or Medicaid recipient, as applicable, at the time such goods are sold or services rendered, such eligibility to be verified by the Borrower making such sale;

(j)     the Borrower that made the sale or rendered the services giving rise to such Medicare Receivable or Medicaid Receivable is under any investigation under any Health Care Laws or subject to any action or proceeding concerning the status of such Borrower as a Medicare supplier or Certified Medicare Provider or Certified Medicaid Providers, as applicable, or the payments under Medicare or Medicaid, as applicable, to such Borrower have been contested, suspended, delayed, deferred or otherwise postponed due to any investigation, action or proceeding by any Medicare/Medicaid Administrative Contractor, the U.S. Justice Department or any other Governmental Body;

(k)     the amount of such Medicare Receivable or Medicaid Receivable exceeds the amounts to which the Borrower making such sale or providing such service is entitled as reimbursement for such eligible Medicare beneficiary or Medicaid recipient, as applicable, under applicable Medicare or Medicaid regulations, as applicable;

(l)     all authorization and billing procedures and documentation required in order for the Borrower making such sale to be reimbursed and paid on such Medicare or Medicaid Receivable by the Medicare/Medicaid Administrative Contractor have not been properly completed or completed in a manner required in order for such Borrower to be so reimbursed and paid;

(m)     the terms of the sale giving rise to such Medicare Receivable or Medicaid Receivable or the practices of such Borrower with respect to such Medicare Receivable or Medicaid Receivable do not comply in all material respects with Applicable Law; or

16

(n)    such Medicare Receivable or Medicaid Receivable is not otherwise satisfactory to Agent as determined in by Agent in its Permitted Discretion.

"Eligible Pharmacy Inventory" shall mean Inventory of Borrowers that would be Eligible Inventory except it consists of drugs, medical devices or DMEPOS that can only be dispensed on the order of a licensed professional; provided that Borrowers are duly licensed to sell and dispense such drugs, medical devices and DMEPOS, as applicable.

"Eligible Pharmacy Receivables" shall mean, with respect to Borrowers, a Pharmacy Receivable arising in the Ordinary Course of Business and which Agent, in its Permitted Discretion, shall deem to be an Eligible Pharmacy Receivable, based on such considerations as Agent may from time to time deem appropriate in its Permitted Discretion. A Pharmacy Receivable shall not be deemed an Eligible Pharmacy Receivable unless such Pharmacy Receivable is subject to Agent's first priority perfected security interest and no other Lien (other than Permitted Encumbrances). In addition, no Pharmacy Receivable shall be an Eligible Pharmacy Receivable if:

(a)    it has been outstanding for more than sixty (60) days after the electronic transaction posting date therefor;

(b)    it is due from any Third Party Payor to the extent that fifty percent (50%) or more of all Pharmacy Receivables from such Third Party Payor are not Eligible Pharmacy Receivables under clause (a) above;

(c)    any covenant, representation or warranty contained in this Agreement with respect to such receivable has been breached;

(d)    it is due from a Third Party Payor who (a) is not duly authorized to conduct business in the United States of America or (b) shall (i) apply for, suffer, or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property or call a meeting of its creditors, (ii) admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary case or proceeding under any state or federal bankruptcy laws (as now or hereafter in effect), (v) be adjudicated a bankrupt or insolvent, (vi) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vii) acquiesce to, or fail to have dismissed, any petition which is filed against it in any involuntary case under such bankruptcy laws, or (viii) take any action for the purpose of effecting any of the foregoing;

(e)    it is subject to any offset, recoupment, deduction, defense, dispute, or counterclaim (to the extent of such offset, deduction, defense or counterclaim) or it is contingent in any respect or for any reason (other than the payment related thereto);

(f)    it is not payable to a Borrower;

(g)    the applicable Borrower was not duly licensed to sell and dispense the Inventory giving rise to such Pharmacy Receivable;

17

(h)    it is a Pharmacy Receivable as to which (1) the Borrower making the sale giving rise to such Pharmacy Receivable does not have a valid and enforceable agreement with the Third Party Payor providing for payment to such Borrower or there is a default thereunder that could be a basis for such Third Party Payor ceasing or suspending any payments to such Borrower, (2) the Inventory sold giving rise to such Pharmacy Receivable is not of the type that are covered under the agreement with the Third Party Payor or the party receiving such Inventory is not entitled to coverage under such agreement, (3) the Borrower making the sale giving rise to such Pharmacy Receivables has not received confirmation from the applicable Third Party Payor that the party receiving the Inventory is entitled to coverage under the terms of the agreement with such Third Party Payor and the Borrower is entitled to reimbursement for such Pharmacy Receivables, (4) the amount of such Pharmacy Receivable exceeds the amounts to which the Borrower making such sale is entitled to reimbursement for the Inventory sold under the terms of the agreement with the applicable Third Party Payor (but solely to the extent of such excess), (5) there are contractual or statutory limitations or restrictions on the rights of the Borrower making such sale to assign its rights to payment arising as a result thereof or to grant any security interest therein which limitations or restrictions have not been satisfied or waived, (6) all authorization and billing procedures and documentation required in order for the Borrower making such sale to be reimbursed and paid on such Pharmacy Receivables by the applicable Third Party Payor have not been properly completed and satisfied to the extent required for such Loan Party to be so reimbursed and paid, or (7) the terms of the sale giving rise to such Pharmacy Receivables and all practices of such Borrower with respect to such Pharmacy Receivables do not comply in all material respects with Applicable Law; or

(i)    such Pharmacy Receivable is not otherwise satisfactory to Agent as determined in by Agent in its Permitted Discretion.

"Eligible Prescription Lists" shall mean and include with respect to each Borrower licensed under Applicable Law to operate a pharmacy, such Borrower's Prescription Lists with respect to customers who currently purchase or otherwise obtain, drugs, medical devices or DMEPOS that can only be dispensed on the order of a licensed professional from such Borrower, in each case which Agent, in its Permitted Discretion, shall deem to be an Eligible Prescription List. Such Prescription Lists shall not be deemed Eligible Prescription Lists unless such Prescription Lists are subject to Agent's first priority perfected security interest and no other Lien (other than Permitted Encumbrances) and are of a type included in an appraisal received by Agent in accordance with this Agreement. In addition, no Prescription List shall be an Eligible Prescription List if:

(a)    such Borrower's computer and/or phone systems are (i) inadequate to facilitate the sale of prescriptions to a potential purchaser and (ii) do not facilitate the transfer of pharmacy prescription files to a potential purchaser;

(b)    such Prescription List is not in a form that may be sold or otherwise transferred or are subject to regulatory restrictions that would prohibit the transfer thereof;

(c)    such Prescription List is located at premises that are not owned or leased by such Borrower; or

(d)     it does not contain the applicable Customer's address, telephone number or other contact information acceptable to Agent in its Permitted Discretion.

"Eligible Receivables" shall mean and include with respect to Borrowers, Receivables of such Borrowers (other than Credit Card Receivables, Medicaid Receivables, Medicare Receivables and Pharmacy Receivables) arising in the ordinary course of business and which Agent, in its Permitted Discretion, shall deem to be Eligible Receivables, based on such considerations as Agent may from time to time deem appropriate. A Receivable shall not be deemed an Eligible Receivable unless such Receivable is subject to Agent's first priority perfected security interest and no other Lien (other than Permitted Encumbrances), and is evidenced by an invoice or other documentary evidence reasonably satisfactory to Agent. In addition, no Receivable shall be an Eligible Receivable if:

(a)     it arises out of a sale made by any Borrower to an Affiliate of any Borrower or to a Person controlled by an Affiliate of any Borrower;

(b)     it is unpaid more than sixty (60) days after the original due date, not to exceed ninety (90) days after the original invoice date;

(c)     fifty percent (50%) or more of the Receivables from the Customer are deemed ineligible under clause (b) above;

(d)     any covenant, representation or warranty contained in this Agreement with respect to such Receivable has been breached;

(e)     the Customer shall (i) apply for, suffer, or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property or call a meeting of its creditors, (ii) admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary case or proceeding under any state or federal bankruptcy laws (as now or hereafter in effect), (v) be adjudicated a bankrupt or insolvent, (vi) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vii) acquiesce to, or fail to have dismissed, any petition which is filed against it in any involuntary case under such bankruptcy laws, or (viii) take any action for the purpose of effecting any of the foregoing;

(f)     the sale is to a Customer outside the continental United States of America or Canada (except Receivables arising from a sale to a Customer located in Quebec shall be ineligible) unless the sale is on letter of credit, guaranty or acceptance terms, in each case acceptable to Agent in its Permitted Discretion;

(g)     the sale to the Customer is on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment or any other repurchase or return basis or is evidenced by chattel paper;

(h)     the Customer is the United States of America or any state thereof, the federal government of Canada, the government of any province or territory of Canada or any department, agency or instrumentality of any of them, unless the applicable Borrower assigns its

19

right to payment of such Receivable to Agent pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. Sub-Section 3727 et seq. and 41 U.S.C. Sub-Section 15 et seq.) or the Financial Administration Act (Canada) or has otherwise complied with other applicable statutes or ordinances;

(i)        the goods giving rise to such Receivable have not been delivered (or shipped to the extent title to such goods would vest in the Customer and such Receivable would be due and payable upon shipping) to the Customer or the services giving rise to such Receivable have not been performed by the applicable Borrower or the Receivable otherwise does not represent a final sale;

(j)        the Receivable of the Customer exceeds a credit limit determined by Agent, in its Permitted Discretion, to the extent such Receivable exceeds such limit; provided however that Agent shall provide Borrowing Agent with three (3) days prior written notice of its intention to impose a credit limit with respect to any Customer;

(k)        the Receivable is subject to any offset, deduction, defense, dispute, or counterclaim (to the extent of such offset, deduction, defense or counterclaim), the Customer is also a creditor or supplier of a Borrower (to the extent of such amount owed by a Borrower to such creditor or supplier) or the receivable is contingent in any respect or for any reason (other than the payment related thereto);

(l)        the applicable Borrower has made any agreement with any Customer for any deduction therefrom, except for discounts or allowances made in the Ordinary Course of Business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each respective invoice related thereto;

(m)        any return, rejection or repossession of the merchandise has occurred or the rendition of services has been disputed;

(n)        such Receivable is not payable to a Borrower;

(o)        such Receivable is a Medicare Receivable or Medicaid Receivable; or

(p)        such Receivable is not otherwise satisfactory to Agent as determined in by Agent in its Permitted Discretion.

"Environmental Complaint" shall have the meaning set forth in Section 9.3(b) hereof.

"Environmental Laws" shall mean all federal, state and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes, relating to the protection of the environment, human health and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Materials and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state, international and local governmental agencies and authorities with respect thereto.

"Equity Interests" shall mean, with respect to any Person, any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, member interests, participation or other equivalents of or interest in (regardless of how designated) equity

of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended or supplemented from time to time and the rules and regulations promulgated thereunder.

"Event of Default" shall have the meaning set forth in Article X hereof.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Hedge Liability or Liabilities" shall mean, with respect to each Borrower and Guarantor, each of its Swap Obligations if, and only to the extent that, all or any portion of this Agreement or any Other Document that relates to such Swap Obligation is or becomes illegal under the CEA, or any rule, regulation or order of the CFTC, solely by virtue of such Borrower's and/or Guarantor's failure to qualify as an Eligible Contract Participant on the Eligibility Date for such Swap. Notwithstanding anything to the contrary contained in the foregoing or in any other provision of this Agreement or any Other Document, the foregoing is subject to the following provisos: (a) if a Swap Obligation arises under a master agreement governing more than one Swap, this definition shall apply only to the portion of such Swap Obligation that is attributable to Swaps for which such guaranty or security interest is or becomes illegal under the CEA, or any rule, regulations or order of the CFTC, solely as a result of the failure by such Borrower or Guarantor for any reason to qualify as an Eligible Contract Participant on the Eligibility Date for such Swap; (b) if a guarantee of a Swap Obligation would cause such obligation to be an Excluded Hedge Liability but the grant of a security interest would not cause such obligation to be an Excluded Hedge Liability, such Swap Obligation shall constitute an Excluded Hedge Liability for purposes of the guaranty but not for purposes of the grant of the security interest; and (c) if there is more than one Borrower or Guarantor executing this Agreement or the Other Documents and a Swap Obligation would be an Excluded Hedge Liability with respect to one or more of such Persons, but not all of them, the definition of Excluded Hedge Liability or Liabilities with respect to each such Person shall only be deemed applicable to (i) the particular Swap Obligations that constitute Excluded Hedge Liabilities with respect to such Person, and (ii) the particular Person with respect to which such Swap Obligations constitute Excluded Hedge Liabilities.

"Excluded Taxes" shall mean, with respect to Agent, any Lender, Participant, Swing Loan Lender, Issuer or any other recipient of any payment to be made by or on account of any Obligations, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes (in lieu of net income taxes) (i) imposed on it by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office or applicable lending office is located or, in the case of any Lender, Participant, Swing Loan Lender or Issuer, in which its applicable lending office is located, or (ii) that are Other Connection Taxes, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction, (c) in the case of a Lender or Participant, any withholding tax that is imposed on amounts payable to such Lender or Participant, at the time such Lender or Participant becomes a party hereto (or designates a new lending office), except to the extent that such Lender or Participant (or its assignor or seller of a participation, if any) was entitled, at the time of designation of a new lending office (or assignment or sale of a

participation), to receive additional amounts from Borrowers with respect to such withholding tax pursuant to Section 3.10(a), (d) such recipient's failure or inability (other than as a result of a Change in Law) to comply with Section 3.10(e) or (e) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Facility Fee" shall have the meaning set forth in Section 3.3 hereof.

"Farm Products" shall mean all agricultural, livestock, poultry, seafood, milk, dairy, or other products sold to any Borrower by a Farm Products Seller, and all proceeds and products thereof, including without limitation (1) "farm products" as such term is defined in the Food Security Act and the UCC, (2) "meats", "meat food products", "livestock", "livestock products", "poultry" and "poultry products" as such terms are defined in the PSA, and (3) "perishable agricultural commodities", as such term is defined in PACA.

"Farm Products Sellers" or "Farm Products Seller" shall mean, collectively, any seller, supplier, or other Person that is, or as determined by Agent in the exercise of its Permitted Discretion, could be, afforded the benefit of any Lien or trust upon any agricultural, livestock, poultry, seafood, milk, dairy, or other products sold to any Borrower, directly or indirectly, and/or any proceeds of such products, under any Sellers' Lien Laws.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations thereunder or official interpretations thereof.

"Federal Funds Effective Rate" shall mean for any day the rate per annum (based on a year of 360 days and actual days elapsed and rounded upward to the nearest 1/100 of 1%) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Federal Funds Effective Rate" as of the date of this Agreement; provided, if such Federal Reserve Bank (or its successor) does not announce such rate on any day, the "Federal Funds Effective Rate" for such day shall be the Federal Funds Effective Rate for the last day on which such rate was announced.

"Federal Funds Open Rate" shall mean for any day the rate per annum (based on a year of 360 days and actual days elapsed) which is the daily federal funds open rate as quoted by ICAP North America, Inc. (or any successor) as set forth on the Bloomberg Screen BTMM for that day opposite the caption "OPEN" (or on such other substitute Bloomberg Screen that displays such rate), or as set forth on such other recognized electronic source used for the purpose of displaying such rate as selected by PNC (an "Alternate Source") (or if such rate for such day does not appear on the Bloomberg Screen BTMM (or any substitute screen) or on any Alternate Source, or if there shall at any time, for any reason, no longer exist a Bloomberg Screen BTMM (or any substitute screen) or any Alternate Source, a comparable replacement rate determined by PNC at such time (which determination shall be conclusive absent manifest error); provided however, that if such day is not a Business Day, the Federal Funds Open Rate for such day shall be the "open" rate on the immediately preceding Business Day.  If and when the Federal Funds Open Rate changes, the rate of interest with respect to any advance to which

22

the Federal Funds Open Rate applies will change automatically without notice to Borrowers, effective on the date of any such change.

"Final Order" means a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the Other Documents under Sections 364(c) and (d) of the Bankruptcy Code on a final basis and entered at or after a final hearing, in form and substance satisfactory to Agent and Required Lenders in their sole discretion. The Final Order shall, among other things, have:

> (a)  authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Maximum Loan Amount provided for herein;

> (b)  granted the claim and Lien status and Liens described in Section 4.1, and prohibited the granting of additional Liens on the assets of Borrowers except for any Liens specifically provided for in such order;

> (c)  provided that such Liens are automatically perfected as of the Petition Date by the entry of the Final Order and also granted to the Agent for the benefit of Agent and the Lenders relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Agent, if the Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Agent to perfect, protect and insure the priority of its Liens upon the Collateral as a matter of non-bankruptcy law;

> (d)  provided that no Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out;

> (e)  provide for payment  in full in cash of all Pre-Petition Obligations with the proceeds of Advances hereunder and reimbursement in full in cash of all professional fees, costs and expenses of the Pre-Petition Agent and the Pre-Petition Lenders, in each case upon entry of such Final Order; and

> (f)  provided Agent with relief from the automatic stay in a manner consistent with the terms of Section 11.1.

"First Data Agreement" shall mean that certain First Data Credit Card Processor Agreement – Electronic Transaction Agreement dated December 22, 2014 by and among CTS Holding, LLC, Citicorp Payment Services (First Data Merchant Services Corporation by power of attorney) and Haggen Operations Holdings, LLC.

"Flood Laws" shall mean all Applicable Laws relating to policies and procedures that address requirements placed on federally regulated lenders under the National Flood Insurance Reform Act of 1994 and other Applicable Laws related thereto.

"Food Security Act" shall mean the Food Security Act of 1984, 7 U.S.C. Section 1631 et. seq., as the same now exists or may hereafter from time to time be amended, modified, recodified or supplemented, together with all rules and regulations thereunder.

23

074658.14086/101390412v.6

"Foreign Currency Hedge" shall mean any foreign exchange transaction, including spot and forward foreign currency purchases and sales, listed or over-the-counter options on foreign currencies, non-deliverable forwards and options, foreign currency swap agreements, currency exchange rate price hedging arrangements, and any other similar transaction providing for the purchase of one currency in exchange for the sale of another currency entered into by any Borrower, Guarantor and/or any of their respective Subsidiaries.

"Foreign Currency Hedge Liabilities" shall have the meaning assigned in the definition of Lender-Provided Foreign Currency Hedge.

"Foreign Lender" shall mean any Lender that is organized under the laws of a jurisdiction other than that in which Borrowers are resident for tax purposes. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" shall mean any Subsidiary of any Person that is not organized or incorporated in the United States, any State or territory thereof or the District of Columbia.

"Formula Amount" shall have the meaning set forth in Section 2.1(a) hereof.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"GOB Liquidator" shall have the meaning set forth in Section 10.7(o).

""GOB Liquidator Retention Order" shall have the meaning set forth in Section 10.7(o).

"Governmental Acts" shall mean any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Body.

"Governmental Body" shall mean any nation or government, any state or other political subdivision thereof or any entity, authority, agency, division or department exercising the executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to a government (including any supra-national bodies such as the European Union or the European Central Bank) and any group or body charged with setting financial accounting or regulatory capital rules or standards (including, without limitation, the Financial Accounting Standards Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

"Guaranteed Obligations" shall have the meaning set forth in Section 17.1.

"Guarantor Security Agreement" shall mean any security agreement executed by any Guarantor in favor of Agent securing the Obligations or the Guaranty of such Guarantor, in form and substance reasonably satisfactory to Agent, including (a) with respect to Debtor Guarantors, the provisions of Article IV of this Agreement, and (b) the Propco Guaranty Security Agreements; as each may be amended, restated, supplemented or otherwise modified from time to time.

"Guarantors" shall mean (a) the Debtor Guarantors, (b) the Propco Guarantors, and (b) any Person who may hereafter guarantee payment or performance of the whole or any part of the Obligations.

"Guaranty" shall mean any guaranty of the Obligations executed by a Guarantor in favor of Agent for its benefit and for the ratable benefit of Lenders, in form and substance reasonably

satisfactory to Agent, including (a) with respect to Debtor Guarantors, the provisions of Article XVII of this Agreement, and (b) the Propco Guaranty.

"Haggen Acquisition" shall mean Haggen Acquisition, LLC, a Delaware limited liability company.

"Haggen Property Lender" shall mean Haggen Property Lender, LLC, a Delaware limited liability company.

"Hazardous Discharge" shall have the meaning set forth in Section 9.3(b) hereof.

"Hazardous Materials" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in or subject to regulation under Environmental Laws.

"Hazardous Wastes" shall mean all waste materials subject to regulation under CERCLA, RCRA or applicable state laws, and any other applicable Federal and state laws, now in force or hereafter enacted relating to hazardous waste disposal.

"Health Care Laws" shall mean all federal, state and local laws, rules, regulations, interpretations, guidelines, ordinances and decrees relating to healthcare, health care providers, medical assistance and cost reimbursement programs, as now or at any time hereafter in effect, applicable to any Borrower, including, but not limited to, all Pharmaceutical Laws, the Social Security Act, the Social Security Amendments of 1972, the Medicare-Medicaid Anti-Fraud and Abuse Amendments of 1977, the Medicare and Medicaid Patient and Program Protection Act of 1987, HIPAA and the Patient Protection and Affordable Care Act of 2010.

"Hedge Liabilities" shall mean collectively, the Foreign Currency Hedge Liabilities and the Interest Rate Hedge Liabilities.

"HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, as the same now exists or may hereafter from time to time be amended, modified, recodified or supplemented, together with all rules and regulations thereunder, including as amended by the Health Information Technology for Economic and Clinical Health Act of 2009.

"HIPAA Compliance Date" shall have the meaning specified in Section 5.30 hereof.

"HIPAA Compliance Plan" shall have the meaning specified in Section 5.30 hereof.

"HIPAA Compliant" shall have the meaning specified in Section 5.30 hereof.

"Holdings" shall mean Haggen Holdings, LLC, a Delaware limited liability company.

"Indebtedness" shall mean, as to any Person at any time, any and all indebtedness, obligations or liabilities (whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several) of such Person for or in respect of: (a) borrowed money; (b) amounts received under or liabilities in respect of any note purchase or acceptance credit facility, and all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (c) all Capitalized Lease Obligations; (d) reimbursement obligations (contingent or otherwise) under any letter of credit agreement, banker's acceptance agreement or similar arrangement; (e) net obligations under any Interest Rate Hedge or other interest rate management device, Foreign Currency Hedge, currency swap agreement,

25

commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement; (f) the deferred purchase price of property or services (but not including trade payables and accrued expenses incurred in the Ordinary Course of Business which are not represented by a promissory note or other evidence of indebtedness and which are not more than one hundred twenty (120) days past invoice date); (g) all Equity Interests of such Person subject to mandatory repurchase or redemption rights or obligations (excluding repurchases or redemptions at the sole option of such Person) prior to the expiration of the Term; (h) all indebtedness, obligations or liabilities secured by a Lien on any asset of such Person, whether or not such indebtedness, obligations or liabilities are otherwise an obligation of such Person; provided that if the foregoing is not assumed by such Person, the amount of such indebtedness shall be deemed to be the lesser of (i) the amount of such indebtedness and (ii) the fair market value of the assets securing such indebtedness; (i) the capitalized amount outstanding under any synthetic lease, title retention operating lease, off-balance sheet loan or similar off-balance sheet financing ; (j) pension plan liabilities of such Person; and (k) any guaranty of any indebtedness, obligations or liabilities of a type described in the foregoing clauses (a) through (j) for another Person, in each case without duplication.

"Indemnified Taxes" shall mean Taxes other than Excluded Taxes.

"Ineligible Professional Expenses" shall mean fees or expenses incurred by any Person, including the Creditors' Committee, in connection with any of the following: (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief:  (i) challenging the legality, validity, priority, perfection, or enforceability of the Obligations (whether Pre-Petition Obligations or Post-Petition Obligations) or the Secured Parties' liens on and security interests in the Collateral, or any similar action against the Propco Lenders in respect of the Indebtedness under the Propco Loan Documents, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations (whether Pre-Petition Obligations or Post-Petition Obligations) or the Secured Parties' liens on and security interests in the Pre-Petition Collateral or the Collateral, or any similar action against the Propco Lenders in respect of the Indebtedness under the Propco Loan Documents, or (iii) preventing, hindering or delaying the Secured Parties' or Propco Lenders' assertion or enforcement of any lien, claim, right or security interest or realization upon any in accordance with the terms and conditions of the Final Order, or, prior to the entry of the Final Order, the Interim Order, (b) a request to use the Cash Collateral (as such term is defined in Section 363 of the Bankruptcy Code) without the prior written consent of the Secured Parties, except to the extent expressly permitted in the Final Order, or, prior to the entry of the Final Order, the Interim Order, (c) a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, other than from the Agent and the Lenders, without the prior written consent of the Agent, (d) the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against the Secured Parties, or any of them, or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from the Secured Parties, or any of them, under Chapter 5 of the Bankruptcy Code; provided, however, that, inclusive within the "Carve Out Cap" (as defined in the Final Order, or, prior to the entry of the Final Order, the Interim Order), an amount not to exceed $25,000 in the aggregate of the Advances hereunder may be used to pay Allowed Professional Fees of the Committee to investigate (but not prosecute) claims against and objections with respect to the

26

Pre-Petition Obligations and pre-petition liens and security interests of the Pre-Petition Secured Parties (including, without limitation, issues regarding validity, perfection, priority, or enforceability of the secured claims of the Pre-Petition Secured Parties).

"Ineligible Security" shall mean any security which may not be underwritten or dealt in by member banks of the Federal Reserve System under Section 16 of the Banking Act of 1933 (12 U.S.C. Section 24, Seventh), as amended.

"Initial Provisional Funding" shall mean the extension of term loans by Haggen Property Lender to Borrowers in an aggregate amount of $8,505,000.

"Insolvency Event" shall mean, with respect to any Person, including without limitation any Lender, such Person or such Person's direct or indirect parent company (a) becomes the subject of a bankruptcy or insolvency proceeding (including any proceeding under Title 11 of the United States Code), or regulatory restrictions, (b) has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it or has called a meeting of its creditors, (c) admits in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (d) with respect to a Lender, such Lender is unable to perform hereunder due to the application of Applicable Law, or (e) in the good faith determination of Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment of a type described in clauses (a) or (b), provided that an Insolvency Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person or such Person's direct or indirect parent company by a Governmental Body or instrumentality thereof if, and only if, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Body or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Intellectual Property" shall mean property constituting a patent, copyright, trademark (or any application in respect of the foregoing), service mark, copyright, copyright application, trade name, mask work, trade secrets, design right, assumed name or license or other right to use any of the foregoing under Applicable Law.

"Intellectual Property Claim" shall mean the assertion, by any means, by any Person of a claim that any Borrower's ownership, use, marketing, sale or distribution of any Inventory, equipment, Intellectual Property or other property or asset is violative of any ownership of or right to use any Intellectual Property of such Person.

"Interest Period" shall mean the period provided for any LIBOR Rate Loan pursuant to Section 2.2(b) hereof.

"Interest Rate Hedge" shall mean an interest rate exchange, collar, cap, swap, floor, adjustable strike cap, adjustable strike corridor, cross-currency swap or similar agreements entered into by any Borrower, Guarantor and/or their respective Subsidiaries in order to provide protection to, or minimize the impact upon, such Borrower, any Guarantor and/or their respective Subsidiaries of increasing floating rates of interest applicable to Indebtedness.

"Interest Rate Hedge Liabilities" shall have the meaning assigned in the definition of Lender-Provided Interest Rate Hedge.

"Interim Order" means a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the Other Documents, for an interim period, under Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a hearing, in form and substance satisfactory to Agent and Required Lenders in their sole discretion; provided that an Interim Order in substantially the form and substance as the form of Interim Order attached hereto as Exhibit B shall be deemed to be satisfactory to Agent and Required Lenders.

"Inventory" shall mean and include as to each Loan Party all of such Loan Party's inventory (as defined in Article 9 of the Uniform Commercial Code) and all of such Loan Party's goods, merchandise and other personal property, wherever located, to be furnished under any consignment arrangement, contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in such Loan Party's business or used in selling or furnishing such goods, merchandise and other personal property, and all Documents.

"Inventory Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(iii) hereof.

"IP Filings" shall mean the Collateral consisting solely of intellectual property assets for which a Lien can be perfected by filing with the U.S. Patent and Trademark Office or Copyright Office.

"Issuer" shall mean (i) Agent in its capacity as the issuer of Letters of Credit under this Agreement and (ii) any other Lender which agrees to issue a Letter of Credit under this Agreement.

"Law(s)" shall mean any law(s) (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance, release, ruling, order, executive order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award of or any settlement arrangement, by agreement, consent or otherwise, with any Governmental Body, foreign or domestic.

"Lender" and "Lenders" shall have the meaning ascribed to such term in the preamble to this Agreement and shall include each Person which becomes a transferee, successor or assign of any Lender. For the purpose of provision of this Agreement or any Other Document which provides for the granting of a security interest or other Lien to the Agent for the benefit of Lenders as security for the Obligations, "Lenders" shall include any Affiliate of a Lender to which such Obligation (specifically including any Hedge Liabilities and any Cash Management Liabilities) is owed.

"Lender Bank Product Agreements" shall have the meaning set forth in Section 1.4.

"Lender-Provided Foreign Currency Hedge" shall mean a Foreign Currency Hedge which is provided by any Lender and for which such Lender confirms to Agent in writing prior to the execution thereof that it: (a) is documented in a standard International Swap Dealers Association, Inc. Master Agreement or another reasonable and customary manner; (b) provides for the method of calculating the reimbursable amount of the provider's credit exposure in a reasonable and customary manner; and (c) is entered into for hedging (rather than speculative) purposes. The liabilities owing to the provider of any Lender-Provided Foreign Currency Hedge (the "Foreign Currency Hedge Liabilities") by any Borrower, Guarantor, or any of their respective Subsidiaries that is party to such Lender-Provided Foreign Currency Hedge shall, for purposes of this

28

Agreement and all Other Documents be "Obligations" of such Person and of each other Borrower and Guarantor, be guaranteed obligations under any Guaranty and secured obligations under any Guarantor Security Agreement, as applicable, and otherwise treated as Obligations for purposes of the Other Documents, except to the extent constituting Excluded Hedge Liabilities of such Person. The Liens securing the Foreign Currency Hedge Liabilities shall be pari passu with the Liens securing all other Obligations under this Agreement and the Other Documents, subject to the express provisions of Section 11.5 hereof.

"Lender-Provided Interest Rate Hedge" shall mean an Interest Rate Hedge which is provided by any Lender and with respect to which such Lender confirms to Agent in writing prior to the execution thereof that it: (a) is documented in a standard International Swap Dealers Association, Inc. Master Agreement or another reasonable and customary manner; (b) provides for the method of calculating the reimbursable amount of the provider's credit exposure in a reasonable and customary manner; and (c) is entered into for hedging (rather than speculative) purposes. The liabilities owing to the provider of any Lender-Provided Interest Rate Hedge (the "Interest Rate Hedge Liabilities") by any Borrower, Guarantor, or any of their respective Subsidiaries that is party to such Lender-Provided Interest Rate Hedge shall, for purposes of this Agreement and all Other Documents be "Obligations" of such Person and of each other Borrower and Guarantor, be guaranteed obligations under any Guaranty and secured obligations under any Guarantor Security Agreement, as applicable, and otherwise treated as Obligations for purposes of the Other Documents, except to the extent constituting Excluded Hedge Liabilities of such Person. The Liens securing the Hedge Liabilities shall be pari passu with the Liens securing all other Obligations under this Agreement and the Other Documents, subject to the express provisions of Section 11.5 hereof.

"Letter of Credit Application" shall have the meaning set forth in Section 2.12(a) hereof.

"Letter of Credit Borrowing" shall have the meaning set forth in Section 2.14(d) hereof.

"Letter of Credit Fees" shall have the meaning set forth in Section 3.2 hereof.

"Letter of Credit Sublimit" shall mean $13,000,000.

"Letters of Credit" shall have the meaning set forth in Section 2.11 hereof.

"LIBOR Alternate Source" shall have the meaning set forth in the definition of LIBOR Rate.

"LIBOR Rate" shall mean for any LIBOR Rate Loan for the then current Interest Period relating thereto, the interest rate per annum determined by Agent by dividing (the resulting quotient rounded upwards, if necessary, to the nearest 1/100th of 1% per annum) (a) the rate which appears on the Bloomberg Page BBAM1 (or on such other substitute Bloomberg page that displays rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market), or the rate which is quoted by another source selected by Agent as an authorized information vendor for the purpose of displaying rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market (a "LIBOR Alternate Source"), at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period as the London interbank offered rate for U.S. Dollars for an amount comparable to such LIBOR Rate Loan and having a borrowing date and a maturity comparable to such Interest Period (or if there shall at any time, for any reason, no longer exist a Bloomberg Page BBAM1 (or any substitute page) or any LIBOR Alternate Source, a comparable

29

replacement rate determined by Agent at such time (which determination shall be conclusive absent manifest error)), by (b) a number equal to 1.00 <u>minus</u> the Reserve Percentage; <u>provided</u>, <u>however</u>, that if the LIBOR Rate determined as provided above would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

The LIBOR Rate shall be adjusted with respect to any LIBOR Rate Loan that is outstanding on the effective date of any change in the Reserve Percentage as of such effective date.  Agent shall give reasonably prompt notice to the Borrowing Agent of the LIBOR Rate as determined or adjusted in accordance herewith, which determination shall be conclusive absent manifest error.

"<u>LIBOR Rate Loan</u>" shall mean any Advance that bears interest based on the LIBOR Rate.

"<u>License Agreement</u>" shall mean any agreement between any Borrower and a Licensor pursuant to which such Borrower is authorized to use any Intellectual Property in connection with the manufacturing, marketing, sale or other distribution of any Inventory of such Borrower or otherwise in connection with such Borrower's business operations.

"<u>Licensor</u>" shall mean any Person from whom any Borrower obtains the right to use (whether on an exclusive or non-exclusive basis) any Intellectual Property in connection with such Borrower's manufacture, marketing, sale or other distribution of any Inventory or otherwise in connection with such Borrower's business operations.

"<u>Licensor/Agent Agreement</u>" shall mean an agreement between Agent and a Licensor, in form and substance reasonably satisfactory to Agent, by which Agent is given the unqualified right, vis-à-vis such Licensor, to enforce Agent's Liens with respect to and to dispose of any Borrower's Inventory with the benefit of any Intellectual Property applicable thereto, irrespective of such Borrower's default under any License Agreement with such Licensor.

"<u>Lien</u>" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any conditional sale or other title retention agreement and any lease having substantially the same economic effect as any of the foregoing.

"<u>Lien Waiver Agreement</u>" shall mean an agreement which is executed in favor of Agent or Pre-Petition Agent by a Person who owns or occupies premises at which any Collateral may be located from time to time in form and substance reasonably satisfactory to Agent or Pre-Petition Agent, as applicable.

"<u>Line Increase Event</u>" shall mean delivery by Loan Parties to Agent and Lenders of copies of one or more final, executed asset purchase agreements (or similar instrument of transfer or assignment) entered into by one or more of the Loan Parties (subject to approval of the Bankruptcy Court and other conditions customary for contracts entered into by debtors in possession) with one or more purchasers with respect to one or more sale(s) outside of the ordinary course of business of the assets of such Loan Parties, including any such sale(s) outside the ordinary course of business of one or more Non-Core Leasehold Interests and any sales of Prescription Lists (but excluding any "going out of business sales" or Core Stores Sale (or other sale of any leasehold interests, Inventory or other assets used in the operation of the Core Stores

30

business)), which such sale(s) and such asset purchase agreements or other instruments shall be on terms and conditions and in form and substance acceptable to Agent and Required Lenders and shall provide for net cash proceeds payable to Loan Parties upon consummation and closing of such sales equal to at least $50,000,000.

"<u>Loan Parties</u>" shall mean the Borrowers and the Debtor Guarantors and "<u>Loan Party</u>" shall mean any of them.

"<u>Local Store Non-Credit Card Retail Proceeds</u>" shall have the meaning set forth in Section 4.08(i) hereof.

"<u>Material Adverse Effect</u>" shall mean a material adverse effect on (a) the financial condition, operations, properties or business of Borrowers taken as a whole but excluding any matters publicly disclosed prior to the filing of the Case and excluding the effect of the filing of the Case or the circumstances and events leading up thereto, (b) the ability of the Borrowers, taken as a whole, to duly and punctually pay and perform the Obligations, (c) the value of the Collateral, taken as a whole, or Agent's Liens on the Collateral or priority of such Liens (other than as the result of the action or inaction of Agent or Lenders) or (d) the practical realization of the benefits of Agent's rights and remedies under this Agreement and the Other Documents.

"<u>Material Contract</u>" shall mean any written contract, agreement, instrument, permit, lease or license of any Borrower, which the failure to comply with could reasonably be expected to result in a Material Adverse Effect.

"<u>Maximum Liquidity Recovery Proceeds</u>" shall mean Twenty Five Million Dollars ($25,000,000).

"<u>Maximum Revolving Advance Amount</u>" shall mean the amount equal to (A) as applicable, (i) from and after entry of the Interim Order and continuing unless and until the occurrence of a Line Increase Event, $200,000,000 minus the outstanding amount of all Pre-Petition Obligations, and (y) from and after the occurrence of a Line Increase Event, $215,000,000 minus the outstanding amount of all Pre-Petition Obligations, minus (B) the amount equal to 75% of the Aggregate Liquidity Pharmacy Proceeds received by Loan Parties and applied to the Obligations in accordance with this Agreement and the Interim Order and Final Order, minus (C) the amount equal to 75% of the Aggregate Liquidity 363 Proceeds received by Loan Parties and applied to the Obligations in accordance with this Agreement and the Interim Order and Final Order.

"<u>Maximum Swing Loan Advance Amount</u>" shall mean, at any time, an amount equal to ten percent (10%) of the Maximum Revolving Advance Amount as in effect at such time.

"<u>Maximum Undrawn Amount</u>" shall mean, with respect to any outstanding Letter of Credit as of any date, the amount of such Letter of Credit that is or may become available to be drawn, including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

"<u>Medicaid</u>" shall mean the health care financial assistance program jointly financed and administered by the Federal and State governments under Title XIX of the Social Security Act.

"<u>Medicaid Receivable</u>" or "<u>Medicare Receivable</u>" shall mean a Receivable of a Borrower arising from the sale of prescription drugs or rendering of services by such Borrower (it being understood that the portion of the purchase price for such prescription drugs or rendering of

services payable by the purchaser of such prescription drugs shall not be deemed a Medicaid Receivable) to eligible Medicaid or Medicare beneficiaries, as applicable, to be paid by a Medicare/Medicaid Administrative Contractor or by the United States of America acting under the Medicaid or Medicare program, as applicable, or any other governmental authority under Medicaid or Medicare, as applicable. For the avoidance of doubt, no Medicaid Receivable or Medicare Receivable shall be deemed to be a Pharmacy Receivable.

"Medicare" shall mean the health care financial assistance program under Title XVIII of the Social Security Act.

"Medicare/Medicaid Administrative Contractor" shall mean any qualified insurance company or other Person that has entered into an ongoing relationship with any Governmental Body to make payments to payees under Medicare, Medicaid or any other Federal, state or local public health care or medical assistance program pursuant to any of the Health Care Laws.

"Modified Commitment Transfer Supplement" shall have the meaning set forth in Section 16.3(d) hereof.

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA to which contributions are required or, within the preceding five plan years, were required by any Borrower or any member of the Controlled Group.

"Multiple Employer Plan" shall mean a Plan which has two or more contributing sponsors (including any Borrower or any member of the Controlled Group) at least two of whom are not under common control, as such a plan is described in Section 4063 or 4064 of ERISA.

"Negotiable Document" shall mean a Document that is "negotiable" within the meaning of Article 7 of the Uniform Commercial Code.

"Net Orderly Liquidation Value Percentage" shall mean, with respect to Inventory of any Borrower, the net orderly liquidation value, expressed as a percentage of the cost of such Inventory as set forth in the applicable Borrower's inventory stock ledger, which value shall be determined by the most recent Inventory appraisal report received by Agent in accordance with this Agreement.

"New Lender" shall have the meaning set forth in Section 2.24(a) hereof.

"Non-Defaulting Lender" shall mean, at any time, any Lender holding a Revolving Commitment that is not a Defaulting Lender at such time.

"Non-Qualifying Party" shall mean any Borrower or any Guarantor that on the Eligibility Date fails for any reason to qualify as an Eligible Contract Participant.

"Note" shall mean collectively, the Revolving Credit Note and the Swing Loan Note.

"Obligations" shall mean and include, (a) all Pre-Petition Obligations, including, without limitation, all "Pre-Petition Obligations" as described in the Interim Order and all indemnification obligations under the Pre-Petition Credit Agreement and (b) to the extent arising under or in connection with this Agreement or any Other Document, any and all loans (including all Advances), advances, debts, liabilities, obligations, covenants and duties owing by any Borrower to Issuer, Swing Loan Lender, Lenders or Agent or to any other direct or indirect subsidiary or affiliate of Agent or any Lender of any kind or nature, present or future (including any interest or other amounts accruing thereon, and any costs and expenses of any Person

payable by any Borrower and any indemnification obligations payable by any Borrower arising or payable after maturity, or after the conversion of the Case to a chapter 7 case as to any Borrower, whether or not a claim for post-filing or post-petition interest or other amounts is allowable or allowed in such proceeding), arising under this Agreement, any Other Document, any Interest Rate Hedge, any Foreign Currency Hedge, or any Cash Management Products and Services, and any and all amendments, restatements, supplements, or modifications thereto, whether or not evidenced by any note, guaranty or other instrument (including, without limitation, under the Interim Order or the Final Order), whether arising under any agreement, instrument or document (including this Agreement and the Other Documents or under the Interim Order or the Final Order) whether or not for the payment of money, whether arising by reason of an extension of credit, opening, extension or modification of a letter of credit, loan, or guarantee, under any interest or currency swap, future, option or other similar agreement, or in any other manner, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of the Agent's or any Lenders non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise or by what agreement or instrument they may be evidenced.  Notwithstanding anything to the contrary contained in the foregoing, the Obligations shall not include any Excluded Hedge Liabilities.

"Ordinary Course of Business" shall mean, with respect to any Borrower, the ordinary course of such Borrower's business as conducted on the Closing Date or in accordance with Borrowers' budget or business plans related thereto delivered to Agent prior to the Closing Date, or as permitted to be conducted pursuant to the terms of this Agreement.

"Opco Subordination Agreement" shall mean that certain Intercreditor Agreement dated as of August 21, 2015 by and among Agent, Propco Lenders, Borrowers, and Guarantors.

"Operations Holdings" shall mean Haggen Operations Holdings, LLC, a Delaware limited liability company.

"Operations Holdings on a Consolidated Basis" shall mean the consolidation in accordance with GAAP of the accounts or other items of Operations Holdings and its Subsidiaries.

"Organizational Documents" shall mean, with respect to any Person, any charter, articles or certificate of incorporation, certificate of organization, registration or formation, certificate of partnership or limited partnership, bylaws, operating agreement, limited liability company agreement, or partnership agreement of such Person and any and all other similar documents relating to such Person's formation, organization or entity governance matters (including any shareholders' or equity holders' agreement or voting trust agreement) and specifically includes, without limitation, any certificates of designation for preferred stock or other forms of preferred equity.

"Other Documents" shall mean the Interim Order, the Final Order, the Cash Management Orders, the Note, any Guaranty (including the Propco Guaranty), any Guarantor Security Agreement (including the Propco Guaranty Security Agreements), any Lender-Provided Interest Rate Hedge, any Lender-Provided Foreign Currency Hedge, any agreement for Cash

33

Management Products and Services, the Management Fee Subordination Agreement, the Processor Letters, and any and all other agreements, instruments and documents, including the Propco Subordination Agreement, the Opco Subordination Agreement and any other subordination agreement, intercreditor agreements, guaranties, pledges, powers of attorney, consents, interest or currency swap agreements or other similar agreements and all other writings heretofore, now or hereafter executed by any Borrower or any Guarantor and/or delivered to Agent or any Lender in respect of the transactions contemplated by this Agreement or any of the foregoing, in each case together with all extensions, renewals, amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"Other Connection Taxes" means, with respect to any recipient, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any provision of this Agreement).

"Other Taxes" shall mean all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any Other Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any Other Document.

"Out-of-Formula Loans" shall have the meaning set forth in Section 16.2(e) hereof.

"PACA" shall mean the Perishable Agricultural Commodities Act, 1930, as amended, 7 U.S.C. Section 499a *et. seq.*, as the same now exists or may hereafter from time to time be amended, modified, recodified or supplemented, together with all rules and regulations thereunder.

"Parent" of any Person shall mean a corporation or other entity owning, directly or indirectly, 50% or more of the Equity Interests issued by such Person having ordinary voting power to elect a majority of the directors of such Person, or other Persons performing similar functions for any such Person.

"Participant" shall mean each Person who shall be granted the right by any Lender to participate in any of the Advances and who shall have entered into a participation agreement in form and substance satisfactory to such Lender in accordance with Section 16.3(b) hereof.

"Participation Advance" shall have the meaning set forth in Section 2.14(d) hereof.

"Participation Commitment" shall mean the obligation hereunder of each Lender holding a Revolving Commitment to buy a participation equal to its Revolving Commitment Percentage (subject to any reallocation pursuant to Section 2.22(b)(iii) hereof) in the Swing Loans made by Swing Loan Lender hereunder as provided for in Section 2.4(c) hereof and in the Letters of Credit issued hereunder as provided for in Section 2.14(a) hereof.

"Payment Office" shall mean initially Two Tower Center Boulevard, East Brunswick, New Jersey 08816; thereafter, such other office of Agent, if any, which it may designate by notice to Borrowing Agent and to each Lender to be the Payment Office.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor.

"Pension Benefit Plan" shall mean at any time any "employee pension benefit plan" as defined in Section 3(2) of ERISA (including a Multiple Employer Plan, but not a Multiemployer Plan) which is covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412, 430 or 436 of the Code and either (i) is maintained or to which contributions are required by Borrower or any member of the Controlled Group or (ii) has at any time within the preceding five years been maintained or to which contributions have been required by a Borrower or any entity which was at such time a member of the Controlled Group.

"Perfection Certificates" shall mean, collectively, any information questionnaire and the responses thereto provided by each Borrower and delivered to Agent.

"Perishable Goods Inventory Advance Rate" shall have the meaning given in Section 2.1(a)(y)(iv).

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (based upon the practices of secured asset-based lenders generally) business judgment.

"Permitted Dividends" shall mean: None.

"Permitted Encumbrances" shall mean: (a) Liens in favor of Agent for the benefit of Agent and Lenders securing the Obligations, including without limitation, Liens securing Hedge Liabilities and Cash Management Products and Services; (b) Liens for Charges not delinquent or being Properly Contested; (c) deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance; (d) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, surety and appeal bonds and other obligations of like nature arising in the Ordinary Course of Business; (e) [RESERVED]; (f) carriers', repairmens', mechanics', workers', materialmen's or other like Liens arising in the Ordinary Course of Business with respect to obligations which are not due or which are being Properly Contested; (g) [RESERVED]; (h) Liens disclosed on Schedule 1.2(a); provided that such Liens shall secure only those obligations which they secure on the Closing Date (and any refinancing thereof) and shall not subsequently apply to any other property or assets of any Borrower other than the property and assets to which they apply as of the Closing Date; (i) easements, rights-of-way, restrictions and other similar encumbrances or Liens on Real Property (A) which, in the aggregate, are not substantial in amount and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business on the property subject to such encumbrances or (B) delivered in connection with a standard and customary title report or included in the public records in which such property or asset is located; (j) statutory landlord's liens and customary landlord's liens in leases, to the extent that same are not required to be waived pursuant to this Agreement and to the extent that all lease payments, fees, charges and other reimbursements owing to the applicable landlord are not past due or delinquent or are being Properly Contested; (k) customary Liens incurred in connection with (1) insurance premium finance obligations to the extent secured only by the unearned premiums thereunder, and (2) membership in cooperative associations to the extent secured only by Equity Interests issued by such cooperative associations or dividends or distributions distributed by such cooperative associations on account of such Equity Interests, (l) Liens securing the Propco Special Advance (including the Initial Provisional Funding) subject in each case to the Propco

35

Subordination Agreement, and (m) Liens in favor of Pre-Petition Agent for the benefit of Agent and Pre-Petition Lenders securing all or any portion of the Pre-Petition Obligations.

"Permitted Indebtedness" shall mean: (a) the Obligations; (b) [RESERVED]; (c) any guarantees of Indebtedness permitted under Section 7.3 hereof; (d) any Indebtedness listed on Schedule 5.8(b)(ii) hereof; (e) Indebtedness consisting of Permitted Loans made by one or more Borrower(s) or by Operations Holdings to any Borrower(s) or to Operations Holdings; (f) [RESERVED]; (g) Interest Rate Hedges and Foreign Currency Hedges that are entered into by Borrowers to hedge their risks with respect to outstanding Indebtedness of Borrowers and not for speculative or investment purposes; (h) Indebtedness incurred in respect of the financing of not more than one year's insurance premiums; (i) Indebtedness in respect of netting services, overdraft protections and other like services, in each case incurred in the ordinary course of business (j) [RESERVED], and (k) the Propco Special Advance (including the Initial Provisional Funding).

"Permitted Investments" shall mean investments in: (a) obligations issued or guaranteed by the United States of America or any agency thereof; (b) commercial paper with maturities of not more than 180 days and a published rating of not less than A-1 or P-1 (or the equivalent rating); (c) certificates of time deposit and bankers' acceptances having maturities of not more than 180 days and repurchase agreements backed by United States government securities of a commercial bank if (i) such bank has a combined capital and surplus of at least $500,000,000, or (ii) its debt obligations, or those of a holding company of which it is a Subsidiary, are rated not less than A (or the equivalent rating) by a nationally recognized investment rating agency; (d) U.S. money market funds that invest solely in obligations issued or guaranteed by the United States of America or an agency thereof; (e) Permitted Loans; and (f) investments in any Borrower or Debtor Guarantor.

"Permitted Loans" shall mean: (a) the extension of trade credit by a Borrower to its Customer(s), in the Ordinary Course of Business in connection with a sale of Inventory or rendition of services, in each case on open account terms; (b) [RESERVED]; and (c) intercompany loans between or among any of the Borrowers and Operations Holdings, so long as, (i) at the request of Agent, each such intercompany loan is evidenced by a promissory note (including, if applicable, any master intercompany note executed by and among Borrowers and Operations Holdings) on terms and conditions (including terms subordinating payment of the indebtedness evidenced by such note to the prior payment in full of all Obligations) acceptable to Agent in its sole discretion that has been delivered to Agent either endorsed in blank or together with an undated instrument of transfer executed in blank by the applicable Borrower(s) and Operations Holdings that are the payee(s) on such note and (ii) with respect to any loans or advances by any Borrower to Operations Holdings, Operation Holdings shall not use the proceeds of such loans or advances for any purpose other than paying incidental expenses incurred in administering Operations Holdings' business or transferring such proceeds to any Borrower.

"Permitted Overadvance" shall mean (a) from the Closing Date through the date (the "Liquidity Reduction Date") that Aggregate Liquidity 363 Proceeds in the amount of at least $30,000,000 are applied to the Obligations in accordance with this Agreement and the Interim Order and the Final Order, $20,000,000, and (b) at all times and under all circumstances after the Liquidity Reduction Date, $15,000,000; provided that, upon the occurrence of any Line Increase

36

Event, then from the date of the Line Increase Event through the Liquidity Reduction Date, the amount of the Permitted Overadvance shall be $40,000,000.

"Permitted Variance" shall have the meaning set forth in Section 6.5(a).

"Person" shall mean any natural person, individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, limited liability partnership, institution, public benefit corporation, joint venture, entity, the Creditors' Committee or Governmental Body (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall have the meaning set forth in the recitals hereto.

"Pharmaceutical Laws" shall mean federal, state and local laws, rules or regulations, codes, orders, decrees, judgments or injunctions issued, promulgated, approved or entered, relating to dispensing, storing or distributing of any health care goods or services including prescription drugs, medical devices, products, or DMEPOS, including Laws, rules or regulations relating to the qualifications of Persons employed to do the same.

"Pharmacy Inventory Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(v).

"Pharmacy Receivables" shall mean each "Account" (as defined in the UCC) of a Borrower that arises from the sale of Inventory consisting of drugs, medical devices or DMEPOS that can only be dispensed on the order of a licensed professional and for which a Third Party Payor is the account debtor, together with all income, payments and proceeds thereof. For the avoidance of doubt, no Pharmacy Receivable shall be deemed to be a Medicaid Receivable or Medicare Receivable.

"Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Benefit Plan and Multiemployer Plan, as defined herein) maintained by any Borrower or any member of the Controlled Group or to which any Borrower or any member of the Controlled Group is required to contribute.

"Planned GOB Sales" shall have the meaning set forth in Section 10.7(o) hereof.

"Planned GOB Sales Order" shall have the meaning set forth in Section 10.7(o) hereof.

"Planned GOB Stores" shall have the meaning set forth in Section 10.7(o) hereof.

"Planned GOB Stores Liquidator Agreement" shall have the meaning set forth in Section 10.7(o).

"PNC" shall have the meaning set forth in the preamble to this Agreement and shall extend to all of its successors and assigns.

"PNCCM" shall have the meaning set forth in the preamble to this Agreement and shall extend to all of its successors and assigns.

"Post-Petition Obligations" shall mean all Obligations other than Pre-Petition Obligations.

"<u>Post-Petition Secured Parties</u>" shall mean, collectively, the Agent, the Lenders, the Issuer and each Lender or Agent, or Affiliate thereof, that is counterparty to any Hedge Agreement or Cash Management Products and Services entered into after the Petition Date.

"<u>Prescription Lists</u>" shall mean, as to each Borrower, such Borrower's retail customer files (including Prescription Scripts for retail customers and other medical information related thereto, subject to any restrictions contained in Sections 1171 through 1179 of the Social Security Act of other applicable law) maintained by the retail pharmacy of such Borrower, wherever located.

"<u>Prescription Script</u>" shall mean an order by a licensed physician or other licensed health care professional for the administration, preparation or dispensing of any drug or medical device executed and delivered in accordance with Applicable Law.

"<u>Pre-Petition Agent</u>" shall have the meaning set forth in the recitals hereto.

"<u>Pre-Petition Collateral</u>" shall mean all "Collateral" as defined in Pre-Petition Credit Agreement in existence as of the Petition Date.

"<u>Pre-Petition Credit Agreement</u>" shall have the meaning set forth in the recitals hereto.

"<u>Pre-Petition Lender</u>" shall have the meaning set forth in the recitals hereto.

"<u>Pre-Petition Loan Documents</u>" shall mean the Pre-Petition Credit Agreement, the "Other Documents" as defined in the Pre-Petition Credit Agreement and each document, agreement and instrument (and all schedules and exhibits thereto) executed in connection therewith, in each case, as in effect immediately prior to the Petition Date.

"<u>Pre-Petition Obligations</u>" shall mean all "Obligations" as defined under the Pre-Petition Credit Agreement.

"<u>Pre-Petition Payment</u>" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or trade payables or other pre-petition claims against any Loan Party.

"<u>Pre-Petition Released Claim</u>" shall have the meaning set forth in Section 1.6 hereof.

"<u>Pre-Petitions Secured Parties</u>" shall mean, collectively, the Pre-Petition Agent, the Pre-Petition Lenders, PNC, as Issuer under the Pre-Petition Credit Agreement, and each Lender or Agent, or Affiliate thereof, counterparty to any Hedge Agreement or Cash Management Products and Services entered into prior to the Petition Date.

"<u>Prescription List Advance Rate</u>" shall have the meaning set forth in Section 2.1(a)(y)(vi).

"<u>Pro Forma Balance Sheet</u>" shall have the meaning set forth in Section 5.5(a) hereof.

"<u>Pro Forma Financial Statements</u>" shall have the meaning set forth in Section 5.5(b) hereof.

"Processor Letter" shall mean any letter agreement substantially in the form attached hereto as Exhibit 4.8(e) between any Borrower and any Credit Card Issuer or Credit Card Processor in favor of Agent acknowledging Agent's first priority security interest in the monies due and to become due to such Borrower (including, without limitation, credits and reserves) under the applicable Credit Card Agreement between such Borrower and Credit Card Issuer or Credit Card Processor, and agreeing to transfer all such amounts to Agent in accordance with Section 4.8 hereof, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Projections" shall have the meaning set forth in Section 5.5(b) hereof.

"Propco" shall mean Haggen Property Holdings, LLC, a Delaware limited liability company.

"Propco Collateral" shall mean all "Collateral" as defined in the Propco Subordination Agreement; provided that, for the avoidance of doubt, upon any termination of the Propco Pledge Agreement in accordance with the terms thereof, none of the "Pledged Collateral" as defined and provided for under the Propco Pledge Agreement shall constitute "Propco Collateral" hereunder.

"Propco Entities" shall mean Propco, Propco North and Propco South.

"Propco Guaranty" shall mean that certain Limited Guaranty Agreement dated as of the August 21, 2015 executed by the Propco Guarantors in favor of Agent, as reaffirmed and modified by the Propco Guarantor Reaffirmation, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Propco Guaranty Security Agreements" shall mean (x) the Propco Pledge Agreement, and (y) the Closing Mortgages (as defined in the Propco Guaranty).

"Propco Guarantors" shall mean Holdings, Propco, Propco North and Propco South in their respective capacities as Guarantors under the Propco Guaranty.

"Propco Guarantor Reaffirmation" shall mean that certain Reaffirmation and Amendment Regarding Limited Guaranty Agreement and Collateral Pledge Agreement dated as of the Closing Date executed by the Propco Guarantors in favor of Agent.

"Propco Lenders" shall mean Propco North and Propco South.

"Propco Loan Documents" shall mean all documents and instruments evidencing the Propco Special Advance and the Initial Provisional Funding.

"Propco North" shall mean Haggen Property North, LLC, a Delaware limited liability company.

"Propco Pledge Agreement" shall mean that certain Collateral Pledge Agreement executed by Propco in favor of Agent dated as of August 21, 2015, as reaffirmed and modified by the Propco Guarantor Reaffirmation, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Propco South" shall mean Haggen Property South, LLC, a Delaware limited liability company.

"Propco Special Advance" shall mean loans from Propco Lenders to Borrowers in an initial principal amount equal to $25,000,000 (inclusive of the Initial Provisional Funding).

39

"Propco Subordination Agreement" shall mean that certain Propco Intercreditor Agreement dated as of August 21, 2015 by and among Agent, Propco Lenders and Haggen Property Lender, as reaffirmed and modified by that certain Reaffirmation and Amendment Regarding Propco Intercreditor Agreement dated as of the Closing Date executed by Agent, Propco Lenders and Haggen Property Lender, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Properly Contested" shall mean, in the case of any Indebtedness, Lien or Taxes, as applicable, of any Person that are not paid as and when due or payable by reason of such Person's bona fide dispute concerning its liability to pay the same or concerning the amount thereof: (a) such Indebtedness, Lien or Taxes, as applicable, are being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (b) such Person has established appropriate reserves as shall be required in conformity with GAAP; (c) the non-payment of such Indebtedness or Taxes during such dispute will not have any effect on the priority of the Liens in favor of Agent or the value of the assets in which Agent has a Lien and a stay of enforcement of any such Lien shall be in effect; and will not result in the forfeiture of any assets of such Person; (d) no Lien is imposed upon any of such Person's assets with respect to such Indebtedness or Taxes unless such Lien (y) is at all times junior and subordinate in priority to the Liens in favor of the Agent (except only with respect to property Taxes and other Taxes or Liens that have priority as a matter of applicable law) and, (z) enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; and (e) if such Indebtedness or Lien, as applicable, results from, or is determined by the entry, rendition or issuance against a Person or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review.

"Protective Advances" shall have the meaning set forth in Section 16.2(f) hereof.

"PSA" shall mean the Packers and Stockyard Act of 1921, 7 U.S.C. Section 181 et. seq., as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Published Rate" shall mean the rate of interest published each Business Day in the Wall Street Journal "Money Rates" listing under the caption "London Interbank Offered Rates" for a one month period (or, if no such rate is published therein for any reason, then the Published Rate shall be the LIBOR Rate for a one month period as published in another publication selected by the Agent).

"Purchasing CLO" shall have the meaning set forth in Section 16.3(d) hereof.

"Purchasing Lender" shall have the meaning set forth in Section 16.3(c) hereof.

"Qualified ECP Loan Party" shall mean each Borrower or Guarantor that on the Eligibility Date is (a) a corporation, partnership, proprietorship, organization, trust, or other entity other than a "commodity pool" as defined in Section 1a(10) of the CEA and CFTC regulations thereunder that has total assets exceeding $10,000,000 or (b) an Eligible Contract Participant that can cause another person to qualify as an Eligible Contract Participant on the Eligibility Date under Section 1a(18)(A)(v)(II) of the CEA by entering into or otherwise providing a "letter of credit or keepwell, support, or other agreement" for purposes of Section 1a(18)(A)(v)(II) of the CEA.

"RCRA" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as same may be amended from time to time.

"Real Property" shall mean all of the owned and leased premises identified on Schedule 4.4 hereto or in and to any other premises or real property that are hereafter owned or leased by any Borrower.

"Receivables" shall mean and include, as to each Loan Party, all of such Loan Party's accounts (as defined in Article 9 of the Uniform Commercial Code), Credit Card Receivables and all of such Loan Party's contract rights, instruments (including those evidencing indebtedness owed to such Loan Party by its Affiliates), documents, chattel paper (including electronic chattel paper), general intangibles relating to accounts, contract rights, instruments, documents and chattel paper, and drafts and acceptances, credit card receivables and all other forms of obligations owing to such Loan Party arising out of or in connection with the sale or lease of Inventory or the rendition of services, all supporting obligations, guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to Agent hereunder.

"Receivables Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(i) hereof.

"Register" shall have the meaning set forth in Section 16.3(e) hereof.

"Reimbursement Obligation" shall have the meaning set forth in Section 2.14(b) hereof.

"Release" shall have the meaning set forth in Section 5.7(c)(i) hereof.

"Releasee" shall have the meaning set forth in Section 1.6 hereof.

"Releasors" shall have the meaning set forth in Section 1.6 hereof.

"Reorganization Plan" means a plan or plans of reorganization in the Case.

"Reportable Compliance Event" shall mean that any Covered Entity becomes a Sanctioned Person, or is charged by indictment, criminal complaint or similar charging instrument, arraigned, or custodially detained in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or has knowledge of facts or circumstances to the effect that it is reasonably likely that any aspect of its operations is in actual or probable violation of any Anti-Terrorism Law.

"Reportable ERISA Event" shall mean a reportable event described in Section 4043(c) of ERISA or the regulations promulgated thereunder, other than an event for which the 30 day notice period is waived.

"Required Interest Rate Hedge" shall have the meaning set forth in Section 6.16 hereof.

"Required Lenders" shall mean Lenders (not including Swing Loan Lender (in its capacity as such Swing Loan Lender) or any Defaulting Lender) holding greater than fifty percent (50%) of either (a) the aggregate of the Revolving Commitment Amounts of all Lenders (excluding any Defaulting Lender), or (b) after the termination of all commitments of Lenders hereunder, the sum of the outstanding Revolving Advances and Swing Loans, plus the Maximum Undrawn Amount of all outstanding Letters of Credit; provided, however, if there are three (3) Lenders or two (2) Lenders, Required Lenders shall mean at least two (2) Lenders (excluding

41

any Defaulting Lender).  For purposes of determining the number of Required Lenders, Lenders that are Affiliates will be counted as a single Lender.

"Required Lenders (Supermajority)" shall mean Lenders (not including Swing Loan Lender (in its capacity as such Swing Loan Lender) or any Defaulting Lender) holding greater than sixty six and two thirds of one percent (66 2/3%) of either (a) the aggregate of the Revolving Commitment Amounts of all Lenders (excluding any Defaulting Lender), or (b) after the termination of all commitments of Lenders hereunder, the sum of the outstanding Revolving Advances and Swing Loans, plus the Maximum Undrawn Amount of all outstanding Letters of Credit; provided, however, if there are three (3) Lenders or two (2) Lenders, Required Lenders (Supermajority) shall mean at least two (2) Lenders (excluding any Defaulting Lender).  For purposes of determining the number of Required Lenders (Supermajority), Lenders that are Affiliates will be counted as a single Lender.

"Reserve Percentage" shall mean as of any day the maximum effective percentage in effect on such day as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the reserve requirements (including supplemental, marginal and emergency reserve requirements) with respect to eurocurrency funding (currently referred to as "Eurocurrency Liabilities".

"Revolving Advances" shall mean Advances other than Letters of Credit and the Swing Loans.

"Revolving Commitment" shall mean, as to any Lender, the obligation of such Lender (if applicable), to make Revolving Advances and participate in Swing Loans and Letters of Credit, in an aggregate principal and/or face amount not to exceed the Revolving Commitment Amount (if any) of such Lender.

"Revolving Commitment Amount" shall mean, (i) as to any Lender other than a New Lender, the Revolving Commitment amount (if any) set forth opposite such Lender's name on Schedule 1.1(a) hereto as such schedule may be updated from time to time by Agent (or, in the case of any Lender that became party to this Agreement after the Closing Date pursuant to Section 16.3(c) or (d) hereof, the Revolving Commitment amount (if any) of such Lender as set forth in the applicable Commitment Transfer Supplement), and (ii) as to any Lender that is a New Lender, the Revolving Commitment amount provided for in the joinder signed by such New Lender under Section 2.24(a)(ix), in each case as the same may be adjusted upon any increase by such Lender pursuant to Section 2.24 hereof, or any assignment by or to such Lender pursuant to Section 16.3(c) or (d) hereof.

"Revolving Commitment Percentage" shall mean,   (i) as to any Lender other than a New Lender, the Revolving Commitment Percentage (if any) set forth opposite such Lender's name on Schedule 1.1(a) hereto as such schedule may be updated from time to time by Agent (or, in the case of any Lender that became party to this Agreement after the Closing Date pursuant to Section 16.3(c) or (d) hereof, the Revolving Commitment Percentage (if any) of such Lender as set forth in the applicable Commitment Transfer Supplement), and (ii) as to any Lender that is a New Lender, the Revolving Commitment Percentage provided for in the joinder signed by such New Lender under Section 2.24(a)(ix), in each case as the same may be adjusted upon any increase in the Maximum Revolving Advance Amount pursuant to Section 2.24 hereof, or any assignment by or to such Lender pursuant to Section 16.3(c) or (d) hereof.

074658.14086/101390412v.6

"Revolving Credit Note" shall mean, collectively, the promissory notes referred to in Section 2.1(a) hereof.

"Revolving Interest Rate" shall mean (a) with respect to Revolving Advances that are Domestic Rate Loans and Swing Loans, an interest rate per annum equal to the sum of the Applicable Margin plus the Alternate Base Rate and (b) with respect to LIBOR Rate Loans: Not Applicable.

"Sale / Leaseback Documents" shall mean each purchase agreement, master lease or other instrument entered into or delivered in connection with the Sale / Leaseback Transactions consummated prior to the Closing Date, as such agreement, lease or instrument is in effect as of the Closing Date, each of which have been delivered to Agent on or before the Closing Date.

"Sale / Leaseback Transactions" shall mean the transactions contemplated pursuant to: (i) that certain Purchase and Sale Agreement and Joint Escrow Instructions by and between Spirit Master Funding IV, LLC and Haggen Holdings, LLC, dated as of November 24, 2014, as the same may be amended from time to time; and (ii) that certain Purchase and Sale Agreement and Joint Escrow Instructions by and between GIG TCG Wave Holdings LLC and Haggen Holdings LLC, dated as of December 4, 2014, as amended from time to time.

"Sanctioned Country" shall mean a country subject to a sanctions program maintained under any Anti-Terrorism Law.

"Sanctioned Person" shall mean any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person, group, regime, entity or thing, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any Anti-Terrorism Law.

"Schedules" shall mean all schedules and statement of financial affairs required to be filed with the Bankruptcy Court under the Federal Rules of Bankruptcy Procedure with respect to the Borrowers and the other debtors in the Case.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Secured Parties" shall mean, collectively, Agent, Issuer, Swing Loan Lender and Lenders, together with any Affiliates of Agent or any Lender to whom any Hedge Liabilities or Cash Management Liabilities are owed and with each other holder of any of the Obligations, shall include both the Pre-Petition Secured Parties and the Post-Petition Secured Parties, and the respective successors and assigns of each of them.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Sellers' Lien Laws" means, collectively, all state, federal, and other Applicable Laws applicable to a Borrower's purchase of Farm Products on credit from any selling party that creates a Lien or imposes a trust upon the agricultural, livestock, poultry, seafood, milk, dairy, or other Farm Products sold and/or the proceeds and products thereof, for the benefit of such selling party, or a creditor thereof, to secure payment for such Farm Products, including without limitation, PACA, PSA, the Food Security Act, or any similar state or federal laws or regulations, including any California and Washington growers' or producers' Liens.

"Sellers' Lien Law Notices" shall have the meaning given in Section 5.29.

"Settlement" shall have the meaning set forth in Section 2.6(d) hereof.

"Settlement Date" shall have the meaning set forth in Section 2.6(d) hereof.

"Social Security Act" shall mean the Social Security Act, 92 U.S.C. §§1396, et seq., as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Sponsor" shall mean Comvest Investment Partners Holdings, LLC.

"Statutory Fees" shall have the meaning given to the term "Statutory Fees" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"Stock Certificates" shall mean Collateral consisting of stock certificates or any other certificates (to the extent certificated) representing Equity Interests of any Borrower or their Subsidiaries pledged as Collateral pursuant to this Agreement or the Other Documents for which a Lien can be perfected by delivering such certificates.

"Subsidiary" shall mean of any Person a corporation or other entity of whose Equity Interests having ordinary voting power (other than Equity Interests having such power only by reason of the happening of a contingency) to elect a majority of the directors of such corporation, or other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person.

"Subsidiary Stock" shall mean (a) with respect to the Equity Interests issued to a Loan Party by any Subsidiary (other than a Foreign Subsidiary), 100% of such issued and outstanding Equity Interests, and (b) with respect to any Equity Interests issued to a Loan Party by any first-tier Foreign Subsidiary, 65% of such issued and outstanding Equity Interests of such first-tier Subsidiary (or such greater percentage that, due to a change in an Applicable Law after the date hereof, could not reasonably be expected to cause any material adverse tax consequences).

"Superpriority Claim" means an allowed claim against any Loan Party or such Loan Party's estate in the Case which is an administrative expense claim having priority over (a) any and all allowed administrative expenses (other than the Carve-Out) and (b) all unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code.

"Swap" shall mean any "swap" as defined in Section 1a(47) of the CEA and regulations thereunder, other than (a) a swap entered into, or subject to the rules of, a board of trade designated as a contract market under Section 5 of the CEA, or (b) a commodity option entered into pursuant to CFTC Regulation 32.3(a).

"Swap Obligation" means any obligation to pay or perform under any agreement, contract or transaction that constitutes a Swap which is also a Lender-Provided Interest Rate Hedge, or a Lender-Provided Foreign Currency Hedge.

"Swing Loan Lender" shall mean PNC, in its capacity as lender of the Swing Loans.

"Swing Loan Note" shall mean the promissory note described in Section 2.4(a) hereof.

"Swing Loans" shall mean the Advances made pursuant to Section 2.4 hereof.

44

"Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Body, including any interest, additions to tax or penalties applicable thereto.

"Term" shall have the meaning set forth in Section 13.1 hereof.

"Termination Date" shall have the meaning set forth in Section 13.1 hereof.

"Termination Event" shall mean: (a) a Reportable ERISA Event with respect to any Plan; (b) the withdrawal of any Borrower or any member of the Controlled Group from a Plan during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) the providing of notice of intent to terminate a Plan in a distress termination described in Section 4041(c) of ERISA; (d) the commencement of proceedings by the PBGC to terminate a Plan; (e) any event or condition (i) which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or (ii) that may result in the termination of a Multiemployer Plan pursuant to Section 4041A of ERISA; (f) the partial or complete withdrawal, within the meaning of Section 4203 or 4205 of ERISA, of any Borrower or any member of the Controlled Group from a Multiemployer Plan; (g) notice that a Multiemployer Plan is subject to Section 4245 of ERISA; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent, upon any Borrower or any member of the Controlled Group.

"Third Party Payor" shall mean any Person, such as a Medicare/Medicaid Administrative Contractor or private health insurance company, which is obligated to reimburse or otherwise make payments to health care providers who provide medical care or medical assistance or other goods or services for eligible patients under Medicare, Medicaid, any other government program or any private insurance contract including, without limitation any Medicare Part D or Medicare Part C plan.

"Toxic Substance" shall mean and include any material present on the Real Property which has been shown to have significant adverse effect on human health or which is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 et seq., applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances. "Toxic Substance" includes but is not limited to asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

"Transactions" shall have the meaning set forth in Section 5.5(a) hereof.

"Transferee" shall have the meaning set forth in Section 16.3(d) hereof.

"UCC Collateral" shall mean the Collateral consisting solely of assets for which Liens can be perfected by filing a Uniform Commercial Code financing statement.

"Uniform Commercial Code" shall have the meaning set forth in Section 1.3 hereof.

"USA PATRIOT Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

1.3.    Uniform Commercial Code Terms.    All terms used herein and defined in the Uniform Commercial Code as adopted in the State of New York from time to time (the "Uniform Commercial Code") shall have the meaning given therein unless otherwise defined herein.

45

Without limiting the foregoing, the terms "accounts", "chattel paper" (and "electronic chattel paper" and "tangible chattel paper"), "commercial tort claims", "deposit accounts", "documents", "equipment", "financial asset", "fixtures", "general intangibles", "goods", "instruments", "inventory", "investment property", "letter-of-credit rights", "payment intangibles", "proceeds", "promissory note" "securities", "software" and "supporting obligations" as and when used in the description of Collateral shall have the meanings given to such terms in Articles 8 or 9 of the Uniform Commercial Code.  To the extent the definition of any category or type of collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

1.4.    <u>Certain Matters of Construction.</u>  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  All references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement.  Any pronoun used shall be deemed to cover all genders.  Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa.  All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.  Unless otherwise provided, all references to any instruments or agreements to which Agent is a party, including references to any of the Other Documents, shall include any and all modifications, supplements or amendments thereto, any and all restatements or replacements thereof and any and all extensions or renewals thereof.  Except as otherwise expressly provided for herein, all references herein to the time of day shall mean the time in New York, New York.  Unless otherwise provided, all financial calculations shall be performed with Inventory valued on a first-in, first-out basis.  Whenever the words "including" or "include" shall be used, such words shall be understood to mean "including, without limitation" or "include, without limitation".  A Default or an Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by Required Lenders.  Any Lien referred to in this Agreement or any of the Other Documents as having been created in favor of Agent, any agreement entered into by Agent pursuant to this Agreement or any of the Other Documents, any payment made by or to or funds received by Agent pursuant to or as contemplated by this Agreement or any of the Other Documents, or any act taken or omitted to be taken by Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of Agent and Lenders.  Wherever the phrase "to the best of Borrowers' knowledge" or words of similar import relating to the knowledge or the awareness of any Borrower are used in this Agreement or Other Documents, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of any Borrower or (ii) the knowledge that a senior officer would have obtained if he/she had engaged in a good faith and diligent performance of his/her duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Borrower and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates (provided that such good faith attempt shall not require the expenditure of funds).  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it

46

would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists. In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder. Notwithstanding anything in this Agreement to the contrary, if there is any conflict or inconsistency between this Agreement and any Lender-Provided Foreign Currency Hedge, any Lender-Provided Interest Rate Hedge or any agreement governing Cash Management Products and Services (collectively, "<u>Lender Bank Product Agreements</u>") with respect to any terms governing amendments, voting, payments, pricing, fees, default and/or acceleration under any Lender Bank Product Agreement, then the applicable terms of any such Lender Bank Product Agreement shall control.

     1.5.   <u>Acknowledgment.</u>

       (a)    As of the Petition Date, the aggregate outstanding principal amount of loans under the Pre-Petition Credit Agreement owed by Borrowers to the Pre-Petition Secured Parties is $[_____ ], the accrued and unpaid interest on such loans totaled $_____] the aggregate outstanding maximum face amount drawable under letters of credit issued under the Pre-Petition Credit Agreement for which Borrowers are liable to the Pre-Petition Secured Parties is [$_____], the accrued and unpaid letter of credit fees payable with respect to such letter of credit to the Pre-Petition Secured Parties totaled $[_____], and the accrued and unpaid facility fees owned by Borrowers to the Pre-Petition Secured Parties totaled $[_____], which such amounts, together with the other Pre-Petition Obligations owing to the Pre-Petition Secured Parties under the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents are owing to Pre-Petition Secured Parties by Borrowers without defense, setoff, claim or counterclaim.

       (b)    Each Loan Party confirms and agrees that Agent, for the benefit of itself and the other Lenders, has and shall continue to have valid, enforceable and perfected first priority security interests and Liens upon Pre-Petition Collateral of the Loan Parties heretofore granted to the Pre-Petition Secured Parties pursuant to the Pre-Petition Loan Documents as in effect immediately prior to the Petition Date to secure all of the Pre-Petition Obligations, as well as valid and enforceable first priority security interests in and Liens upon all Collateral of the Loan Parties granted to Agent, in accordance with the Interim Order and the Final Order, for the benefit of itself and the Post-Petition Secured Parties, upon the entry of, and under, the Interim Order or Final Order, and under this Agreement.

     1.6.   <u>Release.</u>

       (a)    In consideration of and as a condition to the Agent and the Lenders making Advances and providing other credit and financial accommodations to the Borrowers pursuant to the provisions of this Agreement, the Interim Order and the Final Order, each Loan Party, on behalf of itself, its estate, its successors and assigns, and other legal representatives (collectively, the "<u>Releasors</u>"), hereby absolutely releases, forever discharges and acquits each Pre-Petition Secured Party and their respective successors and assigns, and their present and

47

former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (the Pre-Petition Secured Parties and all such other parties being hereinafter referred to collectively as "Releasees") of and from any and all claims, demands, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all other claims, counterclaims, defenses rights of set-off, demands and liabilities whatsoever (individually, a "Pre-Petition Released Claim" and collectively, the "Pre-Petition Released Claims") of every kind, name, nature and description, known or unknown, suspected or unsuspected, both at law and in equity, which, including, without limitation, any so-called "lender liability" claims or defenses, that any Releasor may now or hereafter own, hold, have or claim to have against Releasees, or any of them for, upon, or by reason of any nature, cause or thing whatsoever which has arisen and/or arises at any time on or prior to the date of this Agreement, including in respect of  the Pre-Petition Obligations, the Pre-Petition Loan Documents and any advances, letters of credit or other financial accommodations made by any Pre-Petition Secured Party to the Borrowers pursuant to the Pre-Petition Loan Documents; provided that the releases provided for in this Section 1.6(a) shall not be effective with respect to the Loan Parties until entry of the Final Order, and with respect to the bankruptcy estates of the Loan Parties until the expiration of the "Challenge Period" (as defined in the Final Order, or, prior to the entry of the Final Order, the Interim Order).  In addition, upon the indefeasible payment in full in cash of all the Post-Petition Obligations and termination of the commitments under this Agreement (which payment and termination shall be on terms and conditions acceptable to the Agent), the Post-Petition Secured Parties shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to this Agreement, the Other Documents, the Interim Order or the Final Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated), on terms and conditions acceptable to the Agent.

(b)     Upon the entry of the Interim Order, each Loan Party, on behalf of itself and the Releasors, hereby, absolutely, unconditionally and irrevocably, covenants and agrees, and will cause each other debtor to absolutely, unconditionally and irrevocably, covenant and agree, with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Releasee pursuant to this Section 1.6.  If any Releasor violates the foregoing covenant, the Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

1.7.     Adoption and Ratification.  Each Loan Party hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Pre-Petition Loan Documents to which it is a party and (b) agrees to pay all Pre-Petition Obligations in accordance with the terms of the Pre-Petition Loan Documents and in accordance with the Interim Order and Final Order.  Each Pre-Petition Loan Document to which any Loan Party is a party is hereby incorporated herein by reference and hereby is and shall be deemed adopted and assumed in full by such Loan Party or Loan Parties, each as a debtor and debtor-in-possession, and considered an agreement among the applicable Loan Party or Loan Parties, on the one hand, and the applicable Secured Parties, on the other hand.  Notwithstanding anything to the contrary contained in this Agreement, no failure by any

48

Loan Party to comply with any of the provisions of Articles V, VI, VII, IX or X of the Pre-Petition Credit Agreement at any time from and after the Petition Date shall constitute or give rise to any Event of Default under this Agreement.

II.    ADVANCES, PAYMENTS.

2.1.    <u>Revolving Advances.</u>

(a)    <u>Amount of Revolving Advances</u>.  Subject to the terms and conditions set forth in this Agreement specifically including Sections 2.1(b), (c) and (d), each Lender, severally and not jointly, will make Revolving Advances to Borrowers in aggregate amounts outstanding at any time equal to such Lender's Revolving Commitment Percentage of the lesser of (x) the Maximum Revolving Advance Amount, <u>less</u> the outstanding amount of Swing Loans, <u>less</u> the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit <u>less</u> the Carve-Out Reserve, or (y) an amount equal to the sum of:

(i)    85% of Eligible Receivables, Eligible Medicare Receivables, Eligible Medicaid Receivables, and Eligible Pharmacy Receivables (the "<u>Receivables Advance Rate</u>"), <u>plus</u>

(ii)    90% of Eligible Credit Card Receivables (the "<u>Credit Card Receivables Advance Rate</u>"), <u>plus</u>

(iii)    The lesser of (i) 70% of the lower of cost or market value of Eligible Inventory (other than Eligible Pharmacy Inventory and Inventory consisting of perishable goods), and (ii) 90% of the Net Orderly Liquidation Value Percentage of Eligible Inventory (other than Eligible Pharmacy Inventory and Inventory consisting of perishable goods) (the "<u>Inventory Advance Rate</u>"), <u>plus</u>

(iv)    The lesser of (i) 70% of the lower of cost or market value of Eligible Inventory consisting of perishable goods, and (ii) 85% of the Net Orderly Liquidation Value Percentage of Eligible Inventory consisting of perishable goods (the "<u>Perishable Goods Inventory Advance Rate</u>"), <u>plus</u>

(v)    The lesser of (i) 75% of the lower of cost or market value of Eligible Pharmacy Inventory, and (ii) 90% of the Net Orderly Liquidation Value Percentage of Eligible Pharmacy Inventory (the "<u>Pharmacy Inventory Advance Rate</u>"), <u>plus</u>

(vi)    90% of the net orderly liquidation value of the Eligible Prescription Lists, updated on a quarterly basis and evidenced by an appraisal satisfactory to Agent in its Permitted Discretion (the "<u>Prescription List Advance Rate</u>" and, together with the Pharmacy Inventory Advance Rate, the Perishable Goods Advance Rate, the Inventory Advance Rate, the Credit Card Receivables Advance Rate, and the Receivables Advance Rate, collectively the "<u>Advance Rates</u>"), plus

(vii)    the amount of the Permitted Overadvance as in effect from time to time; <u>minus</u>

(viii) the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit, <u>minus</u>

(ix)    the outstanding amount of Swing Loans, <u>minus</u>

(x)    subject to Section 2.1(d), such reserves as Agent may reasonably deem proper and necessary from time to time from the perspective of an asset-based lender, or as Agent may be directed in writing by Required Lenders, including without limitation, reserves with respect to (a) Sellers' Lien Laws, (b) other events, conditions, contingencies or risks, which could in Agent's Permitted Discretion, have a reasonable likelihood of adversely affecting (i) the Collateral, (ii) Borrowers' business or financial condition, (iii) Agent's Liens, (iv) Borrowers' ability to satisfy their obligations hereunder and under the Other Documents, (v) Agent's ability to enforce its rights hereunder and under the Other Documents, (c) ensuring Borrowers' ability to satisfy future obligations, (d) financial information Agent reasonably believes is inaccurate, incomplete or misleading, (e) any facts that Agent reasonably believes could be expected to result in a Default or an Event of Default, (f) rent reserves, (g) Cash Management Liabilities and/or Hedge Liabilities, and (h) dilution, and including without limitation the Carve-Out Reserve (all collectively, the "<u>Reserves</u>").

The amount derived from the sum of (x) Sections 2.1(a)(y)(i), (ii), (iii), (iv), (v), (vi) and (vii) minus (y) the sum of Sections 2.1 (a)(y)(viii), (ix) and (x) at any time and from time to time shall be referred to as the "Formula Amount". The Revolving Advances shall be evidenced by one or more secured promissory notes (collectively, the "Revolving Credit Note") substantially in the form attached hereto as Exhibit 2.1(a). Notwithstanding anything to the contrary contained in the foregoing or otherwise in this Agreement, the outstanding aggregate principal amount of Swing Loans and the Revolving Advances at any one time outstanding shall not exceed an amount equal to the lesser of (i) the Maximum Revolving Advance Amount less the Maximum Undrawn Amount of all outstanding Letters of Credit or (ii) the Formula Amount.

(b)    <u>Discretionary Rights</u>. Agent shall provide prompt prior written (including email) notice of any change in criteria in the definitions of "Eligible Receivables," "Eligible Medicare Receivables," "Eligible Medicaid Receivables," "Eligible Credit Card Receivables," "Eligible Inventory," "Eligible Pharmacy Inventory," or "Eligible Prescription Lists" or establishment of reserves and sublimits in this Section 2.1 to the Borrowing Agent and absent exigent circumstances, will consult with the Borrowing Agent in advance; provided, however that, if any change in criteria or advance rates would cause the outstanding Revolving Advances to exceed the amount of Revolving Advances permitted under this Agreement then, notwithstanding anything to the contrary, the Borrower shall have three (3) Business Days from the date of such change in criteria or advance rates to repay such excess amount; provided further that Lenders shall have no obligation to make any Advance during such period. The rights of the Agent under this subsection are subject to the provisions of Section 16.2(b) hereof.

(c)    <u>Sublimits for Revolving Advances</u>.

(i)    The aggregate amount of Revolving Advances made to Borrowers against Eligible Inventory consisting of perishable goods shall not exceed in the aggregate, at any time outstanding, twenty five percent (25%) of the Formula Amount.

(ii)    The aggregate amount of Revolving Advances made to Borrowers against Eligible Prescription Lists shall not exceed in the aggregate, at any time outstanding, thirty percent (30%) of the Formula Amount.

(iii)    The aggregate amount of Revolving Advances made to Borrowers against Eligible Medicare Receivables and Eligible Medicaid Receivables shall not exceed in the aggregate, at any time outstanding, two and one half of one percent (2.5%) of the Maximum Revolving Advance Amount.

(d)    <u>Reserves</u>.    Agent and Borrowers hereby acknowledge and agree that Agent has notified Borrowing Agent (such notice, the "<u>Reserve Notice</u>") of any type of Reserves (and the amounts thereof) that will be in place on the Closing Date.  Agent shall have the right at its option and election, exercised in its Permitted Discretion, at any time and from time to time from and after the Closing Date to implement, remove, increase, decrease or otherwise modify in any way any Reserves (and/or the amounts thereof), whether or not of the same type or nature of those Reserves in place on the Closing Date.

2.2.    <u>Procedures for Requesting Revolving Advances; Procedures for Selection of Applicable Interest Rates for All Advances.</u>

(a)    Borrowing Agent on behalf of any Borrower may notify Agent prior to 2:00 p.m. on a Business Day of a Borrower's request to incur, on that day, a Revolving Advance hereunder.  Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any other agreement with Agent or Lenders, or with respect to any other Obligation under this Agreement, become due, same shall be deemed a request for a Revolving Advance maintained as a Domestic Rate Loan as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation, and such request shall be irrevocable.  Furthermore, each Borrower hereby agrees, directs and authorizes that, upon and at any time following the entry of the Final Order, Agent may, in its sole and absolute discretion, at any time and from time to time elect to pay any and/or all of the Pre-Petition Obligations, in whole or in part, in cash, and/or elect to reimburse any and/or all of the professional fees, costs and expenses of the Pre-Petition Agent and the Pre-Petition Lenders (to the extent such professional fees, costs and expenses are payable by the Loan Parties under the Pre-Petition Credit Agreement), in whole or in part, in each case with the proceeds of Advances hereunder, and upon any such election (which may be made by Agent at any time and from time to time without any notice of any kind to Borrowing Agent or any other Borrower), then (x)  Borrowers shall be deemed to have irrevocably requested Revolving Advance(s) hereunder in the aggregate amount necessary for all such payments and reimbursements elected by Agent, (y) upon any such deemed request, notwithstanding anything to the contrary provided for herein, Lenders shall fund their respective Revolving Commitment Percentages of such Revolving Advance(s) in accordance with Section 2.6 and the other relevant provision of this Agreement, whether or not the conditions specified in Section 8.2 are then satisfied and subject only to the limits of the respective Revolving Commitment Amounts, and (z) upon any such funding, Agent shall disburse the proceeds of such Revolving Advance(s) in satisfaction and payment of such Pre-Petition Obligations and reimbursement for such professional fees, costs and expenses of the Pre-Petition Agent and the Pre-Petition Lenders (to the extent such professional fees, costs and

expenses are payable by the Loan Parties under the Pre-Petition Credit Agreement) as so elected by Agent .

**NOTWITHSTANDING ANYTHING TO THE CONTRARY PROVIDED FOR OTHERWISE IN THIS AGREEMENT OR ANY OTHER DOCUMENT, SPECIFICALLY INCLUDING BUT NOT LIMITED TO SECTIONS 2.2(b) THROUGH 2.2(h) HEREOF, UNLESS AND UNTIL AGENT AND EACH LENDER SHALL AGREE (EACH IN ITS SOLE AND ABSOLUTE DISCRETION) IN WRITING WITH BORROWERS PURSUANT TO AN AMENDMENT HERETO ENTERED INTO IN ACCORDANCE WITH SECTION 16.2 HEREOF TO MAKE LIBOR RATE LOANS AVAILABLE UNDER THIS AGREEMENT, NO BORROWER SHALL HAVE ANY RIGHT TO REQUEST OR OBTAIN ANY ADVANCE HEREUNDER AS A LIBOR RATE LOAN NOR TO CONVERT ANY ADVANCE OBTAINED ADVANCE HEREUNDER OBTAINED AS A DOMESTIC RATE LOAN TO A LIBOR RATE LOAN AS A DOMESTIC RATE LOAN TO A LIBOR RATE LOAN, AND NO LENDER SHALL HAVE ANY COMMITMENT, OBLIGATION OR DUTY OF ANY KIND TO PROVIDE OR FUND ANY ADVANCE HEREUNDER AS A LIBOR RATE LOAN OR TO PERMIT THE CONVERSION OF ANY ADVANCE OBTAINED ADVANCE HEREUNDER OBTAINED AS A DOMESTIC RATE LOAN TO A LIBOR RATE LOAN AS A DOMESTIC RATE LOAN TO A LIBOR RATE LOAN. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, UNTIL SUCH TIME AS SUCH AN AMENDMENT IS ENTERED INTO BY BORROWERS, AGENT AND ALL LENDERS, THE PROVISIONS OF SECTIONS 2.2(b) THROUGH 2.2(h) HEREOF SHALL BE INAPPLICABLE.**

(b)     Notwithstanding the provisions of subsection (a) above, in the event any Borrower desires to obtain a LIBOR Rate Loan for any Advance (other than a Swing Loan), Borrowing Agent shall give Agent written notice by no later than 1:00 p.m. on the day which is three (3) Business Days prior to the date such LIBOR Rate Loan is to be borrowed, specifying (i) the date of the proposed borrowing (which shall be a Business Day), (ii) the type of borrowing and the amount of such Advance to be borrowed, which amount shall be in a minimum amount of $1,000,000 and in integral multiples of $100,000 in excess thereof, and (iii) the duration of the first Interest Period therefor.  Interest Periods for LIBOR Rate Loans shall be for one, two, three or six months; provided that, if an Interest Period would end on a day that is not a Business Day, it shall end on the next succeeding Business Day unless such day falls in the next succeeding calendar month in which case the Interest Period shall end on the next preceding Business Day. No LIBOR Rate Loan shall be made available to any Borrower during the continuance of a Default or an Event of Default.  After giving effect to each requested LIBOR Rate Loan, including those which are converted from a Domestic Rate Loan under Section 2.2(e), there shall not be outstanding more than six (6) LIBOR Rate Loans, in the aggregate.

(c)     Each Interest Period of a LIBOR Rate Loan shall commence on the date such LIBOR Rate Loan is made and shall end on such date as Borrowing Agent may elect as set forth in subsection (b)(iii) above, provided that the exact length of each Interest Period shall be determined in accordance with the practice of the interbank market for offshore Dollar deposits and no Interest Period shall end after the last day of the Term.

52

(d)     Borrowing Agent shall elect the initial Interest Period applicable to a LIBOR Rate Loan by its notice of borrowing given to Agent pursuant to Section 2.2(b) or by its notice of conversion given to Agent pursuant to Section 2.2(e), as the case may be.  Borrowing Agent shall elect the duration of each succeeding Interest Period by giving irrevocable written notice to Agent of such duration not later than 1:00 p.m. on the day which is three (3) Business Days prior to the last day of the then current Interest Period applicable to such LIBOR Rate Loan.  If Agent does not receive timely notice of the Interest Period elected by Borrowing Agent, Borrowing Agent shall be deemed to have elected to convert such LIBOR Rate Loan to a Domestic Rate Loan subject to Section 2.2(e) below.

(e)     Provided that no Event of Default shall have occurred and be continuing, Borrowing Agent may, on the last Business Day of the then current Interest Period applicable to any outstanding LIBOR Rate Loan, or on any Business Day with respect to Domestic Rate Loans, convert any such loan into a loan of another type in the same aggregate principal amount provided that any conversion of a LIBOR Rate Loan shall be made only on the last Business Day of the then current Interest Period applicable to such LIBOR Rate Loan.  If Borrowing Agent desires to convert a loan, Borrowing Agent shall give Agent written notice by no later than 1:00 p.m. (i) on the day which is three (3) Business Days prior to the date on which such conversion is to occur with respect to a conversion from a Domestic Rate Loan to a LIBOR Rate Loan, or (ii) on the day which is one (1) Business Day prior to the date on which such conversion is to occur (which date shall be the last Business Day of the Interest Period for the applicable LIBOR Rate Loan) with respect to a conversion from a LIBOR Rate Loan to a Domestic Rate Loan, specifying, in each case, the date of such conversion, the loans to be converted and if the conversion is to a LIBOR Rate Loan, the duration of the first Interest Period therefor.

(f)     At its option and upon written notice given prior to 1:00 p.m. at least three (3) Business Days prior to the date of such prepayment, any Borrower may, subject to Section 2.2(g) hereof, prepay the LIBOR Rate Loans in whole at any time or in part from time to time with accrued interest on the principal being prepaid to the date of such repayment.  Such Borrower shall specify the date of prepayment of Advances which are LIBOR Rate Loans and the amount of such prepayment.  In the event that any prepayment of a LIBOR Rate Loan is required or permitted on a date other than the last Business Day of the then current Interest Period with respect thereto, such Borrower shall indemnify Agent and Lenders therefor in accordance with Section 2.2(g) hereof.

(g)     Each Borrower shall indemnify Agent and Lenders and hold Agent and Lenders harmless from and against any and all losses or expenses that Agent and Lenders may sustain or incur as a consequence of any prepayment, conversion of or any default by any Borrower in the payment of the principal of or interest on any LIBOR Rate Loan or failure by any Borrower to complete a borrowing of, a prepayment of or conversion of or to a LIBOR Rate Loan after notice thereof has been given, including any interest payable by Agent or Lenders to lenders of funds obtained by it in order to make or maintain its LIBOR Rate Loans hereunder.  A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Agent or any Lender to Borrowing Agent shall be conclusive absent manifest error.

(h)     Notwithstanding any other provision hereof, if any Applicable Law, treaty, regulation or directive, or any change therein or in the interpretation or application thereof,

including without limitation any Change in Law, shall make it unlawful for Lenders or any Lender (for purposes of this subsection (h), the term "Lender" shall include any Lender and the office or branch where any Lender or any Person controlling such Lender makes or maintains any LIBOR Rate Loans) to make or maintain its LIBOR Rate Loans, the obligation of Lenders (or such affected Lender) to make LIBOR Rate Loans hereunder shall forthwith be cancelled and Borrowers shall, if any affected LIBOR Rate Loans are then outstanding, promptly upon request from Agent, either pay all such affected LIBOR Rate Loans or convert such affected LIBOR Rate Loans into loans of another type.  If any such payment or conversion of any LIBOR Rate Loan is made on a day that is not the last day of the Interest Period applicable to such LIBOR Rate Loan, Borrowers shall pay Agent, upon Agent's request, such amount or amounts set forth in clause (g) above.  A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Lenders to Borrowing Agent shall be conclusive absent manifest error.

2.3.    Reserved.

2.4.    Swing Loans.

(a)    Subject to the terms and conditions set forth in this Agreement, and in order to minimize the transfer of funds between Lenders and Agent for administrative convenience, Agent, Lenders holding Revolving Commitments and Swing Loan Lender agree that in order to facilitate the administration of this Agreement, Swing Loan Lender may, at its election and option made in its sole discretion cancelable at any time for any reason whatsoever, make swing loan advances ("Swing Loans") available to Borrowers as provided for in this Section 2.4 at any time or from time to time after the date hereof to, but not including, the expiration of the Term, in an aggregate principal amount up to but not in excess of the Maximum Swing Loan Advance Amount, provided that the outstanding aggregate principal amount of Swing Loans and the Revolving Advances at any one time outstanding shall not exceed an amount equal to the lesser of (i) the Maximum Revolving Advance Amount less the Maximum Undrawn Amount of all outstanding Letters of Credit or (ii) the Formula Amount.  All Swing Loans shall be Domestic Rate Loans only.  Borrowers may borrow (at the option and election of Swing Loan Lender), repay and reborrow (at the option and election of Swing Loan Lender) Swing Loans and Swing Loan Lender may make Swing Loans as provided in this Section 2.4 during the period between Settlement Dates.  All Swing Loans shall be evidenced by a secured promissory note (the "Swing Loan Note") substantially in the form attached hereto as Exhibit 2.4(a).  Swing Loan Lender's agreement to make Swing Loans under this Agreement is cancelable at any time for any reason whatsoever and the making of Swing Loans by Swing Loan Lender from time to time shall not create any duty or obligation, or establish any course of conduct, pursuant to which Swing Loan Lender shall thereafter be obligated to make Swing Loans in the future.

(b)    Upon either (i) any request by Borrowing Agent for a Revolving Advance made pursuant to Section 2.2(a) hereof or (ii) the occurrence of any deemed request by Borrowers for a Revolving Advance pursuant to the provisions of the last sentence of Section 2.2(a) hereof, Swing Loan Lender may elect, in its sole discretion, to have such request or deemed request treated as a request for a Swing Loan, and may advance same day funds to Borrowers as a Swing Loan; provided that notwithstanding anything to the contrary provided for herein, Swing Loan Lender may not make Swing Loan Advances if Swing Loan Lender has been

54

notified by Agent or by Required Lenders that one or more of the applicable conditions set forth in Section 8.2 of this Agreement have not been satisfied or the Revolving Commitments have been terminated for any reason.

(c)     Upon the making of a Swing Loan (whether before or after the occurrence of a Default or an Event of Default and regardless of whether a Settlement has been requested with respect to such Swing Loan), each Lender holding a Revolving Commitment shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from Swing Loan Lender, without recourse or warranty, an undivided interest and participation in such Swing Loan in proportion to its Revolving Commitment Percentage. Swing Loan Lender or Agent may, at any time, require the Lenders holding Revolving Commitments to fund such participations by means of a Settlement as provided for in Section 2.6(d) below. From and after the date, if any, on which any Lender holding a Revolving Commitment is required to fund, and funds, its participation in any Swing Loans purchased hereunder, Agent shall promptly distribute to such Lender its Revolving Commitment Percentage of all payments of principal and interest and all proceeds of Collateral received by Agent in respect of such Swing Loan; provided that no Lender holding a Revolving Commitment shall be obligated in any event to make Revolving Advances in an amount in excess of its Revolving Commitment Amount minus its Participation Commitment (taking into account any reallocations under Section 2.22) of the Maximum Undrawn Amount of all outstanding Letters of Credit.

2.5.    Disbursement of Advance Proceeds.    All Advances shall be disbursed from whichever office or other place Agent may designate from time to time and, together with any and all other Obligations of Borrowers to Agent or Lenders, shall be charged to Borrowers' Account on Agent's books. The proceeds of each Revolving Advance or Swing Loan requested by Borrowing Agent on behalf of any Borrower or deemed to have been requested by any Borrower under Sections 2.2(a), 2.6(b) or 2.14 hereof shall, (i) with respect to requested Revolving Advances, to the extent Lenders make such Revolving Advances in accordance with Section 2.2(a), 2.6(b) or 2.14 hereof, and with respect to Swing Loans made upon any request by Borrowing Agent for a Revolving Advance to the extent Swing Loan Lender makes such Swing Loan in accordance with Section 2.4(b) hereof, be made available to the applicable Borrower on the day so requested by way of credit to such Borrower's operating account at PNC, or such other bank as Borrowing Agent may designate following notification to Agent, in immediately available federal funds or other immediately available funds or, (ii) with respect to Revolving Advances deemed to have been requested by any Borrower or Swing Loans made upon any deemed request for a Revolving Advance by any Borrower, be disbursed to Agent to be applied to the outstanding Obligations giving rise to such deemed request. During the Term, Borrowers may use the Revolving Advances and Swing Loans by borrowing, prepaying and reborrowing, all in accordance with the terms and conditions hereof.

2.6.    Making and Settlement of Advances.

(a)     Each borrowing of Revolving Advances shall be advanced according to the applicable Revolving Commitment Percentages of Lenders holding the Revolving Commitments (subject to any contrary terms of Section 2.22). Each borrowing of Swing Loans shall be advanced by Swing Loan Lender alone.

(b)    Promptly after receipt by Agent of a request or a deemed request for a Revolving Advance pursuant to Section 2.2(a) and, with respect to Revolving Advances, to the extent Agent elects not to provide a Swing Loan or the making of a Swing Loan would result in the aggregate amount of all outstanding Swing Loans exceeding the maximum amount permitted in Section 2.4(a), Agent shall notify Lenders holding the Revolving Commitments of its receipt of such request specifying the information provided by Borrowing Agent and the apportionment among Lenders of the requested Revolving Advance as determined by Agent in accordance with the terms hereof.  Each Lender shall remit the principal amount of each Revolving Advance to Agent such that Agent is able to, and Agent shall, to the extent the applicable Lenders have made funds available to it for such purpose and subject to Section 8.2, fund such Revolving Advance to Borrowers in U.S. Dollars and immediately available funds at the Payment Office prior to the close of business, on the applicable borrowing date; provided that if any applicable Lender fails to remit such funds to Agent in a timely manner, Agent may elect in its sole discretion to fund with its own funds the Revolving Advance of such Lender on such borrowing date, and such Lender shall be subject to the repayment obligation in Section 2.6(c) hereof.

(c)    Unless Agent shall have been notified by telephone, confirmed in writing, by any Lender holding a Revolving Commitment that such Lender will not make the amount which would constitute its applicable Revolving Commitment Percentage of the requested Revolving Advance available to Agent, Agent may (but shall not be obligated to) assume that such Lender has made such amount available to Agent on such date in accordance with Section 2.6(b) and may, in reliance upon such assumption, make available to Borrowers a corresponding amount.   In such event, if a Lender has not in fact made its applicable Revolving Commitment Percentage of the requested Revolving Advance available to Agent, then the applicable Lender and Borrowers severally agree to pay to Agent on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to Borrowers through but excluding the date of payment to Agent, at (i) in the case of a payment to be made by such Lender, the greater of (A) (x) the daily average Federal Funds Effective Rate (computed on the basis of a year of 360 days) during such period as quoted by Agent, times (y) such amount or (B) a rate determined by Agent in accordance with banking industry rules on interbank compensation, and (ii) in the case of a payment to be made by Borrower, the Revolving Interest Rate for Revolving Advances that are Domestic Rate Loans.  If such Lender pays its share of the applicable Revolving Advance to Agent, then the amount so paid shall constitute such Lender's Revolving Advance.  Any payment by Borrowers shall be without prejudice to any claim Borrowers may have against a Lender holding a Revolving Commitment that shall have failed to make such payment to Agent.  A certificate of Agent submitted to any Lender or Borrower with respect to any amounts owing under this paragraph (c) shall be conclusive, in the absence of manifest error.

(d)    Agent, on behalf of Swing Loan Lender, shall demand settlement (a "Settlement") of all or any Swing Loans with Lenders holding the Revolving Commitments on at least a weekly basis, or on any more frequent date that Agent elects or that Swing Loan Lender at its option exercisable for any reason whatsoever may request, by notifying Lenders holding the Revolving Commitments of such requested Settlement by facsimile, telephonic or electronic transmission no later than 3:00 p.m. on the date of such requested Settlement (the "Settlement Date").  Subject to any contrary provisions of Section 2.22, each Lender holding a Revolving Commitment shall transfer the amount of such Lender's Revolving Commitment Percentage of

56

the outstanding principal amount (plus interest accrued thereon to the extent requested by Agent) of the applicable Swing Loan with respect to which Settlement is requested by Agent, to such account of Agent as Agent may designate not later than 5:00 p.m. on such Settlement Date if requested by Agent by 3:00 p.m., otherwise not later than 5:00 p.m. on the next Business Day. Settlements may occur at any time notwithstanding that the conditions precedent to making Revolving Advances set forth in Section 8.2 have not been satisfied or the Revolving Commitments shall have otherwise been terminated at such time.  All amounts so transferred to Agent shall be applied against the amount of outstanding Swing Loans and, when so applied shall constitute Revolving Advances of such Lenders accruing interest as Domestic Rate Loans. If any such amount is not transferred to Agent by any Lender holding a Revolving Commitment on such Settlement Date, Agent shall be entitled to recover such amount on demand from such Lender together with interest thereon as specified in Section 2.6(c).

(e)    If any Lender or Participant (a "Benefited Lender") shall at any time receive any payment of all or part of its Advances, or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily or by set-off) in a greater proportion than any such payment to and Collateral received by any other Lender, if any, in respect of such other Lender's Advances, or interest thereon, and such greater proportionate payment or receipt of Collateral is not expressly permitted hereunder, such Benefited Lender shall purchase for cash from the other Lenders a participation in such portion of each such other Lender's Advances, or shall provide such other Lender with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.  Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that each Lender so purchasing a portion of another Lender's Advances may exercise all rights of payment (including rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion, and the obligations owing to each such purchasing Lender in respect of such participation and such purchased portion of any other Lender's Advances shall be part of the Obligations secured by the Collateral, and the obligations owing to each such purchasing Lender in respect of such participation and such purchased portion of any other Lender's Advances shall be part of the Obligations secured by the Collateral.

2.7.    <u>Maximum Advances.</u>  The aggregate balance of Revolving Advances plus Swing Loans outstanding at any time shall not exceed the lesser of (a) the Maximum Revolving Advance Amount less the aggregate Maximum Undrawn Amount of all issued and outstanding Letters of Credit <u>less</u> the Carve-Out Reserve, or (b) the Formula Amount.

2.8.    <u>Manner and Repayment of Advances.</u>

(a)    The Revolving Advances and Swing Loans shall be due and payable in full on the last day of the Term subject to earlier prepayment as herein provided. Notwithstanding the foregoing, all Advances shall be subject to earlier repayment upon (x) acceleration upon the occurrence and during the continuance of an Event of Default under this Agreement or (y) termination of this Agreement.  Each payment (including each prepayment) by

57

any Borrower on account of the principal of and interest on the Advances shall be applied, first to the outstanding Swing Loans and next, pro rata according to the applicable Revolving Commitment Percentages of Lenders, to the outstanding Revolving Advances (subject to any contrary provisions of Section 2.22).

(b)    Each Borrower recognizes that the amounts evidenced by checks, notes, drafts or any other items of payment relating to and/or proceeds of Collateral may not be collectible by Agent on the date received by Agent.  Agent shall conditionally credit Borrowers' Account for each item of payment on the next Business Day after the Business Day on which such item of payment is received by Agent (and the Business Day on which each such item of payment is so credited shall be referred to, with respect to such item, as the "Application Date").  Agent is not, however, required to credit Borrowers' Account for the amount of any item of payment which is unsatisfactory to Agent and Agent may charge Borrowers' Account for the amount of any item of payment which is returned, for any reason whatsoever, to Agent unpaid.  Subject to the foregoing, Borrowers agree that for purposes of computing the interest charges under this Agreement, each item of payment received by Agent shall be deemed applied by Agent on account of the Obligations on its respective Application Date.  Borrowers further agree that there is a monthly float charge payable to Agent for Agent's sole benefit, in an amount equal to (y) the face amount of all items of payment received during the prior month (including items of payment received by Agent as a wire transfer or electronic depository check) multiplied by (z) the Revolving Interest Rate with respect to Domestic Rate Loans for one (1) Business Day (provided that in no event shall this amount be duplicative of any float received by Agent in connection with the receipt of available funds on one Business Day and crediting such amounts to the Advances on the next Business Day).   All proceeds received by Agent shall be applied to the Obligations in accordance with Section 4.8(i).

(c)    All payments of principal, interest and other amounts payable hereunder, or under any of the Other Documents shall be made to Agent at the Payment Office not later than 1:00 p.m. on the due date therefor in Dollars in federal funds or other funds immediately available to Agent.  Agent shall have the right to effectuate payment of any and all Obligations due and owing hereunder by charging Borrowers' Account or by making Advances as provided in Section 2.2 hereof.

(d)    Except as expressly provided herein, all payments (including prepayments) to be made by any Borrower on account of principal, interest, fees and other amounts payable hereunder shall be made without deduction, setoff or counterclaim, except to the extent required by Applicable Law in accordance with Section 3.10 hereof.

2.9.    Repayment of Excess Advances.  Subject to the provisions of Section 2.1(b), if at any time the aggregate balance of outstanding Revolving Advances, Swing Loans, and/or Advances taken as a whole exceeds the maximum amount of such type of Advances and/or Advances taken as a whole (as applicable) permitted hereunder, such excess Advances shall be immediately due and payable without the necessity of any demand, at the Payment Office, whether or not a Default or an Event of Default has occurred.

2.10.    Statement of Account.  Agent shall maintain, in accordance with its customary procedures, a loan account ("Borrowers' Account") in the name of Borrowers in which shall be

recorded the date and amount of each Advance made by Agent or Lenders and the date and amount of each payment in respect thereof; provided, however, the failure by Agent to record the date and amount of any Advance shall not adversely affect Agent or any Lender. Each month, Agent shall send to Borrowing Agent a statement showing the accounting for the Advances made, payments made or credited in respect thereof, and other transactions between Agent, Lenders and Borrowers during such month. The monthly statements shall be deemed correct and binding upon Borrowers in the absence of manifest error and shall constitute an account stated between Lenders and Borrowers unless Agent receives a written statement of Borrowers' specific exceptions thereto within thirty (30) days after such statement is received by Borrowing Agent. The records of Agent with respect to Borrowers' Account shall be conclusive evidence absent manifest error of the amounts of Advances and other charges thereto and of payments applicable thereto. Notwithstanding the foregoing, to the extent Agent incurs any costs, expenses, or legal fees in an amount that, in Agent's Permitted Discretion, are materially in excess of the costs, expenses and legal fees Agent ordinarily incurs in similar transactions with similarly situated borrowers, Agent will endeavor to inform the Borrowing Agent, as promptly as possible, of the incurrence of such costs, expenses or legal feels prior to the payment thereof.

2.11.  Letters of Credit.

(a)  Subject to the terms and conditions hereof, Issuer shall issue or cause the issuance of standby and/or trade letters of credit denominated in Dollars ("Letters of Credit") for the account of any Borrower except to the extent that the issuance thereof would then cause the sum of (i) the outstanding Revolving Advances plus (ii) the outstanding Swing Loans, plus (iii) the Maximum Undrawn Amount of all outstanding Letters of Credit, plus (iv) the Maximum Undrawn Amount of the Letter of Credit to be issued to exceed the lesser of (x) the Maximum Revolving Advance Amount less the Carve-Out Reserve) or (y) the Formula Amount (calculated without giving effect to the deductions provided for in Section 2.1(a)(y)(viii)). The Maximum Undrawn Amount of all outstanding Letters of Credit shall not exceed in the aggregate at any time the Letter of Credit Sublimit. All disbursements or payments related to Letters of Credit shall be deemed to be Domestic Rate Loans consisting of Revolving Advances and shall bear interest at the Revolving Interest Rate for Domestic Rate Loans. Letters of Credit that have not been drawn upon shall not bear interest (but fees shall accrue in respect of outstanding Letters of Credit as provided in Section 3.2 hereof).

(b)  Notwithstanding any provision of this Agreement, Issuer shall not be under any obligation to issue any Letter of Credit if (i) any order, judgment or decree of any Governmental Body or arbitrator having jurisdiction over Issuer (or which Issuer reasonably believes has jurisdiction) shall by its terms purport to enjoin or restrain  Issuer from issuing any Letter of Credit, or any Law applicable to Issuer or any request or directive (whether or not having the force of law) from any Governmental Body with jurisdiction over Issuer shall prohibit, or request that Issuer refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon Issuer with respect to the Letter of Credit any restriction, reserve or capital requirement (for which Issuer is not otherwise compensated hereunder) not in effect on the date of this Agreement, or shall impose upon Issuer any unreimbursed loss, cost or expense which was not applicable on the date of this Agreement, and which Issuer in good faith deems material to it, or (ii) the issuance of the Letter of Credit would violate one or more policies of Issuer applicable to letters of credit generally.

59

2.12.    Issuance of Letters of Credit.

(a)    Borrowing Agent, on behalf of any Borrower, may request Issuer to issue or cause the issuance of a Letter of Credit by delivering to Issuer, with a copy to Agent at the Payment Office, prior to 1:00 p.m., at least five (5) Business Days prior to the proposed date of issuance, such Issuer's form of Letter of Credit Application (the "Letter of Credit Application") completed to the satisfaction of Agent and Issuer; and, such other certificates, documents and other papers and information as Agent or Issuer may reasonably request.  Issuer shall not issue any requested Letter of Credit if such Issuer has received notice from Agent or any Lender that one or more of the applicable conditions set forth in Section 8.2 of this Agreement have not been satisfied or the commitments of Lenders to make Revolving Advances hereunder have been terminated for any reason.

(b)    Each Letter of Credit shall, among other things, (i) provide for the payment of sight drafts or other written demands for payment or acceptances of usance drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein and (ii) have an expiry date not later than twelve (12) months after such Letter of Credit's date of issuance and in no event later than the last day of the Term.  Each standby Letter of Credit shall be subject either to the Uniform Customs and Practice for Documentary Credits as most recently published by the International Chamber of Commerce at the time a Letter of Credit is issued (the "UCP") or the International Standby Practices (International Chamber of Commerce Publication Number 590) (the "ISP98 Rules"), or any subsequent revision thereof at the time a standby Letter of Credit is issued, as determined by Issuer, and each trade Letter of Credit shall be subject to the UCP.  In addition, no trade Letter of Credit may permit the presentation of an ocean bill of lading that includes a condition that the original bill of lading is not required to claim the goods shipped thereunder.

(c)    Agent shall use its reasonable efforts to notify Lenders of the request by Borrowing Agent for a Letter of Credit hereunder.

2.13.    Requirements For Issuance of Letters of Credit.

(a)    Borrowing Agent shall authorize and direct any Issuer to name the applicable Borrower as the "Applicant" or "Account Party" of each Letter of Credit.  If Agent is not the Issuer of any Letter of Credit, Borrowing Agent shall authorize and direct Issuer to deliver to Agent all instruments, documents, and other writings and property received by Issuer pursuant to the Letter of Credit and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit, the application therefor.

(b)    In connection with all trade Letters of Credit issued or caused to be issued by Issuer under this Agreement, each Borrower hereby appoints Issuer, or its designee, as its attorney, with full power and authority if an Event of Default shall have occurred and is continuing: (i) to sign and/or endorse such Borrower's name upon any warehouse or other receipts, and acceptances; (ii) to sign such Borrower's name on bills of lading; (iii) to clear Inventory through the United States of America Customs Department ("Customs") in the name of such Borrower or Issuer or Issuer's designee, and to sign and deliver to Customs officials

powers of attorney in the name of such Borrower for such purpose; and (iv) to complete in such Borrower's name or Issuer's, or in the name of Issuer's designee, any order, sale or transaction, obtain the necessary documents in connection therewith, and collect the proceeds thereof. Neither Agent, Issuer nor their attorneys will be liable for any acts or omissions nor for any error of judgment or mistakes of fact or law, except for Agent's, Issuer's or their respective attorney's willful misconduct.  This power, being coupled with an interest, is irrevocable as long as any Letters of Credit remain outstanding.

     2.14.  <u>Disbursements, Reimbursement.</u>

     (a)    Immediately upon the issuance of each Letter of Credit, each Lender holding a Revolving Commitment shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from Issuer a participation in each Letter of Credit and each drawing thereunder in an amount equal to such Lender's Revolving Commitment Percentage of the Maximum Undrawn Amount of such Letter of Credit (as in effect from time to time) and the amount of such drawing, respectively.

     (b)    In the event of any request for a drawing under a Letter of Credit by the beneficiary or transferee thereof, Issuer will promptly notify Agent and Borrowing Agent. Regardless of whether Borrowing Agent shall have received such notice, Borrowers shall reimburse (such obligation to reimburse Issuer shall sometimes be referred to as a "Reimbursement Obligation") Issuer prior to 12:00 Noon, on each date that an amount is paid by Issuer under any Letter of Credit (each such date, a "Drawing Date") in an amount equal to the amount so paid by Issuer.  In the event Borrowers fail to reimburse Issuer for the full amount of any drawing under any Letter of Credit by 12:00 Noon, on the Drawing Date, Issuer will promptly notify Agent and each Lender holding a Revolving Commitment thereof, and Borrowers shall be automatically deemed to have requested that a Revolving Advance maintained as a Domestic Rate Loan be made by Lenders to be disbursed on the Drawing Date under such Letter of Credit, and Lenders holding the Revolving Commitments shall be unconditionally obligated to fund such Revolving Advance (all whether or not the conditions specified in Section 8.2 are then satisfied or the commitments of Lenders to make Revolving Advances hereunder have been terminated for any reason) as provided for in Section 2.14(c) immediately below.  Any notice given by Issuer pursuant to this Section 2.14(b) may be oral if promptly confirmed in writing; provided that the lack of such a confirmation shall not affect the conclusiveness or binding effect of such notice.

     (c)    Each Lender holding a Revolving Commitment shall upon any notice pursuant to Section 2.14(b) make available to Issuer through Agent at the Payment Office an amount in immediately available funds equal to its Revolving Commitment Percentage (subject to any contrary provisions of Section 2.22) of the amount of the drawing, whereupon the participating Lenders shall (subject to Section 2.14(d)) each be deemed to have made a Revolving Advance maintained as a Domestic Rate Loan to Borrowers in that amount.  If any Lender holding a Revolving Commitment so notified fails to make available to Agent, for the benefit of Issuer, the amount of such Lender's Revolving Commitment Percentage of such amount by 2:00 p.m. on the Drawing Date, then interest shall accrue on such Lender's obligation to make such payment, from the Drawing Date to the date on which such Lender makes such payment (i) at a rate per annum equal to the Federal Funds Effective Rate during the first three

(3) days following the Drawing Date and (ii) at a rate per annum equal to the rate applicable to Revolving Advances maintained as a Domestic Rate Loan on and after the fourth day following the Drawing Date.  Agent and Issuer will promptly give notice of the occurrence of the Drawing Date, but failure of Agent or Issuer to give any such notice on the Drawing Date or in sufficient time to enable any Lender holding a Revolving Commitment to effect such payment on such date shall not relieve such Lender from its obligations under this Section 2.14(c), provided that such Lender shall not be obligated to pay interest as provided in Section 2.14(c)(i) and (ii) until and commencing from the date of receipt of notice from Agent or Issuer of a drawing.

(d)    With respect to any unreimbursed drawing that is not converted into a Revolving Advance maintained as a Domestic Rate Loan to Borrowers in whole or in part as contemplated by Section 2.14(b), because of Borrowers' failure to satisfy the conditions set forth in Section 8.2 hereof (other than any notice requirements) or for any other reason, Borrowers shall be deemed to have incurred from Agent a borrowing (each a "Letter of Credit Borrowing") in the amount of such drawing.  Such Letter of Credit Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the rate per annum applicable to a Revolving Advance maintained as a Domestic Rate Loan.  Each applicable Lender's payment to Agent pursuant to Section 2.14(c) shall be deemed to be a payment in respect of its participation in such Letter of Credit Borrowing and shall constitute a "Participation Advance" from such Lender in satisfaction of its Participation Commitment in respect of the applicable Letter of Credit under this Section 2.14.

(e)    Each applicable Lender's Participation Commitment in respect of the Letters of Credit shall continue until the last to occur of any of the following events: (x) Issuer ceases to be obligated to issue or cause to be issued Letters of Credit hereunder; (y) no Letter of Credit issued or created hereunder remains outstanding and uncancelled; and (z) all Persons (other than Borrowers) have been fully reimbursed for all payments made under or relating to Letters of Credit.

2.15.   <u>Repayment of Participation Advances.</u>

(a)    Upon (and only upon) receipt by Agent for the account of Issuer of immediately available funds from Borrowers (i) in reimbursement of any payment made by Issuer or Agent under the Letter of Credit with respect to which any Lender has made a Participation Advance to Agent, or (ii) in payment of interest on such a payment made by Issuer or Agent under such a Letter of Credit, Agent will pay to each Lender holding a Revolving Commitment, in the same funds as those received by Agent, the amount of such Lender's Revolving Commitment Percentage of such funds, except Agent shall retain the amount of the Revolving Commitment Percentage of such funds of any Lender holding a Revolving Commitment that did not make a Participation Advance in respect of such payment by Agent (and, to the extent that any of the other Lender(s) holding the Revolving Commitment have funded any portion of such Defaulting Lender's Participation Advance in accordance with the provisions of Section 2.22, Agent will pay over to such Non-Defaulting Lenders a pro rata portion of the funds so withheld from such Defaulting Lender).

(b)    If Issuer or Agent is required at any time to return to any Borrower, or to a trustee, receiver, liquidator, custodian, or any official in any insolvency proceeding, any portion

of the payments made by Borrowers to Issuer or Agent pursuant to Section 2.15(a) in reimbursement of a payment made under the Letter of Credit or interest or fee thereon, each applicable Lender shall, on demand of Agent, forthwith return to Issuer or Agent the amount of its Revolving Commitment Percentage of any amounts so returned by Issuer or Agent plus interest at the Federal Funds Effective Rate.

2.16.   Documentation.  Each Borrower agrees to be bound by the terms of the Letter of Credit Application and by Issuer's interpretations of any Letter of Credit issued on behalf of such Borrower and by Issuer's written regulations and customary practices relating to letters of credit, though Issuer's interpretations may be different from such Borrower's own.  In the event of a conflict between the Letter of Credit Application and this Agreement, this Agreement shall govern.  It is understood and agreed that, except in the case of gross negligence or willful misconduct (as mutually agreed to by Agent (in its sole discretion) and Borrowers or as determined by a court of competent jurisdiction in a final non-appealable judgment), Issuer shall not be liable for any error, negligence and/or mistakes, whether of omission or commission, in following Borrowing Agent's or any Borrower's instructions or those contained in the Letters of Credit or any modifications, amendments or supplements thereto.

2.17.   Determination to Honor Drawing Request.  In determining whether to honor any request for drawing under any Letter of Credit by the beneficiary thereof, Issuer shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit and that any other drawing condition appearing on the face of such Letter of Credit has been satisfied in the manner so set forth.

2.18.   Nature of Participation and Reimbursement Obligations.  The obligation of each Lender holding a Revolving Commitment in accordance with this Agreement to make the Revolving Advances or Participation Advances as a result of a drawing under a Letter of Credit, and the obligations of Borrowers to reimburse Issuer upon a draw under a Letter of Credit, shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Section 2.18 under all circumstances, including the following circumstances:

(i)   any set-off, counterclaim, recoupment, defense or other right which such Lender or any Borrower, as the case may be, may have against Issuer, Agent, any Borrower or Lender, as the case may be, or any other Person for any reason whatsoever;

(ii)   the failure of any Borrower or any other Person to comply, in connection with a Letter of Credit Borrowing, with the conditions set forth in this Agreement for the making of a Revolving Advance, it being acknowledged that such conditions are not required for the making of a Letter of Credit Borrowing and the obligation of Lenders to make Participation Advances under Section 2.14;

(iii)   any lack of validity or enforceability of any Letter of Credit;

(iv)   any claim of breach of warranty that might be made by any Borrower, Agent, Issuer or any Lender against the beneficiary of a Letter of Credit, or the existence of any claim, set-off, recoupment, counterclaim, cross-claim, defense or other right

63

which any Borrower, Agent, Issuer or any Lender may have at any time against a beneficiary, any successor beneficiary or any transferee of any Letter of Credit or assignee of the proceeds thereof (or any Persons for whom any such transferee or assignee may be acting), Issuer, Agent or any Lender or any other Person, whether in connection with this Agreement, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between any Borrower or any Subsidiaries of such Borrower and the beneficiary for which any Letter of Credit was procured);

(v)     the lack of power or authority of any signer of (or any defect in or forgery of any signature or endorsement on) or the form of or lack of validity, sufficiency, accuracy, enforceability or genuineness of any draft, demand, instrument, certificate or other document presented under or in connection with any Letter of Credit, or any fraud or alleged fraud in connection with any Letter of Credit, or the transport of any property or provision of services relating to a Letter of Credit, in each case even if Issuer or any of Issuer's Affiliates has been notified thereof;

(vi)     payment by Issuer under any Letter of Credit against presentation of a demand, draft or certificate or other document which is forged or does not fully comply with the terms of such Letter of Credit (provided that the foregoing shall not excuse Issuer from any obligation under the terms of any applicable Letter of Credit to require the presentation of documents that on their face appear to satisfy any applicable requirements for drawing under such Letter of Credit prior to honoring or paying any such draw);

(vii)     the solvency of, or any acts or omissions by, any beneficiary of any Letter of Credit, or any other Person having a role in any transaction or obligation relating to a Letter of Credit, or the existence, nature, quality, quantity, condition, value or other characteristic of any property or services relating to a Letter of Credit;

(viii)     any failure by Issuer or any of Issuer's Affiliates to issue any Letter of Credit in the form requested by Borrowing Agent, unless Agent and Issuer have each received written notice from Borrowing Agent of such failure within three (3) Business Days after Issuer shall have furnished Agent and Borrowing Agent a copy of such Letter of Credit and such error is material and no drawing has been made thereon prior to receipt of such notice;

(ix)     the occurrence of any Material Adverse Effect;

(x)     any breach of this Agreement or any Other Document by any party thereto;

(xi)     the occurrence or continuance of an insolvency proceeding with respect to any Borrower or any Guarantor;

(xii)     the fact that a Default or an Event of Default shall have occurred and be continuing;

(xiii)     the fact that the Term shall have expired or this Agreement or the obligations of Lenders to make Advances have been terminated; and

(xiv)  any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

2.19.   Liability for Acts and Omissions.

(a)      As between Borrowers and Issuer, Swing Loan Lender, Agent and Lenders, each Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit by, the respective beneficiaries of such Letters of Credit.  In furtherance and not in limitation of the foregoing, Issuer shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for an issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (even if Issuer or any of its Affiliates shall have been notified thereof); (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) the failure of the beneficiary of any such Letter of Credit, or any other party to which such Letter of Credit may be transferred, to comply fully with any conditions required in order to draw upon such Letter of Credit or any other claim of any Borrower against any beneficiary of such Letter of Credit, or any such transferee, or any dispute between or among any Borrower and any beneficiary of any Letter of Credit or any such transferee; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, facsimile, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of Issuer, including any Governmental Acts, and none of the above shall affect or impair, or prevent the vesting of, any of Issuer's rights or powers hereunder. Nothing in the preceding sentence shall relieve Issuer from liability for Issuer's gross negligence or willful misconduct (as mutually agreed by Agent (in its sole discretion) and Borrowing Agent or as determined by a court of competent jurisdiction in a final non-appealable judgment) in connection with actions or omissions described in such clauses (i) through (viii) of such sentence.  In no event shall Issuer or Issuer's Affiliates be liable to any Borrower for any indirect, consequential, incidental, punitive, exemplary or special damages or expenses (including attorneys' fees), or for any damages resulting from any change in the value of any property relating to a Letter of Credit.

(b)      Without limiting the generality of the foregoing, Issuer and each of its Affiliates:  (i) may rely on any oral or other communication believed in good faith by Issuer or such Affiliate to have been authorized or given by or on behalf of the applicant for a Letter of Credit; (ii) may honor any presentation if the documents presented appear on their face substantially to comply with the terms and conditions of the relevant Letter of Credit; (iii) may honor a previously dishonored presentation under a Letter of Credit, whether such dishonor was pursuant to a court order, to settle or compromise any claim of wrongful dishonor, or otherwise, and shall be entitled to reimbursement to the same extent as if such presentation had initially been honored, together with any interest paid by Issuer or its Affiliates; (iv) may honor any drawing that is payable upon presentation of a statement advising negotiation or payment, upon

receipt of such statement (even if such statement indicates that a draft or other document is being delivered separately), and shall not be liable for any failure of any such draft or other document to arrive, or to conform in any way with the relevant Letter of Credit; (v) may pay any paying or negotiating bank claiming that it rightfully honored under the laws or practices of the place where such bank is located; and (vi) may settle or adjust any claim or demand made on Issuer or its Affiliate in any way related to any order issued at the applicant's request to an air carrier, a letter of guarantee or of indemnity issued to a steamship agent or carrier or any document or instrument of like import (each an "Order") and honor any drawing in connection with any Letter of Credit that is the subject of such Order, notwithstanding that any drafts or other documents presented in connection with such Letter of Credit fail to conform in any way with such Letter of Credit.

(c)     In furtherance and extension and not in limitation of the specific provisions set forth above, any action taken or omitted by Issuer under or in connection with the Letters of Credit issued by it or any documents and certificates delivered thereunder, if taken or omitted in good faith and without gross negligence (as mutually agreed by Agent (in its sole discretion) and Borrowing Agent or as determined by a court of competent jurisdiction in a final non-appealable judgment), shall not put Issuer under any resulting liability to any Borrower, Agent or any Lender.

2.20.    <u>Mandatory Prepayments.</u>

(a)     When any Loan Party receives any net cash proceeds from a sale or other disposition of any Collateral or any other assets or property (i.e., gross cash proceeds less the reasonable direct costs of such sales or other dispositions approved by Agent, hereinafter, "<u>Net Sales Proceeds</u>"), Borrowers shall promptly repay the Obligations in an amount equal to the of such Net Sales Proceeds by directing payment of the Net Cash Proceeds of such Collateral or other assets or property in accordance with the procedures set forth in Section 4.08(i) (or, with respect to sales of Inventory in the Ordinary Course of Business or any Local Store Non-Credit Card Retail Proceeds, in accordance with the procedures set forth in Section 4.08(i) and/or (j) hereof, as applicable), and until the date of payment, such Net Sale Proceeds shall be held in trust for Agent.  The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof.  Such repayments shall be applied to either the Pre-Petition Obligations or the Post-Petition Obligations as Agent may elect in its sole and absolute discretion in accordance with the Interim Order and the Final Order, subject to Borrowers' ability to reborrow Revolving Advances in accordance with the terms hereof.

(b)     [RESERVED]

(c)     In the event of any issuance or other incurrence of Indebtedness (other than Permitted Indebtedness) by any Loan Party or the issuance of any Equity Interests by any Loan Party, Borrowers shall, no later than one (1) Business Day after the receipt by Loan Parties of (i) the cash proceeds from any such issuance or incurrence of Indebtedness or (ii) the net cash proceeds of any issuance of Equity Interests (i.e., gross cash proceeds less the reasonable direct costs of such issuance approved by Agent, hereinafter, "<u>Net Issuance Proceeds</u>"), as applicable, repay the Obligations in an amount equal to (x) one hundred percent (100%) of such cash proceeds in the case of such incurrence or issuance of Indebtedness and (y) one hundred percent

(100%) of such Net Issuance Proceeds in the case of an issuance of Equity Interests. Such repayments shall be applied to either the Pre-Petition Obligations or the Post-Petition Obligations as Agent may elect in its sole and absolute discretion in accordance with the Final Order, or, prior to the entry of the Final Order, the Interim Order, subject to Borrowers' ability to reborrow Revolving Advances in accordance with the terms hereof.

(d)    When any Loan Party receives any net cash proceeds (i) under any insurance policy on account of damage or destruction of any assets or property of any Loan Party, or (ii) as a result of any taking or condemnation of any assets or property Borrowers shall, no later than one (1) Business Day after the receipt thereof, repay the Obligations in an amount equal to one hundred percent (100%) of such net cash proceeds. Such repayments shall be applied to either the Pre-Petition Obligations or the Post-Petition Obligations as Agent may elect in its sole and absolute discretion in accordance with the Interim Order and the Final Order, subject to Borrowers' ability to reborrow Revolving Advances in accordance with the terms hereof.

(e)    Borrowers shall cause the Propco Entities to turn over to Agent for application to the Obligations, the net cash proceeds (gross proceeds less reasonable costs and expenses incurred directly in conjunction with such disposition, the "Propco Proceeds") received by any applicable Propco Entities from (i) financings or asset sales or other dispositions of any Propco Collateral by any applicable Propco Entities, and/or (ii) financings, leases, subleases or sales of real property constituting Propco Collateral by any applicable Propco Entities whether occurring in any one transaction or a series of related or unrelated transactions as follows: (1) the first $10,000,000 of Propco Proceeds, plus (2) the amount by which such additional Propco Proceeds received by the applicable Propco Entities exceeds $25,000,000, until such time that Borrowers have received Propco Proceeds in an aggregate amount equal to the Maximum Liquidity Recovery Proceeds. Such repayments shall be applied to either the Pre-Petition Obligations or the Post-Petition Obligations as Agent may elect in its sole and absolute discretion in accordance with the Interim Order and the Final Order, subject to Borrowers' ability to reborrow Revolving Advances in accordance with the terms hereof.

2.21.    Use of Proceeds.

(a)    Borrowers shall apply the proceeds of Advances to (i) repay any and/or all of the Pre-Petition Obligations, in whole or in part, in cash, and/or to reimburse any and/or all of the professional fees, costs and expenses of the Pre-Petition Agent and the Pre-Petition Lenders, in whole or in part, in cash, in each case as elected by Agent in its sole and absolute discretion from time to time as provided for herein and in the Interim Order and the Final Order, (ii) pay fees and expenses payable under this Agreement or any of the Other Documents to the Post-Petition Secured Parties, (iii) reimburse drawings under Letters of Credit and provide for its working capital needs in accordance with the Budget subject to the Permitted Variance, (iv) to fund the Carve-Out strictly in accordance with the Budget subject to the Permitted Variance, and (v) to pay for Allowed Professional Fees and Statutory Fees allocated to the Loan Parties during the Case in accordance with the Budget subject to the Permitted Variance; in each case, to the extent such use of proceeds is not otherwise prohibited under the terms of this Agreement.

(b)    Without limiting the generality of Section 2.21(a) above, neither the Borrowers, the Guarantors nor any other Person which may in the future become party to this Agreement or the Other Documents as a Borrower or Guarantor, intends to use nor shall they use any portion of the proceeds of the Advances, directly or indirectly, for any purpose in violation of Applicable Law.

2.22.    Defaulting Lender.

(a)    Notwithstanding anything to the contrary contained herein, in the event any Lender is a Defaulting Lender, all rights and obligations hereunder of such Defaulting Lender and of the other parties hereto shall be modified to the extent of the express provisions of this Section 2.22 so long as such Lender is a Defaulting Lender.

(b)    (i) except as otherwise expressly provided for in this Section 2.22, Revolving Advances shall be made pro rata from Lenders holding Revolving Commitments which are not Defaulting Lenders based on their respective Revolving Commitment Percentages, and no Revolving Commitment Percentage of any Lender or any pro rata share of any Revolving Advances required to be advanced by any Lender shall be increased as a result of any Lender being a Defaulting Lender.  Amounts received in respect of principal of any type of Revolving Advances shall be applied to reduce such type of Revolving Advances of each Lender (other than any Defaulting Lender) holding a Revolving Commitment in accordance with their Revolving Commitment Percentages; provided, that, Agent shall not be obligated to transfer to a Defaulting Lender any payments received by Agent for Defaulting Lender's benefit, nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees) until such time that (A) all Advances that were not advanced pro rata by such Defaulting Lender have been repaid in full in cash to the Persons who made such Advances and (B) either (I) such Defaulting Lender ceases to be a Defaulting Lender pursuant to Section 2.22(e) hereof or (II) such Defaulting Lender's Revolving Commitment has been terminated and the Revolving Commitments, if any, have been reallocated to the remaining Lenders in a manner acceptable to Agent and Lenders.  Amounts payable to a Defaulting Lender shall instead be paid to or retained by Agent.  Agent may hold and, in its discretion, re-lend to a Borrower the amount of such payments received or retained by it for the account of such Defaulting Lender.

(ii)    fees pursuant to Section 3.3(b) hereof shall cease to accrue in favor of such Defaulting Lender.

(iii)    if any Swing Loans are outstanding or any Letters of Credit (or drawings under any Letter of Credit for which Issuer has not been reimbursed) are outstanding or exist at the time any such Lender holding a Revolving Commitment becomes a Defaulting Lender, then:

(A)    Defaulting Lender's Participation Commitment in the outstanding Swing Loans and of the Maximum Undrawn Amount of all outstanding Letters of Credit shall be reallocated among Non-Defaulting Lenders holding Revolving Commitments in proportion to the respective Revolving Commitment Percentages of such Non-Defaulting Lenders to the extent (but only to the extent) that (x) such reallocation does not cause the aggregate sum of outstanding Revolving Advances made by any such Non-Defaulting Lender

holding a Revolving Commitment plus such Lender's reallocated Participation Commitment in the outstanding Swing Loans plus such Lender's reallocated Participation Commitment in the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit to exceed the Revolving Commitment Amount of any such Non-Defaulting Lender, and (y) no Default or Event of Default has occurred and is continuing at such time;

(B)     if the reallocation described in clause (A) above cannot, or can only partially, be effected, Borrowers shall within one Business Day following written notice by Agent (x) first, prepay any outstanding Swing Loans that cannot be reallocated, and (y) second, cash collateralize for the benefit of Issuer, Borrowers' obligations corresponding to such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit (after giving effect to any partial reallocation pursuant to clause (A) above) in accordance with Section 3.2(b) for so long as such Obligations are outstanding;

(C)     if Borrowers cash collateralize any portion of such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit pursuant to clause (B) above, Borrowers shall not be required to pay any fees to such Defaulting Lender pursuant to Section 3.2(a) with respect to such Defaulting Lender's Revolving Commitment Percentage of Maximum Undrawn Amount of all Letters of Credit during the period such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit are cash collateralized;

(D)     if Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit is reallocated pursuant to clause (A) above, then the fees payable to Lenders holding Revolving Commitments pursuant to Section 3.2(a) shall be adjusted and reallocated to Non-Defaulting Lenders holding Revolving Commitments in accordance with such reallocation; and

(E)     if all or any portion of such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit is neither reallocated nor cash collateralized pursuant to clauses (A) or (B) above, then, without prejudice to any rights or remedies of Issuer or any other Lender hereunder, all Letter of Credit Fees payable under Section 3.2(a) with respect to such Defaulting Lender's Revolving Commitment Percentage of the Maximum Undrawn Amount of all Letters of Credit shall be payable to the Issuer (and not to such Defaulting Lender) until (and then only to the extent that) such Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit is reallocated and/or cash collateralized; and

(iv)     so long as any Lender holding a Revolving Commitment is a Defaulting Lender, Swing Loan Lender shall not be required to fund any Swing Loans and Issuer shall not be required to issue, amend or increase any Letter of Credit, unless such Issuer is satisfied that the related exposure and Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit and all Swing Loans (after giving effect to any such issuance, amendment, increase or funding) will be fully allocated to Non-Defaulting Lenders holding Revolving Commitments and/or cash collateral for such Letters of Credit will be provided by Borrowers in accordance with clause (A) and (B) above, and participating interests in any newly made Swing Loan or any newly issued or increased Letter of Credit shall

69

be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.22(b)(iii)(A) above (and such Defaulting Lender shall not participate therein).

(c)     Except with respect to amendments requiring approval of all Lenders (or all Lenders directly affected thereby) pursuant to Section 16.2(b), a Defaulting Lender shall not be entitled to give instructions to Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement and the Other Documents, and all amendments, waivers and other modifications of this Agreement and the Other Documents may be made without regard to a Defaulting Lender and, for purposes of the definition of "Required Lenders", a Defaulting Lender shall not be deemed to be a Lender, to have any outstanding Advances or a Revolving Commitment Percentage.

(d)     Other than as expressly set forth in this Section 2.22, the rights and obligations of a Defaulting Lender (including the obligation to indemnify Agent) and the other parties hereto shall remain unchanged.  Nothing in this Section 2.22 shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Other Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

(e)     In the event that Agent, Borrowers, Swing Loan Lender and Issuer agree in writing that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then Agent will so notify the parties hereto, and, if such cured Defaulting Lender is a Lender holding a Revolving Commitment, then Participation Commitments of Lenders holding Revolving Commitments (including such cured Defaulting Lender) of the Swing Loans and Maximum Undrawn Amount of all outstanding Letters of Credit shall be reallocated to reflect the inclusion of such Lender's Revolving Commitment, and on such date such Lender shall purchase at par such of the Revolving Advances of the other Lenders as Agent shall determine may be necessary in order for such Lender to hold such Revolving Advances in accordance with its Revolving Commitment Percentage.

(f)     If Swing Loan Lender or Issuer has a good faith belief that any Lender holding a Revolving Commitment has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, Swing Loan Lender shall not be required to fund any Swing Loans and Issuer shall not be required to issue, amend or increase any Letter of Credit, unless Swing Loan Lender or Issuer, as the case may be, shall have entered into arrangements with Borrowers or such Lender, satisfactory to Swing Loan Lender or Issuer, as the case may be, to defease any risk to it in respect of such Lender hereunder.

2.23.   Payment of Obligations.   Agent may charge to Borrowers' Account as a Revolving Advance or, at the discretion of Swing Loan Lender, as a Swing Loan (i) all payments with respect to any of the Obligations required hereunder (including without limitation principal payments, payments of interest, payments of Letter of Credit Fees and all other fees provided for hereunder and payments under Sections 16.5 and 16.9) as and when each such payment shall become due and payable (whether as regularly scheduled, upon or after acceleration, upon maturity or otherwise), (ii) without limiting the generality of the foregoing clause (i), (a) all amounts expended by Agent or any Lender pursuant to Sections 4.2 or 4.3 hereof and (b) all

expenses which Agent incurs in connection with the forwarding of Advance proceeds and the establishment and maintenance of any Blocked Accounts or Depository Accounts as provided for in Section 4.8(h), and (iii) any sums expended by Agent or any Lender due to any Borrower's failure to perform or comply with its obligations under this Agreement or any Other Document including any Borrower's obligations under Sections 3.3, 3.4, 4.4, 4.7, 6.4, 6.6, 6.7 and 6.8 hereof, and all amounts so charged shall be added to the Obligations and shall be secured by the Collateral.  To the extent Revolving Advances are not actually funded by the other Lenders in respect of any such amounts so charged, all such amounts so charged shall be deemed to be Revolving Advances made by and owing to Agent and Agent shall be entitled to all rights (including accrual of interest) and remedies of a Lender under this Agreement and the Other Documents with respect to such Revolving Advances.

III.    INTEREST AND FEES.

3.1.    <u>Interest.</u>  Interest on Advances shall be payable in arrears on the first day of each month with respect to Domestic Rate Loans and, with respect to LIBOR Rate Loans, at (a) the end of each Interest Period with respect to LIBOR Rate Loans with an Interest Period not in excess of three months, and (b) for LIBOR Rate Loans with an Interest Period in excess of three months, at the end of each three month period during such Interest Period, provided further that all accrued and unpaid interest shall be due and payable at the end of the Term.  Interest charges shall be computed on the actual principal amount of Advances outstanding during the month at a rate per annum equal to (i) with respect to Revolving Advances, the applicable Revolving Interest Rate, and (ii) with respect to Swing Loans, the Revolving Interest Rate for Domestic Rate Loans (as applicable, the "Contract Rate").  Except as expressly provided otherwise in this Agreement, any Obligations other than the Advances that are not paid when due shall accrue interest at the Revolving Interest Rate for Domestic Rate Loans, subject to the provision of the final sentence of this Section 3.1 regarding the Default Rate.  Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, the applicable Contract Rate for Domestic Rate Loans shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect.  The LIBOR Rate shall be adjusted with respect to LIBOR Rate Loans without notice or demand of any kind on the effective date of any change in the Reserve Percentage as of such effective date.  Upon and after the occurrence of an Event of Default, and during the continuation thereof, at the option of Agent or at the direction of Required Lenders (or, in the case of any Event of Default under Section 10.7, immediately and automatically upon the occurrence of any such Event of Default without the requirement of any affirmative action by any party), the Obligations shall bear interest at the applicable Contract Rate for Domestic Rate Loans plus two percent (2%) per annum  (as applicable, the "Default Rate").

3.2.    <u>Letter of Credit Fees.</u>

(a)    Borrowers shall pay (x) to Agent, for the ratable benefit of Lenders holding Revolving Commitments, fees for each Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, equal to the average daily face amount of each outstanding Letter of Credit multiplied by three percent (3.00%), such fees to be calculated on the basis of a 360-day year for the actual number

71

of days elapsed and to be payable monthly in arrears on the first day of each calendar month and on the last day of the Term, and (y) to Issuer, a fronting fee of one quarter of one percent (0.25%) per annum times the average daily face amount of each outstanding Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, to be payable monthly in arrears on the first day of each calendar monthly and on the last day of the Term. (all of the foregoing fees, the "Letter of Credit Fees"). In addition, Borrowers shall pay to Agent, for the benefit of Issuer, any and all customary administrative, issuance, amendment, payment and negotiation charges with respect to Letters of Credit and all fees and expenses as agreed upon by Issuer and the Borrowing Agent in connection with any Letter of Credit, including in connection with the opening, amendment or renewal of any such Letter of Credit and any acceptances created thereunder, all such charges, fees and expenses, if any, to be payable on demand.  All such charges shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason.  Any such charge in effect at the time of a particular transaction shall be the charge for that transaction, notwithstanding any subsequent change in Issuer's prevailing charges for that type of transaction.  Upon and after the occurrence of an Event of Default, and during the continuation thereof, at the option of Agent or at the direction of Required Lenders (or, in the case of any Event of Default under Section 10.7, immediately and automatically upon the occurrence of any such Event of Default without the requirement of any affirmative action by any party), the Letter of Credit Fees described in clause (x) of this Section 3.2(a) shall be increased by an additional two percent (2.0%) per annum.

(b)     At any time following the occurrence and during the continuance of an Event of Default, at the request of Agent or the Required Lenders (or, in the case of any Event of Default under Section 10.7, immediately and automatically upon the occurrence of such Event of Default, without the requirement of any affirmative action by any party), or upon the expiration of the Term or any other termination of this Agreement (and also, if applicable, in connection with any mandatory prepayment under Section 2.20), Borrowers will cause cash to be deposited and maintained in an account with Agent, as cash collateral, in an amount equal to one hundred and five percent (105%) of the Maximum Undrawn Amount of all outstanding Letters of Credit, and each Borrower hereby irrevocably authorizes Agent, in its discretion, on such Borrower's behalf and in such Borrower's name, to open such an account and to make and maintain deposits therein, or in an account opened by such Borrower, in the amounts required to be made by such Borrower, out of the proceeds of Receivables or other Collateral or out of any other funds of such Borrower coming into any Lender's possession at any time.  Agent may, in its discretion, invest such cash collateral (less applicable reserves) in such short-term money-market items as to which Agent and such Borrower mutually agree (or, in the absence of such agreement, as Agent may reasonably select) and the net return on such investments shall be credited to such account and constitute additional cash collateral, or Agent may (notwithstanding the foregoing) establish the account provided for under this Section 3.2(b) as a non-interest bearing account and in such case Agent shall have no obligation (and Borrowers hereby waive any claim) under Article 9 of the Uniform Commercial Code or under any other Applicable Law to pay interest on such cash collateral being held by Agent.  Borrowers may withdraw amounts credited to any such account: (i) at such time as such Default or Event of Default has been waived by Agent; or (ii) upon the occurrence of all of the following: (x) payment and performance in full of all Obligations; (y) expiration of all Letters of Credit; and (z) termination of this Agreement.  Borrowers hereby assign, pledge and grant to Agent, for its benefit and the ratable benefit of Issuer, Lenders and

each other Secured Party, a continuing security interest in and to and Lien on any such cash collateral and any right, title and interest of Borrowers in any deposit account, securities account or investment account into which such cash collateral may be deposited from time to time to secure the Obligations, specifically including all Obligations with respect to any Letters of Credit.  Borrowers agree that upon the coming due of any Reimbursement Obligations (or any other Obligations, including Obligations for Letter of Credit Fees) with respect to the Letters of Credit, Agent may use such cash collateral to pay and satisfy such Obligations

3.3.    <u>Facility Fee.</u>    If, for any calendar month during the Term, the average daily balance of the sum of unpaid Revolving Advances plus unpaid Swing Loans plus the Maximum Undrawn Amount of all outstanding Letters of Credit (such average daily balance, the "Average Usage") for each day of such calendar month does not equal the Maximum Revolving Advance Amount, then Borrowers shall pay to Agent, for the ratable benefit of Lenders holding the Revolving Commitments based on their Revolving Commitment Percentages, a fee at a rate equal to one-half of one percent (0.50%) per annum on the amount by which the Maximum Revolving Advance Amount exceeds such Average Usage during such fiscal month (as applicable, the "Facility Fee").  Such Facility Fee shall be payable to Agent monthly in arrears on the first day of each calendar month with respect to the previous calendar month.

3.4.    <u>Other Fees.</u>

(a)    <u>Commitment Fee</u>.  Borrowers shall pay to the Agent, for the ratable benefit of the Lenders in accordance with their respective Revolving Credit Commitment Percentages, a commitment fee of $1,525,000 which is fully-earned upon the execution of this Agreement and shall not be subject to rebate or proration upon termination of the Credit Agreement for any reason, and shall be due and payable in two installments as follows: $987,5000 due and payable upon the Closing Date, and $537,500 due and payable on the earlier of (x) the Termination Date, or (y) any earlier accelerations of the Post-Petition Obligations in accordance with the terms of this Agreement.

(b)    <u>Collateral Management Fee</u>.  Borrowers shall pay to the Agent, for the sole and separate account of PNC and not the account of any other Lender, a monthly collateral management fee in the amount of $3,500 per month, payable in arrears on the first day of each month during the Term.  Such fee shall be deemed earned in full on the date when same is due and payable hereunder and shall not be subject to rebate or proration upon termination of the Credit Agreement for any reason.]

(c)    <u>Collateral Monitoring Fee</u>.    Subject to the limitations set forth in Section 4.7 hereof, the Borrowers shall pay to the Agent, for its sole and separate account, on the first day of each month following any month in which Agent performs any collateral monitoring - namely any field examination, collateral analysis or other business analysis, the need for which is to be determined by the Agent and which monitoring is undertaken by each the Agent or for its own benefit - a collateral monitoring fee in an amount equal to $1,000 per day for each person employed to perform such monitoring, plus all reasonable costs and disbursements incurred by the Agent in the performance of such examination or analysis, plus a per-monitoring supervisory review fee of $1,300.

73

(d)    All of the reasonable fees and reasonable out-of-pocket costs and expenses of any appraisals conducted pursuant to Section 4.7 hereof shall be paid for when due, in full and without deduction, off-set or counterclaim by Borrowers.

3.5.    <u>Computation of Interest and Fees.</u>    Interest and fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed.  If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the applicable Contract Rate for Domestic Rate Loans during such extension.

3.6.    <u>Maximum Charges.</u>    In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under Applicable Law.  In the event interest and other charges as computed hereunder would otherwise exceed the highest rate permitted under Applicable Law: (i) the interest rates hereunder will be reduced to the maximum rate permitted under Applicable Law; (ii) such excess amount shall be first applied to any unpaid principal balance owed by Borrowers; and (iii) if the then remaining excess amount is greater than the previously unpaid principal balance, Lenders shall promptly refund such excess amount to Borrowers and the provisions hereof shall be deemed amended to provide for such permissible rate.

3.7.    <u>Increased Costs.</u>    In the event that any Applicable Law or any Change in Law or compliance by any Lender (for purposes of this Section 3.7, the term "Lender" shall include Agent, Swing Loan Lender, any Issuer or Lender and any corporation or bank controlling Agent, Swing Loan Lender, any Lender or Issuer and the office or branch where Agent, Swing Loan Lender, any Lender or Issuer (as so defined) makes or maintains any LIBOR Rate Loans) with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

(a)    subject Agent, Swing Loan Lender, any Lender or Issuer to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any LIBOR Rate Loan, or change the basis of taxation of payments to Agent, Swing Loan Lender, such Lender or Issuer in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 3.10 and the imposition of, or any change in the rate of, any Excluded Tax payable by Agent, Swing Loan Lender, such Lender or the Issuer);

(b)    impose, modify or deem applicable any reserve, special deposit, assessment, special deposit, compulsory loan, insurance charge or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by, any office of Agent, Swing Loan Lender, Issuer or any Lender, including pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c)    impose on Agent, Swing Loan Lender, any Lender or Issuer or the London interbank LIBOR market any other condition, loss or expense (other than Taxes) affecting this Agreement or any Other Document or any Advance made by any Lender, or any Letter of Credit or participation therein;

and the result of any of the foregoing is to increase the cost to Agent, Swing Loan Lender, any Lender or Issuer of making, converting to, continuing, renewing or maintaining its Advances hereunder by an amount that Agent, Swing Loan Lender, such Lender or Issuer deems to be material or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of any of the Advances by an amount that Agent, Swing Loan Lender or such Lender or Issuer deems to be material, then, in any case Borrowers shall promptly pay Agent, Swing Loan Lender, such Lender or Issuer, upon its demand, such additional amount as will compensate Agent, Swing Loan Lender or such Lender or Issuer for such additional cost or such reduction, as the case may be, provided that the foregoing shall not apply to increased costs which are reflected in the LIBOR Rate, as the case may be.  Agent, Swing Loan Lender, such Lender or Issuer shall certify the amount of such additional cost or reduced amount to Borrowing Agent, and the basis of such additional costs or reduced amount and such certification shall be conclusive absent manifest error.

3.8.    Basis For Determining Interest Rate Inadequate or Unfair.  In the event that prior to the commencement of an Interest Period for a LIBOR Rate Loan:

(a)    Agent shall have determined that:

(i)    reasonable means do not exist for ascertaining the LIBOR Rate for any Interest Period; or

(ii)    Dollar deposits in the relevant amount and for the relevant maturity are not available in the London interbank LIBOR market, with respect to an outstanding LIBOR Rate Loan, a proposed LIBOR Rate Loan, or a proposed conversion of a Domestic Rate Loan into a LIBOR Rate Loan; or

(iii)    An event contemplated by Section 2.2(h) hereof shall have occurred; or

(b)    Agent is advised by Required Lenders that the LIBOR Rate will not adequately and fairly reflect the cost to such Lender of the establishment or maintenance of any LIBOR Rate Loan for such Interest Period,

then Agent shall give Borrowing Agent prompt written or telephonic notice of such determination.  If such notice is given, (i) any such requested LIBOR Rate Loan shall be made as a Domestic Rate Loan, unless Borrowing Agent shall notify Agent no later than 1:00 p.m. two (2) Business Days prior to the date of such proposed borrowing, that its request for such borrowing shall be cancelled or made as an unaffected type of LIBOR Rate Loan, (ii) any Domestic Rate Loan or LIBOR Rate Loan which was to have been converted to an affected type of LIBOR Rate Loan shall be continued as or converted into a Domestic Rate Loan, or, if Borrowing Agent shall notify Agent, no later than 1:00 p.m. two (2) Business Days prior to the proposed conversion, shall be maintained as an unaffected type of LIBOR Rate Loan, and (iii) any outstanding affected LIBOR Rate Loans shall be converted into a Domestic Rate Loan, or, if Borrowing Agent shall notify Agent, no later than 1:00 p.m. two (2) Business Days prior to the last Business Day of the then current Interest Period applicable to such affected LIBOR Rate Loan, shall be converted into an unaffected type of LIBOR Rate Loan, on the last Business Day of the then current Interest Period for such affected LIBOR Rate Loans (or sooner, if any Lender

cannot continue to lawfully maintain such affected LIBOR Rate Loan).  Until such notice has been withdrawn, Lenders shall have no obligation to make an affected type of LIBOR Rate Loan or maintain outstanding affected LIBOR Rate Loans and no Borrower shall have the right to convert a Domestic Rate Loan or an unaffected type of LIBOR Rate Loan into an affected type of LIBOR Rate Loan.

3.9.    Capital Adequacy.

(a)    In the event that Agent, Swing Loan Lender or any Lender shall have determined that any Applicable Law or guideline regarding capital adequacy or liquidity, or any Change in Law or any change in the interpretation or administration thereof by any Governmental Body, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Agent, Swing Loan Lender, Issuer or any Lender (for purposes of this Section 3.9, the term "Lender" shall include Agent, Swing Loan Lender, Issuer or any Lender and any corporation or bank controlling Agent, Swing Loan Lender or any Lender and the office or branch where Agent, Swing Loan Lender or any Lender (as so defined) makes or maintains any LIBOR Rate Loans) with any request or directive regarding capital adequacy or liquidity (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on Agent, Swing Loan Lender or any Lender's capital as a consequence of its obligations hereunder (including the making of any Swing Loans) to a level below that which Agent, Swing Loan Lender or such Lender could have achieved but for such adoption, change or compliance (taking into consideration Agent's, Swing Loan Lender's and each Lender's policies with respect to capital adequacy and liquidity) by an amount deemed by Agent, Swing Loan Lender or any Lender to be material, then, from time to time, Borrowers shall pay upon demand to Agent, Swing Loan Lender or such Lender such additional amount or amounts as will compensate Agent, Swing Loan Lender or such Lender for such reduction.  In determining such amount or amounts, Agent, Swing Loan Lender or such Lender may use any reasonable averaging or attribution methods. The protection of this Section 3.9 shall be available to Agent, Swing Loan Lender and each Lender regardless of any possible contention of invalidity or inapplicability with respect to the Applicable Law, rule, regulation, guideline or condition.

(b)    A certificate of Agent, Swing Loan Lender or such Lender setting forth such amount or amounts as shall be necessary to compensate Agent, Swing Loan Lender or such Lender with respect to Section 3.9(a) hereof when delivered to Borrowing Agent shall be conclusive absent manifest error.  Agent shall provide Borrower the basis for such increase and how such increase will apply to the Advances.

3.10.    Taxes.

(a)    Any and all payments by or on account of any Obligations hereunder or under any Other Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes; provided that if Borrowers shall be required by Applicable Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) Agent, Swing Loan Lender, Lender, Issuer or Participant, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made,

76

(ii) Borrowers shall make such deductions and (iii) Borrowers shall timely pay the full amount deducted to the relevant Governmental Body in accordance with Applicable Law. Notwithstanding the foregoing, Borrowers shall not be obligated to pay any portion of the Indemnified Taxes or Other Taxes that are attributable to any withholding or deductions that would not have been paid or claimed had the applicable payee or payees properly claimed a complete exemption with respect thereto by providing the proper forms in connection with this Section 3.10.

(b)     Without limiting the provisions of Section 3.10(a) above, Borrowers shall timely pay any Other Taxes to the relevant Governmental Body in accordance with Applicable Law.

(c)     Each Borrower shall indemnify Agent, Swing Loan Lender, each Lender, Issuer and any Participant, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by Agent, Swing Loan Lender, such Lender, Issuer, or such Participant, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Body.  A certificate as to the amount of such payment or liability delivered to Borrowers by any Lender, Swing Loan Lender, Participant, or Issuer (with a copy to Agent), or by Agent on its own behalf or on behalf of Swing Loan Lender, a Lender or Issuer, shall be conclusive absent manifest error.

(d)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Borrower to a Governmental Body, Borrowers shall deliver to Agent the original or a certified copy of a receipt issued by such Governmental Body evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Agent.

(e)     Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Borrower is resident for tax purposes, or under any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any Other Document shall deliver to Borrowers (with a copy to Agent), at the time or times prescribed by Applicable Law or reasonably requested by Borrowers or Agent, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding. Notwithstanding the submission of such documentation claiming a reduced rate of or exemption from U.S. withholding tax, Agent shall be entitled to withhold United States federal income taxes at the full 30% withholding rate if in its reasonable judgment it is required to do so under the due diligence requirements imposed upon a withholding agent under § 1.1441-7(b) of the United States Income Tax Regulations or other Applicable Law.  Further, Agent is indemnified under § 1.1461-1(e) of the United States Income Tax Regulations against any claims and demands of any Lender, Issuer or assignee or participant of a Lender or Issuer for the amount of any tax it deducts and withholds in accordance with regulations under § 1441 of the Code.  In addition, any Lender, if requested by Borrowers or Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrowers or Agent as will enable

Borrowers or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Without limiting the generality of the foregoing, in the event that any Borrower is resident for tax purposes in the United States of America, any Foreign Lender (or other Lender) shall deliver to Borrowers and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender (or other Lender) becomes a Lender under this Agreement (and from time to time thereafter upon the request of Borrowers or Agent, but only if such Foreign Lender (or other Lender) is legally entitled to do so), whichever of the following is applicable: two (2) duly completed valid originals of IRS Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

(i)    two (2) duly completed valid originals of IRS Form W-8BEN establishing eligibility for benefits of an income tax treaty to which the United States of America is a party resulting in an exemption from or reduction of United States withholding Tax,

(ii)    two (2) duly completed valid originals of IRS Form W-8ECI,

(iii)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of Borrowers within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) two duly completed valid originals of IRS Form W-8BEN,

(iv)    in the case of a lender that is not the beneficial owner of the payments received, executed copies of IRS Form W-8IMY accompanied by all required forms and certificates,

(v)    any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrowers to determine the withholding or deduction required to be made, or

(vi)    To the extent that any Lender is not a Foreign Lender, such Lender shall submit to Agent two (2) originals of an IRS Form W-9 or any other form prescribed by Applicable Law demonstrating that such Lender is not a Foreign Lender and is exempt from United States federal back-up withholding Tax.

(f)    If a payment made to a Lender, Swing Loan Lender, Participant, Issuer, or Agent under this Agreement or any Other Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Person fails to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender, Swing Loan Lender, Participant, Issuer, or Agent shall deliver to the Agent (in the case of Swing Loan Lender, a Lender, Participant or Issuer) and Borrowers (A) a certification signed by the chief financial officer, principal accounting officer, treasurer or

controller of such Person, and (B) other documentation reasonably requested by Agent or any Borrower sufficient for Agent and Borrowers to comply with their obligations under FATCA and to determine that Swing Loan Lender, such Lender, Participant, Issuer, or Agent has complied with such applicable reporting requirements.

(g)    If the Agent, a Lender, Swing Lender, a Participant or the Issuer determines, in its Permitted Discretion, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrowers or with respect to which the Borrowers have paid additional amounts pursuant to this Section, it shall pay to the Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrowers under this Section with respect to the Indemnified Taxes or Other Taxes giving rise to such refund); net of all out-of-pocket expenses of the Agent, Swing Loan Lender, such Lender, Participant, or the Issuer, as the case may be, and without interest (other than any interest paid by the relevant Governmental Body with respect to such refund), provided that the Borrowers, upon the request of the Agent, Swing Loan Lender, such Lender, Participant, or the Issuer, agrees to repay the amount paid over to the Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Body) to the Agent, Swing Loan Lender, such Lender, Participant or the Issuer in the event the Agent, Swing Loan Lender, such Lender, Participant or the Issuer is required to repay such refund to such Governmental Body.  This Section shall not be construed to require the Agent, Swing Loan Lender, any Lender, Participant, or the Issuer to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrowers or any other Person.

3.11.  <u>Replacement of Lenders</u>.  If any Lender (an "Affected Lender") (a) makes demand upon Borrowers for (or if Borrowers are otherwise required to pay) amounts pursuant to Section 3.7 or 3.9 hereof, (b) is unable to make or maintain LIBOR Rate Loans as a result of a condition described in Section 2.2(h) hereof, (c) is a Defaulting Lender, or (d) denies any consent requested by the Agent pursuant to Section 16.2(b) hereof, Borrowers may, within ninety (90) days of receipt of such demand, notice (or the occurrence of such other event causing Borrowers to be required to pay such compensation or causing Section 2.2(h) hereof to be applicable), or such Lender becoming a Defaulting Lender or denial of a request by Agent pursuant to Section 16.2(b) hereof, as the case may be, by notice in writing to the Agent and such Affected Lender (i) request the Affected Lender to cooperate with Borrowers in obtaining a replacement Lender satisfactory to Agent and Borrowers (the "Replacement Lender"); (ii) request the non-Affected Lenders to acquire and assume all of the Affected Lender's Advances and its Revolving Commitment Percentage, as provided herein, but none of such Lenders shall be under any obligation to do so; or (iii) propose a Replacement Lender subject to approval by Agent in its good faith business judgment.  If any satisfactory Replacement Lender shall be obtained, and/or if any one or more of the non-Affected Lenders shall agree to acquire and assume all of the Affected Lender's Advances and its Revolving Commitment Percentage, then such Affected Lender shall assign, in accordance with Section 16.3 hereof, all of its Advances and its Revolving Commitment Percentage, and other rights and obligations under this Loan Agreement and the Other Documents to such Replacement Lender or non-Affected Lenders, as the case may be, in exchange for payment of the principal amount so assigned and all interest and fees accrued on the amount so assigned, *plus* all other Obligations then due and payable to the Affected Lender.  Each Affected Lender hereby appoints Agent or Agent's designee as such Affected Lender's attorney with power at any time to assign, in accordance with Section 16.3 hereof, all

of such Affected Lender's Advances and Revolving Commitment Percentage, and other rights and obligations under this Agreement and the Other Documents to such Replacement Lender or non-Affected Lenders; this power being coupled with an interest is irrevocable until termination of this Agreement.

## IV.    COLLATERAL:  GENERAL TERMS

4.1.    <u>Security Interest in the Collateral.</u>    To secure the prompt payment and performance to the Secured Parties of the Post-Petition Obligations (and, upon entry of the Final Order, any and all Obligations, including without limitation, all Pre-Petition Obligations and Post-Petition Obligations) of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the Agent, for the benefit of itself and the other Secured Parties, shall have and is hereby granted by each Loan Party, effective as of the Petition Date, valid and perfected first priority (subject to the Permitted Liens (as defined in the Interim Order) and the Carve-Out), security interests and liens in and upon all pre- and post- petition property of each Loan Party, whether existing on the Petition Date or thereafter acquired including a continuing security interest in and to and Lien on all of its Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located.  Each Loan Party shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Agent's security interest and shall cause its financial statements to reflect such security interest.  As consideration to Pre-Petition Secured Parties for their agreement to the terms hereof and as replacement collateral for the Pre-Petition Collateral used, consumed or sold by the Loan Parties in the Case, the Collateral shall secure the Pre-Petition Obligations.

4.2.    <u>Perfection of Security Interest.</u>    Without any further order of the Bankruptcy Court, each Loan Party shall take all action that may be necessary or that Agent may reasonably request, so as at all times to maintain the validity, perfection, enforceability and priority of Agent's security interest in and Lien on the Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the Collateral, including (i) immediately discharging all Liens other than Permitted Encumbrances, (ii) delivering Lien Waiver Agreements for distribution centers (to the extent any exist) and locations owned by Affiliates and using commercially reasonable efforts to obtain Lien Waiver Agreements for all other locations, (iii) if requested by Agent, delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the Collateral, (iv) entering into warehousing, lockbox, customs and freight agreements and other custodial arrangements reasonably satisfactory to Agent, and (v) executing and delivering financing statements, control agreements, instruments of pledge (other than mortgages or leasehold mortgages), notices and assignments, in each case in form and substance reasonably satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest and Lien under the Uniform Commercial Code or other Applicable Law.  By its signature hereto, each Loan Party hereby authorizes Agent to file against such Loan Party, one or more financing, continuation or amendment statements pursuant to the Uniform Commercial Code in form and substance satisfactory to Agent (which statements may have a description of collateral which is broader than that set forth herein, including without limitation a description of Collateral as "all assets" and/or "all personal property" of any Loan Party).    All reasonable charges, expenses and fees Agent may incur in doing any of the

foregoing, and any local taxes relating thereto, shall be charged to Borrowers' Account as a Revolving Advance of a Domestic Rate Loan and added to the Obligations, or, at Agent's option, shall be paid by Loan Parties to Agent for its benefit and for the ratable benefit of Lenders immediately upon demand.

4.3.    <u>Preservation of Collateral</u>.  Following the occurrence and during the continuance of a Default or an Event of Default and the demand by Agent for payment of all Obligations due and owing as a result thereof, in addition to the rights and remedies set forth in Section 11.1 hereof, Agent (subject, with respect to clauses (b), (d) and (e), to the terms of any agreement by a Loan Party and the lessor or owner of such Real Property or equipment to the extent Agent is required to comply with such agreement pursuant to Applicable Law): (a) may at any time take such steps as Agent deems necessary to protect Agent's interest in and to preserve the Collateral, including the hiring of security guards or the placing of other security protection measures as Agent may deem appropriate; (b) may employ and maintain at any of any Loan Party's premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the Collateral; (c) may lease warehouse facilities to which Agent may move all or part of the Collateral; (d) may use any Loan Party's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (e) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of Loan Parties' owned or leased property.  Each Loan Party shall cooperate fully with all of Agent's efforts to preserve the Collateral and will take such reasonable actions to preserve the Collateral as Agent may direct.  All of Agent's reasonable out of pocket expenses of preserving the Collateral, including any expenses relating to the bonding of a custodian, shall be charged to Borrowers' Account as a Revolving Advance maintained as a Domestic Rate Loan and added to the Obligations.

4.4.    <u>Ownership and Location of Collateral</u>.

(a)    With respect to the Collateral, at the time the Collateral becomes subject to Agent's security interest:  (i) each Loan Party shall be the sole owner of and fully authorized and able to sell, transfer, pledge and/or grant a first priority security interest in each and every item of its respective Collateral to Agent; and, except for Permitted Encumbrances the Collateral shall be free and clear of all Liens whatsoever; (ii) each document and agreement executed by each Loan Party or delivered to Agent or any Lender in connection with this Agreement shall be true and correct in all material respects; (iii) all signatures and endorsements of each Loan Party that appear on such documents and agreements shall be genuine and each Loan Party shall have full capacity to execute same; and (iv) each Loan Party's equipment and Inventory shall be located as set forth on Schedule 4.4(b) and shall not be removed from such location(s) (other than to another location set forth on such Schedule) without the prior written consent of Agent except with respect to the sale of Inventory in the Ordinary Course of Business.  Schedule 4.4 may be updated from time to time during the term of this Agreement upon ten (10) days prior written notice to Agent by Loan Party.

(b)    (i) There is no location at which any Loan Party has any Inventory (except for Inventory in transit) or other Collateral having a value in excess of $250,000 other than those locations listed on Schedule 4.4(b)(i); (ii) Schedule 4.4(b)(ii) hereto contains a correct and complete list, as of the Closing Date, of the legal names and addresses of each warehouse at

81

which Inventory of any Loan Party is stored; none of the receipts received by any Loan Party from any warehouse states that the goods covered thereby are to be delivered to bearer or to the order of a named Person or to a named Person and such named Person's assigns; (iii) Schedule 4.4(b)(iii) hereto sets forth a correct and complete list as of the Closing Date of (A) each place of business of each Loan Party, including without limitation, each store operated by Loan Parties, and (B) the chief executive office of each Loan Party; and (iv) Schedule 4.4(b)(iv) hereto sets forth a correct and complete list as of the Closing Date of the location, by state and street address, of all Real Property owned or leased by each Loan Party, identifying which properties are owned and which are leased, together with the names and addresses of any landlords.

4.5.    <u>Defense of Agent's and Lenders' Interests.</u>  Until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, Agent's interests in the Collateral shall continue in full force and effect.  During such period no Loan Party shall, without Agent's prior written consent, pledge, sell (except for sales or other dispositions otherwise permitted in Section 7.1(b) hereof), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, any part of the Collateral.  Each Loan Party shall defend Agent's interests in the Collateral against any and all Persons whatsoever.  At any time following demand by Agent for payment of all Obligations following the occurrence and continuance of an Event of Default, Agent shall have the right to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including:  labels, stationery, documents, instruments and advertising materials.  If Agent exercises this right to take possession of the Collateral, Loan Parties shall, upon demand, assemble it in the best manner possible and make it available to Agent at a place reasonably convenient to Agent.  In addition, with respect to all Collateral, Agent and Lenders shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other Applicable Law.  Upon the occurrence and during the continuance of an Event of Default, each Loan Party shall, and Agent may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into any Loan Party's possession, they, and each of them, shall be held by such Loan Party in trust as Agent's trustee, and such Loan Party will immediately deliver them to Agent in their original form together with any necessary endorsement.

4.6.    <u>Inspection of Premises.</u>  At all reasonable times (and so long as no Event of Default has occurred and is continuing during normal business hours upon reasonable prior notice to Borrowing Agent and no more than four times per fiscal year) Agent and each Lender shall (a) have full access to and the right to audit, check, inspect and make abstracts and copies from each Loan Party's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of each Loan Party's business, and (b) may enter upon any premises of any Loan Party for the purpose of inspecting the Collateral and any and all records pertaining thereto and the operation of such Loan Party's business.

4.7.    <u>Appraisals.</u>  Agent may, in its sole discretion, exercised in a commercially reasonable manner, at any time after the Closing Date and from time to time, engage the services of an independent appraisal firm or firms of reputable standing, satisfactory to Agent, for the purpose of appraising the then current values of Loan Parties' assets.  In the event the value of

Loan Parties' Inventory or Prescription Lists as so determined pursuant to such appraisal, is less than anticipated by Agent or Lenders, such that the Revolving Advances are in excess of such Advances permitted hereunder, then, promptly upon Agent's demand for same, Loan Parties shall make mandatory prepayments of the then outstanding Revolving Advances so as to eliminate the excess Advances.

        4.8.    Receivables; Deposit Accounts and Securities Accounts.

        (a)    Each of the Receivables shall be a bona fide and valid account representing a bona fide indebtedness incurred by the Customer therein named, for a fixed sum as set forth in the invoice relating thereto to the extent such Receivable is not a Credit Card Receivable (provided immaterial or unintentional invoice errors shall not be deemed to be a breach hereof) with respect to an absolute sale or lease and delivery (or shipment to the extent title to such goods would vest in the Customer and such Receivable would be due and payable upon shipping) of goods upon stated terms of a Loan Party, or work, labor or services theretofore rendered by a Loan Party as of the date each Receivable is created.  Same shall be due and owing without dispute, setoff or counterclaim except as may be stated on the accounts receivable schedules delivered by Loan Parties to Agent.

        (b)    Each Customer, to each Loan Party's knowledge, as of the date each Receivable is created, is solvent and able to pay all Receivables on which the Customer is obligated in full when due.  With respect to such Customers of any Loan Party who are known to Loan Parties not to be solvent, such Loan Party has set up on its books and in its financial records in accordance with GAAP bad debt reserves adequate to cover such Receivables.

        (c)    Each Loan Party's chief executive office is located as set forth on Schedule 4.4(b)(iii).  Until written notice is given to Agent by Borrowing Agent of any other office at which any Loan Party keeps its records pertaining to Receivables, all such records shall be kept at such executive office.

        (d)    The Loan Parties shall direct their Credit Card Processors to make all ACH or wire transfer payments due from such Credit Card Processors to a Blocked Account and/or Depository Accounts (and any associated lockboxes) as Agent shall designate from time to time as contemplated by Section 4.8(i) or as otherwise agreed to from time to time by Agent. Notwithstanding the foregoing, to the extent any Loan Party directly receives any remittances upon Receivables (including Credit Card Receivables), such Borrower shall, at such Loan Party's sole cost and expense, but on Agent's behalf and for Agent's account, collect as Agent's property and in trust for Agent all amounts received on Receivables (including Credit Card Receivables), and shall not commingle such collections with any Loan Party's funds or use the same except to pay Obligations, and shall as soon as possible and in any event no later than two (2) Business Days after the receipt thereof (i) in the case of remittances paid by check, deposit all such remittances in their original form (after supplying any necessary endorsements) and (ii) in the case of remittances paid by wire transfer of funds, transfer all such remittances, in each case, into such Blocked Accounts(s) and/or Depository Account(s).  Each Loan Party shall deposit in the Blocked Account and/or Depository Account or, upon request by Agent, deliver to Agent, in original form and on the date of receipt thereof, all checks, drafts, notes, money orders, acceptances, cash and other evidences of Indebtedness.

(e)     Borrowers shall deliver to the Agent Processor Letters substantially in the form attached hereto as Exhibit 4.8(e) which have been executed on behalf of such Borrower and delivered to such Borrower's credit card clearinghouses and Credit Card Processors listed on Schedule 5.28.

(f)     At any time following the occurrence and during the continuance of an Event of Default or when Agent in its Permitted Discretion deems it to be necessary to preserve, protect or perfect Agent's interest in the Collateral, Agent shall have the right to send notice of the assignment of, and Agent's security interest in and Lien on, the Receivables to any and all Customers or any third party holding or otherwise concerned with any of the Collateral; provided that to the extent such notice is being sent by Agent when an Event of Default is not continuing, Agent shall consult with Borrowers as to the form of such notice. Subject to Section 11.1(a), at any time after the occurrence and during the continuance of an Event of Default, Agent shall have the sole right to collect the Receivables, take possession of the Collateral, or both. Agent's actual collection expenses, including, but not limited to, stationery and postage, telephone, facsimile, telegraph, secretarial and clerical expenses and the salaries of any collection personnel used for collection, may be charged to Borrowers' Account and added to the Obligations.

(g)     Agent shall have the right to receive, endorse, assign and/or deliver in the name of Agent or any Borrower any and all checks, drafts and other instruments for the payment of money relating to the Receivables, and each Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed. Each Borrower hereby constitutes Agent or Agent's designee as such Borrower's attorney with power (i) at any time: (A) to endorse such Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (B) to sign such Borrower's name on any invoice or bill of lading relating to any of the Receivables, drafts against Customers, assignments and verifications of Receivables; (C) to send verifications of Receivables to any Customer in accordance with Section 9.2 hereof; (D) to sign such Borrower's name on all financing statements or any other documents or instruments deemed necessary or appropriate by Agent to preserve, protect, or perfect Agent's interest in the Collateral and to file same; and (E) to receive, open and dispose of all mail addressed to any Borrower at any post office box/lockbox maintained by Agent for Borrowers or at any other business premises of Agent; and (ii) at any time following the occurrence and during the continuance of an Event of Default: (A) to demand payment of the Receivables; (B) to enforce payment of the Receivables by legal proceedings or otherwise; (C) to exercise all of such Borrower's rights and remedies with respect to the collection of the Receivables and any other Collateral; (D) to sue upon or otherwise collect, extend the time of payment of, settle, adjust, compromise, extend or renew the Receivables; (E) to settle, adjust or compromise any legal proceedings brought to collect Receivables; (F) to prepare, file and sign such Borrower's name on a proof of claim in bankruptcy or similar document against any Customer; (G) to prepare, file and sign such Borrower's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Receivables; (H) to accept the return of goods represented by any of the Receivables; (I) to change the address for delivery of mail addressed to any Borrower to such address as Agent may designate; and (J) to do all other acts and things necessary to carry out this Agreement. All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done maliciously or with gross (not mere) negligence or willful misconduct

84

(as mutually agreed by Agent (in its sole discretion) and Borrowing Agent or as determined by a court of competent jurisdiction in a final non-appealable judgment); this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid.

(h)     Neither Agent nor any Lender shall, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Receivables or any instrument received in payment thereof, or for any damage resulting therefrom.  Upon the occurrence and during the continuation of an Event of Default, Agent may, without notice or consent from any Loan Party, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Receivables or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof.  Agent is authorized and empowered to accept, following the occurrence and during the continuation of an Event of Default, the return of the goods represented by any of the Receivables, without notice to or consent by any Loan Party, all without discharging or in any way affecting any Loan Party's liability hereunder.

(i)     The Loan Parties have established and shall maintain the cash management system in effect on the Petition Date as reflected in the Cash Management Orders.  All Credit Card Receivables, all amounts payable to each Loan Party from Credit Card Issuers and Credit Card Processors and all payments from all non-retail Customers, together with all other proceeds of Collateral (other than proceeds of the sale of Inventory in the Ordinary Course of Business or pursuant to any Approved Going Out of Business Sales (other than Credit Card Receivables, all amounts payable to each Loan Party from Credit Card Issuers and Credit Card Processors and all payments from all non-retail Customers) received or paid to Loan Parties at the retail store locations (including pharmacies) of the Loan Parties and deposited into the local store deposit accounts of such retail store locations in accordance with historical practices of Loan Parties (all such proceeds of the sale of Inventory described in this parenthetical (other than Credit Card Receivables, all amounts payable to each Loan Party from Credit Card Issuers and Credit Card Processors and all payments from all non-retail Customers), the "Local Store Non-Credit Card Retail Proceeds"), shall be deposited by Borrowers into (i) a lockbox account, dominion account or such other "blocked account" ("Blocked Accounts") established at a bank or banks (each such bank, a "Blocked Account Bank") pursuant to an arrangement with such Blocked Account Bank as may be selected by Borrowing Agent and reasonably acceptable to Agent, or (ii) depository accounts ("Depository Accounts") established at Agent for the deposit of such proceeds.  Each applicable Loan Party, Agent and each Blocked Account Bank have entered (or, with respect to any new Blocked Account established pursuant to the Cash Management Orders, will enter) into a deposit account control agreement (each a "Blocked Account Agreement") in form and substance reasonably satisfactory to Agent that is sufficient to give Agent "control" (for purposes of Articles 8 and 9 of the Uniform Commercial Code) over such accounts. All funds deposited in such Blocked Accounts or Depository Accounts shall immediately become subject to the security interest of Agent for its own benefit and the ratable benefit of Issuer, Lenders and all other holders of the Obligations, and Borrowing Agent shall obtain the agreement by such Blocked Account Bank to waive any offset rights against the funds so deposited other than customary offset rights with respect to fees and charge-backs.  Neither Agent nor any Lender assumes any responsibility for such blocked account arrangement, including any claim of accord and satisfaction or release with respect to deposits accepted by any Blocked Account Bank thereunder.  In accordance with the terms of the applicable Blocked

Account Agreement, each Blocked Account Bank shall be instructed to transfer on a daily basis all funds deposited in each Blocked Account to Agent, and to the extent that, prior to the Closing Date, any account control agreement with respect to any Blocked Account did not block the applicable Loan Party's access to the applicable Blocked Account and provide for automatic transfer of all funds on deposit therein to Agent on a daily basis, upon the Closing Date, Agent shall deliver notice to each Blocked Account Bank to block Borrowers' access to the applicable Blocked Accounts and transfer all funds on deposit and thereafter deposited in such Blocked Accounts to Agent, and Agent shall apply all such funds received by it from any and all Blocked Accounts and/or Depository Accounts to the satisfaction of either the Pre-Petition Obligations or the Post-Petition Obligations as Agent may elect in its sole and absolute discretion in accordance with the Interim Order and the Final Order, subject to Borrowers' ability to reborrow Revolving Advances in accordance with the terms hereof.

(j)    Notwithstanding the foregoing, (1) Borrowers shall cause all Local Store Non-Credit Card Retail Proceeds received or paid to Loan Parties at any retail store locations (including pharmacies) of the Loan Parties to be deposited into the respective retail store deposit accounts for such retail store locations on a daily basis in accordance with the historical practices of Loan Parties, (2) Borrowers shall cause all funds in such local store deposit accounts in excess in the amount permitted to be maintained therein in (3) below to be transferred to a Blocked Account or a Depository Account on a daily basis, and (3) Borrowers may maintain up to $25,000 in the aggregate in such local store deposit accounts and/or petty cash deposit accounts at financial institutions that are not subject to deposit account control agreements in favor of Agent.

(k)    No Borrower will, without Agent's consent, compromise or adjust any material amount of the Receivables (or extend the time for payment thereof) or accept any material returns of merchandise or grant any additional discounts, allowances or credits thereon except for those compromises, adjustments, returns, discounts, credits and allowances as have been heretofore customary in the Ordinary Course of Business of such Borrower.

(l)    All deposit accounts (including all Blocked Accounts and Depository Accounts), securities accounts and investment accounts of each Borrower and its Subsidiaries as of the Closing Date are set forth on Schedule 4.8(l).  Subject to Section 4.8(j)(3), no Borrower shall open any new deposit account, securities account or investment account unless (i) Borrowers shall have given at least thirty (30) days (or such lesser period acceptable to Agent) prior written notice to Agent and (ii) if such account is to be maintained with a bank, depository institution or securities intermediary that is not the Agent, such bank, depository institution or securities intermediary, each applicable Borrower and Agent shall first have entered into an account control agreement in form and substance satisfactory to Agent sufficient to give Agent "control" (for purposes of Articles 8 and 9 of the Uniform Commercial Code) over such account.

4.9.    Inventory.  To the extent Inventory held for sale or lease has been produced by any Borrower, it has been produced by such Borrower in material compliance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder and no Inventory would constitute "hot goods" under such act.

4.10.    <u>Maintenance of Equipment.</u>  The equipment (other than obsolete equipment or equipment reasonably deemed by any Borrower as no longer necessary in the operation of such Borrower's business) shall be maintained in good operating condition and repair (reasonable wear and tear excepted) and all necessary replacements of and repairs thereto shall be made so that the value and operating efficiency of the equipment shall be maintained and preserved (reasonable wear and tear excepted).  No Borrower shall use or operate the equipment in violation of any Applicable Law, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

4.11.    <u>Exculpation of Liability.</u>  Nothing herein contained shall be construed to constitute any Secured Party as any Borrower's agent for any purpose whatsoever, nor shall Agent or any Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof.  No Secured Party, whether by anything herein or in any assignment or otherwise, assume any of any Borrower's obligations under any contract or agreement assigned to Agent or such Lender, and no Secured Party shall be responsible in any way for the performance by any Borrower of any of the terms and conditions thereof.

4.12.    <u>Financing Statements.</u>  Except as respects the financing statements filed by Agent, financing statements described on Schedule 1.2(a), and financing statements filed in connection with Permitted Encumbrances, no financing statement covering any of the Collateral or any proceeds thereof is or will be on file in any public office.

V.    REPRESENTATIONS AND WARRANTIES.

Each Borrower, and, in the case of Sections 5.1, 5.2, 5.3, 5.5, 5.6, 5.17 and 5.24, each Debtor Guarantor, represents and warrants as follows:

5.1.    <u>Authority.</u>  Subject to entry by the Bankruptcy Court of the Interim Order and the Final Order, each Loan Party has full power, authority and legal right to enter into this Agreement and the Other Documents to which it is a party and to perform all its respective Obligations hereunder and thereunder.  This Agreement and the Other Documents to which it is a party have been duly executed and delivered by each Loan Party, and, subject to entry by the Bankruptcy Court of the Interim Order and the Final Order, this and this Agreement and the Other Documents to which it is a party constitute the legal, valid and binding obligation of such Loan Party enforceable in accordance with their terms.  Subject to entry by the Bankruptcy Court of the Interim Order and the Final Order, the execution, delivery and performance of this Agreement and of the Other Documents to which it is a party (a) are within such Loan Party's corporate or company powers, as applicable, have been duly authorized by all necessary corporate or company action, as applicable, are not in contravention of law or the terms of such Loan Party's Organizational Documents or to the conduct of such Loan Party's business or of any Material Contract or undertaking to which such Loan Party is a party or by which such Loan Party is bound, including the Acquisition Agreement, (b) will not conflict with or violate any law or regulation, or any judgment, order or decree of any Governmental Body, (c) will not require the Consent of any Governmental Body, any party to a Material Contract or any other Person, except those Consents which will have been duly obtained, made or compiled prior to the Closing Date and which are in full force and effect, and except for Consents where the failure to obtain such Consent could not reasonably be expected to result in a Material Adverse Effect or in

any way materially or adversely impair the Collateral or Agent's Liens in the Collateral, and (d) will not conflict with, nor result in any breach in any of the provisions of or constitute a default under or result in the creation of any Lien except Permitted Encumbrances upon any asset of such Loan Party under the provisions of any Organizational Document or any other agreement, instrument, or other document to which such Loan Party is a party or by which it or its property is a party or by which it may be bound, including the Acquisition Agreement, except where such consent, violation, conflict, breach or default would not cause an Event of Default.

      5.2.   <u>Formation and Qualification.</u>

      (a)   Each Loan Party is duly incorporated or formed, as applicable, and in good standing under the laws of the state listed on Schedule 5.2(a) and is qualified to do business and is in good standing in the states listed on Schedule 5.2(a) which constitute all states in which qualification and good standing are necessary for such Loan Party to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect on such Loan Party. Each Loan Party has delivered to Agent true and complete copies of its Organizational Documents and will promptly notify Agent of any amendment or changes thereto.

      (b)   The only Subsidiaries of Holdings and each Loan Party are listed on Schedule 5.2(b).

      5.3.   <u>Survival of Representations and Warranties.</u>  All representations and warranties of such Loan Party contained in this Agreement and the Other Documents to which it is a party shall be true at the time of such Loan Party's execution of this Agreement and the Other Documents to which it is a party, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the closing of the transactions described therein or related thereto until the Obligations hereunder are paid in full and the Lenders' commitments to make Advances are terminated (unless otherwise required by a non-appealable order from a court of competent jurisdiction).

      5.4.   <u>Tax Returns.</u>  Each Borrower's federal tax identification number is set forth on Schedule 5.4.  Each Borrower has filed all federal, state and local tax returns and other tax reports each is required by law to file and, subject to any restriction under the Interim Order or the Final Order and to any other prohibition under the Bankruptcy Code, but otherwise in accordance with Applicable Law and the Budget subject to the Permitted Variance, has paid all taxes, assessments, fees and other governmental charges that are due and payable, except to the extent being Properly Contested.  The provision for taxes on the books of each Borrower is adequate for all years not closed by applicable statutes, and for its current fiscal year, and no Borrower has any knowledge of any deficiency or additional assessment in connection therewith not provided for on its books as required by GAAP.

      5.5.   <u>Budget</u>. The Budget was prepared in good faith by an Authorized Officer of the Borrowers and based upon assumptions which were reasonable in light of the conditions existing at the time of delivery thereof and reflect the Borrowers' reasonable estimate of its future financial performance for such period (it being understood (for purposes of this representation and warranty only and any determination of the truth and correctness hereof on any date such

representation and warranty is made or deemed to be made by any Loan Party, and not for any other purpose (including without limitation any purpose under Sections 6.5, 9.12 and 9.12 hereof or any purpose under any other provision hereof restricting any Loan Party's actions to those taken in accordance with the Budget subject to the Permitted Variance) under this Agreement or any Other Document) that projections by their nature are inherently uncertain and the results reflected therein may not actually be achieved and actual results may differ and differences may be material).

      5.6.    <u>Entity Names.</u>  No Loan Party has been known by any other company or corporate name, as applicable, in the past five (5) years and does not sell Inventory under any other name except as set forth on Schedule 5.6, nor has any Loan Party been the surviving corporation or company, as applicable, of a merger or consolidation or acquired all or substantially all of the assets of any Person during the preceding five (5) years except as set forth on Schedule 5.6.

      5.7.    <u>O.S.H.A.; Environmental Compliance; Flood Insurance.</u>

      (a)    Each Borrower has duly complied with, and its facilities, business, assets, property, leaseholds, Real Property and equipment are in compliance in all material respects with, the provisions of the Federal Occupational Safety and Health Act and all applicable Environmental Laws; there have been no outstanding citations, notices or orders of non-compliance issued to any Borrower or relating to its business, assets, property, leaseholds or equipment under any such laws, rules or regulations, except in each case where such non-compliance, citations, notices or orders could not reasonably be expected to have a Material Adverse Effect.

      (b)    Each Borrower has been issued all applicable  and material federal, state and local licenses, certificates or permits (collectively, "Approvals") relating to all applicable Environmental Laws,  and all such Approvals are current and in full force and effect, except where the failure to obtain or maintain such Approvals could not reasonably be expected to result in a Material Adverse Effect.

      (c)    Except as set forth on Schedule 5.7(c) or except as could not reasonably be expected to have a Material Adverse Effect: (i) there are no visible signs of releases, spills, discharges, leaks or disposal (collectively referred to as "Releases") of Hazardous Materials at, upon, under or within any Real Property including any premises leased by any Borrower that require a response or remedial action under applicable Environmental Laws; (ii) there are no underground storage tanks or polychlorinated biphenyls on the Real Property including any premises leased by any Borrower except as are in compliance with applicable Environmental Laws; (iii) the Real Property including any premises leased by any Borrower has never been used as a RCRA treatment, storage or disposal facility for Hazardous Waste; and (y) no Hazardous Materials are present on the Real Property, excepting such quantities as are handled in accordance with Environmental Laws and as are necessary for the operation of the commercial business of any Borrower or of its tenants.

      (d)    All Real Property owned by Borrowers, if any, is insured pursuant to policies and other bonds which are valid and in full force and effect and which provide adequate

coverage from reputable and financially sound insurers in amounts sufficient to insure the assets and risks of each such Borrower in accordance with prudent business practice in the industry of such Borrower.

      5.8.    <u>No Litigation, Violation, Indebtedness or Default; ERISA Compliance.</u>

      (a)    [RESERVED].

      (b)    Except as disclosed in Schedule 5.8(b)(i), no Borrower has any pending or, to Borrowers' knowledge, threatened, litigation (in writing), arbitration, actions or proceedings which could reasonably be expected to have a Material Adverse Effect. To the knowledge of Borrowers, no Borrowers have any investigation or audit pending against Borrowers or any of their respective assets which could reasonably be expected to have a Material Adverse Effect. No Borrower has any outstanding Indebtedness for borrowed money other than the Obligations, except for Indebtedness disclosed in Schedule 5.8(b)(ii) or permitted under the definition of Permitted Indebtedness.

      (c)    No Borrower is in violation of any applicable statute, law, rule, regulation or ordinance in any respect which could reasonably be expected to have a Material Adverse Effect, nor is any Borrower in violation of any order of any court, Governmental Body or arbitration board or tribunal binding on it.

      (d)    No Borrower or any member of the Controlled Group maintains or is required to contribute to any Plan other than those listed on Schedule 5.8(d) hereto. Each Plan sponsored by any Borrower or any member of the Controlled Group is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Applicable Law. (i) Except as could not reasonably be expected to result in a Material Adverse Effect: each Borrower and each member of the Controlled Group has met all applicable minimum funding requirements under Section 302 of ERISA and Section 412 of the Code in respect of each Plan, and each Plan sponsored by any Borrower or any member of the Controlled Group is in compliance with Sections 412, 430 and 436 of the Code and Sections 206(g), 302 and 303 of ERISA, without regard to waivers and variances; (ii) each Plan, sponsored by the Borrower or any member of the Controlled Group, which is intended to be a qualified plan under Section 401(a) of the Code as currently in effect has been determined by the Internal Revenue Service to be qualified under Section 401(a) of the Code and the trust related thereto is exempt from federal income tax under Section 501(a) of the Code or an application for such a determination is currently being processed by the Internal Revenue Service or such Plan is entitled to rely upon an opinion letter from the Internal Revenue Service; (iii) neither any Borrower nor any member of the Controlled Group has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due which are unpaid; (iv) no Plan sponsored by the Borrower or any member of the Controlled Group has been terminated by the plan administrator thereof nor by the PBGC, and there is no occurrence which would cause the PBGC to institute proceedings under Title IV of ERISA to terminate any such Plan; (v) neither any Borrower nor any member of the Controlled Group has breached in any material respect any of the responsibilities, obligations or duties imposed on it by ERISA with respect to any Plan; (vi) neither any Borrower nor any member of the Controlled Group has incurred any liability for any excise tax arising under Section 4971, 4972 or 4980B of the Code, and no fact

exists which could give rise to any such liability; (vii) neither any Borrower nor any member of the Controlled Group nor, to the knowledge of any Borrower, any fiduciary of, nor any trustee to, any Plan, has engaged in a "prohibited transaction" described in Section 406 of ERISA or Section 4975 of the Code nor taken any action which would constitute or result in a Termination Event with respect to any such Plan which is subject to ERISA; (viii) no Termination Event has occurred or is reasonably expected to occur; (ix) there exists no Reportable ERISA Event with respect to any Plan sponsored by any Borrower or any member of the Controlled Group; (x) neither any Borrower nor any member of the Controlled Group has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA; (xi) neither any Borrower nor any member of the Controlled Group maintains or is required to contribute to any Plan which provides health, accident or life insurance benefits to former employees, their spouses or dependents, other than in accordance with Section 4980B of the Code; (xii) neither any Borrower nor any member of the Controlled Group has withdrawn, completely or partially, within the meaning of Section 4203 or 4205 of ERISA, from any Multiemployer Plan so as to incur liability under the Multiemployer Pension Plan Amendments Act of 1980 and there exists no fact which would reasonably be expected to result in any such liability; (xiii) no fiduciary (as defined in Section 3(21) of ERISA) of any Plan sponsored by the Borrower or any member of the Controlled Group has any liability for breach of fiduciary duty or for any failure in connection with the administration or investment of the assets of a Plan; and (xiv) no Pension Benefit Plan sponsored by any Borrower or any member of the Controlled Group is in "at risk" status under Section 430(i)(4) of the Code or Section 303(i)(4) of ERISA.

5.9.    Patents, Trademarks, Copyrights and Licenses.   All Intellectual Property owned or utilized by any Borrower: (i) is set forth on Schedule 5.9; (ii) is valid and has been duly registered or filed with all appropriate Governmental Bodies; and (iii) constitutes all of the intellectual property rights which are necessary for the operation of its business.   To Borrowers' knowledge, there is no objection to, pending challenge to the validity of, or proceeding by any Governmental Body to suspend, revoke, terminate or adversely modify, any such Intellectual Property and no Borrower is aware of any grounds for any challenge or proceedings, except as set forth in Schedule 5.9 hereto.   To the extent material to the operations of any Borrower's business, all Intellectual Property owned or held by any Borrower consists of original material or property developed by such Borrower or was lawfully acquired by such Borrower from the proper and lawful owner thereof.   Each of such items has been maintained so as to preserve the value thereof from the date of creation or acquisition thereof.   To the extent that any Intellectual Property disclosed on Schedule 5.9 is no longer material to the operations of Borrowers' business, each Borrower shall have the right to no longer maintain such Intellectual Property.

5.10.    Licenses and Permits.   Except as set forth in Schedule 5.10, each Borrower (a) is in compliance with and (b) has procured and is now in possession of, all material licenses or permits required by any applicable federal, state, provincial or local law, rule or regulation for the operation of its business in each jurisdiction wherein it is now conducting or proposes to conduct business and where such non-compliance or the failure to procure such licenses or permits could reasonably be expected to have a Material Adverse Effect.

5.11.    [RESERVED].

5.12.    [RESERVED].

5.13.   [RESERVED].

5.14.   No Labor Disputes.  No Borrower is involved in any labor dispute and there are no strikes or walkouts or union organization of any Borrower's employees threatened (in writing) or in existence, in each case, the existence of which is materially adverse to the Borrowers, taken as a whole, and no labor contract that is a Material Contract is scheduled to expire during the Term other than as set forth on Schedule 5.14 hereto]

5.15.   Margin Regulations.  No Borrower is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect.  No part of the proceeds of any Advance will be used for "purchasing" or "carrying" "margin stock" as defined in Regulation U of such Board of Governors.

5.16.   Investment Company Act.  No Borrower is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

5.17.   Disclosure.  No representation or warranty made by any Loan Party in this Agreement or in the Acquisition Agreement, or in any financial statement, report, certificate or any other document furnished in connection herewith or therewith contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein not misleading.  There is no fact known to any Loan Party or which reasonably should be known to such Loan Party which such Loan Party has not disclosed to Agent in writing which could reasonably be expected to have a Material Adverse Effect.

5.18.   [RESERVED]

5.19.   Delivery of Acquisition Agreement and Sale / Leaseback Documents.  Agent has received complete copies of the Acquisition Agreement, the Sale / Leaseback Documents and related documents, including all exhibits, schedules and disclosure letters referred to therein or delivered pursuant thereto, if any, with respect to each store property acquired thereunder (but not including the transfer and other closing documents other than the closing statements with respect to its acquisitions of stores to the extent required to be delivered under this Agreement) and all amendments thereto, waivers relating thereto and other side letters or agreements affecting the terms thereof.  None of such documents and agreements has been amended or supplemented, nor have any of the provisions thereof been waived, except pursuant to a written agreement or instrument which has heretofore been delivered to Agent.

5.20.   Swaps.  No Borrower is a party to, nor will it be a party to, any swap agreement whereby such Borrower has agreed or will agree to swap interest rates or currencies unless same provides that damages upon termination following an event of default thereunder are payable on an unlimited "two-way basis" without regard to fault on the part of either party.

5.21.   Business and Property of Borrowers.  Upon and after the Closing Date, Borrowers do not propose to engage in any business other than the business of owning and operating

supermarkets and business reasonably ancillary, related or incidental thereto (including but not limited to pharmacies and fuel centers).  On the Closing Date, each Borrower will own all the property and possess all of the rights and Consents necessary for the conduct of the business of such Borrower.

5.22.    Ineligible Securities.  Borrowers do not intend to use and shall not use any portion of the proceeds of the Advances, directly or indirectly, to purchase during the underwriting period, or for 30 days thereafter, Ineligible Securities being underwritten by a securities Affiliate of Agent or any Lender.

5.23.    Federal Securities Laws.  No Borrower or any of their Subsidiaries (a) is required to file periodic reports under the Exchange Act, (b) has any securities registered under the Exchange Act or (c) has filed a registration statement that has not yet become effective under the Securities Act.

5.24.    Equity Interests.  The authorized and outstanding Equity Interests of each Loan Party, and each legal and beneficial holder thereof as of the Closing Date, are as set forth on Schedule 5.24(a) hereto.  All of the Equity Interests of each Loan Party have been duly and validly authorized and issued and are fully paid and non-assessable and have been sold and delivered to the holders hereof in compliance with, or under valid exemption from, all federal and state laws and the rules and regulations of each Governmental Body governing the sale and delivery of securities.  Except for the rights and obligations set forth on Schedule 5.24(b), there are no subscriptions, warrants, options, calls, commitments, rights or agreement by which any Loan Party or any of the members of any Loan Party is bound relating to the issuance, transfer, voting or redemption of shares of its Equity Interests or any pre-emptive rights held by any Person with respect to the Equity Interests of Loan Party.  Except as set forth on Schedule 5.24(c), Loan Party have not issued any securities convertible into or exchangeable for shares of its Equity Interests or any options, warrants or other rights to acquire such shares or securities convertible into or exchangeable for such shares.

5.25.    [RESERVED].

5.26.    [RESERVED].

5.27.    [RESERVED].

5.28.    Credit Card Agreements.  Schedule 5.28 sets forth all Credit Card Agreements of Borrowers. Such Credit Card Agreements constitute all agreements necessary for each Borrower to operate its business as presently conducted with respect to credit cards and debit cards and no Credit Card Receivables of any Borrower arise from purchases by Customers of Inventory with credit cards or debit cards, other than those which are issued by Credit Card Issuers or Credit Card Processors to whom such Borrower has delivered a Processor Letter, and a copy of which Processor Letter such Borrower has delivered to Agent.  Each of the Credit Card Agreements constitutes the legal, valid and binding obligations of the Borrower that is party thereto and, to the best of each Borrower's knowledge, the other parties thereto, enforceable in accordance with their respective terms and each is in full force and effect except to the extent that the same would not reasonably be expected to result in a Material Adverse Effect. Except for the filing of the

Case, no default or event of default, or act, condition or event which after notice or passage of time or both, would constitute a default or event of default under any of the Credit Card Agreements exists or has occurred and is continuing, in any case, that could reasonably be expected to result in a Material Adverse Effect. Each Borrower has complied in all material respects with all of the terms and conditions of the Credit Card Agreements to the extent necessary for such Borrower to be entitled to receive all payments thereunder. Borrowers have delivered, or caused to be delivered to Agent, true, correct and complete copies of all of the Credit Card Agreements in effect as of the Closing Date.

5.29.  <u>Sellers' Lien Laws</u>.

(a)    No Borrower has received any written notice pursuant to any Sellers' Lien Laws from (i) any Farm Products Seller or (ii) any lender to any Farm Products Seller or any other Person with a security interest in the assets of any Farm Products Seller or (iii) the Secretary of State (or equivalent official) or other Governmental Body of any State, Commonwealth or political subdivision thereof in which any Farm Products purchased by such Borrower are produced, in any case advising or notifying such Borrower of the intention of such Farm Products Seller or other Person to preserve the benefits of any trust applicable to any assets of any Borrower established in favor of such Farm Products Seller or other Person under the provisions of any Seller's Lien Law or claiming a Lien upon or other claim or encumbrance with respect to any Farm Products which may be, or have been, purchased by a Borrower or any related or other assets of such Borrower (all of the foregoing, together with any such notices as any Borrower may at any time hereafter receive, collectively, the "<u>Sellers' Lien Law Notices</u>").

(b)    No Borrower has actual knowledge of any credible claim by any Farm Products Seller against any Borrower under any Sellers' Lien Laws. No Borrower is a "live poultry dealer" (as such term is defined in the PSA) or otherwise purchases or deals in live poultry of any type whatsoever. The Borrowers do not purchase livestock pursuant to cash sales as such term is defined in the PSA. No Borrower is engaged in raising, cultivating, propagating, fattening, grazing or any other farming, livestock or agricultural operations.

5.30.  <u>HIPAA Compliance</u>.

(a)    To the extent that and for so long as any Borrower is a "covered entity" or a "business associate" within the meaning of HIPAA, such Borrower (i) has undertaken or will promptly undertake all appropriate surveys, audits, inventories, reviews, analyses and/or assessments (including any required risk assessments) of all areas of its business and operations required by HIPAA; (ii) has developed or will promptly develop an appropriate plan and time line for becoming HIPAA Compliant (a "<u>HIPAA Compliance Plan</u>"); and (iii) has implemented or will implement those provisions of such HIPAA Compliance Plan in all material respects necessary to ensure that such Borrower is or becomes HIPAA Compliant.

(b)    For purposes hereof, "<u>HIPAA Compliant</u>" shall mean that a Borrower (i) is or will be in compliance in all material respects with each of the applicable requirements of the so-called "Administrative Simplification" or other applicable provisions of HIPAA on and as of each date that any part thereof, or any final rule or regulation thereunder, becomes effective in accordance with its or their terms, as the case may be (each such date, a "<u>HIPAA Compliance</u>

Date") and (ii) is not and would not reasonably be expected to become, as of any date following any such HIPAA Compliance Date, the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine or mandated surveys or reviews conducted by any Governmental Body, government health plan or other accreditation entity).

(c)    Each Borrower has entered into a business associate agreement with any third party acting on behalf of the Borrower as a business associate as defined in 45 C.F.R. §160.103, where the failure to enter into such a business associate agreement has or would reasonably be expected to have a Material Adverse Effect.

(d)    Except as set forth on Schedule 5.30(d), no Borrower is a "business associate" of any other Person within the meaning of HIPAA.  To the extent any Borrower is a business associate of any Person, such Borrower has entered into a business associate agreement in accordance with HIPAA.

5.31.    Compliance with Health Care Laws.  Without limiting the generality of Section 5.30, or any other representation or warranty made herein or in any of the Other Documents:

(a)    Each Borrower is in compliance in all material respects with all applicable Health Care Laws, including all Medicare and Medicaid program rules and regulations applicable to them and the requirement of any Third Party Payor. Without limiting the generality of the foregoing, no Borrower has received notice by a Governmental Body of any violation of any provisions of the Medicare and Medicaid Anti-Fraud and Abuse or Anti-Kickback Amendments of the Social Security Act (presently codified in Section 1128(B)(b) of the Social Security Act) or the Medicare and Medicaid Patient and Program Protection Act of 1987.

(b)    Each Borrower has maintained in all material respects all records required to be maintained by the Accreditation Organization (to the extent required thereunder based on Borrowers' business activities), the Food and Drug Administration, Drug Enforcement Agency and State Boards of Pharmacy, the Federal and State Medicare and Medicaid programs and as otherwise required by Health Care Laws or other Applicable Laws.  No Borrower is required to be accredited by any person in order to bill Medicare, Medicaid or other Third Party Payor other than the Accreditation Organization if Borrowers' business activities so require. Each Borrower has all necessary permits, licenses, franchises, certificates and other approvals or authorizations of Governmental Bodies as are required under Health Care Laws and under such HMO or similar licensure laws and such insurance laws and regulations, as are applicable thereto, and with respect to those facilities and other businesses that participate in Medicare and/or Medicaid, to receive reimbursement under Medicare and Medicaid.

(c)    Each Borrower who is a Certified Medicare Provider or Certified Medicaid Provider has in a timely manner filed all requisite reports or claims required to be filed in connection with all Medicare and Medicaid programs or Third Party Payor, all of which are complete and correct in all material respects. There are no claims, actions or appeals pending (and no Borrower has filed any claims or reports which should result in any such claim, actions or appeals) before any Third Party Payor or Governmental Body, including any Medicare/Medicaid Administrative Contractor, or the Administrator of the Centers for Medicare

95

and Medicaid Services, with respect to any Medicare or Medicaid cost reports filed by any Borrower or claims filed by any Borrower challenging any determination made by any of the foregoing. No validation review or program integrity review related to any Borrower has been conducted by any Third Party Payor or Governmental Body in connection with Medicare or Medicaid programs and to Borrowers' knowledge, no such reviews are scheduled, pending or threatened against or affecting any Borrower, any assets of any Borrower, or the consummation of the Transactions.   There currently exist no restrictions, deficiencies, required plans of correction actions or other such remedial measures applicable to any Borrower with respect to federal and state Medicare and Medicaid certifications or licensure.

5.32.   <u>Health Care Law Compliance.</u>

(a)   The Borrowers have obtained all Consents which are required with respect to the ownership and operations of their businesses under any Health Care Laws.

(b)   The Borrowers are in compliance with all Health Care Laws, and if the Borrowers' business activities so require the requirements of any Accreditation Organization, including, but not limited to,   all limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in the Health Care Laws.

(c)   None of the Borrowers has any liabilities, claims against it or presently outstanding notices imposed or based upon any provision of any Health Care Laws, except for such liabilities, claims, citations or notices which individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect.

(d)   No physician has any direct or indirect "financial relationship" that constitutes an "ownership or investment interest" each as defined in 42 CFR 411.354(b) in any Borrower or any Affiliate of any Borrower.

(e)   No Borrower has, or to its knowledge has been threatened to have, and no owner, officer, manager, employee or person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in any Borrower has, engaged in any of the following:   (A) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment under any applicable Laws; (B) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration (1) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by any Healthcare Laws, or (2) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service, or item for which payment may be made in whole or in part by any Healthcare Laws.   No Borrower has been, or to its knowledge has been threatened to be, and no owner, officer, manager, employee or person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in any Borrower:   (A) has had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. §1320a-7a or is the subject of a proceeding seeking to assess such penalty; (B) has been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. §1320a-7b) or is the subject of a proceeding seeking to

96

assess such penalty, or has been "suspended" or "debarred" from selling products to the U.S. government or its agencies pursuant to the Federal Acquisition Regulation, relating to debarment and suspension applicable to federal government agencies generally (48 C.F.R. Subpart 8.4), or other Applicable Laws or regulations; (C) has been convicted (as that term is defined in 42 C.F.R. §1001.2) of any of those offenses described in 42 U.S.C. §1320a-7b or 18 U.S.C. §§669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty; (D) has been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§3729-3731 or qui tam action brought pursuant to 31 U.S.C. §3729 et seq.; (E) has been made a party to any other action by any governmental authority that may prohibit it from selling products to any governmental or other purchaser pursuant to any law; or (F) was or has become subject to any federal, state, local governmental or private payor civil or criminal investigations or inquiries, proceedings, validation review, program integrity review or statement of charges involving and/or related to its compliance with Healthcare Laws or involving or threatening its participation in Medicare, Medicaid or other payor program of any Governmental Authority.

5.33.   Prescription Lists.  Subject to compliance with HIPAA and applicable state laws, there are no limitations or restrictions on the rights of any Borrower to sell, transfer or otherwise assign the Pharmacy Scripts to any third party so long as such third party has the licenses required under applicable state law to operate a pharmacy and sell products subject to a prescription.

VI.   AFFIRMATIVE COVENANTS.

Each Borrower, and, in the case of Sections 6.1, 6.2(b), (c), (d) and (f), 6.4, 6.5, 6.6, 6.11, 6.12, 6.15 and 6.19, each Debtor Guarantor, shall, until payment in full of the Obligations and termination of this Agreement:

6.1.   Compliance with Laws.  Comply in all material respects with all Applicable Laws with respect to the Collateral or any part thereof or to the operation of such Loan Party's business the non-compliance with which could reasonably be expected to have a Material Adverse Effect (except to the extent any separate provision of this Agreement shall expressly require compliance with any particular Applicable Law(s) pursuant to another standard) or materially and adversely affect the prospects of any Approved Bankruptcy Sale.  Without limiting the generality of the foregoing, each Borrower shall comply in all material respects with respect to Applicable Laws relating to sales of tobacco, alcohol, drugs, devices or DMEPOS. Each Loan Party may, however, contest or dispute any Applicable Laws in any reasonable manner, provided that any related Lien is inchoate or stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's Lien on or security interest in the Collateral.

6.2.   Conduct of Business and Maintenance of Existence and Assets.  Subject to any restriction under the Interim Order or the Final Order and to any other prohibition under the Bankruptcy Code, but otherwise in accordance with Applicable Law and the Budget subject to the Permitted Variance, and also, in the case of Debtor Guarantors, without taking (or being required to take) any actions that would cause any of the representations and warranties in Section 5.21(b) to become untrue:  (a) conduct continuously and operate actively its business according to good business practices and maintain all of its properties useful or necessary in its

business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement and except for store closures approved by the Board of Directors or similar governing body of any Borrower), including all Intellectual Property, and take all actions necessary to enforce and protect the validity of any intellectual property right or other right included in the Collateral and necessary for the operation of Borrowers' business; (b) keep in full force and effect its existence; (c) comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; (d) maintain all authorizations necessary and appropriate to own and operate their businesses (including those relating to sales of Inventory comprising tobacco, alcohol, drugs, devices and/or DMEPOS) in full force and effect, except where the failure to so obtain such authorizations or to so keep such authorizations in full force and effect could not be reasonably expected to result in a Material Adverse Change, and (e) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof where the failure to do so could reasonably be expected to have a Material Adverse Effect; and (f) otherwise operate its business consistent with the anticipated terms of any and all Approved Bankruptcy Sales.

6.3.   Books and Records.  Keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs (including without limitation accruals for taxes, assessments, Charges, levies and claims, allowances against doubtful Receivables and accruals for depreciation, obsolescence or amortization of assets), all in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountant as shall then be regularly engaged by Borrowers.

6.4.   Payment of Taxes.  Subject to any restriction under the Interim Order or the Final Order and to any other prohibition under the Bankruptcy Code, but otherwise in accordance with Applicable Law and the Budget subject to the Permitted Variance, pay, when due, all Taxes, assessments and other Charges lawfully levied or assessed upon such Loan Party or any of the Collateral except for any such tax, assessment or other charge which individually or in the aggregate are of de minimis amounts, including real and personal property Taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales Taxes, subject to such Loan Party's right to Properly Contest any of the foregoing.  If any Tax by any Governmental Body is or may be imposed on or as a result of any transaction between any Loan Party and Agent or any Lender which Agent or any Lender may be required to withhold or pay or if any Taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, as determined in Agent's Permitted Discretion, may possibly create a valid Lien on the Collateral, Agent may without notice to Loan Parties pay the Taxes, assessments or other Charges and each Loan Party hereby indemnifies and holds Agent and each Lender harmless in respect thereof.  Agent will not pay any Taxes, assessments or Charges to the extent that any applicable Loan Party has Properly Contested those Taxes, assessments or Charges.  The amount of any payment by Agent under this Section 6.4 shall be charged to Loan Parties' Account as a Revolving Advance maintained as a Domestic Rate Loan and added to the Obligations and, until Loan Parties shall furnish Agent with an indemnity therefor (or supply Agent with evidence satisfactory to Agent that due provision for

98

the payment thereof has been made), Agent may hold without interest any balance standing to Loan Parties' credit and Agent shall retain its security interest in and Lien on any and all Collateral held by Agent.

6.5.    Budget Compliance.

(a)    Disbursements Covenant.  Commencing with first weekly period reflected in the Initial Budget delivered as of the Closing Date, cause Loan Parties' disbursements to be not more than one hundred ten percent (110%) of forecasted disbursements set forth in the Budget (the "Disbursement Variance"), such covenant to be tested on a rolling four week period provided that for the initial three weekly tests such covenant shall be tested against the Budget as follows: (i) for the first week, based on one week forecast and three weeks actual; (ii) for the second week based on two weeks forecast and two weeks actual; and (iii) for the third week based on three weeks forecast and one week actual, in each case, on a cumulative basis; provided, however, that for any such testing period, the Borrowers may increase disbursements by an amount equal to seventy percent (70%) of receipts of the Borrowers from operations in the ordinary course of business at retail stores of Loan Parties (excluding all such receipts from any Planned GOB Sales once the Planned GOB Sales have commenced) in excess of the amount of such receipts set forth in the Budget for the applicable testing period (the "Increase Variance", and together with the Disbursement Variance, the "Permitted Variance").

(b)    Minimum Receipt Covenant.  Commencing with the first weekly period reflected in the Initial Budget delivered as of the Closing Date, cause Loan Parties' receipts to be at least 85% (the "Required Receipts Percentage") of the forecasted receipts as set forth in the Budget, such covenant to be tested on a rolling 4-week basis; provided that for the initial three weekly tests such covenant shall be tested against the Budget as follows: (i) for the first week, based on one week forecast and three weeks actual; (ii) for the second week based on two weeks forecast and two weeks actual; and (iii) for the third week based on three weeks forecast and one week actual, in each case, on a cumulative basis; and further provided to the extent that the receipts are less than Required Receipts Percentage as set forth in the Budget during any 4-week period, but are above Required Receipts Percentage as set forth in the Budget on a cumulative basis for the entire period from the Petition Date through the end of such 4-week period, Loan Parties shall be deemed to be in compliance with this Section 6.5(b).  Notwithstanding anything to the contrary provided for in the foregoing, upon completion of the Planned GOB Sales with respect to substantially all of the Planned GOB Stores, the Required Receipts Percentage shall be reduced to 80%.

6.6.    Insurance.

(a)    (i) Keep all its insurable properties and properties in which such Loan Party has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to such Loan Party's including business interruption insurance; (ii) maintain a bond, or insurance acceptable to Agent in its Permitted Discretion, in such amounts as is customary in the case of companies engaged in businesses similar to such Loan Party insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with

99

others at any time have access to the assets or funds of such Loan Party either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (iii) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (iv) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which such Loan Party is engaged in business; (v) furnish Agent with (A) copies of all policies and evidence of the maintenance of such policies by the renewal thereof prior to the expiration date thereof, and (B) appropriate loss payable endorsements in form and substance reasonably satisfactory to Agent, naming Agent as an additional insured and mortgagee and/or lender loss payee (as applicable) as its interests may appear with respect to all insurance coverage referred to in clauses (i), and (iii) above, and providing (I) that all proceeds thereunder shall be payable to Agent, or if the loss is less than $1,000,000 payable to Agent and the applicable Loan Party, (II) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (III) that such policy and loss payable clauses may not be cancelled or terminated or amended in a manner materially adverse to the Lenders unless at least thirty (30) days (ten (10) days with respect to failure to pay) prior written notice is given to Agent. In the event of any loss thereunder, the carriers named therein hereby are directed by Agent and the applicable Loan Party to make payment for such loss to Agent and not to such Loan Party and Agent jointly. If any insurance losses are paid by check, draft or other instrument payable to any Loan Party and Agent jointly, Agent may endorse such Loan Party's name thereon and do such other things as Agent may deem advisable to reduce the same to cash.

(b)     Each Loan Party shall take all actions required under the Flood Laws and/or reasonably requested by Agent to assist in ensuring that each Lender is in compliance with the Flood Laws applicable to the Collateral, including, but not limited to, providing Agent with the address and/or GPS coordinates of each structure on any real property, if any, that will be subject to a mortgage in favor of Agent, for the benefit of Lenders, and, to the extent required, obtaining flood insurance for such property, structures and contents prior to such property, structures and contents becoming Collateral, and thereafter maintaining such flood insurance in full force and effect for so long as required by the Flood Laws.

(c)     Agent is hereby authorized during the continuance of an Event of Default, to adjust and compromise claims under insurance coverage referred to in Sections 6.6(a)(i) and (iii) and 6.6(b) above. All loss recoveries received by Agent or Loan Parties under any such insurance shall be paid to Agent to be applied to the Obligations in accordance with Section 2.20(d) (except that the continuance of an Event of Default, in which case to be applied in accordance with Section 11.5). Any surplus shall be paid by Agent to Loan Parties or applied as may be otherwise required by law. Any deficiency thereon shall be paid by Loan Parties to Agent, on demand.

6.7.    Payment of Obligations. Subject to any restriction under the Interim Order or the Final Order and to any other prohibition under the Bankruptcy Code, but otherwise in accordance with Applicable Law and the Budget subject to the Permitted Variance, Borrower shall (a) pay when due its rental obligations under all material leases (provided, however, that for purposes of this Section 6.7, any lease pursuant to which any Borrower is permitted to occupy more than two store locations shall be considered material) under which it is a tenant, (b) pay before the same become past due all claims of a material amount of Farm Product Sellers and

100

other suppliers, sellers or agents of Farm Products and perishable Inventory which, if unpaid, could give rise to a claim under any Sellers' Lien Laws, unless the same are being Properly Contested, and (c) otherwise comply, in all material respects, with all other terms of such leases and keep them in full force and effect (provided, however, that no Borrower shall be required to pay and perform under or keep in effect any lease with respect to any store that its Board of Directors determines the continued operation of which is no longer in the best interest of the Borrowers) and, at in each case, at Agent's reasonable request will provide a certification of having done so.

6.8.    <u>Environmental Matters.</u>

(a)    Ensure that all of Borrowers' operations and businesses conducted on the Real Property is done so in material compliance with all applicable Environmental Laws and it shall manage any and all Hazardous Materials on any Real Property in material compliance with applicable Environmental Laws.

(b)    All potential violations and violations of applicable Environmental Laws shall be reviewed with legal counsel to determine any required reporting to applicable Governmental Bodies and any required corrective actions to address such potential violations or violations.

(c)    Respond promptly to any Hazardous Discharge or Environmental Complaint and take all necessary action in order to safeguard the health of any Person and to avoid subjecting the Collateral to any Lien.  If any Borrower shall fail to respond promptly to any Hazardous Discharge or Environmental Complaint or any Borrower shall fail to comply in all material respects with any of the requirements of any applicable Environmental Laws, Agent on behalf of Lenders may, but without the obligation to do so, for the sole purpose of protecting Agent's interest in the Collateral:  (i) give such notices or (ii) enter onto the Real Property (or authorize third parties to enter onto the Real Property) and take such actions as Agent (or such third parties as directed by Agent) deem reasonably necessary or advisable, to remediate, remove, mitigate or otherwise manage with any such Hazardous Discharge or Environmental Complaint.  All reasonable documented out of pocket costs and expenses incurred by Agent and Lenders (or such third parties) in the exercise of any such rights, including any sums paid in connection with any judicial or administrative investigation or proceedings, fines and penalties, together with interest thereon from the date expended at the Default Rate for Domestic Rate Loans constituting Revolving Advances shall be paid upon demand by Borrowers, and until paid shall be added to and become a part of the Obligations secured by the Liens created by the terms of this Agreement or any Other Document.

(d)    In the event that Agent has reason to believe that a Hazardous Discharge has occurred on any Real Property, Borrowers shall, at Agent's request in its Permitted Discretion, provide Agent, at Borrowers' expense, with an environmental site assessment or environmental compliance audit report prepared by an environmental engineering firm acceptable in the reasonable opinion of Agent, in its Permitted Discretion, to assess with a reasonable degree of certainty the existence of a Hazardous Discharge and the potential costs in connection with abatement, remediation and removal of any Hazardous Materials found on, under, at or within the Real Property.  Any report or investigation of such Hazardous Discharge

101

proposed and acceptable to the responsible Governmental Body shall be acceptable to Agent. If such estimates, individually or in the aggregate, exceed $100,000, Agent shall have the right to require Borrowers to post a bond, letter of credit or other security reasonably satisfactory to Agent to secure payment of these costs and expenses.

6.9.    Standards of Financial Statements.  Cause all financial statements referred to in Sections 9.7, 9.9, 9.12, and 9.13 to the extent GAAP is applicable, to be complete and correct in all material respects (subject, in the case of interim financial statements, to normal year-end audit adjustments) and to be prepared in reasonable detail and in accordance with GAAP (to the extent GAAP is applicable) applied consistently throughout the periods reflected therein (except as disclosed therein and agreed to by such reporting accountants or officer, as applicable).

6.10.    Federal Securities Laws.  Promptly notify Agent in writing if any Borrower or any of their Subsidiaries (a) is required to file periodic reports under the Exchange Act, (b) registers any securities under the Exchange Act or (c) files a registration statement under the Securities Act.

6.11.    Execution of Supplemental Instruments.  Execute and deliver to Agent from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as Agent may reasonably request, in order that the full intent of this Agreement may be carried into effect.

6.12.    Exercise of Rights.  Enforce all of its rights under the Acquisition Agreement and any indemnification agreement executed in connection therewith including, but not limited to, all indemnification rights and pursue all remedies available to it with diligence and in good faith in connection with the enforcement of any such rights.

6.13.    Government Receivables.  At the reasonable request of Agent in its Permitted Discretion, take all steps necessary to protect Agent's interest in the Collateral under the Federal Assignment of Claims Act, the Uniform Commercial Code and all other applicable state or local statutes or ordinances and deliver to Agent appropriately endorsed, any instrument or chattel paper connected with any Receivable arising out of any contract between any Borrower and the United States, any state or any department, agency or instrumentality of any of them; provided, however, that Borrowers shall not be required to comply with the Federal Assignment of Claims Act to the extent such Receivables do not exceed $150,000 outstanding in the aggregate.

6.14.    Healthcare Covenants.  (a) Timely file or caused to be timely filed (after giving effect to any extension duly obtained), all material notifications, reports, submissions, Consent renewals, cost reports and other reports or documents of every kind whatsoever required by Healthcare Laws (which reports will be materially accurate and complete in all respects and not misleading in any respect and shall not remain open or unsettled); and

(b)    Maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts that would materially impair the use or operation of any healthcare or other business conducted or hereafter conducted by any Borrower all Consents necessary under all Applicable Laws to carry on the business of Borrowers as it is conducted on the

102

Closing Date (except in the case of any business the Board of Directors or similar governing body of any Borrower determines in its reasonable judgment not to continue).

6.15.    Keepwell.  If it is a Qualified ECP Loan Party, then jointly and severally, together with each other Qualified ECP Loan Party, hereby absolutely unconditionally and irrevocably (a) guarantees the prompt payment and performance of all Swap Obligations owing by each Non-Qualifying Party (it being understood and agreed that this guarantee is a guaranty of payment and not of collection), and (b) undertakes to provide such funds or other support as may be needed from time to time by any Non-Qualifying Party to honor all of such Non-Qualifying Party's obligations under this Agreement or any Other Document in respect of Swap Obligations (provided, however, that each Qualified ECP Loan Party shall only be liable under this Section 6.15 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 6.15, or otherwise under this Agreement or any Other Document, voidable under applicable law, including applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Loan Party under this Section 6.15 shall remain in full force and effect until payment in full of the Obligations and termination of this Agreement and the Other Documents.  Each Qualified ECP Loan Party intends that this Section 6.15 constitute, and this Section 6.15 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of each other Borrower and Guarantor for all purposes of Section 1a(18(A)(v)(II) of the CEA.

6.16.    Farm Products.  Subject to any restriction under the Interim Order or the Final Order and to any other prohibition under the Bankruptcy Code, but otherwise in accordance with Applicable Law and the Budget subject to the Permitted Variance:

(a)    Each Borrower shall at all times comply in all material respects with all existing and future Sellers' Lien Law Notices during their periods of effectiveness under the applicable Sellers' Lien Laws, including, without limitation, directions to make payments to the Farm Products Seller by issuing payment instruments directly to the secured party with respect to any assets of the Farm Products Seller or jointly payable to the Farm Products Seller and any secured party with respect to the assets of such Farm Products Seller, as specified in the Sellers' Lien Law Notice, so as to terminate or release the security interest in any Farm Products maintained by such Farm Products Seller or any secured party with respect to the assets of such Farm Products Seller under the applicable Sellers' Lien Laws.

(b)    Each Borrower shall take all other actions as may be reasonably required, if any, to ensure that any Farm Products are purchased free and clear of any Lien arising under any Sellers' Lien Law.

(c)    Each Borrower shall promptly notify Agent in writing after receipt by or on behalf of such Borrower of any Sellers' Lien Law Notice or amendment to a previous Sellers' Lien Law Notice, and including any notice from any Farm Products Seller of the intention of such Farm Products Seller to preserve the benefits of any trust applicable to any assets of any Borrower or any Guarantor under the provisions of the Sellers Lien Laws or any other Applicable Law and upon the request of the Agent, such Borrower shall promptly provide Agent with a true, correct and complete copy of such Sellers' Lien Law Notice or amendment, as the

103

case may be, and other information delivered to or on behalf of such Borrower pursuant to the Sellers' Lien Laws.

(d)     To the extent that a Borrower purchases any Farm Products from a Person who produces such Farm Products in a state with a central filing system certified by the United States Secretary of Agriculture, such Borrower shall immediately register, as a buyer, with the Secretary of State of such state (or the designated system operator). Each Borrower shall forward promptly to Agent a copy of such registration as well as a copy of all relevant portions of the master list periodically distributed by any such Secretary of State (or the designated system operator). Each Borrower shall comply with any payment of obligations in connection with the purchase of any Farm Products imposed by a secured party as a condition of the waiver or release of a security interest effective under the Food Security Act or other applicable law whether or not as a result of direct notice or the filing under any applicable central filing system. Each Borrower shall also provide to Agent from time to time upon its request true and correct copies of all state filings recorded in any such central filing system in respect of a Person from whom a Borrower has purchased Farm Products within the preceding twelve (12) months.

6.17.   <u>Prescription Lists.</u>  Subject to any restriction under the Interim Order or the Final Order and to any other prohibition under the Bankruptcy Code, but otherwise in accordance with Applicable Law and the Budget subject to the Permitted Variance, with respect to pharmacy business conducted by any Borrower: (a) each Borrower shall at all times maintain the Prescription Lists in a manner consistent in all material respects with the requirements of Federal, state and local laws and regulations, including all Health Care Laws, which Prescription Lists shall be correct and accurate in all material respects; (b) Borrowers shall use, store and maintain the Pharmacy Scripts with all reasonable care and caution and in accordance with applicable standards of any insurance and in conformity with applicable Health Care Laws (including the requirements of HIPAA) in all material respects; (c) each Borrower shall keep the Pharmacy Scripts in good and marketable condition.

6.18.   <u>[RESERVED].</u>

6.19.   <u>Bankruptcy Schedules and Covenants.</u>

(a)     File with the Bankruptcy Court and deliver to Agent, all Schedules of the Loan Parties within the time periods required by the Bankruptcy Court.

(b)     Serve all secured creditors, all judgment creditors (if any), the twenty (20) largest unsecured creditors, the federal and state taxing authorities, any and all Governmental Bodies holding a claim, the PBGC, the Loan Parties' unions, Environmental Protection Agency and any other party claiming an interest in the Collateral in accordance with the Federal Rules of Bankruptcy Procedure a copy of the Motion and Interim Order as approved by the Bankruptcy Court in accordance with the Federal Rules of Bankruptcy Procedure.

(c)     No later than the date of the entry of any sale order by the Bankruptcy Court with respect to the sale of any retail store of any Loan Party, to the extent necessary to facilitate such sale, the Loan Parties shall either (i) have reached agreements in good faith with representatives of their collective bargaining units for relief from collective bargaining

agreements applicable to personnel of such store, or (ii) have obtained entry of an order by the Bankruptcy Court authorizing relief from the Bankruptcy Court pursuant to section 1113 of the Bankruptcy Code.

VII.    NEGATIVE COVENANTS.

Each Loan Party until satisfaction in full of the Obligations and termination of this Agreement:

7.1.    Merger, Consolidation, Acquisition and Sale of Assets.

(a)    Other than as permitted by the terms of this Agreement or in connection with the Acquisition, enter into any merger, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or Equity Interests of any Person or permit any other Person to consolidate with or merge with it.

(b)    Sell, lease, transfer or otherwise dispose of any of its properties or assets, except (i) the sale of Inventory in the Ordinary Course of Business, and (ii) any other sales or dispositions expressly permitted by this Agreement, the Interim Order or the Final Order;

provided, that the Loan Parties may consummate any and all Approved Bankruptcy Sales provided that the net cash proceeds therefrom are remitted to a Blocked Account in accordance with Section 4.08(i) or a local store retail account in accordance with Section 4.08(j), as applicable.

7.2.    Creation of Liens.  Create or suffer to exist any Lien or transfer upon or against any of its property or assets now owned or hereafter created or acquired, except Permitted Encumbrances.

7.3.    Guarantees.  Become liable upon the obligations or liabilities of any Person by assumption, endorsement or guaranty thereof or otherwise (other than to Lenders) except (a) guarantees by one or more Loan Party(s) of the Indebtedness or obligations of any other Loan Party(s) to the extent such Indebtedness or obligations are permitted to be incurred and/or outstanding pursuant to the provisions of this Agreement and (b) the endorsement of checks in the Ordinary Course of Business.

7.4.    Investments.  Purchase or acquire obligations or Equity Interests of, or any other interest in, any Person, other than Permitted Investments.

7.5.    Loans.  Make advances, loans or extensions of credit to any Person, including any Parent, Subsidiary or Affiliate other than Permitted Loans.

7.6.    Capital Expenditures.  Contract for, purchase or make any expenditure or commitments for Capital Expenditures unless and except to the extent expressly provided for in the Budget subject to the Permitted Variance.

7.7.    Dividends.  Declare, pay or make any dividend or distribution on any Equity Interests of any Loan Party (other than dividends or distributions payable in its stock, or split-ups or reclassifications of its stock) or apply any of its funds, property or assets to the purchase,

redemption or other retirement of any Equity Interest, or of any options to purchase or acquire any Equity Interest of any Loan Party other than Permitted Dividends.

7.8.    <u>Indebtedness.</u>  Create, incur, assume or suffer to exist any Indebtedness (exclusive of trade debt) other than Permitted Indebtedness.

7.9.    <u>Nature of Business.</u>  Substantially change the nature of the business in which it is presently engaged (provided that any business that is reasonably ancillary, related or incidental to Loan Parties' present business shall be permitted), nor except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the Ordinary Course of Business for assets or property which are useful in, necessary for and are to be used in its business as presently conducted (or in any business that is reasonably ancillary, related or incidental to Loan Parties' present business).

7.10.    <u>Transactions with Affiliates.</u>  Other than (a) as set forth on Schedule 7.10, including extensions and renewals thereof, (b) [RESERVED], (c) transactions among Loan Parties which are expressly permitted by the terms of this Agreement and which are in the Ordinary Course of Business, and (d) payment by Loan Parties of dividends and distributions permitted under Section 7.7 hereof, if any; <u>provided that</u>, notwithstanding anything to the contrary provided for in this Section 7.10 or Section 7.7, but in all cases subject to Sections 2.21, 6.5 and 7.22, Loan Parties shall be permitted to continue their existing cash management and disbursement practices whereby proceeds of Advances hereunder may be directed by any Borrower to a deposit account of Operations Holdings but only if and to the extent such proceeds are used solely by Operations Holdings to make transfers of funds to deposit accounts of any Borrower and/or to make disbursements to pay obligations of any Borrower (to the extent not inconsistent with Sections 2.21, 6.5 and 7.22 and the other provisions hereof and of the Interim Order and Final Order regarding payments by the Borrowers of Pre-Petition Payments).

7.11.    <u>Real Property.</u>  Permit any Loan Party's assets or any Advances under this Agreement to be utilized to facilitate the purchase, in whole or part, of any Real Property.

7.12.    <u>Subsidiaries.</u>

(a)    Form or acquire any Subsidiary unless such Subsidiary.

(b)    Enter into any partnership, joint venture or similar arrangement.

7.13.    <u>Fiscal Year and Accounting Changes.</u>  Change its fiscal year from annual accounting periods of Loan Parties ending on the dates specified in Loan Parties' reporting calendar (which is based on a 13 period cycle) as in effect on August 21, 2015 or make any substantial change (a) in accounting treatment and reporting practices except as required by GAAP or (b) in tax reporting treatment except as required by law.

7.14.    <u>Pledge of Credit.</u>  Now or hereafter pledge Agent's or any Lender's credit on any purchases, commitments or contracts or for any purpose whatsoever or use any portion of any Advance in or for any business other than Loan Party's business operations as conducted on the Closing Date or as permitted to be conducted by this Agreement.

106

7.15.    <u>Amendment of Organizational Documents.</u>  (i) Change its legal name, (ii) change its form of legal entity (e.g., converting from a corporation to a limited liability company or vice versa), (iii) change its jurisdiction of organization or become (or attempt or purport to become) organized in more than one jurisdiction, or (iv) otherwise amend, modify or waive any term or material provision of its Organizational Documents which would be materially adverse to the Lenders, unless required by law, in any such case without (x) giving at least fifteen (15) days prior written notice of such intended change to Agent, (y) having received from Agent confirmation that Agent has taken all steps necessary for Agent to continue the perfection of and protect the enforceability and priority of its Liens in the Collateral belonging to such Loan Party and in the Equity Interests of such Loan Party and (z) in any case under clause (iv), having received the prior written consent of Agent and Required Lenders to such amendment, modification or waiver if material and adverse to the Agent or the Lenders.

7.16.    <u>Compliance with ERISA.</u>   (i) (x) Maintain, or permit any member of the Controlled Group to maintain, or (y) become obligated to contribute, or permit any member of the Controlled Group to become obligated to contribute, to any Plan, other than those Plans disclosed on Schedule 5.8(d), which schedules may be updated from time to time with the consent of Agent, which consent shall not be unreasonably withheld, conditioned or delayed, (ii) engage, or permit any member of the Controlled Group to engage, in any non-exempt "prohibited transaction", as that term is defined in Section 406 of ERISA or Section 4975 of the Code that could result in a material liability to any Loan Party or any member of the Controlled Group, (iii) terminate, or permit any member of the Controlled Group to terminate, any Plan where such event could result in any material liability of any Loan Party or any member of the Controlled Group or the imposition of a lien on the property of any Loan Party or any member of the Controlled Group pursuant to Section 4068 of ERISA, (iv) incur, or permit any member of the Controlled Group to incur, any material withdrawal liability to any Multiemployer Plan; (v) fail promptly to notify Agent of the occurrence of any Termination Event, (vi) fail to comply, or permit any member of the Controlled Group to fail to comply, with the requirements of ERISA or the Code or other Applicable Laws in respect of any Plan, to the extent such failure is reasonably likely to have a Material Adverse Effect, (vii) fail to meet, permit any member of the Controlled Group to fail to meet, or permit any Plan to fail to meet all minimum funding requirements under ERISA and the Code, without regard to any waivers or variances, or postpone or delay or allow any member of the Controlled Group to postpone or delay any funding requirement with respect to any Plan, or (viii) cause, or permit any member of the Controlled Group to cause, a representation or warranty in Section 5.8(d) to cease to be true and correct.

7.17.    <u>Prepayment of Indebtedness.</u>   At any time, directly or indirectly, prepay any Indebtedness (other than to Lenders), or repurchase, redeem, retire or otherwise acquire any Indebtedness of any Loan Party, other than Indebtedness among or between Loan Parties and/or Operations Holdings.

7.18.    <u>Pharmacy Scripts.</u>   Except in connection with any Approved Bankruptcy Sale, remove any Pharmacy Scripts from the locations set forth in Schedule 4.4(b)(iii), without the prior written consent of Agent (such consent not to be unreasonably withheld or delayed), except for transfers of Pharmacy Scripts in the Ordinary Course of Business (including at the request of customers with respect to such customer's own Pharmacy Scripts).

7.19.   <u>Membership / Partnership Interests</u>.  Designate or permit any of their Subsidiaries to (a) treat their limited liability company membership interests or partnership interests, as the case may be, as securities as contemplated by the definition of "security" in Section 8-102(15) and by Section 8-103 of Article 8 of the Uniform Commercial Code or (b) certificate their limited liability membership interests or partnership interests, as applicable.

7.20.   <u>Credit Card Arrangements</u>.   Enter into new agreements with Credit Card Processors or Credit Card Issuers other than the ones set forth on Schedule 5.28 hereof unless the Borrowing Agent shall have delivered to the Agent appropriate Processor Letters consistent with the provisions of Section 4.8(e) hereof.

7.21.   <u>Consents</u>.  Rescind, withdraw, limit, revoke, materially amend, materially modify, materially supplement, or otherwise materially alter the nature, tenor or scope of any material Consent for any healthcare or other business conducted or hereafter conducted by Loan Parties, without Agent's prior written consent.

7.22.   <u>Use of Proceeds</u>.  Use any proceeds of any Advance hereunder in violation of or for any purpose not permitted under Section 2.21 hereof.

7.23.   <u>Other Agreements</u>.  Enter into any material amendment, waiver or modification of the Acquisition Agreement or the Sale/Leaseback Documents.

7.24.   <u>Bankruptcy Matters.</u>

(a)   Directly or indirectly, seek, consent or suffer to exist: (i) any modification, stay, vacation or amendment to the Interim Order or Final Order, unless the Agent has consented to such modification, stay, vacation or amendment in writing; (ii) entry of any order in the Case that is not, in form and substance, satisfactory to Agent in its Permitted Discretion; (iii) a priority claim for any administrative expense or unsecured claim (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code) equal or superior to the Superpriority Claim of the Secured Parties in respect of the Obligations, except for the Carve-Out; or (iv) any Lien on any Collateral, having a priority equal or superior to the Lien in favor of the Agent in respect of the Obligations (subject to the Permitted Liens (as defined in the Interim Order) and the Carve-Out).

(b)   Prior to the date on which the Obligations have been indefeasibly paid in full in cash and Agent and Lenders' commitment to make Advances has been terminated, the Loan Parties shall not pay any administrative expense claims not provided for in the Budget; <u>provided</u> <u>however</u> that Loan Parties may pay administrative expense claims with respect to (i) Ineligible Professional Expenses in an amount not to exceed $25,000 in the aggregate to pay Allowed Professional Fees of the Creditors' Committee to investigate (but not prosecute) claims against and objections with respect to the Pre-Petition Obligations and pre-petition Liens and security interests of the Agent and the Lenders (including, without limitation, issues regarding validity, perfection, priority, or enforceability of the secured claims of the Agent and the Lenders), (ii) the Carve-Out, (iii) Obligations due and payable hereunder and (iv) Allowed

Professional Fees and Statutory Fees as set forth in the Budget subject to the Permitted Variance allocated to the Loan Parties during the Case.

(c)      Make any material expenditure except of the type and for the purposes provided for in the Budget.

(d)      Amend, modify or supplement the GOB Liquidator Retention Order, Planned GOB Sales Order, the Core Stores Bidding Procedures Order, the Core Stores Sale Order or any final order of the Bankruptcy Court relating to or any agreement providing for an Approved Bankruptcy Sale without the prior written consent of Agent.

VIII.  CONDITIONS PRECEDENT.

8.1.  <u>Conditions to Effectiveness</u>.  The effectiveness of this Agreement, and the agreement of Lenders to make the initial Advances requested to be made on the Closing Date, if any, is subject to the satisfaction, or waiver by Agent, immediately prior to or concurrently with the Closing Date of the following conditions precedent:

(a)      <u>Note</u>.  Agent shall have received the Notes duly executed and delivered by an authorized officer of each Borrower;

(b)      <u>Execution and Delivery of Other Documents</u>.  Agent shall have received, all duly executed and in form and substance reasonably satisfactory to Agent the Other Documents reasonably requested by the Agent to be delivered as of the Closing Date, including without limitation the the Propco Guaranty and the Propco Guaranty Security Agreements (to the extent described in clause (x) of the definition of Propco Guaranty Security Agreements);

(c)      [RESERVED];

(d)      [RESERVED];

(e)      [RESERVED].

(f)      <u>Closing Certificate</u>.  Agent shall have received a closing certificate signed by the President, Chief Financial Officer or other authorized officer reasonably acceptable to Agent of each Borrower dated as of the date hereof, stating that the Specified Representations are true and correct on and as of such date;

(g)      <u>Borrowing Base</u>.  Agent shall have received a Borrowing Base Certificate evidencing the aggregate amount of Eligible Receivables, Eligible Medicare Receivables, Eligible Medicaid Receivables, Eligible Credit Card Receivables, Eligible Pharmacy Inventory, Eligible Prescription Lists and Eligible Inventory is sufficient in value and amount to support Advances in the amount requested by Borrowers on the Closing Date, if any;

(h)      [RESERVED];

(i)      <u>Filings, Registrations and Recordings</u>.  Each document (including any Uniform Commercial Code financing statement) required by this Agreement, any related

agreement or under law or reasonably requested by the Agent to be filed, registered or recorded in order to create, in favor of Agent, a perfected security interest in or lien upon the Collateral shall have been properly filed, registered or recorded in each jurisdiction in which the filing, registration or recordation thereof is so required  or requested, and Agent shall have received an acknowledgment copy, or other evidence reasonably satisfactory to it, of each such filing, registration or recordation and reasonably satisfactory evidence of the payment of any necessary fee, tax or expense relating thereto;

(j)    Secretary's Certificates, Authorizing Resolutions and Good Standings of Borrowers.  Agent shall have received a certificate of the Secretary or Assistant Secretary (or other equivalent officer, partner or manager) of each Borrower in form and substance reasonably satisfactory to Agent dated as of the Closing Date which shall certify (i) copies of resolutions in form and substance reasonably satisfactory to Agent, of the board of directors (or other equivalent governing body, member or partner) of such Borrower authorizing (x) the execution, delivery and performance of this Agreement, the Notes and each Other Document to which such Borrower is a party (including authorization of the incurrence of indebtedness, borrowing of Revolving Advances and Swing Loans and requesting of Letters of Credit on a joint and several basis with all Borrowers as provided for herein), and (y) the granting by such Borrower of the security interests in and liens upon the Collateral to secure all of the joint and several Obligations of Borrowers (and such certificate shall state that such resolutions have not been amended, modified, revoked or rescinded as of the date of such certificate), (ii) the incumbency and signature of the officers of such Borrower authorized to execute this Agreement and the Other Documents, (iii) copies of the Organizational Documents of such Borrower as in effect on such date, complete with all amendments thereto, and (iv) the good standing (or equivalent status) of such Borrower in its jurisdiction of organization and each applicable jurisdiction where the conduct of such Borrower's business activities or the ownership of its properties necessitates qualification, as evidenced by good standing certificate(s) (or the equivalent thereof issued by any applicable jurisdiction) dated not more than 20 days prior to the Closing Date, issued by the Secretary of State or other appropriate official of each such jurisdiction;

(k)    Secretary's Certificates, Authorizing Resolutions and Good Standings of Guarantors.  Agent shall have received a certificate of the Secretary or Assistant Secretary (or other equivalent officer, partner or manager) of each Guarantor in form and substance reasonably satisfactory to Agent dated as of the Closing Date which shall certify (i) copies of resolutions in form and substance reasonably satisfactory to Agent, of the board of directors (or other equivalent governing body, member or partner) of each Guarantor authorizing (x) the execution, delivery and performance of such Guarantor's Guaranty and each Other Document to which such Guarantor is a party and (y) the granting by such Guarantor of the security interests in and liens upon the Collateral to secure its obligations under its Guaranty (and such certificate shall state that such resolutions have not been amended, modified, revoked or rescinded as of the date of such certificate), (ii) the incumbency and signature of the officers of such Guarantor authorized to execute this Agreement and the Other Documents, (iii) copies of the Organizational Documents of such Guarantor as in effect on such date, complete with all amendments thereto, and (iv) the good standing (or equivalent status) of such Guarantor in its jurisdiction of organization and each applicable jurisdiction where the conduct of such Guarantor's business activities or the ownership of its properties necessitates qualification, as evidenced by good standing certificate(s) (or the equivalent thereof issued by any applicable jurisdiction) dated not

110

more than 30 days prior to the Closing Date, issued by the Secretary of State or other appropriate official of each such jurisdiction;

(l)     Legal Opinion.   Agent shall have received the executed legal opinion of Akerman LLP in form and substance reasonably satisfactory to Agent which shall cover such matters incident to the Propco Guarantors and the Propco Guaranty and the Propco Guaranty Security Agreements executed as of the Closing Date as Agent may reasonably require;

(m)     No Litigation.    Other than the filing of the Case, no litigation, investigation or proceeding before or by any arbitrator or Governmental Body shall be continuing or threatened in writing against any Borrower or against the officers or directors of any Borrower (A) in connection with this Agreement, the Other Documents, the Acquisition Agreement or any of the transactions contemplated thereby and which, in the reasonable opinion of Agent, is deemed material or (B) which could, in the reasonable opinion of Agent, have a Material Adverse Effect; and (ii) no injunction, writ, restraining order or other order of any nature adverse to any Borrower or the conduct of its business or inconsistent with the due consummation of the transactions contemplated hereby shall have been issued by any Governmental Body which could, in the reasonable opinion of Agent, have a Material Adverse Effect;

(n)     [RESERVED];

(o)     Fees.  Agent shall have received all fees payable to Agent and Lenders on or prior to the Closing Date hereunder, including pursuant to Article III hereof and the Fee Letter;

(p)     [RESERVED].

(q)     Payment Instructions.   If applicable, Agent shall have received written instructions from Borrowing Agent directing the application of proceeds of the initial Advances made pursuant to this Agreement;

(r)     [RESERVED];

(s)     [RESERVED];

(t)     Bankruptcy Case.    The Case shall have been commenced in the Bankruptcy Court and all of the first day orders entered at the time of commencement of the Case shall be reasonably satisfactory, in form and substance, to Agent and no trustee or examiner shall have been appointed with respect to the Loan Parties, or any of them, or any property of or any estate of any Loan Party;

(u)     Interim Order.    The Interim Order shall have been entered by the Bankruptcy Court on or before September 11, 2015, which Interim Order (i) shall have been entered upon an application or motion of the Loan Parties satisfactory in form and substance to Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent; (ii) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed; and, if the Interim Order is the subject of a

111

pending objection, appeal or motion for reconsideration in any respect, neither the Interim Order, nor the making of the Advances, the issuance, extension or renewal of any Letters of Credit, or the performance by the Loan Parties of any of the Obligations shall be the subject of a presently effective stay, and (iii) shall otherwise satisfy the requirements of the definition of Interim Order set forth herein. The Loan Parties and the Secured Parties shall be entitled to rely in good faith upon the Interim Order notwithstanding any such objection, appeal or motion for reconsideration. Agent may, however, in its sole discretion, defer any obligations of the Secured Parties to make Advances or to issue or to support the issuance of any Letters of Credit until such time as no such objection, appeal or motion for reconsideration is pending and the period for lodging any such objection, appeal or motion for reconsideration has expired;

(v)    Cash Management Order.  A cash management order shall have been entered by the Bankruptcy Court adopting and implementing cash management arrangements, such order and such cash management arrangements provided for therein to be on terms and conditions and in form and substance satisfactory to Agent and each Lender providing any Cash Management Products and Services to Loan Parties, in the sole discretion of each (the "Cash Management Order");

(w)    Financial Consultant and Investment Banker.  Without limiting Section 8.1(t) above, (i) Debtors shall have filed a motion for approval of the continued retention of Alvarez & Marsal as financial consultant to the Debtors, and (ii) Debtors shall have filed a motion for approval of retention of an investment bank reasonably acceptable to Agent (any such investment bank, the "Investment Bank") to render services in connection with Approved Bankruptcy Sales (it being understood Sagent Advisors is reasonably acceptable to Agent and Lenders);

(x)    Budget.  Agent shall have received and approved the Budget.

8.2.    Conditions to Each Advance.  The agreement of Lenders to make any Advance (including the initial Advances) requested to be made on any date, is subject to the satisfaction of the following conditions precedent as of the date such Advance is made:

(a)    Representations and Warranties.  Each of the representations and warranties made by any Borrower in or pursuant to this Agreement and the Other Documents and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement or the Other Documents shall be true and correct in all respects on and as of such date as if made on and as of such date (except to the extent any such representation or warranty expressly relates only to any earlier and/or specified date);

(b)    No Default.  No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date; provided, however that Agent in its sole discretion may continue to make Advances notwithstanding the existence of an Event of Default or Default and (B) pursuant to Section 16.2(f), Agent, in its Permitted Discretion, may, continue to make Advances notwithstanding the existence of an Event of Default or Default, and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default;

112

(c)    <u>Maximum Advances</u>.  In the case of any type of Advance requested to be made, after giving effect thereto, the aggregate amount of such type of Advance shall not exceed the maximum amount of such type of Advance permitted under this Agreement; an

(d)    <u>Material Adverse Effect</u>.  No Material Adverse Effect shall have occurred since the Closing Date or would occur after giving pro forma effect to the making of such Advance;

(e)    <u>Interim Order/Final Order</u>.  The Interim Order, or, after the entry of the Final Order, the Final Order, shall be in full force and effect and shall not be the subject of any appeal, motion for reconsideration, stay, order of reversal, amendment or modification.

Each request for an Advance by any Borrower hereunder shall constitute a representation and warranty by each Borrower as of the date of such Advance that the conditions contained in this subsection shall have been satisfied.

IX.    INFORMATION AS TO BORROWERS.

Each Borrower shall, or (except with respect to Section 9.11) shall cause Borrowing Agent on its behalf to, until satisfaction in full of the Obligations and the termination of this Agreement:

9.1.    <u>Disclosure of Material Matters.</u>

(a)    [RESERVED]

(b)    With reasonable promptness (and in any event at least once a week), notify Agent of and provide Agent copies of the closing statements with respect to each store acquired pursuant to the Acquisition prior to such notice.

9.2.    <u>Schedules.</u>

(a)    Deliver to Agent:

(i)    Deliver to Agent on or before Tuesday of each week, (1) accounts receivable (including Credit Card Receivables), (2) accounts payable schedules, (3) updates related to Inventory sales for the prior week, which shall be utilized to adjust the Inventory values on the then current Borrowing Base Certificate, (4) [RESERVED], (5) a Borrowing Base Certificate in form and substance satisfactory to Agent (which shall be calculated as of the last day of the prior week and which shall not be binding upon Agent or restrictive of Agent's rights under this Agreement) (provided that notwithstanding anything to the contrary contained in this Agreement, Agent shall not apply cash collections to the reduce the Formula Amount between delivery of Borrowing Base Certificates), and (6) a schedule of all outstanding trade and commercial Letters of Credit reconciled against Borrowers' Inventory.

(b)    In addition, each Borrower will deliver to Agent at such intervals as Agent may reasonably require using Agent's Permitted Discretion: such further schedules, documents and/or information regarding the Collateral as Agent may require including trial balances and test verifications.  Agent shall have the right to confirm and verify all Receivables by any

manner and through any medium it considers advisable and do whatever it may deem reasonably necessary to protect its interests hereunder. The items to be provided under this Section 9.2 are to be in form reasonably satisfactory to Agent and executed by Borrowing Agent on behalf of each Borrower and delivered to Agent from time to time solely for Agent's convenience in maintaining records of the Collateral, and any Borrower's failure to deliver any of such items to Agent shall not affect, terminate, modify or otherwise limit Agent's Lien with respect to the Collateral. Unless otherwise agreed to by Agent, the items to be provided under this Section 9.2 shall be delivered to Agent by the specific method of Approved Electronic Communication designated by Agent, or other method designated by Agent in writing from time to time.

(c)     Deliver to Agent on or before the twenty-eighth (28th) day following the end of each of Borrowers' 13 fiscal month reporting periods, (i) [RESERVED], (ii) accounts receivable (including Credit Card Receivables) ageings inclusive of reconciliations to the general ledger, (iii) accounts payable schedules inclusive of reconciliations to the general ledger and (iv) Inventory reports

9.3.     Environmental Reports.

(a)     [RESERVED].

(b)     In the event any Borrower obtains, gives or receives notice of any Release or threat of Release of a reportable quantity of any Hazardous Materials at the Real Property (any such event being hereinafter referred to as a "Hazardous Discharge") or receives any notice of material violation, request for information or notification that it is potentially responsible for investigation or cleanup of any materially adverse environmental conditions at the Real Property, demand letter or material complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of applicable Environmental Laws affecting the Real Property or any Borrower's interest therein or the operations or the business of such Borrower (any of the foregoing is referred to herein as an "Environmental Complaint") from any Person, including any Governmental Body, then Borrowing Agent shall, within five (5) Business Days, give written notice of same to Agent detailing facts and circumstances of which any Borrower is aware giving rise to the Hazardous Discharge or Environmental Complaint. Such information is to be provided to allow Agent to protect its security interest in and Lien on the Collateral and is not intended to create nor shall it create any obligation upon Agent or any Lender with respect thereto.

(c)     Borrowing Agent shall promptly forward to Agent copies of any request for information, notification of potential material liability, demand letter relating to potential responsibility with respect to the investigation or cleanup of Hazardous Materials at any other site owned, operated or used by any Borrower to dispose of Hazardous Materials and shall continue to forward copies of correspondence between any Borrower and the Governmental Body regarding such claims to Agent until the claim is settled. Borrowing Agent shall promptly forward to Agent copies of all documents and reports concerning a Hazardous Discharge or Environmental Complaint at the Real Property, operations or business that any Borrower is required to file under any applicable Environmental Laws. Such information is to be provided solely to allow Agent to protect Agent's security interest in and Lien on the Collateral.

114

9.4.    <u>Litigation.</u>   Promptly notify Agent in writing of any claim, litigation, suit or administrative proceeding affecting any Borrower or any Guarantor, whether or not the claim is covered by insurance, and of any litigation, suit or administrative proceeding, which in any such case affects any material portion of the Collateral or which could reasonably be expected to have a Material Adverse Effect.

9.5.    <u>Material Occurrences.</u>   Promptly (but in any event within five (5) Business Days) notify Agent in writing upon the occurrence of: (a) any Event of Default or Default; (b) any default or event of default under any Sale / Leaseback Document or notice that any property has been excluded as a property to be purchased by the "purchaser" under any Sale / Lease Back Document; (c) any event, development or circumstance whereby any financial statements or other reports furnished to Agent fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of any Borrower as of the date of such statements; (d) any funding deficiency which, if not corrected as provided in Section 4971 of the Code, could subject any Borrower or any member of the Controlled Group to a tax imposed by Section 4971 of the Code; (e) each and every default by any Borrower which might result in the acceleration of the maturity of any Indebtedness in excess of $2.000,000, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated, and the amount of such Indebtedness; and (f) any other development in the business or affairs of any Borrower or any Guarantor, which could reasonably be expected to have a Material Adverse Effect; in each case describing the nature thereof and the action Borrowers propose to take with respect thereto.

9.6.    <u>Government Receivables.</u>   Other than for any Medicare Receivables or Medicaid Receivables, notify Agent promptly if any of its Receivables arise out of contracts between any Borrower and the United States, any state, or any department, agency or instrumentality of any of them.

9.7.    <u>[RESERVED].</u>

9.8.    <u>Reserved.</u>

9.9.    <u>Monthly Financial Statements.</u>   Furnish Agent and Lenders within thirty (30) days after the end of each fiscal month, an unaudited balance sheet of Operations Holdings on a consolidating and consolidated basis and unaudited statements of income and stockholders' equity and cash flow of Operations Holdings on a consolidating and consolidated basis reflecting results of operations from the beginning of the fiscal year to the end of such fiscal month and for such fiscal month, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to normal and recurring year-end adjustments that individually and in the aggregate are not material to Borrowers' business operations and commencing March 31, 2016 setting forth in comparative form the respective financial statements for the corresponding date and period in the previous fiscal year, subject to any adjustments to presentation as reasonably required by Sponsor.

9.10.   Other Reports.  Furnish Agent as soon as available, but in any event within ten (10) days after the issuance thereof, with copies of such financial statements, reports and returns as each Borrower shall send to its stockholders or members generally.

9.11.   Additional Information.  Furnish Agent with such additional information as Agent shall reasonably request in order to enable Agent to determine whether the terms, covenants, provisions and conditions of this Agreement and the Notes have been complied with by Borrowers including, without the necessity of any request by Agent, (a) copies of all environmental audits and reviews in Borrower's possession and related to Real Property acquired other than pursuant to the Acquisition Agreement, (b) at least fifteen (15) days prior thereto, notice of any Borrower's opening of any new office or place of business (other than stores to be acquired pursuant to the Acquisition Agreement) or any Borrower's closing of any existing office or place of business, and (c) promptly upon any Borrower's learning thereof, notice of any labor dispute to which any Borrower may become a party, any strikes or walkouts relating to any of its plants or other facilities.

9.12.   Budget.  Furnish Agent and Lenders, no less frequently than every four weeks commencing on October 6, 2015, or within five (5) Business Days of any change in the anticipated schedule regarding the Planned GOB Sales as contemplated by the Initial Budget or any change in the intended methodology for payment to any liquidator to be retained for the Planned GOB Sales from the methodology anticipated by the Initial Budget, a proposed updated budget for the thirteen-week period following the date of delivery, which shall be in substantially the same form and detail of the Initial Budget, and accompanied by a certificate signed by an Authorized Officer of the Borrowers to the effect that such Budget has been prepared in good faith based upon assumptions which the Borrowers believe to be reasonable in light of the conditions existing at the time of delivery thereof and that such officer has no reason to question the reasonableness of any material assumptions on which such projections were prepared (it being understood and agreed that the Borrowers may (but are not required to) furnish one or more proposed updated 13-week budgets more frequently than every four weeks); provided that, such proposed budget shall become the "Budget" as defined and for all purposes hereunder and under the Interim Order and (upon entry of the Final Order) the Final Order upon approval thereof by Agent and Required Lenders in their sole discretion following a reasonable opportunity to review and comment thereon.

9.13.   Budget Variance Reporting.  Deliver to Agent on or before Wednesday of each week, a comparison of actual receipts and disbursements and actual Advances outstanding hereunder and under the Pre-Petition Credit Agreement to projected receipts and disbursements and projected Advances outstanding hereunder and under the Pre-Petition Credit Agreement of the prior week in a form substantially similar to that attached as Exhibit C hereto.  In addition, Loan Parties shall, and shall cause their financial consultant Alvarez and Marsal to attend calls no less than once a week to discuss the Borrowers' businesses and the status of the Case with Agent, Lenders and Agent's advisors.

9.14.   Notice of Suits, Adverse Events.  Furnish Agent with prompt written notice of (i) any lapse or other termination of any Consent issued to any Borrower by any Governmental Body or any other Person that is material to the operation of any Borrower's business taken as a whole, (ii) any refusal by any Governmental Body or any other Person to renew or extend any

074658.14086/101390412v.6

such Consent except where the failure of such Governmental Body to renew or extend any such Consent could not reasonably be expected to result in a Material Adverse Effect or in any way materially or adversely impair the Collateral or Agent's Liens in the Collateral; (iii) the receipt of any written notice from a supplier, seller, or agent pursuant to the Food Security Act, PACA or PSA of the intention of such Person to preserve the benefits of any trust applicable to any assets of any Borrower under the provisions of PACA, the PSA, the Food Security Act or any other Applicable Law and such Borrower shall promptly provide Agent with a true, correct and complete copy of such notice and other information delivered to or on behalf of such Borrower, (iii) receipt by Borrowers of any notification that a complaint, petition or other written notice has been filed with a USDA field office or PACA branch regional office asserting that any Borrower has failed to comply with the prompt payment provisions or has otherwise violated PACA, and (iv) copies of any periodic or special reports filed by any Borrower or any Guarantor with any Governmental Body or Person, if such reports indicate any material change in the business, operations, affairs or condition of any Borrower or any Guarantor, or if copies thereof are requested by Lender, and (iv) copies of any notices and other communications from any Governmental Body or Person which specifically relate to any Borrower or any Guarantor and is material to the Borrowers' business operations, taken as a whole.

9.15.    ERISA Notices and Requests.    Furnish Agent with prompt written notice in the event that (i) any Borrower or any member of the Controlled Group knows or has reason to know that a Termination Event has occurred, together with a written statement describing such Termination Event and the action, if any, which such Borrower or any member of the Controlled Group has taken, is taking, or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, Department of Labor or PBGC with respect thereto; (ii) any Borrower or any member of the Controlled Group knows or has reason to know that a prohibited transaction (as defined in Section 406 of ERISA or 4975 of the Code) has occurred that could result in a material liability to any Borrower or member of the Controlled Group together with a written statement describing such transaction and the action which such Borrower or any member of the Controlled Group has taken, is taking or proposes to take with respect thereto; (iii) a funding waiver request has been filed with respect to any Plan maintained by any Borrower or any member of the Controlled Group together with all communications received by any Borrower or any member of the Controlled Group with respect to such request; (iv) any material increase in the benefits of any existing Plan that Borrowers have knowledge of or the establishment of any new Plan or the commencement of contributions to any Plan to which any Borrower or any member of the Controlled Group was not previously contributing shall occur; (v) any Borrower or any member of the Controlled Group shall receive from the PBGC a notice of intention to terminate a Plan or to have a trustee appointed to administer a Plan, together with copies of each such notice; (vi) any Borrower or any member of the Controlled Group shall receive any unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Plan under Section 401(a) of the Code, together with copies of each such letter; (vii) any Borrower or any member of the Controlled Group shall receive a notice regarding the imposition of a material withdrawal liability, together with copies of each such notice; (viii) any Borrower or any member of the Controlled Group shall fail to make a required installment or any other required payment under the Code or ERISA to a Plan on or before the due date for such installment or payment; or (ix) any Borrower or any member of the Controlled Group knows that (a) a Multiemployer Plan has been terminated, (b) the administrator or plan sponsor of a Multiemployer Plan intends to terminate a Multiemployer Plan, (c) the

117

PBGC has instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multiemployer Plan or (d) a Multiemployer Plan is subject to Section 432 of the Code or Section 305 of ERISA.

9.16.    [Reserved].

9.17.    Updates to Certain Schedules.  Deliver to Agent, as shall be required to maintain the related representations and warranties as true and correct in all material respects, updates to the disclosure schedules; provided however that Borrowers shall not update Schedules 1.2(a), 1.2(b), 5.8(b)(i), 5.8(b)(ii) (other than the addition of Permitted Indebtedness), or 7.10 without Agent's prior written consent (which in the case of Schedule 1.2(b) shall not be unreasonably withheld). Any such updated Schedules delivered by Borrowers to Agent in accordance with this Section 9.17 shall automatically and immediately be deemed to amend and restate the prior version of such Schedule previously delivered to Agent and attached to and made part of this Agreement.

9.18.    Financial Disclosure.  To the extent that Agent requests any financial statements, trial balances or other accounting records of any sort from Borrowers and Borrowers fail to promptly deliver such financial statements, trial balances or other accounting records, or an Event of Default has occurred and is continuing, each Borrower hereby irrevocably authorizes and directs all accountants and auditors employed by such Borrower at any time during the Term to exhibit and deliver to Agent and each Lender copies of any of such Borrower's financial statements, trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to Agent and each Lender any information such accountants may have concerning such Borrower's financial status and business operations.  Each Borrower hereby authorizes all Governmental Bodies to furnish to Agent and each Lender copies of reports or examinations relating to such Borrower, whether made by such Borrower or otherwise; however, Agent and each Lender will attempt to obtain such information or materials directly from such Borrower prior to obtaining such information or materials from such accountants or Governmental Bodies.

9.19.    Other Bankruptcy Documents.  Deliver to Agent: (a) contemporaneous with the filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Loan Parties in the Case, with copies of such papers and documents also provided to or served on Agent's counsel; (b) contemporaneous with the receipt and/or execution thereof, copies of all letters of intent, expressions of interest, and offers to purchase with respect to any of the Collateral. (c) contemporaneously with delivery thereof to the Creditors' Committee or any other official or unofficial creditors' committee in the Case, copies of all material written reports and all term sheets for a Reorganization Plan or any sale under Section 363 of the Bankruptcy Code given by the Loan Parties to the Creditors' Committee or any other official or unofficial creditors' committee in the Case, with copies of such reports and term sheets also provided to or served on Agent's counsel; and (d) projections, operating plans and other financial information and information, reports or statements regarding the Loan Parties, their business and the Collateral as Agent may from time to time reasonably request.

X.      EVENTS OF DEFAULT.

The occurrence of any one or more of the following events shall constitute an "Event of Default":

10.1.    <u>Nonpayment</u>.   Failure by any Borrower to pay when due (a) any principal or interest on the Obligations (including without limitation pursuant to Section 2.9), or (b) any other fee, charge, amount or liability provided for herein or in any Other Document, in each case whether at maturity, by reason of acceleration pursuant to the terms of this Agreement, by notice of intention to prepay or by required prepayment; provided, however, such failure to make any payment with respect to any payment, fee or charge provided for herein (other than with respect to principal or interest) shall not be an Event of Default unless such failure continues for three (3) Business Days (it being acknowledged and agreed that such grace period shall not prevent Agent from charging Borrowers' Account or making Advances as provided in Section 2.8(c) hereof or otherwise in accordance with this Agreement for such amount on the date such obligation becomes due and owing);

10.2.    <u>Breach of Representation</u>.   Except as provided in Section 10.18, any representation or warranty made or deemed made by any Borrower or any Guarantor in this Agreement, any Other Document or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith shall prove to have been incorrect or misleading in any material respect on the date when made or deemed to have been made;

10.3.    <u>Financial Information</u>.   Failure by any Borrower to (i) furnish financial information set forth in Sections 9.2, 9.9, 9.10, 9.12 or 9.13 when due, or (ii) permit the inspection of its books or records or access to its premises for audits and appraisals in accordance with the terms hereof;

10.4.    <u>Judicial Actions</u>.   Issuance by a court or other Governmental Body of a notice of Lien, levy, assessment, injunction or attachment (a) against any Borrower's Inventory or Receivables or (b) against a material portion of any other Collateral which is not stayed or lifted within thirty (30) days, unless a Permitted Encumbrance;

10.5.    <u>Noncompliance</u>.  Except as otherwise provided for in Sections 10.1, 10.3, 10.5(ii), 10.18, and 10.19, (i) failure or neglect of any Borrower, any Guarantor or any Person to perform, keep or observe any term, provision, condition or covenant contained in Sections 2.21, 4.5, 4.8(d), 6.2(b) or (c), 6.5, Article VII, 9.1 or 9.15, or (ii) failure or neglect of any Borrower or any Guarantor to perform, keep or observe any other term, provision, condition or covenant, contained herein or any Other Document which is not cured within twenty five (25) days from the occurrence of such failure or neglect;

10.6.    <u>Judgments</u>.  Any (a) judgment or judgments, writ(s), order(s) or decree(s) for the payment of money are rendered against any Borrower or any Guarantor for an aggregate amount in excess of $250,000 or against all Borrowers or Guarantors for an aggregate amount in excess of $250,000 (in each case, not covered by valid and enforceable insurance) and (b) (i) action shall be legally taken by any judgment creditor to levy upon assets or properties of any Borrower or any Guarantor to enforce any such judgment, (ii) such judgment shall remain undischarged for a period of thirty (30) consecutive days during which a stay of enforcement of such judgment, by

119

reason of a pending appeal or otherwise, shall not be in effect, or (iii) any Liens arising by virtue of the rendition, entry or issuance of such judgment upon assets or properties of any Borrower or any Guarantor shall be senior to any Liens in favor of Agent on such assets or properties (unless such seniority and Lien would be permitted as a Permitted Encumbrance);

10.7.    <u>Bankruptcy Defaults and Events of Default.</u>

(a)    the Bankruptcy Court shall enter any order (i) revoking, reversing, staying, vacating, rescinding, modifying, supplementing or amending (x) the Interim Order, the Final Order, the Cash Management Order, the GOB Liquidator Retention Order, Planned GOB Sales Order, the Core Stores Bidding Procedures Order, the Core Stores Sale Order, this Agreement, the Pre-Petition Loan Documents or any Other Document, or (y) any other "first day" orders to the extent such revocation, reversal, stay, vacation, rescission, modification, supplement or amendment is materially adverse to the interests of Secured Parties, or (ii) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Loan Party equal or superior to the priority of the Agent and Lenders in respect of the Obligations, or there shall arise any such Superpriority Claim, or (iii) to grant or permit the grant of a Lien on the Collateral superior to, or pari passu with, the Liens of Agent on the Pre-Petition Collateral or the Collateral (other than the Permitted Liens (as defined in the Interim Order), the Carve-Out);

(b)    the Bankruptcy Court shall enter any order (i) appointing a Chapter 11 trustee under Section 1104 of the Bankruptcy Code in the Case, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in the Case, (iii) appointing a fiduciary or representative of the estate with decision-making or other management authority over some or all of any Loan Party's senior management, (iv) substantively consolidating the estate of any Loan Party with the estate of any other Person, (v) dismissing the Case or converting the Case to a Chapter 7 case; or (vi) approving a sale of substantially all of the assets of the Borrowers and/or of the Loan Parties or any sale of the Core Stores which order does not provide that upon consummation of such sale, all of the Obligations shall be indefeasibly paid and satisfied in full and which shall otherwise be reasonable satisfactory to Agent, and in connection with such sale order, Secured Parties shall not have received a release (on terms and conditions and in form and substance satisfactory to Agent in its sole discretion) of Secured Parties in full from all claims of the Loan Parties and their estates on or before the entry of such sale order;

(c)    this Agreement, any of the Other Documents, the Interim Order or the Final Order for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction, or any of the Loan Parties shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Loan Party) any other Person's motion to, disallow in whole or in part the Secured Parties' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of any Secured Party;

(d)      any Loan Party files a motion with the Bankruptcy Court asserting that the Secured Parties do not have a right to, or supports a motion filed with the Bankruptcy Court that asserts the Secured Parties do not have the right to, credit bid for any assets of the Loan Parties in connection with any sale pursuant to Section 363(k) of the Bankruptcy Code;

(e)      the Bankruptcy Court shall enter any order granting relief from the automatic stay to any creditor holding or asserting a Lien, reclamation claim or other rights on the assets of any Loan Party having a value in excess of $250,000 in the aggregate;

(f)      any application for any of the orders described in clauses (a), (b), (c) or (d) above shall be made and, if made by a Person other than a Loan Party, such application is not being diligently contested by such Loan Party in good faith;

(g)      except (i) as permitted by the Interim Order or Final Order and set forth in the Budget, or (ii) as otherwise agreed to by Agent in writing, and approved by all necessary Bankruptcy Court orders/approvals, any Loan Party shall make any Pre-Petition Payment (including, without limitation, related to any reclamation claims) following the Closing Date; provided further, with respect to any Pre-Petition Payment in respect to employee "PTO" as specified in the Budget, Loan Parties shall not seek the approval of the Bankruptcy Court to pay any such Pre-Petition Payment unless prior to doing so Loan Parties have provided at least 21-days' notice to Agent and Lenders (with notice shall include a detailed reconciliation or breakdown of the amount of PTO priority under 507(a)(4) and (a)(5) of the Bankruptcy Code and earned within 180 days of the filing date and the amount earned prior to 180 days and treated as a prepetition general unsecured non-priority claims, and breakdown of all such "PTO" liabilities as between sick days/time and vacation days/time) and Loan Parties have received consent of Agent and Required Lenders; provided further that nothing in this paragraph (g) shall prevent Loan Parties from paying any such Pre-Petition Payment in respect of employee "PTO" upon an order of the Bankruptcy Court that is entered not on any request or motion of Loan Parties for such an order for such a Pre-Petition Payment and over the objection of Loan Parties;

(h)      any Loan Party shall be unable to pay its post-petition debts as they mature, shall fail to comply with any order of the Bankruptcy Court in any material respect, or shall fail to make, as and when such payments become due or otherwise;

(i)      the period covered by the Budget shall expire without the Budget being updated pursuant to Section 9.12 prior to such expiration;

(j)      any Loan Party shall file a motion in the Case (i) to use cash Collateral under Section 363(c) of the Bankruptcy Code without Agent's prior written consent except to the extent expressly permitted in the Interim Order, (ii) to sell a material portion of the assets of any Loan Party, or the sale of any Store(s) of any Loan Party without Agent's prior written consent, (iii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code, (iv) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under this Agreement, unless such motion and additional financing shall provide that upon initial closing and consummation of such financing, that upon consummation of such sale, all of the

Obligations shall be indefeasibly paid and satisfied in full and Secured Parties receive a release (on terms and conditions and in form and substance satisfactory to Agent in its sole discretion) of Secured Parties in full from all claims of the Loan Parties and their estates, or (v) to take any other action or actions adverse to Secured Parties or their rights and remedies hereunder or under any of the Other Documents or Secured Parties interest in any of the Collateral;

(k)    a Reorganization Plan is filed in the Case by one or more of the Loan Parties which does not contain provisions for termination of Agent's and Lenders' commitment to make Advances hereunder and indefeasible payment in full in cash of all Obligations and the release of the Secured Parties (on terms and conditions and in form and substance satisfactory to Agent) in full from all claims of the Loan Parties and their estates, in each case, on or before, and the continuation of the Liens and security interests granted to Agent until, the effective date of such Reorganization Plan, or (ii) an order shall be entered by the Bankruptcy Court confirming a Reorganization Plan in the Case which does not contain provisions for termination of Agent's and Lenders commitment to make Advances hereunder and indefeasible payment in full in cash of all Obligations and the release of the Secured Parties (on terms and conditions and in form and substance satisfactory to Agent) in full from all claims of the Loan Parties and their estates on or before, and the continuation of the Liens and security interests granted to Agent until, the effective date of such Reorganization Plan upon entry thereof;

(l)    the expiration or termination of the "exclusive period" of the Loan Parties under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization;

(m)    any Loan Party engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the credit facility provided hereunder or the Pre-Petition Loan Documents or the liens on or security interest in the assets of the Loan Parties securing the Obligations or (ii) any Loan Party engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against Secured Parties; provided, however, that it shall not constitute an Event of Default if any Loan Party provides information with respect to the Pre-Petition Loan Documents to a party in interest or is compelled to provide information by an Order of the Bankruptcy Court and provides prior written notice to the Agent and the Lenders of any intention or requirement to do so;

(n)    the termination or rejection of any contract of any Loan Party which would reasonably be expected to result in a Material Adverse Effect;

(o)    any of the following (i) the Loan Parties shall fail to obtain all necessary Bankruptcy Court orders(s) (each such order to be on terms and conditions and in form and substance acceptable to Agent) (collectively, the "GOB Liquidator Retention Order") to allow Loan Parties to retain a liquidator for the purpose of conducting "going out of business sales" and/or liquidations of Inventory and other assets with respect to retail store locations of Loan Parties, other than the Core Stores and/or shall fail to enter into a definitive agreement on terms and conditions and in form and substance acceptable to Agent and Required Lenders with such a liquidator reasonably acceptable to Agent and Required Lenders in accordance with the terms of such GOB Liquidator Retention Order (any such liquidator, the "GOB Liquidator", and any such agreement, the "Planned GOB Stores Liquidator Agreement"), in either case prior to September

18, 2015, (ii) the Loan Parties shall fail to file a motion on or before September 22, 2015 requesting approval to conduct, through the GOB Liquidator, "going out of business sales" with respect to and/or liquidate the Inventory and other property and assets located at an identified list of retail stores (which list shall in number and content be acceptable to and approved by Agent and Required Lenders) (such retail stores as approved by Agent and Required Lenders, the "Planned GOB Stores"; and such "going out of business sales" with respect thereto, the "Planned GOB Sales"), (iii) the Loan Parties shall fail to obtain an order of the Bankruptcy Court on terms and conditions and in form and substance reasonably acceptable to Agent approving the Planned GOB Sales (the "Planned GOB Sales Order") or before October 13, 2015, or (iv) the GOB Liquidator shall have failed to commence the "going out of business sales" at substantially all of the Planned GOB Stores in accordance with the Planned GOB Stores Liquidator Agreement on or before October 14, 2015;

(p)      on or before October 28, 2015, the Loan Parties shall fail to receive and pay over to Agent for application to the Obligations in accordance with this Agreement and the Interim Order and Final Order net cash proceeds from the purchase price and all other cash consideration payable to Loan Parties in connection with one or more Approved Prescription List Sales (not including any sales of Pharmacy Lists pursuant to any asset purchase agreement or similar instrument or similar instrument or transfer or assignment entered into by any Loan Party prior to the Petition Date), each of which sales shall have been approved by appropriate orders of the Bankruptcy Court under Section 363 of the Bankruptcy Code and which orders shall be on terms and conditions and in form and substance reasonably satisfactory to the Agent, in a minimum aggregate amount for all such sales of not less than $30,000,000 (the Approved Prescription List Sales satisfying this Section 10.7(p), the "Liquidity Pharmacy Sales", and the total aggregate amount of net cash proceeds paid to Loan Parties in connection with such Liquidity Pharmacy Sales and applied to the Obligations in accordance with this Agreement and the Interim Order and the Final Order, including any and all Allocated Combined Pharmacy Proceeds, the "Aggregate Liquidity Pharmacy Proceeds"); provided, however, in the event that Loan Parties enter into any one or more sales of assets (other than Approved GOB Sales or an Approved Core Stores Sale (or other sale of any leasehold interests, Inventory or other assets used in the operation of the Core Stores business)) consisting of both Pharmacy Lists and Non-Core Leasehold Interests (and which may include other assets incidental thereto) pursuant to Section 363 of the Bankruptcy Code, each of which such sales shall have been approved by appropriate orders of the Bankruptcy Court under Section 363 of the Bankruptcy Code and which orders shall be on terms and conditions and in form and substance reasonably satisfactory to the Agent (each a "Combined Sale"), the Loan Parties and the Agent (subject to approval from the Required Lenders) shall work together in good faith to allocate the net cash proceeds of such Combined Sale appropriately between the portion thereof attributable to the Pharmacy Lists sold as part of such Combined Sale and the portion thereof attributable to the Non-Core Leasehold Interests and other assets sold as part of such Combined Sale, and upon any such allocation agreed to by the Loan Parties and the Agent (subject to approval from the Required Lenders), the amount of the net cash proceeds of such Combined Sale allocated to the Pharmacy Lists (to the extent actually applied to the Obligations in accordance with the DIP Credit Agreement and the Interim Order and the Final Order) (any such net cash proceeds, "Allocated Combined Pharmacy Proceeds") shall be deemed to be Aggregate Liquidity Pharmacy Proceeds for purposes of determining compliance with this clause (v) and all other purposes under this Agreement and the amount of the net cash proceeds of such Combined Sale allocated to the Non-Core Leasehold

123

Interests and other assets (to the extent actually applied to the Obligations in accordance with the DIP Credit Agreement and the Interim Order and the Final Order) (any such net cash proceeds, "Allocated Combined 363 Proceeds") shall be deemed to be Aggregate Liquidity 363 Proceeds for purposes of determining compliance with the following clause (vi) and all other purposes under this Agreement;

(q)     on or before November 20, 2015, the Loan Parties shall fail to receive and pay over to Agent for application to the Obligations in accordance with this Agreement and the Interim Order and Final Order net cash proceeds from the purchase price and all other cash consideration payable to Loan Parties in connection with one or more Approved 363 Sales of Non-Core Leasehold Interests or other assets sales (other than Approved GOB Sales, an Approved Core Stores Sale (or other sale of any leasehold interests, Inventory or other assets used in the operation of the Core Stores business) or Approved Prescription List Sales), each of which sales shall have been approved by appropriate orders of the Bankruptcy Court under Section 363 of the Bankruptcy Code and which orders shall be on terms and conditions and in form and substance reasonably satisfactory to the Agent, in an aggregate amount for all such sales of not less than $50,000,000, (the Approved 363 Sales satisfying this Section 10.7(q), the "Liquidity 363 Sales", and the total aggregate amount of net cash proceeds paid to Loan Parties in connection with such Liquidity 363 Sales and applied to the Obligations in accordance with this Agreement and the Interim Order and the Final Order, including any and all Allocated Combined 363 Proceeds, the "Aggregate Liquidity 363 Proceeds");

(r)     the Loan Parties shall fail to finalize and commence distribution of an offering memorandum/marketing memorandum prepared by the Investment Bank to market and solicit bids for a Core Stores Sale (in one or more transactions/in lot or in whole) on or before September 30, 2015 (the "Core Stores Offering Memorandum");

(s)     the Loan Parties shall fail to file a motion under section 363 of the Bankruptcy Code seeking authority for a Core Stores Sale (the "Core Stores Bidding Procedures Motion"), together with bidding procedures (the "Core Stores Bidding Procedures"), in each case on terms and conditions and in form and substance satisfactory to the Agent and Required DIP Lenders, on or before October 22, 2015;

(t)     the Loan Parties fail to obtain the an order of the Bankruptcy Court approving the Core Stores Bidding Procedures (the "Core Stores Bidding Procedures Order") on or before November 13, 2015, such Core Stores Bidding Procedures Order to on terms and conditions and in form and substance acceptable to the Agent (and shall at a minimum be substantially consistent with form of order requested in the motion approved by Agent and Required Lenders referenced in clause (s) above), including providing the Secured Parties with the right, in their sole discretion, to credit bid all or any portion of the Obligations with respect to any sale of any of Core Stores;

(u)     the Loan Parties fail to conduct an auction in accordance with the Core Stores Bidding Procedures (the "Core Stores Auction") on or before January 15, 2016;

(v)     the Loan Parties fail to obtain a court order for the Approved Core Stores Sale (the "Core Stores Sale Order") to the successful bidder(s) on or before January 18, 2016

days following the completion of the Core Stores Auction, such Core Stores Sale Order to be on terms and conditions and in form and substance acceptable to the Agent;

(w)    the Approved Core Stores Sale is not consummated on or before February 5, 2016;

(x)    the Case is converted to a case under Chapter 7 of the Bankruptcy Code;

(y)    the Case is dismissed;

(z)    a breach or default occurs under any Planned GOB Stores Liquidator Agreement, or any agreement for any part of any Approved Core Stores Sale, or such agreement is terminated for any reason, in each case, except as consented to by Agent;

(aa)    the Final Order is not entered, following an application or motion of the Loan Parties reasonably satisfactory, in form and substance, to Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent, immediately following the expiration of the Interim Order, and in any case, not later than twenty-two (22) days after the Petition Date;

(bb)    a breach of the terms or provisions of the Interim Order or Final Order;

(cc)    any Person shall be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, or any costs or expenses whatsoever shall be imposed against the Collateral, other than the Carve-Out;

(dd)    the Agent shall be made subject to any equitable remedy of marshalling;

10.8.    Propco Guarantors.

(a)    Any Propco Guarantor shall (a) apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (b) admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (c) make a general assignment for the benefit of creditors, (d) commence a voluntary case under any state or federal bankruptcy or receivership laws (as now or hereafter in effect), (e) be adjudicated a bankrupt or insolvent (including by entry of any order for relief in any involuntary bankruptcy or insolvency proceeding commenced against it), (f) file a petition seeking to take advantage of any other law providing for the relief of debtors, (g) acquiesce to, or fail to have dismissed, within forty five (45) days, any petition filed against it in any involuntary case under such bankruptcy laws, or (h) take any action for the purpose of effecting any of the foregoing; or

(b)    Any Lien on any property or assets of any Propco Guarantor purported to be created under any Propco Guaranty Security Agreement ceases to be or is not a valid and perfected Lien securing the Obligations.

10.9.  Lien Priority.  Any (a) Lien created hereunder or provided for hereby or under any related agreement on Receivables or Inventory for any reason ceases to be or is not a valid and perfected Lien having first priority, or (b) Lien on any other Collateral hereunder or provided for hereby or under any related agreement ceases to be or is not a valid and perfected Lien having a first priority interest (subject, in each case, only to Permitted Liens (as defined in the Interim Order) that have priority as a matter of Applicable Law and the Carve-Out);

10.10.  [RESERVED];

10.11.  Cross Default.  A default of the obligations of any Borrower under any other agreement to which it is a party shall occur which causes a Material Adverse Effect which default is not cured within any applicable grace period;

10.12.  Breach of Guaranty.  Termination or breach of any Guaranty, Guarantor Security Agreement, or similar agreement executed and delivered to Agent in connection with the Obligations of any Borrower, or if any Guarantor attempts to terminate, challenges the validity of, or its liability under, any such Guaranty, Guarantor Security Agreement, or similar agreement;

10.13.  Change of Control.  Any Change of Control shall occur;

10.14.  Invalidity.  Any material provision of this Agreement or any Other Document shall, for any reason, cease to be valid and binding on any Borrower or any Guarantor, or any Borrower or any Guarantor shall so claim in writing to Agent or any Lender or any Borrower challenges the validity of or its liability under this Agreement or any Other Document;

10.15.  Seizures.  Any (a) portion of the Collateral (other than books and records) with a value in excess of $250,000, or (b) any books and records of any Borrower or any Guarantor shall be seized, subject to garnishment or taken by a Governmental Body or (c) the title and rights of any Borrower or any Guarantor which is the owner of any material portion of the Collateral shall have become the subject matter of claim, litigation, suit, garnishment or other proceeding which would, in the opinion of Agent in its Permitted Discretion, upon final determination, result in material impairment or loss of the security provided by this Agreement or the Other Documents;

10.16.  Credit Cards.  If Credit Card Agreements with respect to the processing and/or payment to any Borrower of the proceeds of a material portion of Borrowers' aggregate  Credit Card Receivables are suspended for a period of fifteen (15) or more consecutive days;

10.17.  Pension Plans.  An event or condition specified in Sections 7.16 or 9.15 hereof shall occur or exist with respect to any Plan or the occurrence of any Termination Event and, as a result of such event or condition, together with all other such events or conditions, any Borrower or any member of the Controlled Group shall incur, or in the opinion of Agent be reasonably likely to incur, a liability to a Plan or the PBGC (or both) which, in the reasonable judgment of Agent, would have a Material Adverse Effect; or any Borrower's failure to report a Termination Event in accordance with Section 9.15 hereof;

10.18.  Anti-Terrorism Laws.  If (i) any representation or warranty contained in (x) Section 16.18 hereof or (y) any corresponding section of any Guaranty is or becomes false or misleading at any time, (ii) any Loan Party shall fail to comply with its obligations under Section 16.18 hereof, or (iii) any Guarantor shall fail to comply with its obligations under any section of any Guaranty containing provisions comparable to those set forth in Section 16.18 hereof; or

10.19.  Deposit Account Instructions.  Any instruction or agreement regarding (i) the deposit account(s) into which Medicare Receivables, Medicaid Receivables, Pharmacy Receivables and/or other government receivables are deposited or (ii) the bank accounts related thereto, is amended, modified, revoked or terminated without the written consent of Agent, or if any Borrower or any Guarantor fails, within one Business Day of receipt, to forward collections it receives with respect to any such deposit account(s) as otherwise required pursuant to any such agreement or instructions.

XI.    LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT.

11.1.  Rights and Remedies.

(a)    Upon the occurrence of an Event of Default and at any time thereafter and without any further order of the Bankruptcy Court, at the option of Agent or direction of Required Lenders (i) all Obligations (including all Pre-Petition Obligations) shall be immediately due and payable, other than Cash Management Liabilities and Hedge Liabilities, which, in each case, shall be accelerated at the direction of the applicable Lender to whom such liabilities are owed, (ii) Agent may (or shall at the direction of Required Lenders) terminate the Loan Parties' right to use Cash Collateral by written notice thereof to counsel for the Loan Parties, counsel for any official committee of unsecured creditors ("Committee"), and the U.S. Trustee, without further notice, application or order of the Bankruptcy Court and (iii) Agent at its option or at the direction of Required Lenders shall have the right to terminate the obligations of Secured Parties to make Advances.  Upon the occurrence of any Event of Default and without any further order of the Bankruptcy Court, Agent shall have the right to exercise any and all rights and remedies provided for herein, under the Other Documents, under the Uniform Commercial Code, under the Interim Order, and upon entry of the Final Order, the Final Order and at law or equity generally, including the right to foreclose the security interests granted herein and to realize upon any Collateral by any available judicial procedure and/or to take possession of and sell any or all of the Collateral; provided however in connection with and prior to exercising any foreclosure on any of the Collateral or otherwise exercising remedies against the Collateral, the Agent shall comply with all requirements and procedures in the Interim Order or (after entry of the Final Order) the Final Order.  In furtherance of exercising its remedies, Agent may enter any of any Loan Party's premises or other premises without legal process and without incurring liability to any Loan Party therefor, and Agent may thereupon, or at any time thereafter, in its discretion without notice or demand, take the Collateral and remove the same to such place as Agent may deem advisable and Agent may require the Loan Parties to make the Collateral available to Agent at a convenient place.  With or without having the Collateral at the time or place of sale, Agent may sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as Agent may elect.  Except as to that part of the Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market,

Agent shall give Borrowing Agent reasonable notification of such sale or sales, it being agreed that in all events written notice mailed to Borrowing Agent at least ten (10) days prior to such sale or sales is reasonable notification.  At any public sale Agent or any Secured Party may bid for and become the purchaser, and Agent, any Secured Party or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and all such claims, rights and equities are hereby expressly waived and released by each Loan Party.  In connection with the exercise of the foregoing remedies, including the sale of Inventory, Agent is granted a perpetual non-revocable, royalty free, nonexclusive license and Agent is granted permission to use all of each Loan Party's (a) Intellectual Property which are used or useful in connection with Inventory for the purpose of marketing, advertising for sale and selling or otherwise disposing of such Inventory and (b) Equipment for the purpose of foreclosing on the Collateral.  The cash proceeds realized from the sale of any Collateral shall be applied to the Obligations in the order set forth in Section 11.5 hereof.  Noncash proceeds will only be applied to the Obligations as they are converted into cash.  If any deficiency shall arise, the Loan Parties shall remain liable to the Secured Parties therefor.

        (b)     To the extent that Applicable Law imposes duties on Agent to exercise remedies in a commercially reasonable manner, each Loan Party acknowledges and agrees that it is not commercially unreasonable for Agent: (i) to fail to incur expenses reasonably deemed significant by Agent to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition; (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of; (iii) to fail to exercise collection remedies against Customers or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral; (iv) to exercise collection remedies against Customers and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists; (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature; (vi) to contact other Persons, whether or not in the same business as any Loan Party, for expressions of interest in acquiring all or any portion of such Collateral; (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature; (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets; (ix) to dispose of assets in wholesale rather than retail markets; (x) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure Agent against risks of loss, collection or disposition of Collateral or to provide to Agent a guaranteed return from the collection or disposition of Collateral; or (xii) to the extent deemed appropriate by the Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Agent in the collection or disposition of any of the Collateral.  Each Loan Party acknowledges that the purpose of this Section 11.1(b) is to provide non-exhaustive indications of what actions or omissions by Agent would not be commercially unreasonable in Agent's exercise of remedies against the Collateral and that other actions or omissions by Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 11.1(b).  Without limitation upon the foregoing, nothing contained in this Section 11.1(b) shall be

construed to grant any rights to any Loan Party or to impose any duties on Agent that would not have been granted or imposed by this Agreement or by Applicable Law in the absence of this Section 11.1(b).

11.2.  <u>Agent's Discretion</u>.  Agent shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify, which procedures, timing and methodologies to employ, and what any other action to take with respect to any or all of the Collateral and in what order, and such determination will not in any way modify or affect any of Agent's or Lenders' rights hereunder as against Loan Parties or each other.

11.3.  <u>Setoff</u>.  Subject to Section 14.13, in addition to any other rights which Agent or any Lender may have under Applicable Law, upon the occurrence and during the continuance of an Event of Default hereunder, Agent and such Lender shall have a right, immediately and without notice of any kind, to apply any Loan Party's property held by Agent and such Lender or any of their Affiliates to reduce the Obligations and to exercise any and all rights of setoff which may be available to Agent and such Lender with respect to any deposits held by Agent or such Lender.

11.4.  <u>Rights and Remedies not Exclusive</u>.  The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any rights or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

11.5.  <u>Allocation of Payments After Event of Default</u>.  Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by Agent on account of the Obligations (including without limitation any amounts on account of any of Cash Management Liabilities or Hedge Liabilities), or in respect of the Collateral, may, at Agent's discretion, be applied either to the Pre-Petition Obligations or the Post-Petition Obligations as Agent may elect in its sole and absolute discretion in accordance with the Interim Order and the Final Order; provided that (x) at any such time following an Event of Default, all such amounts applied to the Pre-Petition Obligations in accordance with Agent's election under this sentence shall be applied in accordance with the provisions of Section 11.5 of the Pre-Petition Credit Agreement, and (y) at any such time following an Event of Default, all such amounts applied to the Post-Petition Obligations in accordance with Agent's election under this sentence shall be applied as follows:

FIRST, to the payment of all reasonable documented out-of-pocket costs and expenses (including reasonable attorneys' fees) of Agent in connection with enforcing its rights and the rights of Lenders under this Agreement and the Other Documents, and any Out-of-Formula Loans and Protective Advances funded by Agent with respect to the Collateral under or pursuant to the terms of this Agreement (other than with respect to those arising from or connected with any Cash Management Liabilities and/or Hedge Liabilities);

SECOND, to payment of any fees owed to Agent (other than with respect to those arising from or connected with any Cash Management Liabilities and/or Hedge Liabilities);

THIRD, to the payment of all reasonable documented out-of-pocket costs and expenses (including reasonable attorneys' fees) of each of the Lenders to the extent owing to such Lender pursuant to the terms of this Agreement (other than with respect to those arising from or connected with any Cash Management Liabilities and/or Hedge Liabilities) ;

FOURTH, to the payment of all of the Post-Petition Obligations consisting of accrued interest on account of the Swing Loans;

FIFTH, to the payment of the outstanding principal amount of the Post-Petition Obligations consisting of Swing Loans;

SIXTH, to the payment of all Post-Petition Obligations arising under this Agreement and the Other Documents consisting of accrued fees and interest (other than interest in respect of Swing Loans paid pursuant to clause FOURTH above);

SEVENTH, to the payment of the outstanding principal amount of the Post-Petition Obligations (other than principal in respect of Swing Loans paid pursuant to clause FIFTH above) arising under this Agreement (other than Cash Management Liabilities and Hedge Liabilities) (including the payment or cash collateralization of any outstanding Letters of Credit in accordance with Section 3.2(b) hereof);

EIGHTH, to all other Post-Petition Obligations arising under this Agreement (other than Cash Management Liabilities and Hedge Liabilities) which shall have become due and payable (hereunder, under the Other Documents or otherwise) and not repaid pursuant to clauses "FIRST" through "SEVENTH" above;

NINTH, to any Cash Management Liabilities and Hedge Liabilities which shall have become due and payable and not repaid pursuant to Clauses "FIRST" through "EIGHTH" above;

TENTH, to all other Post-Petition Obligations which shall have become due and payable and not repaid pursuant to clauses "FIRST" through "NINTH"; and

ELEVENTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; (ii) each of the Lenders shall receive (so long as it is not a Defaulting Lender) an amount equal to its pro rata share (based on the proportion that the then outstanding Advances held by such Lender bears to the aggregate then outstanding Advances) of amounts available to be applied pursuant to clauses "SIXTH", "SEVENTH", "EIGHTH" and "TENTH" above; and, with respect to clause "NINTH" above, an amount equal to its pro rata share (based on the proportion that the then outstanding Cash Management Liabilities and Hedge Liabilities held by such Lender bears to the aggregate then outstanding Cash Management Liabilities and Hedge Liabilities); (iii)   notwithstanding anything to the contrary in this Section 11.5, no Swap Obligations of any Non-Qualifying Party shall be paid with amounts received from such Non-Qualifying Party under its Guaranty (including sums received as a result of the exercise of remedies with respect to such Guaranty) or from the proceeds of such Non-Qualifying Party's Collateral if such Swap Obligations would constitute Excluded Hedge Liabilities , provided, however, that to the extent possible appropriate adjustments shall be made with respect to payments and/or the proceeds of Collateral from other Borrowers and/or Guarantors that are Eligible Contract Participants with respect to such Swap Obligations to preserve the allocation to Obligations otherwise set forth above in this Section

130

11.5; and (iv) to the extent that any amounts available for distribution pursuant to clause "SEVENTH" above are attributable to the issued but undrawn amount of outstanding Letters of Credit, such amounts shall be held by Agent as cash collateral for the Letters of Credit pursuant to Section 3.2(b) hereof and applied (A) first, to reimburse Issuer from time to time for any drawings under such Letters of Credit and (B) then, following the expiration of all Letters of Credit, to all other obligations of the types described in clauses "SEVENTH," "EIGHTH", "NINTH", and "TENTH" above in the manner provided in this Section 11.5.

XII.   WAIVERS AND JUDICIAL PROCEEDINGS.

12.1.   Waiver of Notice.  Each Loan Party hereby waives notice of non-payment of any of the Receivables, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

12.2.   Delay.  No delay or omission on Agent's or any Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option or of any Default or Event of Default.

12.3.   Jury Waiver.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, COUNTERCLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT, ANY OTHER DOCUMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, ANY OTHER DOCUMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, COUNTERCLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

XIII.   EFFECTIVE DATE AND TERMINATION.

13.1.   Term.  This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of the Loan Parties signatory hereto and the Secured Parties, shall become effective on the date hereof and shall, unless sooner terminated as herein provided (including by acceleration by Agent), continue in full force and effect for a period ending on the earliest to occur of (the date of such earliest occurrence, the "Termination Date"): (a) February 5, 2016; (b) the effective date or substantial consummation of a Reorganization Plan that has been confirmed by an order of the Bankruptcy Court; (c) the closing of the Approved Core Stores Sale; (d) the date of the conversion of the Case to a case

under Chapter 7 of the Bankruptcy Code; (e) the date of the dismissal of the Case; and (e) twenty-two (22) days after the Petition Date if the Final Order has not been entered as of such date (such period from of the date hereof through and ending on the Termination Date, the "Term").  Borrowers may terminate this Agreement at any time, subject to providing five (5) Business Days' prior written notice to Agent, upon payment in full in cash of the Obligations as provided in Section 13.2 hereof.

      13.2.  <u>Termination.</u>  The termination of the Agreement shall not affect Agent's or any Lender's rights, or any of the Obligations having their inception prior to the effective date of such termination or any Obligations which pursuant to the terms hereof continue to accrue after such date, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created and Obligations (other than contingent indemnity claims not yet asserted or threatened and required to be indemnified hereunder and Obligations not arising directly under this Agreement or the Other Documents to the extent Agent permits such Obligations to remain outstanding and such Obligations are cash collateralized or secured in another manner, in each case on terms and subject to conditions acceptable to Agent in its Permitted Discretion or such Obligations) have been fully paid, disposed of, concluded or liquidated.  The security interests, Liens and rights granted to Agent and Lenders hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that Borrowers' Account may from time to time be temporarily in a zero or credit position, until all of the Obligations (other than contingent indemnity claims not yet asserted or threatened and required to be indemnified hereunder and Obligations not arising directly under this Agreement or the Other Documents to the extent Agent permits such Obligations to remain outstanding and such Obligations are cash collateralized or secured in another manner, in each case on terms and subject to conditions acceptable to Agent in its Permitted Discretion or such Obligations) of each Loan Party have been paid and performed in full after the termination of this Agreement or each Loan Party has furnished Agent and Lenders with an indemnification satisfactory to Agent and Lenders with respect thereto and Agent and the Secured Parties have received a full release from the Loan Parties from all claims of the Loan Parties and their estates for any matters arising out of, relating to or in connection, with the Pre-Petition Loan Documents, this Agreement and the Other Documents or the Loan Parties.  Accordingly, each Loan Party waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and Agent shall not be required to send such termination statements to each Loan Party, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations (other than contingent indemnity claims not yet asserted or threatened and required to be indemnified hereunder and Obligations not arising directly under this Agreement or the Other Documents to the extent Agent permits such Obligations to remain outstanding and such Obligations are cash collateralized or secured in another manner, in each case on terms and subject to conditions acceptable to Agent in its Permitted Discretion or such Obligations) have been paid in full in immediately available funds and the Secured Parties have received a full release from the Loan Parties from all claims of the Loan Parties and their estates for any matters arising out of, relating to or in connection, with the Pre-Petition Loan Documents, this Agreement and the Other Documents.  All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations (other than contingent indemnity claims not yet asserted or threatened and required to be indemnified hereunder) are paid and

performed in full and the Secured Parties have received a full release from the Loan Parties from all claims of the Loan Parties and their estates for any matters arising out of, relating to or in connection, with the Pre-Petition Loan Documents, this Agreement and the Other Documents.

## XIV. REGARDING AGENT.

14.1. <u>Appointment</u>.  Each Lender hereby designates PNC to act as Agent for such Lender under this Agreement and the Other Documents.  Each Lender hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of this Agreement and the Other Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Agent shall hold all Collateral, payments of principal and interest, fees (except the fees set forth in the Fee Letter), charges and collections received pursuant to this Agreement, for the ratable benefit of Lenders.  Agent may perform any of its duties hereunder by or through its agents or employees.  As to any matters not expressly provided for by this Agreement (including collection of the Note) Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of Required Lenders, and such instructions shall be binding; provided, however, that Agent shall not be required to take any action which, in Agent's discretion, exposes Agent to liability or which is contrary to this Agreement or the Other Documents or Applicable Law unless Agent is furnished with an indemnification reasonably satisfactory to Agent with respect thereto.

14.2. <u>Nature of Duties</u>.  Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Other Documents.  Neither Agent nor any of its officers, directors, employees or agents shall be (i) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross (not mere) negligence or willful misconduct (as mutually agreed by the Agent (in its sole discretion) and the Borrowing Agent or as determined by a court of competent jurisdiction in a final non-appealable judgment), or (ii) responsible in any manner for any recitals, statements, representations or warranties made by any Borrower or any officer thereof contained in this Agreement, or in any of the Other Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any of the Other Documents or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Other Documents or for any failure of any Borrower to perform its obligations hereunder.  Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Other Documents, or to inspect the properties, books or records of any Borrower.  The duties of Agent as respects the Advances to Borrowers shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender; and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement or the transactions described herein except as expressly set forth herein.

14.3.  Lack of Reliance on Agent.  Independently and without reliance upon Agent or any other Lender, each Lender has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of each Borrower and each Guarantor in connection with the making and the continuance of the Advances hereunder and the taking or not taking of any action in connection herewith, and (ii) its own appraisal of the creditworthiness of each Borrower and each Guarantor.  Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before making of the Advances or at any time or times thereafter except as shall be provided by any Borrower pursuant to the terms hereof. Agent shall not be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency of this Agreement or any Other Document, or of the financial condition of any Borrower or any Guarantor, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Note, the Other Documents or the financial condition or prospects of any Borrower, or the existence of any Event of Default or any Default.

14.4.  Resignation of Agent; Successor Agent.  Agent may resign on sixty (60) days written notice to each Lender and Borrowing Agent and upon such resignation, Required Lenders will promptly designate a successor Agent reasonably satisfactory to Borrowers (provided that no such approval by Borrowers shall be required (i) in any case where the successor Agent is one of the Lenders or (ii) after the occurrence and during the continuance of any Event of Default).  Any such successor Agent shall succeed to the rights, powers and duties of Agent, and shall in particular succeed to all of Agent's right, title and interest in and to all of the Liens in the Collateral securing the Obligations created hereunder or any Other Document, and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent.  However, notwithstanding the foregoing, if at the time of the effectiveness of the new Agent's appointment, any further actions need to be taken in order to provide for the legally binding and valid transfer of any Liens in the Collateral from former Agent to new Agent and/or for the perfection of any Liens in the Collateral as held by new Agent or it is otherwise not then possible for new Agent to become the holder of a fully valid, enforceable and perfected Lien as to any of the Collateral, former Agent shall continue to hold such Liens solely as agent for perfection of such Liens on behalf of new Agent until such time as new Agent can obtain a fully valid, enforceable and perfected Lien on all Collateral, provided that Agent shall not be required to or have any liability or responsibility to take any further actions after such date as such agent for perfection to continue the perfection of any such Liens (other than to forego from taking any affirmative action to release any such Liens).  After any Agent's resignation as Agent, the provisions of this Article XIV, and any indemnification rights under this Agreement, including without limitation, rights arising under Section 16.5 hereof, shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement (and in the event resigning Agent continues to hold any Liens pursuant to the provisions of the immediately preceding sentence, the provisions of this Article XIV and any indemnification rights under this Agreement, including without limitation, rights arising under Section 16.5 hereof, shall inure to its benefit as to any actions taken or omitted to be taken by it in connection with such Liens).

074658.14086/101390412v.6

14.5.    Certain Rights of Agent.  If Agent shall request instructions from Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any Other Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from Required Lenders; and Agent shall not incur liability to any Person by reason of so refraining.  Without limiting the foregoing, Lenders shall not have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of Required Lenders.

14.6.    Reliance.  Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, email, facsimile, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Other Documents and its duties hereunder, upon advice of counsel selected by it.  Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.

14.7.    Notice of Default.  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Other Documents, unless Agent has received notice from a Lender or Borrowing Agent referring to this Agreement or the Other Documents, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that Agent receives such a notice, Agent shall give notice thereof to Lenders.  Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by Required Lenders; provided, that, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders.

14.8.    Indemnification.  To the extent Agent is not reimbursed and indemnified by Borrowers, each Lender will reimburse and indemnify Agent in proportion to its respective portion of the outstanding Advances and its respective Participation Commitments in the outstanding Letters of Credit and outstanding Swing Loans (or, if no Advances are outstanding, pro rata according to the percentage that its Revolving Commitment Amount constitutes of the total aggregate Revolving Commitment Amounts), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Other Document; provided that Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment).

14.9.    Agent in its Individual Capacity.  With respect to the obligation of Agent to lend under this Agreement, the Advances made by it shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties as Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include

Agent in its individual capacity as a Lender.  Agent may engage in business with any Borrower as if it were not performing the duties specified herein, and may accept fees and other consideration from any Borrower for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

14.10.  <u>Delivery of Documents</u>.  To the extent Agent receives information required under Sections 9.9 and 9.12 or Borrowing Base Certificates from any Borrower pursuant to the terms of this Agreement which any Borrower is not obligated to deliver to each Lender, Agent will promptly furnish such documents and information to Lenders.

14.11.  <u>Borrowers' Undertaking to Agent</u>.  Without prejudice to their respective obligations to Lenders under the other provisions of this Agreement, each Borrower hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent or Lenders or any of them pursuant to this Agreement to the extent not already paid.  Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Borrower's obligations to make payments for the account of Lenders or the relevant one or more of them pursuant to this Agreement.

14.12.  <u>No Reliance on Agent's Customer Identification Program</u>.  To the extent the Advances or this Agreement is, or becomes, syndicated in cooperation with other Lenders, each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 C.F.R. 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of Borrowers, their Affiliates or their agents, the Other Documents or the transactions hereunder or contemplated hereby: (i) any identity verification procedures, (ii) any recordkeeping, (iii) comparisons with government lists, (iv) customer notices or (v) other procedures required under the CIP Regulations or such Anti-Terrorism Laws.

14.13.  <u>Other Agreements</u>.  Each of the Lenders agrees that it shall not, without the express consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the request of Agent, set off against the Obligations, any amounts owing by such Lender to any Borrower or any deposit accounts of any Borrower now or hereafter maintained with such Lender.  Anything in this Agreement to the contrary notwithstanding, each of the Lenders further agrees that it shall not, unless specifically requested to do so by Agent, take any action to protect or enforce its rights arising out of this Agreement or the Other Documents, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Other Documents shall be taken in concert and at the direction or with the consent of Agent or Required Lenders.

XV.    BORROWING AGENCY.

15.1.  <u>Borrowing Agency Provisions</u>.

136

(a)    Each Borrower hereby irrevocably designates Borrowing Agent to be its attorney and agent and in such capacity to (i) borrow, (ii) request advances, (iii) request the issuance of Letters of Credit, (iv) sign and endorse notes, (v) execute and deliver all instruments, documents, applications, security agreements, reimbursement agreements and letter of credit agreements for Letters of Credit and all other certificates, notices, writings and further assurances now or hereafter required hereunder, (vi) make elections regarding interest rates, (vii) give instructions regarding Letters of Credit and agree with Issuer upon any amendment, extension or renewal of any Letter of Credit and (viii) otherwise take action under and in connection with this Agreement and the Other Documents, all on behalf of and in the name of such Borrower or Borrowers, and hereby authorizes Agent to pay over or credit all loan proceeds hereunder in accordance with the request of Borrowing Agent.

(b)    The handling of this credit facility as a co-borrowing facility with a borrowing agent in the manner set forth in this Agreement is solely as an accommodation to Borrowers and at their request. Neither Agent nor any Lender shall incur liability to Borrowers as a result thereof. To induce Agent and Lenders to do so and in consideration thereof, each Borrower hereby indemnifies Agent and each Lender and holds Agent and each Lender harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against Agent or any Lender by any Person arising from or incurred by reason of the handling of the financing arrangements of Borrowers as provided herein, reliance by Agent or any Lender on any request or instruction from Borrowing Agent or any other action taken by Agent or any Lender with respect to this Section 15.1 except due to willful misconduct or gross (not mere) negligence by the indemnified party (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

(c)    All Obligations shall be joint and several, and each Borrower shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability on the part of each Borrower shall in no way be affected by any extensions, renewals and forbearance granted by Agent or any Lender to any Borrower, failure of Agent or any Lender to give any Borrower notice of borrowing or any other notice, any failure of Agent or any Lender to pursue or preserve its rights against any Borrower, the release by Agent or any Lender of any Collateral now or thereafter acquired from any Borrower, and such agreement by each Borrower to pay upon any notice issued pursuant thereto is unconditional and unaffected by prior recourse by Agent or any Lender to the other Borrowers or any Collateral for such Borrower's Obligations or the lack thereof. Each Borrower waives all suretyship defenses.

15.2.    Waiver of Subrogation. Each Borrower expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim which such Borrower may now or hereafter have against the other Borrowers or any other Person directly or contingently liable for the Obligations hereunder, or against or with respect to any other Borrowers' property (including any property which is Collateral for the Obligations), arising from the existence or performance of this Agreement, until termination of this Agreement and indefeasible repayment in full in cash of the Obligations (other than contingent indemnity claims not yet asserted or threatened and required to be indemnified hereunder).

XVI.   MISCELLANEOUS.

16.1.   Governing Law.

(a)      This Agreement shall be governed by and construed in accordance with the laws of the State of New York applied to contracts to be performed wholly within the State of New York except to the extent that the application of the Bankruptcy Code is mandatory.

(b)      IF (I) THE CASE IS DISMISSED, (II) THE BANKRUPTCY COURT ABSTAINS FROM HEARING ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO) OR (III) THE BANKRUPTCY COURT REFUSES TO EXERCISE JURISDICTION OVER ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO), THEN ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM, RELATED TO OR IN CONNECTION WITH THIS AGREEMENT, THE OTHER DOCUMENTS OR THE COLLATERAL SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE BOROUGH OF MANHATTAN, COUNTY OF NEW YORK, STATE OF NEW YORK.  EACH OF THE LOAN PARTIES HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE.  EACH OF THE LOAN PARTIES HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST ANY LOAN PARTY BY ANY SECURED PARTY IN ACCORDANCE WITH THIS SECTION.

(c)      Each Loan Party hereby waives personal service of any and all process upon it and consents that all such service of process may be made by registered mail (return receipt requested) directed to Borrowing Agent at its address set forth in Section 16.6 and service so made shall be deemed completed five (5) days after the same shall have been so deposited in the mails of the United States of America.  Nothing herein shall affect the right to serve process in any manner permitted by law or shall limit the right of Agent or any Lender to bring proceedings against any Loan Party in the courts of any other jurisdiction.  Each Loan Party waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens.  Any judicial proceeding by any Loan Party against Agent or any Lender involving, directly or indirectly, any matter or claim in any way arising out of, related to or connected with this Agreement or any related agreement, shall be brought only in a federal or state court located in the Borough of Manhattan, County of New York, State of New York.

16.2.   Entire Understanding.

(a)    This Agreement and the documents executed concurrently herewith contain the entire understanding between each Loan Party, Agent and each Lender and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by each Loan Party's, Agent's and each Lender's respective officers.  Neither this Agreement nor any portion or provisions hereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged.  The parties hereto shall be permitted to amend this Agreement and the Other Documents without further approval or order of the Court so long as such amendment is not material (for purposes hereof, a "material" amendment shall mean, any amendment that operates to increase the interest rate other than as currently provided in this Agreement, increase the Maximum Revolving Advance Amount, add specific new Events of Default or enlarge the nature and extent of default remedies available to the Agent following an Event of Default) and is undertaken in good faith by the parties hereto.  Notwithstanding the foregoing, Agent may modify this Agreement or any of the Other Documents solely for the purpose of completing missing content of an administrative nature, without the need for a written amendment; provided that the Agent shall send a copy of any such modification to the Loan Parties and each Lender (which copy may be provided by electronic mail).  Each Loan Party acknowledges that it has been advised by counsel in connection with the execution of this Agreement and Other Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement.

(b)    Required Lenders, Agent with the consent in writing of Required Lenders, and Loan Parties may, subject to the provisions of this Section 16.2(b), from time to time enter into written supplemental agreements to this Agreement or the Other Documents executed by Loan Parties, for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lenders, Agent or Loan Parties thereunder or the conditions, provisions or terms thereof or waiving any Event of Default thereunder, but only to the extent specified in such written agreements; provided, however, that no such supplemental agreement shall:

(i)    (x) alter the definitions of Eligible Credit Card Receivables, Eligible Inventory, Eligible Medicare Receivables, Eligible Medicaid Receivables, Eligible Pharmacy Inventory, Eligible Prescription Lists, Eligible Receivables or Eligible Pharmacy Receivables, or (y) include any additional item in the Formula Amount without the consent of Required Lenders (Supermajority);

(ii)    increase the Revolving Commitment Percentage  or the maximum dollar amount of the Revolving Commitment Amount of any Lender without the consent of each Lender directly affected thereby;

(iii)    whether or not any Advances are outstanding, extend the Term or the time for payment of principal or interest of any Advance (excluding the due date of any mandatory prepayment of an Advance), or any fee payable to any Lender, or reduce the principal amount of or the rate of interest borne by any Advances or reduce any fee payable to any Lender, without the consent of each Lender directly affected thereby (except that Required

139

Lenders may elect to waive or rescind any imposition of the Default Rate under Section 3.1 or of default rates of Letter of Credit fees under Section 3.2 (unless imposed by Agent));

(iv)    except in connection with any increase pursuant to Section 2.24 hereof, increase the Maximum Revolving Advance Amount without the consent of all Lenders holding a Revolving Commitment;

(v)    alter the definition of the terms Required Lenders or Required Lenders (Supermajority) or alter, amend or modify this Section 16.2(b) without the consent of all Lenders;

(vi)    alter, amend or modify the provisions of Section 11.5 without the consent of all Lenders;

(vii)    release any Collateral during any calendar year (other than in accordance with the provisions of this Agreement) having an aggregate value in excess of $3,000,000 without the consent of all Lenders;

(viii)    change the rights and duties of Agent without the consent of all Lenders;

(ix)    subject to clause (e) below, permit any Revolving Advance to be made if after giving effect thereto the total of Revolving Advances outstanding hereunder would exceed the Formula Amount for more than sixty (60) consecutive Business Days or exceed one hundred and ten percent (110%) of the Formula Amount without the consent of each Lender directly affected thereby;

(x)    increase the Advance Rates above the Advance Rates in effect on the Closing Date without the consent of each Lender directly affected thereby;

(xi)    release any Guarantor or Borrower without the consent of all Lenders; or

(xii)    permit Borrowers to request and obtain Advances hereunder as, and/or to convert Advances obtained hereunder to, LIBOR Rate Loans without the consent of Agent and all Lenders.

(c)    Any such supplemental agreement shall apply equally to each Lender and shall be binding upon Loan Parties, Lenders and Agent and all future holders of the Obligations. In the case of any waiver, Loan Parties, Agent and Lenders shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default which was waived), or impair any right consequent thereon.

(d)    In the event that Agent requests the consent of a Lender pursuant to this Section 16.2 and such consent is denied (but at least the consent of Required Lenders is obtained), then Agent may, at its option, require such Lender to assign its interest in the

Advances to Agent or to another Lender or to any other Person designated by Agent (the "Designated Lender"), for a price equal to (i) the then outstanding principal amount thereof plus (ii) accrued and unpaid interest and fees due such Lender, which interest and fees shall be paid when collected from Borrowers. In the event Agent elects to require any Lender to assign its interest to Agent or to the Designated Lender, Agent will so notify such Lender in writing within forty five (45) days following such Lender's denial, and such Lender will assign its interest to Agent or the Designated Lender no later than five (5) days following receipt of such notice pursuant to a Commitment Transfer Supplement executed by such Lender, Agent or the Designated Lender, as appropriate, and Agent.

(e)     Notwithstanding (i) the existence of a Default or an Event of Default, (ii) that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied or the commitments of Lenders to make Revolving Advances hereunder have been terminated for any reason, or (iii) any other contrary provision of this Agreement, Agent may at its discretion and without the consent of any Lender, voluntarily permit the outstanding Revolving Advances at any time to exceed the Formula Amount by up to ten percent (10%) of the Formula Amount for up to sixty (60) consecutive Business Days (the "Out-of-Formula Loans"); provided that in no event shall the Revolving Advances (when combined with the outstanding Swing Loans and Letters of Credit) exceed the aggregate Revolving Commitment Amount of all Lenders. If Agent is willing in its sole and absolute discretion to permit such Out-of-Formula Loans, Lenders holding the Revolving Commitments shall be obligated to fund such Out-of-Formula Loans in accordance with their respective Revolving Commitment Percentages, and such Out-of-Formula Loans shall be payable on demand and shall bear interest at the Default Rate for Revolving Advances consisting of Domestic Rate Loans; provided that, if Agent does permit Out-of-Formula Loans, neither Agent nor Lenders shall be deemed thereby to have changed the limits of Section 2.1(a) nor shall any Lender be obligated to fund Revolving Advances in excess of its Revolving Commitment Amount. For purposes of this paragraph, the discretion granted to Agent hereunder shall not preclude involuntary overadvances that may result from time to time due to the fact that the Formula Amount was unintentionally exceeded for any reason, including, but not limited to, Collateral previously deemed to be "Eligible Receivables," "Eligible Medicare Receivables," "Eligible Medicaid Receivables," "Eligible Credit Card Receivables," "Eligible Inventory," "Eligible Pharmacy Inventory," or "Eligible Prescription Lists", as applicable, becomes ineligible, collections of Receivables applied to reduce outstanding Revolving Advances are thereafter returned for insufficient funds or overadvances are made to protect or preserve the Collateral. In the event Agent involuntarily permits the outstanding Revolving Advances to exceed the Formula Amount by more than ten percent (10%), Agent shall use its efforts to have Borrowers decrease such excess in as expeditious a manner as is practicable under the circumstances and not inconsistent with the reason for such excess. Revolving Advances made after Agent has determined the existence of involuntary overadvances shall be deemed to be involuntary overadvances and shall be decreased in accordance with the preceding sentence. To the extent any Out-of-Formula Loans are not actually funded by the other Lenders as provided for in this Section 16.2(e), Agent may elect in its discretion to fund such Out-of-Formula Loans and any such Out-of-Formula Loans so funded by Agent shall be deemed to be Revolving Advances made by and owing to Agent, and Agent shall be entitled to all rights (including accrual of interest) and remedies of a Lender holding a Revolving Commitment under this Agreement and the Other Documents with respect to such Revolving Advances.

141

(f)    In addition to (and not in substitution of) the discretionary Revolving Advances permitted above in this Section 16.2, Agent is hereby authorized by Borrowers and Lenders, at any time in Agent's sole discretion, regardless of (i) the existence of a Default or an Event of Default, (ii) whether any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied or the commitments of Lenders to make Revolving Advances hereunder have been terminated for any reason, or (iii) any other contrary provision of this Agreement, to make Revolving Advances to Borrowers on behalf of Lenders which Agent, in its Permitted Discretion, deems necessary or desirable (a) to preserve or protect the Collateral, or any portion thereof, (b) to enhance the likelihood of, or maximize the amount of, repayment of the Advances and other Obligations, or (c) to pay any other amount chargeable to Borrowers pursuant to the terms of this Agreement (the "Protective Advances"); provided that at any time after giving effect to such Protective Advances, the outstanding Revolving Advances (when combined with the outstanding Swing Loans and Letters of Credit) do not exceed the lesser of (A) the aggregate Revolving Commitment Amount of all Lenders, or (b) one hundred ten percent (110%) of the Formula Amount.   Lenders holding the Revolving Commitments shall be obligated to fund such Protective Advances and effect a settlement with Agent therefor upon demand of Agent in accordance with their respective Revolving Commitment Percentages.  To the extent any Protective Advances are not actually funded by the other Lenders as provided for in this Section 16.2(f), any such Protective Advances funded by Agent shall be deemed to be Revolving Advances made by and owing to Agent, and Agent shall be entitled to all rights (including accrual of interest) and remedies of a Lender holding a Revolving Commitment under this Agreement and the Other Documents with respect to such Revolving Advances.

16.3.    <u>Successors and Assigns; Participations; New Lenders.</u>

(a)    This Agreement shall be binding upon and inure to the benefit of Loan Parties, Agent, each Lender, all future holders of the Obligations and their respective successors and assigns, except that no Loan Party may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

(b)    Each Loan Party acknowledges that in the regular course of commercial banking business one or more Lenders may at any time and from time to time sell participating interests in the Advances to other Persons (each such transferee or purchaser of a participating interest, a "Participant").  Each Participant may exercise all rights of payment (including rights of set-off) with respect to the portion of such Advances held by it or other Obligations payable hereunder as fully as if such Participant were the direct holder thereof provided that (i) Borrowers shall not be required to pay to any Participant more than the amount which it would have been required to pay to Lender which granted an interest in its Advances or other Obligations payable hereunder to such Participant had such Lender retained such interest in the Advances hereunder or other Obligations payable hereunder unless the sale of the participation to such Participant is made with Borrowing Agent's prior written consent, and (ii) in no event shall Loan Parties be required to pay any such amount arising from the same circumstances and with respect to the same Advances or other Obligations payable hereunder to both such Lender and such Participant.  Each Loan Party hereby grants to any Participant a continuing security interest in any deposits, moneys or other property actually or constructively held by such Participant as security for the Participant's interest in the Advances.  No Lenders shall transfer, grant, assign or sell any participation under which the Participant shall have rights to approve

142

any amendment or waiver of this Agreement except to the extent such amendment or waiver would (A) extend the final maturity date or the date for the payments of any installment of fees or principal or interest of any Advances or Letter of Credit reimbursement obligations in which such participant is participating, (B) reduce the amount of any installment of principal of the Advances or Letter of Credit reimbursement obligations in which such participant is participating, (C) except as otherwise expressly provided in this Agreement, reduce the interest rate applicable to the Advances or Letter of Credit reimbursement obligations in which such participant is participating, or (D) except as otherwise expressly provided in this Agreement, reduce any fees payable hereunder.

(c)     Any Lender, with the consent of Agent, which shall not be unreasonably withheld or delayed, may sell, assign or transfer all or any part of its rights and obligations under or relating to Revolving Advances and the Other Documents to one or more Persons (other than (x) an Affiliate or Subsidiary of any Borrower or Guarantor (expressly including, for avoidance of doubt, Sponsor and its Affiliates") or (y) a natural person) and one or more Persons (other than (x) an Affiliate or Subsidiary of any Loan Party or (y) a natural person) may commit to make Advances hereunder (each a "Purchasing Lender"), in minimum amounts of not less than $5,000,000, pursuant to a Commitment Transfer Supplement, executed by a Purchasing Lender, the transferor Lender, and Agent and delivered to Agent for recording. Upon such execution, delivery, acceptance and recording, from and after the transfer effective date determined pursuant to such Commitment Transfer Supplement, (i) Purchasing Lender thereunder shall be a party hereto and, to the extent provided in such Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder with a Revolving Commitment Percentage, as set forth therein, and (ii) the transferor Lender thereunder shall, to the extent provided in such Commitment Transfer Supplement, be released from its obligations under this Agreement, the Commitment Transfer Supplement creating a novation for that purpose. Such Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing Lender and the resulting adjustment of the Revolving Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Each Loan Party hereby consents to the addition of such Purchasing Lender and the resulting adjustment of the Revolving Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Loan Parties shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing.

(d)     Any Lender, with the consent of Agent which shall not be unreasonably withheld or delayed, may directly or indirectly sell, assign or transfer all or any portion of its rights and obligations under or relating to Revolving Advances under this Agreement and the Other Documents to an entity, whether a corporation, partnership, trust, limited liability company or other entity that (i) is engaged in making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of its business and (ii) is administered, serviced or managed by the assigning Lender or an Affiliate of such Lender (a "Purchasing CLO" and together with each Participant and Purchasing Lender, each a "Transferee" and collectively the "Transferees"), pursuant to a Commitment Transfer Supplement modified as appropriate to reflect the interest being assigned ("Modified

Commitment Transfer Supplement"), executed by any intermediate purchaser, the Purchasing CLO, the transferor Lender, and Agent as appropriate and delivered to Agent for recording. Upon such execution and delivery, from and after the transfer effective date determined pursuant to such Modified Commitment Transfer Supplement, (i) Purchasing CLO thereunder shall be a party hereto and, to the extent provided in such Modified Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder and (ii) the transferor Lender thereunder shall, to the extent provided in such Modified Commitment Transfer Supplement, be released from its obligations under this Agreement, the Modified Commitment Transfer Supplement creating a novation for that purpose. Such Modified Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing CLO. Each Loan Party hereby consents to the addition of such Purchasing CLO. Loan Parties shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing.

(e)     Agent, acting as an agent of Borrower, shall maintain at its address a copy of each Commitment Transfer Supplement and Modified Commitment Transfer Supplement delivered to it and a register (the "Register") for the recordation of the names and addresses of each Lender and the outstanding principal, accrued and unpaid interest and other fees due hereunder. The entries in the Register shall be conclusive, in the absence of manifest error, and each Loan Party, Agent and Lenders may treat each Person whose name is recorded in the Register as the owner of the Advance recorded therein for the purposes of this Agreement. The Register shall be available for inspection by Borrowing Agent or any Lender at any reasonable time and from time to time upon reasonable prior notice. Agent shall receive a fee in the amount of $3,500 payable by the applicable Purchasing Lender and/or Purchasing CLO upon the effective date of each transfer or assignment (other than to an intermediate purchaser) to such Purchasing Lender and/or Purchasing CLO.

(f)     Each Loan Party authorizes each Lender to disclose to any Transferee and any prospective Transferee any and all financial information in such Lender's possession concerning such Loan Party which has been delivered to such Lender by or on behalf of such Loan Party pursuant to this Agreement or in connection with such Lender's credit evaluation of such Loan Party.

(g)     Notwithstanding anything to the contrary contained in this Agreement, any Lender may at any time and from time to time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

16.4.     Application of Payments. Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations. To the extent that any Loan Party makes a payment or Agent or any Lender receives any payment or proceeds of the Collateral for any Loan Party's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part

144

thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Agent or such Lender.

    16.5.    <u>Indemnity</u>.    Each Loan Party shall defend, protect, indemnify, pay and save harmless Agent, Issuer, each Lender and each of their respective officers, directors, Affiliates, attorneys, employees and agents (each an "Indemnified Party") for and from and against any and all actual claims, demands, liabilities, obligations, losses, damages, penalties, fines, actions, judgments, suits, costs, charges, expenses and disbursements of any kind or nature whatsoever (including reasonable fees and disbursements of counsel) (collectively, "Claims") which may be imposed on, incurred by, or asserted against any Indemnified Party in arising out of or in any way relating to or as a consequence, direct or indirect, of: (i) this Agreement, the Other Documents, the Advances and other Obligations and/or the transactions contemplated hereby including the Transactions, (ii) any action or failure to act or action taken only after delay or the satisfaction of any conditions by any Indemnified Party in connection with and/or relating to the negotiation, execution, delivery or administration of the Agreement and the Other Documents, the credit facilities established hereunder and thereunder and/or the transactions contemplated hereby including the Transactions, (iii) any Borrower's or any Guarantor's failure to observe, perform or discharge any of its covenants, obligations, agreements or duties under or breach of any of the representations or warranties made in this Agreement and the Other Documents, (iv) the enforcement of any of the rights and remedies of Agent, Issuer or any Lender under the Agreement and the Other Documents, (v) any threatened or actual imposition of fines or penalties, or disgorgement of benefits, for violation of any Anti-Terrorism Law by any Loan Party, any Affiliate or Subsidiary of any Borrowers, or any Guarantor, and (vi) any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not Agent or any Lender is a party thereto, in each case except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of the Indemnified Party or that of its respective affiliates or each of their respective officers, directors, employees, attorneys, advisors and agents (as mutually agreed by Agent (in its sole discretion) and Borrowing Agent or as determined by a court of competent jurisdiction in a final and non-appealable judgment).  Without limiting the generality of any of the foregoing, each Loan Party shall defend, protect, indemnify, pay and save harmless each Indemnified Party from (x) any Claims which may be imposed on, incurred by, or asserted against any Indemnified Party arising out of or in any way relating to or as a consequence, direct or indirect, of the issuance of any Letter of Credit hereunder and (y) any Claims which may be imposed on, incurred by, or asserted against any Indemnified Party under any Environmental Laws with respect to or in connection with the Real Property, any Hazardous Discharge, the presence of any Hazardous Materials affecting the Real Property (whether or not the same originates or emerges from the Real Property or any contiguous real estate), including any Claims consisting of or relating to the imposition or assertion of any Lien on any of the Real Property under any Environmental Laws and any loss of value of the Real Property as a result of the foregoing, in each case except to the extent such Claim is attributable to any Hazardous Discharge resulting from actions on the part of any Indemnified Party or to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of the Indemnified Party or that of its respective affiliates or each of their respective officers, directors, employees, attorneys, advisors and agents (as mutually agreed by Agent (in its sole discretion) and Borrowing Agent or as determined by a

145

court of competent jurisdiction in a final and non-appealable judgment).  Loan Parties' obligations under this Section 16.5 shall arise upon the discovery of a release of any Hazardous Materials at the Real Property, whether or not any federal, state, or local environmental agency has taken or threatened any action in connection with the presence of any Hazardous Materials. Without limiting the generality of the foregoing, this indemnity shall extend to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including reasonable fees and disbursements of counsel) asserted against or incurred by any of the Indemnified Parties by any Person under any Environmental Laws or similar laws by reason of any Borrower's or any other Person's failure to comply with laws applicable to solid or hazardous waste materials, including Hazardous Materials and Hazardous Waste, or other Toxic Substances.  Additionally, if any Taxes (excluding any Excluded Taxes) shall be payable by Agent, Lenders or Loan Parties on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any of the Other Documents, or the creation or repayment of any of the Obligations hereunder, by reason of any Applicable Law now or hereafter in effect, Loan Parties will pay (or will promptly reimburse Agent and Lenders for payment of) all such Taxes, including interest and penalties thereon, and will indemnify and hold the Indemnified Parties harmless from and against all liability in connection therewith.

16.6.  <u>Notice</u>.  Any notice or request hereunder may be given to Borrowing Agent or any Loan Party or to Agent or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section.  Any notice, request, demand, direction or other communication (for purposes of this Section 16.6 only, a "Notice") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail") or facsimile transmission or by setting forth such Notice on a website to which Loan Parties are directed (an "Internet Posting") if Notice of such Internet Posting (including the information necessary to access such site) has previously been delivered to the applicable parties hereto by another means set forth in this Section 16.6) in accordance with this Section 16.6.  Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names in Section 16.6 hereof or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 16.6.  Any Notice shall be effective:

(a)     In the case of hand-delivery, when delivered;

(b)     If given by mail, four (4) days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

(c)     In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, a facsimile or electronic transmission, an Internet Posting or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

(d)     In the case of a facsimile transmission, when sent to the applicable party's facsimile machine's telephone number, if the party sending such Notice receives confirmation of the delivery thereof from its own facsimile machine;

(e)        In the case of electronic transmission, when actually received;

(f)        In the case of an Internet Posting, upon delivery of a Notice of such posting (including the information necessary to access such site) by another means set forth in this Section 16.6; and

(g)        If given by any other means (including by overnight courier), when actually received.

Any Lender giving a Notice to Borrowing Agent or any Loan Party shall concurrently send a copy thereof to Agent, and Agent shall promptly notify the other Lenders of its receipt of such Notice.

(A)        If to Agent or PNC at:

PNC Bank, National Association
4720 Piedmont Row Drive, Suite 300
Charlotte, NC 28210
Attention: Portfolio Manager
Telephone: 704-551-8508
Facsimile: 704-643-7918


with a copy to:

Blank Rome LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Attention: Lawrence F. Flick II
Telephone: (212) 885-5556
Facsimile: (215) 832-5556

and to:

Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, Delaware 19801
Attention:      Regina Stango Kelbon
Telephone:     (302) 425-6424
Facsimile:      (302) 428-5133

(B)        If to a Lender other than Agent, as specified on the signature pages hereof

(C)        If to Borrowing Agent or any Loan Party:


Haggen, Inc.
2211 Rimland Drive

Billingham, WA 98226
Attention: Blake Barnett
Telephone: 949-683-8584
Fax: 360-650-8260

With a copy to:

Comvest Investment Partners Holdings, LLC
525 Okeechobee Blvd.
Suite 1050
West Palm Beach, FL  33401
Attention:
Telephone:
Facsimile:


and:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attention: Frank Merola, Esq.
Telephone: (310) 556-5802
Facsimile: (310) 407-6302

16.7.    Survival.  The obligations of Borrowers and/or Loan Parties (as applicable) under Sections 2.2(f), 2.2(g), 2.2(h), 3.7, 3.8, 3.9, 3.10, 16.5 and 16.9 and the obligations of Lenders under Sections 2.2, 2.15(b), 2.16, 2.18, 2.19, 14.8 and 16.5, shall survive termination of this Agreement and the Other Documents and payment in full of the Obligations.  [CROSS REFERENCES TO BE REVIEWED AND CONFIRMED FOR FINAL DRAFT]

16.8.    Severability.  If any part of this Agreement is contrary to, prohibited by, or deemed invalid under Applicable Laws, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

16.9.    Expenses.  Loan Parties shall pay (i) all reasonable and documented out-of-pocket expenses incurred by Agent and its Affiliates (including the reasonable fees, charges and disbursements of counsel for Agent), the preparation, negotiation, execution, delivery and administration of this Agreement and the Other Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket expenses incurred by Issuer in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, (iii) all reasonable and documented out-of-pocket expenses incurred by Agent, any Lender or Issuer, and shall pay all fees and time charges for attorneys who may be employees of Agent, any Lender or Issuer (including the fees,

148

charges and disbursements of one counsel for Agent, Lenders and Issuer, except to the extent there is a conflict of interest among Agent and Lenders, in which case Borrowers shall pay the fees, charges and disbursements for one counsel for Agent and one counsel for Lenders): (I) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the Other Documents, including its rights under this Section, or (B) in connection with the Advances made or Letters of Credit issued hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit, and (II) in connection with the Case, including without limitation, (1) costs and expenses incurred in connection with review of pleadings and other filings made with the Bankruptcy Court, (2) attendance at all hearings in respect of the Case, and (3) defending and prosecuting any actions or proceedings arising out of or relating to the Pre-Petition Obligations, the Obligations, the Liens securing the Pre-Petition Obligations and the Obligations or any transactions related to arising in connection with the Pre-Petition Loan Documents or the Other Documents, and (iv) all reasonable and documented out-of-pocket expenses of Agent's regular employees and agents engaged periodically to perform audits of the any Loan Party's or any Loan Party's Affiliate's or Subsidiary's books, records and business properties. Each Loan Party agrees that in the event that any actions or proceedings are in effect or are threatened by or Agent reasonably believes any actions or proceedings may be brought by the Official Committee of Unsecured Creditors appointed pursuant to Section 1102 of the Bankruptcy Code or any other party in interest attacking the legality, validity, enforceability of the Pre-Petition Obligations, the Liens arising under the Pre-Petition Credit Agreement or any other matters relating to the Pre-Petition Loan Documents at the time of the consummation of any sale of the assets of the Loan Parties or at the time that Loan Parties propose to pay and satisfy the Obligations in full, Agent may hold a reserve following the date of payment in full of the Obligations as cash collateral for the expenses (including the fees, charges and disbursements of one counsel for Agent, Lenders and Issuer, except to the extent there is a conflict of interest among Agent and Lenders, in which case Borrowers shall pay the fees, charges and disbursements for one counsel for Agent and one counsel for Lenders) expected to be incurred in connection with such actions or proceedings until the earlier of (x) Agent's receipt of a general release satisfactory in form and substance to Agent, and (y) the entry of a final non-appealable order determining the outcome of such litigation.

16.10.  <u>Injunctive Relief</u>.  Each Loan Party recognizes that, in the event any Loan Party fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, or threatens to fail to perform, observe or discharge such obligations or liabilities, any remedy at law may prove to be inadequate relief to Lenders; therefor, Agent, if Agent so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

16.11.  <u>Consequential Damages.</u>  Neither Agent nor any Lender, nor any agent or attorney for any of them, shall be liable to any Borrower, or any Guarantor (or any Affiliate of any such Person) for indirect, punitive, exemplary or consequential damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations or as a result of any transaction contemplated under this Agreement or any Other Document.

16.12.  <u>Captions.</u>  The captions at various places in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement.

16.13.  <u>Counterparts; Facsimile Signatures.</u>  This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.  Any signature delivered by a party by facsimile or electronic transmission (including email transmission of a PDF image) shall be deemed to be an original signature hereto.

16.14.  <u>Construction.</u>  The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits thereto.

16.15.  <u>Confidentiality; Sharing Information.</u>  Agent, each Lender and each Transferee shall hold all non-public information obtained by Agent, such Lender or such Transferee pursuant to the requirements of this Agreement in accordance with Agent's, such Lender's and such Transferee's customary procedures for handling confidential information of this nature; provided, however, Agent, each Lender and each Transferee may disclose such confidential information (a) to its examiners, Affiliates, outside auditors, counsel and other professional advisors, (b) to Agent, any Lender or to any prospective Transferees, and (c) as required or requested by any Governmental Body or representative thereof or pursuant to legal process; provided, further that (i) unless specifically prohibited by Applicable Law, Agent, each Lender and each Transferee shall use its reasonable best efforts prior to disclosure thereof, to notify the applicable Loan Party of the applicable request for disclosure of such non-public information (A) by a Governmental Body or representative thereof (other than any such request in connection with an examination of the financial condition of a Lender or a Transferee by such Governmental Body) or (B) pursuant to legal process and (ii) in no event shall Agent, any Lender or any Transferee be obligated to return any materials furnished by any Loan Party other than those documents and instruments in possession of Agent or any Lender in order to perfect its Lien on the Collateral once the Obligations have been paid in full and this Agreement has been terminated.  Each Loan Party acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to such Loan Party or one or more of its Affiliates (in connection with this Agreement or otherwise) by any Lender or by one or more Subsidiaries or Affiliates of such Lender and each Loan Party hereby authorizes each Lender to share any information delivered to such Lender by such Loan Party and its Subsidiaries pursuant to this Agreement, or in connection with the decision of such Lender to enter into this Agreement, to any such Subsidiary or Affiliate of such Lender, it being understood that any such Subsidiary or Affiliate of any Lender receiving such information shall be bound by the provisions of this Section 16.15 as if it were a Lender hereunder.  Such authorization shall survive the repayment of the other Obligations and the termination of this Agreement.  Notwithstanding any non-disclosure agreement or similar document executed by Agent in favor of any Loan Party or any of any Loan Party's affiliates, the provisions of this Agreement shall supersede such agreements.

16.16.  <u>Publicity.</u>  Each Loan Party and each Lender hereby authorizes Agent to make appropriate announcements of the financial arrangement entered into among Loan Parties, Agent

and Lenders, including announcements which are commonly known as tombstones, in such publications and to such selected parties as Agent shall in its Permitted Discretion deem appropriate.  Agent shall obtain Loan Parties' prior written approval (such approval not to be unreasonably withheld, conditioned or delayed) for any tombstones or art work to be used in its announcements.  Agent and each Lender hereby authorizes Loan Parties after Agent's prior written approval (such approval not to be unreasonably withheld, conditioned or delayed) to make appropriate announcements of the financial arrangement entered into among Borrowing Agent, Agent and Lenders, including announcements which are commonly known as tombstones, in such publications and to such selected parties as Loan Parties shall in its reasonable business judgment exercises in good faith deem appropriate.

16.17.  <u>Certifications From Banks and Participants; USA PATRIOT Act.</u>

(a)    Each Lender or assignee or participant of a Lender that is not incorporated under the Laws of the United States of America or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the USA PATRIOT Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to the Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA PATRIOT Act and the applicable regulations: (1) within ten (10) days after the Closing Date, and (2) as such other times as are required under the USA PATRIOT Act.

(b)    The USA PATRIOT Act requires all financial institutions to obtain, verify and record certain information that identifies individuals or business entities which open an "account" with such financial institution. Consequently, Lender may from time to time request, and each Loan Party shall provide to Lender, such Loan Party's name, address, tax identification number and/or such other identifying information as shall be necessary for Lender to comply with the USA PATRIOT Act and any other Anti-Terrorism Law.

16.18.  <u>Anti-Terrorism Laws.</u>

(a)    Each Loan Party represents and warrants that (i) no Covered Entity is a Sanctioned Person and (ii) no Covered Entity, either in its own right or through any third party, (A) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) does business in or with, or derives any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; or (C) engages in any dealings or transactions prohibited by any Anti-Terrorism Law.

(b)    Each Loan Party covenants and agrees that (i) no Covered Entity will become a Sanctioned Person, (ii) no Covered Entity, either in its own right or through any third party, will (A) have any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) do business in or with, or derive any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; (C) engage in any

151

dealings or transactions prohibited by any Anti-Terrorism Law or (D) use the Advances to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law, (iii) the funds used to repay the Obligations will not be derived from any unlawful activity, (iv) each Covered Entity shall comply with all Anti-Terrorism Laws and (v) the Borrowers shall promptly notify the Agent in writing upon the occurrence of a Reportable Compliance Event.

16.19. <u>Exclusive Remedy For Any Alleged Post-Petition Claim</u>.    Notwithstanding anything to the contrary provided for herein, if any Loan Party asserts that it has any adverse claims against any Post-Petition Secured Party with respect to this Agreement and the transactions contemplated hereby, each Loan Party agrees that its sole and exclusive remedy for any and all such adverse claims will be an action for monetary damages (a "Damage Lawsuit"). Any such Damage Lawsuit, regardless of the procedural form in which it is alleged (e.g., by complaint, counterclaim, cross-claim, third-party claim, or otherwise) will be severed from any enforcement by Post-Petition Secured Parties of their legal, equitable, and contractual rights (including collection of the Obligations and foreclosure or other enforcement against the Collateral) pursuant to the Other Documents, and the Damage Lawsuit (including any and all adverse claims alleged against the Post-Petition Secured Parties) cannot be asserted by any Loan Party as a defense, setoff, recoupment, or grounds for delay, stay, or injunction against any enforcement by any Post-Petition Secured Party of their legal, equitable, and contractual rights under the Final Order, the Other Documents, and otherwise.

16.20. <u>Prohibition on Surcharge; Etc.</u>    No Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out.    The prohibition on surcharging or priming of the Liens of Agent on the Collateral will survive the termination of this Agreement and the dismissal of the Case, such that no Person will be permitted to obtain a Lien or rights (through any means, at law or in equity) which in any case is equal or senior to the Liens of Agent on the Collateral.    Upon the termination of this Agreement and the dismissal of the Case, the Bankruptcy Court will retain jurisdiction over the Collateral for the limited purpose of enforcing this section.

16.21. <u>Marshalling Obligations</u>.    The Agent shall not be subject to any equitable remedy of marshalling.

16.22. <u>Interim Order and Final Order Control</u>.

In the event of any conflict between the terms of the Interim Order and/or the Final Order and this Agreement or any Other Document, the terms of the Interim Order and/or the Final Order, as applicable, shall control.

XVII.  <u>GUARANTY AND SURETYSHIP AGREEMENT</u>.

17.1.  <u>Guaranty and Suretyship Agreement</u>.

Each Debtor Guarantor hereby guarantees, and becomes surety for the prompt payment and performance when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of (i) all of the Post-Petition Obligations (and, upon entry

152

of the Final Order, any and all Obligations, including without limitation, all Pre-Petition Obligations and Post-Petition Obligations) and (ii) all of the costs and expenses and all of the indemnities owing to any Secured Party or other Indemnified Party under the provisions of Sections 16.5 and 16.9 hereof, including without limitation of the foregoing all such costs and expensese of enforcing the provisions of this Agreement (specifically including this Article XVII) against any Debtor Guarantor and/or any Collateral of any Debtor Guarantor (the "Guaranteed Obligations").  The obligations and liabilities of the Debtor Guarantors under this Article XVII are joint and several, and each Debtor Guarantor hereby acknowledges and accepts such joint and several liability and further acknowledges and agrees that the joint and several liabilities of Debtor Guarantors under the provisions of this Article XVII shall be primary and direct liabilities and not secondary liabilities.

17.2.    <u>Guaranty of Payment and Not Merely Collection</u>.

The provisions of this Article XVII constitute a guaranty of payment and not of collection and no Secured Party shall be required, as a condition of any Debtor Guarantor's liability hereunder, to make any demand upon or to pursue any of their rights against any Loan Parties and/or any of the Collateral, or to pursue any rights which may be available to any Secured Party with respect to any other person who may be liable for the payment of the Guaranteed Obligations and/or any other collateral or security available to any Secured Party therefor.

17.3.    <u>Debtor Guarantor and Suretyship Waivers</u>.

The provisions of this Article XVII constitute an absolute, unconditional, irrevocable and continuing guaranty and will remain in full force and effect until all of the Guaranteed Obligations have been paid in full in cash and this Agreement and all Commitments hereunder have been terminated.  The provisions of this Article XVII will not be affected (i) by any surrender, exchange, acceptance, compromise or release by any Secured Party of any other party, or any other guaranty or any Collateral or other collateral or security held by it for any of the Guaranteed Obligations, (ii) by any failure of any Secured Party to take any steps to perfect or maintain their Liens or security interest in or to preserve their rights in or to any Collateral or any other security or other collateral for the Guaranteed Obligations or any guaranty, or (iii) by any irregularity, unenforceability or invalidity of the Guaranteed Obligations or any part thereof or any security therefor or other guaranty thereof, and the provisions of this Article XVII will not be affected by any other facts, events, occurrences or circumstances (except payment or performance of the Guaranteed Obligations in full) that might otherwise give rise to any "guarantor" or "suretyship" defenses to which any Debtor Guarantor might otherwise be entitled, all of which such "guarantor" or "suretyship" defenses are hereby waived by each Debtor Guarantor.  The obligations of each Debtor Guarantor hereunder shall not be affected, modified or impaired by any counterclaim, set-off, deduction or defense of any kind, including any such counterclaim, set-off, deduction or defense based upon any claim such Debtor Guarantor may have against any Borrower or any Secured Party (or any of their respective Affiliates), or based upon any claim any Borrower or any other guarantor or surety may have against any Secured Party (or any of their respective Affiliates), except payment of the Guaranteed Obligations in full in cash.

(a)     Notice of acceptance of the agreement to guaranty provided for under the provisions of this Article XVII, notice of extensions of credit to Loan Parties from time to time, notice of default, diligence, presentment, notice of dishonor, protest, demand for payment, and any defense based upon any Secured Party's failure to comply with the notice requirements of §§ 9-611, 9-612 and 9-613 of the Uniform Commercial Code are hereby waived to the fullest extent permitted by law.  Each Debtor Guarantor hereby waives all defenses based on suretyship or impairment of collateral to the fullest extent permitted by law.

(b)     Secured Parties may at any time and from time to time, without impairing or releasing, discharging or modifying any Debtor Guarantor's liabilities hereunder and (for purposes of this Article XVII only) without notice to or the consent of any Debtor Guarantor (but with the consent of Borrowers to the extent required by the terms of this Agreement or the Other Documents): (a) change the manner, place, time or terms of payment or performance of or interest rates or other fees on, or other terms relating to (including the maturity thereof), any of the Guaranteed Obligations; (b) renew, extend, substitute, modify, amend or alter or refinance, or grant consents or waivers relating to any of the terms and provisions of  this Agreement or any of the Other Documents or of the Guaranteed Obligations, or of any other guaranties, or any security for the Obligations or guaranties, (c) increase (without limit of any kind) or decrease the Guaranteed Obligations (including all loans and extensions of credit thereunder) or modify the terms on which loans and extensions of credit may be made to Loan Parties (including without limitation by making available to Loan Parties under this Agreement and/or any Other Document and as part of the Guaranteed Obligations any new loans, advances or other extensions of credit of any kind, including any such new loans, advances or extension of credit of a new or different type or nature (including any new Cash Management Products and Services of any kind, Foreign Currency Hedges of any kind and/or Interest Rate Hedge of any kind) as compared to the loans, advances and extensions of credit available to Loan Parties under this Agreement as of the date hereof); (d) apply any and all payments by whomever paid or however realized including any proceeds of the Collateral or any other collateral or security, to any Guaranteed Obligations in such order, manner and amount as Agent may determine in its sole discretion in accordance with the terms of this Agreement; (e) settle, compromise or deal with any other Person, including any Borrower or any other guarantor, with respect to the Guaranteed Obligations in such manner as Agent deems appropriate in its sole discretion; (f) substitute, exchange, subordinate, sell, compromise or release any security or guaranty for the Guaranteed Obligations; or (g) take such actions and exercise such remedies hereunder as provided herein.

(c)     Without limiting any of the foregoing, each Debtor Guarantor waives, to the maximum extent permitted by law, (a) all rights and defenses arising out of an election of remedies by any Secured Party, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed such Debtor Guarantor's rights of subrogation and reimbursement against any Borrower, any other guarantor or any other Person and (b) all rights and defenses that such Debtor Guarantor may have because the Obligations are or become secured by real property, which means, among other things: (i) Secured Parties may collect from such Debtor Guarantor without first foreclosing on any real property collateral or personal property collateral pledged by any Borrower or any other guarantor and (ii) if any Secured Party forecloses on any real property pledged by any Borrower or any guarantor: (A) the amount of the Obligations may be reduced only by the price for which such real property is sold at the foreclosure sale, even if such real property is worth more than

154

the sale price; and (B) Secured Parties may collect from such Debtor Guarantor even if Secured Parties, by foreclosing on such real property, have destroyed any right such Debtor Guarantor may have to collect from any Borrower or any other guarantor.  The foregoing is an unconditional and irrevocable waiver of any rights and defenses such Debtor Guarantor may have because the Obligations are secured by real property.

      17.4.   Repayments or Recovery from Secured Parties.

If the incurrence or payment of the Obligations by any Borrower or any Guarantor or the transfer to any Secured Party of any property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of Title 11 of the United States Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if any Secured Party is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that such Secured Party is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys' fees of such Secured Party related thereto, the liability of each Debtor Guarantor automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made and any Liens held by Agent or Pre-Petition previously released or terminated with respect to any Collateral shall be reinstated as of the date on which such Secured Party repays or restores such Voidable Transfer.  The provisions of this Section 17.4 shall survive any release and/or termination of this Agreement (and/or of any Debtor Guarantor's liability under this Article XVII) and will be and remain effective notwithstanding any contrary action which may have been taken by Debtor Guarantor in reliance upon such payment, and any such contrary action so taken will be without prejudice to Secured Parties' rights hereunder and any such release and/or termination will be deemed to have been conditioned upon such payment having become final and irrevocable and indefeasible.

      17.5.   Enforceability of Obligations.

No modification, limitation or discharge of the Guaranteed Obligations arising out of or by virtue of any bankruptcy, reorganization or similar proceeding for relief of debtors under federal or state law with respect to any Borrower or any other guarantor or surety for the Guaranteed Obligations will affect, modify, limit or discharge Debtor Guarantors' liability in any manner whatsoever and the provisions of this Article XVII will remain and continue in full force and effect and will be enforceable against each Debtor Guarantor to the same extent and with the same force and effect as if any such proceeding had not been instituted.  Each Debtor Guarantor hereby waives all rights and benefits which might accrue to it by reason of any such proceeding and will be liable to the full extent hereunder, irrespective of any modification, limitation or discharge of the Guaranteed Obligations that may result from any such proceeding.

**To the maximum extent permitted by law, each Guarantor expressly waives the effect of any statute of limitations or other limitations on any actions under this Guaranty.**

      17.6.   Guaranty Payable upon Event of Default; Remedies.

(a)      Upon the occurrence and during the continuance of any Event of Default under this Agreement: (a) Debtor Guarantors shall pay to Agent the full amount of the Guaranteed Obligations; (b) Agent in its discretion may exercise with respect to any Collateral of any Debtor Guarantor or any other collateral or security for the Guaranteed Obligations any one or more of the rights and remedies provided a secured party under the Uniform Commercial Code or any other applicable law or at equity (all of which such rights and remedies are hereby deemed incorporated herein and confirmed and ratified by Debtor Guarantors as if expressly set forth and granted and agreed to by Debtor Guarantors herein); and/or (c) Agent in its discretion may exercise from time to time any other rights and remedies available to it or any other Secured Party at law, in equity or otherwise.

(b)      The Debtor Guarantors jointly and severally agree that, as between the Debtor Guarantors and the Secured Parties, the obligations of Loan Parties under this Agreement and the Other Documents may be declared to be forthwith due and payable as provided in Section 11.1 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 11.1) for purposes of this Article XVII (specifically including Section 17.1 hereof), notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against Loan Parties and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by Loan Parties) shall forthwith become due and payable by the Debtor Guarantors for purposes of this Article XVII (specifically including Section 17.1 hereof).

(c)      Each Debtor Guarantor hereby acknowledges that the guarantee provided for under the provisions of this Article XVII constitutes an instrument for the payment of money, and consents and agrees that any Secured Party, at its sole option, in the event of a dispute by such Debtor Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

17.7.    Waiver of Subrogation.

Until  the  Guaranteed  Obligations  are  paid  in  full  in  cash  and  this  Agreement  and  all Commitments hereunder have been terminated, each Debtor Guarantor waives in favor of Secured Parties any and all rights which such Debtor Guarantor may have to (a) assert any claim against any Borrower or any other Debtor Guarantor based on subrogation, restitution, reimbursement or contribution rights with respect to payments made under the provisions of this Article XVII, and (b) any realization on any property of any Borrower or any other Debtor Guarantor, including participation in any marshalling of any Borrower's or any other Debtor Guarantor's assets.

17.8.    Continuing Guaranty and Suretyship Agreement.

The provisions of this Article XVII shall constitute a continuing guaranty and suretyship obligation of each Debtor Guarantor with respect to all Guaranteed Obligations from time to time outstanding, arising or incurred, and shall continue in effect, and Secured Parties may continue to act in reliance hereon, until all of the Guaranteed Obligations have been paid in full in cash and this Agreement and all Commitments hereunder have been terminated, and until such time, no

Debtor Guarantor shall have any right to terminate or revoke the provisions of this Article XVII nor any of the guarantee and surety agreements and other covenants and undertakings provided for herein.

       17.9.   <u>General Limitation on Guarantee Obligations</u>.

If, in the course of any legal action or proceeding under any applicable law, including any bankruptcy or insolvency proceedings with respect to any Debtor Guarantor(s) (including the Case), the obligations of any Debtor Guarantor under the provisions of this Article XVII would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under the provisions of this Article XVII, then, notwithstanding any other provision to the contrary, the amount of such liabilities of such Debtor Guarantor under the provisions of this Article XVII shall, without any further action by such Debtor Guarantor, any Secured Party or any other person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 17.10) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

       17.10.   <u>Right of Contribution</u>.

Each Debtor Guarantor hereby agrees that to the extent that any Debtor Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Debtor Guarantor shall be entitled to seek and receive contribution from and against any other Debtor Guarantor hereunder which has not paid its proportionate share of such payment. Each Debtor Guarantor's right of contribution shall be subject to the terms and conditions of Section 17.7 hereof. The provisions of this Section 17.10 shall in no respect limit the obligations and liabilities of any Debtor Guarantor to Secured Parties, and each Debtor Guarantor shall remain liable to Secured Parties for the full amount guaranteed by such Debtor Guarantor hereunder.

       17.11.   Keepwell.

Without limiting any other provision of this Article XVII or otherwise limiting the provisions of Section 6.15 as to the Loan Parties generally, each Debtor Guarantor hereby agrees that, for the purposes of this Article XVII as an absolute, unconditional, irrevocable and continuing guaranty agreement, the provisions of Section 6.15 are hereby incorporated and restated in this Article XVII as an obligation of each Debtor Guarantor that is and/or may hereafter be a Qualified ECP Loan Party from time to time.

*[Signature page follows]*

Each of the parties has signed this Agreement as of the day and year first above written.

**HAGGEN, INC.**

By: _____

Name: _____

Title: _____

**HAGGEN OPCO NORTH, LLC**

By: _____

Name: _____

Title: _____

**HAGGEN OPCO SOUTH, LLC**

By: _____

Name: _____

Title: _____

**PNC BANK, NATIONAL ASSOCIATION**,
As Lender and as Agent

By:    _____
Name:
Title:

**SCHEDULE 1.1(a)**

**COMMITMENTS**

| **Lender** | **Revolving Commitment Amount** | **Revolving Commitment Percentage** |
|---|---|---|
|  |  |  |