## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HAGGEN HOLDINGS, LLC, *et al.,*[1] | Case No. 15-11874 (KG) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF BLAKE BARNETT IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Blake Barnett, declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1.    I am the Chief Financial Officer of Haggen Holdings, LLC ("**Haggen**") and the other above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**,").  I hold a Master of Business Administration from University of California, Irvine and have been the Chief Financial Officer (or Interim Chief Financial Officer) of the Debtors since May 30, 2014.  In such capacity, I am familiar with the day-to-day operations, business and financial affairs of the Debtors.

2.    On September 8, 2015 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") thereby commencing the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**").  The Debtors intend to continue in possession of their assets and the management of their businesses as debtors-in-possession during the pendency of these Chapter 11 Cases.  To enable the Debtors to operate effectively and to avoid the adverse effects of the chapter 11 filings, the Debtors have requested various types of relief in "first day"

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Haggen Holdings, LLC (7558), Haggen Operations Holdings, LLC (6341), Haggen Opco South, LLC (7257), Haggen Opco North, LLC (5028), Haggen Acquisition, LLC (7687), and Haggen, Inc. (4583).  The mailing address for each of the Debtors is 2211 Rimland Drive, Bellingham, WA 98226.

applications and motions (the "**First Day Motions**") filed with the Court concurrently herewith. The First Day Motions seek relief to, among other things: (a) continue the Debtors' operations while in chapter 11 with as little disruption as possible; (b) maintain the confidence and support of employees, customers and other key constituencies and (c) establish procedures for the smooth and efficient administration of these Chapter 11 Cases.  Gaining and maintaining the support of the Debtors' employees, customers and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' business with minimal disruption, will be crucial to the success of the Debtors' efforts in these Chapter 11 Cases.

3.      I submit this declaration (the "**Declaration**") on the Debtors' behalf in conjunction with their petitions and in support of the First Day Motions, as well as to explain to the Court and other interested parties the circumstances that compelled the Debtors to seek relief under the Bankruptcy Code.  A copy of the resolutions of the Board of Directors authorizing the filing of the Debtors' petitions is annexed to each Debtor's respective petition.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge and the knowledge I have acquired from those who report to me, my review of certain relevant documents, or my opinion based upon experience, knowledge and information concerning the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth herein.  I am duly authorized to submit this Declaration on behalf of the Debtors.

## **BACKGROUND**

### A.      Overview of the Debtors' Business

4.      Headquartered in Bellingham, Washington, Haggen was founded in 1933 as a single grocery store.  From 1933 to 2014, Haggen grew into a 30 store family-run grocery chain,

with stores located in the northwestern United States.  In 2011, the Haggen family sold a majority equity interest to the Comvest Group Holdings LLC, which currently owns the majority of the equity interests in the Haggen enterprise.  In a single acquisition described below, Haggen rapidly expanded in 2014 and 2015, and, as of the Petition Date, Haggen owned and operated 164 stores through three operating companies: Haggen, Inc., Haggen Opco North, LLC ("**Haggen North**") and Haggen Opco South, LLC ("**Haggen South**").

5.     Haggen's northwest operations are run by Haggen, Inc. and Haggen North (Haggen Pacific Northwest), which operate 18 and 46 stores, respectively, in Washington and Oregon.  Haggen's southwest operations are run by Haggen South (Haggen Pacific Southwest), which operates 100 stores in California, Arizona and Nevada.  Including, the corporate headquarters, Haggen employed approximately 10,880 employees as of the Petition Date.  A chart detailing the organizational structure of Haggen and its subsidiaries as of the Petition Date is attached hereto as Exhibit A.

**B.     Prepetition Capital Structure**

6.     On February 12, 2015, Haggen, Inc., Haggen North and Haggen South (together, the "**Borrowers**") entered into a financing arrangement with PNC Bank, National Association (as agent and lender) and other participating lenders (collectively, "**PNC**" and, together with the Borrowers, the "**Revolving Loan Parties**") under which PNC provided a revolving line of credit facility to finance the Debtors' operations (the "**Credit Facility**").  The terms and conditions of the Credit Facility are in part evidenced by a Revolving Credit and Security Agreement (the "**PNC Loan Agreement**") pursuant to which PNC agreed to provide the Borrowers (i) a revolving line of credit facility in the amount of $180,000,000 and (ii) a smaller "Swing Loan" facility up to an additional $20,000,000.  In connection with the Credit Facility, the Borrowers

executed two notes, both dated February 12, 2015, in the original principal of $180,000,000 (the "**Revolving Note**") and $20,000,000 (the "**Swing Loan Note**").  As of September 7, 2015, the outstanding balance on the Revolving Note was approximately $154,067,263 and the outstanding balance on the Swing Loan Note was $0 (together, the "**PNC Obligations**").

