**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>HAGGEN HOLDINGS, LLC, *et al.,*[1]<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 15-11874 (KG)<br>)<br>) (Jointly Administered)<br>)<br>) **Requested Hearing Date**:<br>) **September 24, 2015 at 1:00 p.m. (ET)**<br>)<br>) **Requested Objection Deadline**:<br>) **September 23, 2015 at 12:00 p.m. (Noon) (ET)** |

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105,  363 AND 365 FOR ENTRY OF AN ORDER (I) APPROVING ASSUMPTION OF ASSET PURCHASE AGREEMENT, (II) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, AND (III) GRANTING RELATED RELIEF**

Haggen Holdings, LLC and its above-captioned affiliated debtors and debtors in possession (each a "**Debtor**," and collectively, the "**Debtors**") hereby submit this motion (the "**Sale Motion**") for the entry of an order, substantially in the form attached hereto as Exhibit 1 (the "**Proposed Sale Order**"), pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), (i) approving the assumption of the Asset Purchase Agreement (as amended by that certain letter agreement dated September 16, 2015, the "**Amendment**" and collectively, the "**Purchase Agreement**"), by and among Debtors Haggen Opco South, LLC, Haggen Opco North, LLC and Haggen, Inc. (collectively, the "**Operating Debtors**"), Albertson's LLC and Safeway Inc. (collectively, the "**Buyers**"), a copy of which is attached as Exhibit A to the Proposed Sale Order; (ii) authorizing the Operating Debtors to sell the Assets (as defined below) to the Buyers free and clear of all liens, claims,

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Haggen Holdings, LLC (7558), Haggen Operations Holdings, LLC (6341), Haggen Opco South, LLC (7257), Haggen Opco North, LLC (5028), Haggen Acquisition, LLC (7687), and Haggen, Inc. (4583).  The mailing address for each of the Debtors is 2211 Rimland Drive, Bellingham, WA 98226.

interests and encumbrances and other interests of any kind or nature whatsoever against the Operating Debtors or the Assets, (iii) finding that the Buyers are entitled to the protections of section 363(m) of the Bankruptcy Code as a "good faith" purchaser and (iv) granting such other and further relief as the Court may deem necessary.  In the support of the Sale Motion, the Debtors rely upon the *Declaration of Jonathan P. Goulding in Support of the Debtors' Motion Pursuant to 11 U.S.C. §§ 105,  363 and 365 for Entry of an Order (I) Approving Assumption of Asset Purchase Agreement, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, and (III) Granting Related Relief*, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "**Amended Standing Order**").  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**").

## BACKGROUND

2.    On September 8, 2015 (the "**Petition Date**"), the Debtors filed voluntary petitions with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to

01:17689762.1

sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

3.    The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

4.    No official committee of creditors has been appointed in these chapter 11 cases.

5.    Information about the Debtors' business, capital structure and the events leading up to the Petition Date are set forth in the *Declaration of Blake Barnett in Support of Debtors' Chapter 11 Petitions and First-Day Motions* [Dkt. No. 15], which is incorporated herein by reference.

### RELIEF REQUESTED

6.    Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Bankruptcy Rules 2002-1 and 6004-1, the Debtors seek entry of the Proposed Sale Order:  (i) approving the assumption of the Purchase Agreement, providing for the sale of (A) all original and all copies of any and all prescription records, customer records, lists and medical profiles and all other written or recorded information (the "**Records**") in any form relating to the operation of the Pharmacies (as defined in the Purchase Agreement), (B) the goodwill of such Pharmacies (the "**Goodwill**") and (C) prescription drug inventory (the "**Eligible Inventory**", and together with the Goodwill and Records, the "**Assets**"), with each of the foregoing as more specifically identified in the Purchase Agreement, to the Buyers; (ii) authorizing the Operating Debtors to sell the Assets to the Buyers free and clear of all liens, claims, interests and encumbrances (the "**Sale Transaction**"); (iii) finding that the Buyers are entitled to the protections of section 363(m) of the Bankruptcy Code

as a "good faith" purchaser; and (iv) granting such other and further relief in connection with the Sale Transaction as the Court may deem necessary.

