**Exhibit 1**

**Proposed Sale Order**

01:17689762.1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>HAGGEN HOLDINGS, LLC, *et al.,*[1]<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 15-11874(KG)<br>)<br>) (Jointly Administered)<br>)<br>) **Ref. Docket No. _____** |

**ORDER (I) APPROVING ASSUMPTION OF ASSET PURCHASE
AGREEMENT, (II) AUTHORIZING THE SALE OF CERTAIN
OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
INTERESTS AND ENCUMBRANCES, AND (III) GRANTING RELATED RELIEF**

Upon consideration of the motion, dated September 16, 2015 (Docket No. **[___]**) (the

"**Sale Motion**")[2], filed by the above-captioned debtors and debtors in possession (collectively,

the "**Debtors**"), seeking, among other things, the entry of an order (the "**Sale Order**"), pursuant

to sections 105, 363 and 365 of the  United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*

(the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local**

**Bankruptcy Rules**"), authorizing and approving the Debtors' assumption of the Purchase

Agreement and the sale of the Assets pursuant to the Purchase Agreement; and the Court having

conducted a hearing on the Sale Motion (the "**Sale Hearing**") on _____ ___, 2015, at which

time all interested parties were offered an opportunity to be heard with respect to the Sale

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Haggen Holdings, LLC (7558), Haggen Operations Holdings, LLC (6341), Haggen Opco South, LLC (7257), Haggen Opco North, LLC (5028), Haggen Acquisition, LLC (7687), and Haggen, Inc. (4583).  The mailing address for each of the Debtors is 2211 Rimland Drive, Bellingham, WA 98226.

[2]  Capitalized terms used herein but not otherwise defined have the meanings given to them in the Purchase Agreement (as defined below) or, if not defined in the Purchase Agreement, the meanings given to them in the Sale Motion.

01:17689681.1

Motion; and the Court having reviewed and considered (i) the Sale Motion and the exhibits thereto, (ii) the Asset Purchase Agreement, dated as of September 1, 2015 (as amended by the Amendment (defined below), the "**Purchase  Agreement**"), a copy of which is attached hereto as Exhibit A, by and between Haggen Opco South, LLC, Haggen Opco North, LLC and Haggen, Inc., as Sellers (the "**Operating Debtors**"), and Albertson's LLC and Safeway Inc., as Buyers (the "**Buyers**"), whereby the Debtors have agreed, among other things, to sell the Assets to the Buyers (the "**Sale Transaction**"), (iii) the letter agreement, dated as of September 16, 2015 (the "**Amendment**"), a copy of which is attached hereto as Exhibit B, entered into by the Operating Debtors and the Buyers, whereby the parties thereto agreed to certain amendments to the Purchase Agreement, (iv) the declaration of Jonathan P. Goulding in support of the Sale Motion [Docket No.___], (v) all objections to the Sale Motion or the Sale Transaction, and (vi) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and it appearing that due and proper notice of the Sale Motion, the Purchase Agreement, and the form of this order (the "**Proposed Sale Order**") having been provided in accordance with the applicable Bankruptcy Rules and Local Bankruptcy Rules and this Court's order [Docket No. ___] shortening notice for the hearing to consider the Sale Motion (the "**Order Shortening Notice**"); and all objections to the Sale Motion having been withdrawn, resolved or overruled as provided in this Sale Order; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates and creditors and all parties in interest in these chapter 11 cases; and upon the record of the Sale Hearing and these chapter 11 cases; and after due deliberation thereon; and good cause appearing therefor, it is hereby

01:17689681.1

2

**FOUND AND DETERMINED THAT:**

A.      **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  The Court's findings shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Sale Hearing.

B.      **Jurisdiction and Venue**.  This Court has jurisdiction over the Sale Motion, the Sale Transaction and the property of the Debtors' estates, including the Assets, pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U. S. C. § 157.  Venue of these chapter 11 cases and the Sale Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

C.      **Statutory and Rule Predicates**.  The statutory and other legal predicates for the relief sought in the Sale Motion and provided for herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, 9007 and 9014, and Local Bankruptcy Rules 2002-1 and 6004-1.

D.      **Notice and Opportunity to Object**.  Actual written notice of, and a fair and reasonable opportunity to object to and to be heard with respect to the Sale Motion, the Sale Transaction, the sale of the Assets free and clear of any Claims (as defined below), and the relief requested in the Sale Motion has been given under the circumstances, as required by the Bankruptcy Code and the Bankruptcy Rules, to all interested Persons (as such term is defined in

01:17689681.1

3

section 101(41) of the Bankruptcy Code) entitled to notice, including, but not limited to, the following: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors; (iii) counsel to the Debtors' pre-petition and post-petition lenders; (iv) all parties that, as of the filing of the Sale Motion, have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002; (v) all applicable federal, state and local taxing and regulatory authorities having jurisdiction over the Assets; (vi) all parties known to the Debtors to have expressed interest in the possible purchase of the Assets; and (vii) all known Persons asserting any Claims against the Assets.

E.      **Final Order**.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

F.      **Sound Business Purpose**.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for assumption of the Purchase Agreement, approval of the Sale Motion, the Purchase Agreement (including the assumption thereof), and the Sale Transaction and in entering into the Purchase Agreement, the Amendment and related Bill of Sale, Assignment and Assumption Agreement (the "**Related Agreements**").   The Operating Debtors' entry into and performance under the Purchase Agreement and Related Agreements (i) is a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties, (ii) provide value to and are beneficial to the Debtors' estates, and are in the best interests of the Debtors and their stakeholders, and (iii) are reasonable and appropriate under the circumstances.   Business justifications for the Sale Transaction include, but are not limited to, the following: (i) the Purchase Agreement constitutes the highest and best offer received for the Assets; (ii) the Purchase Agreement presents the best opportunity to maximize the value of the Assets on a

01:17689681.1

going concern basis and avoid decline and devaluation of the Assets; (iii) unless the Sale Transaction and all of the other transactions contemplated by the Purchase Agreement are concluded expeditiously, as provided for pursuant to the Purchase Agreement, recoveries to creditors may be diminished; and (iv) the value of the Debtors' estates will be maximized through the sale of the Assets pursuant to the Purchase Agreement.

G.      **Highest and Best Value**.  As demonstrated by the evidence provided in support of the Motion or otherwise proffered or adduced at the Sale Hearing, (i) the Debtors and their advisors, including Pacific Pharmacy Consultants ("**Pacific**") as a broker for the sale of the Assets, engaged in a fair, competitive, and arms' length marketing process for the Assets prior to the Petition Date consistent with industry standards for the sale of similar assets, (ii) the sale process was non-collusive, and (iii) the process conducted by the Debtors obtained the highest and best value for the Assets for the Debtors and their estates.

H.      **Fair Consideration**.  The consideration to be paid by the Buyers under the Purchase Agreement (i) constitutes fair and reasonable consideration for the Assets, (ii) is the highest and best offer for the Assets, (iii) will provide a greater recovery for the Debtors' estates and creditors than would be provided by any other practically available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and other laws of the United States, any state, territory, possession or District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

I.      **No Successor or Other Derivative Liability**.  The sale and transfer of the Assets to the Buyers, will not subject the Buyers to any liability (including any successor liability) with respect to the Assets or the operation of the Debtors' business or by reason of such transfer, except that, upon the closing of the Sale Transaction, the Buyers shall remain liable for the

01:17689681.1

5

Assumed Liabilities and Obligations (as defined in the Purchase Agreement).  The Buyers (i) are not, and shall not be considered a successor to the Debtors; (ii) has not, *de facto* or otherwise, merged with or into the Debtors; (iii) is not a continuation or substantial continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses or operations, or any enterprise of the Debtors, and (iv) does not have a common identity of incorporators, directors or equity holders with the Debtors.

J.      **Good Faith; No Collusion**.  The Operating Debtors and the Buyers, and their respective counsel and advisors, have negotiated, proposed and entered into the Purchase Agreement, the Amendment, and each of the transactions contemplated in good faith, without collusion and from arm's-length bargaining positions.  Each Buyer is a "good faith purchaser" and is acting in good faith within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby.  The Buyers have proceeded in good faith in all respects in that, among other things, (i) the Buyers recognized that the Debtors were free to deal with any other party interests in acquiring the Assets, (ii) all payments to be made by the Buyers and all other material agreements or arrangements entered into by the Buyers and the Debtors in connection with the Sale Transaction have been disclosed and are appropriate. The sale price in respect of the Assets was not controlled by any agreement among any potential purchasers of the Assets and neither the Debtors nor the Buyers have engaged in collusion or any conduct that would cause or permit the Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.  Accordingly, neither the Purchase Agreement nor the Sale Transaction may be avoided and no party shall be entitled to damages or other recovery pursuant to section 363(n) of the Bankruptcy Code.  The Buyers are not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the

01:17689681.1

Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Buyers and the Debtors.

K.      **Notice**.  As evidenced by the certificates of service filed with the Court: (i) due, proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Hearing, the Sale Transaction, the Proposed Sale Order and the other relief requested in the Sale Motion was provided by the Debtors; (ii) such notice was good, sufficient and appropriate under the particular circumstances and complied with the applicable Bankruptcy Rules and Local Rules and the Order Shortening Notice; and (iii) no other or further notice of the Sale Motion, the Sale Transaction, the Sale Hearing, the Proposed Sale Order or any of the relief requested in the Sale Motion is required.

L.      **Satisfaction of Section 363(f) Standards**.  The Debtors may sell the Assets free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, encumbrances and other interests of any kind or nature whatsoever against the Debtors or the Assets, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against the Debtors, and any derivative, vicarious, transferee or successor liability claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether known or unknown, and whether imposed by agreement, understanding, law, equity or otherwise arising under or out of,

01:17689681.1

7

in connection with, or in any way related to the Debtors, the Debtors' interests in the Assets, the operation of the Debtors' businesses, or the transfer of the Debtors' interests in the Assets to the Buyers, and all liabilities of the Debtors (other than the Assumed Liabilities and Obligations) (collectively, the "**Claims**"), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied; provided, however, that, nothing herein shall be deemed, or construed as, a ruling or determination by this Court that the Assumed Liabilities and Obligations encumber the Assets. Without limiting the generality of the foregoing, "Claims" shall include any and all liabilities or obligations whatsoever arising under or out of, in connection with, or in any way relating to: (1) any of the employee benefit plans, including any Claims related to unpaid contributions or current or potential withdrawal or termination liability; (2) any of the Debtors' collective bargaining agreements; (3) the Worker Adjustment and Retraining Notification Act of 1988; or (4) any of the Debtors' current and former employees. Those holders of Claims who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object that have an interest in the Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claim pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Claims that constitute interests in the Assets, if any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force and effect that such holders had prior to the Sale Transaction, subject to any defenses of the Debtors. All Persons having Claims of any kind or nature whatsoever against the Debtors or the Assets shall be

01:17689681.1

8

forever barred, estopped and permanently enjoined from pursuing or asserting such Claims against the Buyers or any of their assets, property, affiliates, successors, assigns, or the Assets.

M.       PNC Bank, National Association, in its capacity as agent and lender under the Debtors' prepetition facility ("**PNC**"), has consented to the sale of the Assets to the Buyers pursuant to the Purchase Agreement free and clear of any Claims of PNC against the Assets; provided that payment of the Purchase Price (as defined in the Sale Motion) is deposited by wire transfer into the master concentration account held by Haggen Operations Holdings, LLC, ending in 1634 at PNC (the "**Concentration Account**") to be applied to the Obligations (as defined in the interim order [Dkt. No. 55] (the "**Interim DIP Order**") in accordance with the terms of the Interim DIP Order and any order approving such postpetition financing on a final basis (together with the Interim Order, the "**DIP Orders**"); provided, further that the Purchase Price is without any setoff or deduction of any kind other than as set forth in the Purchase Agreement.

N.       The Buyers would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby if the sale of the Assets was not free and clear of all Claims, or if the Buyers would, or in the future could, be liable for any such Claims, including, as applicable, the liabilities related to the business that will not be assumed by the Buyers, as described in the Purchase Agreement.  A sale of the Assets other than one free and clear of all Claims would adversely impact the Debtors, their estates and their creditors, and would yield substantially less value for the Debtors' estates, with less certainty than the Sale Transaction.

O.       The total consideration to be provided under the Purchase Agreement reflects the Buyers' reliance on this Sale Order to provide them, pursuant to sections 105(a) and 363(f) of the

01:17689681.1

9

Bankruptcy Code, with title to and possession of the Assets free and clear of all Claims (including, without limitation, any potential derivative, vicarious, transferee or successor liability claims).

P. **Validity of the Transfer**. As of the applicable Transfer Date (as defined in Purchase Agreement), the transfer of the applicable Assets to the Buyers will be a legal, valid and effective transfer of such Assets, and will vest the Buyers with all right, title and interest of the Operating Debtors in and to such Assets, free and clear of all Claims. The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) of the Bankruptcy Code and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

Q. The Operating Debtors (i) have full corporate or limited liability company (as applicable) power and authority to execute the Purchase Agreement and all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate action of the Operating Debtors, (ii) have all of the corporate or limited liability company (as applicable) power and authority necessary to consummate the transactions contemplated by the Purchase Agreement, and (iii) upon entry of this Sale Order, other than any consents identified in the Purchase Agreement (including with respect to antitrust matters), need no consent or approval from any other Person to consummate the Sale Transaction.

R. The Assets constitute property of the Operating Debtors' estates and good title is vested in the Operating Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The Operating Debtors are the sole and rightful owners of the Assets with all right, title

01:17689681.1

and interest to transfer and convey the Assets to the Buyers, and no other Person has any ownership right, title, or interests therein.

S.      The Purchase Agreement is a valid and binding contract between the Operating Debtors and the Buyers and shall be enforceable pursuant to its terms.  The Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession or the District of Columbia.  The Purchase Agreement and the Sale Transaction itself, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Operating Debtors, any chapter 7 or chapter 11 trustee appointed in these chapter 11 cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

T.      The Sale Transaction does not constitute a de facto plan of reorganization or liquidation as it does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtors, (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtors, (iii) circumvent chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests or extend debt maturities.

U.      **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  The sale of the Assets must be approved and consummated promptly in order to preserve the value of the Assets. Therefore, time is of the essence in consummating the Sale Transaction, and the Operating Debtors and the Buyers intend to close the Sale Transaction as soon as reasonably practicable.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Purchase Agreement.  Accordingly, there is cause to lift the stay

01:17689681.1

11

contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regards to the transactions contemplated by this Sale Order.

V.    **Personally Identifiable Information**.    As contemplated in the Purchase Agreement, and subject to the terms of this Sale Order, the sale to the Buyers under the Purchase Agreement of any personally identifiable information (as such term is defined in section 101(41A) of the Bankruptcy Code) and private health information about individuals is consistent with the recommendations of any consumer privacy ombudsman appointed in these chapter 11 cases and satisfies the requirements of section 363(b)(1)(A).

W.    **Legal and Factual Bases**.    The legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS ORDERED THAT**:

1.    **Motion is Granted**.    The Sale Motion and the relief requested therein is granted and approved as set forth herein.

2.    **Objections Overruled**.    All objections, if any, to the Sale Motion or the relief requested therein that have not been withdrawn with prejudice, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits and with prejudice.

3.    **Notice.** Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

4.    **Fair Purchase Price**.    The consideration provided by the Buyers under the Purchase Agreement is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the

01:17689681.1

Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

5.    **Approval of the Purchase Agreement**.    The Purchase Agreement, the Amendment (including the Operating Debtors' and Buyers' entry into the Amendment), and all transactions contemplated therein (including, but not limited to, all ancillary agreement contemplated thereby) and all of the terms and conditions thereof are hereby approved.  The failure specifically to include any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement (including, but not limited to, all ancillary agreements contemplated thereby) be authorized and approved in its entirety.

6.    **Assumption of the Purchase Agreement**.  The Operating Debtors' assumption of the Purchase Agreement pursuant to section 365 of the Bankruptcy Code is authorized and approved and shall be effective upon the entry of this Sale Order.

7.    **Consummation of Sale Transaction**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Operating Debtors, as well as their officers, employees and agents, are authorized to execute, deliver and perform their obligations under and comply with the terms of the Purchase Agreement and to close and consummate the Sale Transaction, pursuant to and in accordance with the terms and conditions of the Purchase Agreement and this Sale Order.

8.    The Operating Debtors, their affiliates and their respective officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and implement all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and to take all further actions as may be (a)

01:17689681.1

13

reasonably requested by the Buyers for the purpose of assigning, transferring, granting, conveying and conferring to the Buyers, or reducing to the Buyers' possession, the Assets or (b) necessary or appropriate to the performance of the obligations contemplated by the Purchase Agreement or to implement the Sale Transaction, all without further order of the Court.

9.      All Persons that are currently in possession of some or all of the Assets are hereby directed to surrender possession of such Assets to the Buyers as of the applicable Transfer Date. The Operating Debtors agree to exercise commercially reasonable efforts to assist the Buyers in assuring that all Persons that are presently, or on the applicable Transfer Date may be, in possession of some or all of the Assets will surrender possession of the Assets to either (i) the Operating Debtors before the applicable Transfer Date or (ii) the Buyers on or after the Transfer Date.

10.     All Persons are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Operating Debtors to transfer the Assets to the Buyers in accordance with the Purchase Agreement and this Sale Order; provided that the foregoing restriction shall not prevent any party from appealing this Sale Order in accordance with applicable law or opposing any appeal of this Sale Order.

11.     Each and every any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

12.     **Transfer of Assets Free and Clear**.  Pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code, the Operating Debtors are authorized to transfer the Assets in

01:17689681.1

14

accordance with the terms of the Purchase Agreement.  The Assets shall be transferred to the Buyers, and upon each applicable Transfer Date, such transfer shall: (a) be valid, legal, binding and effective; (b) vest the Buyers with all right, title and interest of the Operating Debtors in the Assets; and (c) be free and clear of all Claims (including Claims of any Governmental Authority (as defined in Purchase Agreement)) in accordance with section 363(f) of the Bankruptcy Code, with all Claims that represent interests in property to attach to the net proceeds of the Sale Transaction, in the same order of their priority and with the same validity, force and effect which they now have against the Assets, subject to any claims and defenses the Debtors may possess with respect thereto.  At the closing of the Sale Transaction, the Debtors shall deposit the Purchase Price by wire transfer into the Concentration Account to be applied to the Obligations in accordance with the terms of the DIP Orders, without any setoff or deduction of any kind other than other than as set forth in the Purchase Agreement.

13.    Except to the extent expressly included in the Assumed Liabilities and Obligations, in the Purchase Agreement or the Related Agreements or to enforce the Purchase Agreement or the Related Agreements, all Persons (as defined in Purchase Agreement) (and their respective successors and assigns) including, without limitation, the Debtors, the Debtors' estates, all debt security holders, equity security holders, governmental, tax and regulatory authorities, governmental units, lenders, employees, former employees, pension plans, multiemployer pension plans, labor unions, trade creditors and any other creditors holding Claims against the Debtors, the Assets or the Debtors' businesses (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Assets or the transfer of the Assets to the Buyers, are hereby forever barred, estopped and permanently

01:17689681.1

15

enjoined from asserting or pursuing such Claims relating to the Assets or the transfer of the Assets against the Buyers, their affiliates, successors or assigns, its property or the Assets, including, without limitation, taking any of the following actions with respect to or based on a Claim relating to the Assets or the transfer of the Assets (other than Assumed Liabilities and Obligations): (a) commencing or continuing in any manner any action or other proceeding against the Buyers, their affiliates, successors or assigns, assets or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Buyers, their affiliates, successors or assigns, assets, or properties; (c) creating, perfecting, or enforcing any Claims against the Buyers, their successors or assigns, assets or properties; (d) asserting a Claim as a setoff, right of subrogation or recoupment of any kind against any obligation due the Buyers or their successors or assigns; (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order or the agreements or actions contemplated or taken in respect thereof; (f) interfering with, preventing, restricting, prohibiting or otherwise enjoining the consummation of the Sale Transaction.   No such Persons shall assert or pursue against the Buyers or their affiliates, successors or assigns any such Claim.

