## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HAGGEN HOLDINGS, LLC, *et al.*,[1] | Case No. 15-11874 (KG) |
| Debtors. | (Jointly Administered) |
| | **Requested Hearing Date**: October 19, 2015 at 11:00 a.m. (ET) |
| | **Requested Objection Deadline**: October 16, 2015 at 12:00 p.m. (Noon) (ET) |

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363, 365, 503
AND 507 FOR APPROVAL OF: (I) (A) GLOBAL BIDDING PROCEDURES,
(B) BID PROTECTIONS, (C) FORM AND MANNER OF NOTICE OF SALE
TRANSACTIONS AND SALE HEARING, AND (D) ASSUMPTION AND ASSIGNMENT
PROCEDURES; AND (II) (A) PURCHASE AGREEMENTS, (B) SALE OF CERTAIN
OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS
AND ENCUMBRANCES, AND (C) ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND LEASES**

Haggen Holdings, LLC and its above-captioned affiliated debtors and debtors in possession (each a "**Debtor**," and collectively, the "**Debtors**") hereby submit this motion (the "**Motion**"), pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), for the entry of (i) an order, substantially in the form attached hereto as **Exhibit A** (the "**Global Bidding Procedures Order**"), (a) authorizing and approving the Global Bidding Procedures (as defined below), (b) authorizing and approving certain bidding protections to the Stalking Horse Bidders (as defined below), (c) authorizing and approving the form and manner of notice of the Sale Transactions (as defined below) and scheduling a sale hearing related thereto, and (d) authorizing and approving certain

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Haggen Holdings, LLC (7558), Haggen Operations Holdings, LLC (6341), Haggen Opco South, LLC (7257), Haggen Opco North, LLC (5028), Haggen Acquisition, LLC (7687), and Haggen, Inc. (4583).  The mailing address for each of the Debtors is 2211 Rimland Drive, Bellingham, WA 98226.

procedures for the assumption and assignment of executory contracts and unexpired leases; and (ii) orders (each, a "**Sale Order**") authorizing and approving (a) entry into the asset purchase agreements, (b) the sale of certain of the Debtors' assets free and clear of liens, claims, interests and encumbrances, and (c) the assumption and assignment of certain executory contracts and leases.  In support of the Motion, the Debtors rely upon and incorporate herein by reference the Declaration of Scott Moses (the "**Moses Declaration**") and the Declaration of Jonathan P. Goulding (the "**Goulding Declaration**"), which were filed contemporaneously herewith.   In further support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "**Amended Standing Order**").  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**").

## BACKGROUND

2.    On September 8, 2015 (the "**Petition Date**"), the Debtors filed voluntary petitions with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to

01:17771650.1

sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

3.    The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

4.    On September 21, 2015 the United States Trustee for the District of Delaware appointed the official committee of unsecured creditors (the "**Creditors' Committee**") pursuant to section 1102 of the Bankruptcy Code.

5.    Information about the Debtors' business, capital structure and the events leading up to the Petition Date are set forth in the *Declaration of Blake Barnett in Support of Debtors' Chapter 11 Petitions and First-Day Motions* [Docket No. 15] (the "**First Day Declaration**"), which is incorporated herein by reference.

## RELIEF REQUESTED

6.    Pursuant to sections 105, 363, 365, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, the Debtors seek entry of:

(a)    the Global Bidding Procedures Order[2]:

      i.    authorizing and approving the Global Bidding Procedures attached as **Exhibit 1** thereto;

      ii.    authorizing and approving certain bidding protections to the Stalking Horse Bidders, including break-up fees and expense reimbursements, each subject to the occurrence of certain conditions set forth in the applicable Stalking Horse Agreements (namely, the consummation of a higher or better Sale Transaction);

      iii.    scheduling one or more auctions (each, an "**Auction**") for the Debtors' Stores (as defined below and as identified on **Exhibit B** attached hereto) and related assets to be held on **November 9, 2015**;

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the applicable Stalking Horse Agreement or the Global Bidding Procedures Order, as applicable.

iv.      scheduling a hearing (the "**Sale Hearing**") to (A) consider approval of the Stalking Horse Packages for **November 13, 2015**, if (1) the Stalking Horse Bids are the only Qualified Bids (as defined below) received, or (2) a Stalking Horse Bidder, after the Auction for its Stalking Horse Package, is the Successful Bidder and such Successful Bid for the Stalking Horse Package does not add any Additional Contracts that were not identified in its original Stalking Horse Bid, or (B) **November 24, 2015**, if more than one Qualified Bid is received for the Stalking Horse Packages, or for the Additional Stores and the Auction is conducted;

v.       authorizing and approving global procedures for the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases and the determination of cure costs (the "**Assumption and Assignment Procedures**");

vi.      approving various deadlines in connection with the foregoing; and

vii.     authorizing and approving (i) notice of the Auction and Sale Hearing in the forms attached as **Exhibit 2** (the "**Global Sale Notice**") and **Exhibit 3** (the "**Global Publication Sale Notice**") thereto, and (ii) notice of the proposed cure costs and the assumption and assignment of certain contracts of the Debtors in the form attached as **Exhibit 4** thereto (the "**Cure Notice**"); and

(b)     each Sale Order,[3] including those attached to the Stalking Horse Agreements,[4] authorizing and approving:

i.       the sale of certain Stores free and clear of liens, claims, interests and other encumbrances (collectively, the "**Sale Transactions**"); and

ii.      the assumption and assignment of executory contracts and/or unexpired leases of the Debtors that are to be assumed and assigned as part of a particular Sale Transaction.

## THE DEBTORS' SALE STRATEGY

7.      As set forth in further detail in the First Day Declaration, Haggen Holdings, LLC owns directly or indirectly each of the Debtors (collectively, "**Haggen**"). Prior to

---

[3] A form of Sale Order is attached hereto as **Exhibit F**.

[4] The Sale Order for the Gelson's Stalking Horse Agreement (as defined below) is attached thereto as Exhibit F thereto. The Sale Order for the Smart and Final Stalking Horse Agreement (as defined below) is attached as Exhibit E thereto.

the Petition Date, Haggen owned and operated 164 grocery stores and one pharmacy-only store through three operating companies: Haggen, Inc. ("**Haggen, Inc.**"), Haggen Opco North, LLC ("**Haggen North**"), and Haggen Opco South, LLC ("**Haggen South**" and, together with Haggen, Inc. and Haggen North, the "**Operating Debtors**").

8.      Prior to the Petition Date, the Debtors began experiencing financial difficulties.  As a result, the Debtors' management, in consultation with their professional advisors, including Alvarez & Marsal, performed a comprehensive analysis of the Debtors' financial performance, which included an in-depth review of the performance of the Debtors' grocery stores and the market in which the Debtors operate.

