**EXHIBIT A**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**HAGGEN OPCO SOUTH, LLC,**

**HAGGEN OPCO NORTH, LLC,**

**HAGGEN, ~~INC.~~**

**OPERATIONS HOLDINGS, LLC**

**AND**

**ALBERTSON'S LLC**

**November ~~13,~~__, 2015**

DOC ID - ~~23682888.1~~23682888.9

LA 51933579v2
LA 51934594

## TABLE OF CONTENTS

Page

**ARTICLE 1 ASSET PURCHASE; PURCHASE PRICE** .................................................... **1**

    Section 1.1    Purchase and Sale of Assets. ................................................. 1

    Section 1.2    Purchase Price; Deposit. ...................................................... 5

    Section 1.3    Closing. ................................................................................... 6

    Section 1.4    Closing Actions and Deliveries. .......................................... 6

    Section 1.5    Purchase Price Adjustment. ............................................... 8

    Section 1.6    Allocation of Purchase Price. ........................................... 11

    Section 1.7    Casualty/Condemnation Stores. ....................................... 11

**ARTICLE 2 REPRESENTATIONS AND WARRANTIES OF SELLERS** ............... ~~11~~12

    Section 2.1    Organization and Qualification. ...................................... ~~11~~12

    Section 2.2    Authority and Enforceability. .......................................... 12

    Section 2.3    Consents and Approvals; No Violations. ......................... 12

    Section 2.4    Litigation. ............................................................................ 13

    Section 2.5    Permits; Compliance with Laws. ..................................... 13

    Section 2.6    Environmental, Health, and Safety Matters. ................. 13

    Section 2.7    Real Property and Equipment. ......................................... 14

    Section 2.8    Taxes. ................................................................................... 15

    Section 2.9    Title to Assets. .................................................................... 15

    Section 2.10    Related Party Transactions. ............................................ ~~15~~16

    Section 2.11    No Other Representations and Warranties. .................. ~~15~~16

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF BUYER** ...................... 16

    Section 3.1    Organization. ..................................................................... ~~16~~17

    Section 3.2    Authority. ........................................................................... ~~16~~17

    Section 3.3    Consents and Approvals; No Violations. ......................... ~~16~~17

    Section 3.4    Litigation. ............................................................................ 17

    Section 3.5    Sufficiency of Funds. ......................................................... 17

    Section 3.6    Solvency. .............................................................................. ~~17~~18

    Section 3.7    Acknowledgement by Buyer; No Other Representations and Warranties. ~~17~~18

**ARTICLE 4 COVENANTS** ............................................................................................. ~~17~~18

    Section 4.1    Transfer Taxes. .................................................................. ~~17~~18

| | | |
|---|---|---:|
| Section 4.2 | Further Assurances. | 1718 |
| Section 4.3 | Preservation of Records; Cooperation. | 18 |
| Section 4.4 | Public Announcements; Confidentiality. | 1819 |
| Section 4.5 | ~~Delivery of Disclosure Schedules~~ | ~~18~~[Intentionally Omitted.] 19 |
| Section 4.6 | Operating Covenants; Access. | 19 |
| Section 4.7 | Reasonable Efforts; Further Assurances; Cooperation. | 1920 |
| Section 4.8 | ~~Termination and Adjustment Rights of Buyer as to Store Properties and Related Acquired Assets.~~ | ~~21~~[Intentionally Omitted.] 22 |
| Section 4.9 | Delivery of Possession. | 2122 |
| Section 4.10 | Bulk Sales Laws. | 2122 |
| Section 4.11 | No Use of Names. | 2122 |
| Section 4.12 | Settlement Agreements. | 22 |
| **ARTICLE 5 CLOSING CONDITIONS** | | **2223** |
| Section 5.1 | Conditions to Obligation of Buyer. | 2223 |
| Section 5.2 | Conditions to Obligation of Seller. | 2326 |
| **ARTICLE 6 TERMINATION** | | **2427** |
| Section 6.1 | Termination of Agreement. | 2427 |
| Section 6.2 | Effect of Termination. | 2528 |
| Section 6.3 | Buyer Deposit. | 2528 |
| **ARTICLE 7 MISCELLANEOUS** | | **2528** |
| Section 7.1 | Definitions. | 2528 |
| Section 7.2 | Expenses. | 3134 |
| Section 7.3 | Entire Agreement; Amendment; Waiver; Assignment. | 3134 |
| Section 7.4 | Notices. | 3135 |
| Section 7.5 | Governing Law; Jurisdiction. | 3336 |
| Section 7.6 | Exhibits and Schedules; Construction; Interpretation. | 3337 |
| Section 7.7 | Parties in Interest. | 3438 |
| Section 7.8 | Severability. | 3438 |
| Section 7.9 | AS IS CONDITION; DISCLAIMER OF WARRANTIES; EXCLUSIVITY OF REPRESENTATIONS AND WARRANTIES. | 3438 |
| Section 7.10 | Counterparts. | 3640 |
| Section 7.11 | Waiver of Jury Trial. | 3640 |
| Section 7.12 | Specific Performance. | 3740 |

| | | |
|---|---|---|
| **Section 7.13** | **Survival.** | ~~37~~41 |
| **Section 7.14** | **Time of Essence.** | ~~37~~41 |
| **Section 7.15** | **Non-Recourse.** | ~~38~~41 |
| **Section 7.16** | **Bankruptcy Court Approval.** | ~~38~~42 |

<u>Exhibits</u>:

Exhibit 1.1:        Store Properties
Exhibit 1.2~~:~~        ~~Store Properties Subject to Lease Renegotiation~~<u>Exhibit 1.3:</u>
    Separable Stores
Exhibit A:        Form of Bills of Sale
Exhibit B:        Form of Assignment and Assumption Agreements
Exhibit C:        Form of Assignment and Assumption of Lease
Exhibit D:        Form of Sale Order

<u>LA 51934594</u>

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of November ~~13,~~ **__,** 2015, is made by and among Haggen Opco South, LLC, a Delaware limited liability company, ("Opco South"), Haggen Opco North, LLC, a Delaware limited liability company ("Opco North")**,** and Haggen~~, Inc.~~ **Operations Holdings, LLC**, a Delaware ~~corporation~~ ~~("Haggen Inc.~~**limited liability company ("Operations Holdings**", and collectively with Opco South and Opco North, "Sellers" and individually, a "Seller"), and Albertson's LLC, a Delaware limited liability company ("Buyer"). Sellers and Buyer shall be referred to herein from time to time collectively as the "Parties" and each individually as a "Party."  Definitions of capitalized terms are set forth in Section 7.1.

WHEREAS, each Seller is a debtor and debtor in possession in those certain bankruptcy cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") filed on September 8, 2015 in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 15-11874 (as Jointly Administered, collectively, the "Chapter 11 Case");

WHEREAS, in connection with the Chapter 11 Case and subject to the terms and conditions contained herein, following the entry of the Sale Order (as defined herein) determining Buyer to be the highest or best bidder with respect to the Store Properties and subject to the terms and conditions thereof, Sellers shall sell, transfer and assign to Buyer, and Buyer shall purchase, acquire and accept from Sellers, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Assets (as defined herein), and Buyer shall assume from Sellers the Assumed Liabilities (as defined herein), all as more specifically set forth herein and in the Sale Order;

WHEREAS, Buyer acknowledges that Sellers and their Affiliates have conducted or will conduct prior to Closing "going-out-of-business sales" at the Store Properties; and

WHEREAS, the transactions contemplated by this Agreement and the other Transaction Documents are subject to ~~(i) in the case of the Store Properties set forth on Exhibit 1.2, Buyer entering into agreements with the landlord of each such Store Property on terms acceptable to Buyer in accordance with the provisions of Section 4.8 and (ii)~~ approval of the Sale Order by the Bankruptcy Court and will be consummated pursuant to the Bid Procedures Order and the Sale Order.

NOW, THEREFORE, in consideration of the premises and the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

# ARTICLE 1
## ASSET PURCHASE; PURCHASE PRICE

**Purchase and Sale of Assets.**

(a) <u>Sale of Assets</u>.  Subject to the terms and conditions set forth herein and in the Bid Procedures Order and the Sale Order, at the Closing, Sellers shall sell, assign, assume and assign, transfer, convey and deliver to Buyer, and Buyer shall purchase, acquire and accept from Sellers, free and clear of any Liens other than Permitted Liens, all of Sellers' right, title and interest in, to and under the following assets, properties and rights which are located at any Store Property at Closing (collectively, the "<u>Assets</u>"):

(i)    the Store Leases, together with (only to the extent of Seller's interest therein) the Improvements located on or attached to the underlying real property, and all rights arising out of the ownership thereof including: all options and rights of first refusal, all Real Property Documents creating or modifying any such interest, and all of Seller's rights, title and interest in and under such Real Property Documents related to such Store Property; all easements and rights-of-way; water rights; rights, title and interest in all strips and gores; all reciprocal easements; all alleys and the land laying in the bed of any street, road or right-of-way; all of Seller's right, title and interest in and to any award made or to be made in lieu thereof, and in and to any unpaid award, for any taking by condemnation of, or any damages to, any Store Property by reason of a change of grade of any street, road or avenue; and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, subject to the rights of the landlord (including rights to ownership or use of such property) under such Store Leases;

(ii)    if and to the extent assignable, all third party guarantees and warranties (collectively, the "<u>Guarantees</u>") to the extent they relate exclusively to the ownership or operation of the Store Properties or the Equipment;

(iii)    all computer, networking, security and telephone hardware and software, furniture, furnishings, signage, forklifts and other vehicles, equipment, machinery, tooling, parts, racking, refrigerators, freezers, fixtures, trade fixtures, shopping carts, shelf tags, aisle markers, electronic surveillance equipment, store models, shelving and other tangible personal property located at the Store Properties as of the date hereof and owned by Seller or any Affiliate thereof, including all point-of-sale and check cashing technologies and software **(solely if and to the extent such software is freely transferable)** and all devices and pinpads related thereto, together with all rights of Seller or any Affiliate thereof against the manufacturers and/or suppliers of such equipment, and any and all rights to any software used in any computer equipment included in the Assets **(solely if and to the extent such rights to any software are freely transferable)** (collectively, the "<u>Equipment</u>");

(iv)    to the extent (A) permitted under applicable Law and (B) used exclusively in connection with the Store Properties, all files, documents, instruments, papers, computer files and records and all other non-privileged books and records of

DOC ID - ~~23682888.1~~23682888.9

Seller or any Affiliate thereof in any form or media (collectively, the "Files and Records");

        (v)    all security, vendor, utility and other deposits actually being held by a third party (the "Deposits") related exclusively to the Store Properties, and all prepaid rent and other prepaid expenses related to the Store Properties (collectively, the "Prepaid Expenses"); and

        (vi)    to the extent ~~assignable~~**transferable**, all permits, federal and state registrations and licenses ~~exclusively related to the Store Properties ("~~**and all pending applications therefor, in each case, primarily related to the other Assets, including all Type 21 Distilled Spirits Liquor Licenses (or in the case of Store Properties located in states other than California, the comparable beer/wine and spirits liquor license) (collectively, the "Liquor** Licenses") **primarily related to the Store Properties**.

    (b) Excluded Assets.  Notwithstanding the foregoing, Buyer expressly understands and agrees that it is not purchasing or acquiring, and Sellers are not selling, transferring or assigning, any of the following assets or properties of Sellers (the "Excluded Assets"):

        (i)    any signs or personal property which contain the name (or trade derivative thereof) or logo of Sellers, including all uniforms supplied to Sellers' employees;

        (ii)    all undeposited or uncollected checks and food stamps;

        (iii)    accounts receivable relating to the Store Properties, in each case, prior to the Effective Time, including delinquent rent payments, tenant reimbursements, refunds of insurance premiums, credit and debit card receivables, pharmacy claims accrued, whether billed or unbilled, and WIC/SNAP accruing to, or held for, the benefit of a Seller (collectively, the "Accounts Receivable");

        (iv)    all Intellectual Property of Sellers and their Affiliates, including trademarks, service marks, trade names, and similar intangibles including any right to use, or interest in, any of the name of a Seller or any Affiliate thereof, or any similar name or intangible registered or licensed to any of the foregoing, or any trade names used by Sellers or any Affiliate thereof, and all goodwill of Sellers and their Affiliates;

        (v)    claims, rebates, refunds and other general intangibles arising from the operation of the Store Properties prior to the Effective Time;

        (vi)    all of Sellers' rights to refunds and credits of Taxes attributable to the Store Properties or the Assets for periods occurring prior to the Effective Time;

        (vii)    all Inventory;

(viii)    all Pharmacy Assets;

(ix)    all casualty insurance, title insurance, liability insurance and other insurance policies of Sellers and their Affiliates and claims thereunder;

**(x)    any and all rights to any software used in any computer equipment included in the Assets that is not freely transferable by the Sellers;**

**(xi)**    ~~(x)~~ the books and business records of Sellers and their Affiliates relating to (A) assets that are not included in the Assets, (B) Liabilities of Sellers or any of their Affiliates which do not constitute Assumed Liabilities, or (C) corporate, chain-wide or division-level operations, policies, or plans, including the following: policy, compliance and procedures manuals; internal audit reports and any information, books, records or files (whether in writing or electronic format) concerning the financial performance, strategic plans, budgets, forecasts, projections, or competitive or capital spending analysis of excluded operations; and employee manuals and employee handbooks; and instructional, promotional and educational materials;

**(xii)**    ~~(xi)~~ any lease, sublease, license, sublicense or other contract relating to the installation, use or operation of ATM or similar banking machines, in-store banking facilities, in-store medical clinics, photo-finishing equipment, Starbucks or other coffee vendor, sushi, juice or similar kiosks or slot machines or other gaming devices at the Store Properties or as part of the operations of the Store Properties (and any interest of Sellers or any of their Affiliates in such equipment);

**(xiii)**    ~~(xii)~~ all cash and cash equivalents, bank accounts and securities of Sellers as of the Effective Time;

**(xiv)**    ~~(xiii)~~ all contracts of Sellers and their Affiliates other than the Store Leases;

**(xv)**    ~~(xiv)~~ all assets of Sellers and any Affiliate thereof not located at any Store Property at Closing (assuming Sellers' material compliance with Section 4.6(a)(iii)) or not primarily related to the Assets or Store Properties;

**(xvi)**    ~~(xv)~~ the rights which accrue or will accrue to Sellers under the Transaction Documents; ~~and~~

**(xvii)**    ~~(xvi)~~ all equipment and other assets and items located in or at the Store Properties that (A) are owned by third parties, (B) are leased to a Seller or an Affiliate thereof pursuant to a contract or agreement, or (C) are trucks, vans, autos, rail trucks or sea containers;

**(xviii)**    ~~(xvii)~~ all customer data and information; ~~and~~

**(xix)**    ~~(xviii)~~ all property which, upon installation thereof, under the relevant Store Lease becomes the property of the landlord thereunder~~.~~**; and**

**(xx)    all rights to any Legal Proceeding of any nature available to or being pursued by any Seller to the extent related to the Haggen Litigation, whether arising by way of counterclaim or otherwise.**

(c) <u>Assumption of Certain Liabilities</u>.  On and subject to the terms and conditions of this Agreement and the Sale Order, at the Closing, Buyer shall assume and agree to pay, perform and discharge when due only the following Liabilities (collectively, the "<u>Assumed Liabilities</u>"):

(i)    all Liabilities arising out of or relating to the ownership of the Assets after the Effective Time, including any Liabilities of Buyer in respect of the Adjustment Amount;

(ii)    all Liabilities arising under or relating to the Store Leases, in each case after the Effective Time;

(iii)    all Liabilities for Taxes relating to the Store Properties or the Assets (other than the Excluded Assets) for any taxable period (or portion thereof) beginning after the Effective Time; and

(iv)    all other Liabilities of Buyer under this Agreement or any other Transaction Document.