7.    The PNC Obligations and all other amounts owed under the Credit Facility are secured by a first-position security interest (the "**PNC Prepetition Liens**") in substantially all of the Borrowers' personal property, assets, including accounts receivable, equipment and fixtures, general intangibles, inventory, deposit accounts, contract rights and other rights to payment, and the proceeds and products thereof (the "**PNC Prepetition Collateral**").  Additionally, on February 12, 2015, the Borrowers executed an intellectual property security agreement pursuant to which they granted to PNC a security interest in certain trademarks to secure their obligations under the PNC Loan Agreement.

8.    On February 12, 2015, Haggen Operations Holdings, LLC and Haggen Acquisition, LLC (together, the "**PNC Guarantors**") executed a guaranty and suretyship agreement pursuant to which both guaranteed the payment and performance of all obligations of the Borrowers to PNC under the PNC Loan Agreement (the "**PNC Guaranty**").  To secure their obligations under the PNC Guaranty, the PNC Guarantors executed a guarantor security agreement, dated February 12, 2015, in favor of PNC pursuant to which they granted to PNC a security interest in substantially all of their personal property.  In addition, Haggen Operations Holdings, LLC also executed a collateral pledge agreement in favor of PNC in which it pledged its equity interests Haggen North, Haggen South and Haggen Acquisition, LLC to secure its guaranty obligations.  Similarly, Haggen Acquisition, LLC also executed a collateral pledge

01:17659349.1

agreement in favor of PNC in which it pledged its equity interests Haggen, Inc. to secure its guaranty obligations.

9.      On August 21, 2015, the Borrowers entered into a subordinated loan agreement (the "**Subordinated Loan Agreement**") with Haggen Property North, LLC ("**Haggen Property North**") and Haggen Property South, LLC ("**Haggen Property South**" and, together with Haggen Property North, the "**Haggen Property Lenders**") pursuant to which the Borrowers obtained a subordinated loan in the original principal amount of $25,000,000 (the "**Subordinated Loan**").  The obligations owed by the Borrowers to the Haggen Property Lenders under the Subordinated Loan Agreement are secured by a second subordinated lien on the Borrowers' personal property, subject to the Intercreditor Agreement (as defined below).  As of the Petition Date, the obligations owed by the Debtors under the Subordinated Loan Agreement is $25,000,000.

10.     The Borrowers, PNC and the Haggen Property Lenders are parties to that certain intercreditor agreement dated as of August 21, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "**Intercreditor Agreement**"), which governs the respective rights, obligations and priorities of the Revolving Loan Parties and Haggen Property Lenders with respect to the matters referred to therein.  The liens and security interests granted to the Haggen Property Lenders in the PNC Prepetition Collateral are governed by and subject to the Intercreditor Agreement and are junior to the liens and security interests granted to the Revolving Loan Parties.

11.     As a grocery chain with 164 stores, the Debtors purchase merchandise and inventory from numerous vendors throughout the United States.  Additionally, the Debtors have liabilities arising from their leased stores.  In addition, the Debtors are responsible for lease

payments for certain equipment used at their facilities.  As of the Petition Date, the Debtors'
books and records list approximately $91,415,119 in trade liabilities.

## C.    Events Leading To Chapter 11

12.    Over the decades following its formation in 1933, Haggen, Inc. expanded,
opening additional stores in Washington and Oregon.  Ultimately, Haggen, Inc. grew into a 30-
store business with approximately $600 million of annual revenues.  From 2011 to 2014, Haggen
reduced its store base to 18, including a stand-alone pharmacy location.  The vast majority of
Haggen's current 164 stores, however, were acquired in connection with an acquisition from
Albertson's LLC ("**Albertson's**").  In 2015, Albertson's and Safeway, Inc. completed a merger.
In connection with the merger, the Federal Trade Commission ("**FTC**") required Albertson's to
sell 146 of their locations in Washington, Oregon, California, Arizona, and Nevada (collectively,
the "**Albertson's Locations**").

13.    After extensive negotiations with Albertson's, in December 2014, Haggen
executed an asset purchase agreement with Albertson's ("**Albertson's APA**").  The Albertson's
Locations were then transitioned to Haggen in a staggered schedule from February 14, 2015 to
June 23, 2015.

14.    During the transition process, the Haggen team faced the task of closing the
Albertson's Locations and rebranding them as Haggen stores, essentially opening a brand new
chain of 146 grocery stores in just over 120 days, while limiting each store closure to only 1–2
days.