7.    A copy of the Asset Purchase Agreement and the Amendment are attached to the Proposed Sale Order as Exhibits A and B, respectively.

8.    The Debtors, on behalf of themselves and their respective estates, agree and acknowledge that the Buyers' purchase of the Assets, their participation in the Debtors' chapter 11 cases for the purpose of obtaining approval of the Sale Transaction and Proposed Sale Order and all other actions taken, or that may be taken, by the Buyers or their agents in connection with Purchase Agreement, Related Agreements or this Order shall not constitute, and shall not be deemed to constitute, the Buyers' knowing and voluntary consent to have this Court adjudicate any claims or causes of action other than Matters of Retained Jurisdiction (as defined in paragraph 30 of the Proposed Sale Order). The Matters of Retained Jurisdiction shall not include any claims, counterclaims or causes of action arising in, or related to, the following two pending civil actions: (i) Haggen Holdings, LLC v. Albertson's LLC & Albertson's Holdings LLC, Case No. 1:15-cv-00768, which is pending in the United States District Court for the District of Delaware; and (ii) Albertson's LLC and Albertson's Holdings LLC v. Haggen Holdings, LLC, Case No. N15C-07-161, which is pending in the Superior Court for the State of Delaware.

## THE MARKETING PROCESS

9.    Prior to the Petition Date, the Debtors began experiencing financial difficulties. As a result, the Debtors' management, in consultation with their professional advisors, including Alvarez & Marsal, performed a comprehensive analysis of the Debtors'

01:17689762.1

-4-

financial performance, which included an in-depth review of the performance of the Debtors' grocery stores and the market in which the Debtors operate.

10.     The results of such financial analysis allowed the Debtors to identify two categories of stores: (a) "non-core" stores, which are losing money and are located in non-strategic locations and, thus, provide limited benefit to the Debtors, and (b) "core" stores, which are relatively successful and located in strategic locations.  The Debtors concluded that it was in the best interests of the Debtors and their stakeholders to restructure around its core stores, and to maximize the value of its non-core stores (each, a "**Closing Store**" and, collectively, the "**Closing Stores**") through a sale or other disposition (the "**Store Closing Sales**").

11.     In early-August 2015, before the Petition Date, the Debtors identified twenty-seven (27) locations as the initial Closing Stores.  Certain of those initial twenty-seven (27) Closing Stores have operating pharmacies on the premises. The Debtors have since commenced Store Closing Sales with respect to certain of the Closing Stores.

12.     In connection with the anticipated liquidation of the Closing Stores, the Operating Debtors determined, in their business judgment, that a sale of the Assets (as defined below) of the pharmacies was in the best interests of the Debtors and their stakeholders. Accordingly, the Debtors commenced a competitive, arms' length marketing process for these Assets consistent with industry standards for the sale of similar assets.  In furtherance of that process, on August 5, 2015, the Debtors engaged Pacific Pharmacy Consultants ("**Pacific**") as a broker for the sale of the Assets, and shortly thereafter, Pacific began marketing the Assets of the pharmacies.

13.     Beginning on or about August 8, 2015, Pacific, on behalf of the Debtors, reached out to various third-parties, including major drug store chains.  Throughout the process,

01:17689762.1

Pacific contacted approximately seven (7) potential bidders.  The Debtors provided these parties with the list of fifteen (15)[2] locations and the information related to the pharmacy locations necessary to make a bid, including the physical address of each store, the average annualized prescription count, and the estimated book inventory.  The Debtors requested that all interested parties submit a bid on a final and best basis on or before August 13, 2015.  In the Debtors' business judgment, selling prescriptions and customer records through a best and final bid submission process accommodated the need to close the transactions on an accelerated timeline, as the store closings for certain of the Closing Stores were publicly announced and the marketing for such sales had already commenced.