14.     This Sale Order (a) shall be effective as a determination that, as of the each applicable Transfer Date, all Claims, have been unconditionally released, discharged and terminated as to the Buyers and the applicable Assets, and that the conveyances and transfers described herein have been effected, and (b) is and shall be binding upon and govern the acts of all Persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, county and local officials and all other Persons

01:17689681.1

16

who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Buyers are the assignees and owners of the Assets free and clear of all Claims, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to herein as "**Recording Officers**").  All Recording Officers are authorized and specifically directed to strike recorded encumbrances, claims, liens and other interests against the Assets recorded prior to the date of this Sale Order.  A certified copy of this Sale Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded encumbrances, claims, liens and other interests against the Assets recorded prior to the date of this Sale Order. All Recording Officers are hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

15.     Following the closing of the Sale Transaction, no holder of any Claim shall interfere with the Buyers' title to or use and enjoyment of the Assets based on or related to any such Claim or based on any actions the Operating Debtors may take in these chapter 11 cases.

16.     Except with respect to Assumed Liabilities and Obligations, or as expressly set forth in the Purchase Agreement or the Related Agreements, the Buyers and their successors and assigns shall have no liability for any Claim relating to the Assets or the transfer of the Assets, whether known or unknown as of the applicable Transfer Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee or successor or otherwise, of any kind, nature or character whatsoever, by reason of any theory of law or equity, including Claims relating to the Assets or the transfer of the Assets arising under, without limitation: (a) any employment or labor agreements or the termination thereof; (b) any pension,

01:17689681.1

17

welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Operating Debtors or any Operating Debtor's affiliates or predecessors or any current or former employees of any of the foregoing, or the termination of any of the foregoing; (c) the Operating Debtors' business operations or the cessation thereof; (d) any litigation involving one or more of the Operating Debtors; and (e) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Notification Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) the Multiemployer Pension Plan Amendments Act of 1980,(xi) state and local discrimination laws, (xii) state and local unemployment compensation laws or any other similar state and local laws, (xiii) state workers' compensation laws or (xiv) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (xv) any antitrust laws; (xvi) any product liability or similar laws, whether state or federal or otherwise; (xvii) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (xviii) any bulk sales or similar laws; (xix) any federal, state or local tax statutes, regulations or ordinances, including, without limitation,

01:17689681.1

18

the Internal Revenue Code of 1986, as amended; and (xx) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability.

17.    If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in the Operating Debtors or the Assets shall not have been delivered to the Debtors prior to the applicable Transfer Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the Person has with respect to the Operating Debtors or the Assets or otherwise, then with regard to the Assets that are purchased by the Buyers pursuant to the Purchase Agreement and this Sale Order (a) the Operating Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the Person with respect to the Assets and (b) the Buyers are hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Assets.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, county or local government agency, department or office.

18.    On each applicable Transfer Date, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Assets acquired under the Purchase Agreement or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in all of the Assets to the Buyers.

19.    To the maximum extent available under applicable law and to the extent provided for under the Purchase Agreement, the Buyers shall be authorized, as of the applicable Transfer

01:17689681.1

19

Date, to operate under any license, permit, registration and governmental authorization or approval of the Operating Debtors with respect to the Assets and, to the maximum extent available under applicable law and to the extent provided for under the Purchase Agreement, all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been transferred to the Buyers as of the applicable Transfer Date.  All existing licenses or permits applicable to the Assets shall remain in place for the Buyers' benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures.

20.    **<u>No Successor or Other Derivative Liability</u>**.  By virtue of the Sale Transaction, the Buyers and their affiliates, successors and assigns shall not be deemed or considered to, (a) be a legal successor, or otherwise be deemed a successor to any of the Debtors, (b) have, *de facto* or otherwise, merged with or into any or all Debtors, or (c) be a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Operating Debtors or their respective estates, businesses or operations, or any enterprise of the Operating Debtors, in each case by any law or equity, and the Buyers have not assumed nor are they in any way responsible for any liability or obligation of the Operating Debtors or the Operating Debtors' estates, except with respect to the Assumed Liabilities.  Without limitation, the Buyers and their affiliates, successors and assigns shall have no successor, transferee or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, de facto merger, substantial continuity, or other law, rule, regulation or doctrine, whether known or unknown as of the applicable Transfer Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated

01:17689681.1

or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the applicable Transfer Date, including, without limitation, liabilities on account of any taxes or other Governmental Authority fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any way relating to, the Assets prior to the applicable Transfer Date or arising based on actions of the Debtors taken after the applicable Transfer Date.

21.     **Good Faith Purchaser**.   The transactions contemplated by the Purchase Agreement are undertaken by the Buyers without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the transfer of the Assets to the Buyers, free and clear of Claims, unless such authorization is duly stayed before the Transfer Date pending such appeal. The Buyers are good faith purchasers of the Assets and are entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.  The Operating Debtors and the Buyers will be acting in good faith if they proceed to consummate the Sale Transaction at any time after entry of this Sale Order.

22.     **No Avoidance of Purchase Agreement**.  Neither the Operating Debtors nor the Buyers have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. Accordingly, the Purchase Agreement and the Sale Transaction shall not be avoidable under section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Purchase Agreement or the Sale Transaction.

01:17689681.1

21

23.    **Waiver of Bankruptcy Rules 6004(h), 6006(d) and 7062**.  Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d) or 7062 or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Time is of the essence in closing the Sale Transaction and the Operating Debtors and the Buyers intend to close the Sale Transaction as soon as practicable.  Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the initial Transfer Date, or risk its appeal will be foreclosed as moot.

24.    **Personally Identifiable Information**.    After appointment of any consumer privacy ombudsman in these chapter 11 cases, in accordance with section 332 of the Bankruptcy Code, and after giving due consideration to the facts, circumstances and conditions of the Purchase Agreement, as well as the report of the consumer privacy ombudsman filed with the Court, no showing was made that the sale of personally identifiable information or private health information contemplated in the Purchase Agreement, subject to the terms of this Sale Order, would violate applicable nonbankruptcy law.

25.    **Binding Effect of Sale Order**.    The terms and provisions of the Purchase Agreement and this Sale Order shall be binding in all respects upon the Debtors, their estates and their creditors, any affected third parties, all holders of equity interests in the Debtors, all holders of any claims, whether known or unknown, against the Debtors, any holders of Claims against or on all or any portion of the Assets, including, but not limited to all contract counterparties, leaseholders, governmental units, and any trustees, examiners, administrators, responsible officers, estate representatives, or similar entities for the Debtors, if any, subsequently appointed

01:17689681.1

22

in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the debtors' chapter 11 cases, and each of their respective affiliates, successors and assigns.  The Purchase Agreement and the Sale Order shall inure to the benefit of the Debtors, their estates and creditors, the Buyers and their respective successors and assigns.  The Purchase Agreement, the Sale Transaction and this Sale Order shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner or receiver.

26.    **Conflicts; Precedence**.  In the event that there is a direct conflict between the terms of this Sale Order, the Purchase Agreement, and any documents executed in connection therewith, the provisions contained in this Sale Order, the Purchase Agreement and any documents executed in connection therewith shall govern, in that order.  Nothing contained in any chapter 11 plan hereinafter confirmed in these chapter 11 cases, any order confirming such plan, or in any other order of any type or kind entered in these chapter 11 cases (including, without limitation, any order entered after any conversion of any or all of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code) or in any related proceeding shall alter, conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Sale Order.

27.    **Modification of Purchase Agreement**.  The Purchase Agreement, and any Related Agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed each party, and in accordance with the terms thereof, without further order of the Court; provided that any such modification, amendment or supplement does not materially change the terms of the Purchase Agreement or any Related Agreements, documents or other instruments.

28.    **Bulk Sales; Taxes**.  No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction (including those relating to Taxes other than Transfer Taxes) shall

01:17689681.1

23

apply in any way to the transactions contemplated by the Purchase Agreement, the Sale Motion or this Sale Order. Except as otherwise expressly provided in the Purchase Agreement, all obligations of the Operating Debtors relating to Taxes, whether arising under any law, by the Purchase Agreement, or otherwise shall be the obligation of and fulfilled and paid by the Operating Debtors.

29.    **Automatic Stay**.  To the extent applicable, the automatic stay pursuant to section 362(a) of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court (a) to allow the Buyers to give the Debtors any notice under the Purchase Agreement and (b) to allow the Buyers to take any and all acts or actions in accordance with the Purchase Agreement.

30.    **Retention of Jurisdiction**.  This Court shall retain exclusive jurisdiction to interpret, enforce and implement the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith) and to enforce the injunctions set forth herein (collectively, "**Matters of Retained Jurisdiction**").  Notwithstanding anything to the contrary in the Sale Order, the Sale Motion, the Purchase Agreement and the Related Agreements, the Buyers' purchase of the Assets, their participation in the Debtors' chapter 11 cases for the purpose of obtaining approval of the Sale Transaction and Proposed Sale Order and all other actions taken, or that may be taken, by the Buyers or their agents in connection with the Purchase Agreement, the Related Agreements or this Order shall not constitute, and shall not be deemed to constitute, the Buyers' knowing and voluntary consent to have this Court adjudicate any claims or causes of action other than Matters of Retained Jurisdiction.  Matters of Retained Jurisdiction shall not include any claims, counterclaims or causes of action arising in, or related to, the

01:17689681.1

24

following two pending civil actions: (i) *Haggen Holdings, LLC v. Albertson's LLC & Albertson's Holdings LLC*, Case No. 1:15-cv-00768, which is pending in the United States District Court for the District of Delaware and (ii) *Albertson's LLC and Albertson's Holdings LLC v. Haggen Holdings, LLC*, Case No. N15C-07-161, which is pending in the Superior Court for the State of Delaware.

Dated: _____, 2015
          Wilmington, Delaware

                                  _____
                                    KEVIN GROSS
                                    UNITED STATES BANKRUPTCY JUDGE

01:17689681.1

25

**Exhibit A**

**Asset Purchase Agreement**

01:17689681.1

# Asset Purchase Agreement
(Non-Bulk Sales States)

THIS ASSET PURCHASE AGREEMENT ("**Agreement**") is entered into as of ~~August~~ *September* ~~1st~~, 2015, by and among Albertson's LLC, a Delaware limited liability company ("**ABS**"), Safeway Inc., a Delaware corporation ("**Safeway**" or "**SWY**" and together with ABS, collectively, the "**Buyers**" and each, a **Buyer**"), Haggen Opco North, LLC, a Delaware limited liability company ("**North Seller**") and Haggen Opco South, LLC, a Delaware limited liability company ("**South Seller**", and together with North Seller, collectively, the "**Sellers**" and each, a "**Seller**"). Buyers and Sellers may be collectively referred to herein as the "**Parties**," and individually as a "**Party**," as the circumstances require.

1.     **Sale of Assets.** On the terms and subject to the conditions set forth in this Agreement, each Seller agrees to sell, convey, assign, transfer and deliver the Assets (defined below), free of Liens (defined later) (other than PNC Liens [defined later]), that relate exclusively to any pharmacy set forth next to such Seller's name in "**Exhibit A**" attached hereto (such pharmacies on Exhibit A, the "**Pharmacies**") and each Buyer agrees to purchase, acquire and accept all right, title and interest in and to such Assets that relate exclusively to any Pharmacy set forth next to such Buyer's name in such "**Exhibit A**". Such transfers of Assets shall occur on the relevant Transfer Date (defined later) for each Pharmacy to which such Assets relate. Buyers shall not acquire any assets other than the Assets.

"**Assets**" shall collectively refer to any of the following, to the extent that the following relate exclusively to any Pharmacy:

    A.     All original and all copies of any all prescription records, customer records, lists and medication profiles, and all other written or recorded information in any form relating to the operation of the Pharmacies including, without limitation, prescription refill logs, signature logs, prescription hard copies, a computer backup tape and if requested by the relevant Buyer, a paper record (in alphabetical order by last name) of all patient profiles (collectively, "**Records**"). Each Seller warrants that the Records it is conveying hereunder shall contain, at a minimum, all of the information included in **Exhibit "B"** attached hereto and incorporated herein by reference. Each Seller further warrants that to its knowledge the information contained in the Records it is conveying hereunder is complete, accurate, current and in compliance with applicable state board of pharmacy and Drug Enforcement Agency ("**DEA**") rules and regulations. Notwithstanding the foregoing, the Records, where possible, shall be provided to the relevant Buyer in computerized/electronic format consistent with industry standards and in the form of the original reports/print-outs from each Seller's respective Pharmacy database and not

from abstracts or compilations, which the relevant Buyer may, at such Buyer's sole election and expense, have converted to a format of Buyer's choice.

B.    The goodwill of the Pharmacy, which shall exclude, for the avoidance of doubt, any trademarks, trade names, service marks, logos or other intellectual property of any Seller, any proprietary technology of any Seller and any rights or claims of any Seller related to ongoing litigation or similar matters, including any claims against any Buyer or its parents, subsidiaries or affiliates ("**Goodwill**").

C.    The relevant Seller's entire inventory of Prescription Drugs located at the Pharmacy (except as otherwise provided) on the Transfer Date (defined below) (collectively, "**Inventory**").

   (i)    "**Prescription Drugs**" shall mean all drugs required by Law (defined below) to be dispensed under the supervision of a registered or licensed pharmacist owned by Seller and utilized in the operation of the Pharmacies, and located at the Pharmacies as of the date a physical count of the inventory is taken as set forth in Section 3B.

   (ii)    "**Law(s)**" shall mean all laws, statutes, rules, regulations, ordinances, common law and other pronouncements (including, without limitation, guidance documents) having the effect of law of the United States or of any other governmental authority.

Notwithstanding the foregoing, the Inventory shall not include: (a) any item that is within 90 days of expiration on the Transfer Date, or expired date-coded merchandise; (b) any damaged Inventory, including, but not limited to, items which are materially soiled, distressed, spoiled, shop worn, faded (including faded labels), defective, infested, adulterated, recalled, misbranded, subject to visible deterioration, or not otherwise fit for sale; (c) any compounded products or bulk chemicals; (d) any pharmaceutical medications administered via injection except for such medications that are routinely sold in the relevant Buyer's store locations listed in "**Exhibit A**" ("**Buyer's Stores**"), in such Buyer's reasonable discretion, such as insulin, Humira, cyanocobalamin, methotrexate, Byetta and Symlin; (e) any pharmaceutical medications repackaged for retail dispensing and sale; (f) seasonal or gift items; (g) any sample Inventory not for retail sale; and (h) Thalomid, Isotretinoin (including brand names:  Accutane, Amnesteen, Claravis, Sotret) and non-branded PSI;  (i) any pseudoephedrine products; and (j) any Prescription Drugs of the type which the relevant Buyer does not already sell and does not intend, in its sole and absolute discretion, to begin to sell at the location to receive each group of the relevant Seller's Assets.

Notwithstanding anything herein to the contrary, the Buyers shall not be obligated to purchase Inventory from the Sellers that would cause Buyers to exceed the Inventory Cap (defined below) for the respective Pharmacy.

This Agreement is for the sale of tangible assets and Goodwilll only and does not include the sale of any Seller's accounts receivable or cash or cash equivalents in any form and the Buyers do not assume any Seller's contracts. Buyers shall not assume or become liable for any Seller's liabilities, obligations, claims, taxes or indebtedness of any kind of nature whatsoever, whether fixed or contingent, liquidated or unliquidated, accrued or not accrued, due or not yet due related to: (a) such Seller, (b) the Pharmacies, or (c) the Assets; other than the Assumed Liabilities and Obligations (the "**Liabilities and Obligations**").

2.    **Assumption of Liabilities.** On the terms and subject to the conditions set forth in this Agreement, on each Transfer Date, the Buyer shall assume all  liabilities, obligations, claims, taxes or indebtedness of any kind of nature whatsoever, whether fixed or contingent, liquidated or unliquidated, accrued or not accrued, due or not yet due related to or arising in connection with the use, non-use or ownership of the Assets acquired by Buyer on such Transfer Date, to the extent such liabilities, obligations, claims, taxes or indebtedness arise during, accrue during, and are attributable to, the period from and after such Transfer Date (the "**Assumed Liabilities and Obligations**").

3.    **Inspection of Assets; Inventory.**

A.    For a period commencing on the date of this Agreement and expiring the day immediately prior to each respective Transfer Date ("**Inspection Period**"), each Seller shall (at such date and times as a Buyer elects, provided it is during normal Pharmacy business hours) give such Buyer reasonable access to the Assets for examination by such Buyer or its agents. Each Seller shall also furnish to the relevant Buyer all information concerning such Seller's Assets as such Buyer may reasonably request, including, but not limited to, delivering (to the extent permitted by Law) to such Buyer within ten (10) days following the date of this Agreement copies of any and all audits that relate to such Seller's Assets from any third party plan, including, without limitation, private (commercial) and federal and state funded plans within the last two (2) years (or the period of Seller's ownership or operation of the relevant Pharmacy, if shorter).

B.    A physical count of the Inventory for each Pharmacy shall be taken immediately after normal business hours on the date prior to the respective Transfer Date or at a time mutually agreed upon by the Parties on each respective Transfer Date by the relevant Buyer and Seller, and an inventory service mutually agreed upon by such Parties ("**Inventory Service**"). Inventory shall be taken using "whole/half" estimating, as that term is customarily used in the pharmacy industry.  For Inventory items having a

value in excess of $300, such Buyer may elect to take the inventory for such items using "exact count" as that term is customarily used in the pharmacy industry. Such Parties shall equally split the cost of the Inventory Service. The final inventory report shall be set forth in writing and signed by the relevant Buyer and Seller as soon as reasonably practicable but no later than twenty-four hours after the physical count (such report, the "**Final Inventory Report**"). The Inventory price shall be based upon Seller's invoice cost of each item purchased. If the Seller's invoice cost is not immediately available to the Inventory Service at the time the physical count of the Inventory is taken, the Inventory price shall be based on Buyer's pricing table or, if such item does not appear on the Buyer pricing table, either as such cost is reflected on the wholesaler sticker affixed to such item or otherwise as may be mutually agreed by Buyers and Sellers.