9.      The results of such financial analysis allowed the Debtors to identify two categories of stores: (a) "non-core" stores, which are losing money and are located in non-strategic locations and, thus, provide limited benefit to the Debtors, and (b) "core" stores, which are relatively successful and located in strategic locations.  The Debtors concluded that it was in the best interests of the Debtors and their stakeholders to restructure around their core stores, and to maximize the value of their non-core stores (each, a "**Store**" and, collectively, the "**Stores**")[5] through a sale or other disposition (the "**Store Closing Sales**").

10.      To that end, in early-August, 2015, before the Petition Date, the Debtors identified twenty-seven (27) locations as the initial Stores for which it would conduct Store Closing Sales (the "**Phase 1 Stores**"),[6] many of which have operating pharmacies on the premises.  The Debtors had commenced Store Closing Sales in the Phase 1 Stores prior to the Petition Date and, on September 24, 2015, the Court entered orders authorizing the Debtors to

---

[5] As used in connection with the Global Bidding Procedures, the term "Stores" shall be deemed to include the Stores and related assets.

[6] The Debtors subsequently revised the initial twenty-seven (27) Stores to include those stores that were ultimately reflected on <u>Exhibit A</u> of the Letter Agreement Governing Inventory Disposition, dated August 24, 2015.

continue such Store Closing Sales postpetition on an interim basis [Docket No. 155] and to sell

the assets of certain of its pharmacies [Docket No. 160], respectively.

11.     Thereafter, the Debtors identified 100 additional Stores for which it would

conduct Store Closing Sales (the "**Phase 2 Stores**").[7]  On September 24, 2015, the Debtors filed

a motion seeking authority to implement global procedures to liquidate the inventory and

furniture, fixtures and equipment of the Phase 2 Stores and to sell, transfer, or abandon certain

surplus, obsolete, non-core, or burdensome assets located at such stores [Docket No. 172].

Additionally, on September 25, 2015, the Debtors filed a motion seeking authority to sell certain

assets of the pharmacies located in the Phase 2 Stores [Docket No. 183].

12.     Given the Debtors' severe liquidity constraints and the significant

operating losses associated with continuing to operate in and otherwise occupy the Stores, the

Debtors determined that it was in their best interest to conduct the Store Closing Sales, and

separately, market and sell the Stores and certain additional assets.  In pursuit of the sale of the

Stores, on the Petition Date, the Debtors, with the assistance of Sagent Advisors, LLC

("**Sagent**"), its previously-engaged investment banker, began to market their Stores for sale to

other grocery store operators, who would later operate the purchased Stores as going concerns.

13.     As part of the marketing and solicitation process, Sagent prepared a

comprehensive information package, containing store-by-store information for the Debtors'

entire Store portfolio, to be shared with potential buyers upon the signing of a confidentiality

agreement; furthermore, each package was tailored to reflect the particular Stores in which each

potential buyer had expressed interest.  The Debtors and Sagent contacted, or were contacted by,

a total of 131 parties, including parties that had, prior to the Petition Date, expressed interest in

---

[7] A list of the Phase 2 Stores is attached as <u>Exhibit A</u> to the Second Letter Agreement Governing Inventory
Disposition, dated September 21, 2015.

acquiring the Stores.  A total of 92 parties executed confidentiality agreements and were granted access to an electronic data room containing diligence and other confidential information with respect to the Debtors' business.  Twenty-five of these parties submitted proposals to purchase Stores.

14.     After extensive deliberations with Sagent, and separate negotiations with several bidders regarding the terms of an asset purchase agreement, the Debtors secured two separate stalking horse agreements (collectively, the "**Stalking Horse Bids**") for the sale of a total of 36 Stores.  The total purchase price for the Stalking Horse Bids is approximately $92 million, subject to certain adjustments and subject to higher or otherwise better offers.

15.     The Stalking Horse Bids were submitted by: Gelson's Markets ("**Gelson's**"), and Smart & Final Stores, LLC ("**Smart & Final**") (each, a "**Stalking Horse Bidder**").  The Stores included in each Stalking Horse Bid are identified on **Exhibit C** attached hereto.  The stalking horse agreements are attached hereto as **Exhibit D** and **Exhibit E** (each, a "**Stalking Horse Agreement**").

16.     With the Store Closing Sales winding down at the Phase 1 Stores and scheduled to commence in the near-term at the Phase 2 Stores, the Debtors now seek authority to proceed with the robust bidding and auction process set forth herein in order to generate the maximum value for the Stores.  In consultation with their advisors, the Debtors developed global bidding and auction procedures for the sale of the Stores (the "**Global Bidding Procedures**").  In order to stimulate bidding, under such procedures, potential buyers may submit bids for (a) all of the Stores in a particular stalking horse bid (a "**Stalking Horse Package**"), or (b) one or more of the Stores, in any combination, whether or not such Stores are included in a Stalking Horse Package.  Thus, the Global Bidding Procedures will preserve flexibility in the sale process and

generate the greatest level of interest and the highest or best value for the Stores. Additionally, by establishing global dates for submitting bids, conducting auctions, and approving sales, the Global Bidding Procedures will provide clarity as to the bidding and auction process to all interested parties.

17.    The proposed sale process and transactions contemplated by this Motion are reasonable and necessary under the circumstances of these chapter 11 cases, as they will allow the Debtors to realize the maximum value of their Stores for the benefit of their estates and all stakeholders. Simply put, the Debtors' declining revenues are insufficient to support the continued operation of the Stores. Accordingly, the closure of the Stores and the subsequent sale of such stores represents the best opportunity for the Debtors to preserve and enhance the value of their estates. In fact, the Sales Transactions are expected to yield approximately $92 million in gross proceeds and, thus, provide the Debtors with a necessary and significant cash infusion.

## THE PROPOSED SALE TRANSACTIONS

### A.    The Stalking Horse Agreements[8]

18.    The Stalking Horse Agreements attached hereto, each of which the Debtors and the applicable Stalking Horse Bidder have negotiated at arm's-length, will serve as a baseline for all prospective bidders to negotiate from. These agreements generally provide that the assets the Debtors seek to sell include the unexpired leases of each Store to be acquired (the "**Transferred Contracts**") and certain inventory, equipment, furnishings and books and records. Upon consummation of a Sale Transaction, the Debtors would assume and assign the Transferred Contracts to the applicable Stalking Horse Bidder. The Debtors are responsible for paying any certain cure costs (the "**Cure Costs**") related to the assumption and assignment of Transferred

---

[8] In the event of any inconsistencies between the provisions of the Stalking Horse Agreements and the general description of such agreements in this Motion, the Stalking Horse Agreements shall control.

Contracts in accordance with the terms and conditions of the applicable Stalking Horse Agreement.

19.     The Global Bidding Procedures provide for standard bid protections, such as initial overbid amounts and subsequent bidding increments.  The Stalking Horse Agreements include provisions for the payment of break-up fees and capped expense reimbursements (together, the "**Termination Payment**"), as an administrative expense, upon the Debtors' consummation of a Sale Transaction for the applicable Stalking Horse Package with another bidder.

20.     The Stalking Horse Agreements include various customary representations, warranties and covenants by and from the applicable Debtor and the Stalking Horse Bidders, as well as certain conditions to closing and rights of termination.  Furthermore, the Stalking Horse Agreements include covenants, conditions and termination rights related to these chapter 11 cases.