(d) <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary in this Agreement, Buyer shall not assume any Liabilities that are not Assumed Liabilities (such excluded Liabilities, collectively, the "<u>Excluded Liabilities</u>").

(e) Severability of Store Properties.  In the event that Sellers or their Affiliates shall effect the sale of any Store Property and related Assets to any other Person as part of an auction process conducted in accordance with the Bid Procedures Order, such Store Property and related Assets shall be treated as Excluded Assets, in which case the Purchase Price shall be reduced by the Allocated Amount with respect to such Store Property and the related Assets located thereat.  Any Store Properties that are treated as Excluded Assets in accordance with this Section 1.1(e) shall be added to the list of Separable Stores and removed from Exhibit 1.1.

**Section 1.1    Purchase Price; Deposit.**

(a) Subject to adjustment as set forth in <u>Section 1.5</u>, the aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Buyer for the Assets acquired by Buyer hereunder, in addition to the assumption of the Assumed Liabilities, shall consist of:

(i)    the Base Amount; <u>plus</u>

(ii)    the Closing Adjustment Amount.

(b) In accordance with the Bid Procedures Order, Buyer and Sellers have entered into an escrow agreement (as amended, supplemented, amended and restated or otherwise

modified from time to time, the "Escrow Agreement"), with Titlevest Services, LLC (the "Escrow Holder"). Concurrently with the execution and delivery of the Escrow Agreement, Buyer deposited $2,460,0022,460,002.20 (the "Buyer Deposit") with the Escrow Holder by wire transfer of immediately available funds.  The Escrow Holder holds the Buyer Deposit in a segregated non-interest-bearing account (the "Escrow Account") pursuant to the terms of the Escrow Agreement.  Buyer and Sellers (collectively) shall share equally all costs under the Escrow Agreement, including any fees of the Escrow Holder.  The Buyer Deposit**, less an amount equal to $300,000 (the "Holdback Amount")** shall become payable, and shall be paid, to the Sellers at the Closing.  At the Closing, Buyer and Sellers shall instruct the Escrow Holder to deliver the Buyer Deposit **less the Holdback Amount** to Sellers by wire transfer of immediately available funds into an account designated by Sellers.  If this Agreement is validly terminated prior to the Closing, the Buyer Deposit shall be released and distributed to Buyer or Sellers, as applicable, in accordance with the terms of the Escrow Agreement and Section 6.3.  In the event the Buyer Deposit exceeds the Purchase Price, the amount of the Purchase Price shall be delivered to Sellers from the Buyer Deposit at the Closing and balance of the Buyer Deposit shall be released to the Buyer.  In the event of any conflict between the Escrow Agreement and this Agreement, the terms of this Agreement shall prevail.  Upon the addition of a Store Property to the list of Separable Stores, Buyer and Sellers shall promptly execute and deliver to the Escrow Holder a joint written instruction in accordance with the terms of the Escrow Agreement to deliver an amount from the Escrow Account equal to 10% of the Allocated Amount with respect to such Store Property to Buyer.

**Section 1.2**    **Closing.**

The closing of the transactions contemplated hereby (the "Closing") shall take place as described below at 10:00 a.m. Los Angeles, California time on the second (2nd) Business Day following the satisfaction or (to the extent permitted) waiver of the conditions set forth in ARTICLE 5 (excluding those conditions that, by their terms, cannot be satisfied until the Closing), or at such other place and time as the Parties shall mutually agree.  The Closing shall be effective as of 12:01 a.m. Los Angeles, California time (the "Effective Time") on the day of the Closing (the "Closing Date").

**Section 1.3**    **Closing Actions and Deliveries.**

(a)  At least fivethree (53) Business Days prior to the Closing Date, Sellers shall have prepared and delivered to Buyer a statement (the "Estimated Statement") setting forth, with reasonable supporting detail, Sellers' good faith estimate of (i) the Closing Adjustment Amount (the "Estimated Adjustment Amount"), and (ii) the Closing Cash Consideration.  Following delivery by Sellers to Buyer of the Estimated Statement, and until the close of business on the Business Day prior to the Closing Date, Buyer shall be permitted to review Sellers' calculations contained therein and Sellers shall provide Buyer and its representatives with such access during normal business hours to Sellers' books and records and management of Sellers and their respective Affiliates as Buyer may reasonably request in order for Buyer and Buyer's representatives to review the Estimated Statement.  Sellers shall consider in good faith any revisions to the calculations set forth in the Estimated Statement proposed in good faith by Buyer

and, to the extent Sellers agree to any such revisions, such revisions shall be binding on the Parties for purposes of determining the Estimated Statement.

        (b)    On the Closing Date, Sellers shall deliver to Buyer:

        (i)    bills of sale in the form of Exhibit A hereto (the "Bills of Sale"), duly executed by the applicable Seller, transferring the tangible personal property included in the Assets to Buyer;

        (ii)    assignment and assumption agreements in the form of Exhibit B hereto (the "Assignment and Assumption Agreements"), duly executed by the applicable Seller, effecting the assignment to and assumption by Buyer of the Assets and the Assumed Liabilities;

        (iii)    with respect to each Store Lease, an Assignment and Assumption of Lease substantially in the form of Exhibit C (each, an "Assignment and Assumption of Lease"), duly executed by the applicable Seller;

        (iv)    with respect to any Store Properties which are "ground leases" **under which Seller owns fee simple title to the Improvements located on such Store Properties**, Quitclaim Deeds (collectively, the "Quitclaim Deeds"), in ~~a form reasonably acceptable to Buyer~~**substantially the form of the deed that conveyed to Seller title to such Improvements**, conveying fee simple title to the Improvements located on such Store Properties;

        (v)    the Real Estate Excise Tax Affidavit **to the extent** required to be executed in connection with the recording of any deeds for the Store Properties which are "ground leases" and are located in the State of Washington (the "WA Tax Affidavit");

        (vi)    Form 593-C, Real Estate Withholding Certificate in connection with the Store Properties which are "ground leases" and are located in the State of California.

        (vii)    a certificate pursuant to Treasury Regulations Section 1.1445-2(b), in a form reasonably acceptable to Buyer, that each Seller is not a foreign person within the meaning of Section 1445 of the Code, duly executed by the applicable Seller;

        (viii)    a certificate of the secretary of each Seller certifying to (A) such entity's certificate of formation and limited liability company agreement or certificate of incorporation and bylaws (or similar governing documents), (B) the adoption of resolutions of such entity approving the transactions contemplated hereby, and (C) the incumbency of the officers signing this Agreement and other Transaction Documents on behalf of such entity (together with their specimen signatures);

        (ix)    each Seller's Closing Certificate; and

(x)    such other documents, instruments or certificates as shall be reasonably requested by Buyer.

(c) On the Closing Date, Buyer shall deliver to Sellers:

(i)    the Closing Cash Consideration by wire transfer of immediately available funds to the account(s) specified in writing by Sellers;

(ii)    the Bills of Sale, the Assignment and Assumption Agreements, each Assignment and Assumption of Lease and the WA Tax Affidavit, each duly executed by Buyer;

(iii)    a certificate of the secretary of Buyer certifying to (A) Buyer's certificate of formation and limited liability company agreement (or similar governing documents), (B) the adoption of resolutions of Buyer approving the transactions contemplated hereby, and (C) the incumbency of the officers signing this Agreement and other Transaction Documents on behalf of Buyer (together with their specimen signatures);

(iv)    the Buyer's Closing Certificate; and

(v)    such other documents, instruments or certificates as shall be reasonably requested by Sellers.

(d) At the Closing, Buyer and Sellers shall deliver to Escrow Holder joint written instructions instructing the Escrow Holder to deliver the Buyer Deposit **less the Holdback Amount** to Sellers by wire transfer of immediately available funds to an account designated by Sellers.

**Section 1.4    Purchase Price Adjustment.**

(a)    The following items, for the pertinent time periods, shall be adjusted and shall be added to (in the case of amounts to be paid by Buyer) or deducted from (in the case of amounts to be paid by Sellers) the Purchase Price, as the case may be, (an amount equal to the sum of such additions (which shall be expressed as positive numbers in such calculation) and deductions (which shall be expressed as negative numbers in such calculation), which may be a positive or negative number, the "Adjustment Amount"):

(i)    personal property Taxes associated with the Assets or Store Properties that are imposed on a periodic basis and are required to be paid for a Tax period that includes (but does not end on) the Closing Date shall be prorated as of the Effective Time between Buyer and Sellers as follows:  Sellers shall bear the proportion of, and shall have the sole responsibility for, such Taxes equal to a fraction, the numerator of which is equal to the number of days which shall have elapsed from the beginning of the applicable Tax period through the Effective Time and the denominator of which is the number of days in the entire applicable Tax period and Buyer shall be responsible for the remainder (the "Personal Property Tax Proration");

(ii)    the real property Taxes and assessments including commercial rent Taxes, ad valorem, sewer rents, business improvement district, license, intangibles and other similar Taxes (including any similar personal property Taxes) required to be paid by a Seller or any Affiliate thereof pursuant to the Store Leases shall be prorated as of the Effective Time between Buyer and Sellers as follows:  Sellers shall bear the proportion of, and shall have the sole responsibility for, such real property Taxes equal to a fraction, the numerator of which is equal to the number of days which shall have elapsed from the beginning of the applicable Tax period through the Effective Time and the denominator of which is the number of days in the entire applicable Tax period and Buyer shall be responsible for the remainder (the "Real Property Tax Proration");

(iii)    the Adjustment Amount shall be increased for the full amount of all Deposits included in the Assets;

(iv)    Sellers shall attempt to obtain final meter readings for utilities at the Store Properties as of the Effective Time and shall pay for all utilities through the Effective Time and, in the event a Seller shall not have paid for any such utilities because it was not practicable to obtain any such meter reading for any utility as of the Effective Time or because there are utilities which are not metered, then the cost of any such utilities shall be prorated as of the Effective Time between Sellers and Buyer (based on Sellers' good faith estimates of such costs based on Sellers' most recent utility bills for such services) as follows:  Sellers shall bear the proportion of, and shall have the sole responsibility for, such utilities equal to a fraction, the numerator of which is equal to the number of days which shall have elapsed from the beginning of the applicable utility period through the Effective Time and the denominator of which is the number of days in the entire applicable utility period and Buyer shall be responsible for the remainder (the "Utility Proration"); provided, however, that the Final Adjustment Amount shall account for any deficiency in the original proration based on the final utility bills once received;

(v)    any and all other Store Lease related income, expenses, payments or receipts, rentals (including percentage rent), costs, charges or fees connected with a Seller's or any Affiliate of a Seller's use or operation of any Store Property, including, without duplication, Prepaid Expenses, and all common area costs paid by a Seller or any Affiliate thereof to landlords or third parties pursuant to any declarations, reciprocal easement agreements, shopping center covenants or other covenants, conditions and restrictions that encumber any Store Property, shall be prorated between Sellers and Buyer as of the Effective Time and Sellers shall bear their (and their Affiliates') proportion thereof through the Effective Time; and any and all revenues from Assets such as copy machines, vending machines, pay phones and the like shall be apportioned as of the end of the month in which the Effective Time occurs and Seller shall retain such revenues for that month prior to the Effective Time; and **with respect to any percentage rents on adjusted gross sales payable under any of the Store Leases ("Percentage Rents"): (A) such Percentage Rents shall be estimated as of the Effective Time for the month or quarter (as the case may be) for the relevant installment; (B) such estimated Percentage Rents shall be apportioned for that payment period as between the Buyer and Seller as of the Effective Time (the "Percentage Rent**

**Proration"), it being understood that Seller shall be responsible for all Percentage Rents to the extent they are attributable to adjusted gross sales occurring prior to the Effective Time; (C) the estimated amount of such Percentage Rents apportioned to Sellers (which, for the avoidance of doubt, shall be 100% in respect of any Store Property that is delivered dark at the Effective Time and with respect to which Buyer has no adjusted gross sales during the applicable period) shall be taken into account in calculating the Estimated Adjustment Amount hereunder (and shall therefore reduce the amount payable by the Buyer at Closing); and (D) the actual Percentage Rents payable for such installment period, if any, shall be paid by Buyer when due; and (E) the Final Adjustment Amount shall account for any inaccuracy in the original proration of Percentage Rent based on the final invoices for Percentage Rent once received; and**

(vi)    the Adjustment Amount shall be (A) decreased by the amount of any transfer taxes owed by Sellers pursuant to Section 4.1 in the event that such amount has not been paid at the Closing, and (B) increased by the amount of any transfer taxes owed by Buyer pursuant to Section 4.1 in the event that such amount has not been paid at the Closing.

(b) Within one-hundred and twenty (120) days after the Closing Date, Buyer shall prepare and deliver to Sellers a statement (the "Closing Statement") calculating the Adjustment Amount as of the Closing Date (the "Closing Adjustment Amount").

(c) If Sellers dispute any amounts as shown on the Closing Statement, Sellers shall deliver to Buyer within thirty (30) days after receipt of the Closing Statement a notice (the "Dispute Notice") setting forth Sellers' calculation of such amounts and describing in reasonable detail the basis for the determination of such different amounts.  If Sellers do not deliver a Dispute Notice to Buyer within such thirty (30) day period, the Closing Statement prepared and delivered by Buyer shall be deemed to be the "Final Closing Statement."  The Parties shall use commercially reasonable efforts to resolve such differences within a period of thirty (30) days after Sellers have given the Dispute Notice.  If the Parties resolve such differences, the Closing Statement agreed to by the Parties shall be deemed to be the Final Closing Statement.  If Buyer and Sellers do not reach a final resolution on the Closing Statement within thirty (30) days after Sellers has given the Dispute Notice, unless Buyer and Sellers mutually agree to continue their efforts to resolve such differences, the Neutral Accountant shall resolve such differences, pursuant to an engagement agreement among Buyer, Sellers and the Neutral Accountant (which Buyer and Sellers agree to execute promptly), in the manner provided below.  The Neutral Accountant shall only decide the specific items under dispute by the Parties (the "Disputed Items"), solely in accordance with the terms of this Agreement.  Buyer and Sellers shall each be entitled, along with its agents and representatives, to make a presentation to the Neutral Accountant, pursuant to procedures to be agreed to among Buyer, Sellers and the Neutral Accountant (or, if they cannot agree on such procedures, pursuant to procedures determined by the Neutral Accountant), regarding such Party's determination of the amounts to be set forth on the Final Closing Statement; and the Parties shall use commercially reasonable efforts to cause the Neutral Accountant to resolve the differences between Buyer and Sellers and determine the amounts to be set forth on the Final Closing Statement within twenty (20) days after the

engagement of the Neutral Accountant.  The Neutral Accountant's determination shall be based solely on such presentations of the Parties (i.e., not on independent review) and on the definitions and other terms included herein; provided, that, notwithstanding anything to the contrary in this Section 1.5(c), the Neutral Accountant shall consider in good faith any reasonable third party evaluation of the Closing Adjustment Amount commissioned by Buyer or Sellers at their own expense.  The Closing Statement determined by the Neutral Accountant shall be deemed to be the Final Closing Statement.  Such determination by the Neutral Accountant shall be conclusive and binding upon the Parties, absent fraud or manifest error, and shall be considered an arbitral award for all purposes.  The fees and expenses of the Neutral Accountant shall be paid by the Party whose calculation of the Adjustment Amount is farther from the Neutral Accountant's calculation thereof.  Nothing in this Section 1.5(c) shall be construed to authorize or permit the Neutral Accountant to: (i) determine any questions or matters whatsoever under or in connection with this Agreement except for the Disputed Items; or (ii) resolve any such differences by making an adjustment to the Closing Statement that is outside of the range defined by amounts as finally proposed by Buyer and Sellers.  Sellers and their accountants and other representatives shall be permitted reasonable access to the financial records of Buyer used to prepare the Closing Statement, at reasonable times during regular business hours during the period beginning on the delivery of the Closing Statement and ending on the date when the Final Closing Statement shall have been finalized.