15.    The accelerated closing schedule presented challenges of scale, which made
Albertson's cooperation and good faith implementation of the Albertson's APA essential.  This
did not occur.  On the contrary, Albertson's engaged in numerous breaches of the Albertson's

01:17659349.1

APA and other conduct that made the transitioning and rebranding unsuccessful, leading to major drop-offs in customer levels at the new stores. This, in turn, led to a severe liquidity crisis for the Debtors.

16.    Haggen, the buyer under the Albertson's APA, has recently filed a lawsuit (the "**Albertson's Lawsuit**") against Albertson's in Delaware federal court. The complaint filed in the Albertson's Lawsuit details the actions Albertson's took that ultimately led to Haggen's failure in its efforts to operate Haggen stores in the Albertson's Locations.

**D.    Prepetition Store Closing Efforts**

17.    Following the acquisition of the Albertson's Locations, the Debtors' liquidity dropped precipitously. During the period from June 19, 205 until the Petition Date, the Debtors' availability under their prepetition Credit Facility dropped from $35,988,128 to $2,334,274. In the weeks leading up to the Petition Date, the Debtors' operations continued to generate increasingly negative cashflow. As a result of, among other things, these liquidity issues, Haggen determined to close several of its recently acquired stores. In particular, Haggen entered into an agreement with Hilco Merchant Resources, LLC in late August 2015 to conduct going-out-of-business sales for 27 of its stores.

18.    Additionally, Haggen has engaged Sagent Advisors to market for sale some of the Haggen North and Haggen South locations and to explore market interest in various store locations. As a result of these efforts, a number of third parties have expressed interest in acquiring a number of the Haggen North and Haggen South locations.

**E.    Steps in Chapter 11**

19.    The Debtors' historical operations are comprised of 17 grocery stores operated by Haggen, Inc. These stores are profitable, earning approximately $25 million in annual EBITDA,

01:17659349.1

and enjoy a strong brand reputation in the Pacific Northwest. The Debtors believe that the stores operated by Haggen, Inc., augmented by some of the acquired stores, will ultimately form a set of successful core stores (the "**Core Stores**") that is among their most valuable assets. The Debtors intend to reorganize around, or sell as a going concern, the Core Stores for the benefit of their creditors.

20.     Unlike the Core Stores, many of the recently acquired stores operated by Haggen South and Haggen North are presently unprofitable and represent a negative cash drain on the Debtors' business. Because of the negative cash burn, and the Debtors' inability to finance their operations under their existing Credit Facility, the Debtors must promptly identify the appropriate course of action for these stores. The Debtors' existing prepetition lenders have offered the Debtors a postpetition credit facility (the "**DIP Facility**") that will provide the Debtors with the needed liquidity to identify and document certain value-maximizing transactions. Such transactions include, among others, a sales of portions of the Debtors' prescription business and sales of a group or groups of their non-Core Stores to competitors (the "**Identified Transactions**"). If the Debtor is able to execute on such Identified Transactions, the DIP Facility will provide additional liquidity to allow the Debtors to consummate the Identified Transactions. Additionally, the DIP Facility will provide the Debtors with sufficient liquidity to maximize the value of their remaining assets.

**FIRST DAY MOTIONS**

**A.     Facts in Support of First Day Motions**

21.     To enable the Debtors to operate effectively and to avoid the adverse effects of the chapter 11 filings, all or certain of the Debtors have filed, or intend to file, the motions and applications described below.

01:17659349.1

22.     In connection with the preparation for these bankruptcy cases, I have reviewed each of the First Day Motions referenced below.  The First Day Motions were prepared with my input and assistance, or the input and assistance of employees or designees working under my supervision.  I believe the information contained in the First Day Motions is accurate and correct. As set forth more fully below, I believe that the entry of orders granting the relief requested in these motions and applications is critical to the Debtors' ability to preserve the value of their estates and assist in their sale efforts.

**B.     Motion Related to Case Management**

i.     *Motion of the Debtors for an Order Directing Joint Administration of Their Related Chapter 11 Cases*

23.     The Debtors seek the joint administration of their Chapter 11 Cases for procedural purposes only.  I believe that it would be far more practical and expedient for the administration of these Chapter 11 Cases if this Court were to authorize their joint administration.  Joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative notices, applications and orders.  It is my understanding that no prejudice will befall any party by the joint administration of the Debtors' cases as the relief sought therein is solely procedural and is not intended to affect substantive rights.