14.     The Debtors received several bids to purchase the Assets located at different Pharmacies.  Although multiple bids were received, most were offers to purchase the Assets of a subset of the Pharmacies.  However, in each instance, the Buyers submitted higher bids with respect to each individual Pharmacy.  Moreover, only the bid from the Buyers proposed to (i) purchase the Assets of thirteen (13) of the Pharmacies on the Pharmacy List, including those located within ten (10) Closings Stores that are subject to ongoing Store Closing Sales, and (ii) offer an additional $500,000 if permitted to purchase all of the Assets they bid on. The Debtors determined, in their business judgment, that the Buyers' bid, which included the additional $500,000 and contemplated the purchase of certain Assets that would otherwise be unsold at this time, was the best bid for the Assets.  On or about August 14, 2015, the Debtors notified the Buyers that they were the winning bidders for the Assets.

15.     On September 9, 2015, the Debtors filed a motion [Docket No. 12] seeking authorization to continue certain Store Closing Sales that had begun prior to the Petition

---

[2] The Debtors began the marketing process with an initial list of fourteen (14) Pharmacies, which was subsequently modified to include the final fifteen (15) Pharmacies that were subject to Pacific's marketing process (as modified, the "**Pharmacy List**").

01:17689762.1

Date, which the court approved [Docket No. 66] (the "**Hilco GOB Order**") on September 11, 2015 to the extent provided for in the Hilco GOB Order.  The majority of the Assets that are subject to the Purchase Agreement are held at pharmacies that are subject to the ongoing Store Closing Sales, which are scheduled to close on or before September 30, 2015.

## THE PURCHASE AGREEMENT

16.    The Operating Debtors and the Buyers have negotiated, at arm's length, the Purchase Agreement for the sale of the Assets at the store locations, as identified on Exhibit 2 attached hereto.  The salient terms of the Purchase Agreement are as follows:[3]

A.    **Purchase Price.**  In consideration of the Records and Goodwill, and subject to the terms of the Purchase Agreement, the Buyers will purchase the Records and Goodwill in the Operating's Debtors possession for an aggregate amount equal to $8,909,000.00 (subject to the adjustments set forth in the Purchase Agreement) (the "**Purchase Price**").  The Buyers will purchase the Inventory for a maximum of $3,574,500.00 (to be capped on a per pharmacy basis as set forth in the Purchase Agreement and an aggregate inventory cap of $3,250,000 for all Pharmacies).  In addition to the Purchase Price, if the Assets (as defined in the Purchase Agreement) of all of the Pharmacies are transferred to the attendant Buyer's stores, according to the terms of the Purchase Agreement, the Buyers shall also pay the Operating Debtors $500,000 on the Transfer Date for the thirteenth Pharmacy.

B.    **Purchase Price Adjustments**.  The Purchase Price is subject to various adjustments on a per pharmacy basis as set forth in Exhibit F to the Purchase Agreement.

C.    **Closing Date**.  The closing of each transaction shall take place in accordance with the dates provided for under the Purchase Agreement, which dates shall be mutually agreed upon by the Parties as soon as reasonably practicable.  Unless the Parties otherwise mutually agree in writing, if the initial Transfer Date shall not have occurred on or prior to October 15, 2015, the Purchase Agreement shall automatically terminate and all rights and obligations of the Parties under the Purchase Agreement shall terminate upon such termination and shall become null and void (except that Section 12 of the Purchase Agreement and clauses (A), (E),

---

[3]  Capitalized terms used but not otherwise defined in this summary chart shall have the meanings ascribed to them in the Purchase Agreement.  To the extent that this summary differs in any way from the terms set forth in the Purchase Agreement, the terms of the Purchase Agreement shall control.

01:17689762.1

(F), (G), (K), (N), (P), and (S) of Section 19 of the Purchase Agreement shall survive such termination).

D.  **Excluded Assets**.  The Buyers are not acquiring any assets not included in the Assets, including, among other things, any item within 90 days of expiration on the Transfer Date, or expired date-coded merchandise, damaged inventory, any Prescription Drugs of the type the relevant Buyer does not sell or intend to sell.