4.     **Transfer of Assets.**

A.     **Physical Transfer of Possession.** Each Seller shall deliver possession of its Records to the relevant Buyer immediately after normal business hours on the day prior to the relevant Transfer Date or on the Transfer Date (but prior to Buyer opening for business in the respective Buyer's Store on the Transfer Date) at a time mutually agreed upon by the Parties. The Transfer Date for any Assets shall be the date to be set forth in "**Exhibit A**" opposite the Pharmacy to which such Assets relate (**"Transfer Date"**). The Parties agree and acknowledge that the schedule of Transfer Dates on Exhibit "A" shall be mutually agreed upon by the Parties within seven (7) days after the date hereof and shall provide that the first Transfer Date shall occur no later than fifteen (15) days after the date hereof and the final Transfer Date shall occur no later than twenty-nine (29) days after the date hereof. Notwithstanding anything herein to the contrary, each Seller may retain copies of any Records to the extent required by applicable Laws. Each Seller shall deliver possession of its Inventory to the relevant Buyer on the respective Transfer Date immediately after (i) the count of such Inventory is completed, and (ii) the Final Inventory Report is signed by the relevant Buyer and Seller. The Inventory shall be in essentially the same quality and condition as on the date of this Agreement and each Buyer may, as reasonably necessary, examine applicable purchase orders and delivery receipts for the respective Pharmacy to confirm the same. Concurrently with the transfer of the Assets for the respective Pharmacy to the relevant Buyer, (a) the applicable Seller and applicable Buyer shall each deliver to the other a duly executed and acknowledged Bill of Sale, Assignment and Assumption Agreement in the form attached hereto as **Exhibit "E"** and incorporated herein by reference (**"Bill of Sale"**), (b) for each Pharmacy, such Buyer shall deliver to such Seller one copy of a DEA order form number 222 for all controlled substances purchased hereunder, and (c) such Seller shall deliver to such Buyer any documentation related to the Inventory received by Seller from the wholesaler or manufacturer thereof as required

by the Drug Supply Chain Security Act.  Each Party shall also deliver to the other (or the Escrow Agent [as defined below], as applicable) such additional documents as are required by Law or the terms of this Agreement to complete the sale of the Assets to Buyers.  Each Seller shall, upon request of the relevant Buyer, perform such further acts, assignments, transfers, and assurances as may be reasonably required to convey and transfer all of such Seller's right, title and interest in the Seller's Assets to the relevant Buyer.

B.    **Requests by Pharmacy Customers.**  Buyers agree that, in the event, prior to the respective Transfer Date, a Seller receives from any Pharmacy customer any objection to the relocation of such Pharmacy customer's prescription records to Buyers and/or any instruction from a Pharmacy customer to relocate said Pharmacy customer's prescription records to a pharmacy other than the location to which Buyers intend to relocate the Records, Sellers shall be relieved of their obligation to relocate such Pharmacy customer's prescription records to Buyers except to the extent that such a relocation is required by Law.  Buyers further agree that in the event a Pharmacy customer objects, after the Transfer Date, to the relocation of such Pharmacy customer's prescription records to Buyers, Buyers shall immediately relocate such Pharmacy customer's prescription records to the location designated by such Pharmacy customer and shall further purge said Pharmacy customer's prescription records from Buyers' files except to the extent Buyers are required by Law to retain such Records. The provisions of this **Section 4B** shall survive the Transfer Date.

C.    **Fire or Other Casualty.**  If there is a fire or other casualty which results in damage to or destruction of all or any portion of the Assets prior to the Transfer Date for such Assets, then the Buyers may, at their sole election, (i) terminate this Agreement by written notice to Sellers, or (ii) proceed to acquire the remaining portion of the Assets, in which event the Purchase Price shall be proportionately reduced to reflect the fair market value of the remaining Assets after the fire or other casualty.

D.    **Delivery of Escrow Agreement and Other Documents.**  On the first Transfer Date, as a condition to closing, each Buyer and Seller shall execute and deliver, and the parties shall cause the Escrow Agent to execute and deliver, the Escrow Agreement (as defined later). On each Transfer Date, as a condition to such closing, each relevant Buyer and Seller shall deliver, each to the other, all documents necessary to transfer to such Buyer all of such Seller's right, title and interest in the Assets being purchased hereunder on such Transfer Date or required by this Agreement to be delivered on such date, in form and substance reasonably satisfactory to such Buyer and duly executed by an authorized officer of such Seller and shall take all other action reasonably necessary to consummate transactions contemplated by this Agreement to occur on such Transfer Date.

5.    **Purchase Price.** The Purchase Prices for the Assets of each Pharmacy shall be those sums set forth in **Exhibit "F"** ("Purchase Price(s)"), subject to the adjustments as provided therein and subject to the inventory cap for each respective Pharmacy in the amounts set forth on **Exhibit "G"** ("Inventory Cap") and an aggregate inventory cap of $3,250,000 for all Pharmacies. In addition to the Purchase Price payments, if the Assets of all thirteen Pharmacies are transferred to the attendant Buyer's Stores as set forth in Exhibit A according to the terms of this Agreement, Buyers shall also pay Sellers $500,000 at the Transfer Date for the thirteenth Pharmacy (such amount, together with aggregate Purchase Price payments, the **"Total Purchase Price"**). Each Seller shall, on or before the Transfer Date, deliver to Buyers a form W-9 Request for Taxpayer Identification Number.

6.    **Payment of Total Purchase Price.**

   A.    On each respective Transfer Date, Buyer shall pay to the relevant Seller (or its designee), in accordance with its previously provided wire instructions, 30% of the portion of the Purchase Price for the Records and Goodwill of the respective Pharmacy (without offset for any reason other than for (i) prescription rate reduction calculations as provided in **Exhibit F** and (ii) solely with respect to the payment on the penultimate and/or final Transfer Date, as applicable, the Broker Fee as described in Section 8E) and deposit the remainder of such portion of the Purchase Price with the Escrow Agent (to be held and distributed in accordance with the Escrow Agreement). Subject to the respective Inventory Cap, on the earlier of the first business day immediately following each respective Transfer Date or the day after the Final Inventory Report is signed, Buyer shall pay to the relevant Seller (or its designee), in accordance with its previously provided wire instructions, 30% of the portion of the Purchase Price for the Inventory from the Final Inventory Report (without offset for any reason whatsoever), pay to any Lien holder (only to the extent requested by Seller) any Payoff Amount (as defined below), and deposit the remainder of such portion of the Purchase Price with the Escrow Agent (to be held and distributed in accordance with the Escrow Agreement).

   B.    Sellers shall obtain the indefeasible releases of any Liens to the extent encumbering the Assets on, or prior to, each respective Transfer Date for such Assets, except for Liens for which the secured party is identified as PNC Bank, National Association, as Agent ("PNC") and with respect to which a Lien Termination Letter that provides that such Liens for the respective Assets shall be indefeasibly released on the terms set forth therein has been executed by PNC and Sellers and delivered to Buyers prior to the respective Transfer Date (such Liens, the **"PNC Liens"**). If any Liens encumbering the Assets exist as of the relevant Transfer Date for such Assets, the relevant Seller shall provide the relevant Buyer with reasonable evidence of the indefeasible release of such Liens (to the extent encumbering the Assets being transferred) effective as of or prior to the relevant Transfer Date (or

{35946668;13}6

as set forth in a Lien Termination Letter, with respect to PNC Liens) (**"Evidence of Termination"**), such as (for purposes of illustration and not limitation) a written acknowledgement from the Lienholder that such Liens have been indefeasibly released with respect to such Assets effective as of or prior to the Transfer Date or a payoff letter in customary form from the holder of such Liens stating that upon receipt of the payoff amount set forth therein (**"Payoff Amount"**) the holder of such Liens shall fully indefeasibly release and discharge any such Liens on the Assets as of the Transfer Date. Furthermore, the Parties acknowledge and agree that an executed letter in substantially the form attached hereto as **Exhibit "D"** (**"Lien Termination Letter"**) shall constitute Evidence of Termination hereunder with respect to all Liens held by or in favor of the person or entity delivering such Lien Termination Letter.

C.     Attached hereto as **Exhibit "C"** are results from searches conducted by Corporation Service Company (the **"Service Company"**) of the Uniform Commercial Code (**"UCC"**) filings in the state of Delaware (collectively, the **"Pre-Closing Lien Search Results"**), which Pre-Closing Lien Search Results are current as of the date set forth on **Exhibit "C"**. Prior to the respective Settlement Date (defined below) for a Pharmacy, the Service Company shall (i) update the Pre-Closing Lien Search Results for the relevant Pharmacy to be current through the relevant Transfer Date and (ii) conduct (x) a UCC debtor search, federal judgment search, state judgment search, state tax lien search and federal tax lien search in the state in which the Pharmacy is located, as identified on Exhibit "A" and (y) a UCC debtor search, county judgment search, federal tax lien search and state tax lien search in the county in which the Pharmacy is located, as identified on Exhibit "A" (in each case, to the extent such searches are available in such jurisdictions), each of which shall be current through the relevant Transfer Date (such results, the **"Lien Search Results"**). The Parties acknowledge and agree that the Lien Search Results shall be in substantially the same form as the Pre-Closing Lien Search Results with all the underlying financing statements and lien documents attached thereto. Each Party hereby waives any rights to object to the form of the Pre-Closing Lien Search Results or the Lien Search Results provided that the Lien Search Results are in substantially the same form as the Pre-Closing Lien Search Results with all the underlying financing statements and lien documents attached thereto. For the avoidance of doubt, the Lien Search Results for a Pharmacy shall not include any searches of any filings or records not included in the Pre-Closing Lien Search Results or explicitly set forth above, nor shall any Lien Search Results include searches in jurisdictions other than the state of Delaware or the county and state in which the relevant Pharmacy is located (as identified on Exhibit "A"). If the Lien Search Results for a Pharmacy reflect that a Lien remained outstanding as of a Transfer Date with respect to the Assets being transferred on such date (**"Post-Closing Lien"**), the relevant Seller shall take such actions to pay off and indefeasibly release such Post-Closing Lien

so that such Lien no longer encumbers the Assets. Notwithstanding anything herein to the contrary, "Post-Closing Liens" shall not include (i) any Buyer Encumbrances, (ii) any Liens for which a Lien Termination Letter or other Evidence of Termination has been provided to the relevant Parties or (iii) any liens reflected on the Pre-Closing Lien Search Results other than the liens for which the secured party is identified as PNC or Haggen Property North, LLC.  Seller shall also pay off any Permitted Liens to the extent encumbering any Assets being transferred to the extent such Permitted Liens are shown in any Lien Search Results as outstanding after the Transfer Date for such Assets (but, for the avoidance of doubt, the existence or settlement of any Permitted Lien shall not be deemed a breach of any provision of this Agreement). With respect to each Pharmacy, upon the earlier of (i) the Parties' receipt of Lien Search Results that do not reflect the existence of any outstanding Post-Closing Liens with respect to the Assets transferred from such Pharmacy (other than PNC Liens) or (ii) to the extent the Lien Search Results identify any Post-Closing Liens with respect to the Assets transferred from such Pharmacy (other than PNC Liens), the Parties' receipt of reasonable evidence of the indefeasible release of such Liens, such as a release, settlement statement, payoff letter or similar document from all persons or entities secured by such Post-Closing Lien stating that such Post-Closing Lien has been indefeasibly released with  respect to, and no longer encumbers any, such Assets (each, a "**Release Condition**"), any remaining balance of the Purchase Price for the respective Pharmacy held by the Escrow Agent shall be immediately and automatically distributed in accordance with wire instructions provided by the relevant Seller (and the Parties shall execute joint written instructions to such effect to the extent necessary or requested by the Escrow Agent) (such date referred to as the "**Settlement Date**"). Each Buyer acknowledges and agrees that it shall have no, and hereby waives its, right to dispute or delay any payment due to any Seller upon the occurrence of a Release Condition or make any claim of any kind on the amounts then due to any Seller that have been deposited with the Escrow Agent (whether under a set-off theory or otherwise). Notwithstanding anything to the contrary herein, each Seller acknowledges and agrees that, with respect to any remaining balance of the Purchase Price for the relevant Pharmacy that is held by the Escrow Agent, (i) until such time that the Release Condition with respect to such remaining balance of the Purchase Price and the relevant Settlement Date have occurred, Seller and any person or entity claiming, by, through or under such Seller (including, but not limited to, any bankruptcy estate of such Seller created by its bankruptcy filing or any chapter 11 or chapter 7 trustee appointed in any such bankruptcy case) shall have solely a contingent interest in such remaining balance of the Purchase Price and (ii) such contingent interest with respect to such remaining balance of the Purchase Price shall not mature until the respective Release Condition and the Settlement Date have occurred.

**D.**     If the Assets of all thirteen of the Pharmacies are transferred to the attendant Buyer's Stores according to the terms of this Agreement, on the Transfer Date for the thirteenth Pharmacy, Buyers shall also pay (without offset for any reason whatsoever) to Sellers $500,000, in accordance with written wire transfer instructions provided by Sellers prior to the Transfer Date (which wire transfer instructions shall specify the allocation of the $500,000 between the Sellers).

**7.**     **Escrow Agent; Escrow Agreement.** The Parties acknowledge and agree that the Escrow Agent shall be a national commercial escrow company reasonably approved by Sellers and Buyers. The Buyers shall be responsible for the Escrow Agent's fees ("**Fees**"), plus all out-of-pocket expenses for lien searches, wiring expenses, recording and filing fees and expenses to comply with bulk sales (whether incurred by the Buyers, Escrow Agent or Sellers) (collectively, "**Costs**"). In no event will the total sum of the Fees and Costs payable by Buyers exceed $15,000 ("**Buyer's Total Obligation**"). Sellers shall pay the Fees and Costs that exceed Buyer's Total Obligation. Notwithstanding the foregoing, all costs and fees incurred in connection with the release of any Lien or encumbrance on the Assets shall be each respective Seller's sole responsibility. Each Party shall sign written instructions directing the Escrow Agent to perform its obligations as set forth in this Agreement.

The Parties and the Escrow Agent shall enter into an Escrow Agreement, which agreement shall be in form and substance as provided by this Agreement and reasonably acceptable to the Buyers and the Sellers. The Parties shall use their reasonable best efforts, in good faith, to finalize the form of Escrow Agreement within five (5) days after the date hereof, provided that if the Escrow Agreement is not finalized at such time, Sellers or Buyers may terminate this Agreement without liability upon written notice (at any time prior to the finalization of the Escrow Agreement). Each Buyer hereby expressly disclaims and waives any right to any funds that are deposited with the Escrow Agent, and the Escrow Agreement shall provide that no Buyer shall have any right or access to any of the funds deposited with the Escrow Agent. For the avoidance of doubt, the foregoing sentence does not constitute a waiver of any of Buyer's other rights under this Agreement. The Escrow Agreement shall provide that any portion of Purchase Price held by the Escrow Agent shall be immediately and automatically released upon the satisfaction of any Release Condition relating to such Purchase Price and shall otherwise be in accordance with terms of this Agreement. Any joint instructions to be executed by the Parties as required by this Agreement or the Escrow Agreement shall be executed by all Parties as soon as reasonably practicable but no later than twenty-four hours after the occurrence of any event triggering the execution of such joint written instructions; the Parties agree that time is of the essence.

**8**   **Representations and Warranties of Seller.**

Each Seller represents and warrants as follows, severally and not jointly, and only with respect to itself and its Assets:

A.   **Liens.** Seller represents and warrants that it is the sole owner of its Assets and that such Assets shall, as of the Transfer Date for such Assets, be free and clear of all **"Liens"** as herein defined, except for the PNC Liens. The term **"Liens"** shall collectively refer to all liens, claims, judgments, options, charges, rights of first refusal, security interests, mortgages, deeds of trust, licenses, leases, tax liens, assessments or other encumbrances with respect to any item of the Assets (whether secured or unsecured), in each case, other than (x) (i) liens for non delinquent taxes and non delinquent statutory liens arising other than by reason of default and liens for any taxes or assessments (including any interest, penalties or additions to any such taxes or assessments) that are being contested in good faith by appropriate proceedings, (ii) statutory liens of landlords, liens of carriers, warehousemen, mechanics and materialmen incurred in the ordinary course of business for sums not yet due, and (iii) liens to secure obligations to landlords, lessors or renters under leases or rental agreements or underlying leased property (the "**Permitted Liens**") or (y) any of the following held by or in favor of any Buyer or its affiliates: claims, judgments, options, charges, rights of first refusal, security interests, mortgages, deeds of trust, licenses, leases, tax liens, assessments or other encumbrances ("**Buyer Encumbrances**"), the existence of which shall not constitute a breach of this Agreement. For purposes of this Agreement, a Lien shall be deemed "material" (as such term is used in this Agreement), if the indebtedness or obligation owing under any such Lien encumbering the Assets exceeds $20,000.

B.   **Prescription Rate.** Seller represents and warrants that to its knowledge, the average weekly prescription rates (for the period beginning on the date of acquisition of each Pharmacy under the 2014 Agreement and ending August 13, 2015) for each of its Pharmacies as provided by Pacific Pharmacy Consultants and set forth in "**Exhibit "H"** are true and accurate in all material respects. Seller further represents and warrants that the foregoing prescription rates are adjusted "net of reversals" as that term is customarily used in the pharmacy industry, it being further understood that reversals denote prescriptions that were initially filled by the Pharmacy but not delivered to the customer and eventually returned to the Pharmacy Inventory. Each Seller agrees that the prescription rates provided for each Pharmacy in **Exhibit H** will be utilized as the basis for the Prescription Rate reduction calculations set forth in **Exhibit F.**

C.   **Authority.** The individuals signing this Agreement on behalf of Seller each represent and warrant that he/she is duly authorized to sign on behalf of

such Seller and that, to his or her knowledge, the Sellers named are all of the necessary and proper parties required to effectuate the terms of this Agreement. The execution and performance of this Agreement by Seller has been duly authorized by all necessary corporate action and does not contravene any other obligations or restrictions to which Seller or its Assets are bound.

D.   **Compliance with Laws.**   Seller represents and warrants that it has materially complied with all Laws relating to the operation of its Pharmacies and that, to its knowledge, there are no material pending actions, suits, claims or judgments, or DEA or State Board of Pharmacy actions or investigations, against the Pharmacies or against such Seller related to the Pharmacies.  Neither the execution and delivery of this Agreement by such Seller nor the consummation by such Seller of the transaction contemplated herein will (i) constitute a violation of any laws or contracts to which such Seller is a party, or (ii) constitute a violation of or a default under, or conflict with, any term or provision of the Certificate of Formation of such Seller.

E.   **Brokers.**  Seller has utilized the services of Pacific Pharmacy Consultants (Dale Malee) to facilitate this Agreement.  Buyers agree to pay 4% of the portion of the Total Purchase Price payable by Buyers under this Agreement ("Broker Fee") to Pacific Pharmacy Consultants within three (3) business days after the final Transfer Date, to be deducted from the amounts otherwise payable by Buyers in respect of Purchase Price on the final Transfer Date (or, if reasonably anticipated that the Broker Fee exceeds such amount payable on the final Transfer Date, to be deducted from the amounts otherwise payable by Buyers in respect of Purchase Price on the penultimate Transfer Date and, to the extent necessary to pay any remaining balance of the Broker Fee, the final Transfer Date) (notwithstanding anything herein to the contrary).  Seller warrants that other than its arrangement with Pacific Pharmacy Consultants, it has not entered into any contracts with any brokers or finders with respect to, nor has Seller obligated itself to pay any real estate commissions or finder's fees on account of, the execution of this Agreement or the transactions contemplated herein.