21.     The Sale Transactions contemplated by the Stalking Horse Agreements are subject to approval by the Bankruptcy Court and entry of the Global Bidding Procedures Order and the applicable Sale Orders.

**B.     Terms of Specific Stalking Horse Bids**

22.     Certain material terms of each of the Stalking Horse Agreements are described below:

(a)     Stalking Horse Agreement with Gelson's[9]

---

[9] In the event of any inconsistencies between the provisions of the Gelson's Stalking Horse Agreement and the general description of such agreement in this Motion, the Gelson's Stalking Horse Agreement shall control.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Gelson's Stalking Horse Agreement.

i.  <u>Assets</u>.  Eight (8) Stores and other assets for a base cash Purchase Price of approximately $36,000,000, plus additional consideration in connection with the Pharmacy Inventory acquired by Gelson's.

ii.  <u>Termination Payment</u>.  Break-up fee of $1,000,000, plus the reasonable and documented out of pocket amounts expended or incurred by or on behalf of the Stalking Horse Bidder, to third parties, in connection with Stalking Horse Bidder due diligence review and the preparation, negotiation, execution and delivery of the Stalking Horse Agreement (including attorneys' fees) and its representation in the Chapter 11 Case through the later of (A) the consummation of any such Alternative Transaction and (B) the payment of the Break-Up Fee in full, up to a maximum of $700,000.

iii.  <u>Back-Up Bidder</u>.  The Stalking Horse Bidder did not agree to serve as a Back-Up Bidder.

iv.  <u>Bankruptcy Milestones</u>.  Bankruptcy Court must enter the Global Bidding Procedures Order on or prior to October 26, 2015.  The Debtors must commence the Auction on or prior to the Auction date set forth in the Global Bidding Procedures Order. The Bankruptcy Court must enter the Sale Order within one (1) business day of the date of the Sale Hearing set forth in the Global Bidding Procedures Order.

v.  <u>Closing</u>.  Closing to occur no later than December 31, 2015.

vi.  <u>Records Retention</u>.  The Stalking Horse Bidder will acquire certain books and records of the Debtors' and, subject to the terms and conditions of the applicable Stalking Horse Agreement, will allow reasonable access to such books and records.

(b)  <u>Stalking Horse Agreement with Smart and Final</u>[10]

i.  <u>Assets</u>.  Twenty-eight (28) Stores and other assets, including assumed liabilities for a cash purchase price of $56,000,000, subject to adjustment as set forth in the Stalking Horse Agreement.

ii.  <u>Termination Payment</u>.  Break-up fee of 3% of the Purchase Price, plus reasonable and documented out-of-pocket amounts expended or incurred by or on behalf of Buyer, to third parties, in connection with The Staking Horse Bidder's due diligence review and the preparation, negotiation, execution and delivery of the Transaction Documents (including attorneys' fees) and its representation in the

---

[10] In the event of any inconsistencies between the provisions of the Smart and Final Stalking Horse Agreement and the general description of such agreement in this Motion, the Smart and Final Stalking Horse Agreement shall control.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Smart and Final Stalking Horse Agreement.

Chapter 11 Case through the later of (i) the consummation of any such Alternative Transaction and (ii) the payment of the Break-Up Fee in full, in the case of clause (b), up to a maximum of $1,500,000.

iii. <u>Back-Up Bidder</u>.  The Stalking Horse Bidder did not agree to serve as a Back-Up Bidder.

iv. <u>Bankruptcy Milestones</u>.  The Debtors must use their commercially reasonable efforts to obtain entry of the Global Bidding Procedures Order within twenty three (23) days of the date on which this Motion is filed (or if such twenty three (23) day period expires on a date that is not a Business Day, by the next Business Day thereafter); conduct an auction in accordance with the Global Bidding Procedures Order on or prior to the auction date set forth in the Global Bidding Procedures Order and use commercially reasonable efforts to obtain entry of the Sale Order within one (1) Business Day of the date on scheduled for the hearing on the Sale Order set forth in the Global Bidding Procedures Order.

v. <u>Closing</u>.  Closing to occur no later than December 15, 2015.

vi. <u>Records Retention</u>.  The Stalking Horse Bidder will acquire certain books and records of the Debtors' and, subject to the terms and conditions of the applicable Stalking Horse Agreement, will allow reasonable access to such books and records.

23.    In addition to the salient terms of the Stalking Horse Agreements described above, in accordance with Local Bankruptcy Rule 6004-1(b)(iv), the Debtors note the following with respect to the Stalking Horse Agreements:

(a) <u>No Sale to an Insider</u>.  None of the Stalking Horse Bidders are an insider of the Debtors within the meaning set forth in section 101(31) of the Bankruptcy Code.

(b) <u>Agreements with Management</u>.  No agreements with management have been entered into in connection with the sale of the Stores.

(c) <u>Releases</u>.  Each of the proposed Sale Orders provide that the Stalking Horse Bidders shall have no liability for any Interests or Claims relating to the Stores or the transfer of Stores.

(d) <u>Public Auction Contemplated</u>.  As set forth herein, the Debtors are pursuing a public sale of the Stores subject to a competitive bid process in accordance with industry standards.

(e) <u>Closing and Other Deadlines</u>.  The Closing deadlines in the applicable Stalking Horse Agreements are set forth in paragraphs 22(a)(v) and 22(b)(v) above.

(f) <u>Good Faith Deposit</u>.  Each of the Stalking Horse Bidders have provided a good faith deposit of 10% of the applicable Purchase Price for their respective Sale Transactions.

(g) <u>Interim Arrangements with Proposed Buyers</u>.  Pursuant to, and subject to the conditions set forth therein, the Stalking Horse Agreement with Gelson's provides that Gelson's shall grant the applicable Debtor a license to own and operate certain Pharmacies during the time that Gelson's is obtaining permits necessary to own and operate such Pharmacies.  No interim arrangements have been entered into with the Smart and Final in connection with the sale of the Stores.

(h) <u>Use of Proceeds</u>.  Each of the proposed Sale Orders provides that the proceeds of the Sale Transactions shall be deposited by wire transfer into the master concentration account held by Haggen Operations Holding, LLC, ending in 1634 at PNC Bank, National Association to be applied to the Obligations (as defined in the order approving the Debtors' postpetition financing on an interim basis [Docket. No. 55] (the "**Interim DIP Order**") in accordance with the terms of the Interim DIP Order and any order approving such postpetition financing on a final basis (together with the Interim DIP Order, the "**DIP Orders**")); <u>provided</u>, <u>further</u> that each Purchase Price is without any setoff or deduction of any kind other than as set forth in the applicable Stalking Horse Agreement.

(i) <u>Tax Exemption</u>.  No provision of the Stalking Horse Agreements addresses the use of tax exemptions.

(j) <u>Record Retention</u>.  The Debtors will retain their books and records (or copies thereof) to administer these chapter 11 cases.