(d) Promptly, but no later than five (5) Business Days after the final determination of the Closing Statement, if the Closing Adjustment Amount set forth in the Closing Statement: (i) exceeds the Estimated Adjustment Amount, Buyer shall pay or cause to be paid, by wire transfer of immediately available funds to the account(s) designated by ~~Seller~~**Sellers**, such excess amount; or (ii) is less than the Estimated Adjustment Amount, ~~Seller shall pay or cause to be paid,~~**Buyer and Seller shall instruct the Escrow Holder to deliver an amount equal to such shortfall to Buyer from the Holdback Amount, and to the extent the shortfall exceeds the Holdback Amount, Buyer and Sellers shall instruct the Escrow Holder to deliver 100% of the Holdback Amount to Buyer and Sellers shall pay or cause to be paid the excess of the shortfall over the Holdback Amount** by wire transfer of immediately available funds to the account(s) designated by Buyer~~, an amount equal to the amount of such shortfall~~.  Any payments made pursuant to this Section 1.5(d) shall be treated as an adjustment to the Purchase Price by the Parties and shall be paid in cash.  **Buyer and Sellers shall instruct the Escrow Holder to deliver the balance of the Holdback Amount, if any, to Sellers after payment of the amounts contemplated to be paid in clause (ii) of this Section 1.5(d) are paid, or, if such payments are not required to be paid, 180 calendar days after the Closing Date.**

(e) Notwithstanding anything to the contrary contained herein, if the Personal Property **Tax** Proration ~~or,~~ Real Property **Tax Proration or Percentage Rents** Proration cannot be finally determined at the time of the delivery of the Closing Statement because of the unavailability of the final amount of applicable Taxes **or Percentage Rents Proration** at such time, such items shall be apportioned or reapportioned, as the case may be, as soon as practicable after the delivery of the Final Closing Statement.  Upon any such apportionment or reapportionment, Sellers or Buyer (as the case may be) shall pay any amounts due to the other Party as a result thereof within thirty (30) days after written demand (accompanied by reasonable supporting documentation).  **If the Personal Property Tax Proration, Real Property Tax**

**Proration or Percentage Rents Proration cannot be so finally determined at the time of the delivery of the Closing Statement, the Holdback Amount shall be held by the Escrow Holder until such apportionment or reapportionment and Buyers and Sellers shall instruct the Escrow Holder to disburse the Holdback Amount in accordance with the procedures described in Section 1.5(d) above**.

(f)  If any payments are to be made from Sellers to Buyer pursuant to any provision of this Agreement (including, but not limited to this Section 1.5), such amounts owed from Sellers to Buyer shall be entitled to administrative priority treatment under Section 503 of the Bankruptcy Code.  Sellers shall not have any right to set-off amounts due Buyer pursuant to this Agreement by any amounts which may be owed by Buyer to Sellers pursuant to any other agreement or Order.

**Section 1.5    Allocation of Purchase Price.**

Buyer and Sellers shall agree on the allocation of the Purchase Price (including any liabilities that are considered to be an increase to the Purchase Price for federal income Tax purposes) among the Assets within sixty (60) days after the Closing Date.  The Parties agree to file (or cause to be filed) (i) all required federal Forms 8594, an Asset Acquisition Statement under Section 1060, and (ii) all other Tax Returns (including amended Tax Returns and claims for refund) in a manner consistent with such allocation of the Purchase Price described herein. The Parties agree to refrain from taking any position that is inconsistent with such allocation, and to use their commercially reasonable efforts to sustain such allocation in any subsequent Tax audit or Tax dispute.

**Section 1.6    Casualty/Condemnation Stores.**

Notwithstanding anything to the contrary in this Agreement, if, during the period beginning on the date hereof and ending on the Effective Time, any Store Property (any such Store Property, a "Casualty/Condemnation Store") is materially damaged, or destroyed, by fire or other casualty or subject to a taking such that restoration of such Store Property to substantially the same condition prior to such casualty/condemnation would (a) take six (6) months or longer, (b) in the case of a condemnation, such Store Property cannot be substantially restored to the condition prior to such condemnation or (c) the applicable landlord of such Store Property shall have the right to terminate the applicable Store Lease as a result of such casualty or condemnation, then Buyer shall have the right to treat such Store Property and related Assets located thereat as Excluded Assets, in which case the Purchase Price shall be reduced by the Allocated Amount with respect to such Store Property and the related Assets located thereat**, and the Parties shall proceed with the Closing for all other applicable Store Properties and Assets in accordance with the terms of this Agreement**. Any Store Properties that are treated as Excluded Assets in accordance with this Section 1.7 shall be added to the list of Separable Stores and removed from Exhibit 1.1.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Disclosure Schedule, Sellers hereby jointly and severally represent and warrant to Buyer as follows:

**Section 2.1** **Organization and Qualification.**

Each Seller is duly organized, validly existing and in good standing under the laws of the State of Delaware.  Subject to the necessary authority from the Bankruptcy Court, each Seller has the requisite limited liability company  or corporate power and authority, as applicable, to own, lease and operate its properties and to carry on its business as presently conducted.

**Section 2.2** **Authority and Enforceability.**  Subject to the entry of the Sale Order, each Seller has all requisite limited liability company or corporate power and authority, as applicable, to execute and deliver this Agreement and each other Transaction Document to which such Seller is or will be a party, and to consummate the transactions contemplated hereby. Subject to the entry of the Sale Order, this Agreement and each other Transaction Document to which each Seller is a party has been (or, in the case of each Transaction Document to which such Seller will be a party, will be) duly and validly executed and delivered by such Seller and constitutes a valid, legal and binding agreement of such Seller, enforceable against such Seller in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at Law or in equity).

**Section 2.3** **Consents and Approvals; No Violations.**

(a)  Except (i) as set forth in Section 2.3(a) of the Disclosure Schedule, and assuming the accuracy of the representations and warranties set forth in Section 3.3, (ii) as may be necessary as a result of any facts or circumstances relating solely to Buyer or any of its Affiliates, and (iii) as may be required pursuant to the Bankruptcy Code, the Bid Procedures Order or the Sale Order, no material filing with or material notice to, and no material permit, authorization, consent or approval of, or material Order of, any court or tribunal or administrative, governmental or regulatory body or agency (a "Governmental Entity") or any other Person is necessary for the execution and delivery by a Seller of this Agreement or the consummation by a Seller of the transactions contemplated hereby.

(b)  Subject to the entry of the Sale Order and any other order(s) necessary to consummate the transactions contemplated by this Agreement, neither the execution, delivery and performance of this Agreement by a Seller nor the consummation by a Seller of the transactions contemplated hereby will (i) conflict with or result in any breach of any provision of the certificate of formation or limited liability company agreement or certificate of incorporation or bylaws (or similar governing documents) of a Seller or any Affiliate thereof, (ii) except as set forth in Section 2.3(b) of the Disclosure Schedule, result in a material violation or material breach of, or cause acceleration, or constitute (with or without due notice or lapse of time or both) a material default (or give rise to any right of termination, modification, cancellation or

LA 51934594

acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which a Seller or any Affiliate thereof is a party or by which a Seller or any Affiliate thereof or any of a Seller's or any Affiliate of a Seller's properties or assets may be bound, (iii) violate any Order or Law applicable to a Seller or any Affiliate thereof or any of a Seller's or any Affiliate of a Seller's properties or assets, or (iv) result in the creation or imposition of any Lien on any of the Assets, except for Permitted Liens.

**Section 2.4    Litigation.**  Except as set forth in Section 2.4 of the Disclosure Schedule[+] and other than the Chapter 11 Case, there is no Legal Proceeding (excluding union grievances and other Legal Proceedings related to unions, collective bargaining agreements or labor practice agreements) pending or, to Sellers' Knowledge, threatened against a Seller or any of its Affiliates related to the Assets or any Store Property, or that challenges the validity or enforceability of any Transaction Document or seeks to enjoin or prohibit consummation of the transactions contemplated thereby.  Except as disclosed in Section 2.4 of the Disclosure Schedule and other than in connection with the Chapter 11 Case, no Seller nor any of its Affiliates is subject to any outstanding Order related to the Assets or any Store Property.

**Section 2.5    Permits; Compliance with Laws.**

(a) Each Seller has all material authorizations, approvals, Orders, consents, licenses, certificates, permits, registrations and qualifications from each Governmental Entity reasonably necessary to permit the ownership of the Store Properties and the use of the Assets**, including the Liquor Licenses** (collectively, the "Permits"), and all such Permits are valid**, active** and in full force and effect**, except for Liquor Licenses for Store Properties in Arizona which are inactive due to the closure of such Store Properties**.  No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit.  Each Seller is in compliance in all material respects with all Permits.  **Since September 8, 2015, no Liquor Licenses have been sold or transferred by Sellers.**

(b) Each Seller is in compliance, in all material respects, with all applicable Laws and Orders which apply to the ownership of the Assets.

(c) Section 2.5(c) of the Disclosure Schedule sets forth a true and correct list of all Licenses with respect to the Store Properties.

**Section 2.6    Environmental, Health, and Safety Matters.**

Solely with respect to the period during which a Seller has been a lessee under a Store Lease with respect to a Store Property:

(a) Except as set forth in Section 2.6(a) of the Disclosure Schedule, to Sellers' Knowledge, Sellers and each Affiliate thereof is in compliance in all material respects with

---

[+] NTD: Haggen litigation to be disclosed on this Schedule.

Environmental, Health, and Safety Requirements (including obtaining all permits and licenses required thereunder) applicable to the Store Properties.

(b) Except as set forth in Section 2.6(b) of the Disclosure Schedule, no Seller nor any Affiliate thereof has received any written notice, report or other information regarding any material violation of Environmental, Health, and Safety Requirements relating to any Store Property.

(c) To Sellers' Knowledge, except as set forth in Section 2.6(c) of the Disclosure Schedule, no Hazardous Substances have been released at or from any Store Property in a manner or to a degree that requires a Seller to report, investigate, assess, remediate or abate them pursuant to applicable Environmental, Health, and Safety Requirements.

(d) To Sellers' Knowledge, except as set forth in Section 2.6(d) of the Disclosure Schedule, no Store Property contains, or is served by, any underground storage tanks or septic systems.

(e) As used herein: (i) "Environmental, Health, and Safety Requirements" shall mean all Laws concerning pollution or protection of human health or the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, or cleanup of any Hazardous Substances, as such requirements are enacted and in effect on or prior to the Closing Date; (ii) "Hazardous Substances" shall mean any hazardous substance, hazardous waste, pollutant or other substance listed or regulated pursuant to any Environmental, Health and Safety Requirement, including petroleum-based compounds and asbestos containing materials, and (iii) "Environmental Report" means any documents, studies or reports listed in Section 2.6(d) of the Disclosure Schedule.

### Section 2.7    Real Property and Equipment.

(a) Leased Real Properties.  Section 2.7(a) of the Disclosure Schedule sets forth each lease, sublease, license or similar occupancy agreement, together with all amendments or supplements thereto, of real property ("Leased Real Property") to which a Seller or any Affiliate thereof is a party or by which it is bound as lessee, in each case, related to the Store Properties (each a "Store Lease," and collectively the "Store Leases").[a]  Except as set forth in Section 2.7(a) of the Disclosure Schedule, each Store Lease is valid and binding on the applicable Seller and, to Sellers' Knowledge, on the other parties thereto and is in full force and effect.  Except as a result of the filing of the Chapter 11 Case or as set forth in Section 2.7(a) of the Disclosure Schedule, each Seller and, to Sellers' Knowledge, each of the other parties thereto has performed in all material respects all obligations required to be performed by it under each Store Lease.  To Sellers' Knowledge, except as a result of the filing of the Chapter 11 Case, there is no circumstance that given notice or passage of time shall become a default under each Store Lease. Except as set forth in Section 2.7(a) of the Disclosure Schedule, no Seller nor any Affiliate thereof has received any written notice of existing, pending or threatened (i) condemnation proceedings affecting any Store Property or (ii) zoning, building code or other moratorium

---

[a] Schedule to include NDOT Lease of landscape and parking area with store #2231.

proceedings which would reasonably be expected to adversely affect the ability to operate the Store Properties.  Except as set forth in Section 2.7(a) of the Disclosure Schedule, neither the whole nor any material portion of any Store Property currently has been damaged or destroyed by fire or other casualty.  Except as a result of the filing of the Chapter 11 Case and except as set forth in Section 2.7(a) of the Disclosure Schedule, no Seller is in default or breach in any material respect under any of the Store Leases and, to Sellers' Knowledge, no landlord or other party is in default or breach in any material respect under any Store Lease, and no Seller nor any Affiliate thereof has received any written notice of default or termination of any Store Lease.

(b) Equipment.  ~~Section 2.7(b) of the Disclosure Schedule sets forth a true, correct and complete list of Equipment owned by a Seller at each Store Property.~~  The Equipment constitutes all of the Equipment used or held for use at the Store Properties and are sufficient for Buyer to operate the Store Properties from and after the Closing Date in substantially the same manner as they were operated prior to the Sellers' initiation of "going- out- of- business" sales at such Store Properties, and no Equipment has been sold in any such sale**, provided however, that solely with respect to the Store Properties identified on Exhibit 1.1 as "06323AS" (Bakersfield, CA), "SS00551AS" (Tacoma, WA), "SS02137AS" (La Mesa, CA), "SS02611AS" (Tuscon, AZ), Sellers have sold Equipment pursuant to "going out of business" sales at such Store Properties in the amounts set forth on Schedule 2.7.**

(c) Complete Copies.  Sellers have delivered to Buyer a complete copy of each Store Lease, in each case, as amended or otherwise modified and in effect as of the date hereof, to the extent in the actual possession of a Seller or any of its Affiliates.

**Section 2.8    Taxes.**

Sellers have timely filed with the appropriate taxing authorities all material Tax Returns with respect to the Assets and the Store Properties required to be filed and all such Tax Returns are true, correct and complete in all material respects.  All Taxes owed by a Seller or any Affiliate thereof with respect to the Assets and the Store Properties have been timely paid, and there are no Liens for Taxes on any of the Assets or Store Properties, other than liens for non-delinquent real property Taxes.

**Section 2.9**    Title to Assets.

(a) As of the date of this Agreement, (i) a Seller or an Affiliate thereof is the sole and lawful owner of, and has good title to, or a valid leasehold interest in, all of the Assets, free and clear of all Liens other than the Permitted Liens **and the Liens set forth in Section 2.9(a) of the Disclosure Schedule**, and (ii) none of the Assets is in the possession, custody, or control of any Person other than a Seller or an Affiliate thereof.

(b) As of the Closing, (i) Sellers shall be the sole and lawful owners of, and have good title to, or a valid leasehold interest in, and the power to sell, assign or transfer to the Buyer, all of the Assets free and clear of all Liens other than the Permitted Liens, and (ii) none of the Assets shall be in the possession, custody, or control of any Person other than Sellers.

**Section 2.10    Related Party Transactions.**

Section 2.10 of the Disclosure Schedule sets forth all contracts or arrangements between a Seller, on the one hand, and any Affiliate of such Seller, on the other, related to the Assets or any Store Property, which are to be acquired by Buyer pursuant to the terms and conditions of this Agreement.

**Section 2.11    No Other Representations and Warranties.**

Except for the representations and warranties contained in this ARTICLE 2 (including the related portions of the Disclosure Schedule) and the Sellers' Closing Certificates, no Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of a Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Assets furnished or made available to Buyer and its representatives (including any information, documents or material made available to Buyer in any electronic data room, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the ownership of the Assets, or any representation or warranty arising from statute or otherwise in Law.  Notwithstanding the foregoing, this Section 2.11 shall be subject to the last sentence of Section 7.9(h).