**C.      Motions Related to Financing of Operations**

i.    *Motion of the Debtors for an Order, Pursuant to Sections 105(a), 345, 363 and 503(b) of the Bankruptcy Code, Bankruptcy Rule 2015 and Local Rule 2015-2, (A) Authorizing and Approving (I) Continued Use of Cash Management System and (II) Use of Prepetition Bank Accounts and Business Forms, (B) Authorizing Banks Participating in the Cash Management System to Honor Certain Transfers and Charge Certain Amounts, (C) Waiving the Requirements of Section 345(b) on an Interim Basis, (D) Granting Administrative Expense Status to Post-Petition Intercompany Claims and (E) Granting Related Relief (the "Cash Management Motion")*

24.      The Debtors request (a) authorization to continue the use of (i) their current cash management system and (ii) the Debtors' existing bank accounts and business forms, including, authorization for the Debtors to open and close bank accounts; (b) for all banks participating in the cash management system to honor certain transfers and charge bank fees and certain other amounts; (c) a waiver of the requirements of section 345(b) of the Bankruptcy Code with respect to the Debtors' deposit practices on an interim basis; and (d) the granting of administrative expense status to post-petition intercompany claims.  The Debtors also request that the Court grant any necessary relief related to the foregoing.

25.      In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect, transfer, and disburse funds generated by their operations (the "**Cash Management System**").  The Cash Management System is comprised of approximately 66 bank accounts at various financial institutions (the "**Bank Accounts**").  The depository bank accounts are predominantly maintained with PNC Bank and U.S. Bank, although accounts are also maintained at other banks (collectively, the "**Banks**").

26.      The Cash Management System enables the Debtors to efficiently collect and disburse cash generated by their business, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, reduce administrative expenses, and efficiently obtain accurate account balances and

other financial data.  The Debtors' centralized Cash Management System is essential to their business operations and are necessary to generate the timely and accurate financial information necessary to manage their complex business.

27.     In order to minimize expenses, the Debtors also seek authorization to continue using their existing business forms and checks without alteration or change.  Additionally, the Debtors request authority for the Banks to accept and honor all representations from the Debtors as to which checks, drafts, wires or automated clearing house transfers should be honored or dishonored consistent with any order of this Court and governing law, whether such checks, drafts, wires or automated clearing house transfers are dated prior to, on or subsequent to the Petition Date.  The Debtors also request the Banks be authorized, but not directed, to charge back returned items to the Bank Accounts in the normal course of business.

28.     Accordingly, on behalf of the Debtors, I respectfully request that the Cash Management Motion be approved.

ii.   *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtor Loan Parties to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral of Pre-Petition Secured Parties, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief, Pursuant to 11 U.S.C. Sections 105, 361, 362, 363(c), (d) &(e), 364(c), 364(d)(1), 364(e) and 507(b) (the "**DIP/Cash Collateral Motion**")[2]*

29.     The Debtors are seeking authority to enter into a DIP Facility that will provide post-petition financing, in the form of new money revolving loans and a roll-up of the loans existing under their existing Credit Facility.  The Debtors have an immediate need to obtain financing and use of cash collateral for, among other things, working capital purposes and to pay expenses incurred in these chapter 11 cases.  Without immediate access to such financing, the

---

[2] As used in this section C(ii), capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP/Cash Collateral Motion.

Debtors would be unable to operate their business, and the Debtors' ability to reserve and maximize the value of their assets and operations would be irreparably harmed.

30.     Further, the use of cash collateral alone would be insufficient to meet the Debtors' liquidity needs in chapter 11.  Accordingly, the Debtors require both the additional financing provided by the proposed DIP Facility and the use of cash collateral.  The terms of the DIP Facility have been negotiated at arms' length, and the Debtors have been unable to obtain credit on more favorable terms than contained in the proposed DIP Facility.

31.     Accordingly, on behalf of the Debtors, I respectfully request that the DIP/Cash Collateral Motion be approved.

## D.    Motions Related to Operations

i.    *Debtors' Motion for an Order, Pursuant to Sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code (A) Authorizing:  (I) Payment of Prepetition Employee Wages, Salaries, and Other Compensation; (II) Reimbursement of Prepetition Employee Business Expenses; (III) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (IV) Payment of Workers' Compensation Obligations; (V) Payments for Which Prepetition Payroll Deductions were Made; (VI) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (VII) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and Contributions; and (B) Authorizing Banks to Honor and* <u>*Process Check and Electronic Transfer Requests Related Thereto (the "Wages Motion")*</u>[3]

32.     The Debtors request the entry of interim and final orders (a) authorizing, but not directing, the Debtors, in accordance with their stated policies and in their discretion, to (i) pay prepetition employee wages, salaries and other accrued compensation, (ii) reimburse prepetition employee business expenses, (iii) make contributions to prepetition benefit programs and continue such programs in the ordinary course of their business, (iv) pay prepetition union dues and deductions and continue making contributions to union benefit plans, (v) honor workers'

---

[3] As used in this section D(i), capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Wages Motion.

compensation obligations, (vi) make payments for which prepetition payroll deductions were made, (vii) pay processing costs and administrative expenses relating to the foregoing payments and contributions and (viii) make payments to third parties incident to the foregoing payments and contributions, and (b) authorizing banks and other financial institutions to honor and process check and electronic transfer requests related to the foregoing.