17.  Moreover, in addition to the above-described salient features of the Purchase Agreement, in accordance with Local Bankruptcy Rule 6004-1(b)(iv), the Debtors note the following with respect to the Purchase Agreement:

A.  **No Sale to an Insider**.  The Buyers are not insiders of the Debtors within the meaning set forth in section 101(31) of the Bankruptcy Code.

B.  **Agreements with Management**.  No agreements with management have been entered into in connection with the sale of the Assets.

C.  **Releases**.  The Proposed Sale Order provides that the Buyers shall have no liability for any Claims (as defined in the Proposed Sale Order) relating to the Assets or transfer of Assets.

D.  **Private Sale/No Competitive Bidding**.  As set forth herein, the Debtors are pursuing a private sale of the Assets, but which were subject to a competitive bid process in accordance with industry standards prior to the Petition Date.

E.  **Closing and Other Deadlines**.  In addition to the deadlines set forth in paragraph 16.C above, the following deadlines are conditions to closing the Purchase Agreement: (i) the Debtor shall have filed the Sale Motion by September 16, 2015; and (ii) by no later than October 9, 2015, this Court shall have entered the order approving (x) the Operating Debtors' assumption of the Purchase Agreement pursuant to section 365 of the Bankruptcy Code and (y) approving the sale of the Assets in accordance with the Purchase Agreement free and clear of all Liens pursuant to section 363 of the Bankruptcy Code.

F.  **Good Faith Deposit**.  The Purchase Agreement does not require the Buyers to provide a good faith deposit.

G.  **Interim Arrangements with Proposed Buyer**.  No interim arrangement with the Buyers have been entered into in connection with the sale of the Assets.

01:17689762.1

-8-

H. **Use of Proceeds**.  The Proposed Sale Order provides that the proceeds of the Sale Transaction shall be deposited by wire transfer into the master concentration account held by Haggen Operations Holdings, LLC, ending in 1634 at PNC (the "**Concentration Account**") to be applied to the Obligations.

I. **Tax Exemption**.  No provision of the Purchase Agreement addresses the use of tax exemptions.

J. **Record Retention**.  The Debtors do not seek to sell all or substantially all of their assets and will retain their books and records (or copies thereof) to enable it to administer these chapter 11 cases.

K. **Sale of Claims**.  The Purchase Agreement does not provide for the sale by the Debtors of any rights, claims or causes of action, including, but not limited to, any rights or claims arising under chapter 5 of the Bankruptcy Code.

L. **Successor Liability**.  The Proposed Sale Order and the Purchase Agreement limits the Buyers' successor liability.

M. **Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests**.  As set herein, the Proposed Sale Order authorizes the Operating Debtors to sell the Assets to the Buyers free and clear of all liens, claims, encumbrances and other interests of any kind or nature whatsoever against the Operating Debtors or the Assets.

N. **Credit Bid**.  The Purchase Agreement and the Sale Order do not provide for any credit bidding pursuant to section 363(k) of the Bankruptcy Code or otherwise.

O. **Relief from Bankruptcy Rule 6004(h)**.  For the reasons set forth below, the Debtors do seek relief from Bankruptcy Rule 6004(h).

## BASIS FOR RELIEF REQUESTED

### A.   Assumption of the Agreement is Authorized Under Section 365(a)

18.   Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  The United States Court of Appeals for the Second Circuit has stated that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable

01:17689762.1

-9-

property of the estate and to 'renounce title to and abandon burdensome property.'" <u>Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)</u>, 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

19.     The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard.  <u>See</u> <u>In re AbitibiBowater Inc.</u>, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances.); <u>In re HQ Global Holdings, Inc.</u>, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice).  "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" <u>Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)).  Indeed, "the sole issue is whether the rejection benefits the estate." <u>In re HQ Global</u>, 290 B.R. at 511.