F.   **Pending Litigation.**   Seller represents and warrants that to Seller's knowledge, no litigation is pending, threatened or likely with respect to the Assets or its Pharmacies which could reasonably be expected to prevent, enjoin, alter or delay the consummation of the transactions contemplated by this Agreement. For the avoidance of doubt, the Parties agree and acknowledge that any outstanding dispute or litigation by and between any Buyer (or any of its parents, subsidiaries or affiliates) and any Seller (or any of its parents, subsidiaries or affiliates) related to the 2014 Agreement is not reasonably be expected to prevent, enjoin, alter or delay the consummation of the transactions contemplated by this Agreement.

G. **Wholesale Distribution.** Seller represents and warrants that its Inventory has been sourced exclusively from McKesson Corporation or its affiliated companies (other than Inventory acquired from a Buyer or any affiliate thereof under the 2014 Agreement [defined later]).

H. **Exclusive Representations.** The representations and warranties in this Section 8 are the sole and exclusive representations and warranties made by the Sellers with respect to the Pharmacies, Assets or any Seller. Each Seller hereby disclaims all other express or implied representations or warranties with respect to itself or any of the Pharmacies or Assets, including the warranties of merchantability, suitability, fitness for a particular purpose or quality with respect to any of the tangible assets and properties of any Seller (including the Assets). Except as expressly set forth herein, the condition of all Assets shall be "as is" and "where is". None of the Sellers is directly or indirectly making any representations or warranties regarding any prospective or pro-forma financial information, financial projections or other forward-looking statements of any Seller or Pharmacy.

9   **Representations and Warranties of Buyers.**

Each Buyer represents and warrants as follows, severally and not jointly, and only with respect to itself:

A. **Authority.** Each individual signing this Agreement on behalf of Buyer represents and warrants that he/she is duly authorized to sign on behalf of such Buyer and that, to his or her knowledge, the Buyers named are all of the necessary and proper parties required to effectuate the terms of this Agreement. The execution and performance of this Agreement by Buyer has been duly authorized by all necessary corporate action and does not contravene any other obligations or restrictions to which Buyer or its assets are bound.

B. **Compliance with Laws.** Buyer represents and warrants that neither the execution and delivery of this Agreement by Buyer nor the consummation by Buyer of the transaction contemplated herein will (i) constitute a violation of any Laws or contracts to which Buyer is a party, or (ii) constitute a violation of or a default under, or conflict with, any term or provision of the Certificate of Formation or Articles of Incorporation, as applicable, of Buyer.

10   **Buyers' Conditions to Closing.** The closing of this transaction is subject to all of the following conditions in favor of Buyers. If any of the following conditions are not satisfied or waived in writing by Buyers as of the respective Transfer Date, Buyers may, in Buyer's sole discretion: (i) terminate this Agreement (so long as no Buyer is then in material breach of any of its representations, warranties, material

covenants or material agreements contained in this Agreement) as to such Pharmacy and/or any other Pharmacies for which the Transfer Date has not occurred without any liability to Sellers, or (ii) postpone the Transfer Date as to such Pharmacy and/or any other Pharmacies for which the Transfer Date has not occurred without any liability to Sellers until such time as Sellers' have fully satisfied all of the following conditions, provided Buyers may subsequently exercise their right of termination as provided under subsection (i) if Sellers have failed to satisfy all conditions.

A.   **Representations Are True.** Sellers' representations are true in all material respects at all times from the date hereof through the final Transfer Date (other than such representations that are made as of a specified date, which representations shall be true in all material respects as of such date).

B.   **Records Successfully Converted.** From the date of this Agreement through the respective Transfer Dates, each Seller shall provide during regular business hours to Buyers, and Two Point, Buyers' data conversion vendor (the "**Data Conversion Vendor**"), access to such Seller's pharmacy system and data contained therein to the extent necessary to effectuate the terms of this Agreement. Furthermore, each Seller will use its commercially reasonable efforts to assist Buyers, at no cost to Sellers, in the conversion of Sellers' data to an application in a format that is acceptable to and usable by Buyers in conducting each Buyer's business in its normal course, at Buyer's sole and absolute discretion. In the event that any Seller's pharmacy system data cannot be electronically converted, such Seller agrees to use its commercially reasonable efforts to facilitate access to such Seller's pharmacy data in allowing Buyers, and Buyers' agents, the use of such Seller's pharmacy systems to achieve electronic duplication and/or access to Seller's pharmacy data to the extent necessary to effectuate the terms of this Agreement. Notwithstanding the foregoing, Buyers shall not use any Seller's pharmacy system data for any specific Pharmacy unless the transaction closes on the subject Pharmacy's Transfer Date as provided herein. If the transaction does not close with regard to a Pharmacy on the respective Transfer Date as provided herein, Buyers will, at Seller's written request, return or destroy all copies of and keep confidential and will not use or disclose, Seller's data or other non-public information received in connection herewith related to such Pharmacy.

C.   **Performance.** Each of the material obligations of any Seller to be performed by it on or before the respective Transfer Date pursuant to the terms of this Agreement shall have been duly performed in all material respects by such Seller on or before such Transfer Date, including the delivery of evidence of the indefeasible release of any Liens in accordance with Section 6(b).

D.   **No Material Change.**  During the period from the date of this Agreement until the relevant Transfer Date of any Assets, there will not have been any material adverse change in such Assets or the Pharmacy from which such Assets are being transferred (other than any change related to the anticipated closing of the Pharmacy, any Buyer's posting of signs or notices at the Pharmacy or any other action of any Buyer) or any action, claim, litigation or proceeding pending or threatened against any Seller (other than by any Buyer or its parents, subsidiaries or affiliates) which would have a materially adverse effect on such Assets.

E.   **Prescription Rate Average.**  Seller must provide for each Pharmacy, on the date that is two business days before the respective Transfer Date, a prescription audit report for that respective Pharmacy from Seller's pharmacy system (PDX) (subject to reasonable verification by the Data Conversion Vendor) ("**Prescription Rate Statement**") stating the average weekly prescription rate, net of reversals as described in Section 8(B), for the period beginning on the date that Seller acquired the Records under the 2014 Agreement until the date two business days before the Transfer Date for such Pharmacy, as adjusted pursuant to the following sentence ("**Prescription Rate**").   Any prescriptions transferred from a Seller's Pharmacy to any Buyer or its parent, subsidiary or affiliate on or after August 14, 2015 as reasonably verified by the Data Conversion Vendor shall be added back into the Seller's prescription count for purposes of calculating the Prescription Rate for that respective Pharmacy.   For purposes of example and without limiting the foregoing, if a Seller acquired a Pharmacy on June 1, 2015 under the 2014 Agreement and the Transfer Date for the Pharmacy is September 5, 2015, then the Prescription Rate period under this Section 10(E) would be calculated from June 1, 2015 until September 3, 2015 (2 business days before the Transfer Date), or 95 days.  If during such 95 day period, Seller filled 9450 prescriptions and 50 prescriptions were transferred from the Pharmacy to other stores operated by Buyer or its parent, subsidiaries or affiliate from August 14, 2015 to September 3, 2015, then the Prescription Rate would be 700 (9450 + 50 = 9500 prescriptions divided by 95 days = 100 prescription per day X 7 days per week = 700).

F.   **Legal Actions.**  No action, suit or proceeding before any court or any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government (collectively, "**Governmental Authority**") shall have been commenced, no investigation by any Governmental Authority shall have been commenced, and no action, suit or proceeding by any Governmental Authority shall have been threatened, against any of the Parties to this Agreement, or any of the principals, officers or directors of any of them, or any of the Pharmacies, or the Assets, seeking to restrain, prevent or change the transactions contemplated hereby or questioning the validity or legality of any of such transactions or seeking

damages in connection with any of such transactions, and to the extent affirmative approval thereof is needed from any such Governmental Authority, it is obtained. For the avoidance of doubt, the Parties agree and acknowledge that any outstanding dispute or litigation by and between any Buyer (or any of its parents, subsidiaries or affiliates) and any Seller (or any of its parents, subsidiaries or affiliates) related to the 2014 Agreement is not seeking to restrain, prevent or change the transactions contemplated hereby or questioning the validity or legality of any of such transactions or seeking damages in connection with any of such transactions.

G.   **License and Consents.**   There shall have been obtained such licenses, approvals, and consents of all governmental bodies or agencies (all such licenses, approvals and consents are referred to collectively herein as the "**Approvals**"), which counsel for Buyers may reasonably deem necessary or appropriate so that consummation of the transactions contemplated by this Agreement will be in substantial compliance with all applicable laws, statutes, rules, regulations, ordinances, common law and other pronouncements (including guidance documents) having the effect of law of the United States, or any domestic state, county, city, municipality or other political subdivision or of any Governmental Authority (collectively, "**Laws**"); provided, however, that the Parties agree that nothing herein shall limit, waive, release or abate Sellers' obligations to use commercially reasonable efforts to assist Buyers in obtaining the necessary approvals as required under this Agreement.

11   **Sellers' Conditions to Closing.**   The closing of this transaction is subject to all of the following conditions in favor of Sellers.  If any of the following conditions are not satisfied or waived in writing by Sellers as of the respective Transfer Date, Sellers may terminate this Agreement (so long as no Seller is then in material breach of any of its representations, warranties, material covenants or material agreements contained in this Agreement) as to such Pharmacy and/or any other Pharmacies on which the Transfer Date has not occurred without any liability to Buyers.

A. **Representations Are True.**  Buyers' representations are true in all material respects at all times from the date hereof through the final Transfer Date (other than such representations that are made as of a specified date, which representations shall be true in all material respects as of such date).

B. **Legal Actions.**   No action, suit or proceeding before any court or any Governmental Authority shall have been commenced, no investigation by any Governmental Authority shall have been commenced, and no action, suit or proceeding by any Governmental Authority shall have been threatened, against any of the Parties to this Agreement, or any of the principals, officers or

directors of any of them, or any of the Pharmacies, or the Assets, seeking to restrain, prevent or change the transactions contemplated hereby or questioning the validity or legality of any of such transactions or seeking damages in connection with any of such transactions.

C. **Performance.** Each of the material obligations of any Buyer to be performed by it on or before the respective Transfer Date pursuant to the terms of this Agreement shall have been duly performed in all material respects by such Buyer on or before such Transfer Date.

12. <u>**Confidentiality.**</u> From and after the date of this Agreement, Sellers shall keep the transaction contemplated hereby strictly confidential except as may be required by Law or in connection with pending litigation, enforcing Sellers' rights hereunder, third party claims or resolving outstanding accounts receivable or other customer or vendor disputes or inquiries, and provided that Sellers may make disclosures to their officers, directors, affiliates, managers, executives, employees impacted by the transaction contemplated hereby, advisors, investors or financing sources, representative and agents. Each Seller shall endeavor to promptly notify Buyer, in writing, of any inquiries such Seller receives from any prior Pharmacy customer regarding the closing of the subject Pharmacies or this transaction. From and after the date of this Agreement, each Seller shall keep all Records and information about the Assets confidential both before and after the transfer thereof (except that such Seller may release to an individual customer any records belonging to said customer upon the customer's request or as otherwise required by Law). Sellers shall have absolutely no right to use any of the Records or information included in the Assets after the transfers thereof to Buyers, except as may be required by Law or in connection with pending litigation, enforcing Sellers' rights hereunder, third party claims or resolving outstanding accounts receivable or other customer or vendor disputes or inquiries, provided that (i) such information is used only for the limited purposes specified herein, and (ii) access to such information is at Buyer's Store at such times and under such supervision as Buyer reasonably deems appropriate. The Assets are being transferred to Buyer for Buyer's sole and exclusive use. Sellers acknowledge that as of the relevant Transfer Date, any information transferred to Buyers pursuant to this Agreement relating to Pharmacy customers is owned solely by Buyers and may not be sold or transferred to any other person by Sellers. None of the Parties shall issue a press release or otherwise publicly disseminate any information concerning this Agreement or the sale of the Assets by Sellers to Buyers that is not already publicly known or otherwise as allowed in this Agreement without the prior written consent of the other Parties, not to be unreasonably withheld. The Buyers acknowledge and agree that any proprietary or non-public information obtained by any Buyer or its agents in connection with this Agreement shall be kept confidential and not disclosed by Buyers (except to the Data Conversion Vendor), provided that the foregoing shall not apply after the Transfer Date with respect to information included in the Assets transferred to Buyers on such date.

13.   **Normal Business Operations.** Each Seller shall, at all times after the date hereof and prior to the Transfer Date of each of its Pharmacies, operate such Pharmacy business in substantially the same manner (including, without limitation, like pricing, hours, customer service, advertising and business standards) as Seller operated such Pharmacy business in the 12 months (or number of total months of operation of such Pharmacy if less than 12 months) prior to the date of this Agreement, in each case, except as would not have a material adverse effect on the Pharmacies or the Assets taken as a whole. Prior to the respective Transfer Dates, Sellers shall not dispose of any material portion of the Assets except by retail sales in the ordinary course of business. Sellers shall promptly notify Buyers of any material change of which Sellers become aware in any condition with respect to all or any material portion of the Assets or of any event or circumstance of which Sellers become aware which makes any representation or warranty of Sellers under this Agreement materially untrue or misleading, or any material covenant of Sellers under this Agreement incapable of being performed. For the avoidance of doubt, Buyers agree and acknowledge that some or all of the Pharmacies plan to discontinue operations on or around the Transfer Dates and such discontinuation, activities related thereto and its impact on the Assets shall not be deemed a breach of this Agreement. Each Seller, on behalf of itself and its affiliated companies, agrees that on the respective Transfer Date, Buyers shall have the right, but not obligation, to hire any head pharmacist, pharmacist in charge (PIC), pharmacist, pharmacy clerk or pharmacy technician that worked in the Pharmacy being transferred on the respective Transfer Date. Sellers shall allow the Buyers to interview such Pharmacy employees prior to the respective Transfer Date provided such interviewing process does not unreasonably interfere with Sellers' business operations.

14.   **Taxes.** Sellers shall pay all transfer and sales taxes and assessments on the transfer of the Assets. All other taxes on the Assets for the tax year in which the Transfer Dates occur shall be prorated between the relevant Buyer and Seller as of the Transfer Dates. Buyers and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with any audit, litigation or other proceeding with respect to taxes related to the Assets. Such cooperation shall include the retention and upon the other Party's request the timely provision of all records, returns and other information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

15.   **Like-Kind Exchange.** Buyers and Sellers acknowledge that Buyers may wish to structure this transaction as a tax deferred exchange of like-kind property within the meaning of Section 1031 of the Code.

16.   **Cooperation of Seller.** Sellers shall cooperate with Buyers in transferring to Buyers' Stores the prescription-drug trade of Sellers' Pharmacy customers as provided in this Agreement. Such cooperation shall include the following actions:

A.    **Signs.** For six (6) months after the respective Transfer Date, each Seller shall allow Buyers to display in, on, or about the Pharmacies signs (in form and substance reasonably acceptable to Seller) notifying the Pharmacies' customers that the Assets were relocated to Buyers' Store. Each Seller shall be bound by this provision only while it has possession or control of the premises where the respective Pharmacy is located and only if the relevant landlord (if applicable) consents to such signage, provided Seller agrees to use commercially reasonable efforts at Buyers' expense to secure any required landlord consent.

B.    **Inform Customers.** After the respective Transfer Date, for as long as the subject Pharmacy remains open to the public for business, each Seller shall use its commercially reasonable efforts to inform all persons who visit or call the Pharmacy for the purpose of getting prescriptions filled that the Assets have been relocated to the pharmacy in the respective Buyer's Store.

C.    **Physician Letters.** After the Transfer Date, each Seller shall allow Buyers to send a letter in the name of such Seller in form and substance reasonably acceptable to such Seller to all physicians that have referred prescriptions to Seller's Pharmacy during Seller's operation of such Pharmacy which says that the Assets have been relocated to the respective Buyer's Store. The letter referred to herein would be prepared and mailed by each Buyer at Buyer's expense, after Sellers consent to the form and substance of the letter, not to be unreasonably withheld, conditioned or delayed.

D.    **Customer Letters.** After the respective Transfer Date, each Seller shall allow Buyers to send a letter in the name of such Seller in form and substance reasonably acceptable to such Seller to such Seller's Pharmacy customers which informs those customers of the relocation of the Assets from such Seller to a Buyer and directs them to get their prescriptions filled at the pharmacy in such Buyer's Store. The letter referred to herein would be prepared and mailed by each Buyer at Buyer's expense, after Sellers consent to the form and substance of the letter, not to be unreasonably withheld, conditioned or delayed.

E.    **Telephone/Facsimile Line.** On or before each respective Transfer Date, each Seller shall place an order with the telephone company and will, to the extent reasonably practicable, complete in a timely manner all necessary actions (at Buyers' cost and expense) required to transfer to Buyers the incoming telephone and facsimile lines of the subject Pharmacy. Each Seller shall pay all charges incurred prior to the Transfer Date relating to yellow pages advertising for the Pharmacy and cancel the same prior to the Transfer Date at its sole expense.

F. **Licenses/Approvals.** Each Seller agrees to use reasonable, commercial efforts in assisting Buyers (at Buyers' sole expense) with obtaining all necessary licenses, permits, assignments, conveyances, approvals, and such other items as may be necessary or required for the approval and subsequent operation of the respective Pharmacies by Buyer in Buyer's Stores.

17. **Indemnity.**

A. This Agreement constitutes an agreement to sell certain assets only and, other than as specifically set forth in this Agreement, Buyers do not assume any liability, debt or obligation of Sellers of any kind or nature whatsoever. Each Seller shall indemnify, defend and hold harmless each Buyer and its affiliates and subsidiaries ("**Buyer Indemnitees**") from and against all liabilities, losses, claims, damages, expenses (including, without limitation, reasonable costs and attorney's fees, and reasonable costs and attorney's fees on appeal), judgments, proceedings, and causes of action of any kind (but expressly excluding any and all indirect, consequential, exemplary or special damages, punitive damages, lost profits, lost revenues or diminution in value) (collectively, "**Losses**") arising out of, resulting from, relating to or in any way connected with: (i) such Seller's ownership, use or operation of the Pharmacies or Assets for the entire period beginning as of the date on which the Assets were received by Seller pursuant to the 2014 Agreement through the time at which such Assets are transferred to a Buyer hereunder; and/or (ii) the breach of any representation or warranty given by such Seller hereunder or such Seller's default in the performance of any agreement contained herein or in any instrument incidental hereto; and/or (iii) the Liabilities and Obligations, but excluding any Liabilities and Obligations relating to any Pharmacy or Assets arising prior to the date on which such Pharmacy or Assets were transferred to Seller or its affiliates pursuant to the 2014 Agreement.

B. Each Buyer shall indemnify, defend and hold harmless each Seller and its affiliates, parents and subsidiaries ("**Seller Indemnitees**") from and against all Losses arising out of, resulting from, relating to or in any way connected with (i) such Buyer's ownership, use or operation of the Assets for the entire period from and after the time at which such Assets are transferred to a Buyer; and/or (ii) the breach of any representation or warranty given by such Buyer hereunder or such Buyer's default in the performance of any agreement contained herein or in any instrument incidental hereto; and/or (iii) the Assumed Liabilities and Obligations.

C. Notwithstanding anything else contained in this Agreement to the

contrary, except in the case of common law actual fraud or as provided in Section 19(I)(i)(b), indemnification pursuant to the provisions of this Section 17 shall be the exclusive remedy of the Parties for any misrepresentation or breach of any warranty, covenant or other provision contained in this Agreement, and no person will have any other entitlement, remedy or recourse, whether in contract, tort or otherwise, relating to or in connection with this Agreement or the transactions contemplated hereby, it being agreed that all of such other entitlements, remedies and recourses are expressly waived and released by the parties, to the fullest extent permitted by Law.