(k) <u>Sale of Claims</u>.  Pursuant to the Stalking Horse Agreement with Smart and Final, the term "Assets" includes all Claims arising under Sections 544, 545, 547, 548 or 553 of the Bankruptcy Code or similar state Laws against (A) any counterparties to the Assigned Contracts or Store Leases (each as defined in the Smart and Final Stalking Horse Agreement), in each case in their respective capacities as such, or (B) any vendors or service providers for the Store Properties or the Business, in each case in their respective capacities as such.  The Gelson's Stalking Horse Agreement does not provide for the sale by the Debtors of any rights, claims or causes of action arising under chapter 5 of the Bankruptcy Code.

(l) <u>Successor Liability</u>.  The proposed Sale Orders and each of the Stalking Horse Agreements limit the Stalking Horse Bidders' successor liability.

01:17771650.1

-12-

(m) Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests. As set forth herein, the proposed Sale Orders authorize the applicable Debtor to sell the Stores to buyers free and clear of all liens, claims, encumbrances and other interests of any kind or nature whatsoever against the Debtors or the Stores.

(n) Credit Bid. The proposed Sale Orders provide for credit bidding pursuant to section 363(k) of the Bankruptcy Code by PNC Bank, National Association, (A) as agent under that certain Debtors-in-Possession Revolving Credit and Security Agreement, dated as of September 11, 2015, and (B) as agent under that certain Revolving Credit and Security Agreement, dated as of February 12, 2015 (in each capacity, a "**Secured Lender**").

(o) Relief from Bankruptcy Rule 6004(h). For the reasons set forth below, the Debtors seek relief from Bankruptcy Rule 6004(h).

## GLOBAL BIDDING PROCEDURES

**A.    Overview**

24.    Certain of the key terms of the Global Bidding Procedures are included below, including those provisions required to be highlighted pursuant to Local Bankruptcy Rule 6004-1(c):[11]

(a)    Additional Stores. In order to stimulate bidding on as many Stores as possible, the Global Bidding Procedures include procedures for the sale of the Stalking Horse Packages, as well as certain of the Debtors' other Stores (the "**Additional Stores**"), including certain executory contracts and unexpired leases related thereto (such contracts and leases, the "**Additional Contracts**"). The Additional Stores are set forth on **Schedule 2** attached to the Global Bidding Procedures Order.

(b)    Provisions Governing Qualification of Bidders. Potential Bidders must submit to the Debtors or their advisors: (i) documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction; (ii) an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors, which by its

---

[11] The following summary is qualified in its entirety by reference to the provisions of the Global Bidding Procedures. In the event of any inconsistencies between the provisions of the Global Bidding Procedures and the terms herein, the terms of the Global Bidding Procedures shall govern. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Global Bidding Procedures.

terms will inure to the benefit of the Successful Bidder(s); (iii) a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, after consultation with the Consultation Parties, that the interested party has a bona fide interest in consummating a sale transaction; (iv) sufficient information, as determined by the Debtors, to allow the Debtors, after consultation with the Consultation Parties to determine that the interested party has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Debtors in their discretion); and (v) a non-binding written indication of interest identifying the Stores in which the party is interest in purchasing, submitted no later than October 26, 2015 (the "**Global Indication of Interest Date**").

(c)    <u>Provisions Governing Qualified Bids</u>.

    i.    <u>Global Bid Deadline</u>.  The Global Bidding Procedures establish **November 2, 2015, at 5:00 p.m. (ET)** (the "**Global Bid Deadline**") as the deadline for the submission of any and all bids.

    ii.    <u>Proposed Stores and Valuation</u>.  Each Bid must clearly identify and list the particular Stores, additional assets (such as inventory) and liabilities that the Potential Bidder seeks to acquire, whether individually, in combination or in connection with a Stalking Horse Package.  The Bid must identify, on a per Store basis, the valuations, in U.S. dollars, that the Potential Bidder associates with each of those Stores and a description of any significant assumptions on which such valuations are based.  To the extent the Bid proposes to purchase additional assets associated with the Stores, such as fixtures or equipment, the Bid shall clearly identify the value, in U.S. dollars, associated with such assets.

    iii.    <u>Marked Agreements</u>.  Each Bid must include either (a) a copy of an asset purchase agreement reflecting the terms and conditions of its Bid, which agreement must be marked to show any proposed amendments and modifications to the form of purchase agreement posted by the Debtors in the Data Room or (b) a copy of a lease assumption and assignment agreement reflecting the terms and conditions of its Bid, which agreement must be marked to show any proposed amendments and modifications to the form of lease assumption and assignment agreement posted by the Debtors in the Data Room (either (a) or (b) hereof, the "**Marked Agreement**").

    iv.    <u>Unconditional Offer</u>.  A statement that the Bid is formal, binding and unconditional (except for those conditions expressly set forth in the applicable Marked Agreement) and is not subject to any due

diligence or financing contingency and is irrevocable until the first business day following the closing of the proposed sale transaction, except as otherwise provided in these Global Bidding Procedures.

v.  <u>Form of Consideration</u>.  Unless the Bid includes a credit bid (as described below), a statement confirming that the Bid is based on an all-cash offer, including, in the case of a bid for a Stalking Horse Package, sufficient cash consideration to pay any applicable Termination Payment (as such term is defined in the applicable Stalking Horse Agreement); <u>provided</u> that any Bid that includes a credit bid shall also include a cash component sufficient to pay, and earmarked exclusively for payment of, any applicable Termination Payment (if such Bid relates to a Stalking Horse Package).

vi.  <u>Purchase Price; Minimum Bid</u>.

A.  <u>Stalking Horse Package</u>.  Bidders may submit Bids for any specified Stalking Horse Package; <u>provided</u> that Bids for any Stores in the Stalking Horse Package satisfy the overbid requirements set forth in the applicable Stalking Horse Agreement for Stores included in such Stalking Horse Package (the "**Minimum Overbid Requirement**").

B.  <u>Bids for Individual Stores or Combination of Stores</u>.  Bidders may also submit Bids for individual Stores or combinations of Stores, whether or not such Stores are included in a Stalking Horse Package (each a "**Partial Bid**"); <u>provided</u> that Bids for any Stores in the Stalking Horse Package satisfy the requirements set forth in the applicable Stalking Horse Agreement for Stores included in such Stalking Horse Package (the "**Minimum Bid Requirement**").  The Debtors will determine, after consultation with the Consultation Parties, whether such Bids qualify as Qualified Bids.  Generally, to be considered a Qualified Bid, the Debtors, in consultation with the Consultation Parties, must conclude that a Partial Bid, when taken together with other Partial Bids, satisfies the criteria for being a Qualified Bid in accordance with these Global Bidding Procedures and any applicable Stalking Horse Agreement.