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to Sellers as follows:

**Section 3.1    Organization.**  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and has all requisite power and authority to carry on its businesses as now being conducted, except where the failure to have such power or authority would not be reasonably expected to prevent or materially delay the consummation of the transactions contemplated hereby.

**Section 3.2    Authority.**  Buyer has all necessary power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of Buyer and no other proceeding (including by its direct or indirect equityholders) on the part of Buyer is necessary to authorize this Agreement or to consummate the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Buyer and constitutes a valid, legal and binding agreement of Buyer, enforceable against Buyer in accordance with its terms assuming the due authorization, execution and delivery by the other Parties, except (i) to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other Laws affecting the enforcement of creditors' rights generally, and (ii) that the availability of equitable remedies, including specific performance, is subject to the discretion of the court before which any proceeding thereof may be brought.

**Section 3.3    Consents and Approvals; No Violations.**  No material filing with or material notice to, and no material permit, authorization, consent or approval of, or material Order of, any Governmental Entity is necessary for the execution and delivery by Buyer of this Agreement or the consummation by Buyer of the transactions contemplated hereby, except where the failure to obtain such permits, authorizations, consents or approvals or to make such filings or give such notice would not, individually or in the aggregate, be reasonably expected to prevent or materially delay the consummation of the transactions contemplated hereby.  Neither the execution, delivery and performance of this Agreement by Buyer nor the consummation by Buyer of the transactions contemplated hereby will (a) conflict with or result in any breach of any provision of the certificate or articles of incorporation or bylaws (or similar governing documents) of Buyer, (b) result in a material violation or material breach of, or constitute (with or without due notice or lapse of time or both) a material default (or give rise to any right of termination, cancellation or acceleration) under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which Buyer is a party or by which Buyer or any of its properties or assets may be bound or (c) violate any Law or Order applicable to Buyer or any of Buyer's Affiliates or any of their respective properties or assets.

**Section 3.4    Litigation.**  As of the date hereof, Buyer is not a party to any litigation or threatened litigation which would reasonably be expected to affect or prohibit the consummation of the transactions contemplated hereby.

**Section 3.5    Sufficiency of Funds.**  Buyer has and will have at Closing sufficient cash on hand or other sources of immediately available funds to enable it to pay the Purchase Price and consummate the transactions contemplated by this Agreement.

**Section 3.6    Solvency.**  Immediately after giving effect to the transactions contemplated by this Agreement and the other Transaction Documents, Buyer shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Sellers.  In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

**Section 3.7    Acknowledgement by Buyer; No Other Representations and Warranties.**  Buyer acknowledges and agrees that it has conducted its own independent review and analysis of the Assets of Sellers and the Store Properties.  Except for the representations and warranties contained in this ARTICLE 3 and the Buyer's Closing Certificate, neither Buyer nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Buyer.

# ARTICLE 4
# COVENANTS

**Section 4.1    Transfer Taxes.**

Notwithstanding anything to the contrary herein, all transfer, sales and use, value added, registration, documentary, stamp and similar Taxes (including any penalties, interest, additions to Tax and costs and expenses relating to such Taxes, but excluding any transfer gains Taxes), whether for real or personal property, imposed in connection with the sale of the Assets or any other transaction that occurs pursuant to this Agreement (such Taxes, "Transfer Taxes") shall be borne by Buyer as to 50% and Sellers as to 50%; provided, that, in the event any such amounts owed by Sellers or Buyer are not paid at the Closing, Section 1.5(a)(vi) shall govern.  The Party required to prepare each Tax Return in respect of Transfer Taxes pursuant to applicable Law shall timely prepare and file all such Tax Returns and other filings with respect to the applicable Transfer Taxes, and Buyer and Sellers shall each bear on a 50% basis Buyer's reasonable out-of-pocket costs of preparing such Tax Returns. Buyer and Sellers will cooperate with each other in the preparation of any such Tax Returns or other filings and shall provide each other with any applicable exemption certificates.

**Section 4.2    Further Assurances.**  If any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request.

**Section 4.3    Preservation of Records; Cooperation.**

(a) For a period of six (6) years after the Closing Date, Buyer shall maintain and preserve, in a manner consistent with its document retention and destruction policies, as in effect from time to time, all accounting and auditing books and records included in the Assets (and any

material documents relating to any material governmental or non-governmental proceeding) relating to operation of the Store Properties prior to the Closing Date.

(b) For a period of three (3) years after the Closing Date, Buyer shall provide Sellers with reasonable access, at reasonable times during regular business hours and upon reasonable advance written notice, to the materials referenced in Section 4.3(a) in connection with the administration of the Chapter 11 Case, any Tax audit, other government investigation or claim by or against a third party (but excluding in connection with any claim or dispute between the Parties), in each case, subject to the imposition of customary confidentiality and attorney client privilege protections. Each Party agrees to cooperate with the other Party, and to cause its Affiliates and successors to do so, in the preparation for and prosecution of the defense of any Legal Proceeding arising out of or relating to any Store Property related to facts or circumstances that arose prior to the Closing. Such cooperation shall include providing access to the books and records of the cooperating party relating to any such Legal Proceeding and making available evidence within the cooperating party's control and persons needed as witnesses employed by the cooperating party, as reasonably needed for such defense and at reasonable times and upon reasonable advance written notice. The requesting party shall reimburse the cooperating party for its actual out-of-pocket costs relating to its cooperation under this Section 4.3(b).

**Section 4.4    Public Announcements; Confidentiality.**

(a) No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Party, such approval not to be unreasonably withheld, conditioned or delayed, unless a press release or public announcement is required by applicable Law, rule or requirement of the Securities and Exchange Commission or securities exchange, or an Order of the Bankruptcy Court. The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and shall make any applicable disclosures regarding this Agreement (i) to the Bankruptcy Court and (ii) as contemplated by the Bid Procedures Order.

(b) Buyer acknowledges and agrees that the letter agreement, dated September 30, 2015, by and between Albertson's LLC and Comvest Investment Partners Holdings, LLC (as amended from time to time, the "Confidentiality Agreement"), remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of such Confidentiality Agreement, information provided to Buyer pursuant to this Agreement. If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this Section 4.4(b) shall nonetheless continue in full force and effect.

**Section 4.5    ~~Delivery of Disclosure Schedules.~~ [Intentionally Omitted.]**

~~Sellers shall deliver to Buyer Disclosure Schedules in form and substance reasonably satisfactory to Buyer by 5 PM EST on November 16, 2015 (it being understood that, for purposes of determining the Sellers' compliance with its representations and warranties contained in Article 2, Sellers shall be deemed to have delivered all such Disclosure Schedules on the date of this Agreement).~~

**Section 4.6    Operating Covenants; Access.**

(a)  Except as set forth in Section 4.6 of the Disclosure Schedule, as required or contemplated by this Agreement, as consented to by Buyer in its ~~sole~~**reasonable** discretion or as required by applicable Law or by an Order of the Bankruptcy Court, during the period from the date of this Agreement to the Closing, Sellers shall, and shall cause their respective Affiliates to, as applicable, (i) cease business operations at the Store Properties; (ii) maintain the Assets (including Equipment) in working condition, subject to ordinary wear and tear; (iii) not intentionally take any action that would reasonably be expected to result in any of the conditions set forth in ARTICLE 5 not being satisfied; (iv) not transfer or remove any asset that would be included within the Assets (including Equipment) at Closing from any Store Property, other than cash on hand; and (v) not enter into any amendment to, or otherwise modify or cause the termination or lapse of, any of the Store Leases.  Notwithstanding anything to the contrary set forth in this Agreement, nothing herein shall restrict Sellers' ability to sell, liquidate, move, transfer, assign or take any other action with respect to Excluded Assets, including Inventory and Pharmacy Assets.

(b)  During the period commencing on the date hereof and ending on the Closing Date, Sellers will, and will cause their officers, employees and auditors to, provide Buyer, its financing sources and their respective accountants, counsel and other authorized representatives reasonable access, not to be unreasonably conditioned or delayed, during normal business hours, under reasonable circumstances and otherwise in accordance with the terms of the Store Leases, to the Assets, premises, officers, employees, landlords, properties, contracts, books and records related to the Store Properties, and shall cause the officers of Sellers to otherwise reasonably cooperate with the conduct of due diligence by Buyer and Buyer's representatives.

**Section 4.7    Reasonable Efforts; Further Assurances; Cooperation.**

(a)  Subject to the other provisions hereof, each Party shall use its commercially reasonable efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable Law to obtain all regulatory approvals and to satisfy all conditions to its obligations hereunder and to cause the Closing to be effected as soon as practicable, but in any event on or prior to the Expiration Date, in accordance with the terms hereof, and shall cooperate fully with each other Party and its officers, directors, managers, employees, agents, counsel, accountants and other designees in connection with any step required to be taken as a part of its obligations hereunder, including the following:

(i)    From and after the date hereof, Sellers shall provide Buyer (A) with copies of all motions or pleadings relating to this Agreement, the Sale Order, or the transactions contemplated under any of the foregoing not less than two (2) Business Days prior the intended date of filing and (B) with prompt notice of any objections raised by any party in interest with respect to this Agreement, the Sale Order or the transactions contemplated by any of the foregoing.

(ii)    Each Party shall promptly make all filings and submissions and shall use commercially reasonable efforts to take all other actions necessary, proper or

advisable under applicable Laws, to obtain any required approval of any Governmental Entity with jurisdiction over the transactions contemplated hereby. Each Party shall use commercially reasonable efforts to furnish all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated hereby. Each of the Parties shall cooperate with the others in promptly filing any other necessary applications, reports or other documents with any Governmental Entity having jurisdiction with respect to this Agreement and the transactions contemplated hereby, and in seeking necessary consultation with and prompt favorable action by such Governmental Entity.

(iii)    Sellers and Buyer shall use commercially reasonable efforts to give all notices to, and obtain all consents from, all third parties that are described in Section 2.3(b) of the Disclosure Schedules; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested, in each case other than any Cure Costs required to be paid by Seller pursuant to this Agreement or the Sale Order. Sellers shall file in the Chapter 11 Case such motions or pleadings as may be appropriate and necessary to (i) preserve the Sellers' right or ability to assume and assign any of the Store Leases (including, without limitation, pursuant to Section 365(d)(4) of the Bankruptcy Code with respect to leased real property) and (ii) to give effect to such assumptions and assignments in accordance with Section 365 of the Bankruptcy Code and the Bid Procedures Order. Notwithstanding any provision in this Agreement to the contrary, from and after the date hereof through the Closing Date, Sellers will not reject or take any action to reject, repudiate or disclaim (or fail to take any action that would result in rejection, repudiation or disclaimer by operation of law of) any Store Lease without the prior written consent of Buyer.

(iv)    In the event any Legal Proceeding by any Governmental Entity or other Person is commenced that questions the validity or legality of the transactions contemplated hereby or seeks damages in connection therewith, the Parties shall (A) cooperate reasonably and use all commercially reasonable efforts to defend against such Legal Proceeding, (B) in the event an injunction or other Order is issued in any such Legal Proceeding, use commercially reasonable efforts to have such injunction or other Order lifted, and (C) cooperate reasonably regarding any other impediment to the consummation of the transactions contemplated hereby.

(b) Sellers shall cooperate with Buyer in connection with Buyer's efforts to obtain any Permits required to be obtained by it for Buyer's ownership and operation of the Store Properties and shall cooperate with Buyer to secure from the applicable Governmental Entity consent to the issuance of any necessary temporary or provisional Permits (including liquor or similar licenses) required for Buyer's operation of the Store Properties following the Closing. **For avoidance of doubt, it shall not be a condition precedent to Buyer's obligations under this Agreement that the issuance of any such Permits be accomplished.**

(c) Prior to the Closing, upon discovery, Sellers shall promptly notify Buyer if Sellers obtains knowledge that the representations and warranties of Seller in this Agreement are not true and correct in all material respects, or if Seller obtains knowledge of any material errors

in, or omissions from, the Disclosure Schedules.  The delivery of any notice pursuant to this Section 4.7(c) shall not cure any breach of any representation or warranty requiring disclosure of such matter or any breach of any covenant or agreement contained in this Agreement or any of the other Transaction Documents or otherwise limit or affect the rights of, or remedies available to, Buyer under this Agreement.  For the avoidance of doubt, the closing conditions set forth in Section 5.1(a) and the termination provisions of ARTICLE 6 shall be read without giving effect to any notification delivered pursuant to this Section 4.7(c).

Section 4.8    Termination and Adjustment Rights of Buyer as to Store Properties and Related Acquired Assets. [Intentionally Omitted].

With respect to each Store Property set forth on Exhibit 1.2, Buyer shall have the right to contact the landlords with respect to such Store Properties on a confidential basis in accordance with this Section 4.8, and in furtherance thereof, Sellers shall promptly (and in any event no later than one (1) Business Day following the date hereof) provide Buyer with the contact information for each such landlord.  In the event that Buyer is unable to reach an agreement with the landlord of the applicable Store Properties on terms satisfactory to Buyer in its sole discretion (provided, that Buyer shall negotiate in good faith with each applicable landlord) prior to the Closing (or such longer period as may be agreed by the Parties), then Buyer may elect, by delivering written notice to Sellers prior to the Closing, to treat the applicable Store Property and the related Assets as Excluded Assets, in which case the Purchase Price shall be reduced by the Allocated Amount with respect to such Store Property and the related Assets located thereat.  Any Store Properties that are treated as Excluded Assets in accordance with this Section 4.8 shall be added to the list of Separable Stores and removed from Exhibit 1.1.

Section 4.9    Delivery of Possession.

At the Closing, Sellers shall deliver to Buyer possession of the Store Properties.  At the time of delivery to Buyer, (a) each of the Store Properties, including all Improvements and Equipment included in the Assets located at such Store Properties, shall be dark and in broom clean condition and all refrigeration and HVAC systems shall be operating and running, **(provided, that, to the extent such refrigeration or HVAC system in any Store Property is not operating or running, Buyer and Sellers shall reasonably agree to a reduction to the Purchase Price reflecting the cost to repair or replace such refrigeration or HVAC systems in a manner reasonably satisfactory to the Buyer)** and (b) all Excluded Assets shall have been removed by Sellers from each of the Store Properties and the Assets.  At the Closing, Sellers shall deliver to Buyer's designated representative the keys and access and security codes to the Store Properties and the combinations to all safes at the Store Properties.

Section 4.10    Bulk Sales Laws.

The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Assets to Buyer and waive all claims related to the non-compliance therewith.

Section 4.11    No Use of Names.

Buyer agrees that it shall not use the names or logos of Sellers or any of their Affiliates or any similar name or logos.  Each Seller shall, **with respect to all Stores located in Washington and Oregon,** at Sellers' expense, remove its outside pylon and building signs (which shall remain such Seller's property) from the Store Properties prior to the Closing Date.  **Buyer shall, with respect to the Stores located in California, Arizona and Nevada, at Buyer's expense after the Closing, remove Sellers' outside pylon and building signs from the Store Properties, which the Parties agree shall result in a $2,500 reduction in the Allocated Amount for each such Store, it being understood that such items shall be deemed abandoned by Sellers and Buyer shall have the right to discard or dispose of such items in a reasonable manner.**  As soon as reasonably practicable following the Closing, but before commencing general operations at the Store Properties, Buyer shall remove the other names and logos of Sellers or its Affiliates appearing on the Assets, at Buyer's expense (including names appearing on shopping carts).  Subject to the foregoing, Buyer shall not have the right to use affirmatively the names or logos of Seller or any of its Affiliates for advertising purposes or otherwise for Buyer's benefit.