33.    As of August 28, 2015, the Debtors employed approximately 10,880 employees across three business units: 2,000 at Haggen, Inc. 3,730 at Haggen North and 5,140 at Haggen South.  Approximately 685 of the Debtors' employees are salaried, with the balance accruing wages on an hourly basis.  Approximately 80%, or 8,700, of the employees are union members: 1,600 at Haggen, Inc., 2,680 at Haggen North and 4,420 at Haggen South.

34.    The employees perform a variety of critical functions for the Debtors, and their knowledge, skills and understanding of the Debtors' infrastructure, business operations and vendor relations is essential to the success of these Chapter 11 Cases.  Without the continued service and dedication of the employees, it will be difficult, if not impossible, to operate the Debtors' business without an unexpected or inopportune interruption and to prosecute these Chapter 11 Cases in a manner that will maximize the value of the Debtors' estates.  The employees have an intimate knowledge of the Debtors' infrastructure and operations, and any deterioration in the employees' morale and welfare at this critical time undoubtedly would adversely impact the Debtors and the success of these cases.  Additionally, maintaining the Workers' Compensation Program is justified because applicable state law mandates this coverage.

35.    Thus, to operate the Debtors' business without an unexpected or inopportune interruption and to prosecute these Chapter 11 Cases in a manner that will maximize the value of

01:17659349.1

the Debtors' estates and to minimize the personal hardship that the employees will suffer if prepetition employee-related obligations are not paid when due or as otherwise expected, and to maintain employee morale and a focused workforce during this critical time, the Debtors believe that it is necessary and in the best interest of their estates and all stakeholders to seek the relief requested herein.

36.     Accordingly, on behalf of the Debtors, I respectfully request that the Wages Motion be approved.

ii.    *Debtors' Motion for an Order, Pursuant to Sections 105(a), 363(c), 503(b)(1), 1107(a), and 1108 of the Bankruptcy Code, Authorizing (I) the Debtors to Honor Prepetition Obligations Related to Customer Programs and Otherwise Continue Customer Programs in the Ordinary Course of Business and (II) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto (the "Customer Programs Motion")*

37.     The Debtors request (i) authority to, in their discretion, continue, maintain, implement new, and/or terminate, and to pay, honor, and otherwise satisfy pre-petition obligations related to, their pre-petition customer practices and programs, in the ordinary course of business and in a manner consistent with past practice and (ii) an order authorizing banks and other financial institutions to honor and process check and electronic transfer requests related to the foregoing.

38.     The success and viability of the Debtors' business depends upon the loyalty of their customers. To maximize customer loyalty, the Debtors have maintained and followed, in the ordinary course of their business, practices and programs for the benefit of their customers (collectively, the "**Customer Programs**"), which include (i) return, refund, exchange, price-guarantee, and rain check policies, (ii) the honoring of gift cards, (iii) coupon redemption and store programs, (iv) the sale of bus passes, (v) the offering of dry cleaning services in conjunction with partners, (vi) lottery programs, (vii) catering services, (viii) charitable giving

programs, (ix) utility payment programs, (x) money orders and money grams, (xi) the sale of tickets to local events and (xii) the acceptance of donations for local school districts.

39.    The Debtors use the Customer Programs to reward customer loyalty, provide services and goods to attract customers to their stores and provide incentives to buy products from their stores.  Many, if not most, of the Customer Programs are standard in the retail food business.  Without the ability to continue the Customer Programs and to satisfy the related pre-petition obligations, the Debtors risk surrendering their market share of business to their competitors.  Moreover, some of the Customer Programs are charitable contribution programs.