20.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing.  <u>See</u> <u>In re Integrated Res.</u>, 147 B.R. at 656; <u>see</u> <u>also</u> <u>Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").  Generally, courts defer to a debtor in possession's business

01:17689762.1

judgment to assume or reject an executory contract or lease. See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate"); see also N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Control Data Corp. v. Zelman (In re Minges), 602 F.2d 38, 42-43 (2d Cir. 1979); In re Riodizio, Inc., 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997); In re G Survivor Corp., 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

21.    Here, the Debtors have exercised their sound business judgment in determining that assumption of the Purchase Agreement is in the best interests of the Debtors and their estates, and, accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code. See, e.g., Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course"). If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease. See, e.g., In re Philadelphia Newspapers, LLC, 424 B.R. 178, 182–83 (Bankr. E.D. Pa. 2010).

22.    As a key component of the Debtors' continuing efforts to preserve and maximize estate value, to reduce administrative expenses and to successfully prosecute these chapter 11 cases, the Debtors have concluded, in their business judgment, that the assumption of the Purchase Agreement is beneficial to the Debtors' estates. The Debtors determined that the

01:17689762.1

sale of the Assets allows the Operating Debtors to capitalize on assets that would no longer be viable for sale upon the completion of the liquidation of certain of the Closing Stores. Furthermore, after the Operating Debtors' marketing process and their extensive, arms'-length negotiations with the Buyers, the Operating Debtors determined that entering into the Purchase Agreement would provide the greatest return for the Assets. Additionally, the Debtors believe that the terms set forth in the Purchase Agreement are fair and equitable and present a valuable opportunity to enhance the recovery to the Debtors' estates through the sale of assets that, absent an accelerated process, would otherwise diminish in value and ultimately be lost. Assumption of the Purchase Agreement allowing the Operating Debtors to sell the Assets will present increased recoveries and permit significant cost savings that will certainly inure to the benefit of the Debtors' estates and all stakeholders.

23.    Were the Purchase Agreement not assumed and the sale of the Assets were not permitted to go forward, the Debtors' estates could lose the value of all of the Assets, which continue to decrease in value with the passage of time. In fact, given the nature of the Assets, each passing day increases the risk that customers will transfer their prescriptions to other locations, which will diminish the Assets and negatively impact the Purchase Price. As a general matter, these types of assets are only valuable to a buyer when the pharmacy is still open and operating and the pharmacy has an ongoing relationship with the patient. For this reason, it is imperative that the Operating Debtors are permitted to sell these assets before the Closing Stores liquidate and the Assets at such liquidating stores lose all saleable value.

24.    Furthermore, an expeditious sale of the Assets will also permit the timely closing of the stores subject to the ongoing Store Closing Sales, which if completed on the

01:17689762.1

proposed timeline will decrease administrative expenses associated with paying additional rent at the Closing Stores.

25.    Therefore, the Debtors request that this Court authorize the assumption of the Agreement.

**B.    Sale of the Assets Pursuant to the Purchase Agreement is an Appropriate Exercise of Sound Business Judgment and Should Be Approved**

26.    The Court may grant the relief requested herein pursuant to sections 105(a) and 363 of the Bankruptcy Code. Section 105(a) provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).

27.    To obtain Court approval to sell property under section 363(b) of the Bankruptcy Code, the Debtors need only show a legitimate business justification for the proposed action. See, e.g., Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); In re Johns-Manville Corp., 60 B.R. at 616 (stating that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct") (citation omitted). When a valid business justification exists, the law vests the debtor's decision to sell property out of the ordinary course of business with a strong presumption "'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" In re Integrated Res., Inc., 147 B.R.

01:17689762.1

at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  Accordingly, parties challenging a debtor's decision must make a showing of "bad faith, self-interest or gross negligence." In re Integrated Res., Inc., 147 B.R. at 656 (citations omitted).