D.     Sellers' aggregate liability (excluding any liability for proven common law actual fraud) under this Agreement shall not exceed the Purchase Price actually received by Sellers.

18.    **Marketing to Pharmacy's Customers.** From the date of this Agreement, each Seller shall not use any of the Records that is specific to a customer of the Pharmacies to (directly or indirectly):

A.     Encourage or solicit the transfer by customers of the Pharmacies of their records and/or prescriptions to any stores/pharmacies operated by Seller or its affiliated companies in the same trade area as the receiving Pharmacy; or

B.     Send letters or other communications in any form to the customers of the Pharmacies or send letters, any form of incentives or other communications to the customers of receiving pharmacies of Buyers soliciting or encouraging the relocation of such customers' prescription information or files to another store or pharmacy operated by such Seller in the same trade area as the receiving pharmacies of Buyer; or

C.     Advertise or communicate publicly the fact that a pharmacist previously working in a Seller's Pharmacy has transferred to another pharmacy operated by Seller or any other person in the same trade area as the Pharmacy;

provided that the foregoing shall not prohibit any Seller from making general public advertisements, solicitations or announcements provided such advertisements, solicitations or announcements do not specifically target former customers of the Pharmacies and do not mention a Pharmacy's location-specific name (and the foregoing shall not prohibit the mention of any Seller's name generally) or specific location.

Subject to **Section 4B** of this Agreement, from the date of this Agreement until the relevant Transfer Date, each Seller will take commercially reasonable efforts to encourage

{35946668;13}20

the transfer of the prescriptions and records of the Pharmacies' customers to Buyers' Stores.

**19.   Miscellaneous.**

A.   **Notices.**  All notices given hereunder shall be in writing and shall be given by facsimile (original to be promptly delivered via U.S. Mail or express delivery service), personal delivery, U.S. Mail (return receipt requested), or United States Express Mail (postage or delivery charge prepaid) or other established express delivery service (such as Federal Express or DHL), addressed to the appropriate Party as follows:

North Seller:   2211 Rimland Drive, Ste. 300
Bellingham, WA 98226
Attn: Elizabeth C. Parkes
Facsimile No.: 360.752-6427

With a copy to (which shall not constitute notice hereunder):

Akerman LLP
One Southeast Third Avenue
Suite 2500
Miami, Florida 33131-1714
Attn: Carl Roston
Facsimile No.: 305.995.6920

South Seller:   2211 Rimland Drive, Ste. 300
Bellingham, WA 98226
Attn: Elizabeth C. Parkes
Facsimile No.: 360.752-6427

With a copy to (which shall not constitute notice hereunder):

Akerman LLP
One Southeast Third Avenue
Suite 2500
Miami, Florida 33131-1714
Attn: Carl Roston
Facsimile No.: 305.995.6920

Safeway:   **Safeway Inc.**
250 Parkcenter Boulevard, Boise, ID 83706 (street address)   P.O. Box 20, Boise, ID 83726 (mailing address)
Attn: Brent Tingey
Facsimile No.: (208) 395-6575

ABS:        **Albertson's LLC**
            250 Parkcenter Boulevard, Boise, ID 83706 (street
address)

            P.O. Box 20, Boise, ID 83726 (mailing address)
            Attn: Brent Tingey
            Facsimile No.: (208) 395-6575

All notices shall be deemed given upon receipt. The person and address to which notices are to be given may be changed at any time by any Party upon written notice to the other Party.

B.     **Entire Agreement.** This Agreement constitutes the entire agreement of the Parties with respect to the transfer of the Assets from Sellers to Buyers as set forth herein and supersedes all other prior agreements, oral or written with respect thereto; provided, however, that, for the avoidance of doubt, with respect to all other matters, this Agreement shall not supersede in any respect, or otherwise effectuate any modification or waiver of, any provision of that certain Asset Purchase Agreement, dated December 10, 2014, by and among Haggen Holdings, LLC, Albertson's Holdings LLC and ABS, as amended (the "**2014 Agreement**"), and the 2014 Agreement shall remain in full force and effect to the full extent provided therein, nor shall this Agreement impact or relate to any disputes or litigation relating to the 2014 Agreement. In the event of any ambiguity in the terms of the 2014 Agreement and the terms of this Agreement regarding which agreement shall govern a particular matter, the terms of the 2014 Agreement shall govern such matter. This Agreement shall not impact or affect in any way any Seller's operations or ownership of any of its locations or assets other than the Pharmacies and the Assets (to the extent provided herein). There shall be no presumption or standard of construction in favor of or against either Party.

C.     **Modification.** This Agreement may not be modified in any respect whatsoever, in whole or in part, except by an instrument in writing duly executed by Buyers and Sellers.

D.     **Successors and Assigns.** All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, their successors and assigns.

E.     **Attorneys' Fees.** The prevailing Party in any legal action or proceeding to enforce the terms or conditions of this Agreement, or any declaratory relief action to interpret the terms of this Agreement (including any appeal), shall be entitled to recover its reasonable costs and attorneys' fees. The

prevailing Party will be the Party that substantially prevails in such action or proceeding.

F.    **Headings.**   The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

G.    **Severability.**  If any of the terms of this Agreement are held by any court of competent jurisdiction to be unenforceable under any present or future Law, the remainder of this Agreement will not be affected thereby.  It is the intention of the Parties that if any such provision is held to be unenforceable, there will be added in lieu thereof a provision as similar in terms to such provisions as is possible to be legal, valid and enforceable.

H.    **Survival of Terms.**  All representations and warranties contained in this Agreement shall survive the Transfer Dates until the date which is fifteen (15) months after the date hereof.   None of the covenants or other agreements contained in this Agreement shall survive the Transfer Dates other than those which by their terms contemplate performance after the Transfer Dates, and each such surviving covenant and agreement shall survive the Transfer Dates for the period contemplated by its terms.  All indemnification obligations under Section 17(A) and Section 17(B) (other than Section 17(A)(ii) and Section 17(B)(ii) which shall survive as set forth in the first sentence of this Section 19(H)) shall survive the Transfer Dates indefinitely.

I.    **Default.**

    (i)    In the event of any default by any Party to this Agreement, the non-defaulting Party may:

        (a)    Terminate this Agreement upon written notice to the defaulting Party, and recover from the defaulting Party all Losses to which  the non-defaulting Party is entitled under Section 17 related to such breach;

        (b)    Seek specific performance of the covenants in Section 12, 16 and 18 of this Agreement or any covenant or obligation to deliver instructions to the Escrow Agent as provided herein or in the Escrow Agreement and/or injunctive relief with respect thereto (but not with respect to any other matters or obligations herein), in addition, recover all Losses to which the non-defaulting party is entitled under Section 17; or

        (c)    Pursue all other remedies available under this Agreement, the Parties intending that remedies be cumulative and liberally enforced

so as to adequately and completely compensate the non-defaulting Party subject to, and in accordance with the terms, conditions and limitations set forth in this Agreement.

(ii)     Neither Party shall be deemed to be in default under this Agreement except upon the expiration of thirty (30) days (ten [10] days in the event of failure to pay money) from receipt of written notice from the other Party specifying the particulars in which such Party has failed to perform its obligations (or breached any of its representations or warranties) under this Agreement unless such Party, prior to expiration of said thirty (30) days period (ten [10] days in the event of failure to pay money), has remedied the particulars specified in said notice of default.

J.    **Counterparts.**    This Agreement may be executed by facsimile copies (originals to be promptly delivered via U.S. Mail or express delivery service) in two or more counterparts and once so executed by the Parties hereto, each such counterpart shall be deemed to be an original, but all such counterparts together shall constitute one agreement.  Facsimile and e-mail signatures shall be deemed originals for purposes of enforcement.

K.    **No Third Party Beneficiaries.**  It is the intention of the Parties that no individual or entity be construed or considered to be an intended or implied third-party beneficiary under this Agreement.

L.    **Time of the Essence.**  All times provided for in this Agreement for the performance of any act will be strictly construed, time being of the essence.

M.    **Incorporation of Exhibits.**    All exhibits are incorporated into this Agreement as if set forth in full herein.  Any capitalized terms in the exhibits that are not otherwise defined therein shall have the same meaning as in this Agreement.

N.    **Waiver.**  No covenant, term or condition, or breach or default thereof, shall be deemed waived except by written consent of the Party against whom the waiver is claimed.  Any claim of the breach or default of any covenant, term or condition of this Agreement shall not be deemed a waiver of the breach or default of any other covenant, term or condition or of any subsequent breach or default of the same or any other covenant, term or condition herein.

O.    **Set-off Right.** Each Buyer shall be entitled to set-off or recoup against any and all amounts otherwise due a Seller pursuant to this Agreement any amounts finally determined by a court of competent jurisdiction to be owed to such Buyer from such Seller pursuant to the rights to indemnification provided in this Agreement, and each Seller shall be entitled to set-off

against any and all amounts otherwise due a Buyer pursuant to this Agreement any amounts finally determined by a court of competent jurisdiction to be owed to such Seller from such Buyer pursuant to the rights to indemnification provided in this Agreement (each, a "**Right to Set-off**"). Except for the Right to Set-off, Buyers shall not, and each Buyer acknowledges that it has no right, under this Agreement, or any other agreement, document or Law, to withhold, offset, recoup or debit any amounts owed (or which become due and owing) under this Agreement or any performance due to any Seller under this Agreement against any amounts owed (or to become due and owing), whether hereunder or under any other agreement, arrangement or action, to any Buyer or any affiliate thereof by any Seller or any affiliate thereof. Except for the Right to Set-off, Sellers shall not, and each Seller acknowledges that it has no right, under this Agreement, or any other agreement, document or Law, to withhold, offset, recoup or debit any amounts owed (or which become due and owing) under the Agreement or any performance due to any Buyer under this Agreement against any amounts owed (or to become due and owing), whether hereunder or under any other agreement, arrangement or action, to any Seller or any affiliate thereof by any Buyer or any affiliate thereof. For the avoidance of doubt, this Section 19(O) shall not prohibit any calculations of or adjustments to Purchase Price the extent specifically set forth in Exhibit "F" or the application of the Inventory Cap as specified in this Agreement.

P.      **Transaction Expenses.** Except as otherwise provided herein, all fees, costs and expenses incurred by each Buyer and each Seller in connection with the transaction contemplated by this Agreement shall be borne by the Party incurring the same.

Q.      **Cooperation.** From and after the date of this Agreement and for six (6) months after the final Transfer Date, each Party shall provide to the other (upon request), to the extent permitted by Law, such documents, access, rights and information as such Party may reasonably request in a timely manner as necessary for such Party's consummation of the transactions contemplated hereby.

R.      **Force Majeure.** Performance hereunder shall be excused during the period and to the extent that such performance is rendered impossible or impracticable or unduly burdensome due to: acts of God; strikes, lockouts, or labor difficulty; governmental requirements; explosion, accident, riot, or civil commotion; act of war; fire or other casualty; or any other cause other than financial beyond the reasonable control of the Party whose performance is to be excused.

S.      **Governing Law; Jurisdiction; Jury Trial Waiver.** This Agreement shall be governed by and construed in accordance with the laws of the State of

Delaware. Each of the Parties hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Court of Chancery and Superior Courts in the State of Delaware and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the agreements delivered in connection herewith or the transactions contemplated hereby or thereby or for recognition or enforcement of any judgment relating thereto, and each of the Parties hereby irrevocably and unconditionally (i) agrees not to commence any such action or proceeding except in such court, (ii) agrees that any claim in respect of any such action or proceeding may be heard and determined in such Delaware courts, (iii) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in such Delaware court, and (iv) waives, to the fullest extent permitted by Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in such Delaware courts. Each of the Parties agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 19(A). Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by Law. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. No dispute or litigation related to this Agreement or the transactions contemplated herein shall become part of, or shall be litigated as or claimed to be part of any other dispute or litigation between the parties hereto and/or their respective parent, subsidiaries or affiliates.

T.    **Buyer not a Successor.** Nothing in this Agreement shall be constructed as intending that any Buyer is successor to any Seller's pharmacy business. Buyers are only acquiring the Assets and assuming the Assumed Liabilities and Obligations, and will be operating their own businesses separate and apart from Sellers.

THE SUBMISSION OF THIS AGREEMENT FOR EXAMINATION, THE NEGOTIATION OF THIS AGREEMENT BY THE PARTIES, OR THE NEGOTIATION OF ALL OR ANY PART OF THE TRANSACTION DESCRIBED HEREIN, DOES NOT CONSTITUTE AN OFFER TO BUY. THE EXECUTION OF THIS AGREEMENT BY SELLER DOES NOT AND SHALL NOT CONSTITUTE A BINDING CONTRACT UNTIL SUCH TIME AS THIS AGREEMENT HAS BEEN EXECUTED BY BUYERS AND DELIVERED TO THE PARTIES. THE PARTIES ACKNOWLEDGE AND AGREE THAT NO NEGOTIATIONS OR CONDUCT OF THE PARTIES, NOR THE EXECUTION OF THIS AGREEMENT BY A SINGLE PARTY, SHALL GIVE RISE TO ANY RIGHTS IN A SELLER TO TAKE ANY ACTION IN RELIANCE UPON THIS AGREEMENT OR ANY NEGOTIATIONS RELATED

THERETO OR TO OTHERWISE ANTICIPATE OR EXPECT THAT BUYERS WILL SIGN THIS AGREEMENT UNTIL IT IS IN FACT SIGNED BY AND DELIVERED TO ALL PARTIES.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

**BUYERS:**                                    **SELLERS:**

**SAFEWAY INC.**                               **HAGGEN OPCO NORTH, LLC**
a Delaware corporation                         a Delaware limited liability company

By: _____                   By: _____
Name: _BRADLEY R. BECKSTROM_                    Name: _____
Its: _AUTHORIZED SIGNATORY_                     Its: _____


**ALBERTSON'S LLC**                            **HAGGEN OPCO SOUTH, LLC**
a Delaware limited liability company           a Delaware limited liability company

By: _____                   By: _____
Name: _BRADLEY R. BECKSTROM_                    Name: _____
Its: _VICE PRESIDENT_                          Its: _____

{35946668;10}

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

BUYERS:

SELLERS:

SAFEWAY, INC.
a Delaware corporation

HAGGEN OPCO NORTH, LLC
a Delaware limited liability company

By: _____

By: _____
Name: _____
Name: _Blake____Barnett_
Its: _____
Its: _CFO_


ALBERTSON'S, LLC
a Delaware limited liability company

HAGGEN OPCO SOUTH, LLC
a Delaware limited liability company

By: _____

By: _____
Name: _____
Name: _Blake____Barnett_
Its: _____
Its: _CFO_

## EXHIBIT "A"

| Seller | Seller's Pharmacy | Buyer; Buyer's Store | Transfer Date |
|---|---|---|---|
| North Seller | 211 North Eighth Street, Klamath Falls, County Klamath, OR 97601 (Haggen Store 2114) | ABS, 5500 South Sixth Street, Klamath Falls, OR 97603 (Albertsons Store 577) | To be determined by the Parties in accordance with Section 4(A). |
| North Seller | 2740 South Sixth Street, Klamath Falls, County Klamath, OR 97603 (Haggen Store 2122) | ABS, 5500 South Sixth Street, Klamath Falls, OR 97603 (Albertsons Store 577) | To be determined by the Parties in accordance with Section 4(A). |
| South Seller | 10380 East Broadway, Blvd, Tucson, Pima County, AZ 85748 (Haggen Store 2197) | ABS, 9595 East Broadway, Tucson, AZ 85748 (Albertsons Store 964) | To be determined by the Parties in accordance with Section 4(A). |
| South Seller | 3901 Portola Pkwy, Irvine, CA, Orange County, 92620 (Haggen Store 2201). | ABS, 14201 Jeffrey Road, Irvine, CA 92620 (Albertsons Store 6591) | To be determined by the Parties in accordance with Section 4(A). |
| North Seller | 8515 SW Tualatin-Sherwood, Tualatin, Washington County, OR 97062 (Haggen Store 61) | SWY, 17779 SW Lower Boones Ferry Rd., Lake Oswego, OR 97035 (Safeway Store 1047) | To be determined by the Parties in accordance with Section 4(A). |
| South Seller | 2800 Cochran, Simi Valley, Ventura County, CA 93065 (Haggen Store 2157) | SWY, 1855 E. Cochran, Simi Valley, CA 93065 (Safeway Store 2501) | To be determined by the Parties in accordance with Section 4(A). |
| South Seller | 1636 West Twenty Fifth Street, San Pedro, Los Angeles County, CA 90732 (Haggen Store 2178); | SWY, 1440 West Twenty Fifth Street, San Pedro, CA 90732 (Safeway Store 2162) | To be determined by the Parties in accordance with Section 4(A). |
| South Seller | 671 Rancho Santa Fe, San Marcos, San Diego County, CA 92078 (Haggen Store 2191) | SWY, 3439 Via Montebello, Carlsbad, CA 92009 (Safeway Store 2764) | To be determined by the Parties in accordance with Section 4(A). |
| South Seller | 660 E. Los Angeles Ave, Simi Valley, Ventura County, CA 93065 (H.S. 2199) | SWY, 1855 E. Cochran, Simi Valley, CA 93065 (Safeway Store 2501) | To be determined by the Parties in accordance with Section 4(A). |
| South Seller | 25872 Muirlands Blvd., Mission Viejo, Orange County, CA 92691 (Haggen Store 2202) | SWY, 26022 Marguerite Parkway, Mission Viejo, CA 92692 (Safeway Store 2210) | To be determined by the Parties in accordance with Section 4(A). |
| South Seller | 6235 East Spring, Long Beach, Los Angeles County, CA 90808 (Haggen Store 2209) | SWY, 5949 East Spring, Long Beach, CA 90808 (Safeway Store 2203) | To be determined by the Parties in accordance with Section 4(A). |
| South Seller | 1416 E. Route 66, Flagstaff, Coconino County, AZ 86001 (Haggen Store 2222) | SWY, 1201 South Plaza Way, Flagstaff, AZ 86001 (Safeway Store 2028) | To be determined by the Parties in accordance with Section 4(A). |
| South Seller | 7450 East Hwy 69, Prescott Valley, Yavapai County, AZ 86314 (Haggen Store 2223) | SWY, 7720 East Hwy 69, Prescott Valley, AZ83614 (Safeway Store 1055) | To be determined by the Parties in accordance with Section 4(A). |

## EXHIBIT "B"

### PRESCRIPTION PATIENT RECORD INFORMATION

- Prescription Number
- Transfer Number
- Quantity
- Patient First Name
- Patient Last Name
- Patient Address
- Patient Phone Number
- Doctor Name
- Doctor DEA
- Doctor Phone Number
- Doctor Address
- Drug Description
- Allergies/Medication Interaction
- Mfg. NDC Number
- SIG Description
- Price Code
- Price
- Co-pay
- Cost
- Filling R.Ph. or Rx Tech.
- Refills Remaining
- Refill Number
- Original date entered
- Last refill date
- Last Substitution Date
- Date of Birth
- Third Party Insurance plan/code
- Dr. NPI Number

## EXHIBIT "C"

### PRE-CLOSING LIEN SEARCH RESULTS

Please see attached.