To the extent that a Bid includes Stores included in a particular Stalking Horse Package and others that are not included in that same Stalking Horse Package, the Bidder shall be required to submit separate Bids with respect to those Stores subject to a Stalking Horse Package and those

01:17771650.1

Stores that are not included in such Stalking Horse Package.

vii.     Required Approvals.  A statement or evidence (i) that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings and (ii) of the Potential Bidder's plan and ability to obtain all governmental and regulatory approvals to operate the business and Stores included in its Bid from and after closing the sale transaction and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals.   A Potential Bidder further agrees that its legal counsel will coordinate in good faith with Debtors' legal counsel to discuss and explain Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Marked Agreement.

viii.    Financing Sources.  A Bid must contain written evidence of a commitment for financing or other evidence that the Debtors determine, in their business judgment, demonstrates that the Bidder wherewithal to consummate and perform obligations.  A Bid must further contain appropriate contact information for any financing sources.  For the avoidance of doubt, the source and manner of financing of a Bid need not be the same as, or more certain than, the source and manner of financing of the Stalking Horse Bidder.

ix.     Executory Contracts and Unexpired Leases.  Each Bid must include a list of all executory contracts and unexpired leases that the Bidder proposes to assume.

x.      No Entitlement to Expense Reimbursement or Other Amounts. Except as provided with respect to a Stalking Horse Bidder in a Stalking Horse Agreement, a statement that the Bid does not entitle the Potential Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Assets.

xi.     As Is, Where Is.    Each Bid must include a written acknowledgement and representation that the Bidder: (a) has had an opportunity to conduct any and all due diligence regarding the Assets before making its offer; (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Stores in making its Bid; and (c) did not rely

upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Stores or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's proposed markup of the Stalking Horse Purchase Agreement.

xii.   Good Faith Deposit.  Each Bid must be accompanied by a good faith cash deposit in the amount of ten percent (10%) of the proposed purchase price, to be deposited, prior to the Global Bid Deadline, with an escrow agent selected by the Debtors pursuant to the escrow agreement to be provided by the Debtors to the Potential Bidders.

(d)   Provisions Providing Bid Protections to Stalking Horse Bidder.

   i.   Gelson's shall be granted the right to a Termination Payment comprised of a break-up fee of $1,000,000, plus reimbursement for up to $700,000 of expenses.

   ii.   Smart & Final shall be granted the right to a Termination Payment comprised of a break-up fee of 3% of the cash purchase price, plus reimbursement for up to $1,500,000 of expenses.

(e)   Cancellation of the Auction.   With respect to each Stalking Horse Package, if no Qualified Bid other than the one submitted by the applicable Stalking Horse Bidder is received by the Global Bid Deadline, the Debtors will not conduct the Auction for that Stalking Horse Package. The cancellation of an Auction for a particular Stalking Horse Package shall have no impact on the sale process for any other Stalking Horse Package.

(f)   Determination and Announcement of Baseline Bids.   In consultation with the Consultation Parties, the Debtors shall make a determination regarding:

   iii.   the Store or combination of Stores to be auctioned by the Debtors, including a Stalking Horse Package (each, an "**Auction Package**"); provided that an Auction Package for a Stalking Horse Package may not include less than all of the Stores in such Stalking Horse Package;

   iv.   the Store or Stores included in an Auction Package;

   v.   the highest or best Qualified Bid (or collection of Qualified Bids) for each Auction Package (each, a "**Baseline Bid**") to serve as the starting point at the Auction for such Auction Package;

vi.    which Bids have been determined to be Qualified Bids and the Auction Package applicable to such Qualified Bid (provided that the Debtors may permit a Qualified Bidder to bid on any other Auction Package); and

vii.    the time and place for the Auction of each such Auction Package.

On or before **November 6, 2015 at 5:00 p.m. (ET)**, the Debtors shall file notice of the foregoing on the Court's docket and publish such notice on the website of their claims and noticing agent and in the Data Room.

(g)    <u>Closing with Alternative Backup Bidders</u>.  Except to the extent otherwise provided in a Stalking Horse Agreement, the Back-Up Bid shall remain open and irrevocable until the earliest to occur of (A) 60 days after the completion of the Auction, or such other date as may be provided for in an applicable Stalking Horse Agreement, (B) the consummation of the transaction with the Successful Bidder, or (C) the release of such bid by the Debtors (such date, the "**Back-Up Bid Expiration Date**").  If the transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid.

(h)    <u>Modification of Bidding and Auction Procedures</u>.  The Debtors reserve the right, as they reasonably determine to be in the best interests of their estates to carry out the Global Bidding Procedures, to modify the Global Bidding Procedures consistent with their fiduciary duties and bankruptcy law, without further order of the Court.

## B.    Key Dates and Deadlines

25.    The Global Bidding Procedures establish the following key dates for the sale process:

| October 26, 2015 | Global Non-Binding Indication of Interest Date |
|---|---|
| November 2, 2015 at 5:00 p.m. (ET) | Global Binding Bid Deadline / Objection Deadline to Assumption and Assignment of Transferred Contracts[12] |
| November 6, 2015 at 5:00 p.m. (ET) | Objection Deadline to Sale |

---

[12] This objection deadline applies to all objections to the sale of the Stores, with the exception of objections related to adequate assurance of future performance by a Successful Bidder other than one of the Stalking Horse Bidders.

| | |
|---|---|
| **November 6, 2015** | Deadline for Debtors to Designate and Publish Qualified Bidders; select Baseline Bids; and Publish Stores to be included in the Auction |
| **November 9, 2015** | Auction<br><br>Time and Location: To Be Announced |
| **November 13, 2015** | Sale Hearing if Auction is not Conducted or if applicable Stalking Horse Bidder, after the applicable Auction, is Successful Bidder and such Successful Bid for the applicable Stalking Horse Package does not add any Additional Contracts that were not identified in its original Stalking Horse Bid |
| **November 20, 2015 at 5:00 p.m. (ET)** | Adequate Assurance Objection Deadline for Successful Bidders other than the Stalking Horse Bidders and for Additional Contracts |
| **November 24, 2015 at 2:00 p.m. (ET)** | Sale Hearing if Auction is Conducted and Sale Hearing does not otherwise occur on November 13, 2015 |

26.    The Global Bidding Procedures further provide for the following sale notice procedures, sale objection deadline, and Global Bid Deadline:

(a)    Notice of Sale, Auction, and Sale Hearing:

i.    Within three (3) days after entry of the Global Bidding Procedures Order, the Debtors shall cause the Global Sale Notice to be served by email, mail, facsimile or overnight delivery on: (1) the U.S. Trustee; (2) counsel to PNC Bank, National Association, as agent under the Debtors' Credit Facility and DIP Facility (each, as defined in First Day Declaration); (3) counsel to the Creditors' Committee; (4) all parties known by the Debtors to assert a lien on any of the Stores; (5) all persons known or reasonably believed to have asserted an interest in any of the Stores; (6) all non-Debtor parties to any of the applicable Transferred Contracts and Additional Contracts; (7) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial

portion of the Stores or making an equity investment in the Debtors within the three (3) months prior to the Petition Date; (8) the Office of the United States Attorney for the District of Delaware; (9) the Office of the Attorney General in each state in which the Debtors operate; (10) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (11) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (12) all environmental authorities having jurisdiction over any of the Stores, including the Environmental Protection Agency; (13) counsel to each Stalking Horse Bidder; (14) all of the multiemployer pension plans to which any of the Debtors is a contributing employer and all of the single employer defined benefit plans to which any Debtor is a contributor; (15) all of the labor unions that represent employees of any Debtor; (16) the Federal Trade Commission; (17) the United States Attorney General/Antitrust Division of Department of Justice; (18) all of the Debtors' known creditors (for whom identifying information and addresses are available to the Debtors); and (19) all other parties that had filed a notice of appearance and demand for service of papers in these chapter 11 cases under Bankruptcy Rule 9010(b) as of the date of entry of the Bidding Procedures Order (collectively, the "**Sale Notice Parties**").

ii.    Within three (3) days after entry of the Global Bidding Procedures Order, the Debtors shall cause the Global Publication Sale Notice to be published on the website of the Debtors' claims and noticing agent and once in *The New York Times*, national edition.