**Section 4.12    Settlement Agreements.**

**(a)  From and after the date hereof, Buyer and Sellers shall take all actions reasonably necessary to satisfy the conditions precedent to the effectiveness of that certain Settlement Agreement (the "Wave Settlement Agreement"), dated as of the date hereof, by and among Haggen Holdings, LLC, Opco North, Opco South and GIG TCG Wave Master Property Owner LLC ("Wave"), including, but not limited to, the execution and delivery of the leases and letter agreement between Wave and Buyer in substantially the forms delivered by Wave to Buyer on November 23, 2015 and November 24, 2015 of the respective drafts of such leases for the stores identified in the Wave Settlement Agreement as Stores #2095 (Ashland, OR), #2099 (Burien, WA), #2136 (Tujunga, CA), #2176 (Rancho Cucamonga, CA), #2077 (Puyallup, WA) (and subject to approval by the Federal Trade Commission, #2072 (Redmond, WA).**

**(b)  From and after the date hereof, Buyer and Sellers shall take all actions reasonably necessary to satisfy the conditions precedent to the effectiveness of that certain Settlement Agreement (the "Spirit Settlement Agreement"), dated as of the date hereof, by and among by and among Operations Holdings, Haggen Holdings, LLC and Spirit SPE HG 2015-1 ("Spirit").**

## ARTICLE 5
## CLOSING CONDITIONS

**Section 5.1    Conditions to Obligation of Buyer.**

The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the fulfillment on or prior to the Closing of each of the following conditions, any one or more of which (to the extent permitted by applicable Law) may be waived by Buyer:

(a)  The Transactional Reps shall be true, correct and complete in all respects **(other than de minimis failures of the Transactional Reps to be true, correct and complete)**,

both as of the date of this Agreement and as of the Closing (other than the Transactional Reps that are made as of a specified date, which Transactional Reps shall be true, correct and complete in all respects **(other than de minimis failures of the Transactional Reps to be true, correct and complete)** as of such date).  The representations and warranties of Sellers contained in this Agreement other than the Transactional Reps shall be true, correct and complete in all respects (disregarding all materiality and similar qualifications), both as of the date of this Agreement and as of the Closing **(other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true, correct and complete as of such date), except as would not have a material adverse effect on Sellers' ability to consummate the transactions contemplated hereby**.

(b)  Sellers shall have performed or complied in all material respects with its obligations and covenants required by this Agreement to be performed or complied with by it at or prior to the Closing.

(c)  All applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated;

(d)  No temporary restraining Order, Law, preliminary or permanent injunction, cease and desist Order, or other Order issued by any Governmental Entity, shall be in effect prohibiting or preventing the transactions contemplated by this Agreement.

(e)  Each Seller shall have delivered to Buyer a certificate, dated as of the Closing Date, executed by a duly authorized officer of such Seller to the effect that the conditions set forth in Section 5.1(a) and Section 5.1(b) have been satisfied (the "Seller's Closing Certificates").

(f)  The Bankruptcy Court shall have entered the Sale Order on the docket and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

(g)  Sellers shall have paid all Cure Costs associated with the Store Leases and **the** Real Property Documents.

(h)  Sellers shall have made the deliveries to Buyer and the Escrow Holder required under Section 1.4(b) and Section 1.4(d).

(i)  The liquidation sales conducted in accordance with the relief sought in the Liquidation Motion shall have ended at each Store Property.

(j)  ~~Sellers shall have delivered to Buyer Disclosure Schedules in form and substance reasonably satisfactory to Buyer by 5 PM EST on November 16, 2015.~~**In addition to the satisfaction of the conditions set forth in (a)-(i) above, solely with respect to the Store Properties identified in the Wave Settlement Agreement as Stores #2095 (Ashland, OR), #2099 (Burien, WA), #2136 (Tujunga, CA), #2176 (Rancho Cucamonga, CA), #2077 (Puyallup, WA) (collectively, the "Wave Store Properties"), the assignment and assumption of the Wave Store Properties (and the Assets located thereat and related**

thereto) shall be conditioned upon the approval of the Wave Settlement Agreement by the Bankruptcy Court and the effectiveness and consummation of such Wave Settlement Agreement.  For the avoidance of doubt, if each other condition is fulfilled or waived with respect to the other Store Properties but the condition set forth in this clause (j) has not yet been fulfilled or waived, then the Closing with respect to such other Store Properties shall occur as contemplated by Section 1.3, the Purchase Price to be paid at such Closing for the other Store Properties shall be reduced by the aggregate Allocated Amount for the Wave Store Properties set forth on Exhibit 1.1 and, if the condition set forth in this clause (j) is thereafter fulfilled prior to the Expiration Date, then the Closing shall proceed at such time with respect to the Wave Store Properties and related Assets and the Purchase Price to be paid at such closing for the Wave Store Properties shall be the aggregate Allocated Amount for the Wave Store Properties set forth on Exhibit 1.1.

(k) In addition to the satisfaction of the conditions set forth in (a)-(i) above, solely with respect to the Store Properties identified in the Spirit Settlement Agreement as Stores #2130 (Lompoc, CA) and #2125 (Renton, WA), (collectively, the "Spirit Store Properties"), the assignment and assumption of the Spirit Store Properties (and the Assets located thereat and related thereto) shall be conditioned upon the approval of the Spirit Settlement Agreement by the Bankruptcy Court and the effectiveness and consummation of such Spirit Settlement Agreement.  For the avoidance of doubt, if each other condition is fulfilled or waived with respect to the other Store Properties but the condition set forth in this clause (k) has not yet been fulfilled or waived, then the Closing with respect to such other Store Properties shall occur as contemplated by Section 1.3, the Purchase Price to be paid at such Closing for the other Store Properties shall be reduced by the aggregate Allocated Amount for the Spirit Store Properties set forth on Exhibit 1.1 and, if the condition set forth in this clause (k) is thereafter fulfilled prior to the Expiration Date, then the Closing shall proceed at such time with respect to the Spirit Store Properties and related Assets and the Purchase Price to be paid at such closing for the Spirit Store Properties shall be the aggregate Allocated Amount for the Spirit Store Properties set forth on Exhibit 1.1.

(l) In addition to the satisfaction of the conditions set forth in (a)-(i) above, soely with respect to the Store Property identified on Exhibit 1.1 as "06019AS" (Henderson, NV) (the "Henderson Property"), the assignment and assumption of such Store Property (and the Assets located thereat and related thereto) shall be conditioned upon the delivery by Sellers of a valid, binding and effective amendment to that certain Multi Use Lease, dated January 19, 2005, between Albertson's Inc. and the State of Nevada, acting by and through its Department of Transportation, extending the term of such lease in accordance with the terms and conditions of such lease.  For the avoidance of doubt, if each other condition is fulfilled or waived with respect to the other Store Properties but the condition set forth in this clause (l) has not yet been fulfilled or waived, then the Closing with respect to such other Store Properties shall occur as contemplated by Section 1.3, the Purchase Price to be paid at such Closing for the other Store Properties shall be reduced by the aggregate Allocated Amount for the Henderson Property set forth on Exhibit 1.1 and, if the condition set forth in this clause (l) is thereafter fulfilled prior to the Expiration Date, then the Closing shall proceed at such time with respect to the

**Henderson Property and related Assets and the Purchase Price to be paid at such closing for the Henderson Property shall be the aggregate Allocated Amount for the Property set forth on Exhibit 1.1.**

**(m)Notwithstanding anything in this Agreement to the contrary, Buyer and Sellers agree that the assignment and assumption of the Store Property identified on Exhibit 1.1 as "00468AS" (Puyallup, WA) (the "Puyallup Property") shall be conditioned upon (i) the delivery by Sellers of a WARN notice to employees employed at the Puyallup Property, (ii) the expiration of the applicable statutory waiting period with respect to the termination of such employees and (iii) the applicable Seller remaining current on the Lease for such Store Property and not being in default on such Lease as well as (iv) the fulfillment or waiver of each other condition set forth in clauses (a)-(j) above.  For the avoidance of doubt, if each other condition is fulfilled or waived with respect to the other Store Properties but the condition set forth in this clause (m) has not yet been fulfilled or waived, then the Closing with respect to such other Store Properties shall occur as contemplated by Section 1.3 (the "First Closing"), the Purchase Price to be paid at such First Closing for the other Store Properties shall be reduced by the Allocated Amount for the Puyallup Property set forth on Exhibit 1.1; and, if the conditions set forth in this clause (m) are thereafter fulfilled prior to the Expiration Date, then the Closing with respect to the Puyallup Property and related Assets (the "Second Closing") shall proceed at such time, and the Purchase Price to be paid at such Second Closing for the Puyallup Property shall be the Allocated Amount for the Puyallup Property set forth on Exhibit 1.1.  It is understood and agreed that solely with respect to the Puyallup Property, the Expiration Date shall be deemed to be March 31, 2016, and this Agreement shall continue in full force and effect solely with respect to the Puyallup Property until such Expiration Date, provided, that neither Buyer nor Sellers shall terminate this Agreement with respect to the Puyallup Property as a result of March 31, 2016 having passed without the prior consent of Wave, not to be unreasonably withheld.  In the event of a First Closing, the adjustments contemplated by Section 1.5 shall be made in respect of the Store Properties to be conveyed at such time; and the adjustments contemplated by Section 1.5, to the extent they relate to the Puyallup Property, shall be made at the time of the Second Closing; provided that, for purposes of the Final Closing Statement and the Closing Adjustment Amount, the adjustments in respect of both such Closings shall be calculated on an aggregate basis.**

**Section 5.2    Conditions to Obligation of Sellers.**

The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment on or prior to the Closing of each of the following conditions, any one or more of which (to the extent permitted by applicable Law) may be waived by Seller:

(a)  The representations and warranties of Buyer contained in this Agreement shall be true, correct and complete in all respects (disregarding all materiality and similar qualifications), both as of the date of this Agreement and as of the Closing (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true, correct and complete as of such date), except where the failure of such

representations and warranties to be true, correct and complete would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

(b) Buyer shall have performed or complied in all material respects with its obligations and covenants required by this Agreement to be performed or complied with by Buyer at or prior to the Closing.

(c) All applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated;

(d) No temporary restraining Order, Law, preliminary, or permanent injunction, cease and desist Order or other order issued by any Governmental Entity shall be in effect prohibiting or preventing the transactions contemplated by this Agreement.

(e) Buyer shall have delivered to Sellers a certificate, dated as of the Closing Date, executed by Buyer to the effect that the conditions set forth in Section 5.2(a) and Section 5.2(b) have been satisfied (the "Buyer's Closing Certificate").

(f) The Bankruptcy Court shall have entered the Sale Order on the docket and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

(g) Buyer shall have made the deliveries to Sellers and the Escrow Holder required under Section 1.4(c) and Section 1.4(d).

(h) The liquidation sales conducted in accordance with the relief sought in the Liquidation Motion shall have ended at each Store Property.

**(i)  In addition to the satisfaction of the conditions set forth in (a)-(h) above, solely with respect to the Wave Store Properties, the assignment and assumption of the Wave Store Properties (and the Assets located thereat and related thereto) shall be conditioned upon the approval of the Wave Settlement Agreement by the Bankruptcy Court and the effectiveness and consummation of such Wave Settlement Agreement.**

**(j)  In addition to the satisfaction of the conditions set forth in (a)-(h) above, solely with respect to the Spirit Store Properties, the assignment and assumption of the Spirit Store Properties (and the Assets located thereat and related thereto) shall be conditioned upon the approval of the Spirit Settlement Agreement by the Bankruptcy Court and the effectiveness and consummation of such Spirit Settlement Agreement.**

## ARTICLE 6
## TERMINATION

### Section 6.1    Termination of Agreement.

This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing as provided below:

(a) Buyer and Sellers may terminate this Agreement by mutual written consent at any time prior to the Closing;

(b) Buyer may terminate this Agreement by giving written notice to Sellers at any time prior to the Closing if:

(i)     a chapter 11 trustee or examiner with expanded powers is appointed in the Chapter 11 Case for Sellers or any of their affiliated debtors; or

(ii)     the Chapter 11 Case of Sellers or any of their affiliated debtors is converted to a case under chapter 7 or is dismissed.

(c) Buyer may terminate this Agreement (so long as Buyer is not then in material breach of any of its representations, warranties, material covenants or material agreements contained in this Agreement) by giving written notice to Sellers at any time prior to the Closing:

(i)     in the event that Sellers have breached any representation, warranty, covenant or agreement contained in this Agreement, which breach would cause the failure of any condition set forth in Section 5.1 to be satisfied and Buyer shall have provided written notice of such breach to Seller, and such breach, if curable, has continued without cure for a period of ten (10) days after receipt of such notice by Sellers;

(ii)     if the Closing shall not have occurred on or before the Expiration Date by reason of the failure of any condition precedent set forth in Section 5.1 to have occurred (unless such failure shall be due to the failure of Buyer to perform or comply with any of the representations, warranties, material covenants, material agreements, or conditions of this Agreement to be performed or complied with by it prior to Closing);

(d) Sellers may terminate this Agreement (so long as Sellers are not then in material breach of any of their representations, warranties, material covenants or material agreements contained in this Agreement) by giving written notice to Buyer at any time prior to the Closing:

(i)     in the event Buyer has breached any representation, warranty, covenant or agreement contained in this Agreement which breach would cause the failure of any condition set forth in Section 5.2 to be satisfied and Sellers shall have provided written notice of such breach to Buyer, and the breach, if curable, has continued without cure for a period of ten (10) days after receipt of such notice by Buyer; or

(ii)     if the Closing shall not have occurred on or before the Expiration Date by reason of the failure of any condition precedent set forth in Section 5.2 to have occurred (unless such failure shall be due to the failure of Sellers to perform or comply with any of the representations, warranties, material covenants, material agreements, or conditions of this Agreement to be performed or complied with by Sellers prior to Closing).

Section 6.2    **Effect of Termination.**

If either Party terminates this Agreement pursuant to Section 6.1, all rights and obligations of the Parties hereunder shall terminate without any Liability of either Party to the other Party except for the Liabilities of a Party then in material and willful breach; provided, that, in connection with any termination of this Agreement, the aggregate Liability of Buyer shall not exceed the Buyer Deposit (and, for the avoidance of doubt, if the Buyer Deposit is paid to Seller pursuant to Section 6.3 in connection with any such termination, Buyer shall have no further Liability hereunder).  Notwithstanding the foregoing, this Section 6.2, Section 4.4, Section 6.3 and ARTICLE 7 shall survive any termination of this Agreement.

Section 6.3    **Buyer Deposit.**

In the event of a termination of this Agreement pursuant to Section 6.1(a), Section 6.1(b), Section 6.1(c), or Section 6.1(d)(ii), Buyer shall be entitled to disbursement of the Buyer Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon) from the Escrow Account.  In the event of a termination of this Agreement pursuant to Section 6.1(d)(i), Sellers shall be entitled to disbursement of the Buyer Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon) from the Escrow Account.  In the event that this Agreement is terminated, then Sellers and Buyer will deliver to the Escrow Holder, promptly following the effective date of any such termination, joint written instructions to pay Sellers or Buyer, as applicable, the Buyer Deposit from the Escrow Account, subject to the terms of the Escrow Agreement.

## ARTICLE 7
## MISCELLANEOUS

Section 7.1    **Definitions.**

(a)  For purposes of this Agreement, the terms set forth below have the following meanings:

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.

"Allocated Amount" means the amount of the Purchase Price allocated to a Store Property and the related Assets located thereat as set forth on Exhibit 1.1.

"Antitrust Law" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other Laws and Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, whether in the United States or elsewhere.

"Base Amount" means an amount equal to the sum of the Allocated Amounts for Store Properties set forth on Exhibit 1.1 hereto as of the Closing, after taking into account the removal of the Separable Stores set forth on Exhibit 1.31.2 as of the Closing.