40.    Accordingly, on behalf of the Debtors, I respectfully request that the Customer Programs Motion be approved.

iii.    *Debtors' Motion (1) for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 503(b), 1107(a) and 1108 of the Bankruptcy Code, (I) Authorizing the Debtors To Pay Certain Prepetition Claims (A) Arising Under the Perishable Agricultural Commodities Act and the Packers and Stockyards Act of 1921, (B) of Lien Vendors, and (C) of Critical Vendors and Service Providers, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Granting Certain Related Relief, and (2) for Entry of a Final Order, Pursuant to Sections 105(a) and 503(b)(9) of the Bankruptcy Code, Establishing Exclusive Procedures for the Assertion, Resolution, Allowance and Satisfaction of Claims Arising Under Section 503(b)(9) of the Bankruptcy Code (the "Vendor Motion")*[4]

41.    Through the Vendor Motion, the Debtors request authority, in their discretion, to pay, in the ordinary course of business, prepetition claims (i) arising under PACA or PASA, (ii) upon which a lien may arise as a result of the Debtors' shipping and distribution network, mechanic's liens, artisan's liens, materialman's liens or any other similar liens, and (iii) of certain critical vendors and service providers.

---

[4] As used in this section D(iii), capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Vendor Motion.

42.     The Debtors rely on several vendors which supply the Debtors with, among other items, meat, poultry, dairy products, frozen foods, and produce protected by PACA or PASA, and these vendors may be eligible to assert PACA/PASA claims, in priority ahead of all other creditors in these Chapter 11 Cases.  In addition, an integral component of operating the Debtors' stores is the efficient flow of inventory and products.  Accordingly, the Debtors rely extensively on, among others, numerous shippers and warehousemen and certain other third-party vendors and service providers, to ship, transport, store, and deliver inventory, raw materials, and other products used in the Debtors' ordinary course operations.  The Debtors also regularly use service providers to repair, maintain, and improve their properties.  These vendors could potentially assert liens against the Debtors' property for amounts that the Debtors owe to them.

43.     Finally, to maintain consistency and keep their businesses running efficiently and seamlessly, the Debtors rely heavily on a number of key vendors and service providers that supply the Debtors with goods and services that are critical to the Debtors' business.  It is essential that the Debtors are able to maintain their business relationships with, and honor outstanding payment obligations to, these Critical Vendors given the role that they play in the Debtors' business.

44.     The goods and services provided by the Vendors are necessary to ensure that there are not any unexpected or inopportune interruptions to the Debtors' operations, because the Vendors are the most cost-efficient and, in many cases, the only source from which the Debtors can procure critical goods and services within a timeframe that would permit the Debtors to avoid unanticipated interruptions, delays or shutdowns in operations.  Any failure to pay the Vendor Claims would, in the Debtors' business judgment, result in the Vendors refusing to provide necessary goods and services to the Debtors.   Any unexpected or inopportune

01:17659349.1

interruption, delay or shutdown in the Debtors' operations resulting from a refusal by the Vendors to do business with the Debtors on a post-petition basis would have disastrous effects on the Debtors' business and undermine the Debtors' ability to preserve and maximize the value of their estates.

45.     Moreover, the PACA/PASA Vendors will be eligible to assert PACA/PASA Claims, likely granting them priority ahead of all other creditors in these chapter 11 cases, and the Lien Vendors may assert and perfect possessory liens or construction, materialman's, mechanic's or other similar statutory liens on the Debtors' assets, thereby jeopardizing the Debtors' ability to prosecute these cases in a timely and efficient manner.  With respect to the Critical Vendor Claims, the Debtors have reviewed their accounts payable and undertaken a process to identify those vendors which are essential to avoid any unexpected or inopportune interruptions to their operations.  I believe that the authority to pay the Critical Vendor Claims is vital to the Debtors' efforts to preserve and maximize estate value.  Also, for a significant portion of the PACA/PASA Claims and the Critical Vendor 503(b)(9) Claims, the Debtors' payment of the same merely affects the timing of such payments, and not the amount to be received by these Vendors on account of their Vendor Claims which, based on my knowledge and conversations with the Debtors' professional advisors, are likely afforded administrative expense priority under section 503(b)(9) of the Bankruptcy Code.

46.     Through the Vendor Motion, the Debtors also seek to establish exclusive procedures for the assertion, resolution, allowance and satisfaction of claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code in these chapter 11 cases.  I believe that establishing and implementing the Proposed 503(b)(9) Procedures is necessary and appropriate, and will allow the Debtors to address the Asserted 503(b)(9) Claims in a timely and efficient manner.  I

am advised that the Proposed 503(b)(9) Procedures and related notice requirements comply with the Bankruptcy Rules, and are reasonably calculated to provide notice to all parties that may wish to assert a claim pursuant to section 503(b)(9) of the Bankruptcy Code in these chapter 11 cases.