28.    Ample business justification exists for the Operating Debtors' entry into the Purchase Agreement and related Bill of Sale, Assignment and Assumption Agreement (the "**Related Agreements**") and the sale of the Assets pursuant to the Purchase Agreement and the Related Agreements.   Given the nature of the Assets, including the laws and regulations imposed on a transfer or sale, there is a limited pool of potential purchasers.  First, the Debtors are required by applicable nonbankruptcy law to transfer customer records and prescriptions held at a closing location to a nearby pharmacy.  Second, it is axiomatic that customers of retail pharmacies will use a pharmacy within a geographic area of convenience.  Third, when a pharmacy is closing, the value of pharmacy-related assets particularly customer prescriptions, is unstable and transactions must occur on an accelerated timeline to avoid permanent and significant diminution of value.

29.    The Assets were marketed through a competitive bid process in accordance with industry standards that evidenced that the Buyers' offer was the highest or best available for such assets.  The Purchase Price is a fair and reasonable price for the Assets and, as a result, consummating the transactions under the Purchase Agreement will maximize the value of the Debtors' assets for the benefit of all stakeholders.  The Operating Debtors' customers need access to their prescription drugs immediately and, in light of the ongoing closings at the Closing Stores, customers may transfer their prescriptions and files elsewhere prior to a sale.  Any interruption or delay in the Operating Debtors' ability to efficiently close the sale to the Buyers could have adverse consequences to the Operating Debtors' realizing the

01:17689762.1

-14-

full Purchase Price for the Assets.  Given that the proceeds of the sales inure to the benefit of the

Debtors' stakeholders and with each day that the Operating Debtors are unable to close the

transactions under the Purchase Agreement, the Debtors risk irreparable harm.  Additionally,

similar relief has been granted by bankruptcy courts.  See, e.g., In re The Great Atlantic &

Pacific Tea Co., Inc,, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. Aug. 25, 2015) (finding that

the debtors "demonstrated good, sufficient, and sound business purposes and justifications" for

approval of the motion, purchase agreement and sale transactions); In re The Great Atlantic &

Pacific Tea Co., Inc., Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. June 20, 2011) (same).

30.    The Purchase Agreement was negotiated at arm's-length and reflects

customary market terms that are inherently reasonable.  Therefore, the Operating Debtors'

determination to enter into the Purchase Agreement to sell the Assets to the Buyers is a valid

and sound exercise of their business judgment.

**C.    Proceeding by Private Sale Reflects a Sound Exercise of the Debtors'
Business Judgment**

31.    A debtor has broad discretion in determining the manner in which its

assets are sold.  See Berg v. Scanlon (In re Alisa P'ship), 15 B.R. 802, 802 (Bankr. D. Del. 1981)

("[T]he manner of [the] sale is within the discretion of the trustee[.]"); see also In re Bakalis, 220

B.R. 525, 531-32 (Bankr. E.D.N.Y. 1998) (although not without limit, "a trustee's business

judgment enjoys great judicial deference") (internal citation omitted).  Accordingly, if a debtor in

possession concludes that a particular private purchase offer is the "most advantageous to the

estate," a court should defer to the debtor in possession's business judgment.  In re Bakalis, 220

B.R. at 532.

32.    There is a sound business justification for the Debtors' preference to

proceed by private sale, rather than conducting a formal post-petition auction and sale of the

01:17689762.1

Assets. The Purchase Price represents a fair offer for the Assets and will infuse value into the Debtors' estates, to the benefit of the Debtors' creditors. In addition, because the Operating Debtors are required by nonbankruptcy law to transfer customer records and prescriptions held at a closing location, the Operating Debtors have the opportunity to capitalize on the value of the Assets only during the time that the Closing Stores (including, the pharmacies located therein) remain open, and upon the closing of the applicable stores, the majority of the Assets will no longer be saleable. Thus, in order to monetize the Assets while they still retain some value, it is imperative to sell the Assets while the stores are operational, which leaves insufficient time to conduct a public auction for the Assets.