# CORPORATION SERVICE COMPANY

www.cscglobal.com

CSC- West Trenton
P.O.Box 77132
830 Bear Tavern Road, Suite 305
West Trenton, NJ 08628-1020
800-631-2155
609-530-0877 (Fax)

| | | | |
|---|---|---|---|
| **Matter#** | 074658-14086 44S-K | **Order#** | 764507-3 |
| **Project Id :** | | **Order Date** | 08/28/2015 |
| **Additional Reference :** | NOT PROVIDED | | |

|  |  |
|---|---|
| **Subject:** | **HAGGEN OPCO NORTH, LLC** |
| **Jurisdiction:** | **DE - SECRETARY OF STATE** |
| **Request for:** | **UCC Debtor Search** |
| **Thru Date:** | **August 21, 2015** |
| **Result:** | **Certified results retrieved** |
| **Original:** | 4 |
| **Amendment:** | 1 |
| **Followup:** | Per your request, a full listing with copies limited from 01/22/2015 to present has been provided.Per your request, active, lapsed and terminated filings have been included. |

Ordered by MARY ANNE KOWALCZYK at BLANK ROME

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Betty-Jean Konieczny
bkoniecz@cscinfo.com

**Corporation Service Company(R) Terms and Conditions**

You agree that all information that Corporation Service Company furnishes to you will be used solely as one factor in your credit, insurance, marketing or other business decisions and will not be used (i) in determining a consumer's eligibility for credit or insurance where such credit or insurance is to be used primarily for personal, family or household purposes, (ii) for employment purposes, or (iii) for governmental licenses. Use of the information in the above manner is a violation of the Fair Credit Reporting Act.

# Delaware

PAGE   1

## The First State

CERTIFICATE

SEARCHED AUGUST 28, 2015, AT  9:50 A.M.
FOR DEBTOR "HAGGEN OPCO NORTH, LLC"

```
    1 OF    4    FINANCING STATEMENT                      50624980
           EXPIRATION DATE: FEBRUARY 12, 2020
 DEBTOR: HAGGEN OPCO NORTH, LLC
         2211 RIMLAND DRIVE                               ADDED 02-12-15
         BELLINGHAM                    WA   98226
SECURED: PNC BANK, NATIONAL ASSOCIATION, AS AGENT
         COMMERCIAL LOAN SERVICE CENTER/                  ADDED 02-12-15
         DCC, 500 FIRST AVENUE
         PITTSBURGH                    PA   15219
              F I L I N G   H I S T O R Y
50624980  FILED 02-12-15    AT  4:08 P.M.   FINANCING STATEMENT

    2 OF    4    FINANCING STATEMENT                      51454312
           EXPIRATION DATE: APRIL 6, 2020
 DEBTOR: HAGGEN OPCO NORTH, LLC
         2211 RIMLAND DRIVE                               ADDED 04-06-15
         BELLINGHAM                    WA   98226
SECURED: PAPYRUS-RECYCLED GREETINGS, INC.
         111 N. CANAL STREET, SUITE 700                   ADDED 04-06-15
         CHICAGO                       IL   60606--720
              F I L I N G   H I S T O R Y
51454312  FILED 04-06-15    AT  3:07 P.M.   FINANCING STATEMENT

    3 OF    4    FINANCING STATEMENT                      51454320
           EXPIRATION DATE: APRIL 6, 2020
 DEBTOR: HAGGEN OPCO NORTH, LLC
         2211 RIMLAND DRIVE                               ADDED 04-06-15
         BELLINGHAM                    WA   98226
SECURED: AMERICAN GREETINGS CORPORATION
         ONE AMERICAN ROAD                                ADDED 04-06-15
         CLEVELAND                     OH   44144
              F I L I N G   H I S T O R Y
51454320  FILED 04-06-15    AT  3:07 P.M.   FINANCING STATEMENT
52589579  FILED 06-17-15    AT 11:33 A.M.   AMENDMENT
```

Jeffrey W. Bullock, Secretary of State

20153781902UCXL

151229362

AUTHENTICATION: 2685107

DATE: 08-28-15

# Delaware

PAGE   2

### The First State

```
 4 OF    4   FINANCING STATEMENT              53658910
         EXPIRATION DATE: AUGUST 21, 2020
 DEBTOR: HAGGEN OPCO NORTH, LLC
         2211 RIMLAND DRIVE                          ADDED 08-21-15
         BELLINGHAM                    WA  98226
SECURED: HAGGEN PROPERTY NORTH, LLC, AS ADMINISTRATIVE AGENT
         2211 RIMLAND DRIVE                          ADDED 08-21-15
         BELLINGHAM                    WA  98226
              F I L I N G   H I S T O R Y
53658910  FILED 08-21-15    AT 10:27 A.M.   FINANCING STATEMENT
          E N D   O F   F I L I N G   H I S T O R Y
```

THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE
ABOVE LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING
STATEMENTS, LAPSED FINANCING STATEMENTS, FEDERAL TAX LIENS AND
UTILITY SECURITY INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE
ABOVE DEBTOR, AS OF AUGUST 21, 2015 AT 11:59 P.M.

Jeffrey W. Bullock, Secretary of State

20153781902UCXL

151229362

AUTHENTICATION: 2685107

DATE: 08-28-15

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Corporation Service Company     8008585294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
CORPORATION SERVICE COMPANY

2711 CENTERVILLE ROAD

SUITE 400

WILMINGTON DE 19808
```

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 04:08 PM 02/12/2015
INITIAL FILING # 2015 0624980

SRV: 150190343

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| HAGGEN OPCO NORTH, LLC | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2211 RIMLAND DRIVE | BELLINGHAM | WA | 98226 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, AS AGENT | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| COMMERCIAL LOAN SERVICE CENTER/ DCC, 500 FIRST AVENUE | PITTSBURGH | PA | 15219 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

All of Debtor's assets, including but not limited to, all now owned or
hereafter acquired or arising accounts, inventory, machinery, furniture,
fixtures, equipment, general intangibles, chattel paper, contract rights,
documents, instruments, deposit accounts, commercial tort claims and investment
property; and all cash and non-cash proceeds thereof (including, without
limitation, insurance proceeds) and proceeds of proceeds.

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum  [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]  [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

:074658-14086   [96206051]

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
|---|---|
| Corporation Service Company | 8008585294 |

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

```
  CORPORATION SERVICE COMPANY
  2711 CENTERVILLE ROAD
  SUITE 400

  WILMINGTON DE 19808
```

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 03:07 PM 04/06/2015
INITIAL FILING # 2015 1454312

SRV: 150470456

---

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| HAGGEN OPCO NORTH, LLC | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2211 RIMLAND DRIVE | BELLINGHAM | WA | 98226 | US |

| 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|
| | | |

---

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|
| | | |

---

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P)** - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PAPYRUS-RECYCLED GREETINGS, INC. | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 111 N. CANAL STREET, SUITE 700 | CHICAGO | IL | 60606-720 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

INVENTORY HERETOFORE OR HEREAFTER SOLD OR DELIVERED BY SECURED PARTY OR ITS SUBSIDIARIES OR AFFILIATES TO DEBTOR FOR SALE PURSUANT TO SCAN-BASED TRADING FROM TIME TO TIME WHEREVER LOCATED INCLUDING, WITHOUT LIMITATION, EVERYDAY AND SEASONAL COUNTER CARDS; EVERYDAY SEASONAL GIFT PACKAGING; EVERYDAY AND SEASONAL CELLOS; EVERYDAY STATIONERY; EVERYDAY AND SEASONAL NON-CARD ACCESSORIES; AND BOXED CHRISTMAS CARDS, TOGETHER WITH ALL PROCEEDS THEREOF, INCLUDING, WITHOUT LIMITATION, CASH, ACCOUNTS, INSTRUMENTS, CHATTEL PAPER, GENERAL INTANGIBLES AND LETTER OF CREDIT RIGHTS.   THE FOREGOING SECURITY INTEREST SHALL BE A PURCHASE MONEY SECURITY INTEREST TO THE FULLEST EXTENT PERMITTED UNDER THE UNIFORM COMMERCIAL CODE.

---

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum   [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   (optional) | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

[97787518]

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] | |
|---|---|
| Corporation Service Company | 8008585294 |

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
CORPORATION SERVICE COMPANY

2711 CENTERVILLE ROAD

SUITE 400

WILMINGTON DE 19808
```

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 03:07 PM 04/06/2015
INITIAL FILING # 2015 1454320

SRV: 150470457

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| HAGGEN OPCO NORTH, LLC | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2211 RIMLAND DRIVE | BELLINGHAM | WA | 98226 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| AMERICAN GREETINGS CORPORATION | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| ONE AMERICAN ROAD | CLEVELAND | OH | 44144 | US |

## 4. This FINANCING STATEMENT covers the following collateral:

INVENTORY HERETOFORE OR HEREAFTER SOLD OR DELIVERED BY SECURED PARTY OR ITS SUBSIDIARIES OR AFFILIATES TO DEBTOR FOR SALE PURSUANT TO SCAN-BASED TRADING FROM TIME TO TIME WHEREVER LOCATED INCLUDING, WITHOUT LIMITATION, EVERYDAY AND SEASONAL COUNTER CARDS; EVERYDAY AND SEASONAL ALTERNATIVE CARDS; EVERYDAY SEASONAL GIFT PACKAGING; EVERYDAY AND SEASONAL GIFT WRAP, BOWS, RIBBONS, GIFT CARDS, AND GIFT WRAP ATTACHMENTS; EVERYDAY AND SEASONAL GIFT BAGS AND GIFT BOXES; EVERYDAY AND SEASONAL STATIONERY AND CELLOS; EVERYDAY AND SEASONAL NON-CARD ACCESSORIES; EVERYDAY AND SEASONAL STICKERS; EVERYDAY AND SEASONAL PARTY GOODS; AND INVENTIONS-BRANDED PRODUCTS, TOGETHER WITH ALL PROCEEDS THEREOF, INCLUDING, WITHOUT LIMITATION, CASH, ACCOUNTS, INSTRUMENTS, CHATTEL PAPER, GENERAL INTANGIBLES AND LETTER OF CREDIT RIGHTS. THE FOREGOING SECURITY INTEREST SHALL BE A PURCHASE MONEY SECURITY INTEREST TO THE FULLEST EXTENT PERMITTED UNDER THE UNIFORM COMMERCIAL CODE.

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum   [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

[97787147]

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] | |
|---|---|
| Corporation Service Company | 8008585294 |

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
CORPORATION SERVICE COMPANY

2711 CENTERVILLE ROAD

SUITE 400

WILMINGTON DE 19808
```

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 11:33 AM 06/17/2015
INITIAL FILING # 2015 1454320
AMENDMENT     # 2015 2589579
SRV: 150932614

---

**1a. INITIAL FINANCING STATEMENT FILE #**

2015 1454320

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**3.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor **or** ☐ Secured Party of record. Check only **one** of these two boxes.

Also check **one** of the following three boxes **and** provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c. ☐ DELETE name: Give record name to be deleted in item 6a or 6b. ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

**6. CURRENT RECORD INFORMATION:**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **OR** 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **OR** 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | | |

**8. AMENDMENT (COLLATERAL CHANGE):** check only **one** box.

Describe collateral ☐ deleted or ☐ added, or give entire ☒ restated collateral description, or describe collateral ☐ assigned.

INVENTORY HERETOFORE OR HEREAFTER SOLD OR DELIVERED BY SECURED PARTY OR ITS SUBSIDIARIES OR AFFILIATES TO DEBTOR FOR SALE PURSUANT TO SCAN-BASED TRADING FROM TIME TO TIME WHEREVER LOCATED INCLUDING, WITHOUT LIMITATION, EVERYDAY AND SEASONAL COUNTER CARDS; EVERYDAY AND SEASONAL ALTERNATIVE CARDS; EVERYDAY GIFT PACKAGING; EVERYDAY AND SEASONAL GIFT WRAP, BOWS, RIBBONS, GIFT CARDS, AND GIFT WRAP ATTACHMENTS; EVERYDAY AND SEASONAL GIFT BAGS AND GIFT BOXES; EVERYDAY AND SEASONAL STATIONERY AND CELLOS; EVERYDAY AND SEASONAL NON-CARD ACCESSORIES; EVERYDAY AND SEASONAL STICKERS; EVERYDAY AND SEASONAL PARTY GOODS; AND INVENTIONS-BRANDED PRODUCTS, TOGETHER WITH ALL PROCEEDS THEREOF, INCLUDING, WITHOUT LIMITATION, CASH, ACCOUNTS, INSTRUMENTS, CHATTEL PAPER, GENERAL INTANGIBLES AND LETTER OF CREDIT RIGHTS. THE FOREGOING SECURITY INTEREST SHALL BE A PURCHASE MONEY SECURITY INTEREST TO THE FULLEST EXTENT PERMITTED UNDER THE UNIFORM COMMERCIAL CODE.

---

**9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT**

American Greetings Corporation

**10. OPTIONAL FILER REFERENCE DATA**

Debtor: Haggen Opco North, LLC

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Angela Ramey, Esq. (305) 982-5699 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| angela.ramey@akerman.com |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Angela Ramey, Esq.
c/o Akerman LLP
One S.E. Third Avenue, 25th Floor
Miami, FL 33131

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 10:27 AM 08/21/2015*
*INITIAL FILING # 2015 3658910*

*SRV: 151200855*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| HAGGEN OPCO NORTH, LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2211 Rimland Drive | Bellingham | WA | 98226 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| HAGGEN PROPERTY NORTH, LLC, as Administrative Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2211 Rimland Drive | Bellingham | WA | 98226 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the debtor whether now owned or hereafter acquired, including all proceeds thereof.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
|---|---|
| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: |
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
File with Delaware - Secretary of State

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

**CORPORATION SERVICE COMPANY**

www.cscglobal.com

CSC- West Trenton
P.O.Box 77132
830 Bear Tavern Road, Suite 305
West Trenton, NJ 08628-1020
800-631-2155
609-530-0877 (Fax)

Matter#    074658-14086 44S-K

Order#    764507-4

Project Id :

Order Date    08/28/2015

Additional Reference :  NOT PROVIDED

| | |
|---|---|
| Subject: | **HAGGEN OPCO SOUTH, LLC** |
| Jurisdiction: | **DE - SECRETARY OF STATE** |
| Request for: | **UCC Debtor Search** |
| Thru Date: | **August 21, 2015** |
| Result: | **Certified results retrieved** |
| Original: | 5 |
| Amendment: | 1 |
| Followup: | Per your request, a full listing with copies limited from 01/22/2015 to present has been provided.  Per your request, active, lapsed and terminated filings have been included. |

Ordered by MARY ANNE KOWALCZYK at BLANK ROME

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Betty-Jean Konieczny
bkoniecz@cscinfo.com

Corporation Service Company(R) Terms and Conditions

You agree that all information that Corporation Service Company furnishes to you will be used solely as one factor in your credit, insurance, marketing or other business decisions and will not be used (i) in determining a consumer's eligibility for credit or insurance where such credit or insurance is to be used primarily for personal, family or household purposes, (ii) for employment purposes, or (iii) for governmental licenses. Use of the information in the above manner is a violation of the Fair Credit Reporting Act.

# Delaware

PAGE    1

## The First State

CERTIFICATE

SEARCHED AUGUST 28, 2015, AT  9:51 A.M.
FOR DEBTOR "HAGGEN OPCO SOUTH, LLC"

```
  1 OF    5    FINANCING STATEMENT                    50624998
          EXPIRATION DATE: FEBRUARY 12, 2020
 DEBTOR: HAGGEN OPCO SOUTH, LLC
         2211 RIMLAND DRIVE                           ADDED 02-12-15
         BELLINGHAM                    WA   98226
SECURED: PNC BANK, NATIONAL ASSOCIATION, AS AGENT
         COMMERCIAL LOAN SERVICE CENTER/             ADDED 02-12-15
         DCC, 500 FIRST AVENUE
         PITTSBURGH                    PA   15219
                 F I L I N G    H I S T O R Y
50624998  FILED 02-12-15    AT  4:08 P.M.   FINANCING STATEMENT

  2 OF    5    FINANCING STATEMENT                    51454338
          EXPIRATION DATE: APRIL 6, 2020
 DEBTOR: HAGGEN OPCO SOUTH, LLC
         2211 RIMLAND DRIVE                           ADDED 04-06-15
         BELLINGHAM                    WA   98226
SECURED: AMERICAN GREETINGS CORPORATION
         ONE AMERICAN ROAD                            ADDED 04-06-15
         CLEVELAND                     OH   44144
                 F I L I N G    H I S T O R Y
51454338  FILED 04-06-15    AT  3:07 P.M.   FINANCING STATEMENT
52589561  FILED 06-17-15    AT 11:33 A.M.   AMENDMENT

  3 OF    5    FINANCING STATEMENT                    51454353
          EXPIRATION DATE: APRIL 6, 2020
 DEBTOR: HAGGEN OPCO SOUTH, LLC
         2211 RIMLAND DRIVE                           ADDED 04-06-15
         BELLINGHAM                    WA   98226
SECURED: PAPYRUS-RECYCLED GREETINGS, INC.
         111 N. CANAL STREET, SUITE 700              ADDED 04-06-15
         CHICAGO                       IL   60606--720
                 F I L I N G    H I S T O R Y
51454353  FILED 04-06-15    AT  3:08 P.M.   FINANCING STATEMENT
```

Jeffrey W. Bullock, Secretary of State

20153781993UCXL

151229374

AUTHENTICATION: 2685115

DATE: 08-28-15

# Delaware

PAGE   2

## The First State

```
    4 OF    5   FINANCING STATEMENT              51830123
            EXPIRATION DATE: APRIL 29, 2020
 DEBTOR: HAGGEN OPCO SOUTH, LLC
         49 DISCOVERY, STE 150                   ADDED 04-29-15
         IRVINE                    CA   92618
SECURED: WELLS FARGO FINANCIAL LEASING, INC.
         800 WALNUT STREET,                      ADDED 04-29-15
         MAC N0005-044
         DES MOINES                 IA   50309
              F I L I N G   H I S T O R Y
51830123  FILED 04-29-15    AT 11:32 A.M.   FINANCING STATEMENT

    5 OF    5   FINANCING STATEMENT              53658969
            EXPIRATION DATE: AUGUST 21, 2020
 DEBTOR: HAGGEN OPCO SOUTH, LLC
         2211 RIMLAND DRIVE                      ADDED 08-21-15
         BELLINGHAM                 WA   98226
SECURED: HAGGEN PROPERTY NORTH, LLC, AS ADMINISTRATIVE AGENT
         2211 RIMLAND DRIVE                      ADDED 08-21-15
         BELLINGHAM                 WA   98226
              F I L I N G   H I S T O R Y
53658969  FILED 08-21-15    AT 10:29 A.M.   FINANCING STATEMENT
         E N D   O F   F I L I N G   H I S T O R Y
```

THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE
ABOVE LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING
STATEMENTS, LAPSED FINANCING STATEMENTS, FEDERAL TAX LIENS AND
UTILITY SECURITY INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE
ABOVE DEBTOR, AS OF AUGUST 21, 2015 AT 11:59 P.M.

Jeffrey W. Bullock, Secretary of State

20153781993UCXL

151229374

AUTHENTICATION: 2685115

DATE: 08-28-15

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] | |
|---|---|
| Corporation Service Company | 8008585294 |

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