(b)    Objection Deadline for Sale Transaction:  The Global Bidding Procedures Order establishes **November 6, 2015 at 5:00 p.m. (ET)** ("**Sale Objection Deadline**") as the deadline to file and serve objections to the sale of any Stores.

27.    The Debtors respectfully submit that the timeline set forth in the Global Bidding Procedures are reasonable and necessary under the circumstances of these cases.  Such timeline provides for approximately thirty days between the filing of this Motion and the Global Bid Deadline, which will allow parties in interest sufficient time to formulate bids.  Furthermore, since the Petition Date, the Stores have been extensively marketed to both strategic and financial buyers.  Moreover, relevant information regarding the Debtors' businesses has been made available in an electronic data room during the Debtors' sale process.  Therefore, it is likely that

many of the potential bidders have already conducted diligence on the Debtors' businesses.  To

the extent that any potential bidder has not previously conducted such diligence, such bidder will

have immediate access to, subject to the execution of an appropriate confidentiality agreement,

the information regarding the Debtors' Stores contained in the data room.

### ASSUMPTION AND ASSIGNMENT PROCEDURES

28.     The Assumption and Assignment Procedures will, among other things,

govern the Debtors' provision of notice to counterparties to Transferred Contracts and Additional

Contracts that such contracts may be assumed and assigned to a Stalking Horse Bidder (or

another Successful Bidder) and of the Cure Costs the Debtors believe are necessary pursuant to

section 365 of the Bankruptcy Code to assume and assign such contracts.

29.     Pursuant to the Assumption and Assignment Procedures, within three (3)

days after the entry of the Global Bidding Procedures Order, the Debtors shall file with the Court

and serve on each party to the Transferred Contracts the Cure Notice.  Any objection to proposed

Cure Costs (a "**Cure Objection**") or to a Stalking Horse Bidder's provisions of adequate

assurance of future performance (an "**Adequate Assurance Objection**") must: (a) be in writing

and specify the nature of such objection; (b) comply with the Bankruptcy Rules and the Local

Bankruptcy Rules; and (c) be filed with the Court and served on (i) co-counsel to the Debtors,

Stroock & Stroock & Lavan, LLP, 2029 Century Park East, Los Angeles, California 90067

(Attn: Frank Merola, Esq.) and 180 Maiden Lane, New York, New York 10038 (Attn: Sayan

Bhattacharyya, Esq.) and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North

King Street, Wilmington, Delaware 19801 (Attn: Matthew Lunn, Esq. and Robert Poppiti, Jr.,

Esq.); (ii) proposed counsel to the Creditors' Committee, Pachulski Stang Ziehl & Jones LLP,

919 North Market Street, 17th Floor, Wilmington, Delaware 19801 (Attn: Bradford Sandler,

Esq.); (iii) counsel to the Applicable Stalking Horse Bidder; and (iv) counsel to PNC Bank,

National Association, as agent under the Debtors' Credit Facility and DIP Facility (each, as defined in First Day Declaration), Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington Delaware 19801 (Attn: Regina Kelbon, Esq. and Michael Graziano, Esq.) (collectively, the "**Objection Notice Parties**") by **November 2, 2015 at 5:00 p.m. (ET)**.

30.     If a Stalking Horse Bid is outbid at the Auction, the Debtors will consummate a Sale Transaction with a party other than the applicable Stalking Horse Bidder. Likewise, a Sale Transaction might include the purchase of Additional Stores and, therefore, the assumption and assignment of Additional Contracts. Accordingly, the Debtors will provide the following additional notice and opportunities to object to the assumption and assignment of Transferred Contracts and Additional Contracts:

(a)     If a Successful Bidder other than a Stalking Horse Bidder prevails at the Auction, then: (i) as soon as possible after the conclusion of the Auction, the Debtors shall file with the Bankruptcy Court a notice that identifies the Successful Bidder and provides notice that the Debtors will seek to assume and assign the Transferred Contracts and any Additional Contracts to the Successful Bidder; and (ii) the deadline to file and serve an Adequate Assurance Objection shall be extended to four (4) days prior to Sale Hearing; provided that the deadline to object to Cure Costs shall not be extended.

(b)     By **November 13, 2015**, the Debtors shall serve by first class mail upon each non-Debtor counterparty to an Additional Contract included in an Auction Package a notice indicating: (i) the applicable Cure Costs for the Additional Contract and (ii) that the Debtors' may seek to assume and assign the Additional Contracts to a Successful Bidder or a Stalking Horse Bidder, as applicable (such notice, an "**Additional Cure Notice**"). The Debtors shall also post a copy of any Additional Cure Notices on the website for these chapter 11 cases maintained by the Debtors' claims and noticing agent. Any Cure Objection for an Additional Contract must be filed and served within seven (7) days of service of the Additional Cure Notice. Any Adequate Assurance Objection for an Additional Contract must be filed and served four (4) days prior to the Sale Hearing.

**BASIS FOR RELIEF**

A.    **Sufficient  Business Justification Exists for Consummation of the Sale Transactions Under Bankruptcy Code Sections 105(a) and 363(b)**

        31.    Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor.  See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070–71 (2d Cir. 1983); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of In re Lionel Corp.); In re Delaware &  Hudson Ry. Co., 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in Abbotts Dairies); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999) (same).

        32.    The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

01:17771650.1

-23-

33.     The Debtors submit that their decision to consummate the Sale Transactions represents a reasonable exercise of the Debtors' business judgment and, accordingly, such sales should be approved under sections 105(a) and 363(b) of the Bankruptcy Code.  As discussed above, the Stores continuously suffer negative cash flow, which presents a significant drain on the Debtors' liquidity and the Sale Transactions, together with the Store Closing Sales, will generate significant value for the Debtors' estates.  Therefore, a sale of the Stores, conducted in accordance with the Global Bidding Procedures, represents the best path forward for maximizing recoveries to the Debtors' estates, their creditors, and all parties in interest.