"Bid Procedures Order" means that certain Order Granting Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363, 365, 503 and 507 and Fed. R. Bankr. P. 2002, 6004 and 6006 for Approval of (I) Global Bidding Procedures, (II) Bid Protections, (III) Form and Manner of Notice of Sale Transactions and Sale Hearing, and (IV) Assumption and Assignment Procedures [Docket No. 494].

"Business Day" means any day of the year on which national banking institutions in the City of Los Angeles, CA are open to the public for conducting business and are not required or authorized to close.

"Closing Cash Consideration" means an amount in cash, which shall be equal to the following: (i) the Base Amount, plus (ii) the Estimated Adjustment Amount, less (iii) the Buyer Deposit.

"Cure Costs" means any and all amounts, costs or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to section 365(b)(1) of the Bankruptcy Code to effectuate, pursuant to the Bankruptcy Code, the assumption by a Seller and assignment to Buyer of the Store Leases, as determined by the Bankruptcy Court or as agreed to by a Seller and the non-Seller counterparty to the applicable Store Lease.

"Disclosure Schedule" means the disclosure schedule dated the date hereof regarding this Agreement that has been provided by Sellers to Buyer.

"Expiration Date" means December 31, 2015.

"Final Adjustment Amount" means the Adjustment Amount, as finally determined in accordance with the terms and conditions of Section 1.5.

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"Haggen Litigation" means any claims, counterclaims or causes of action arising in, or related to, the following two pending civil actions: (i) Haggen Holdings, LLC v. Albertson's LLC & Albertson's Holdings LLC, Case No. 1:15-cv-00768, which is pending in the United States District Court for the District of Delaware and (ii) Albertson's LLC and Albertson's Holdings LLC v. Haggen Holdings, LLC, Case No. N15C-07-161, which is pending in the Superior Court for the State of Delaware.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Improvements" means the buildings, fixtures, lighting, electrical, mechanical, plumbing and heating, ventilation and air conditioning systems and improvements located on or attached to the Store Properties, which are owned by a Seller, if any.

"Intellectual Property" means: (i) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof; (ii) all trademarks, service marks, trade dress, logos, trade names, and corporate names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith; (iii) all copyrightable works, all copyrights, and all applications, registrations and renewals in connection therewith; (iv) all trade secrets and confidential information (including ideas, research and development, know-how, formulas, compositions and manufacturing and production processes and techniques); (v) all computer software (including data and related documentation); and (vi) all copies and tangible embodiments thereof (in whatever form or medium).

"Inventory" means merchandise inventory, pharmacy merchandise (legend, non-legend and generic), supplies, containers, labels, packaging material, maintenance supplies, beverages (alcoholic and non-alcoholic), food and other similar items, whether in broken or unbroken units, which are located in or held for sale at the Store Properties.

"IRS" means the Internal Revenue Service.

"Knowledge of Seller" or words of similar effect, regardless of case, means the actual knowledge, after reasonable inquiry, of ~~Ken Hull,~~ John Caple, John Clougher or Blake Barnett.

"Law" means any federal, state, local or foreign law (including common law), statute, code, ordinance, rule, regulation or other requirement or rule of law of any Governmental Entity.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private), claims, hearings, investigations, charges, complaints, demands or governmental proceedings.

"Liability" means any liability, obligation or commitment of any nature whatsoever (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due, or otherwise), including any liability for Taxes and any accounts payable.

"Lien" means, with respect to any property or asset, any mortgage, lien, pledge, charge, claim, security interest, community or other marital property interest, equitable interest, license, option, right of way, easement, encroachment, servitude, right of first offer or first refusal, buy/sell agreement or other encumbrance with respect to the use, construction, voting, transfer, receipt of income or exercise of any other attribute of ownership in respect of such property or asset.

"Liquidation Motion" means that certain Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, and 554 for Approval of (I) Global Procedures for (A) Store Closings, and (B) the Expedited Sale, Transfer, or Abandonment of De Minimis Assets, and (II) Entry into a Liquidation Agreement, filed in the Chapter 11 Case on September 24, 2015 [Docket No. 172].

"Neutral Accountant" means a big five accounting firm agreed upon by the Parties not then employed by Buyer, Sellers or any of their respective Affiliates.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Permitted Liens" means (i) liens identified in Section 7.1(a) of the Disclosure Schedule, (ii) liens for Taxes that are not yet due and payable, (iiiii) statutory liens of landlords, liens of carriers, warehousemen, mechanics and materialmen incurred in the ordinary course of business for sums not yet due, (ivii) liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance and other types of social security, (iv) purchase money liens, (viv) minor irregularities of title which do not materially detract from the value or use of such property, and (viivi) liens to secure obligations to landlords, lessors or renters under leases or rental agreements or underlying leased property.

"Person" means an individual, partnership, corporation, limited liability company, joint stock company, unincorporated organization or association, trust, joint venture, association or other organization, whether or not a legal entity, or a Governmental Entity.

"Pharmacy Asset" means all Pharmacy Records, Prescriptions Lists, pharmacy scripts, pharmacy inventory and other pharmacy assets, supplies and equipment located at or related to any Store Property.

"Pharmacy Records" means all files, documents, instruments, papers, books, computer files and records and all other records, including all Prescription Lists, in any media relating to the patients, doctors, pharmaceuticals, controlled substances, or prescriptions of, administered by or filled at the Store Properties and/or relating to any Law or Order concerning any of the foregoing.

"Prescription Lists" means retail customer files (including prescriptions for retail customers and other medical information related thereto) maintained by a retail pharmacy at any of the Store Properties.

"Real Property Documents" means leases, subleases, options, contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, recognition agreements, estoppel certificates, development agreements, entitlement agreements, zoning agreements, written approvals and authorizations and written signage rights and approvals, surveys, amendments or supplements to any of the foregoing, and recorded memoranda of any of the foregoing, in each case, with respect to Store Properties.

"Sale Order" means an order of the Bankruptcy Court, in substantially the form set forth in Exhibit D: (a) approving (i) this Agreement, the other Transaction Documents and the execution, delivery, and performance by Seller of this Agreement, the other Transaction Documents and the other instruments and agreements contemplated hereby and thereby; (ii) the sale of the Assets to Buyer free and clear of all liens, other than any Permitted Liens or any Assumed Liabilities; and (iii) the assumption of the Assumed Liabilities by Buyer on the terms

set forth herein and in the other Transaction Documents; (b) determining that Buyer is a good faith purchaser; and (c) providing that the Closing will occur in accordance with the terms and conditions hereof.

"Separable Stores" means the Stores set forth on Exhibit 1.31.2 under the heading "Separable Stores", together with any Store added in accordance with Section 1.1(e) and Section 1.7.

"Store Properties" means the stores operated by a Seller or any Affiliate thereof at the locations identified on Exhibit 1.1 hereto, as amended from time to time after the execution of this Agreement by the removal of Separable Stores.

"Subsidiary" means, with respect to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions are at any time directly or indirectly owned by such Person.

"Tax" or "Taxes" means all United States federal, state, local and foreign taxes including: (i) taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, profits, sales, use, excise, withholding, ad valorem, stamp, transfer, value added, registration, documentary, stamp, gains, escheat, unclaimed property, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, net worth, license, severance, occupation, premium, environmental, customs duties, disability, real property, personal property, alternative or add-on minimum, estimated, or other tax of any kind or any charge of any kind in the nature of (or similar to) taxes whatsoever, including any interest, penalty, or addition thereto, whether disputed or not; and (ii) any liability for the payment of any amounts of the type described in clause (i) of this definition as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, as a result of any tax sharing or tax allocation agreement, arrangement or understanding, or as a result of being liable for another person's taxes as a transferee or successor, by contract or otherwise.

"Tax Return" means any return, report, declaration, form, filing, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transaction Document" means this Agreement, the Bills of Sale, the Assignment and Assumption Agreements, each Assignment and Assumption of Lease and the other agreements, instruments and documents required to be delivered at the Closing.

"Transactional Reps" means the representations and warranties set forth in Section 2.1, Section 2.2, and Section 2.3(b)(i).

(b) Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| 2014 Agreement | Section 7.3 |

| Term | Section |
|------|---------|
| Accounts Receivable | Section 1.1(b)(iii) |
| Adjustment Amount | Section 1.5(a) |
| Agreement | Preamble |
| Assets | Section 1.1(a) |
| Assignment and Assumption Agreement | Section 1.4(b) |
| Assignment and Assumption of Lease | Section 1.4(b) |
| Assumed Liabilities | Section 1.1(c) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bill of Sale | Section 1.4(b) |
| Buyer | Preamble |
| Buyer Deposit | Section 1.2(b) |
| Buyer's Closing Certificate | Section 5.2(e) |
| Casualty/Condemnation Store | Section 1.7 |
| Chapter 11 Case | Recitals |
| Closing | Section 1.3 |
| Closing Adjustment Amount | Section 1.5(b) |
| Closing Date | Section 1.3 |
| Closing Statement | Section 1.5(b) |
| Deposits | Section 1.1(a)(v) |
| Dispute Notice | Section 1.5(c) |
| Disputed Items | Section 1.5(c) |
| Effective Time | Section 1.3 |
| Equipment | Section 1.1(a)(iii) |
| Escrow Account | Section 1.2(b) |
| Escrow Agreement | Section 1.2(b) |
| Escrow Holder | Section 1.2(b) |
| Estimated Adjustment Amount | Section 1.4(a) |
| Estimated Statement | Section 1.4(a) |
| Excluded Asset | Section 1.1(b) |
| Excluded Liability | Section 1.1(d) |
| Files and Records | Section 1.1(a)(iv) |
| Final Closing Statement | Section 1.5(c) |
| Governmental Entity | Section 2.3(a) |
| Guarantees | Section 1.1(a)(ii) |
| Leased Real Property | Section 2.7(a) |
| Non-Party Affiliate | Section 7.15 |
| **Opco North** | **Preamble** |
| **Opco South** | **Preamble** |

LA 51934594

| Term | Section |
|------|---------|
| **Operations Holdings** | **Preamble** |
| Party | Preamble |
| Permits | Section 2.5(a) |
| Permitted Liens | Section 2.7(b) |
| Personal Property Tax Prorations | Section 1.5(a)(i) |
| Prepaid Expenses | Section 1.1(a)(v) |
| Proceeds | Section 1.7 |
| Purchase Price | Section 1.2(a) |
| Real Property Tax Prorations | Section 1.5(a)(ii) |
| Sellers | Preamble |
| Seller's Closing Certificate | Section 5.1(e) |
| **Store Closing Date** | **Section 4.9** |
| Store Lease | Section 2.7(a) |
| **Transferred Employees** | **Section 4.5(a)** |
| Utility Proration | Section 1.5(a)(iv) |

LA 51934594

**Section 7.2    Expenses.**  Except as expressly set forth in this Agreement, all fees and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement, including the fees and disbursements of counsel, financial advisors and accountants, shall be paid by the Party incurring such fees or expenses.  Without limiting the foregoing, for the avoidance of doubt, Sellers shall pay all fees and expenses owed to any Person set forth in Section 7.2 of the Disclosure Schedule.

**Section 7.3    Entire Agreement; Amendment; Waiver; Assignment.**  This Agreement (a) constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof**; provided, however, that, for the avoidance of doubt, with respect to all other matters, this Agreement shall not supersede in any respect, or otherwise effectuate any modification or waiver of, any provision of that certain Asset Purchase Agreement, dated December 10, 2014, by and among Haggen Holdings, LLC, Albertson's Holdings LLC and Buyer, as amended (the "2014 Agreement"), and the 2014 Agreement shall remain in full force and effect to the full extent provided therein, nor shall this Agreement impact or relate to any disputes or litigation relating to the 2014 Agreement, including the Haggen Litigation; in the event of any ambiguity in the terms of the 2014 Agreement and the terms of this Agreement regarding which agreement shall govern a particular matter, the terms of the 2014 Agreement shall govern such matter**, (b) can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by Buyer, in the case of an amendment, supplement, modification or waiver sought to be enforced against Buyer, or Sellers, in the case of an amendment, supplement, modification or waiver sought to be enforced against Sellers; and (c) shall not be assigned by any Party (whether by operation of Law or otherwise) without the prior written consent of the other Parties, provided, that, Buyer (i) may assign or designate in whole or in part its rights or obligations hereunder to one or more Affiliates of Buyer, including any wholly owned Subsidiary of Buyer, or to a successor of Buyer, in each case without the prior written consent of Sellers, provided, however, that in the event of an assignment to an Affiliate, Buyer shall remain responsible for the performance of its obligations hereunder.

**Section 7.4    Notices.**  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given by personal delivery, nationally recognized overnight courier, certified mail or facsimile at the following addresses (or to such other address as a Party may have specified by notice given to the other Party pursuant to this provision):

      To Buyer:

          Albertson's LLC
          250 East Parkcenter Boulevard
          Boise, Idaho 83706
          Facsimile: (208) 395-6575
          Attention:  Legal Department

with a copy (which shall not constitute notice to Buyer) to:

> Schulte Roth & Zabel LLP
> 919 Third Avenue
> New York, NY 10016
> Facsimile: (212) 593-5955
> Attention:  Stuart D. Freedman, Esq.
>                   David Hillman, Esq.

To Sellers:

> Haggen Opco South, LLC
> Haggen Opco North, LLC
> Haggen, Inc.
> **Operations Holdings, LLC**
> 2211 Rimland Drive
> Bellingham, WA 98226
> Facsimile: 360-650-8260
> Attention: Blake Barnett, Chief Financial Officer

with a copy (which shall not constitute notice to Sellers) to:

> Akerman LLP
> One Southeast Third Avenue, 25th Floor
> Miami, FL 33131
> Facsimile: 305-374-5095
> Attention: Carl Roston

> and

> Stroock & Stroock & Lavan LLP
> 2029 Century Park East, Suite 1600
> Los Angeles, CA 90067
> Facsimile: 310-407-6302
> Attention: Frank A. Merola

Any such notice or communication shall be deemed to have been received (i) when delivered, if personally delivered, (ii) on the next Business Day after dispatch, if sent postage pre-paid by nationally recognized, overnight courier guaranteeing next Business Day delivery, (iii) on the 5th Business Day following the date on which the piece of mail containing such communication is posted, if sent by certified mail, postage prepaid, return receipt requested, and (iv) on confirmation of receipt when transmitted via facsimile; provided, that if confirmation of receipt is not received on a Business Day or is received after 5:00 p.m. Los Angeles, California time on a Business Day, such notice or communication shall be deemed to have been received the following Business Day.

**Section 7.5    Governing Law; Jurisdiction.**  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflict of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, the Parties agree that if any dispute arises out of or in connection with this Agreement or any of the documents executed hereunder or in connection herewith, the Bankruptcy Court shall have exclusive personal and subject matter jurisdiction and shall be the exclusive venue to resolve any and all disputes relating to the transactions contemplated hereby and any of the documents executed hereunder or in connection herewith.  Such court shall have sole jurisdiction over such matters and the Parties affected thereby and Buyer and Sellers each hereby consent and submit to such jurisdiction; provided, however, that if the Chapter 11 Case shall have closed and cannot be reopened, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York and any appellate court thereof, for the resolution of any such claim or dispute. Notwithstanding anything to the contrary in this Agreement, the Sale Order and the transactions contemplated thereunder, Buyer's participation in the Bankruptcy Cases for the purpose of obtaining approval of the sale of Assets, this Agreement, the Sale Order and all other actions taken, or that may be taken, by Buyer or its agents in connection with all of the foregoing shall not constitute, and shall not be deemed to constitute, Buyer's knowing and voluntary consent to have the Bankruptcy Court adjudicate any claims or causes of action, including any claims, counterclaims or causes of action arising in, or related to, the Haggen Litigation.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  In the event any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 7.4, unless another address has been designated by such Party in a notice given to the other Parties in accordance with the provisions of Section 7.4.