47.     Therefore, on behalf of the Debtors, I respectfully request that the Vendor Motion be approved.

iv.     *Debtors' Motion for an Order, Pursuant to Sections 105(a), 363 and 364 of the Bankruptcy Code, (I) Authorizing (A) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums and Broker Fees, and (B) Continuation of Insurance Premium Financing Programs; and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto (the "**Insurance Motion**")*[5]

48.     The Debtors request the entry of an order authorizing, but not directing, the Debtors to (a) continue and, to the extent necessary, renew liability, property and other insurance programs and pay policy premiums and broker fees arising thereunder or in connection therewith, including prepetition obligations arising in the ordinary course of business, and (b) continue the Debtors' insurance premium financing program and renew or enter into new premium financing programs, as necessary, under substantially similar terms.

49.     In the ordinary course of business, the Debtors have maintained, and continue to maintain, a number of insurance programs for directors and officers, general liability, property, umbrella and crime.  Continuation of the Insurance Programs is essential for preserving the value of the Debtors' assets and, in most cases, such coverage is required by the various contracts and laws that govern the Debtors.  Similarly, the services provided by the Broker are critical to ensuring that the Debtors obtain the necessary insurance coverage on advantageous terms at

---

[5] As used in this section D(iv), capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Insurance Motion.

01:17659349.1

competitive rates, and the Broker has a significant amount of institutional knowledge regarding the Debtors' insurance needs.  If the Debtors were forced to replace the Broker, the Debtors would necessarily be required to spend time, energy and resources getting a new insurance broker up to speed on the Debtors' insurance needs.  Furthermore, it is my understanding that, pursuant to the chapter 11 operating guidelines issued by the United States Trustee for Region 3 pursuant to 28 U.S.C. § 586, the Debtors are obligated to maintain certain insurance coverage, which coverage is provided by the policies included in the Insurance Programs.

50.    Because it is not economically advantageous for the Debtors to pay the premiums on each of their Insurance Programs on an annualized basis, from time to time, in the ordinary course of business, the Debtors finance the premiums on certain of the Insurance Programs.  If the Debtors are unable to continue making payments under the PFA, Flatiron Capital may be permitted to terminate the Financed Programs.  The Debtors would then be required to obtain replacement insurance on an expedited basis and likely at a significantly increased cost.

51.    Accordingly, on behalf of the Debtors, I respectfully request that the Insurance Motion be approved.

v.    *Debtors' Motion for Entry of Interim and Final Orders, Pursuant To Sections 105(a), 363(b), 507(a)(8), 541, 1107(a) and 1108 of the Bankruptcy Code, Authorizing (I) the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto (the "**Taxes and Fees Motion**")*[6]

52.    The Debtors request authority to pay certain prepetition taxes and fees that, in the ordinary course of business, accrued or arose before the Petition Date.  In the ordinary course of business, the Debtors incur or collect certain Taxes and Fees and remit such Taxes and Fees to various Authorities.  Any failure to pay the Taxes and Fees could impair the Debtors' ability to

---

[6] As used in this section D(v), capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Taxes and Fees Motion.

continue their business operations.  Any unexpected or inopportune interruption of the Debtors'

operations during the course of these Chapter 11 Cases could greatly diminish estate value and

frustrate the Debtors' chapter 11 efforts.   In addition, certain of the Authorities may take

precipitous action against the Debtors' directors and officers for certain unpaid Taxes and Fees

that undoubtedly would distract those individuals from their duties related to the Debtors'

prosecution of these cases.  Finally, based on my knowledge and conversations with the Debtors'

professional advisors, it is my understanding that certain of the Taxes and Fees are entitled to

priority status under the Bankruptcy Code and, as a result, must be paid in full before any general

unsecured obligations may be satisfied.

53.     Therefore, on behalf of the Debtors, I respectfully request that the Taxes and Fees

Motion be approved.

vi.     *Motion of the Debtors for an Interim Order and a Final Order (I) Prohibiting Utility*
        *Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility*
        *Providers Adequately Assured of Future Performance, and (III) Establishing  Procedures*
        *for Determining Adequate Assurance of Payment (the "**Utilities Motion**")*[7]

54.     The Debtors request through the Utilities Motion the entry of interim and final

orders, among other things: (a) prohibiting the Debtors' Utility Companies from altering,

refusing, or discontinuing Utility Services on account of pre-petition invoices; (b) deeming the

Utility Companies adequately assured of future payment; (c) establishing procedures for

determining additional adequate assurance of future payment and authorizing the Debtors to

provide additional adequate assurance of future payment to the Utility Companies; and (d)

setting a final hearing related to the relief requested in the Utilities Motion.

---

[7] As used in this section D(vi), capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Utilities Motion.