33.    Also, given the unique nature of the Assets, the Debtors do not anticipate receiving any competing offers on terms more favorable to those in the Purchase Agreement, as there is necessarily a limited number of potential bidders. Finally, since the Purchased Assets cannot be utilized by the Debtors, the Sale Transaction will not affect the remainder of the Debtors' operations. Therefore, the Debtors believe, in their business judgment, that selling the Purchased Assets in the manner provided herein will bring more benefit to the Debtors' creditors and these estates than, for example, holding the Purchased Assets and conducting a formal post-petition auction process would.

34.    Further, as a practical matter, the sale of the Purchased Assets represents an efficient means for their disposition. The Debtors believe that it would be unlikely that an auction for the Purchased Assets would produce a higher and better offer for the Purchased Assets as a whole, and that auctioning the Purchased Assets off on a piecemeal basis would be costly, impractical, and unlikely to produce an overall price greater than the Purchase Price. On the other hand, the Sale Transaction involves purchasers that are ready, willing, and able to close

01:17689762.1

-16-

in a timely and efficient manner. Accordingly, a lengthy auction process, which is unlikely to garner much interest from outside buyers, would not be in the Debtors' best interests. A private sale to the Buyers in the manner provided for herein is the optimum means of extracting immediate value out of the Purchased Assets and, thus, preserving and maximizing the value of the Debtors' estates.

**D.    Sale of the Assets Free And Clear of All Liens, Claims, Interests or Encumbrances is Warranted**

35.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

36.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets and commencement of the sales "free and clear" of liens and interests. See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re

01:17689762.1

Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell assets free and clear of liens. See In re Trans World Airlines, Inc., 322 F.3d 283, 289 (3d Cir. 2003).

37. The Debtors submit that it is appropriate to sell the Assets free and clear of any and all liens, claims, interests and encumbrances (other than the Assumed Liabilities and Obligations (as defined in the Purchase Agreement)) in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to the sale of the Assets. In particular, the Debtors believe that at least section 363(f)(2) of the Bankruptcy Code will be met because the Debtors' pre-petition secured lenders, by and through PNC Bank, National Association, as Agent ("**PNC**"), have consented to the Sale Transaction. In fact, pursuant to the Purchase Agreement, the Debtors have agreed to obtain releases of any liens encumbering the Assets and PNC has agreed to execute and deliver a lien termination letter in the form attached as Exhibit D to the Purchase Agreement, provided that payment of the Purchase Price is deposited by wire transfer into Concentration Account to be applied to the Obligations (as defined in the interim order [Docket No. 55] approving the Debtors' postpetition financing (the "**Interim DIP Order**")) in accordance with the terms of the Interim DIP Order and any order approving such postpetition financing on a final basis. Moreover, with respect to any other party asserting a lien, claim, interest, or encumbrance against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f). Furthermore, the Debtors propose that any liens, claims, interest and encumbrances asserted against the Assets be transferred to and attach to the amounts earned by the Operating Debtors under Sale Transaction.

01:17689762.1

-18-

38.     Additionally, the Debtors previously informed counsel for the agent to the DIP Lenders of the Debtors' marketing efforts for the sale of the Assets.   Neither of the foregoing constituents object to the Sale Transaction.   Moreover, the Debtors believe that any claim or interest against the Assets, which are not being used in furtherance of the Debtors' administration of these chapter 11 cases except for the generation of proceeds, would be either in bona fide dispute or the party asserting such claim or interest could be compelled to accept monetary satisfaction for such claim or interest.

39.     Additionally, any entity holding a lien, claim or encumbrance on the Assets that does not object to the sale should be deemed to have consented.  See FutureSource LLC v. Reuters Ltd., 312 F.3d 281, 285–86 (7th Cir. 2002) (stating that "[i]t is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); In re Elliot, 94 B.R. at 345 (same); see also In re Enron Corp., Case No. 01-16034, 2003 WL 21755006, at *2 (Bankr. S.D.N.Y. July 28, 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).

40.     Accordingly, the Debtors submit that the sale of the Assets to the Buyers in accordance with the Purchase Agreement, free and clear of any liens, claims, encumbrances, and other interests satisfy the statutory requirements of section 365(f) of the Bankruptcy Code.