```
┌                                                    ┐
    CORPORATION SERVICE COMPANY

    2711 CENTERVILLE ROAD

    SUITE 400


  ⌊ WILMINGTON DE 19808                              ⌋
```

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 04:08 PM 02/12/2015*
*INITIAL FILING # 2015 0624998*

*SRV: 150190347*

---

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| HAGGEN OPCO SOUTH, LLC | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2211 RIMLAND DRIVE | BELLINGHAM | WA | 98226 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, AS AGENT | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| COMMERCIAL LOAN SERVICE CENTER/ DCC, 500 FIRST AVENUE | PITTSBURGH | PA | 15219 | US |

**4.  This FINANCING STATEMENT covers the following collateral:**

All of Debtor's assets, including but not limited to, all now owned or hereafter acquired or arising accounts, inventory, machinery, furniture, fixtures, equipment, general intangibles, chattel paper, contract rights, documents, instruments, deposit accounts, commercial tort claims and investment property; and all cash and non-cash proceeds thereof (including, without limitation, insurance proceeds) and proceeds of proceeds.

---

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

:074658-14086    [96205792]

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] | |
|---|---|
| Corporation Service Company | 8008585294 |

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
┌                                              ┐
    CORPORATION SERVICE COMPANY

    2711 CENTERVILLE ROAD

    SUITE 400


  WILMINGTON DE 19808
└                                              ┘
```

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 03:07 PM 04/06/2015
INITIAL FILING # 2015 1454338

SRV: 150470459

---

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| HAGGEN OPCO SOUTH, LLC | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2211 RIMLAND DRIVE | BELLINGHAM | WA | 98226 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

---

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

---

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| AMERICAN GREETINGS CORPORATION | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| ONE AMERICAN ROAD | CLEVELAND | OH | 44144 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

INVENTORY HERETOFORE OR HEREAFTER SOLD OR DELIVERED BY SECURED PARTY OR ITS SUBSIDIARIES OR AFFILIATES TO DEBTOR FOR SALE PURSUANT TO SCAN-BASED TRADING FROM TIME TO TIME WHEREVER LOCATED INCLUDING, WITHOUT LIMITATION, EVERYDAY AND SEASONAL COUNTER CARDS; EVERYDAY AND SEASONAL ALTERNATIVE CARDS; EVERYDAY SEASONAL GIFT PACKAGING; EVERYDAY AND SEASONAL GIFT WRAP, BOWS, RIBBONS, GIFT CARDS, AND GIFT WRAP ATTACHMENTS; EVERYDAY AND SEASONAL GIFT BAGS AND GIFT BOXES; EVERYDAY AND SEASONAL STATIONERY AND CELLOS; EVERYDAY AND SEASONAL NON-CARD ACCESSORIES; EVERYDAY AND SEASONAL STICKERS; EVERYDAY AND SEASONAL PARTY GOODS; AND INVENTIONS-BRANDED PRODUCTS, TOGETHER WITH ALL PROCEEDS THEREOF, INCLUDING, WITHOUT LIMITATION, CASH, ACCOUNTS, INSTRUMENTS, CHATTEL PAPER, GENERAL INTANGIBLES AND LETTER OF CREDIT RIGHTS. THE FOREGOING SECURITY INTEREST SHALL BE A PURCHASE MONEY SECURITY INTEREST TO THE FULLEST EXTENT PERMITTED UNDER THE UNIFORM COMMERCIAL CODE.

---

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum   [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

[97787105]

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Corporation Service Company                                    8008585294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CORPORATION SERVICE COMPANY

2711 CENTERVILLE ROAD

SUITE 400

WILMINGTON DE 19808

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 11:33 AM 06/17/2015
INITIAL FILING # 2015 1454338
AMENDMENT      # 2015 2589561
SRV: 150932611

1a. INITIAL FINANCING STATEMENT FILE #

2015 1454338

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.

☐ DELETE name: Give record name to be deleted in item 6a or 6b.

☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

6a. ORGANIZATION'S NAME

OR

| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

7a. ORGANIZATION'S NAME

OR

| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | |
|---|---|---|
| | | |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☒ restated collateral description, or describe collateral ☐ assigned.

INVENTORY HERETOFORE OR HEREAFTER SOLD OR DELIVERED BY SECURED PARTY OR ITS SUBSIDIARIES OR AFFILIATES TO DEBTOR FOR SALE PURSUANT TO SCAN-BASED TRADING FROM TIME TO TIME WHEREVER LOCATED INCLUDING, WITHOUT LIMITATION, EVERYDAY AND SEASONAL COUNTER CARDS; EVERYDAY AND SEASONAL ALTERNATIVE CARDS; EVERYDAY GIFT PACKAGING; EVERYDAY AND SEASONAL GIFT WRAP, BOWS, RIBBONS, GIFT CARDS, AND GIFT WRAP ATTACHMENTS; EVERYDAY AND SEASONAL GIFT BAGS AND GIFT BOXES; EVERYDAY AND SEASONAL STATIONERY AND CELLOS; EVERYDAY AND SEASONAL NON-CARD ACCESSORIES; EVERYDAY AND SEASONAL STICKERS; EVERYDAY AND SEASONAL PARTY GOODS; AND INVENTIONS-BRANDED PRODUCTS, TOGETHER WITH ALL PROCEEDS THEREOF, INCLUDING, WITHOUT LIMITATION, CASH, ACCOUNTS, INSTRUMENTS, CHATTEL PAPER, GENERAL INTANGIBLES AND LETTER OF CREDIT RIGHTS. THE FOREGOING SECURITY INTEREST SHALL BE A PURCHASE MONEY SECURITY INTEREST TO THE FULLEST EXTENT PERMITTED UNDER THE UNIFORM COMMERCIAL CODE.

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT

American Greetings Corporation

10. OPTIONAL FILER REFERENCE DATA

Debtor: Haggen Opco South, LLC

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Corporation Service Company                8008585294

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

CORPORATION SERVICE COMPANY

2711 CENTERVILLE ROAD

SUITE 400

WILMINGTON DE 19808

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 03:08 PM 04/06/2015*
*INITIAL FILING # 2015 1454353*

*SRV: 150470461*

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| HAGGEN OPCO SOUTH, LLC | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2211 RIMLAND DRIVE | BELLINGHAM | WA | 98226 | US |

| 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION |
|---|---|
| | |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION |
|---|---|
| | |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PAPYRUS-RECYCLED GREETINGS, INC. | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 111 N. CANAL STREET, SUITE 700 | CHICAGO | IL | 60606-720 | US |

4.  This FINANCING STATEMENT covers the following collateral:

INVENTORY HERETOFORE OR HEREAFTER SOLD OR DELIVERED BY SECURED PARTY OR ITS SUBSIDIARIES OR AFFILIATES TO DEBTOR FOR SALE PURSUANT TO SCAN-BASED TRADING FROM TIME TO TIME WHEREVER LOCATED INCLUDING, WITHOUT LIMITATION, EVERYDAY AND SEASONAL COUNTER CARDS; EVERYDAY SEASONAL GIFT PACKAGING; EVERYDAY AND SEASONAL CELLOS; EVERYDAY STATIONERY; EVERYDAY AND SEASONAL NON-CARD ACCESSORIES; AND BOXED CHRISTMAS CARDS, TOGETHER WITH ALL PROCEEDS THEREOF, INCLUDING, WITHOUT LIMITATION, CASH, ACCOUNTS, INSTRUMENTS, CHATTEL PAPER, GENERAL INTANGIBLES AND LETTER OF CREDIT RIGHTS.  THE FOREGOING SECURITY INTEREST SHALL BE A PURCHASE MONEY SECURITY INTEREST TO THE FULLEST EXTENT PERMITTED UNDER THE UNIFORM COMMERCIAL CODE.

6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum          [if applicable]   |  7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional]    ☐ All Debtors   ☐ Debtor 1   ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

[97787434]

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] | |
|---|---|
| Corporation Service Company | 8008585294 |

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
CORPORATION SERVICE COMPANY