34.     Additionally, the Debtors believe that the notice procedures set forth in the Global Bidding Procedures are reasonable and adequate under the circumstances.  Specifically, the proposed notice procedures provide for actual notice of the Auction, Sale Hearing and Sale Transactions to all known creditors of the Debtors.  Moreover, notice by publication will also be provided.

35.     Furthermore, the Debtors entered into each of the Stalking Agreements after an extensive and fulsome effort to market the Debtors' Stores.  Therefore, although the Debtors believe that the value to be provided pursuant to the terms set forth in each of the Stalking Horse Agreements is fair and reasonable, the Debtors submit that the Global Bidding Procedures and the Auction will ensure that the Debtors' estates receive the highest or best value available by allowing the market to test the Purchase Price (as defined in the Stalking Horse Agreements) of the Stores.  In addition, compliance with such procedures will establish that the Debtors and the Stalking Horse Bidders or any other Successful Bidders have proceeded in good faith.

01:17771650.1

36.     For the foregoing reasons, the Debtors submit that ample business justification exists for the consummation of Sale Transactions and, therefore, request that this Court approve such sales.

**B.      The Sale of the Stores Free and Clear of All Liens, Encumbrances and Other Interests Is Authorized Under Bankruptcy Code Section 363(f)**

37.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

38.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Stores "free and clear" of liens and interests.  See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).  Furthermore, a debtor possesses broad authority to sell assets free and clear of liens.  See In re Trans World Airlines, Inc., 322 F.3d 283, 289 (3d Cir. 2003).

39.    The Debtors submit that, in the interest of attracting the best offers, it is appropriate to sell their Stores on a final "as is" basis, free and clear of any and all liens, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code, because one or more of the tests of section 363(f) are satisfied with respect to the sale of such assets.    In particular, the Debtors believe that at least section 363(f)(2) of the Bankruptcy Code will be met because the Debtors' prepetition secured lenders and postpetition lenders are secured by, among other things, the Stores and have consented to its sale; provided that payments of the Purchase Prices are deposited by wire transfer into the Concentration Account to be applied to the Obligations  in accordance with the DIP Orders.

40.    Moreover, with respect to any other party asserting a lien, claim, or encumbrance against the Stores, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code.  In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested.  Such lienholders that do not object to the Sale Transactions should be deemed to have consented.  See FutureSource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); In re Elliot, 94 B.R. at 345 (same).

41.    Furthermore, the Debtors propose that any liens, claims, and encumbrances asserted against the Stores be transferred to and attach to the amounts earned by

the Debtors under the Sale Transactions.  Application of the proceeds generated by the Sale Transactions will be subject to the provisions of the DIP Orders.

42.     Accordingly, the Debtors request that the Court authorize the Debtors to consummate the Sale Transactions without interference by any landlords or other persons affected, directly or indirectly, by such sales.

### C.     The Sale Transactions Should Be Subject to the Protections of Section 363(m)

43.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.  See 11 U.S.C. § 363(m).  In approving the sales free and clear of liens, claims and encumbrances, the Debtors request that the Court find and hold that all purchasers of Stores purchased in accordance with the Global Bidding Procedures are entitled to the protections afforded by section 363(m) of the Bankruptcy Code.  Such relief is appropriate in that selection of the Successful Bidders will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction.  See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.), 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

### D.     The Court Should Approve the Global Bidding Procedures

44.     The Debtors have designed the Global Bidding Procedures to maximize value for the Debtors' estates and creditors, as well as to ensure an orderly sale process.  In particular, the Global Bidding Procedures will allow the Debtors to conduct the Auction in a

controlled, fair and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Stores.  Furthermore, the Global Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare any bids received in order to determine which bids are in the best interests of the Debtors' estates and their creditors.  Furthermore, the Global Bidding Procedures will incentivize interested parties to bid on as many Stores as possible by allowing: (a) such parties to submit bids for one or more of the Stores, in any combination, whether or not such Stores are included in a Stalking Horse Package, and (b) subject to certain exceptions, the Debtors to combine bids for less than a Stalking Horse Package in order to compete with such Stalking Horse Package.

45.     The Debtors submit that the forgoing procedures are fair, transparent and will derive the highest and/or best bids for the Stores.  Such bidding procedures should be approved when they provide a benefit to the estate by maximizing the value of the assets and enhance competitive bidding.  See In re Integrated Res., Inc., 147 B.R. at 659.  Therefore, the Debtors request that the Court approve the Global Bidding Procedures, including the dates established thereby for the Auction and the Sale Hearing.

**E.      The Bid Protections Have a Sound Business Purpose and Should Be Approved**

46.     The Debtors are also requesting, in connection with the Global Bidding Procedures Order, certain bid protections for the Stalking Horse Bidders, such as: (a) the provision of a Termination Payment (including a break-up fee and expense reimbursement) to be paid to the Stalking Horse Bidder upon the occurrence of certain "triggering events" typical and customary for transactions of this kind, including, among other things, consummation of a competing transaction, and (b) the initial overbid requirement and the subsequent bidding increments (together with the Termination Payment, the "**Bid Protections**").

47.     The United States Court of Appeals for the Third Circuit has held that, in the bankruptcy sale context, bidding incentives are measured against the administrative expense provisions of section 503(b) of the Bankruptcy Code and must provide an actual benefit to a debtor's estate and be necessary to preserve the value of estate assets.    In re O'Brien Envtl. Energy, Inc., 181 F. 3d 527, 533 (3d Cir. 1999); see also In re Reliant Energy Channelview LP, 594 F.3d 200, 206-07 (3d Cir. 2010).   In particular, a break-up fee may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." See O'Brien Envtl. Energy, 181 F. 3d. at 537.   Additionally, if the availability of a break-up fee were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

48.     The Debtors submit that the Bid Protections collectively provide the Debtors' estates with the types of benefits generally contemplated by the Third Circuit and, therefore, should be approved.   Indeed, based on the extensive marketing process that the Debtors and their advisors have conducted thus far, the Debtors have determined that the Bid Protections were necessary to attract and retain each of the Stalking Horse Bidders.   Simply stated, the Bid Protections were a material inducement for, and condition of, each Stalking Horse Bidder's entry into the applicable Stalking Horse Agreement.   Moreover, by inducing the Stalking Horse Bidders to hold their offers open as a baseline from which other potential purchasers can submit higher and/or better offers, the Bid Protections serve to encourage more competitive bidding and, in turn, will increase the likelihood that the Purchase Price of the Stores

will reflect their true worth.  As such, the Bid Protections will enable the Debtors to maximize the value of their estates for the benefit of all economic stakeholders in these chapter 11 cases.

49.     Furthermore, the Debtors believe that the Bid Protections are well within market and fair and reasonable in amount, especially where each Termination Payment will be paid out of the proceeds of any competing transaction that is consummated.