**Section 7.6     Exhibits and Schedules; Construction; Interpretation.**  If and to the extent any information required to be furnished in any Section of the Disclosure Schedule is contained in this Agreement or in any other Section of the Disclosure Schedule, such information shall be deemed to be included in all Sections of the Disclosure Schedule in which the information would otherwise be required to be included to the extent that the disclosure is reasonably apparent from its face to be applicable to such other Sections of the Disclosure Schedule.  Disclosure of any fact or item in any Section of the Disclosure Schedule shall not be considered an admission by Seller that such item or fact (or any non-disclosed item or information of comparable or greater significance) represents a material exception or fact, event or circumstance or that such item or fact will in fact exceed any applicable threshold limitation set forth in the Agreement and shall not be construed as an admission by Seller of any non-compliance with, or violation of, any third party rights (including to any intellectual property rights) or any applicable Law of any Governmental Entity, such disclosures having been made solely for the purposes of creating exceptions to the representations made herein or of disclosing any information required to be disclosed under the Agreement.  When a reference is made in this Agreement to an article, section, paragraph, clause, schedule or exhibit, such reference shall be deemed to be to this Agreement unless otherwise indicated.   The text of all schedules is incorporated herein by reference.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.  As used in this Agreement: (a) the terms "hereof," "herein," and "herewith" and words of similar import will, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, (b) the word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if", (c) any reference herein to "Dollars" or "$" shall mean United States dollars, (d) the use of "or" herein is not intended to be exclusive (i.e., "or" shall mean and/or unless the context otherwise requires), (e) references herein to a Person are also to its successors and permitted assigns, and any reference herein to a Governmental Entity shall be deemed to include reference to any successor thereto, and (f) whenever the phrase "ordinary course of business" is used in this Agreement without being followed by the words "consistent with past practice", it will be deemed to be followed by such words.

**Section 7.7     Parties in Interest.**  This Agreement shall be binding upon and inure solely to the benefit of each Party and its successors and permitted assigns and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

**Section 7.8     Severability.**  If any term or other provision of this Agreement is invalid, illegal or unenforceable, all other provisions of this Agreement shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.

**Section 7.9  AS IS CONDITION; DISCLAIMER OF WARRANTIES; EXCLUSIVITY OF REPRESENTATIONS AND WARRANTIES.** EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN ANY OF THE TRANSACTION DOCUMENTS OR IN ANY CERTIFICATE DELIVERED PURSUANT HERETO, BUYER WILL BE ACQUIRING THE ASSETS ON THE CLOSING DATE IN THEIR THEN EXISTING CONDITION "AS IS", "WHERE IS", SUBJECT TO ALL LEGAL REQUIREMENTS, ANY STATE OF FACTS WHICH AN ACCURATE SURVEY OR PHYSICAL INSPECTION OF THE ASSETS MIGHT REVEAL, WITHOUT WARRANTIES, EITHER EXPRESS OR IMPLIED, "WITH ALL FAULTS" INCLUDING BOTH LATENT AND PATENT DEFECTS, AND THE EXISTENCE OF HAZARDOUS MATERIALS, IF ANY.

(a) EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN ANY OF THE TRANSACTION DOCUMENTS OR IN ANY CERTIFICATE DELIVERED PURSUANT HERETO, NO WARRANTIES OR REPRESENTATIONS HAVE BEEN MADE OR ARE MADE, AND NO RESPONSIBILITY HAS BEEN OR IS HEREBY ASSUMED BY SELLERS, AND SELLERS EXPRESSLY DISCLAIM, AND BUYER HEREBY WAIVES, ALL SUCH OTHER WARRANTIES AND REPRESENTATIONS WHATSOEVER, EXPRESS OR IMPLIED, AS TO THE CONDITION OR USE OF THE ASSETS, OR AS TO ANY OTHER FACT OR MATTER RELATED TO THE ASSETS OR ANY PORTION THEREOF, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO BUYER OR ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA).

(b) WITHOUT LIMITING THE FOREGOING, EXCEPT TO THE EXTENT THAT THE SAME MAY BE OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT OR SET FORTH IN THE TRANSACTION DOCUMENTS OR IN ANY CERTIFICATE DELIVERED PURSUANT HERETO, NO WARRANTIES OR REPRESENTATIONS HAVE BEEN MADE OR ARE MADE, AND NO RESPONSIBILITY HAS BEEN OR IS HEREBY ASSUMED, BY SELLERS (AND SELLERS EXPRESSLY DISCLAIM, AND BUYER HEREBY WAIVES ALL SUCH OTHER WARRANTIES AND REPRESENTATIONS WHATSOEVER, EXPRESS OR IMPLIED), AS TO THE ENVIRONMENTAL CONDITION OF THE ASSETS INCLUDING THE PRESENCE OF HAZARDOUS MATERIALS, IF ANY, WHETHER LOCATED ABOVE OR BELOW GROUND, OR ON OR OFF THE PREMISES, OF THE STORE PROPERTIES. TO THE EXTENT THAT SELLER PROVIDES TO BUYER ANY INFORMATION REGARDING ANY OF THE FOREGOING OR THE RESULTS OF ANY INSPECTION OR ANY ENGINEERING OR ENVIRONMENTAL REPORTS, SELLER MAKES NO WARRANTIES OR REPRESENTATIONS, EXCEPT TO THE EXTENT THAT THE SAME MAY BE OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT OR SET FORTH IN THE TRANSACTION DOCUMENTS OR IN ANY CERTIFICATE DELIVERED PURSUANT HERETO, WITH RESPECT TO THE CONTENT, ACCURACY, COMPLETENESS, METHODOLOGY OR ANY OTHER MATTER CONCERNING SUCH REPORTS.

(c) BUYER ACKNOWLEDGES AND AGREES THAT THE PROVISIONS OF THIS SECTION 7.9 WERE NEGOTIATED AND AGREED TO BY BUYER AND SELLERS AND WERE A MATERIAL FACTOR IN THE DETERMINATION OF THE AMOUNT OF THE PURCHASE PRICE OF THE ASSETS.

(d) With respect to any projection, forecast or business plan delivered by or on behalf of Sellers or any of their Affiliates to Buyer, Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections, forecasts and plans, (ii) it is familiar with such uncertainties, (iii) it is taking full responsibility for making its own evaluation of the adequacy and accuracy of all such projections, forecasts and plans so furnished to it, and (iv) except to the extent that any warranties or representations may be otherwise expressly set forth in this Agreement or set forth in the Transaction Documents or in any certificate delivered pursuant hereto, it shall have no claim of any kind whatsoever against any Person with respect thereto.

(e) With respect to any appraisals or environmental reports of Sellers reviewed by Buyer in connection with the transactions contemplated hereunder, Buyer acknowledges and agrees that no Seller nor any of their respective agents has made or makes any representations or warranties to Buyer except to the extent that the same may be otherwise expressly set forth in this Agreement or set forth in the Transaction Documents or in any certificate delivered pursuant hereto, and Sellers expressly disclaim all representations and warranties with respect to any appraisals or environmental reports of Sellers except to the extent that the same may be otherwise expressly set forth in this Agreement or set forth in the Transaction Documents or in any certificate delivered pursuant hereto, including, but not limited to, any representations as to or concerning (i) the means, methodologies or protocols of the third party consultants, (ii) the accuracy or completeness of said reports, (iii) the scope of work upon which the reports are based, (iv) the appropriateness of the scope of work for the assessment of the market value of the Assets or the environmental matters relating to the Store Properties, as applicable, (v) the insurable value of the Assets, (vi) the replacement cost value of the Assets, (vii) the accuracy or reasonableness of the conclusions of the third party consultants, and/or (viii) any suggested or required remediation or other clean up of any Store Property. Sellers expressly disclaim any obligation or responsibility, express or implied, to update or supplement any reports.

(f) TO THE EXTENT REQUIRED TO BE OPERATIVE, THE DISCLAIMERS OF WARRANTIES CONTAINED HEREIN ARE "CONSPICUOUS" DISCLAIMERS FOR PURPOSES OF ANY APPLICABLE LAW.

(g) Notwithstanding anything to the contrary in this Section 7.9 or elsewhere in this Agreement, each of the Parties retains all of its rights and remedies with respect to claims based on fraud.

**Section 7.10   Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile, portable document format or other electronic means shall be effective as delivery of a manually executed counterpart to this Agreement.

**Section 7.11   Waiver of Jury Trial.**  EACH OF THE PARTIES HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE.   EACH OF THE PARTIES EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT ANY OF THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

**Section 7.12   Specific Performance.**

The Parties recognize and agree that if for any reason any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, immediate and irreparable harm or injury would be caused for which money damages would not be an adequate remedy.  Accordingly, the Parties hereto acknowledge and hereby agree that in the event of any breach or threatened breach by Sellers, on the one hand, or Buyer, on the other hand, of any of their respective covenants or obligations set forth in this Agreement, Sellers, on the one hand, and Buyer, on the other hand, shall be entitled to an injunction or injunctions to prevent or restrain breaches or threatened breaches of this Agreement by the other Parties (as applicable), and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of the other (as applicable) under this Agreement.  The Parties acknowledge and agree that any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction.  The Parties hereto further agree that (a) by seeking the remedies provided for in this Section 7.12, a Party shall not in any respect waive its right to seek any other form of relief that may be available to a Party under this Agreement, including monetary damages and (b) nothing set forth in this Section 7.12 or otherwise shall require any Party hereto to institute any proceeding for (or limit any Party's right to institute any proceeding for) specific performance under this Section 7.12 prior to or as a condition to exercising any termination right under ARTICLE 6 (and pursuing damages after such termination), nor shall the commencement of any legal proceeding pursuant to this Section 7.12 or anything set forth in this Section 7.12 restrict or limit any Party's right to terminate this Agreement in accordance with the terms of ARTICLE 6 or pursue any other remedies under this Agreement that may be available then or thereafter.

**Section 7.13   Survival.**

The representations and warranties of each of Sellers and Buyer contained in this Agreement (whether or not contained in ARTICLE 2 or ARTICLE 3) shall not survive, and shall terminate at, the Closing, and none of Sellers or Buyer shall have liability after the Closing for

any breach of any of its representations or warranties contained in this Agreement. None of the covenants or other agreements contained in this Agreement shall survive the Closing other than those which by their terms contemplate performance after the Closing, and each such surviving covenant or agreement shall survive the Closing for the period contemplated by its terms (or if no such survival period is contemplated, then indefinitely).

### Section 7.14    Time of Essence.

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

### Section 7.15    Non-Recourse.

All claims or causes of action (whether in contract or in tort, in law or in equity, by statute or otherwise) that may be based upon, arise out of or relate to this Agreement or the other Transaction Documents, or the negotiation, execution or performance of this Agreement or the other Transaction Documents (including any representation or warranty made in or in connection with this Agreement or the other Transaction Documents or as an inducement to enter into this Agreement or the other Transaction Documents), may be made only against the Persons that are expressly identified as parties hereto and thereto. No Person who is not a named party to this Agreement or the other Transaction Documents, including any past, present or future director, officer, employee, incorporator, member, partner, stockholder, equityholder, controlling person, Affiliate, agent, attorney or representative of any named party to this Agreement or the other Transaction Documents (the "Non-Party Affiliates") shall have any liability (whether in contract or in tort, in law or in equity, by statute or otherwise, or based upon any theory that seeks to impose liability of an entity party against its owners or Affiliates, including by or through theories of equity, agency, control, instrumentality, single business enterprise, piercing the veil or undercapitalization) for any obligations or liabilities arising under, in connection with or related to this Agreement or the other Transaction Documents (as the case may be) or for any claim based on, in respect of, or by reason of this Agreement or the other Transaction Documents (as the case may be) or the negotiation or execution hereof or thereof; and each Party waives and releases all such liabilities, claims and obligations against any such Non-Party Affiliates. Notwithstanding the foregoing, this Section 7.15 shall be subject to Section 7.9(h).

### Section 7.16    Bankruptcy Court Approval.

The Parties acknowledge that this Agreement shall not become effective until it has been approved by the Bankruptcy Court pursuant to the Sale Order.

* * * * *

IN WITNESS WHEREOF, each of the Parties has caused this Asset Purchase Agreement to be duly executed on its behalf as of the day and year first above written.

ALBERTSON'S LLC

By:_____
    Name:
    Title:

HAGGEN OPCO SOUTH, LLC

By:_____
Name:
Title:

HAGGEN OPCO NORTH, LLC

By:_____
Name:
Title:

HAGGEN~~, INC.~~ **OPERATIONS HOLDINGS, LLC**

By:_____
Name:
Title:

**Exhibit 1.1**
**Store Properties**

| | | | | Sq. Ft. | |
|---|---|---|---|---|---|
| 00261AS | 1120 Campbell Street | Baker City | OR | 48,239 | $300,000 |
| 00468AS | 11012 Canyon Rd. East | Puyallup | WA | 49,896 | $1 |
| 00470AS | 14215 SE Petrovitsky Rd | Renton | WA | 43,134 | $1 |
| 00472AS | 2800 Milton Way | Milton | WA | 53,891 | $1 |
| 00972AS | 1350 N Silverbell Road | Tucson | AZ | 60,080 | $700,000 |
| 01027AS | 1980 Mcculloch Blvd | Lake Havasu City | AZ | 57,175 | $1,000,000 |
| 06014AS | 575 College Drive | Henderson | NV | 60,716 | $1 |
| 06019AS | 190 N. Boulder Hwy | Henderson | NV | 58,254 | $100,000 |
| 06028AS | 2910 Bicentennial Parkway | Henderson | NV | 55,000 | $200,000 |
| 06323AS | 3500 Panama Lane | Bakersfield | CA | 50,672 | $300,000 |
| 06339AS | 1500 N. "H" Street | Lompoc | CA | 47,512 | $300,000 |
| 06379AS | 8200 E Stockdale Hwy | Bakersfield | CA | 45,336 | $200,000 |
| 06397AS | 6240 Foothill Blvd | Tujunga | CA | 57,429 | $200,000 |
| 06523AS | 8850 Foothill Blvd. | Rancho Cucamonga | CA | 66,618 | $100,000 |
| 06742AS | 7895 Highland Village Place | San Diego | CA | 50,597 | $400,000 |
| 06763AS | 12475 Rancho Bernardo Rd | Rancho Bernardo | CA | 51,602 | $900,000 |
| 06771AS | 1608 Broadway St | El Cajon | CA | 50,607 | $800,000 |
| SS00311AS | 5415 Main St | Springfield | OR | 53,821 | $1 |
| SS00442AS | 15332 Aurora Ave N | Shoreline | WA | 52,277 | $500,000 |
| SS00517AS | 7601 Evergreen Way | Everett | WA | 51,862 | $1,300,000 |
| SS00551AS | 15805 Pacific Ave. S. | Tacoma | WA | 43,865 | $1 |
| SS01082AS | 3355 Bethel Rd. SE | Port Orchard | WA | 54,765 | $200,000 |
| SS01468AS | 4300 NE 4th | Renton | WA | 62,500 | $1,700,000 |
| SS01669AS | 26518 Bouquet Canyon Rd | Saugus | CA | 36,48 | $200,000 |

| | | | | | |
|---|---|---|---|---|---|
| SS02048AS | 163 S. Turnpike Rd | Goleta | CA | ~~8 38,44 9~~ | $1,600,000 |
| SS02137AS | 5630 Lake Murray Blvd | La Mesa | CA | ~~27,29 0~~ | $1,560,000 |
| SS02611AS | 10380 East Broadway Boulevard | Tucson | AZ | ~~58,80 3~~ | $1,000,000 |
| SS02949AS | 4831 Point Fosdick Dr Nw | Gig Harbor | WA | ~~63,77 7~~ | $500,000 |
| SS04292AS | 585 Siskiyou Boulevard | Ashland | OR | ~~23,86 8~~ | $200,000 |
| ~~00411AS~~ | ~~15840 1st Avenue South~~ | ~~Burien~~ | ~~WA~~ | ~~40,59 3~~ | ~~$1~~ |
| 00473AS | 12725 First Ave. S. | Burien | WA | ~~48,52 8~~ | $100,000 |
| ~~00476AS~~ | ~~19881 SR 2~~ | ~~Monroe~~ | ~~WA~~ | ~~52,19 3~~ | ~~$100,000~~ |
| ~~00568AS~~ | ~~3075 Hilyard St.~~ | ~~Eugene~~ | ~~OR~~ | ~~33,149~~ | ~~$200,000~~ |
| ~~06164AS~~ | ~~28090 South Western Ave~~ | ~~San Pedro~~ | ~~CA~~ | ~~56,982~~ | ~~$100,000~~ |
| ~~06589AS~~ | ~~1910 N. Campus Ave.~~ | ~~Upland~~ | ~~CA~~ | ~~52,443~~ | ~~$1~~ |
| | | | | ~~Total:~~ | ~~$14,760,008~~14,360,006 |

DOC ID - ~~23682888.1~~23682888.9

LA 51934594

**Exhibit 1.2**
**Store Properties Subject to Lease Negotiation**

| REID | Address | City | ST | Sq. Ft. | Allocated Amount |
|---|---|---|---|---|---|
| 00411AS | 15840 1st Avenue South | Burien | WA | 40,593 | $1 |
| 00473AS | 12725 First Ave. S. | Burien | WA | 48,528 | $100,000 |
| 00476AS | 19881 SR 2 | Monroe | WA | 52,193 | $100,000 |
| 00568AS | 3075 Hilyard St. | Eugene | OR | 33,149 | $200,000 |
| 06164AS | 28090 South Western Ave | San Pedro | CA | 56,982 | $100,000 |
| 06589AS | 1910 N. Campus Ave. | Upland | CA | 52,443 | $1 |

**Exhibit 1.3**

**Separable Stores**

| | | Sq. Ft. | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Exhibit A**
**Form of Bill of Sale**

[See attached.]