55.    The Utility Companies provide the Debtors with natural gas, electricity, telecommunications, internet connectivity, water, waste disposal and/or other similar services. The Utility Companies service the Debtors' headquarters, their retail stores, and distribution facilities, among other places.  The Debtors could not operate their business or serve their customers in the absence of continuous Utility Services.  Thus, any interruption in such services would severely disrupt the Debtors' day-to-day operations and be extremely harmful to their business.

56.    In general, the Debtors have established a good payment history with many of their Utility Companies, making payments on a regular and timely basis.  Historically, the Debtors have paid on average approximately $3,940,000 per month on account of the Utility Services.  To provide adequate assurance to the Utility Companies, as required under section 366 of the Bankruptcy Code, the Debtors propose to deposit a sum of $1,970,000, which represents 50% of the Debtors' estimated monthly cost of the Utility Services subsequent to the Petition Date, into a segregated account to be maintained during the pendency of these Chapter 11 Cases in the manner provided for in the Proposed Interim Order and the Proposed Final Order.

57.    I believe and am advised that the Assurance Procedures are necessary, because if such procedures were not approved, the Debtors could be forced to address numerous additional adequate assurance requests by the Utility Companies in a disorganized manner during the critical first weeks of these Chapter 11 Cases.  Moreover, a Utility Company could unilaterally determine, on or after the 30th day following the Petition Date, that it is not adequately assured of future payment and discontinuing service or making an exorbitant demand for payment to continue service.

58.     Accordingly, on behalf of the Debtors, I respectfully request that the Utilities Motion be approved.

vii.    *Emergency Motion for Interim and Final Orders:  (i) Authorizing the Debtors to Assume the Disposition Agreement; (ii) Authorizing and Approving the Conduct of Store Closing or Similar Themed Sales, with Such Sales to be Free and Clear of all Liens, Claims and <u>Encumbrances; and (iii) Granting Related Relief (the "**Hilco Assumption Motion**")</u>*

59.     Prior to the Petition Date, the Debtors determined to close 27 stores and run going-out-of-business sales at such stores ("**Store Closing Sales**").  Accordingly, in August, 2015, the Debtors and their advisors began contacting certain nationally-recognized potential liquidators (the only parties that can effectuate a transaction of this magnitude) to solicit interest in bidding on the right to conduct the Store Closing Sales.  The Debtors discussed the Store Closing Sales with such nationally-recognized liquidator firms, and the Debtors' advisors solicited both equity and fee-based bids, to allow them to identify the highest and best bid.

60.     After extensive negotiations, with the assistance of Alvarez & Marsal North America, LLC, the Debtors selected Hilco Merchant Resources, LLC ("**Hilco**") to conduct the Store Closing Sales, in accordance with the terms of a Letter Agreement Governing Inventory Disposition (the "**Disposition Agreement**").  The Store Closing Sales commenced on or about August 26, 2015.  Following the Petition Date, the Debtors seek to assume the Disposition Agreement, and allow Hilco to continue with the Store Closing Sales.  The Debtors' submit that assumption of the Disposition Agreement and that the ability to continue with Store Closing Sales, without interruption, is necessary to preserve the value of the Debtors' estate and avoid irreparable harm.

61.     Therefore, on behalf of the Debtors, I respectfully request that the Hilco Assumption Motion be approved.

01:17659349.1

### E.      Retention of Professionals

*viii.    Debtors' Application to Employ and Retain Kurtzman Carson Consultants, LLC, as*
*Notice, Claims and Balloting Agent to the Debtors (the "**KCC Retention Application**")*

62.     The Debtors request entry of an order, pursuant to section 156(c) of title 28 of the
United States Code and Local Rule 2002-1(f), authorizing the retention and appointment of
Kurtzman Carson Consultants, LLC ("**KCC**") as claims and noticing agent in these Chapter 11
Cases.   I believe that the relief requested in the KCC Retention Application will ease the
administrative burden on the Clerk of the Court in connection with these Chapter 11 Cases.   In
addition, I have been advised by counsel that KCC's retention is required by the Local Rules in
light of the anticipated number of creditors.

63.     Therefore, on behalf of the Debtors, I respectfully request that the KCC Retention
Application be approved.

### CONCLUSION

In furtherance of their chapter 11 efforts, for the reasons stated herein and in each of the
First Day Motions, the Debtors respectfully request that the relief sought in the First Day
Motions be approved.

Dated: September 9, 2015

Haggen Holdings, LLC, *et al.*,
Debtors and Debtors-in-Possession

*/s/ Blake Barnett*
Blake Barnett
Chief Financial Officer
Haggen Holdings, LLC

01:17659349.1

**EXHIBIT A**

Organizational Chart

# Haggen Organizational Chart



\* Indicates a debtor entity.