01:17689762.1

**E.    The Buyers Should be Deemed a Good Faith Purchaser Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

41.    Section 363(m) of the Bankruptcy Code protects the sale of a debtor's property to a good faith purchaser.  Section 363(m) provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease  were stayed pending appeal.

11 U.S.C. § 363(m).

42.    Section 363(m) thus protects a purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  Although the Bankruptcy Code does not define "good faith purchaser," to demonstrate a lack of good faith, a party must show fraud or collusion between a proposed purchaser and the debtor in possession or other bidders. See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser's and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)); see also Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d Cir. 1997); In re GSC, Inc., 453 B.R. 132, 180 (Bankr. S.D.N.Y. 2011).

43.    The Operating Debtors negotiated and entered into the Purchase Agreement with the Buyers without collusion, in good faith and an arm's-length bargaining position, and the Debtors believe that none of the parties have engaged in any conduct that

01:17689762.1

-20-

would cause or permit the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. The Buyers have not exerted control or undue influence over the Operating Debtors. The Buyers do not, and will not, share any common incorporators, officers, directors or stockholders with the Operating Debtors, and none of the Buyers are an insider of the Debtors. See 11 U.S.C. § 101(31).

44.    Accordingly, the Debtors request that the Court determine that Buyers are acquiring the Assets pursuant to the Purchase Agreements have acted in good faith and are entitled to the protections afforded to good faith purchasers under section 363(m) of the Bankruptcy Code.

## SATISFACTION OF BANKRUPTCY RULE 6003(b)

45.    Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code within twenty-one days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm." There is no question that the Debtors' failure to consummate the Sale Transaction on an accelerated basis would likely result in immediate and irreparable harm to the Debtors' estates by depriving the Debtors of the opportunity to monetize the Assets. As set forth above, in order to preserve the value of the Assets, the Debtors must consummate the sale as soon as possible to provide a seamless transition for their customers after the Pharmacies close. To the extent the sales are delayed, the customers may transfer their prescriptions to other locations and the Assets will decrease and diminish the Purchase Price.

46.    For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

01:17689762.1

**WAIVER OF BANKRUPTCY RULE 6004(h)**

47.     The Debtors request a waiver of any stay of the effectiveness of the Proposed Sale Order.  Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  See FED. R. BANKR. P. 6004(a) and (h).  Unless the Sale Transaction is consummated expeditiously, the customers will likely transfer their prescriptions to another location, thereby diminishing the value of the Assets.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004, to the extent it applies.

**NOTICE**

48.     Notice of this Motion has been provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors; (iii) counsel to PNC Bank, as agent under the Debtors' Credit Facility and DIP Facility (each, as defined in First Day Declaration); (iv) all parties that, as of the filing of the Sale Motion, have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002; (v) all applicable federal, state and local taxing and regulatory authorities having jurisdiction over the Assets; (vi) all parties known to the Debtors to have expressed interest in the possible purchase of the Assets; and (vii) all known Persons asserting any Claims against the Assets.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

**NO PRIOR REQUEST**

49.     The Debtors have not previously sought the relief requested herein from this or any other Court.

01:17689762.1

-22-

## CONCLUSION

WHEREFORE, the Debtors request entry of the Proposed Sale Order, granting

the relief requested herein and such other and further relief as is just and proper.

Dated: September 16, 2015
      Wilmington, Delaware

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Robert F. Poppiti, Jr.*
Matthew B. Lunn (No. 4119)
Robert F. Poppiti, Jr. (No. 5052)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1256

-and-

STROOCK & STROOCK & LAVAN LLP
Frank A. Merola (admitted *pro hac vice*)
Sayan Bhattacharyya (admitted *pro hac vice* pending)
Matthew G. Garofalo (admitted *pro hac vice* pending)
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*PROPOSED COUNSEL TO THE DEBTORS
AND DEBTORS-IN-POSSESSION*

01:17689762.1