2711 CENTERVILLE ROAD

SUITE 400

WILMINGTON DE 19808
```

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 11:32 AM 04/29/2015
INITIAL FILING # 2015 1830123

SRV: 150583236

---

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| HAGGEN OPCO SOUTH, LLC | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 49 DISCOVERY, STE 150 | IRVINE | CA | 92618 | US |

| 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|
| | | |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|
| | | |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| WELLS FARGO FINANCIAL LEASING, INC. | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 800 WALNUT STREET, MAC N0005-044 | DES MOINES | IA | 50309 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

Lessee: HAGGEN OPCO SOUTH, LLC

Lessor: Wells Fargo Financial Leasing, Inc.

This UCC-1 Financing Statement covers all of Lessee's right, title and interest in and to the following:

Quantity          Description of Goods          Serial Numbers (if known)

(1) Canon IR5051 copier SN GQM60716

and all existing and future accessions, accessories, attachments, replacements, replacement parts, additions, substitutions and repairs thereto, software programs embedded therein, and all proceeds (cash and non-cash), including the proceeds of all insurance policies, thereof (collectively, the Goods) THE CONTRACT UNDER WHICH LESSOR HAS LEASED, RENTED OR OTHERWISE PROVIDED THE GOODS TO LESSEE IS INTENDED TO BE A TRUE LEASE (i.e. A LEASE AS DEFINED IN

---

| 6. | This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

603-0125271-000-    [99010549]

## UCC FINANCING STATEMENT **ADDENDUM** – COLLATERAL

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

| | |
|---|---|
| | 9a. ORGANIZATION'S NAME |
| OR | HAGGEN OPCO SOUTH, LLC |

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
|---|---|---|
| | | |

This FINANCING STATEMENT covers the following collateral

THE UNIFORM COMMERCIAL CODE) AND NOT A SECURED TRANSACTION. THIS FILING IS MADE FOR INFORMATIONAL PURPOSES TO PROVIDE PUBLIC NOTIFICATION OF LESSOR'S OWNERSHIP OF THE GOODS. HOWEVER, IN THE EVENT SUCH CONTRACT IS DEEMED TO BE A SECURED TRANSACTION, THEN IN ACCORDANCE WITH THE CONTRACT, LESSEE SHALL BE DEEMED TO HAVE GRANTED TO LESSOR A FIRST PRIORITY SECURITY INTEREST IN THE GOODS AND THIS FILING SHALL HAVE THE EFFECT OF PERFECTING SUCH SECURITY INTEREST.

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Angela Ramey, Esq.  (305) 982-5699

**B. E-MAIL CONTACT AT FILER (optional)**
angela.ramey@akerman.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

⌐ Angela Ramey, Esq.
c/o Akerman LLP
One S.E. Third Avenue, 25th Floor
Miami, FL 33131 ⌐

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 10:29 AM 08/21/2015*
*INITIAL FILING # 2015 3658969*

*SRV: 151200865*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| HAGGEN OPCO SOUTH, LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 2211 Rimland Drive | Bellingham | WA 98226 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| | | | |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| HAGGEN PROPERTY NORTH, LLC, as Administrative Agent | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 2211 Rimland Drive | Bellingham | WA 98226 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
All assets of the debtor whether now owned or hereafter acquired, including all proceeds thereof.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box
☐ Agricultural Lien  ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
File with Delaware - Secretary of State

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

## EXHIBIT "D"

## LIEN TERMINATION LETTER

Please see attached.



_____, 2015

Albertson's LLC
P.O. Box 20, Boise, ID 83726
Attn: Brent Tingey
Facsimile No.: (208) 395-6575

Safeway Inc.
P.O. Box 20, Boise, ID 83726 (mailing address)
Attn: Brent Tingey
Facsimile No.: (208) 395-6575

Re:   Pharmacy Sale

Ladies and Gentlemen:

Reference is hereby made to that certain Revolving Credit and Security Agreement, dated as of February 12, 2015 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among HAGGEN, INC., a Washington corporation ("Haggen"), HAGGEN OPCO NORTH, LLC, a Delaware limited liability company ("Haggen Opco North"), HAGGEN OPCO SOUTH, LLC, a Delaware limited liability company ("Haggen Opco South" and, together with Haggen Opco North, Haggen, and each Person joined thereto as a borrower from time to time, collectively, the "Borrowers", and each a "Borrower"), the financial institutions which are now or which hereafter become a party thereto (collectively, the "Lenders" and each individually a "Lender"), PNC CAPITAL MARKETS LLC, as sole lead arranger and sole bookrunner, and PNC BANK, NATIONAL ASSOCIATION ("PNC"), as agent for the Lenders (PNC, in such capacity, the "Agent"). All capitalized terms used herein without definition shall have the respective meanings assigned to such terms in the Credit Agreement.

Borrowers have informed Agent that Borrowers wish to sell certain pharmacy-related inventory, prescriptions, and prescription lists relating to the pharmacies of the stores set forth on Exhibit A (the "Pharmacies", and each, a "Pharmacy") to Albertson's LLC and Safeway Inc. The foregoing transaction is referred to as the "Pharmacy Sale".

This letter will confirm that, notwithstanding anything to the contrary contained in the Credit Agreement, Agent will release its lien on the assets of each Pharmacy sold in the Pharmacy Sale upon:

(a)   receipt by the Agent of a fully-executed counterpart of this letter agreement; and

(b)   payment of all of the Purchase Price for such Pharmacy (as defined in the Asset Purchase Agreement governing the Pharmacy Sale) in the following deposit account maintained with Agent (the "Designated Account"):

{36060292;2}

074658.14086/101370266v.2

| Bank: | PNC Bank, National Association |
|---|---|
| ABA Routing No.: | 8026321634 |
| Account No.: | 8026321634 |
| Reference: | Haggen Operations Holdings, LLC Collection Account F/B/O PNC Bank |

Upon satisfaction of both of the foregoing conditions with respect to a Pharmacy, all liens and security interests of Agent in the assets of such Pharmacy sold in the Pharmacy Sale shall be automatically terminated and released. Notwithstanding anything to the contrary contained herein or under applicable law, Agent hereby consents to the sale by Albertson's LLC and/or Safeway Inc. in the ordinary course of any Inventory included as a purchased item in connection with the Pharmacy Sale.

This letter agreement may be executed by each party on a separate counterpart, each of which when so executed and delivered shall be an original, but all of which together shall constitute one agreement. Delivery of an executed counterpart of this letter agreement by facsimile shall have the same force and effect as the delivery of an original executed counterpart. Any party delivering an executed counterpart of this letter agreement by facsimile shall also deliver an original executed counterpart, but the failure to do so shall not affect the validity, enforceability or binding effect of this letter agreement.

This letter agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS LETTER AGREEMENT HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS LETTER AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH, (C) CERTIFIES THAT IT HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER AND (D) MAKES THIS WAIVER VOLUNTARILY.

[Signatures on Following Page]

Please confirm your agreement to the terms and provisions hereof by returning to the Agent a signed counterpart of this letter agreement.

Very truly yours,

**PNC BANK, NATIONAL ASSOCIATION,** as Agent

By:_____
    Name:
    Title:

Accepted and agreed to as of the date first set forth above:

**ALBERTSON'S, LLC**

By:_____
   Name:
   Title:

**SAFEWAY INC.**

By:_____
   Name:
   Title:

**HAGGEN, INC.**

By: _____
Name: _____
Title: _____

**HAGGEN OPCO NORTH, LLC**

By: _____
Name: _____
Title: _____

**HAGGEN OPCO SOUTH, LLC**

By: _____
Name: _____
Title: _____

## Exhibit A

### Pharmacies

1. 211 North Eighth Street, Klamath Falls, County Klamath, OR 97601 (Haggen Store 2114)
2. 2740 South Sixth Street, Klamath Falls, County Klamath, OR 97603 (Haggen Store 2122)
3. 10380 East Broadway, Blvd, Tucson, Pima County, AZ 85748 (Haggen Store 2197)
4. 3901 Portola Pkwy, Irvine, CA, Orange County, 92620 (Haggen Store 2201)
5. 8515 SW Tualatin-Sherwood, Tualatin, Washington County, OR 97062 (Haggen Store 61)
6. 2800 Cochran, Simi Valley, Ventura County, CA 93065 (Haggen Store 2157
7. 1636 West Twenty Fifth Street, San Pedro, Los Angeles County, CA 90732 (Haggen Store 2178)
8. 671 Rancho Santa Fe, San Marcos, San Diego County, CA 92078 (Haggen Store 2191)
9. 660 E. Los Angeles Ave, Simi Valley, Ventura County, CA 93065 (H.S. 2199)
10. 25872 Muirlands Blvd., Mission Viejo, Orange County, CA 92691 (Haggen Store 2202)
11. 6235 East Spring, Long Beach, Los Angeles County, CA 90808 (Haggen Store 2209)
12. 1416 E. Route 66, Flagstaff, Coconino County, AZ 86001 (Haggen Store 2222)
13. 7450 East Hwy 69, Prescott Valley, Yavapai County, AZ 86314 (Haggen Store 2223)

**EXHIBIT "E"**

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT is executed and delivered pursuant to the terms of that certain Asset Purchase Agreement dated August _____, 2015, ("**Agreement**") between _____("**Seller**"), and _____ ("**Buyer**").

All capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Agreement.

Seller, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby sell, assign, grant, bargain, transfer, convey and deliver to Buyer, its successors and assigns, all of Seller's right, title and interest in and to the Assets (as defined in the Agreement) that relate exclusively to the Pharmacy located at [_____] with the exception of all items specifically excluded by the Agreement or disposed of by Seller in accordance with the terms of the Agreement (the "**Pharmacy Assets**").

Buyer acknowledges that Seller makes no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Agreement.

In addition, Seller hereby assigns and transfers to Buyer any and all warranties relating exclusively to the Pharmacy Assets which may be lawfully assigned or transferred.

Seller hereby assigns, and Buyer hereby assumes and agrees to pay, perform and discharge when due, all of the Assumed Liabilities and Obligations in accordance with the terms of the Agreement.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed as of this _____ day of _____, 2015.

| **Seller:** | **Buyer:** |
|---|---|
| | |
| _____ | _____ |
| a _____ | a _____ |
| | |
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Its: _____ | Its: _____ |

## EXHIBIT "F"

## Purchase Price

<u>2114</u>

The Purchase Price for (Haggen Store 2114) shall be the sum of (i) Six Hundred Eighty Nine Thousand and 00/100ths Dollars ($689,000.00) collectively for the Records and Goodwill, plus (ii) the cost of the Inventory determined in accordance with **Section 3** of the Agreement ("**Inventory Payment**").

The Purchase Price for (Haggen Store 2114) is subject to adjustment as follows:  If the Prescription Rate as set forth in the respective Prescription Rate Statement is less than 1226, the Purchase Price shall be reduced by $519.91 for every prescription below 1325. For purposes of example only and without limiting the foregoing, if the Prescription Rate in the Prescription Rate Statement is 1200 (which is 125 prescriptions below 1325), then the Purchase Price shall be reduced by $64,988.75 (i.e., 125 prescriptions X $519.91 per prescription).

<u>2122</u>

The Purchase Price for (Haggen Store 2122) shall be the sum of (i) One Million, Eight Hundred Thousand and 00/100ths Dollars ($1,800,000.00) collectively for the Records and Goodwill, plus (ii) the Inventory Payment.

The Purchase Price for (Haggen Store 2122) is subject to adjustment as follows:  If the Prescription Rate as set forth in the respective Prescription Rate Statement is less than 1387, the Purchase Price shall be reduced by $1,200.83 for every prescription below 1499. For purposes of example only and without limiting the foregoing, if the Prescription Rate in the Prescription Rate Statement is 1400 (which is 99 prescriptions below 1499), then the Purchase Price shall be reduced by $118,882.17 (i.e., 99 prescriptions X $1200.83 per prescription).

<u>2197</u>

The Purchase Price for (Haggen Store 2197) shall be the sum of (i) Four Hundred Eighty Five Thousand and 00/100ths Dollars ($485,000.00) collectively for the Records and Goodwill, plus (ii) the Inventory Payment.

The Purchase Price for (Haggen Store 2197) is subject to adjustment as follows:  If the Prescription Rate as set forth in the respective Prescription Rate Statement is less than 401, the Purchase Price shall be reduced by $1120.79 for every prescription below 433. For purposes of example only and without limiting the foregoing, if the Prescription Rate in the Prescription Rate Statement is 400 (which is 33 prescriptions below 433), then the

Purchase Price shall be reduced by $36,986.07 (i.e., 33 prescriptions X $1120.79 per prescription).

<u>2201</u>

The Purchase Price for (Haggen Store 2201) shall be the Inventory Payment.

<u>61</u>

The Purchase Price for (Haggen Store 61) shall be the sum of (i) One Hundred Seventy Five Thousand and 00/100ths Dollars ($175,000.00) collectively for the Records and Goodwill, plus (ii) the Inventory Payment.

The Purchase Price for (Haggen Store 61) is subject to adjustment as follows: If the Prescription Rate as set forth in the respective Prescription Rate Statement is less than 335, the Purchase Price shall be reduced by $483.43 for every prescription below 362. For purposes of example only and without limiting the foregoing, if the Prescription Rate in the Prescription Rate Statement is 300 (which is 62 prescriptions below 362), then the Purchase Price shall be reduced by $29,972.66 (i.e., 62 prescriptions X $483.43 per prescription).

<u>2157</u>

The Purchase Price for (Haggen Store 2157) shall be the sum of (i) Four Hundred Seventy Five Thousand and 00/100ths Dollars ($475,000.00) collectively for the Records and Goodwill, plus (ii) the Inventory Payment.

The Purchase Price for the (Haggen Store 2157) is subject to adjustment as follows: If the Prescription Rate as set forth in the respective Prescription Rate Statement is less than 504, the Purchase Price shall be reduced by $871.56 for every prescription below 545. For purposes of example only and without limiting the foregoing, if the Prescription Rate in the Prescription Rate Statement is 500 (which is 45 prescriptions below 545), then the Purchase Price shall be reduced by $39,220.20 (i.e., 45 prescriptions X $871.56 per prescription).

<u>2178</u>

The Purchase Price for (Haggen Store 2178) shall be the sum of (i) Five Hundred Fifty Thousand and 00/100ths Dollars ($550,000.00) collectively for the Records and Goodwill, plus (ii) the Inventory Payment.

The Purchase Price for (Haggen Store 2178) is subject to adjustment as follows: If the Prescription Rate as set forth in the respective Prescription Rate Statement is less than 442, the Purchase Price shall be reduced by $1150.07 for every prescription below 478. For purposes of example only and without limiting the foregoing, if the Prescription Rate

in the Prescription Rate Statement is 400 (which is 78 prescriptions below 478), then the Purchase Price shall be reduced by $89,705.46 (i.e., 78 prescriptions X $1150.07 per prescription).

2191

The Purchase Price for (Haggen Store 2191) shall be the sum of (i) Three Hundred Thousand and 00/100ths Dollars ($300,000.00) collectively for the Records and Goodwill, plus (ii) the Inventory Payment.

The Purchase Price for (Haggen Store 2191) is subject to adjustment as follows:  If the Prescription Rate as set forth in the respective Prescription Rate Statement is less than 734, the Purchase Price shall be reduced by $377.61 for every prescription below 794. For purposes of example only and without limiting the foregoing, if the Prescription Rate in the Prescription Rate Statement is 700 (which is 94 prescriptions below 794), then the Purchase Price shall be reduced by $35,495.34 (i.e., 94 prescriptions X $377.61 per prescription).

2199

The Purchase Price for (Haggen Store 2199) shall be the sum of (i) Nine Hundred Eighty Five Thousand and 00/100ths Dollars ($985,000.00) collectively for the Records and Goodwill, plus (ii) the Inventory Payment.

The Purchase Price for (Haggen Store 2199) is subject to adjustment as follows:  If the Prescription Rate as set forth in the respective Prescription Rate Statement is less than 829, the Purchase Price shall be reduced by $1,099.78 for every prescription below 896. For purposes of example only and without limiting the foregoing, if the Prescription Rate in the Prescription Rate Statement is 800 (which is 96 prescriptions below 896), then the Purchase Price shall be reduced by $105,578.88 (i.e., 96 prescriptions X $1099.78 per prescription).

2202

The Purchase Price for (Haggen Store 2202) shall be the sum of (i) Six Hundred Thousand and 00/100ths Dollars ($600,000.00) collectively for the Records and Goodwill, plus (ii) the Inventory Payment.

The Purchase Price for (Haggen Store 2202) is subject to adjustment as follows: If the Prescription Rate as set forth in the respective Prescription Rate Statement is less than 868, the Purchase Price shall be reduced by $639.49 for every prescription below 938. For purposes of example only and without limiting the foregoing, if the Prescription Rate in the Prescription Rate Statement is 850 (which is 88 prescriptions below 938), then the Purchase Price shall be reduced by $56,275.12 (i.e., 88 prescriptions X $639.49 per prescription).

<u>2209</u>

The Purchase Price for (Haggen Store 2209) shall be the sum of (i) One Million, Two Hundred Fifty Thousand and 00/100ths Dollars ($1,250,000.00) collectively for the Records and Goodwill, plus (ii) the Inventory Payment.

The Purchase Price for (Haggen Store 2209) is subject to adjustment as follows:  If the Prescription Rate as set forth in the respective Prescription Rate Statement is less than 889, the Purchase Price shall be reduced by $1,300.78 for every prescription below 961. For purposes of example only and without limiting the foregoing, if the Prescription Rate in the Prescription Rate Statement is 900 (which is 61 prescriptions below 961), then the Purchase Price shall be reduced by $79,347.58 (i.e., 61 prescriptions X $1300.78 per prescription).

<u>2222</u>

The Purchase Price for (Haggen Store 2222) shall be the sum of (i) Eight Hundred Thousand and 00/100ths Dollars ($800,000.00) collectively for the Records and Goodwill, plus (ii) the Inventory Payment.

The Purchase Price for (Haggen Store 2222) is subject to adjustment as follows:  If the Prescription Rate as set forth in the respective Prescription Rate Statement is less than 610, the Purchase Price shall be reduced by $1214.81 for every prescription below 659. For purposes of example only and without limiting the foregoing, if the Prescription Rate in the Prescription Rate Statement is 600 (which is 59 prescriptions below 659), then the Purchase Price shall be reduced by $71,673.79 (i.e., 59 prescriptions X $1214.81 per prescription).

<u>2223</u>

The Purchase Price for (Haggen Store 2223) shall be the sum of (i) Eight Hundred Thousand and 00/100ths Dollars ($800,000.00) collectively for the Records and Goodwill, plus (ii) the Inventory Payment.

The Purchase Price for (Haggen Store 2223) is subject to adjustment as follows:  If the Prescription Rate as set forth in the respective Prescription Rate Statement is less than 778 the Purchase Price shall be reduced by $951.14 for every prescription below 841.  For purposes of example only and without limiting the foregoing, if the Prescription Rate in the Prescription Rate Statement is 700 (which is 141 prescriptions below 841), then the Purchase Price shall be reduced by $134,110.74 (i.e., 141 prescriptions X $951.14 per prescription).

## EXHIBIT "G"
### Limits on Inventory ("Inventory Cap(s)")

For (Haggen Store 2114), not more than $522,500.00 collectively for the Prescription Drugs as that term is described in Subsection 1(C).

For Haggen Store 2122), not more than $451,000.00 collectively for the Prescription Drugs as that term is described in Subsection 1(C).

For (Haggen Store 2197), not more than $220,000.00 collectively for the Prescription Drugs as that term is described in Subsection 1(C).

For (Haggen Store 2201), not more than $220,000.00 collectively for the Prescription Drugs as that term is described in Subsection 1(C).

For (Haggen Store 61), not more than $165,000.00 collectively for the Prescription Drugs as that term is described in Subsection 1(C).

For (Haggen Store 2157), not more than $242,000.00 collectively for the Prescription Drugs as that term is described in Subsection 1(C).

For (Haggen Store 2178), not more than $269,000.00 collectively for the Prescription Drugs as that term is described in Subsection 1(C).

For (Haggen Store 2191), not more than $192,500.00 collectively for the Prescription Drugs as that term is described in Subsection 1(C).

For (Haggen Store 2199), not more than $220,000.00 collectively for the Prescription Drugs as that term is described in Subsection 1(C).

For (Haggen Store 2202), not more than $522,500.00 collectively for the Prescription Drugs as that term is described in Subsection 1(C).

For (Haggen Store 2209), not more than $192,500.00 collectively for the Prescription Drugs as that term is described in Subsection 1(C).

For (Haggen Store 2222), not more than $165,000.00 collectively for the Prescription Drugs as that term is described in Subsection 1(C).

For (Haggen Store 2223), not more than $192,500.00 collectively for the Prescription Drugs as that term is described in Subsection 1(C).

## EXHIBIT "H"

| Pharmacy | Average Weekly Prescription Rate |
|---|---|
| (Haggen Store 2114) | 1,325 |
| (Haggen Store 2122) | 1,499 |
| (Haggen Store 2197) | 433 |
| (Haggen Store 2201) | 538 |
| (Haggen Store 61) | 362 |
| (Haggen Store 2157) | 545 |
| (Haggen Store 2178) | 478 |
| (Haggen Store 2191) | 794 |
| (Haggen Store 2199) | 896 |
| (Haggen Store 2202) | 938 |
| (Haggen Store 2209) | 961 |
| (Haggen Store 2222) | 659 |
| (Haggen Store 2223) | 841 |

{35946668;13}

**Exhibit B**

**Amendment**

Albertson's LLC
Safeway Inc.
250 Parkcenter Boulevard
Boise, ID 83726

September 16, 2015

Haggen Opco North, LLC
Haggen Opco South, LLC
2211 Rimland Drive, Ste. 300
Bellingham, WA 98226

Re:    Albertson's/Haggen Asset Purchase Agreement, dated September 1, 2015

Gentlemen:

Reference is made to that certain Asset Purchase Agreement, dated as of September 1, 2015 (as amended, the "**APA**"), by and among (a) Albertson's LLC, a Delaware limited liability company ("**ABS**"), Safeway Inc., a Delaware corporation ("**Safeway**" or "**SWY**" and together with ABS, collectively, the "**Buyers**" and each, a "**Buyer**"), and (b) Haggen Opco North, LLC, a Delaware limited liability company ("**North Seller**") and Haggen Opco South, LLC, a Delaware limited liability company ("**South Seller**", and together with North Seller, collectively, the "**Sellers**" and each, a "**Seller**").  Each Seller and Buyer is referred to individually herein as a "**Party**" and collectively as the "**Parties**." Capitalized terms used herein and not defined shall have the meanings ascribed to them in the APA.

This letter agreement memorializes certain agreements made with respect to the Parties' obligations under the APA as follows:

1.    Haggen, Inc., a Washington corporation, is hereby added as a party to the APA and the definitions of "Sellers" and "Seller" shall be deemed to include Haggen, Inc. Notwithstanding anything to the contrary set forth in the APA (including Exhibit "A" thereto), the Seller for the Pharmacy located at 8515 SW Tualatin-Sherwood, Tualatin, Washington County, OR 97062 (Haggen Store 61) is Haggen, Inc. The notice address for Haggen, Inc. pursuant to **Section 19** of the APA shall be the same as that for North Seller.

2.    **Section 4(A)** of the APA is hereby amended by deleting the third sentence of such **Section 4(A)** and replacing it in its entirety with the following sentence:

"The Parties agree and acknowledge that the schedule of Transfer Dates on Exhibit "A" shall be mutually agreed upon by the Parties as soon as reasonably practicable."

3.    Notwithstanding anything to the contrary set forth in the APA (including, without limitation, **Sections 6** and **7** of the APA), the Parties acknowledge and agree that, subject to the terms and upon the conditions set forth herein and in the APA:

{36171170;6}

LA 51908486v2

September 16, 2015
Page 2

(A)    on each respective Transfer Date, Buyer shall pay to the relevant Seller (or its designee), in accordance with its previously provided wire instructions, 100% of the portion of the Purchase Price for the Records and Goodwill of the respective Pharmacy (without offset for any reason other than for (i) prescription rate reduction calculations as provided in **Exhibit F** to the APA and (ii) solely with respect to the payment on the penultimate and/or final Transfer Date, as applicable, the Broker Fee as described in **Section 8E** of the APA);

(B)    subject to the respective Inventory Cap, on the earlier of the first business day immediately following each respective Transfer Date or the day after the Final Inventory Report is signed, Buyer shall pay to the relevant Seller (or its designee), in accordance with its previously provided wire instructions, 100% of the portion of the Purchase Price for the Inventory from the Final Inventory Report (without offset for any reason whatsoever);

(C)    Sellers shall be under no obligation to conduct Lien searches or deliver Lien Search Results; and

(D)    the Parties shall not be required to enter into an Escrow Agreement and any references thereto are hereby deemed deleted from the APA.

4.    **Section 10(E)** of the APA is hereby amended by deleting the first sentence of such **Section 10(E)** and replacing it in its entirety with the following sentence:

"Seller must provide for each Pharmacy, on the  date that is two business days before the respective Transfer Date, a prescription audit report for that respective Pharmacy from Seller's pharmacy system (PDX) (subject to reasonable verification by the Data Conversion Vendor) ("**Prescription Rate Statement**") stating the average weekly prescription rate, net of reversals as described in Section 8(B), for the period beginning on the date that Seller acquired the Records under the 2014 Agreement (or, with respect to the Pharmacy owned by Haggen, Inc., May 1, 2015) until the date two business days before the Transfer Date for such Pharmacy, as adjusted pursuant to the following sentence ("**Prescription Rate**")."

5.    **Section 10** of the APA is hereby amended and supplemented by adding the following new paragraph H:

"**H.    Bankruptcy**.

(i)    By no later than September 16, 2015, Sellers shall have filed a motion (the "**Sale Motion**") seeking entry of an order (which order shall be in form and substance acceptable to Sellers and Buyers in their sole and absolute discretion) from the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") presiding over the Sellers' currently pending bankruptcy proceedings, jointly administered as Case No. 15-11874-KG, approving (x) Sellers' assumption of this Agreement pursuant to section 365 of the Bankruptcy Code and (y) the sale of the Assets in accordance with the Agreement free and clear of all Liens pursuant to section 363 of the Bankruptcy Code (the "**Assumption and Sale Order**"), and thereafter, the Sellers

{36171170;6}

September 16, 2015
Page 3

shall provide adequate notice of the Sale Motion (including to all known Persons asserting any Liens against the Assets) as required by the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware;

(ii)     By no later than October 9, 2015, the Bankruptcy Court shall have entered the Assumption and Sale Order;

(iii)    There shall be no order staying, reversing, modifying or amending the Assumption and Sale Order as of the first Transfer Date; and

(iv)     The Assumption and Sale Order shall not be subject to any challenge that challenges any Buyer's good faith under section 363(m) of the Bankruptcy Code."

6.       Unless the Parties otherwise mutually agree in writing, if the initial Transfer Date shall not have occurred on or prior to October 15, 2015, the APA shall automatically terminate and all rights and obligations of the Parties under the APA shall terminate upon such termination and shall become null and void (except that **Section 12** of the APA and clauses (A), (E), (F), (G), (K), (N), (P), and (S) of **Section 19** of the APA shall survive such termination).

7.       Except to the extent modified by this letter agreement, the APA remains in full force and effect.  In the event of any conflict between the terms of this letter agreement and the terms of the APA, the terms of this letter agreement shall control.  This letter agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this letter agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  The exchange of copies of this letter agreement and of signature pages by facsimile transmission or by electronic transmission in Adobe Acrobat format shall constitute effective execution and delivery of this letter agreement as to the Parties and may be used in lieu of the original letter agreement for all purposes.  The provisions of **Section 19** of the APA are incorporated by reference herein and shall be deemed applicable to this letter agreement *mutatis mutandis*.

[Signature Page Follows]

{36171170;6}

LA 51908486v2

SAFEWAY, INC.

By: _____
Name: BRADLEY R. BECKSTROM
Title: AUTHORIZED SIGNATORY

ALBERTSON'S, LLC

By: _____
Name: BRADLEY R. BECKSTROM
Title: VICE PRESIDENT

CONSENTED AND AGREED TO
on this [___]th day of September, 2015

HAGGEN OPCO NORTH, LLC

By:_____
Name:
Title:

HAGGEN OPCO SOUTH, LLC

By:_____
Name:
Title:

HAGGEN, INC.

By:_____
Name:
Title:

{36171170;6}[Signature Page to APA Letter Agreement]

SAFEWAY, INC.

By: _____
Name:
Title:


ALBERTSON'S, LLC

By: _____
Name:
Title:


CONSENTED AND AGREED TO
on this_____ th day of September, 2015

HAGGEN OPCO NORTH, LLC

By:_____
Name:  Blake Barnett
Title:   CFO


HAGGEN OPCO SOUTH, LLC

By:_____
Name:  Blake Barnett
Title:   CFO


HAGGEN, INC.

By:_____
Name:  Blake Barnett
Title:   CFO


*[Signature Page to APA Letter Agreement]*

## **Exhibit 2**

### **Store Locations**

1. 211 North Eighth Street, Klamath Falls, County Klamath, OR 97601 (Haggen Store 2114)
2. 2740 South Sixth Street, Klamath Falls, County Klamath, OR 97603 (Haggen Store 2122)
3. 10380 East Broadway Blvd, Tucson, Pima County, AZ 85748 (Haggen Store 2197)
4. 3901 Portola Pkwy, Irvine, CA, Orange County, 92620 (Haggen Store 2201)
5. 8515 SW Tualatin-Sherwood, Tualatin, Washington County, OR 97062 (Haggen Store 61)
6. 2800 Cochran, Simi Valley, Ventura County, CA 93065 (Haggen Store 2157)
7. 1636 West Twenty Fifth Street, San Pedro, Los Angeles County, CA 90732 (Haggen Store 2178)
8. 671 Rancho Santa Fe, San Marcos, San Diego County, CA 92078 (Haggen Store 2191)
9. 660 E. Los Angeles Ave, Simi Valley, Ventura County, CA 93065 (Haggen Store 2199)
10. 25872 Muirlands Blvd., Mission Viejo, Orange County, CA 92691 (Haggen Store 2202)
11. 6235 East Spring, Long Beach, Los Angeles County, CA 90808 (Haggen Store 2209)
12. 1416 E. Route 66, Flagstaff, Coconino County, AZ 86001 (Haggen Store 2222)
13. 7450 East Hwy 69, Prescott Valley, Yavapai County, AZ 86314 (Haggen Store 2223)