50.     Similar types of bid protections have been approved by this Court.  See, e.g., In re Magic Brands, LLC, Case No. 10-11310 (BLS), Docket No. 267 (Bankr. D. Del. May 18, 2010) (authorizing stalking horse expense reimbursement); In re Spheris, Inc., Case No. 10-10352 (KG), Docket No. 122 (Bankr. D. Del. Feb. 23, 2010) (authorizing stalking horse expense reimbursement); In re Anchor Blue Retail Grp., Inc., Case No. 09-11770 (PJW), Docket No. 137 (Bankr. D. Del. June 12, 2009) (authorizing stalking horse expense reimbursement up to $1,000,000.00); In re Sharper Image Corp., Case No. 08-10322 (KG), Docket No. 244 (Bankr. D. Del. Mar. 12, 2008) (authorizing reimbursement of expenses for initial bidder in store closing sales auction); In re Tweeter Home Entm't Grp., Inc., Case No. 07-10787 (PJW), Docket No. 211 (Bankr. D. Del. June 27, 2007) (authorizing debtor to pay stalking horse's termination payment); In re Radnor Holdings Corp., Case No. 06-10894 (PJW), Docket No. 277 (Bankr. D. Del. Sept. 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); In re Riverstone Networks, Inc., Case No. 06-10110 (CSS), Docket No. 80 (Bankr. D. Del. Feb. 24, 2006) (authorizing stalking horse expense reimbursement).

51.     For the foregoing reasons, the Debtors respectfully request that this Court authorize the Bid Protections.

01:17771650.1

**F.      The Assumption and Assignment of Contracts in Connection with the Sale**
**Transactions Satisfies  Bankruptcy Code Section 365**

52.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor in possession, "subject to the court's approval, may assume or reject any executory

contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The United States Court of

Appeals for the Second Circuit has stated that "[t]he purpose behind allowing the assumption or

rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable

property of the estate and to 'renounce title to and abandon burdensome property.'"  Orion

Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d

Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

53.     The standard applied to determine whether the assumption of a contract or

an unexpired lease should be authorized is the "business judgment" standard.   See In re

AbitibiBowater Inc., 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to

assume or reject an executory contract will stand so long as "a reasonable business person would

make a similar decision under similar circumstances."); In re HQ Global Holdings, Inc., 290

B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is

governed by the business judgment standard and can only be overturned if the decision was the

product of bad faith, whim, or caprice). As described above, "[t]he business judgment rule 'is a

presumption that in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best interest

of the company.'"  In re Integrated Res., Inc., 147 B.R. at 656 (quoting Smith v. Van Gorkom,

488 A.2d at 872).  Indeed, "the sole issue is whether the rejection benefits the estate."  In re HQ

Global, 290 B.R. at 511.

54.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing.  See In re Integrated Res., Inc., 147 B.R. at 656; see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").  Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease.  See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate."); see also N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Control Data Corp. v. Zelman (In re Minges), 602 F.2d 38, 42-43 (2d Cir. 1979); In re Riodizio, Inc., 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997); In re G Survivor Corp., 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

55.     Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Transferred Contracts and any Additional Contracts is in the best interests of the Debtors and their estates, and, accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code.  See, e.g., In re Philadelphia Newspapers, LLC, 424 B.R. 178, 182-83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr.

D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

56.     As set forth above, the Sale Transactions contemplated by the Stalking Horse Agreements will provide significant benefits to the Debtors' estates.  To that end, the assumption, assignment and sale of the Transferred Contracts and Additional Contracts is necessary for the Debtors to obtain the benefits of any purchase agreement.  In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k).  Thus, following an assignment to the Successful Bidder of any Transferred Contract and Additional Contract, the Debtors will be relieved from any liability for any breach associated therewith.

57.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the assumed Transferred Contracts and Additional Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  The Debtors propose to file with this Court and serve on each counterparty to a Transferred Contract and Additional Contract that will be assumed a Cure Notice which indicates the proposed Cure Cost for each such contract.  As such, each contract counterparty will have the opportunity to object to the proposed assumption and assignment to the Successful Bidder and to the proposed Cure Cost, if applicable.  Moreover, the payment or reserve of the applicable Cure Cost will be a condition to the Debtors' assumption and assignment of any Transferred Contract or Additional Contract.

58.     Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate

assurance of future performance by the assignee of such contract or lease is provided."    11 U.S.C. § 365(f)(2).   The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption.   See In re Fleming Cos., Inc., 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same);  see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

59.    Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.   See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

60.    Here, each Successful Bidder will have provided adequate assurance of future performance with respect to any Transferred Contract or Additional Contract because such party will be required to provide evidence to demonstrate its ability to perform under the applicable contracts.   Furthermore, given that the Debtors will submit evidence that all requirements for the assumption and assignment of such contracts at the Sale Hearing, the Court

01:17771650.1

and other interested parties will have the opportunity to evaluate the ability of each Successful

Bidder to provide adequate assurance of future performance.

61.    Therefore, the Debtors respectfully request that the Court (a) approve the

proposed assumption and assignment of the applicable Transferred Contracts and Additional

Contracts, and (b) find that all anti-assignment provisions of such contracts to be unenforceable

under section 365(f) of the Bankruptcy Code.[13]

## **WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)**

62.    Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use,

sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after

entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Furthermore,

Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory

contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry

of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

63.    As set forth throughout this Motion, any delay in the Debtors' ability to

consummate the Sale Transactions would be detrimental to the Debtors, their creditors and

estates, and would impair the Debtors' ability to take advantage of the substantial cost-savings

that can be achieved by an expeditious closing of the Sale Transactions.

64.    For this reason and those set forth above, the Debtors submit that ample

cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h) and

6006(d), to the extent applicable.

---

[13]    Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease..." 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

## **NOTICE**

65.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the proposed counsel to the Creditors' Committee; (iii) counsel to PNC Bank, as agent under the Debtors' Credit Facility and DIP Facility (each, as defined in First Day Declaration); (iv) all parties that, as of the filing of this Motion, have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002; (v) all applicable federal, state and local taxing and regulatory authorities having jurisdiction over the Store Closing Assets; (vi) all of the landlords and subtenants for the Stores; (vii) all parties known to the Debtors who hold any liens or security interest in the Debtors' assets who have filed UCC-1 financing statements against the Debtors, or who, to the Debtors' knowledge, have asserted any liens on any of the Debtors' assets; and (viii) all unions representing employees of the Stores.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **NO PRIOR REQUEST**

66.     The Debtors have not previously sought the relief requested herein from this or any other Court.

*Remainder of page intentionally left blank*

01:17771650.1

## CONCLUSION

WHEREFORE, the Debtors request entry of the Global Bidding Procedures Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated: October 3, 2015
        Wilmington, Delaware

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert F. Poppiti, Jr.*
Matthew B. Lunn (No. 4119)
Robert F. Poppiti, Jr. (No. 5052)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1256

-and-

STROOCK & STROOCK & LAVAN LLP
Frank A. Merola (admitted *pro hac vice*)
Sayan Bhattacharyya (admitted *pro hac vice*)
Matthew G. Garofalo (admitted *pro hac vice*)
180 Maiden Lane
New York, NY 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*PROPOSED COUNSEL TO THE DEBTORS
AND DEBTORS-IN-POSSESSION*

01:17771650.1