## BILL OF SALE

[●], 2015

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, [Haggen Opco South, LLC], a Delaware limited liability company ("Seller"), does hereby grant, bargain, transfer, sell, assign, convey and deliver to [●], a [●] ("Buyer"), all of its right, title and interest in and to the Assets, as such term is defined in the Asset Purchase Agreement, dated [●], 2015, by and among Buyer and Seller (the "Purchase Agreement"), to have and to hold the same unto Buyer, its successors and assigns, forever**.  Each term which is capitalized, but not defined, in this Bill of Sale shall have the meaning ascribed to such term in the Purchase Agreement**.

Buyer acknowledges that Seller makes no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

All of the terms and provisions of this Bill of Sale are binding upon Seller, Buyer and their respective successors and assigns and will inure to the benefit of the parties and their respective successors and assigns. Notwithstanding the foregoing, no provision of this Bill of Sale shall in any way amend any of the express provisions (including the warranties, covenants, agreements, conditions, representations and obligations and indemnifications, and the limitations related thereto, of Seller or Buyer) set forth in the Purchase Agreement, this Bill of Sale being intended solely to effect the transfer of the Purchased Assets.  In the event of a conflict between the terms of this Bill of Sale and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail and govern.

This Bill of Sale may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original but all such counterparts together shall constitute one and the same instrument.  This Bill of Sale may be executed by facsimile or portable document format signature, which shall have full force and effect as if original.

The terms and conditions of this Bill of Sale shall be governed and construed in accordance with the laws of the State of New York without giving effect to the conflicts of laws principles thereof or of any other state~~.  The~~**, except to the extent that the Laws of such state are superseded by the Bankruptcy Code.  Without limiting any party's right to appeal any order of the Bankruptcy Court, the** parties ~~hereto~~ agree that **if any dispute arises out of or in connection with this Bill of Sale, the** Bankruptcy Court shall ~~be the~~**have** exclusive ~~forum for enforcement of this Bill of Sale and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; provided that if the Bankruptcy Court determines that it does not have~~**personal and** subject matter jurisdiction ~~over any action or proceeding arising out of or~~**and shall be the exclusive venue to resolve any and all disputes** relating to this Bill of Sale~~, then each party: (a) agrees that all such actions or proceedings shall be heard and determined in a New York federal court sitting in the City of New York; (b) irrevocably submits to the jurisdiction of~~

such court in any such action or proceeding; (c) consents that any such action or proceeding may be brought in such courts and waives any objection that such party **and the transactions contemplated hereby. Such court shall have sole jurisdiction over such matters and the parties affected thereby and Buyer and Seller each hereby consent and submit to such jurisdiction; provided, however, that if the Chapter 11 Case shall have closed and cannot be reopened, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York and any appellate court thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they** may now or hereafter have to the **laying of** venue or jurisdiction or that such action or proceeding was **of any such dispute** brought in an inconvenient court; and (d) agrees that service of process **such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. In the event any such action, suit or proceeding is commenced, the parties hereby agree and consent that service of process may be made, and personal jurisdiction over any party hereto** in any such action**, suit** or proceeding may be effected**obtained,** by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address as provided in Section 7.4 of the Purchase Agreement (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by New York Law)**service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the party at the address of such party set forth in Section 7.4 of the Purchase Agreement, unless another address has been designated by such party in a notice given to the other parties in accordance with the provisions of Section 7.4 of the Purchase Agreement. Notwithstanding anything to the contrary in this Bill of Sale, the Sale Order and the transactions contemplated thereunder, Buyer's participation in the Bankruptcy Cases for the purpose of obtaining approval of the sale of Assets, this Bill of Sale, the Sale Order and all other actions taken, or that may be taken, by Buyer or its agents in connection with all of the foregoing shall not constitute, and shall not be deemed to constitute, Buyer's knowing and voluntary consent to have the Bankruptcy Court adjudicate any claims or causes of action, including any claims, counterclaims or causes of action arising in, or related to, the Haggen Litigation. For the avoidance of doubt, this Bill of Sale shall not supersede in any respect, or otherwise effectuate any modification or waiver of, any provision of that certain Asset Purchase Agreement, dated December 10, 2014, by and among Haggen Holdings, LLC, Albertson's Holdings LLC and Buyer, as amended (the "2014 Agreement"), and the 2014 Agreement shall remain in full force and effect to the full extent provided therein, nor shall this Bill of Sale impact or relate to any disputes or litigation relating to the 2014 Agreement, including the Haggen Litigation; in the event of any ambiguity in the terms of the 2014 Agreement and the terms of this Bill of Sale regarding which agreement shall govern a particular matter, the terms of the 2014 Agreement shall govern such matter**.

* * * * *

IN WITNESS WHEREOF, each of the parties has caused this Bill of Sale to be executed in its name and delivered by a duly authorized officer, on the date first above written.

[HAGGEN OPCO SOUTH, LLC]

By:_____
    Name:
    Title:

[●]

By:_____
    Name:
    Title:

**Exhibit B**
**Form of Assignment and Assumption Agreement**

[See attached.]

**Exhibit C**
**Form of Assignment and Assumption of Lease**

[See attached.]

Recording Requested By
And When Recorded, Return To:

_____

_____

_____

_____

DO NOT WRITE ABOVE THIS LINE
FOR RECORDER'S USE ONLY

APN:

_____,
Store #_____

## ASSIGNMENT AND ASSUMPTION
## OF LEASE

This ASSIGNMENT AND ASSUMPTION OF LEASE ("**Assignment**") is made as of the \_\_\_\_\_ day of _____, 2015  (the "**Effective Date**"), by and between [**Haggen Opco South, LLC**], a Delaware limited liability company ("**Assignor**") and [●], a [●] ("**Assignee**").

RECITALS:

Whereas, this Assignment is executed and delivered pursuant to the terms of that certain Asset Purchase Agreement dated [●], 2015 (the "**APA**"), by and between Assignor and Assignee (each term which is capitalized, but not defined, in this Assignment shall have the meaning ascribed to such term in the APA); and

For and in consideration of Ten Dollars ($10.00) and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Assignor desires to assign to Assignee the Lease described in **Schedule I** attached hereto and incorporated herein by this reference including all amendments, modifications, and supplements thereto and security deposits (if any) relating thereto (collectively, the "**Lease**"), and Assignee desires to accept an assignment of the Lease together with all right, title and interest of the Assignor thereunder.  The property encumbered by the Lease ("**Leased Premises**") is described on **Schedule II** attached hereto and incorporated herein.  The parties agree as follows:

**1.** Assignor hereby assigns to Assignee, and to Assignee's successors and assigns, all of Assignor's estate, right, title and interest as tenant of the leasehold estate described under the Lease (including, for greater certainty, all rights, privileges and options contained in the Lease), free and clear of all Liens (except Permitted Liens).

**2**.     Assignee hereby accepts said assignment, and assumes and agrees to pay, perform and discharge when due any and all of the Assumed Liabilities related to or arising under the Lease to the same extent as if the Assignee were named therein as the tenant thereunder.

**3**.     Each party executing this Assignment represents that he is authorized to do so on behalf of the entity for which he is signing and that his signature binds said entity.    This Assignment is binding upon and inures to the benefit of the parties hereto, their successors and assigns.    **[If Lease or Memorandum of Lease of record:** This Assignment shall be recorded in the appropriate public records of the county in which the Leased Premises is located.]

**4**.     The terms of the APA, including, but not limited to, the representations, warranties, covenants, agreements and indemnities relating to the Lease are incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the APA shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.   In the event of any conflict or inconsistency between the terms of the APA and the terms hereof, the terms of the APA shall govern**. For the avoidance of doubt, this Assignment shall not supersede in any respect, or otherwise effectuate any modification or waiver of, any provision of that certain Asset Purchase Agreement, dated December 10, 2014, by and among Haggen Holdings, LLC, Albertson's Holdings LLC and Buyer, as amended (the "2014 Agreement"), and the 2014 Agreement shall remain in full force and effect to the full extent provided therein, nor shall this Assignment impact or relate to any disputes or litigation relating to the 2014 Agreement, including the Haggen Litigation; in the event of any ambiguity in the terms of the 2014 Agreement and the terms of this Assignment regarding which agreement shall govern a particular matter, the terms of the 2014 Agreement shall govern such matter**.

**5**.     Assignor hereby agrees to pay all Cure Costs relating to the Lease as provided in section 5.1 of the APA.   Assignee shall not be liable for any liabilities arising from the Lease prior to the Closing Date (except Assumed Liabilities).

**6**.     This Assignment and Assumption of Lease shall be governed ~~by~~ and construed in accordance with the ~~internal~~ laws of the State of New York without giving effect to ~~any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction). The parties hereto agree that the Bankruptcy Court shall be the exclusive forum for enforcement of~~**the conflicts of laws principles thereof or of any other state, except to the extent that the Laws of such state are superseded by the Bankruptcy Code.  Without limiting any party's right to appeal any order of the Bankruptcy Court, the parties agree that if any dispute arises out of or in connection with** this Assignment and Assumption of Lease~~ or the Transactions and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; provided that if~~, the Bankruptcy Court ~~determines that it does not have~~**shall have exclusive personal and** subject matter jurisdiction ~~over any action or proceeding arising out of or~~**and shall be the exclusive venue to resolve any and all disputes** relating to this Assignment and Assumption of Lease~~, then each party: (a) agrees that all such actions or proceedings shall be~~

DOC ID – ~~23682888.1~~**23682888.9**

heard and determined in a New York federal court sitting in the City of New York; (b) irrevocably submits to the jurisdiction of such court in any such action or proceeding; (c) consents that any such action or proceeding may be brought in such courts and waives any objection that such party **and the transactions contemplated hereby. Such court shall have sole jurisdiction over such matters and the parties affected thereby and Assignor and Assignee each hereby consent and submit to such jurisdiction; provided, however, that if the Chapter 11 Case shall have closed and cannot be reopened, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York and any appellate court thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they** may now or hereafter have to the **laying of** venue or jurisdiction or that such action or proceeding was **of any such dispute** brought in an inconvenient court; and (d) agrees that service of process **such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. In the event any such action, suit or proceeding is commenced, the parties hereby agree and consent that service of process may be made, and personal jurisdiction over any party hereto** in any such action**, suit** or proceeding may be effected**obtained,** by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address as provided in section 7.4 of the APA (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by New York Law)**service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the party at the address of such party set forth in Section 7.4 of the APA, unless another address has been designated by such party in a notice given to the other parties in accordance with the provisions of Section 7.4 of the APA. Notwithstanding anything to the contrary in this Assignment, the Sale Order and the transactions contemplated thereunder, Assignee's participation in the Bankruptcy Cases for the purpose of obtaining approval of the sale of Assets, this Assignment, the Sale Order and all other actions taken, or that may be taken, by Assignee or its agents in connection with all of the foregoing shall not constitute, and shall not be deemed to constitute, Assignee's knowing and voluntary consent to have the Bankruptcy Court adjudicate any claims or causes of action, including any claims, counterclaims or causes of action arising in, or related to, the Haggen Litigation.**

7.    This Assignment, and the consents thereto, may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute a single instrument, and shall be effective upon the date first written above.

*[The remainder of the page is blank; signatures follow.]*

DOC ID - 23682888.12**3682888.9**

*LA 51933579v2*

*LA 51934594*

IN WITNESS WHEREOF, the parties have executed this Assignment as of the date first written above.

**ASSIGNOR**:

**[Haggen Opco South, LLC]**, a Delaware limited liability company

By:_____

Name:_____

Title:_____


THE STATE OF _____          )
                                     ) ss.
County of _____            )


On this _____ day of _____, 2015, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, to me known to be the _____ of [Haggen Opco South, LLC], the limited liability company that executed the foregoing instrument, and acknowledged to me that the said instrument is the free and voluntary act an deed of said limited liability company, for the uses and purposes therein mentioned, and on oath stated that he is authorized to execute the said instrument.

WITNESS MY HAND and official seal hereto affixed the day, month and year in this certificate first above written.

_____
Notary Public in and for the State of _____

Residing at _____

My commission expires: _____

**ASSIGNEE**:

[●],
a [●]

By:_____
Name:_____
Title:_____


THE STATE OF _____        )
                                 ) ss.
County of _____         )

   On this _____ day of _____, 20__, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, to me known to be the _____ of_____, the _____ that executed the foregoing instrument, and acknowledged to me that the said instrument is the free and voluntary act an deed of said limited liability company, for the uses and purposes therein mentioned, and on oath stated that he is authorized to execute the said instrument.

   WITNESS MY HAND and official seal hereto affixed the day, month and year in this certificate first above written.


_____
Notary Public in and for the State of _____
Residing at _____
My commission expires: _____


List of Schedules:
Schedule I - Lease

DOC ID - 23682888.123682888.9


*LA 51933579v2*

*LA 51934594*

Schedule II - Leased Premises

DOC ID - 23682888.123682888.9

*LA 51933579v2*

*LA 51934594*

## SCHEDULE I
### Lease

## SCHEDULE II
### Legal Description, Leased Premises

**Exhibit D**
**Form of Sale Order**

[See attached.]

Document comparison by Workshare Compare on Wednesday, November 25, 2015 2:37:52 PM

| Input: | |
|---|---|
| Document 1 ID | file://\\stroock\dfs01\FolderRedirection\NYOFolderRedirect\jlau\Desktop\Haggen\APAs filed 11-16\Revised Haggen APA (CLEAN).docx |
| Description | Revised Haggen APA (CLEAN) |
| Document 2 ID | file://C:\Users\jlau\AppData\Local\Temp\6\Workshare\wmtemp51b4\(51934594_1) Haggen - Albertsons APA (Filing Version).DOCX |
| Description | (51934594_1) Haggen - Albertsons APA (Filing Version) |
| Rendering set | Stroock-strikethru(color) |

| Legend: |
|---|
| **Insertion** |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 244 |
| Deletions | 280 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 524 |