## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HH LIQUIDATION, LLC, *et al.*,[1] | Case No. 15-11874 (KG) |
| | (Jointly Administered) |
| Debtors. | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF HH LIQUIDATION, LLC, *et al.*, | |
| Plaintiffs, | Adv. Pro. 16-_____ (KG) |
| -against- | |
| COMVEST GROUP HOLDINGS, LLC, COMVEST INVESTMENT PARTNERS III, L.P., COMVEST INVESTMENT PARTNERS IV, L.P., COMVEST HAGGEN HOLDINGS III, LLC, COMVEST HAGGEN HOLDINGS IV, LLC, COMVEST ADVISORS, LLC, HAGGEN PROPERTY HOLDINGS, LLC, HAGGEN PROPERTY SOUTH, LLC, HAGGEN PROPERTY NORTH, LLC, HAGGEN PROPERTY HOLDINGS II, LLC, HAGGEN SLB, LLC, JOHN CAPLE, CECILIO RODRIGUEZ, MICHAEL NIEGSCH, JOHN CLOUGHER, BLAKE BARNETT, WILLIAM SHANER and DERRICK ANDERSON, | |
| Defendants. | |

## COMPLAINT AND OBJECTION TO CLAIMS

Dated: September 7, 2016

**PACHULSKI STANG ZIEHL & JONES LLP**
Bradford J. Sandler (Bar No. 4142)
Robert J. Feinstein (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: HH Liquidation, LLC (f/k/a Haggen Holdings, LLC) (7558); HH Operations, LLC (f/k/a Haggen Operations Holdings, LLC) (6341), HH OpCo South, LLC (f/k/a Haggen OpCo South, LLC) (7257), HH OpCo North, LLC (f/k/a Haggen OpCo North, LLC) (5028), HH Acquisition, LLC (f/k/a Haggen Acquisition, LLC) (7687), and HH Legacy, Inc. (f/k/a Haggen, Inc.) (4583). The mailing address for each of the Debtors is 2211 Rimland Drive, Bellingham, WA 98226.

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ....................................................... 1

    A.    Preliminary Statement....................................................... 1

    B.    Summary of Comvest's Scheme............................................ 3

    C.    Comvest's Failed Scheme Leads to the Debtors' Bankruptcy and Reveals Fraudulent Transfers and Breaches of Fiduciary Duty ......................... 5

THE PARTIES.......................................................................... 7

    A.    The Plaintiff ...................................................................... 7

    B.    The Defendants ................................................................. 9

JURISDICTION AND VENUE ............................................... 14

STATEMENT OF FACTS ....................................................... 14

    A.    Haggen's Background....................................................... 14

    B.    Overview of the Albertson's Transaction and Related Structuring .................... 15

    C.    Specific Elements of the Albertson's Acquisition and Related Structuring ........ 21

    D.    Comvest Segregates Albertson's Real Estate Assets for Itself .......................... 23

    E.    Step 1:  Formation of a New Corporate Structure Including PropCo, SLB and  OpCo Entities ................................................................. 24

    F.    Step 2:  Holdings Transfers the Real Property to the Bankruptcy Remote Entities for No Consideration ............................................. 27

    G.    Step 3:  Finance the Acquisition Through Sale Leaseback Agreements ............. 28

        1.    The SLB Entities Sell the Real Property................................... 30

        2.    The SLB Leases are Imposed on the OpCo Entities, not the SLB Entities ................................................................. 33

    H.    Step 4: Contribute the Remaining Real Property to the PropCo Entities ........... 34

    I.    Step 5:  Comvest Extracts More Value by Imposing Onerous Leases on the OpCo Entities ................................................................. 36

    J.    Haggen's "Plan" to Absorb the Albertson's Stores was an Unmitigated Disaster ................................................................. 37

    K.    The PropCo Entities "Loan" $25 million to the OpCo Entities on the Eve of Bankruptcy................................................................. 39

    L.    Comvest's Domination and Control Harmed the Debtors.................................. 41

CAUSES OF ACTION .............................................................................................................. 43

PRAYER FOR RELIEF ........................................................................................................... 135

APPENDIX I:  DEFINITIONS

APPENDIX II:  SUMMARY OF CAUSES OF ACTION

The Official Committee of Unsecured Creditors of HH Liquidation, LLC (the "Committee" or the "Plaintiff")[2] and its affiliated debtors and debtors in possession (collectively, the "Debtors"), by its undersigned counsel, derivatively on behalf of the Debtors, as and for its Complaint against Comvest Group Holdings, LLC ("CGH"), Comvest Investment Partners III, L.P. ("CIP III"), Comvest Investment Partners IV, L.P. ("CIP IV"), Comvest Haggen Holdings III, LLC ("CHH III"), Comvest Haggen Holdings IV, LLC ("CHH IV"), Comvest Advisors, LLC ("Comvest Advisors" and together with CGH, CIP III, CIP IV, CHH III, and CHH IV, "Comvest"), non-Debtor affiliates Haggen Property Holdings, LLC ("Property Holdings"), Haggen Property South LLC ("PropCo South"), Haggen Property North, LLC ("PropCo North" and together with Property Holdings and PropCo South, the "PropCo Entities"), Haggen Property Holdings II, LLC ("Property Holdings II"), and Haggen SLB, LLC ("Haggen SLB" and together with Property Holdings II, the "SLB Entities"), and John Caple ("Caple"), Cecilio Rodriguez ("Rodriguez"), Michael Niegsch ("Niegsch"), John Clougher ("Clougher"), Blake Barnett ("Barnett"), William Shaner ("Shaner"), and Derrick Anderson ("Anderson" and together with Caple, Rodriguez, Niegsch, Clougher, Barnett, and Shaner, the "Officers and Directors," and the Officers and Directors together with Comvest, the PropCo Entities, and the SLB Entities, the "Defendants"), alleges upon knowledge as to its own status, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

### A.    Preliminary Statement

1.    Plaintiff seeks the avoidance of fraudulent transfers and monetary damages for egregious breaches of fiduciary duty arising from a convoluted Machiavellian

---

[2] For convenience, attached as Appendix I is a list of all defined terms used in this Complaint.

scheme whereby Debtor HH Liquidation, LLC (f/k/a Haggen Holdings, LLC) ("Holdings")

acquired 146 supermarkets from Albertson's early last year,[3] and then covertly siphoned away

valuable real estate assets that Haggen acquired from Albertson's so they would not be available

to satisfy the claims of the Debtors' suppliers, landlords, employees and other unsecured

creditors.  This elaborate scheme was done at the direction, and for the benefit, of the Debtors'

controlling shareholder, Comvest.

      2.      Comvest devised a way for Haggen,[4] which until then owned and operated

only 18 supermarkets, to finance the purchase of 146 stores from Albertson's.  Comvest caused

Haggen to create new operating subsidiaries, or "OpCo Entities," that would conduct business

and incur substantial liabilities, while covertly stripping away the valuable real estate assets and

transferring them gratuitously into putative bankruptcy remote non-Debtor "PropCo Entities" for

Comvest's own benefit and to the intended detriment of Haggen's creditors, who were unaware

of Comvest's behind-the-curtain machinations.

      3.      Immediately after consummating the acquisition and related sale-

leaseback and other transactions concocted by Comvest, the newly formed OpCo Entities were

forced to operate under the weight of store leases with substantial and artificially-inflated rental

obligations imposed on them.  Almost immediately after being formed, the OpCo Entities

experienced devastating financial losses in stores that were previously profitable.  Haggen's

mounting operating losses, which were exacerbated by management's ineptitude in converting

the newly-acquired stores to the Haggen brand in an abbreviated time frame, resulted in an epic

---

[3] The 146 stores were acquired from Albertson's LLC and Albertson's Holdings LLC (together, "Albertson's"), Safeway, Inc. ("Safeway") and The Von Companies, Inc.  Upon information and belief, Safeway and The Von Companies, Inc. are or were affiliates of Albertson's and assignors of some of the stores' leases described in this Complaint.  For the sake of brevity, the Complaint refers to them collectively as "Albertson's" when appropriate.

[4] References to "Haggen" are to the entire Haggen enterprise as it may have existed at the referenced time period, including all subsidiaries and affiliates, and without regard to whether any entity was a debtor at the referenced time period.

failure.  Less than a year after the acquisition, the Debtors defaulted on their debt obligations,

filed for bankruptcy, and sold off all of their store locations, even the original 18 stores, leaving

approximately $100 million dollars of unsatisfied liabilities owed to suppliers, landlords and

laid-off employees.

4.      In short, this is a case of corporate opportunism and greed run amok that

inflicted massive financial harm on the debtor OpCo Entities and their creditor constituencies.

**B.      Summary of Comvest's Scheme**

5.      Haggen started in 1933 as a family-owned business operating a single

grocery store.  Over the ensuing decades, the Haggen family built a successful operation and

opened 29 additional stores in Washington and Oregon, all owned by a single entity, Haggen,

Inc. (n/k/a HH Legacy, Inc.).  In 2011, however, the Haggen family sold a majority interest in

Haggen to a private equity firm, Comvest.  Under Comvest's ownership and control, Haggen

initially downsized its business, closing ten locations over the next two years.  By 2014, Haggen

was a somewhat smaller, but profitable, chain of 18 grocery stores and one stand-alone pharmacy

that was not highly leveraged and was able to meet its obligations as they came due.  That all

came to an abrupt end in late 2014, when Albertson's announced that it was required to dispose

of approximately 168 supermarkets (presumably at forced-sale prices) in five Western states in

order to gain FTC approval of its acquisition of Safeway.  Under Comvest's control, Haggen

acquired 146 of those stores, a massive overnight expansion of more than 800% that it proposed

to accomplish in a mere couple of months.  For approximately $309 million, Holdings contracted

to purchase the 146 stores, including the valuable fee owned properties and long-term ground

leases associated with many of the stores, having a combined appraised value in excess of $450

million.

6.     Instead of causing Holdings (or subsidiaries) to pay for and receive the Albertson's assets, Comvest concocted a series of complex and inter-dependent transactions designed to strip away the real estate assets to be acquired from Albertson's and place those real estate assets into separate PropCo entities to benefit itself, and isolate those real property assets from the reach of the Debtors' suppliers, landlords, employees and other creditors who would be surreptitiously relegated to look for payment only to insolvent "OpCo Entities" which were doomed to fail.  Comvest's scheme had five key steps:

a.     First, Comvest devised and created a new corporate structure below Holdings, which it principally owned, under which both OpCo Entities (*i.e.*, "operating entities" that would incur liabilities to suppliers, landlords, employees, etc.) and putatively separate "asset-holding entities" (*i.e.*, non-debtor entities, including the PropCo Entities and the SLB Entities, that, as intended, had no creditors) were established.

b.     Second, the rights to acquire certain of the real estate assets from Albertson's were gratuitously "contributed," *i.e.*, transferred for no consideration, into the newly-created SLB Entities, which then immediately sold those properties to third parties for over $350 million pursuant to "sale leaseback" transactions under which the SLB Entities received the proceeds but the OpCo Entities (and not the SLB Entities) were made the obligors under the leases.  A portion of the sale leaseback proceeds were remitted to Albertson's to finance the transaction, and the balance was retained by the SLB Entities, for Comvest's benefit.

c.     Third, Comvest caused Holdings to gratuitously "contribute" its rights to acquire the remaining real estate assets from Albertson's into the newly-created PropCo Entities.  The PropCo Entities were ostensibly separate and insulated from the operating entities, and thus their newly-acquired assets were intended to be shielded from the operating liabilities for Comvest's ultimate benefit.

d.     Fourth, a portion of the funds received by the SLB Entities in the sale-leaseback transactions was used to finance Holdings' acquisition of the remaining fee-owned and ground-lease properties that Albertson's transferred to the PropCo Entities.

e.     Finally, leases and sub-leases were created between the PropCo Entities and the OpCo Entities with substantial, above-market rent obligations imposed on the OpCo Entities that quickly contributed to the destruction of their profitability.

7.      The aggregate effect of these transactions was akin to a leveraged buyout, in that Comvest financed the Albertson's acquisition by leveraging the acquired real estate assets, and further did so in a way that attempted to hive off the most valuable real estate assets into entities that would be shielded from the substantial liabilities associated with operating over 160 supermarkets in five states.

8.      Comvest designed a structure of PropCo and OpCo Entities, together with an unconventional sale-leaseback structure whereby the SLB Entities received the sale proceeds, which were used to pay for the acquired real estate assets, but the OpCo Entities were forced to incur the massive rental obligations that were the functional equivalent of debt service obligations, to leverage the assets and accomplish its goal of ensuring that none of its capital was at risk.  Although Comvest made a $50 million equity contribution, it structured the transaction in such a way that it received real estate assets worth more than $100 million and placed those assets into the PropCo Entities, which they fully intended to be bankruptcy-remote entities.

9.      The PropCo Entities are owned by Holdings, a holding company 80% owned by Comvest.  Comvest's scheme was designed to minimize its risk profile by keeping the real property assets available for itself even if the OpCo Entities failed and outside creditors were left holding the proverbial empty bag.

C.      **Comvest's Failed Scheme Leads to the Debtors' Bankruptcy and Reveals Fraudulent Transfers and Breaches of Fiduciary Duty**

10.      The transaction quickly proved to be a fiasco.  Due to, among other things, the lack of preparedness on Comvest's and Haggen's part to properly transition the Albertson's stores to Haggen's format and to operate the new, much larger grocery store chain, and the imposition of above-market rents on the OpCo Entities under the sale-leaseback and PropCo leases, the acquisition failed spectacularly, with devastating consequences for the OpCo Entities'

creditors and employees.  Within nine (9) months, the OpCo Entities' supermarkets were experiencing massive operating losses, the Debtors defaulted on their credit line with PNC Bank, and were in full retreat.  On September 8, 2015, only months after consummating the last store acquisition, the Debtors filed for bankruptcy protection and moved quickly to liquidate 100 of the 146 stores that were acquired only months before.  Within months, every store – even the original 18 – was liquidated, selling for an aggregate sales price that satisfied the Debtors' secured debts, but left unsatisfied over $100 million of liabilities owed to suppliers, third party landlords, employees and other creditors.  By any measure, the acquisition was a debacle for all involved, except Comvest.[5]  Relying on the convoluted corporate and capital structure it developed, Comvest tried to slink away from the smoldering ruins of Haggen with more than $100 million dollars' worth of real estate assets harbored in the non-debtor PropCo Entities.

11.     Regardless of whether the multiple interrelated transfers and transactions described herein are collapsed into a single transaction or are considered as a series of separate steps, they constitute a fraudulent transfer that cannot withstand scrutiny and must be set aside under the applicable provisions of Chapter 5 of the Bankruptcy Code.  Avoidance of these transfers under applicable law would thus make the assets of the PropCo and SLB Entities available to satisfy unpaid claims against the Debtors.

12.     In addition, Plaintiff asserts claims arising from the same facts and circumstances for damages for breach of fiduciary duty, equitable subordination, substantive consolidation, and the disallowance of the PropCo Entities' claims against the Debtors' estates,

---

[5] Ironically, Albertson's reacquired a large number of these stores with FTC approval.

including an eleventh-hour "loan" by the PropCo Entities to the OpCo Entities made in a failed effort to shore up their finances and avoid bankruptcy.[6]

## THE PARTIES

**D.**   **The Plaintiff**

13.     On September 8, 2015 (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under title 11 of the United States Code (the "Bankruptcy Code").  These cases are being jointly administered for procedural purposes pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  No trustee or examiner has been appointed in the Debtors' cases.

14.     On September 21, 2015, the United States Trustee for Region 3 appointed the Committee to represent the interests of all general unsecured creditors in these cases pursuant to section 1102 of the Bankruptcy Code.

15.     On January 14, 2016, Plaintiff, the Debtors, Comvest, the PropCo Entities, and Property Holdings II executed and filed that certain *Stipulation and Order (1) Granting Derivative Standing to the Official Committee of Unsecured Creditors to Commence Litigation Against Haggen Property Holdings, LLC, Haggen Property South, LLC, Haggen Property North, LLC, Haggen Property Holdings II, LLC, Haggen Property Holdings III, LLC, Comvest Partners and/or Directors and Officers Thereof; and (2) Providing for a Litigation Standstill*, at Docket No. 1216 (the "Initial Standing Stipulation").  On January 15, 2016, the Court approved the Initial Standing Stipulation.  *See* Docket No. 1235.

16.     On April 29, 2016, Plaintiff and the Debtors executed and filed that certain *Stipulation and Order Granting Derivative Standing to the Official Committee of Unsecured*

---

[6]  For convenience, attached as Appendix II is a chart identifying in general terms each of Plaintiff's causes of action.

*Creditors to Commence Litigation Against Haggen SLB, LLC and/or its Past and/or Present Directors and Officers*, at Docket No. 1858 (the "Second Standing Stipulation" and together with the Initial Stipulation, the "Standing Stipulations").  On May 2, 2016, the Court approved the Second Standing Stipulation.  *See* Docket No. 1858.

      17.    Pursuant to the Standing Stipulations, Plaintiff has derivative standing to assert and prosecute the claims asserted in this Complaint on behalf of the Debtors and their bankruptcy estates.

      18.    Holdings, one of the Debtors on whose behalf Plaintiff brings these causes of action, is a limited liability company formed under the laws of the state of Delaware with a business address of 2211 Rimland Drive, Bellingham, Washington.  Upon information and belief, prior to the Petition Date, Comvest or certain of its affiliates owned the majority of the interests of Holdings and acted as its manager.  Holdings, in turn, directly or indirectly owned and operated approximately 18 supermarkets and one pharmacy in Oregon and Washington before contracting  to purchase 146 stores from Albertson's.

      19.    HH Operations, LLC (f/k/a Haggen Operations Holding, LLC) ("Operations"), one of the Debtors on whose behalf Plaintiff brings these causes of action, is a limited liability company formed at the time of the Albertson's transaction under the laws of the state of Delaware with a business address of 2211 Rimland Drive, Bellingham, Washington.  Upon information and belief, prior to the Petition Date, Operations was owned and managed by its sole member, Holdings.

      20.    HH OpCo South, LLC (f/k/a Haggen OpCo South, LLC) ("OpCo South"), one of the Debtors on whose behalf Plaintiff brings these causes of action, is a limited liability company formed at the time of the Albertson's transaction under the laws of the state of

Delaware with a business address of 2211 Rimland Drive, Bellingham, Washington.  Upon information and belief, prior to the Petition Date, OpCo South was owned and managed by its sole member, Operations.

21.    HH OpCo North, LLC (f/k/a Haggen OpCo North, LLC) ("OpCo North," and together with OpCo South, the "OpCo Entities"), one of the Debtors on whose behalf Plaintiff brings these causes of action, is a limited liability company formed at the time of the Albertson's transaction under the laws of the state of Delaware with a business address of 2211 Rimland Drive, Bellingham, Washington.  Upon information and belief, prior to the Petition Date, OpCo North was owned and managed by its sole member, Operations.

22.    HH Acquisition, LLC (f/k/a Haggen Acquisition, LLC) ("Acquisition"), one of the Debtors on whose behalf Plaintiff brings these causes of action, is a limited liability company formed under the laws of the state of Delaware with a business address of 2211 Rimland Drive, Bellingham, Washington.  Upon information and belief, prior to the Petition Date, Acquisition was owned and managed by its sole member, Operations.

23.    HH Legacy, Inc. (f/k/a Haggen, Inc.) ("Haggen, Inc."), one of the Debtors on whose behalf Plaintiff brings these causes of action, is a limited liability company formed under the laws of the state of Delaware with a business address of 2211 Rimland Drive, Bellingham, Washington.  Upon information and belief, prior to the Petition Date, Haggen, Inc. was owned and managed by its sole member, Acquisition.

**E.    The Defendants**

24.    Defendant CGH is a limited liability company formed under the laws of the state of Delaware.  Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808 ("CSC"), is CGH's registered agent.

25.     Upon information and belief, Defendant CIP III is a limited partnership formed under the laws of the state of Delaware, and is owned and/or controlled, directly or indirectly, by CGH.  CSC is CIP III's registered agent.

26.     Upon information and belief, Defendant CIP IV is a limited partnership formed under the laws of the state of Delaware, and is owned and/or controlled, directly or indirectly, by CGH.  CSC is CIP IV's registered agent.

27.     Upon information and belief, Defendant CHH III is a limited liability company formed under the laws of the state of Delaware, and is owned and/or controlled, directly or indirectly, by CGH.  CSC is CHH III's registered agent.

28.     Upon information and belief, Defendant CHH IV is a limited liability company formed under the laws of the state of Delaware, and is owned and/or controlled, directly or indirectly, by CGH.  CSC is CHH IV's registered agent.

29.     Upon information and belief, Defendant Comvest Advisors is a limited liability company formed under the laws of the state of Delaware, and is owned and/or controlled, directly or indirectly, by CGH.  CSC is Comvest Advisors' registered agent.

30.     Defendant Property Holdings is a limited liability company formed at the time of the Albertson's transaction under the laws of the state of Delaware with a business address of 2211 Rimland Drive, Bellingham, Washington.  Upon information and belief, at all relevant times prior to the Petition Date, Property Holdings had no officers or employees and was owned and managed by its sole member, Debtor Holdings.

31.     Defendant PropCo South is a limited liability company formed at the time of the Albertson's transaction under the laws of the state of Delaware with a business address of 2211 Rimland Drive, Bellingham, Washington.  Upon information and belief, at all relevant

times prior to the Petition Date, PropCo South had no officers or employees and was owned and managed by its sole member, non-Debtor Defendant Property Holdings.

32.    Defendant PropCo North is a limited liability company formed at the time of the Albertson's transaction under the laws of the state of Delaware with a business address of 2211 Rimland Drive, Bellingham, Washington.  Upon information and belief, at all relevant times prior to the Petition Date, PropCo North had no officers or employees and was owned and managed by its sole member, non-Debtor Defendant Property Holdings.

33.    Defendant Property Holdings II is a limited liability company formed at the time of the Albertson's transaction under the laws of the state of Delaware, with a business address of 2211 Rimland Drive, Bellingham, Washington.  Upon information and belief, at all relevant times prior to the Petition Date, Property Holdings II had no officers or employees and was owned and managed by its sole member, Debtor Holdings.

34.    Defendant Haggen SLB is a limited liability company formed at the time of the Albertson's transaction under the laws of the state of Delaware, with a business address of 2211 Rimland Drive, Bellingham, Washington.  Upon information and belief, at all relevant times prior to the Petition Date, Haggen SLB had no officers or employees and was owned and managed by its sole member, Debtor Acquisition.

35.    Upon information and belief, Defendant John Caple is an individual residing in the state of Florida.  At all relevant times, Mr. Caple was a Partner in Comvest Partners.  In addition, Mr. Caple has served as (a) a Manager of Holdings since at least January 1, 2014, as well as President and Chief Executive Officer for the period beginning no later than January 1, 2014 through January 30, 2015, and (b) a Director of Haggen, Inc. since at least January 1, 2014.

36.     Upon information and belief, Defendant Cecilio Rodriguez is an individual residing in the state of Florida.  At all relevant times, Mr. Rodriguez was the Chief Financial Officer of Comvest Partners.  In addition, Mr. Rodriguez has served as (a) Secretary and Chief Financial Officer of Holdings for the period November 24, 2014 through January 30, 2015, as well as a Manager of Holdings since November 24, 2014, and (b) a Director of Haggen, Inc. for the period beginning no later than September 1, 2014 through December 6, 2014.

37.     Upon information and belief, Defendant Michael Niegsch is an individual residing in the state of Florida.  At all relevant times, Mr. Niegsch was a Vice President of Comvest Partners.  In addition, Mr. Niegsch has served as a Manager of Holdings since January 30, 2015.

38.     Upon information and belief, Defendant John Clougher is an individual residing in the state of Washington.  Mr. Clougher has served as Chief Executive Officer of (a) Holdings since January 30, 2015, as well as a Manager of Holdings since that time, (b) Acquisition since December 6, 2014, (c) Haggen, Inc. since September 8, 2014, as well as President since that time, Treasurer for the period September 8, 2014 through January 1, 2015, and Director since December 6, 2014, (d) Operations since December 22, 2014, (e) OpCo North since December 2, 2014, as well as President since that time, (f) Haggen SLB since December 2, 2014, as well as President since that time, (g) Property Holdings for the period December 2, 2014 through October 8, 2015, (h) Property Holdings II for the period December 2, 2014 through October 8, 2015, (i) Haggen Property Holdings III, LLC ("Property Holdings III") for the period December 2, 2014 through October 8, 2015, and (j) PropCo North for the period December 2, 2014 through October 8, 2015.

39.     Upon information and belief, Blake Barnett is an individual residing in the state of Washington.  Mr. Barnett has served as the Chief Financial Officer of (a) Holdings since January 30, 2015, (b) Acquisition since January 30, 2015, (c) Haggen, Inc. since January 1, 2015, (d) Operations since December 22, 2014, (e) OpCo North since December 2, 2015, (f) Property Holdings from December 2, 2014 through October 8, 2015, (g) Property Holdings II from December 2, 2014 through October 8, 2015, (h) Property Holdings III from December 2, 2014 through October 8, 2015, (i) Haggen SLB since December 2, 2015, (j) OpCo South since December 2, 2014 (as well Vice President since October 29, 2015), (k) PropCo South from December 2, 2014 through October 8, 2015, and (l) PropCo North from December 2, 2014 through October 8, 2015.

40.     Upon information and belief, William Shaner is an individual residing in the state of Washington.  Mr. Shaner served as (a) a Manager and President of Haggen Holdings LLC (n/k/a HH Liquidation, LLC) from January 30, 2015 to September 2, 2015; (b) President of Acquisition from January 30, 2015 to September 2, 2015; (c) President of Operations from December 22, 2014 to September 2, 2015; and (d) President and Chief Executive Officer of OpCo South from December 2, 2014 to September 2, 2015.

41.     Upon information and belief, Derrick Anderson is an individual residing in the state of Washington.  Mr. Anderson has served as the Secretary of (a) Holdings since January 30, 2015, (b) Acquisition since December 6, 2014, (c) Haggen, Inc. since September 8, 2014, (d) Operations since December 22, 2014, (e) OpCo South since December 2, 2014 (as well as Vice President since October 29, 2015), (f) OpCo North since December 2, 2014, (g) Haggen SLB since December 2, 2014, (h) Property Holdings from December 2, 2014 through October 8, 2015, (i) Property Holdings II from December 2, 2014 through October 8, 2015, (j) Property

13

Holdings III from December 2, 2014 through October 8, 2015, (k) PropCo North from December 2, 2014 through October 8, 2015, (l) PropCo South from December 2, 2014 through October 8, 2015.[7]

## JURISDICTION AND VENUE

42.     The Court has jurisdiction over this action under 28 U.S.C. §§ 157(a) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and Plaintiff confirms its consent pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware to the entry of final orders by the Court for the matters contained herein to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## STATEMENT OF FACTS

**A.     Haggen's Background**

43.     Haggen was founded in 1933 as a single grocery store.  In the ensuing decades, the Haggen family successfully operated the company and opened additional stores.  In 1962, the Haggen family concentrated all of their business activities in a single corporate entity, Haggen, Inc.  By 2011, Haggen, Inc. owned and operated a successful 30-store chain of grocery stores in the states of Washington and Oregon.

---

[7] For the avoidance of doubt, the Officers and Directors are being sued solely in their capacities as officers and directors of the applicable Haggen entities and not in their capacities as officers and directors of any Comvest entity. However, as applicable, the relationship between each Director and Comvest is alleged.

44.      In 2011, the Haggen family sold an 80% equity interest in Haggen, Inc. to a Florida-based private equity firm, Comvest.  Specifically, defendant CGH, a Comvest entity, purchased its majority stake in Haggen, Inc. through two limited liability companies that it formed for that purpose.  Thus, in January 2011, CGH formed Holdings, and acquired 80% of the membership interests of that entity with the Haggen family obtaining the balance of the membership interests.  At about the same time, CGH also formed Acquisition.  Holdings solely owned the membership interests in Acquisition, and Acquisition owned all of the stock of Haggen, Inc.

45.      Over the next four years, Haggen closed a number of stores and as of the end of 2014, Haggen operated 18 grocery stores and one pharmacy on a profitable basis.

**B.      Overview of the Albertson's Transaction and Related Structuring**

46.      As described in more detail below, in December 2014, Holdings contracted to acquire 146 grocery stores and related real estate assets from Albertson's (the "Albertson's Acquisition").

47.      From when the Albertson's opportunity first presented itself earlier in 2014, Comvest was focused on making a "real estate play" as opposed to simply expanding the Haggen supermarket chain, as well as minimizing its risk in the transaction and enriching itself even at the expense of outside creditors.  After first learning certain Albertson's stores in Washington and Oregon were going to come to market in or about August 2014, Comvest ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████  By November, after the package of stores to be acquired was expanded, Comvest had settled on a path forward.

48.    A total of 146 supermarkets and associated real estate (fee owned interests, long-term ground leases and store leases) were to be acquired by Holdings from Alberton's under the final purchase agreement.  Seventy-nine (79) of the supermarkets acquired from Albertson's were stores that were leased by Albertson's or Safeway from third-party landlords (the "Leased Stores"), while the other sixty-seven (67) stores (the "Real Property") either were situated on very valuable fee-owned real estate or were stores built and/or owned by Albertson's or Safeway but which were subject to very valuable long-term ground leases that Albertson's had with third-party landlords.

49.    Unlike the Real Property, which were the subject of the convoluted transactions challenged herein, the Leased Stores were simply assigned by Holdings to the OpCo Entities, and the OpCo Entities thereafter paid rent directly to the third-party landlords.  As a result, the Leased Stores are not the subject of any of Plaintiff's fraudulent transfer claims.

50.    However, at Comvest's direction, the valuable Real Property assets acquired by Holdings (the purchaser under the agreement with Albertson's) were transferred for no consideration to one of the newly-created "bankruptcy-remote" entities (*i.e.*, either one of the PropCo Entities or one of the SLB Entities), with the dual intention leverage them to fund the acquisition and placing their substantial remaining equity value beyond the reach of the claims of the OpCo Entities' suppliers, employees and other creditors, in a series of simultaneous, inter-related transactions.

51.     Comvest and the Officers and Directors carried out this plan with mechanical precision, as a multitude of entities and transaction documents had to be crafted to achieve their convoluted scheme.  First, before executing its agreement with Albertson's, Comvest and the Officers and Directors caused Holdings to create an elaborate new corporate structure -- including the creation of at least ten (10) new entities -- designed to separate the operating companies from bankruptcy-remote entities that would receive and hold the valuable Real Property and the rights and benefits related thereto for Holdings' and ultimately Comvest's benefit.

52.     After establishing the new corporate structure, Holdings "contributed" or transferred 39 of the 67 parcels of Real Property to one of the SLB Entities for no consideration, whereupon they were immediately sold by the applicable SLB Entity in atypical "sale leaseback transactions" to third parties for an aggregate price of approximately $358.8 million.  Upon information and belief, the sale proceeds were distributed, directly or indirectly, as follows: (a) approximately $232.4 million was sent to Albertson's to satisfy a portion of Holding's overall purchase price; and (b) approximately $126.4 million was sent to the SLB Entities (and of that amount, approximately $76.2 million was sent to Albertson's to purchase certain Real Property on behalf of the PropCo Entities).

53.     What made the sale-leaseback transactions atypical is that the sellers, the SLB Entities, received the economic benefits, *i.e.*, the sale proceeds, but in a departure from conventional sale-leaseback transactions, the OpCo Entities -- not the SLB Entities -- were burdened with leasing back the properties, and at rental rates that were inflated well-above market in order to generate more sale proceeds.  In this manner, the proceeds from the sale-leaseback sales were used for Comvest's ultimate benefit (since the SLB Entities, the PropCo

Entities and Holdings were intended to be bankruptcy-remote entities), but the financial obligations incurred to acquire those properties were imposed on the OpCo Entities, to the detriment of their unsuspecting suppliers and other creditors.

54.     The remainder of the 28 Real Property assets were gratuitously transferred into one of the PropCo Entities and then leases were created between the applicable Propco Entity and one of the OpCo Entities at inflated rents, thereby extracting more value for Comvest. For those parcels of Real Property subject to third-party ground leases that were conveyed to one of PropCo Entities, the applicable the PropCo Entity (a) assumed the obligations under such ground lease, but (b) then imposed a sub-lease on the OpCo Entities that required payment of both the rent due under the ground lease, plus inflated "market rent," resulting in total rent substantially in excess of the rent owed under the underlying ground lease and fair market rent.

55.     Upon information and belief, the aggregate value of the Real Property assets Holdings ended up gratuitously transferring to the PropCo Entities was approximately $118.3 million.  In addition, the PropCo Entities were further enriched by the rents thereafter paid by the OpCo Entities to the PropCo Entities following the closing of the transaction.

56.     The acquisition of the various properties from Albertson's was orchestrated to set up the assets in a complicated web of interrelated companies and transactions, as depicted in the following manner:



57.     While Comvest planned the transaction to benefit the PropCo Entities,

Holdings and ultimately itself, the economic burdens of the transaction were placed on the OpCo

Entities in the form of above-market rents imposed on PropCo and sale leaseback stores, or in

the case of properties subject to ground leases, substantial  increases in rent above market rates.

The massive and inflated rental obligations incurred by the OpCo Entities contributed directly to

their rapid collapse, as almost immediately after the closing a large number of previously

profitable stores began losing money and continued to do so in the ensuing months leading up to

Haggen's precipitous bankruptcy filing and liquidation.

58.    Management was not prepared to operate such a large chain of grocery stores and their complete failure to timely and effectively remodel and transition the Albertson's stores to the Haggen banner contributed to the Debtors' collapse.  In just several months' time, the Debtors defaulted on their bank debt and filed for bankruptcy with a plan to immediately sell most of the stores they had just acquired, and ultimately all of the stores were liquidated leaving a huge financial hole.

59.    Unsuspecting creditors are owed approximately $100 million for which they believed they could look to all of Haggen's assets for satisfaction.  Since Holdings was and remains a privately held entity, with few exceptions, vendors, landlords and other creditors doing business with the Debtors were totally unaware until the bankruptcy filing that Comvest and Holdings had secretly developed and implemented their scheme to balkanize the assets and place the most valuable acquired assets, the Real Property, beyond their reach in putatively bankruptcy-remote PropCo Entities.  The Debtors' bankruptcy filing has exposed Comvest's scheme to enrich itself at the expense of the Debtors' creditors.

60.    To summarize, at Comvest's direction, Holdings (a) created a new and elaborate corporate structure designed to separate and shield the valuable Real Property from Haggen's operating liabilities and creditors, (b) used a significant portion of the Real Property acquired from Albertson's to finance the acquisition, (c) placed the remaining proceeds and Real Property into the PropCo Entities ostensibly beyond the reach of creditors for no consideration, and (d) siphoned substantial additional value from the OpCo Entities by imposing leases with above-market rent obligations.  Each of these transactions was actually or constructively fraudulent.

61.     The transactions should also be collapsed and viewed as a single, integrated transaction because each of the Defendants knew of the components, all of which were coordinated and developed together and conditioned on one another.

**C.      Specific Elements of the Albertson's Acquisition and Related Structuring**

62.     As indicated, Comvest concocted and implemented a lengthy list of steps and transactions to effectuate its scheme.  The salient steps, transactions, and sequence of events are as follows.

63.     In March 2014, AB Acquisition LLC (Albertson's parent company) and Safeway executed a merger agreement pursuant to which AB Acquisition LLC acquired all of Safeway's outstanding common stock.

64.     The Federal Trade Commission (the "FTC") required Albertson's to divest 168 stores as a condition to closing.  Haggen determined to submit a bid and prepared and presented a business plan to Albertson's and the FTC and thereby gained conditional approval to acquire 146 of those stores.

65.     Thereafter, Albertson's LLC and Albertson's Holdings LLC, as sellers, and Holdings, as the buyer, entered into that certain Asset Purchase Agreement, dated as of December 10, 2014 (the "APA").

66.     On January 27, 2015, the FTC issued an order approving Holdings' acquisition of 146 stores from Albertson's.

67.     On or about January 30, 2015, Comvest Advisors entered into that certain Amended and Restated Management Agreement with Holdings, Haggen, Inc., OpCo South and OpCo North (together with the original Management Agreement between Comvest Advisors and Haggen, Inc., dated August 29, 2011, and any amendments thereto, the "Comvest Management Agreement").  Upon information and belief, Haggen paid Comvest certain fees and expenses,

purportedly pursuant to the Comvest Management Agreement (such fees and expenses, collectively, the "Comvest Fees").

68.     The Albertson's Acquisition and Haggen's working capital requirements were funded by: (a)  proceeds from the Sale Leaseback Transactions (as defined below), (b) a capital contribution from Comvest, and (c) the PNC Revolver (as defined below), which essentially was used to purchase the store inventory.

69.     Upon information and belief, in connection with the Albertson's Acquisition, Comvest made an equity investment in Holdings in the aggregate amount of $51.5 million (the "Comvest Investment").  This investment was made pursuant to two Subscription Agreements dated January 30, 2015, whereby (i) CHH III purportedly paid $10.815 million for a certain number of Holdings' Class A Units, and (ii) CHH IV purportedly paid $40.685 million for a certain number of Holdings' Class A Units.  John Caple, a Comvest Partner and Manager of Holdings, signed each Subscription Agreement on behalf of both Holdings and the applicable Comvest entity.

70.     Upon information and belief, Haggen paid Comvest $1.5 million as a "transaction fee" in connection with the Comvest Investment (together with the Comvest Fees, the "Comvest Payments"), effectively reducing the Comvest Investment to $50 million.

71.     Comvest attempted to make the Comvest Investment a riskless endeavor. As described herein, while Comvest was purportedly making a $50 million equity investment in Holdings, it was also simultaneously executing a scheme to shelter for its benefit real estate assets with a net value of over $118 million.

72.     On February 12, 2015, Haggen, Inc., OpCo North and OpCo South, as borrowers, and PNC Bank, N.A., as agent for itself and certain lenders, entered into a *Revolving*

*Credit and Security Agreement*, as amended on February 20, 2015 (the "PNC Revolver").  Under

the PNC Revolver, PNC provided the Debtors with a revolving line of credit of up to $210

million and a "Swing Loan" facility of up to $23 million.  Holdings, the PropCo Entities and the

SLB Entities were not liable on the PNC Revolver.

73.     Upon information and belief, the PNC Revolver was intended to provide

the newly-expanded Haggen enterprise with working capital to finance, among other things, the

purchase of inventory and the expected retro-fitting of stores and transitional expenses.

74.     The real estate purchase was funded through the Comvest's elaborate plan

for the Real Property.  Pursuant to its agreement with Albertson's, Holdings acquired and

converted each of the 146 stores on a rolling basis during the period from February 17, 2015,

through around June 19, 2015.  Pursuant to the APA, Holdings paid Albertson's for each store on

each store's "Closing Date."  But Holdings did not retain any of the valuable Real Property it

purchased, which had an appraised value of approximately $450 million, but rather transferred

the Real Property into the PropCo and SLB Entities for Comvest's ultimate benefit.

**D.      Comvest Segregates Albertson's Real Estate Assets for Itself**

75.     Comvest caused (a) some of the Real Property to be conveyed to the SLB

Entities and then immediately sold by the SLB Entities as part of the Sale Leaseback

Transactions, with the proceeds being used, in part, to pay Albertson's, and (b) the remaining

Real Property assets to be transferred to the bankruptcy-remote PropCo Entities.  Thus, through

an interrelated series of transactions, a portion of the Real Property assets was used to finance the

Albertson's Acquisition, while the remainder was stripped away from the operating assets and

secreted in the PropCo Entities for Comvest's ultimate benefit for no consideration.  These steps

are detailed below.

**E.**     **Step 1:  Formation of a New Corporate Structure Including PropCo, SLB and OpCo Entities**

76.     As set forth above, from 1962 to 2011, the Haggen stores were owned and operated through a singular corporate entity, Haggen, Inc., that had no affiliates or subsidiaries. Thus, for almost fifty years, Haggen's organizational "chart" looked like this:



77.     In 2011, as part of Comvest's acquisition of a controlling interest in Haggen, Holdings and Acquisition were formed.  The equity owners of the enterprise (Comvest and members of the Haggen family, through a corporate vehicle named HHI Corp.) owned the membership interests in Holdings, which owned all of the membership interests in Acquisition, which owned all of common stock in Haggen, Inc. as follows:

78.     This relatively simple corporate structure remained in place until about a week before the APA was signed in late 2014.   At that time, Comvest, through the exercise of its majority ownership and control of Holdings, created a complex web of new entities for the purpose of acquiring and separating the valuable Real Property from the OpCo Entities' operations and associated liabilities, all for its own benefit.

79.     To that end, Comvest caused Holdings to create ten new entities.  Five of those entities, consisting of the PropCo Entities and the SLB Entities, were the recipients of the Real Property assets, and are purportedly "bankruptcy remote," as Comvest intended that those entities would not incur any material liabilities, such that their equity value would inure to Holdings, itself a holding company, and its principal owner, Comvest.  Three of the other new entities -- the OpCo Entities -- were created to act as the operating entities and were saddled with above-market leases and all other operating liabilities, but without adequate means to satisfy them.

80.     Specifically, on December 2, 2014 (just eight days before the APA was executed), Comvest caused Holdings to create:

- Property Holdings, a PropCo Entity whose membership interests are solely owned by Holdings, and which, prior to the Petition Date, never had any independent officers or employees;

- PropCo South, a PropCo Entity whose membership interests are solely owned by Property Holdings, and which, prior to the Petition Date, never had any independent officers or employees;

- PropCo North, a PropCo Entity whose membership interests are solely owned by Property Holdings, and which, prior to the Petition Date, never had any independent officers or employees;

- Property Holdings II, an SLB Entity whose membership interests are solely owned by Holdings, and which, prior to the Petition Date, never had any independent officers or employees;

- Haggen SLB, an SLB Entity whose membership interests are solely owned by Acquisition, and which, prior to the Petition Date, had no independent officers or employees;

- Operations, the holding company for the OpCo Entities whose membership interests are solely owned by Holdings;

- OpCo South, an OpCo Entity whose membership interests are solely owned by Operations;

- OpCo North, an OpCo Entity whose membership interests are solely owned by Operations;

- Haggen Property Holdings III, an entity whose membership interests are solely owned by Holdings; and

- Haggen Fuel Holdings, LLC, an entity whose membership interests are solely owned by Holdings.

81.     Each of the PropCo Entities and SLB Entities was intended to be a bankruptcy remote special purpose entity and was established for the sole purpose of shielding the assets held by those entities from the OpCo Entities' creditors.

82.     Thus, on the eve of the signing of the Albertson's APA, Haggen's radically different new corporate structure looked as follows:



83.     From the time of their formation in December 2014 through the Petition Date, PropCo South and PropCo North:

(a)     had no independent managers, but were managed solely by their corporate owner, Property Holdings,

26

(b)     had no creditors (other than PNC, to which the PropCo Entities allegedly provided various mortgages/deeds of trust to secure a limited guarantee, and certain insider obligations),

(c)     did not create or maintain any board minutes,

(d)     did not utilize or maintain their own business forms or domain name, and

(e)     maintained their business addresses, their books and records and their e-mail server at the Debtors' location.

84.     From the time of their formation in December 2014 through the Petition Date, the SLB Entities:

(a)     had no independent managers, but were managed solely by their respective corporate owner,

(b)     had no creditors,

(c)     did not create or maintain any board minutes,

(d)     did not utilize or maintain their own business forms or domain name, and

(e)     maintained their business addresses, their books and records and their e-mail server at the Debtors' location.

**F.      Step 2:  Holdings Transfers the Real Property to the Bankruptcy Remote Entities for No Consideration**

85.     With this new corporate structure in place, Comvest and the Officers and Directors caused Holdings to transfer the Real Property assets to the PropCo Entities and the SLB Entities, all of which were intended to be "bankruptcy remote," for no consideration.

86.     Pursuant to the APA, each of the 146 stores, including the real estate associated with such store, was acquired from Albertson's on a rolling basis and was subject to its own closing.  As each store, whether fee owned or subject to a ground lease, was acquired, the rights to the associated Real Property were transferred to one of the PropCo Entities or one of the SLB Entities, as applicable, through a series of "Contribution Agreements" (each a "Contribution Agreement" and collectively, the "Contribution Agreements"), while the operations at each store

27

were to be conducted by the OpCo Entities under leases with either the PropCo Entities or the sale leaseback landlords, as applicable.

87.    Beginning on February 17, 2015, and continuing from time to time through June 8, 2015, Holdings executed at least 15 Contribution Agreements pursuant to which Holdings "contributed" or transferred the right to acquire certain specified Real Property and related assets to various non-Debtor affiliates for no consideration.

88.    In each of the transactions subject to the Contribution Agreements, the right to acquire the specified Real Property was "contributed" or transferred from Holdings, directly or indirectly, to one of the PropCo Entities (PropCo South or PropCo North) or one of the SLB Entities (Property Holdings II and Haggen SLB) for no consideration.

89.    Each of the Contribution Agreements: (a) utilized virtually the same form; (b) identified the Real Property that was being contributed; (c) was signed by the same eight entities -- Holdings, Haggen SLB, Operations, Acquisition, Property Holdings, Property Holdings II, PropCo South and PropCo North -- regardless of whether each such entity was actually a party to the transaction subject to the particular Contribution Agreement; and (d) omitted any reference to any consideration being paid for the rights being transferred.  One person -- Defendant Derrick Anderson -- signed every insider Contribution Agreement, purportedly as Secretary for all eight entities.

## G.    Step 3:  Finance the Acquisition Through Sale Leaseback Agreements

90.    Certain of the Real Property that was subject to the Contribution Agreements was first transferred to the SLB Entities and then immediately resold to third parties (the "SLB Properties") in "sale leaseback" transactions (collectively, the "Sale Leaseback Transactions").  The Sale Leaseback Transactions were an integral component of Comvest's plan to leverage the assets acquired in the Albertson's Acquisition while simultaneously stripping

substantial value away from the operations into bankruptcy remote entities for Comvest's benefit.

91.    Indeed, as Comvest considered its options to finance the transaction, █

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

92.    Ultimately, the Sale Leaseback Transactions engineered by Comvest did not follow the typical model. A typical sale leaseback transaction is composed of two integrated steps. First, the owner of real property sells the property to a third party; the buyer then simultaneously leases the real property back to the original owner. Thus, the original owner obtains the benefits (in the form of the sales proceeds) and incurs the liabilities (in the form of the rent payable under the new lease). Typical sale leaseback transactions enable property owners to convert real property to cash while simultaneously retaining the right to occupy and use the premises consistent with the new lease obligations.

93.    Here, however, the SLB Entities acquired the SLB Properties pursuant to the Contribution Agreements (for no consideration), sold those Properties to the sale leaseback counterparties (Spirit and Garrison, as defined below), and received the sale proceeds of over $350 million, but the OpCo Entities, not the SLB Entities, entered into the leases with the sale-leaseback counterparties and incurred the substantial rental obligations. Thus, in contrast to a traditional sale leaseback transaction, the benefits and liabilities were divided, with the SLB Entities receiving the cash proceeds from the sale of the SLB Properties, while the OpCo Entities were burdened with the liabilities associated with the new leases which, in most cases, were set

at above-market rates in order to increase the value of the Sale Leaseback Transactions and maximize the proceeds for the SLB Entities and, ultimately, Comvest.

94.     Upon information and belief, the sale of the SLB Properties would have yielded a price millions of dollars less than the actual price paid if the leases imposed on the OpCo Entities were set at market rates.  Instead of selling the SLB Properties based on fair market rent, Comvest caused the OpCo Entities to enter into above-market leases for the sole purpose of artificially increasing the purchase price to be paid to the SLB Entities for the sale of the SLB Properties.  The inflation of the rents inured to the benefit of the SLB Entities and ultimately Comvest, but to the detriment of the OpCo Entities.

95.     The proceeds from the Sale Leaseback Transactions were used in part to pay a portion of the purchase price to Albertson's, including (as discussed below) the cost of Real Properties that were "contributed" to the PropCo Entities, and were otherwise used for the benefit of the SLB Entities, the PropCo Entities and ultimately Comvest.  ██████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████     The precise steps taken in the Sale Leaseback Transactions are described below.

### 1.    The SLB Entities Sell the Real Property

96.     Holdings entered into two agreements in order to effectuate the Sale Leaseback Transactions.

97.     First, Holdings signed that certain "Purchase and Sale Agreement and Joint Escrow Instructions" with Spirit Master Funding IV, LLC (collectively, with that entity's affiliates, "Spirit"), dated as of November 24, 2014 (together with any amendments thereto, the "Spirit SLB Agreement").

98.     Pursuant to the Spirit SLB Agreement, the SLB Entities sold twenty (20) parcels of real estate (and improvements) located in Arizona, California, Nevada, Oregon, and Washington (the "Spirit SLB Properties").

99.     Fifteen (15) of the twenty (20) Spirit SLB Properties were "contributed" or transferred to Holdings II and sold to Spirit for an aggregate sales price of approximately $165.6 million.  Pursuant to the APA, approximately $108.5 million of the sales proceeds was, directly or indirectly, tendered to Albertson's affiliates, and approximately $57.1 million was retained by Property Holdings II.  *See* Exhibit A.

100.     Five (5) of the twenty (20) Spirit SLB Properties were "contributed" or transferred to Haggen SLB and sold to Spirit for an aggregate sales price of approximately $58.8 million.  Pursuant to the APA, approximately $38.5 million of the sales proceeds was, directly or indirectly, tendered to Albertson's affiliates, and approximately $20.3 million was retained by Haggen SLB.  *See* Exhibit B.

101.     Thus, pursuant to the Spirit SLB Agreement, twenty (20) properties that were acquired as part of the Albertson's Acquisition and were "contributed" or transferred to the SLB Entities for no consideration were sold for an aggregate price of approximately $224.4 million.  Of that amount, approximately $147 million was, directly or indirectly, paid to Albertson's affiliates while approximately $77.4 million was retained by the SLB Entities.

102.     Holdings entered into a second agreement with respect to the Sale Leaseback Transactions, this one with GIG TCG Wave Holdings, LLC (collectively, with that entity's affiliates, "Garrison").  On December 4, 2014, Holdings and Garrison executed a "Purchase and Sale Agreement and Joint Escrow Instructions" (together with any amendments thereto, the "Garrison SLB Agreement").

103.    Pursuant to the Garrison SLB Agreement, the SLB Entities sold nineteen (19) parcels of real estate (and improvements) located in Arizona, California, Nevada, Oregon, and Washington (the "Garrison SLB Properties").

104.    Eighteen (18) of the nineteen (19) Garrison SLB Properties were "contributed" or transferred to Holdings II and sold to Garrison for an aggregate sales price of approximately $125.2 million.  Pursuant to the APA, approximately $79.4 million of the sales proceeds was, directly or indirectly, tendered to Albertson's affiliates, and approximately $45.8 million was retained by Holdings II.  *See* Exhibit A.

105.    One (1) of the nineteen (19) Garrison SLB Properties was "contributed" or transferred to Haggen SLB and sold to Garrison for a sales price of approximately $9.25 million. Pursuant to the APA, approximately $6.05 million of the sales proceeds was, directly or indirectly, tendered to Albertson's affiliates, and approximately $3.2 million was retained by Haggen SLB.  *See* Exhibit B.

106.    Thus, pursuant to the Garrison SLB Agreement, nineteen (19) properties that were acquired as part of the Albertson's Acquisition and were "contributed" to the SLB Entities for no consideration were sold for an aggregate price of approximately $134.4 million. Of that amount, approximately $85.4 million was, directly or indirectly, paid to Albertson's affiliates while approximately $49 million was retained by the SLB Entities.

107.    In the aggregate, the Sale Leaseback Transactions -- covering both the Spirit SLB Properties and the Garrison SLB Properties -- concerned thirty-nine (39) parcels of real estate that were sold by the SLB Entities for a total of approximately $358.8 million.  Of that amount, approximately $232.4 million was, directly or indirectly, paid to Albertson's affiliates while approximately $126.4 million was retained by the SLB Entities.

108.    Exhibits A and B list the Real Property associated with each store subject to the Sale Leaseback Transactions, together with the identity of the seller (*i.e.*, Holdings II or Haggen SLB), the sales price, the state in which the store was located, and the allocation of the sales proceeds as between the specified SLB Entity and the Albertson's affiliate.

### 2.    The SLB Leases are Imposed on the OpCo Entities, not the SLB Entities

109.    While the SLB Entities reaped the benefits of the Sale Leaseback Transactions, the costs -- in the form of third-party leases with Spirit and Garrison -- were separated and thrust upon the OpCo Entities.

110.    Spirit entered into a Master Lease Agreement and related documents pursuant to which it leased certain of the Spirit SLB Properties to Operations (together with any amendments thereto, the "Spirit Lease").

111.    In addition, an affiliate of Spirit, Spirit SPE HG 2015-1, LLC, as landlord, also entered into a Master Lease Agreement with Operations, as Tenant, as of February 12, 2015, with respect to certain of the other Spirit SLB Properties (together with any amendments thereto, and the Spirit Lease, the "Spirit Master Leases").

112.    Separately, on February 17, 2015, Garrison, as landlord, and OpCo South and OpCo North, as tenants, entered into that certain Master Land and Building Lease (together with any amendments thereto, the "Garrison Lease").  The Garrison Lease set forth the terms by which the OpCo Entities leased each of the Garrison SLB Properties following Garrison's acquisition of them from the SLB Entities.

113.    The parties to the Garrison Lease expected properties to be added to the Garrison Lease pursuant to the Albertson's APA, and agreed to amend the Garrison Lease as each New Demised Property (as defined in the Garrison Lease) was added.

114.     Thus, pursuant to the Garrison Lease and the Garrison SLB Agreement, as Holdings closed on each store, Garrison entered into leases with OpCo South (with respect to Garrison SLB Properties located in Arizona, California or Nevada), and OpCo North (with respect to Garrison SLB Properties located in Washington or Oregon).

115.     The rents charged to the OpCo Entities under the leases executed as part of the Sale Leaseback Transactions were substantially greater than fair market rent and this was no accident.  By increasing the rent, the SLB Entities received a higher purchase price for the SLB Properties than they would have otherwise received.

116.     While Holdings was a guarantor of the Spirit Master Leases and the Garrison Lease, Comvest intended that the OpCo Entities and Operations would pay all of rents to Spirit and Garrison such that Holdings, consistent with its status as a holding company, would not be called upon to satisfy those obligations and thus the valuable assets in the PropCo Entities would inure to the benefit of Holdings' owners, principally Comvest, undiminished by any creditor claims.

## H.     Step 4: Contribute the Remaining Real Property to the PropCo Entities

117.     At the same time that Holdings "contributed" the right to acquire certain of the Real Property to the SLB Entities to be utilized in the Sale Leaseback Transactions, Holdings also "contributed" the right to acquire twenty-eight (28) other parcels of Real Property (fee owned or ground leases), directly or indirectly, to the PropCo Entities pursuant to the Contribution Agreements (collectively, the "Owned Properties").

118.     At the direction of Comvest and the Officers and Directors, fourteen (14) of the Owned Properties were "contributed" to PropCo North.  Attached as Exhibit C is a list of the Owned Properties "contributed" by Holdings to PropCo North.

119.    PropCo North provided no consideration to Holdings for those Owned

Properties but, upon information and belief, proceeds from the Sale Leaseback Transactions were

diverted to Albertson's for their acquisition.

120.    Pursuant to the terms of the APA and the relevant Contribution

Agreements, and the use of a portion of the proceeds from the SLB Transactions (to which

PropCo North was not even a party), Comvest ultimately diverted Owned Properties to PropCo

North with a net value of not less than $19.5 million.

121.    At the direction of Comvest and the Officers and Directors, the other

fourteen (14) Owned Properties were "contributed" to PropCo South.  Attached as Exhibit D is a

list of the Owned Properties "contributed" by Holdings to PropCo South.

122.    PropCo South provided no consideration to Holdings for those Owned

Properties but, upon information and belief, proceeds from the Sale Leaseback Transactions were

diverted to Albertson's for their acquisition.

123.    Pursuant to the terms of the APA and the relevant Contribution

Agreements, and the use of a portion of the proceeds from the SLB Transactions (to which

PropCo South was not even a party), Comvest ultimately diverted Owned Properties to PropCo

South with a net value of not less than $22.6 million.

124.    In sum, the scheme devised by Comvest and executed by the Officers and

Directors caused valuable Owned Property to be transferred by Holdings, directly or indirectly,

to the non-Debtor, bankruptcy-remote PropCo Entities for no consideration.  These transactions

were undertaken for the sole purpose of stripping away the Owned Properties from the operating

entities, thereby attempting to shield them from the claims of the OpCo Entities' unsecured

creditors.

I.      **Step 5:  Comvest Extracts More Value by Imposing Onerous Leases on the OpCo Entities**

125.    After the Owned Properties were "contributed" or transferred to one of the PropCo Entities, Comvest caused the OpCo Entities, as tenants, to enter into leases or subleases with the PropCo Entities, as landlords (collectively, and as may have been amended, the "PropCo Leases"), at inflated rental rates.  The PropCo Leases are identified on Exhibits E and F, respectively.

126.    There were two types of PropCo Leases.  The first type of PropCo Lease concerned stores that were situated on Owned Properties that were previously owned in fee simple by Albertson's (collectively, the "Owned Property Leases").  Following the Alberton's Acquisition, each fee-owned property became subject to an Owned Property Lease pursuant to which an OpCo Entity, as tenant, paid rent to a PropCo Entity, as landlord, at an inflated rate.  As a result of the imposition of the Owned Property Leases, substantial value was transferred from the OpCo Entities to the PropCo Entities and the increased occupancy costs contributed to the operating losses for those stores.

127.    The second type of PropCo Lease concerned Owned Properties that were subject to third-party ground leases.  The ground leases for these Owned Properties were assigned to one of the PropCo Entities and then a sublease was imposed on one of the OpCo Entities, as sub-tenant, whereby the OpCo Entities were required to pay rent to the applicable PropCo Entity, as sub-landlord (collectively, and as may have been amended, the "PropCo Subleases"), that included the rent due under the ground lease, plus intentionally inflated "market rent," taxes and other obligations due under the ground lease.  Consequently, the rent charged by the PropCo Entities to the OpCo Entities under the PropCo Subleases substantially exceeded the

rent due under the existing ground leases acquired from Albertson's and was at above-market rates.

128.    As a result of the imposition of the onerous PropCo Subleases, substantial value was transferred from the OpCo Entities to the PropCo Entities and the increased occupancy costs contributed to the reduction in profits for those stores that had only been paying rent pursuant to the pre-existing ground leases.

129.    The OpCo Entities did not receive any consideration or benefit in exchange for incurring the obligations imposed on them under the PropCo Leases, as the rents thereunder were above-market and contributed materially to the OpCo stores' operating losses, insolvency, and ultimate failure.

130.    The imposition of the PropCo Leases was orchestrated by Comvest for its sole benefit; the PropCo Entities were the instruments that Comvest used; and the Officers and Directors approved, participated in, and acquiesced in the imposition of the PropCo Leases on the OpCo Entities.

## J.    Haggen's "Plan" to Absorb the Albertson's Stores was an Unmitigated Disaster

131.    While Comvest caused the Haggen enterprise to invest substantial time, money and effort extracting value from the Albertson's Acquisition for Comvest's benefit, Haggen's plan for integrating 146 grocery stores in five different states over a several-month period was far less well thought out.  The plan for a small regional chain to acquire 146 stores and reopen them under a different brand in an abbreviated time frame was ambitious beyond reason, and Haggen's efforts to execute on the closings and transitioning of the stores were grossly inadequate.

132.    ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

133.     By April, just two months into the process, Haggen was confronted with the prospect of converting 64 stores in just eight weeks and observed: ███████████████

█████████████████████████████████████████████████████████

████████  But Haggen's fate was already sealed.

134.     After the FTC required Albertson's to divest a substantial number of stores as a condition to the Albertson's/Safeway merger, Haggen, at Comvest's direction, represented to Albertson's and the FTC that it could quickly and competently increase the stores under its management by almost tenfold.  As part of the plan it presented to integrate the Albertson's stores, Haggen contended that it could manage the transition by creating the proper infrastructure, hiring experienced management, and maintaining sufficient funding and capital to enable it to enter new communities, meet the needs of its customers, and withstand expected and unexpected challenges, all in a compacted time frame.  Haggen's representations and contentions quickly proved to be baseless and it's plan unworkable.

135.     By August, Haggen was in full retrenchment: █████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████

136.     The planning and execution of the Albertson's Acquisition constitutes a breach of the duty of care by the Officers and Directors, and given the intent and effect of the

scheme to benefit Holdings' controlling shareholder, Comvest, to the detriment of the OpCo Entities and their creditors, also constitutes a breach of the duty of loyalty.

137.    The Officers and Directors breached their duty of care by, among other things, failing to create and execute a viable plan to absorb and integrate 146 new stores, failing to maintain adequate capital, failing to retain and hire senior management, failing to establish the infrastructure needed to take an 18-store enterprise operating in two states to a 164-store supermarket chain operating throughout the western United States, and by acquiescing to the execution of the Contribution Agreements and the imposition of the onerous PropCo Leases on the OpCo Entities.

138.    The consequences were disastrous: the OpCo Entities' expenses escalated and sales plummeted almost immediately at many of the converted stores.  Thousands of customers were driven away because, among other things, the price points imposed by Haggen for its products were too high for Albertson's former customers, and Haggen failed to develop and implement a positive retail experience for the new communities it was entering.  Further, the OpCo Entities quickly sank under the weight of the PropCo Leases, and stores that were profitable before the acquisition under Albertson's ownership suffered operating losses that were never reversed.

**K.**    **The PropCo Entities "Loan" $25 million to the OpCo Entities on the Eve of Bankruptcy**

139.    By August 2015, the OpCo Entities were hemorrhaging cash while the PropCo Entities sat on the valuable Owned Property and the rental stream provided by the OpCo Entities pursuant to the PropCo Leases. ███████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████.

140.    Just eight months after signing the APA, the PNC Revolver was fully drawn by the OpCo Entities, which had dwindling cash reserves and continuing operating losses. With no third-party funding available to them in their financial condition, the undercapitalized OpCo Entities were forced to "borrow" $25 million from their asset-rich, non-Debtor affiliates into which Comvest had diverted significant value.

141.    More particularly, Debtors Haggen, Inc., OpCo South and OpCo North, as borrowers (the "Intercompany Borrowers"), and PropCo North and PropCo South, as lenders (the "Intercompany Lenders"), entered into that certain Term Loan and Security Agreement, dated as of August 7, 2015 (together with any amendments thereto, the "Intercompany Loan"), pursuant to which the Intercompany Borrowers purportedly obtained a $25 million subordinated loan secured by a second lien junior to PNC's lien on the Intercompany Borrowers' personal property.

142.    Upon information and belief, defendant Blake Barnett signed the Intercompany Loan on behalf of both the Intercompany Borrowers and the Intercompany Lenders.

143.    In accordance with the terms of the Intercompany Loan, on August 7, 2015, the Intercompany Borrowers issued a secured promissory note in favor of PropCo North in the amount of $12,640,750, and a separate secured promissory note in favor of PropCo South in the amount of $12,359,250 (together, the "Intercompany Notes").  Upon information and belief, defendant Blake Barnett signed both Intercompany Notes on behalf of each of the Intercompany Borrowers.

144.    Upon information and belief, the Intercompany Loan closed on August 21, 2015, and was subject to that certain Intercreditor Agreement among Haggen Property Lender LLC, Haggen Property Holdings, LLC, the Intercompany Lenders, and PNC, which governed the respective rights, obligations and priorities of the parties.  The obligations under the Intercompany Notes were subordinated to the extent provided in the Intercompany Agreement.

145.    The Intercompany Loan was not the product of an arms' length negotiation.

146.    In August 2015, the Intercompany Borrowers could not have obtained a $25 million loan from a third party on the same or similar terms as provided for in the Intercompany Loan.

147.    In substance, the Intercompany Loan was an equity investment made to undercapitalized entities disguised as a loan, to the detriment of the OpCo Entities' general unsecured creditors.

**L.    Comvest's Domination and Control Harmed the Debtors**

148.    Comvest owned, dominated, and controlled the Haggen enterprise, including the Debtors, and used such ownership, domination and control to impose the transactions described herein for its benefit and to the Debtors' detriment.

149.    The transactions included the creation of a new corporate structure for the sole purpose of carrying out Comvest's scheme; the "contribution" or transfer to the PropCo Entities and SLB Entities of the right to acquire the Real Property for no consideration; the execution of the Sale Leaseback Transactions to finance the Albertson's Acquisition and to extract value, including the acquisition of the Owned Properties and the imposition of above-market leases with the third-party landlords; the imposition of the above-market PropCo Leases on the OpCo Entities for the sole purpose of transferring value from the OpCo Entities to the

PropCo Entities; and the extraction of additional value in the form of fees and other distributions, including but not limited to, the Comvest Payments (together, the "Challenged Transactions").

150.    The PropCo Entities and the SLB Entities were the vehicles through which Comvest realized the foregoing benefits, including the value of the Owned Properties, the payment of the cost of the Albertson's Acquisition, the rents paid by the OpCo Entities to the PropCo Entities under the PropCo Leases, and the payment of fees and other distributions to Comvest, none of which benefitted the OpCo Entities or their creditors but in fact worked to their detriment.

151.    The Debtors were dominated and controlled by Comvest and the Officers and Directors who, while acting for their own benefit, imposed the transactions described herein upon the OpCo Entities and caused them to enter into such transactions, and to make the transfers and incur the obligations described herein.  Comvest and the Officers and Directors took the actions described herein in bad faith.  As a result of such domination and control by Comvest and the Officers and Directors, any requisite intent for actual or constructive fraud is implied, imputed, inferred, or transferred to the Debtors because Comvest and the Officers and Directors, as insiders of the Debtors, supply any intent required on the part of the transferor or obligor.

152.    The Challenged Transactions, whether viewed separately or collapsed into a single transaction, benefitted Comvest and harmed the Debtors' creditors, and are avoidable as actual and constructive fraudulent transfers as set forth herein.

153.    Pursuant to section 544(a) of the Bankruptcy Code, Plaintiff asserts the rights of a hypothetical lien creditor as of the Petition Date.  Additionally, Plaintiff alleges for purposes of state fraudulent transfer laws made applicable by section 544(b) of the Bankruptcy

Code, that there are unpaid creditors whose claims arose before the challenged transfers were

made and the challenged obligations were incurred in connection with the Albertson's

Acquisition, as well as creditors whose claims arose after.

## CAUSES OF ACTION

### COUNT 1
**(Against PropCo North and Comvest)**
**(Avoidance of Transfer of the PropCo North Owned Properties to PropCo North,**
**11 U.S.C. §§ 548(a)(1)(A) and 550)**

154.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

155.    At all relevant times, Holdings had an interest in the Owned Properties,

and in the right to acquire the Owned Properties, listed on Exhibit C (the "PropCo North Owned

Properties").

156.    Within two years of the Petition Date, Holdings directly or indirectly

transferred the PropCo North Owned Properties to PropCo North.

157.    The direct or indirect transfer of the PropCo North Owned Properties from

Holdings to PropCo North was made with the actual intent to hinder, delay or defraud the

Debtors' creditors.

158.    Actual fraudulent intent can be inferred from at least the following

"badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or

affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable

Contribution Agreements; (c) the PropCo North Owned Properties were transferred to PropCo

North, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) Holdings

retained control of the PropCo North Owned Properties after the transfers; (e) the direct or

indirect transfer of the PropCo North Owned Properties from Holdings to PropCo North was not

publicly disclosed; (f) the Contribution Agreements were not the subject of arms' length

negotiations; (g) PropCo North provided no consideration to Holdings for the PropCo North

Owned Properties; (h) the same person, Derrick Anderson, signed each applicable Contribution

Agreement on behalf of eight different parties even though not all of the eight parties had an

interest in each transfer effectuated by each Contribution Agreement; and (i) the Debtors were

insolvent or became insolvent shortly after Holdings transferred the PropCo North Owned

Properties to PropCo North.

159.    The transfers of the PropCo North Owned Properties from Holdings to

PropCo North were made for Comvest's benefit.

160.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit

of the Debtors' estates the PropCo North Owned Properties, or the value of such property, from

PropCo North and Comvest.

161.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of

the PropCo North Owned Properties from Holdings to PropCo North, and to a judgment against

PropCo North and Comvest to recover the PropCo North Owned Properties or their value.

## COUNT 2
### (Against PropCo North and Comvest)
### (Avoidance of Transfer of the PropCo North Owned Properties to PropCo North, 11 U.S.C. §§ 548(a)(1)(B) and 550)

162.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

163.    At all relevant times, Holdings had an interest in the PropCo North Owned

Properties.

164.    Within two years of the Petition Date, Holdings directly or indirectly

transferred the PropCo North Owned Properties to PropCo North.

165.     Holdings received less than reasonably equivalent value from PropCo North in exchange for the transfer of the PropCo North Owned Properties.

166.     Holdings transferred the PropCo North Owned Properties to PropCo North when Holdings (a) was insolvent, or Holdings became insolvent as a result of such transfers; (b) was engaged in business, or was about to engage in business, for which any property remaining with Holdings was unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

167.     The transfers of the PropCo North Owned Properties from Holdings to PropCo North were made for Comvest's benefit.

168.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PropCo North Owned Properties, or the value of such property, from PropCo North and Comvest.

169.     Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PropCo North Owned Properties from Holdings to PropCo North, and to a judgment against PropCo North and Comvest to recover the PropCo North Owned Properties or their value.

**<u>COUNT 3</u>**
**(Against PropCo North and Comvest)**
**(Avoidance of Transfer of the PropCo North Washington Properties to PropCo North, 11 U.S.C. §§ 544(b) and 550, and RCW § 19.40.041(a)(1))**

170.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

171.     At all relevant times, Holdings had an interest in the PropCo North Owned Properties, including those identified on Exhibit C as being located in the state of Washington (the "<u>PropCo North Washington Properties</u>").

172.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PropCo North Washington Properties to PropCo North.

173.    The direct or indirect transfer of the PropCo North Washington Properties from Holdings to PropCo North was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

174.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable Contribution Agreements; (c) the PropCo North Washington Properties were transferred to PropCo North, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) Holdings retained control of the PropCo North Washington Properties after the transfers; (e) the direct or indirect transfer of the PropCo North Washington Properties from Holdings to PropCo North was not publicly disclosed; (f) the Contribution Agreements were not the subject of arms' length negotiations; (g) PropCo North provided no consideration to Holdings for the PropCo North Washington Properties; (h) the same person, Derrick Anderson, signed each applicable Contribution Agreement on behalf of eight different parties even though not all of the eight parties had an interest in each transfer effectuated by each Contribution Agreement; and (i) the Debtors were insolvent or became insolvent shortly after Holdings transferred the PropCo North Washington Properties to PropCo North.

175.    The transfers of the PropCo North Washington Properties from Holdings to PropCo North were made for Comvest's benefit.

176.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PropCo North Washington Properties, or the value of such property, from PropCo North and Comvest.

177.     Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PropCo North Washington Properties from Holdings to PropCo North and to a judgment against PropCo North and Comvest to recover the PropCo North Washington Properties or their value.

<u>**COUNT 4**</u>
**(Against PropCo North and Comvest)**
**(Avoidance of Transfer of the PropCo North Washington Properties to PropCo North,
11 U.S.C. §§ 544(b) and 550, and RCW § 19.40.041(a)(2))**

178.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

179.     At all relevant times, Holdings had an interest in the PropCo North Washington Properties.

180.     Within four years of the Petition Date, Holdings directly or indirectly transferred the PropCo North Washington Properties to PropCo North.

181.     Holdings received less than reasonably equivalent value from PropCo North in exchange for the transfer of the PropCo North Washington Properties.

182.     Holdings transferred the PropCo North Washington Properties to PropCo North when Holdings (a) was engaged in business, or was about to engage in business, for which Holdings' remaining property was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts became due.

183.     The transfers of the PropCo North Washington Properties from Holdings to PropCo North were made for Comvest's benefit.

184.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PropCo North Washington Properties, or the value of such property, from PropCo North and Comvest.

185.     Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PropCo North Washington Properties from Holdings to PropCo North, and to a judgment against PropCo North and Comvest to recover the PropCo North Washington Properties or their value.

## COUNT 5
### (Against PropCo North and Comvest)
### (Avoidance of Transfer of the PropCo North Washington Properties to PropCo North, 11 U.S.C. §§ 544(b) and 550, and RCW § 19.40.051(a))

186.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

187.     At all relevant times, Holdings had an interest in the PropCo North Washington Properties.

188.     Within four years of the Petition Date, Holdings directly or indirectly transferred the PropCo North Washington Properties to PropCo North.

189.     Holdings received less than reasonably equivalent value from PropCo North in exchange for the transfer of the PropCo North Washington Properties.

190.     Holdings transferred the PropCo North Washington Properties to PropCo North when Holdings was insolvent or Holdings became insolvent as a result of the transfers.

191.     The transfers of the PropCo North Washington Properties from Holdings to PropCo North were made for Comvest's benefit.

192.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PropCo North Washington Properties, or the value of such property, from PropCo North and Comvest.

193.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PropCo North Washington Properties from Holdings to PropCo North, and to a judgment against PropCo North and Comvest to recover the PropCo North Washington Properties or their value.

**COUNT 6**
**(Against PropCo North and Comvest)**
**(Avoidance of Transfer of the PropCo North Oregon Properties to PropCo North,**
**11 U.S.C. §§ 544(b) and 550, and ORS § 95.230(a)(1))**

194.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

195.    At all relevant times, Holdings had an interest in the PropCo North Owned Properties, including those identified on Exhibit C as being located in the state of Oregon (the "PropCo North Oregon Properties").

196.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PropCo North Oregon Properties to PropCo North.

197.    The direct or indirect transfer of the PropCo North Oregon Properties from Holdings to PropCo North was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

198.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable Contribution Agreements; (c) the PropCo North Oregon Properties were transferred to PropCo

49

North, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) Holdings retained control of the PropCo North Oregon Properties after the transfers; (e) the direct or indirect transfer of the PropCo North Oregon Properties from Holdings to PropCo North was not publicly disclosed; (f) the Contribution Agreements were not the subject of arms' length negotiations; (g) PropCo North provided no consideration to Holdings for the PropCo North Oregon Properties; (h) the same person, Derrick Anderson, signed each applicable Contribution Agreement on behalf of eight different parties even not all of the eight parties had an interest in each transfer effectuated by each Contribution Agreement; and (i) the Debtors were insolvent or became insolvent shortly after Holdings transferred the PropCo North Oregon Properties to PropCo North.

199.    The transfers of the PropCo North Oregon Properties from Holdings to PropCo North were made for Comvest's benefit.

200.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PropCo North Oregon Properties, or the value of such property, from PropCo North and Comvest.

201.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PropCo North Oregon Properties from Holdings to PropCo North and to a judgment against PropCo North and Comvest to recover the PropCo North Oregon Properties or their value.

### COUNT 7
**(Against PropCo North and Comvest)**
**(Avoidance of Transfer of the PropCo North Oregon Properties to PropCo North,**
**11 U.S.C. §§ 544(b) and 550, and ORS § 95.230 (a)(2))**

202.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

203.    At all relevant times, Holdings had an interest in the PropCo North Oregon Properties.

204.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PropCo North Oregon Properties to PropCo North.

205.    Holdings received less than reasonably equivalent value from PropCo North in exchange for the transfer of the PropCo North Oregon Properties.

206.    Holdings transferred the PropCo North Oregon Properties to PropCo North when Holdings (a) was engaged in business, or was about to engage in business, for which Holdings' remaining property was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts became due.

207.    The transfers of the PropCo North Oregon Properties from Holdings to PropCo North were made for Comvest's benefit.

208.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PropCo North Oregon Properties, or the value of such property, from PropCo North and Comvest.

209.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PropCo North Oregon Properties from Holdings to PropCo North, and to a judgment against PropCo North and Comvest to recover the PropCo North Oregon Properties or their value.

## COUNT 8
**(Against PropCo North and Comvest)**
**(Avoidance of Transfer of the PropCo North Oregon Properties to PropCo North,**
**11 U.S.C. §§ 544(b) and 550, and ORS § 95.240 (1))**

210.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

211.    At all relevant times, Holdings had an interest in the PropCo North Oregon Properties.

212.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PropCo North Oregon Properties to PropCo North.

213.    Holdings received less than reasonably equivalent value from PropCo North in exchange for the transfer of the PropCo North Oregon Properties.

214.    Holdings transferred the PropCo North Oregon Properties to PropCo North when Holdings was insolvent or Holdings became insolvent as a result of the transfers.

215.    The transfers of the PropCo North Oregon Properties from Holdings to PropCo North were made for Comvest's benefit.

216.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PropCo North Oregon Properties, or the value of such property, from PropCo North and Comvest.

217.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PropCo North Oregon Properties from Holdings to PropCo North, and to a judgment against PropCo North and Comvest to recover the PropCo North Oregon Properties or their value.

**COUNT 9**
**(Against PropCo South and Comvest)**
**(Avoidance of Transfer of PCS Owned Properties to PropCo South,**
**11 U.S.C. §§ 548(a)(1)(A) and 550)**

218.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

219.    At all relevant times, Holdings had an interest in the Owned Properties, and in the right to acquire the Owned Properties, listed on Exhibit D (the "PCS Owned Properties").

220.    Within two years of the Petition Date, Holdings directly or indirectly transferred the PCS Owned Properties to PropCo South.

221.    The direct or indirect transfer of the PCS Owned Properties from Holdings to PropCo South was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

222.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable Contribution Agreements; (c) the PCS Owned Properties were transferred to PropCo South, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) Holdings retained control of the PCS Owned Properties after the transfers; (e) the direct or indirect transfer of the PCS Owned Properties from Holdings to PropCo South was not publicly disclosed; (f) the Contribution Agreements were not the subject of arms' length negotiations; (g) PropCo South provided no consideration to Holdings for the PCS Owned Properties; (h) the same person, Derrick Anderson, signed each applicable Contribution Agreement on behalf of eight different parties even though not all of the eight parties had an interest in each transfer effectuated by each Contribution Agreement; and (i) the Debtors were insolvent or became insolvent shortly after Holdings transferred the PCS Owned Properties to PropCo South.

223.    The transfers of the PCS Owned Properties from Holdings to PropCo South were made for Comvest's benefit.

224.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS Owned Properties, or the value of such property, from PropCo South and Comvest.

225.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PCS Owned Properties from Holdings to PropCo South, and to a judgment against PropCo South and Comvest to recover the PCS Owned Properties or their value.

**COUNT 10**
**(Against PropCo South and Comvest)**
**(Avoidance of Transfer of PCS Owned Properties to PropCo South,**
**11 U.S.C. §§ 548(a)(1)(B) and 550)**

226.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

227.    At all relevant times, Holdings had an interest in the PCS Owned Properties.

228.    Within two years of the Petition Date, Holdings directly or indirectly transferred the PCS Owned Properties to PropCo South.

229.    Holdings received less than reasonably equivalent value from PropCo South in exchange for the transfer of the PCS Owned Properties.

230.    Holdings transferred the PCS Owned Properties to PropCo South when Holdings (a) was insolvent, or Holdings became insolvent as a result of such transfers; (b) was engaged in business, or was about to engage in business, for which any property remaining with Holdings was unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

231.    The transfers of the PCS Owned Properties from Holdings to PropCo South were made for Comvest's benefit.

232.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS Owned Properties, or the value of such property, from PropCo South and Comvest.

233.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PCS Owned Properties from Holdings to PropCo South, and to a judgment against PropCo South and Comvest to recover the PCS Owned Properties or their value.

**COUNT 11**
**(Against PropCo South and Comvest)**
**(Avoidance of Transfer of the PCS Arizona Properties to PropCo South,**
**11 U.S.C. §§ 544(b) and 550, and ARS § 44-1004 (A)(1))**

234.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

235.    At all relevant times, Holdings had an interest in the PCS Owned Properties, including those identified on Exhibit D as being located in the state of Arizona (the "PCS Arizona Properties").

236.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PCS Arizona Properties to PropCo South.

237.    The direct or indirect transfer of the PCS Arizona Properties from Holdings to PropCo South was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

238.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable Contribution Agreements; (c) the PCS Arizona Properties were transferred to PropCo South, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) Holdings retained control of the PCS Arizona Properties after the transfers; (e) the direct or indirect transfer of the PCS Arizona Properties from Holdings to PropCo South was not publicly disclosed; (f) the Contribution Agreements were not the subject of arms' length negotiations; (g) PropCo South

55

provided no consideration to Holdings for the PCS Arizona Properties; (h) the same person,

Derrick Anderson, signed each applicable Contribution Agreement on behalf of eight different

parties even though not all of the eight parties had an interest in each transfer effectuated by each

Contribution Agreement; and (i) the Debtors were insolvent or became insolvent shortly after

Holdings transferred the PCS Arizona Properties to PropCo South.

239.    The transfers of the PCS Arizona Properties from Holdings to PropCo

South were made for Comvest's benefit.

240.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit

of the Debtors' estates the PCS Arizona Properties, or the value of such property, from PropCo

South and Comvest.

241.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of

the PCS Arizona Properties from Holdings to PropCo South and to a judgment against PropCo

South and Comvest to recover the PCS Arizona Properties or their value.

**COUNT 12**
**(Against PropCo South and Comvest)**
**(Avoidance of Transfer of the PCS Arizona Properties to PropCo South,**
**11 U.S.C. §§ 544(b) and 550, and ARS § 44-1004(A)(2))**

242.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

243.    At all relevant times, Holdings had an interest in the PCS Arizona

Properties.

244.    Within four years of the Petition Date, Holdings directly or indirectly

transferred the PCS Arizona Properties to PropCo South.

245.    Holdings received less than reasonably equivalent value from PropCo

South in exchange for the transfer of the PCS Arizona Properties.

246.    Holdings transferred the PCS Arizona Properties to PropCo South when Holdings (a) was engaged in business, or was about to engage in business, for which Holdings' remaining property was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts became due.

247.    The transfers of the PCS Arizona Properties from Holdings to PropCo South were made for Comvest's benefit.

248.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS Arizona Properties, or the value of such property, from PropCo South and Comvest.

249.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PCS Arizona Properties from Holdings to PropCo South, and to a judgment against PropCo South and Comvest to recover the PCS Arizona Properties or their value.

**COUNT 13**
**(Against PropCo South and Comvest)**
**(Avoidance of Transfer of the PCS Arizona Properties to PropCo South,**
**11 U.S.C. §§ 544(b) and 550, and ARS § 44-1005)**

250.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

251.    At all relevant times, Holdings had an interest in the PCS Arizona Properties.

252.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PCS Arizona Properties to PropCo South.

253.    Holdings received less than reasonably equivalent value from PropCo South in exchange for the transfer of the PSC Arizona Properties.

254.     Holdings transferred the PCS Arizona Properties to PropCo South when Holdings was insolvent or Holdings became insolvent as a result of the transfers.

255.     The transfers of the PCS Arizona Properties from Holdings to PropCo South were made for Comvest's benefit.

256.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS Arizona Properties, or the value of such property, from PropCo South and Comvest.

257.     Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PCS Arizona Properties from Holdings to PropCo South, and to a judgment against PropCo South and Comvest to recover the PCS Arizona Properties or their value.

**COUNT 14**
**(Against PropCo South and Comvest)**
**(Avoidance of Transfer of the PCS Nevada Properties to PropCo South,**
**11 U.S.C. §§ 544(b) and 550, and NRS § 112.180(1)(a))**

258.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

259.     At all relevant times, Holdings had an interest in the PCS Owned Properties, including those identified on Exhibit D as being located in the state of Nevada (the "PCS Nevada Properties").

260.     Within four years of the Petition Date, Holdings directly or indirectly transferred the PCS Nevada Properties to PropCo South.

261.     The direct or indirect transfer of the PCS Nevada Properties from Holdings to PropCo South was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

262.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable Contribution Agreements; (c) the PCS Nevada Properties were transferred to PropCo South, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) Holdings retained control of the PCS Nevada Properties after the transfers; (e) the direct or indirect transfer of the PCS Nevada Properties from Holdings to PropCo South was not publicly disclosed; (f) the Contribution Agreements were not the subject of arms' length negotiations; (g) PropCo South provided no consideration to Holdings for the PCS Nevada Properties; (h) the same person, Derrick Anderson, signed each applicable Contribution Agreement on behalf of eight different parties even though not all of the eight parties had an interest in each transfer effectuated by each Contribution Agreement; and (i) the Debtors were insolvent or became insolvent shortly after Holdings transferred the PCS Nevada Properties to PropCo South.

263.    The transfers of the PCS Nevada Properties from Holdings to PropCo South were made for Comvest's benefit.

264.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS Nevada Properties, or the value of such property, from PropCo South and Comvest.

265.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PCS Nevada Properties from Holdings to PropCo South and to a judgment against PropCo South and Comvest to recover the PCS Nevada Properties or their value.

## COUNT 15
### (Against PropCo South and Comvest)
### (Avoidance of Transfer of the PCS Nevada Properties to PropCo South,
### 11 U.S.C. §§ 544(b) and 550, and NRS § 112.180(1)(b))

266.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

267.    At all relevant times, Holdings had an interest in the PCS Nevada Properties.

268.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PCS Nevada Properties to PropCo South.

269.    Holdings received less than reasonably equivalent value from PropCo South in exchange for the transfer of the PCS Nevada Properties.

270.    Holdings transferred the PCS Nevada Properties to PropCo South when Holdings (a) was engaged in business, or was about to engage in business, for which Holdings' remaining property was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts became due.

271.    The transfers of the PCS Nevada Properties from Holdings to PropCo South were made for Comvest's benefit.

272.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS Nevada Properties, or the value of such property, from PropCo South and Comvest.

273.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PCS Nevada Properties from Holdings to PropCo South, and to a judgment against PropCo South and Comvest to recover the PCS Nevada Properties or their value.

**COUNT 16**
**(Against PropCo South and Comvest)**
**(Avoidance of the PCS Nevada Properties to PropCo South,**
**11 U.S.C. §§ 544(b) and 550, and NRS § 112.190)**

274.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

275.    At all relevant times, Holdings had an interest in the PCS Nevada Properties.

276.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PCS Nevada Properties to PropCo South.

277.    Holdings received less than reasonably equivalent value from PropCo South in exchange for the transfer of the PCS Nevada Properties.

278.    Holdings transferred the PCS Nevada Properties to PropCo South when Holdings was insolvent or Holdings became insolvent as a result of the transfers.

279.    The transfers of the PCS Nevada Properties from Holdings to PropCo South were made for Comvest's benefit.

280.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS Nevada Properties, or the value of such property, PropCo South and Comvest.

281.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PCS Nevada Properties from Holdings to PropCo South, and to a judgment against PropCo South and Comvest to recover the PCS Nevada Properties or their value.

## COUNT 17
### (Against PropCo South and Comvest)
### (Avoidance of Transfer of the PCS California Properties to PropCo South,
### 11 U.S.C. §§ 544(b) and 550, and Cal. Civ. Code § 3439.04(a)(1))

282.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

283.    At all relevant times, Holdings had an interest in the PCS Owned

Properties, including those identified on Exhibit D as being located in the state of California (the

"PCS California Properties").

284.    Within four years of the Petition Date, Holdings directly or indirectly

transferred the PCS California Properties to PropCo South.

285.    The direct or indirect transfer of the PCS California Properties from

Holdings to PropCo South was made with the actual intent to hinder, delay or defraud the

Debtors' creditors.

286.    Actual fraudulent intent can be inferred from at least the following

"badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or

affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable

Contribution Agreements; (c) the PCS California Properties were transferred to PropCo South,

an insider by virtue of the fact that it was indirectly owned by Holdings; (d) Holdings retained

control of the PCS California Properties after the transfers; (e) the direct or indirect transfer of

the PCS California Properties from Holdings to PropCo South was not publicly disclosed; (f) the

Contribution Agreements were not the subject of arms' length negotiations; (g) PropCo South

provided no consideration to Holdings for the PCS California Properties; (h) the same person,

Derrick Anderson, signed each applicable Contribution Agreement on behalf of eight different

parties even though not all of the eight parties had an interest in each transfer effectuated by each

Contribution Agreement; and (i) the Debtors were insolvent or became insolvent shortly after Holdings transferred the PCS California Properties to PropCo South.

287.    The transfers of the PCS California Properties from Holdings to PropCo South were made for Comvest's benefit.

288.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS California Properties, or the value of such property, from PropCo South and Comvest.

289.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PCS California Properties from Holdings to PropCo South and to a judgment against PropCo South and Comvest to recover the PCS California Properties or their value.

## COUNT 18
### (Against PropCo South and Comvest)
### (Avoidance of Transfer of the PCS California Properties to PropCo South, 11 U.S.C. §§ 544(b) and 550, and Cal. Civ. Code § 3439.04(a)(2))

290.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

291.    At all relevant times, Holdings had an interest in the PCS California Properties.

292.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PCS California Properties to PropCo South.

293.    Holdings received less than reasonably equivalent value from PropCo South in exchange for the transfer of the PCS California Properties.

294.    Holdings transferred the PCS California Properties to PropCo South when Holdings (a) was engaged in business, or was about to engage in business, for which Holdings'

remaining property was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts became due.

295.    The transfers of the PCS California Properties from Holdings to PropCo South were made for Comvest's benefit.

296.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS California Properties, or the value of such property, from PropCo South and Comvest.

297.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PCS California Properties from Holdings to PropCo South, and to a judgment against PropCo South and Comvest to recover the PCS California Properties or their value.

### COUNT 19
**(Against PropCo South and Comvest)**
**(Avoidance of the PCS California Properties to PropCo South,**
**11 U.S.C. §§ 544(b) and 550, and Cal. Civ. Code § 3439.05)**

298.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

299.    At all relevant times, Holdings had an interest in the PCS California Properties.

300.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PCS California Properties to PropCo South.

301.    Holdings received less than reasonably equivalent value from PropCo South in exchange for the transfer of the PCS California Properties.

302.    Holdings transferred the PCS California Properties to PropCo South when Holdings was insolvent or Holdings became insolvent as a result of the transfers.

303.    The transfers of the PCS California Properties from Holdings to PropCo South were made for Comvest's benefit.

304.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS California Properties, or the value of such property, from PropCo South and Comvest.

305.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PCS California Properties from Holdings to PropCo South, and to a judgment against PropCo South and Comvest to recover the PCS California Properties or their value.

**COUNT 20**
**(Against PropCo North and Comvest)**
**(Avoidance of the PropCo North Lease Obligations,**
**11 U.S.C. §§ 548(a)(1)(A) and 550)**

306.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

307.    Exhibit E lists those PropCo Leases in which PropCo North was the landlord and OpCo North was the tenant (the "PropCo North Leases").  The PropCo North Leases were obligations incurred by OpCo North to PropCo North within two years of the Petition Date.

308.    OpCo North transferred money to PropCo North in the form of rent payable under each applicable PropCo North Lease (the "PropCo North Rent Payments," and together with the PropCo North Leases, the "PropCo North Lease Obligations") within two years of the Petition Date.

309.    The transfers were made, and the obligations incurred, in respect of the PropCo North Lease Obligations with the actual intent to hinder, delay or defraud OpCo North's creditors.

310.     Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable PropCo North Leases; (c) the PropCo North Lease Obligations were made to PropCo North, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) the PropCo North Obligations were not publicly disclosed; (e) the PropCo North Leases (including the PropCo North Rent Payments payable thereunder) were not the subject of arms' length negotiations; (f) the same person, Derrick Anderson, signed each applicable PropCo North Lease on behalf of PropCo North and OpCo North; and (g) OpCo North was insolvent or became insolvent shortly after the PropCo North Leases were executed and the PropCo North Rent Payments were transferred to PropCo North.

311.     The PropCo North Lease Obligations were incurred and made for Comvest's benefit.

312.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PropCo North Rent Payments, or the value of such property, from PropCo North and Comvest.

313.     Accordingly, Plaintiff is entitled to judgment (i) avoiding the PropCo North Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo North and Comvest the PropCo North Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo North against the Debtors for damages arising from the rejection of the PropCo North Leases.

**COUNT 21**
**(Against PropCo North and Comvest)**
**(Avoidance of the PropCo North Lease Obligations,**
**11 U.S.C. §§ 548(a)(1)(B) and 550)**

314.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

315.    OpCo North made the transfers, and incurred the obligations, in respect of

the PropCo North Lease Obligations within two years of the Petition Date.

316.    OpCo North received less than reasonably equivalent value from PropCo

North in exchange for the transfers made, and the obligations incurred, in respect of the PropCo

North Lease Obligations.

317.    OpCo North incurred the obligations under the PropCo North Leases, and

made the PropCo North Rent Payments, to PropCo North when OpCo North (a) was insolvent,

or OpCo North became insolvent as a result of such obligations and transfers; (b) was engaged in

business, or was about to engage in business, for which any property remaining was

unreasonably small capital; or (c) intended to incur, or believed that OpCo North would incur,

debts beyond its ability to pay as such debts matured.

318.    The PropCo North Lease Obligations were incurred and made for

Comvest's benefit.

319.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit

of the Debtors' estates the PropCo North Rent Payments, or the value of such property, from

PropCo North and Comvest.

320.    Accordingly, Plaintiff is entitled to judgment (i) avoiding the PropCo

North Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo North

and Comvest the PropCo North Rent Payments made thereunder or their value, and (iii)

disallowing any claim by PropCo North against the Debtors for damages arising from the rejection of the PropCo North Leases.

## COUNT 22
### (Against PropCo North and Comvest)
### (Avoidance of the PropCo North Washington Lease Obligations,
### 11 U.S.C. §§ 544(b) and 550, and RCW § 19.40.041(a)(1))

321.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

322.    Exhibit E lists those PropCo Leases that relate to the PropCo North Washington Properties (the "PropCo North Washington Leases").  The PropCo North Washington Leases were obligations incurred by OpCo North to PropCo North within four years of the Petition Date.

323.    OpCo North transferred money to PropCo North in the form of rent payable under each applicable PropCo North Washington Lease (the "PropCo North Washington Rent Payments," and together with the PropCo North Washington Leases, the "PropCo North Washington Lease Obligations") within four years of the Petition Date.

324.    The transfers were made, and the obligations incurred, in respect of the PropCo North Washington Lease Obligations with the actual intent to hinder, delay or defraud OpCo North's creditors.

325.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable PropCo North Washington Leases; (c) the PropCo North Washington Lease Obligations were made to PropCo North, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) the PropCo North Washington Obligations were not publicly disclosed; (e) the PropCo North

Washington Leases (including the PropCo North Washington Rent Payments payable

thereunder) were not the subject of arms' length negotiations; (f) the same person, Derrick

Anderson, signed each applicable PropCo North Washington Lease on behalf of PropCo North

and OpCo North; and (g) OpCo North was insolvent or became insolvent shortly after the

PropCo North Washington Leases were executed and the PropCo North Washington Rent

Payments were transferred to PropCo North.

326.    The PropCo North Washington Lease Obligations were incurred and made

for Comvest's benefit.

327.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit

of the Debtors' estates the PropCo North Washington Rent Payments, or the value of such

property, from PropCo North and Comvest.

328.    Accordingly, Plaintiff is entitled to judgment (i) avoiding the PropCo

North Washington Lease Obligations as fraudulently incurred obligations, (ii) recovering from

PropCo North and Comvest the PropCo North Washington Rent Payments made thereunder or

their value, and (iii) disallowing any claim by PropCo North against the Debtors for damages

arising from the rejection of the PropCo North Washington Leases.

### COUNT 23
**(Against PropCo North and Comvest)**
**(Avoidance of the PropCo North Washington Lease Obligations,**
**11 U.S.C. §§ 544(b) and 550, and RCW § 19.40.041(a)(2))**

329.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

330.    OpCo North made the transfers, and incurred the obligations, in respect of

the PropCo North Washington Lease Obligations within four years of the Petition Date.

331.     OpCo North received less than reasonably equivalent value from PropCo North in exchange for the transfers made, and the obligations incurred, in respect of the PropCo North Washington Lease Obligations.

332.     OpCo North incurred the obligations under the PropCo North Washington Leases, and made the PropCo North Washington Rent Payments, to PropCo North when OpCo North (a) was engaged in business, or was about to engage in business, for which any property remaining was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

333.     The PropCo North Washington Lease Obligations were incurred and made for Comvest's benefit.

334.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PropCo North Washington Rent Payments, or the value of such property, from PropCo North and Comvest.

335.     Accordingly, Plaintiff is entitled to judgment (i) avoiding the PropCo North Washington Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo North and Comvest the PropCo North Washington Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo North against the Debtors for damages arising from the rejection of the PropCo North Washington Leases.

### COUNT 24
**(Against PropCo North and Comvest)**
**(Avoidance of the PropCo North Washington Lease Obligations,**
**11 U.S.C. §§ 544(b) and 550, and RCW § 19.40.051(a))**

336.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

70

337.    OpCo North made the transfers, and incurred the obligations, in respect of the PropCo North Washington Lease Obligations within four years of the Petition Date.

338.    OpCo North received less than reasonably equivalent value from PropCo North in exchange for the transfers made, and the obligations incurred, in respect of the PropCo North Washington Lease Obligations.

339.    OpCo North incurred the obligations under the PropCo North Washington Leases, and made the PropCo North Washington Rent Payments, to PropCo North when OpCo North was insolvent or OpCo North became insolvent as a result of such transfers and obligations.

340.    The PropCo North Washington Lease Obligations were incurred and made for Comvest's benefit.

341.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PropCo North Washington Rent Payments, or the value of such property, from PropCo North and Comvest.

342.    Accordingly, Plaintiff is entitled to judgment (i) avoiding the PropCo North Washington Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo North and Comvest the PropCo North Washington Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo North against the Debtors for damages arising from the rejection of the PropCo North Washington Leases.

### COUNT 25
**(Against PropCo North and Comvest)**
**(Avoidance of the PropCo North Oregon Lease Obligations,**
**11 U.S.C. §§ 544(b) and 550, and ORS § 95.230(1)(a))**

343.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

344.    Exhibit E lists those PropCo Leases that relate to the PropCo North Oregon Properties (the "PropCo North Oregon Leases").  The PropCo North Oregon Leases were obligations incurred by OpCo North to PropCo North within four years of the Petition Date.

345.    OpCo North transferred money to PropCo North in the form of rent payable under each applicable PropCo North Oregon Lease (the "PropCo North Oregon Rent Payments," and together with the PropCo North Oregon Leases, the "PropCo North Oregon Lease Obligations") within four years of the Petition Date.

346.    The transfers were made, and the obligations incurred, in respect of the PropCo North Oregon Lease Obligations with the actual intent to hinder, delay or defraud OpCo North's creditors.

347.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable PropCo North Oregon Leases; (c) the PropCo North Oregon Lease Obligations were made to PropCo North, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) the PropCo North Oregon Obligations were not publicly disclosed; (e) the PropCo North Oregon Leases (including the PropCo North Oregon Rent Payments payable thereunder) were not the subject of arms' length negotiations; (f) the same person, Derrick Anderson, signed each applicable PropCo North Oregon Lease on behalf of PropCo North and OpCo North; and (g) OpCo North was insolvent or became insolvent shortly after the PropCo North Oregon Leases were executed and the PropCo North Oregon Rent Payments were transferred to PropCo North.

348.    The PropCo North Oregon Lease Obligations were incurred and made for Comvest's benefit.

349.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PropCo North Oregon Rent Payments, or the value of such property, from PropCo North and Comvest.

350.     Accordingly, Plaintiff is entitled to judgment (i) avoiding the PropCo North Oregon Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo North and Comvest the PropCo North Oregon Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo North against the Debtors for damages arising from the rejection of the PropCo North Oregon Leases.

### COUNT 26
**(Against PropCo North and Comvest)**
**(Avoidance of the PropCo North Oregon Lease Obligations,**
**11 U.S.C. §§ 544(b) and 550, and ORS § 95.230(1)(b))**

351.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

352.     OpCo North made the transfers, and incurred the obligations, in respect of the PropCo North Oregon Lease Obligations within four years of the Petition Date.

353.     OpCo North received less than reasonably equivalent value from PropCo North in exchange for the transfers made, and the obligations incurred, in respect of the PropCo North Oregon Lease Obligations.

354.     OpCo North incurred the obligations under the PropCo North Oregon Leases, and made the PropCo North Oregon Rent Payments, to PropCo North when OpCo North (a) was engaged in business, or was about to engage in business, for which any property remaining was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

355.     The PropCo North Oregon Lease Obligations were incurred and made for Comvest's benefit.

356.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PropCo North Oregon Rent Payments, or the value of such property, from PropCo North and Comvest.

357.     Accordingly, Plaintiff is entitled to judgment (i) avoiding the PropCo North Oregon Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo North and Comvest the PropCo North Oregon Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo North against the Debtors for damages arising from the rejection of the PropCo North Oregon Leases.

**COUNT 27**
**(Against PropCo North and Comvest)**
**(Avoidance of the PropCo North Oregon Lease Obligations,**
**11 U.S.C. §§ 544(b) and 550, and ORS § 95.240(1))**

358.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

359.     OpCo North made the transfers, and incurred the obligations, in respect of the PropCo North Oregon Lease Obligations within four years of the Petition Date.

360.     OpCo North received less than reasonably equivalent value from PropCo North in exchange for the transfers made, and the obligations incurred, in respect of the PropCo North Oregon Lease Obligations.

361.     OpCo North incurred the obligations under the PropCo North Oregon Leases, and made the PropCo North Oregon Rent Payments, to PropCo North when OpCo North was insolvent or OpCo North became insolvent as a result of such transfers and obligations.

362.     The PropCo North Oregon Lease Obligations were incurred and made for Comvest's benefit.

363.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PropCo North Oregon Rent Payments, or the value of such property, from PropCo North and Comvest.

364.     Accordingly, Plaintiff is entitled to judgment (i) avoiding the PropCo North Oregon Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo North and Comvest the PropCo North Oregon Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo North against the Debtors for damages arising from the rejection of the PropCo North Oregon Leases.

**COUNT 28**
**(Against PropCo South and Comvest)**
**(Avoidance of the PCS Lease Obligations,**
**11 U.S.C. §§ 548(a)(1)(A) and 550)**

365.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

366.     Exhibit F lists those PropCo Leases in which PropCo South was the landlord and OpCo South was the tenant (the "PCS Leases").  The PCS Leases were obligations incurred by OpCo South to PropCo South within two years of the Petition Date.

367.     OpCo South transferred money to PropCo South in the form of rent payable under each applicable PCS Lease (the "PCS Rent Payments," and together with the PCS Leases, the "PCS Lease Obligations") within two years of the Petition Date.

368.     The transfers were made, and the obligations incurred, in respect of the PCS Lease Obligations with the actual intent to hinder, delay or defraud OpCo South's creditors.

75

369.     Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable PCS Leases; (c) the PCS Lease Obligations were made to PropCo South, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) the PCS Lease Obligations were not publicly disclosed; (e) the PCS Leases (including the PCS Rent Payments payable thereunder) were not the subject of arms' length negotiations; (f) the same person, Derrick Anderson, signed each applicable PCS Lease on behalf of PropCo South and OpCo South; and (g) OpCo South was insolvent or became insolvent shortly after the PCS Leases were executed and the PCS Rent Payments were transferred to PropCo South.

370.     The PCS Lease Obligations were incurred and made for Comvest's benefit.

371.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS Rent Payments, or the value of such property, from PropCo South and Comvest.

372.     Accordingly, Plaintiff is entitled to judgment (i) avoiding the PCS Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo South and Comvest the PCS Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo South against the Debtors for damages arising from the rejection of the PCS Leases.

**COUNT 29**
**(Against PropCo South and Comvest)**
**(Avoidance of the PCS Lease Obligations,**
**11 U.S.C. §§ 548(a)(1)(B) and 550)**

373.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

374.    OpCo South made the transfers, and incurred the obligations, in respect of the PCS Lease Obligations within two years of the Petition Date.

375.    OpCo South received less than reasonably equivalent value from PropCo South in exchange for the transfers made, and the obligations incurred, in respect of the PCS Lease Obligations.

376.    OpCo South incurred the obligations under the PCS Leases, and made the PCS Rent Payments, to PropCo South when OpCo South (a) was insolvent, or OpCo South became insolvent as a result of such obligations and transfers; (b) was engaged in business, or was about to engage in business, for which any property remaining was unreasonably small capital; or (c) intended to incur, or believed that OpCo South would incur, debts beyond its ability to pay as such debts matured.

377.    The PCS Lease Obligations were incurred and made for Comvest's benefit.

378.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS Rent Payments, or the value of such property, from PropCo South and Comvest.

379.    Accordingly, Plaintiff is entitled to judgment (i) avoiding the PCS Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo South and Comvest the PCS Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo South against the Debtors for damages arising from the rejection of the PCS Leases.

**COUNT 30**
**(Against PropCo South and Comvest)**
**(Avoidance of the PCS Arizona Lease Obligations,**
**11 U.S.C. §§ 544(b) and 550, and ARS § 44-1004 (A)(1))**

380.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

381.    Exhibit F lists those PropCo Leases that relate to the PCS Arizona Properties (the "PCS Arizona Leases").  The PCS Arizona Leases were obligations incurred by OpCo South to PropCo South within four years of the Petition Date.

382.    OpCo South transferred money to PropCo South in the form of rent payable under each applicable PCS Arizona Lease (the "PCS Arizona Rent Payments," and together with the PCS Arizona Leases, the "PCS Arizona Lease Obligations") within four years of the Petition Date.

383.    The transfers were made, and the obligations incurred, in respect of the PCS Arizona Lease Obligations with the actual intent to hinder, delay or defraud OpCo North's creditors.

384.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable PCS Arizona Leases; (c) the PCS Arizona Lease Obligations were made to PropCo South, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) the PCS Arizona Obligations were not publicly disclosed; (e) the PCS Arizona Leases (including the PCS Arizona Rent Payments payable thereunder) were not the subject of arms' length negotiations; (f) the same person, Derrick Anderson, signed each applicable PCS Arizona Lease on behalf of PropCo South and OpCo South; and (g) OpCo South was insolvent or became insolvent shortly after the PCS

Arizona Leases were executed and the PCS Arizona Rent Payments were transferred to PropCo South.

385.    The PCS Arizona Lease Obligations were incurred and made for Comvest's benefit.

386.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS Arizona Rent Payments, or the value of such property, from PropCo South and Comvest.

387.    Accordingly, Plaintiff is entitled to judgment (i) avoiding the PCS Arizona Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo South and Comvest the PCS Arizona Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo South against the Debtors for damages arising from the rejection of the PCS Arizona Leases.

**COUNT 31**
**(Against PropCo South and Comvest)**
**(Avoidance of the PCS Arizona Lease Obligations,**
**11 U.S.C. §§ 544(b) and 550, and ARS § 44-1004(A)(2))**

388.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

389.    OpCo South made the transfers, and incurred the obligations, in respect of the PCS Arizona Lease Obligations within four years of the Petition Date.

390.    OpCo South received less than reasonably equivalent value from PropCo South in exchange for the transfers made, and the obligations incurred, in respect of the PCS Arizona Lease Obligations.

391.    OpCo South incurred the obligations under the PCS Arizona Leases, and made the PCS Arizona Rent Payments, to PropCo South when OpCo South (a) was engaged in

business, or was about to engage in business, for which any property remaining was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

392.    The PCS Arizona Lease Obligations were incurred and made for Comvest's benefit.

393.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS Arizona Rent Payments, or the value of such property, from PropCo South and Comvest.

394.    Accordingly, Plaintiff is entitled to judgment (i) avoiding the PCS Arizona Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo South and Comvest the PCS Arizona Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo South against the Debtors for damages arising from the rejection of the PCS Arizona Leases.

**COUNT 32**
**(Against PropCo South and Comvest)**
**(Avoidance of the PCS Arizona Lease Obligations,**
**11 U.S.C. §§ 544(b) and 550, and ARS § 44-1005)**

395.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

396.    OpCo South made the transfers, and incurred the obligations, in respect of the PCS Arizona Lease Obligations within four years of the Petition Date.

397.    OpCo South received less than reasonably equivalent value from PropCo South in exchange for the transfers made, and the obligations incurred, in respect of the PCS Arizona Lease Obligations.

398.     OpCo South incurred the obligations under the PCS Arizona Leases, and made the PCS Arizona Rent Payments, to PropCo South when OpCo South was insolvent or OpCo South became insolvent as a result of such transfers and obligations.

399.     The PCS Arizona Lease Obligations were incurred and made for Comvest's benefit.

400.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS Arizona Rent Payments, or the value of such property, from PropCo South and Comvest.

401.     Accordingly, Plaintiff is entitled to judgment (i) avoiding the PCS Arizona Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo South and Comvest the PCS Arizona Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo South against the Debtors for damages arising from the rejection of the PCS Arizona Leases.

**COUNT 33**
**(Against PropCo South and Comvest)**
**(Avoidance of the PCS Nevada Lease Obligations,**
**11 U.S.C. §§ 544(b) and 550, and NRS § 112.180 (1)(a))**

402.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

403.     Exhibit F lists those PropCo Leases that relate to the PCS Nevada Properties (the "PCS Nevada Leases").  The PCS Nevada Leases were obligations incurred by OpCo South to PropCo South within four years of the Petition Date.

404.     OpCo South transferred money to PropCo South in the form of rent payable under each applicable PCS Nevada Lease (the "PCS Nevada Rent Payments," and

together with the PCS Nevada Leases, the "PCS Nevada Lease Obligations") within four years of the Petition Date.

405.    The transfers were made, and the obligations incurred, in respect of the PCS Nevada Lease Obligations with the actual intent to hinder, delay or defraud OpCo North's creditors.

406.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable PCS Nevada Leases; (c) the PCS Nevada Lease Obligations were made to PropCo South, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) the PCS Nevada Obligations were not publicly disclosed; (e) the PCS Nevada Leases (including the PCS Nevada Rent Payments payable thereunder) were not the subject of arms' length negotiations; (f) the same person, Derrick Anderson, signed each applicable PCS Nevada Lease on behalf of PropCo South and OpCo South; and (g) OpCo South was insolvent or became insolvent shortly after the PCS Nevada Leases were executed and the PCS Nevada Rent Payments were transferred to PropCo South.

407.    The PCS Nevada Lease Obligations were incurred and made for Comvest's benefit.

408.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS Nevada Rent Payments, or the value of such property, from PropCo South and Comvest.

409.    Accordingly, Plaintiff is entitled to judgment (i) avoiding the PCS Nevada Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo South and

Comvest the PCS Nevada Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo South against the Debtors for damages arising from the rejection of the PCS Nevada Leases.

**COUNT 34**
**(Against PropCo South and Comvest)**
**(Avoidance of the PCS Nevada Lease Obligations,**
**11 U.S.C. §§ 544(b) and 550, and NRS § 112.180(1)(b))**

410.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

411.    OpCo South made the transfers, and incurred the obligations, in respect of the PCS Nevada Lease Obligations within four years of the Petition Date.

412.    OpCo South received less than reasonably equivalent value from PropCo South in exchange for the transfers made, and the obligations incurred, in respect of the PCS Nevada Lease Obligations.

413.    OpCo South incurred the obligations under the PCS Nevada Leases, and made the PCS Nevada Rent Payments, to PropCo South when OpCo South (a) was engaged in business, or was about to engage in business, for which any property remaining was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

414.    The PCS Nevada Lease Obligations were incurred and made for Comvest's benefit.

415.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS Nevada Rent Payments, or the value of such property, from PropCo South and Comvest.

416.    Accordingly, Plaintiff is entitled to judgment (i) avoiding the PCS Nevada Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo South and Comvest the PCS Nevada Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo South against the Debtors for damages arising from the rejection of the PCS Nevada Leases.

**COUNT 35**
**(Against PropCo South and Comvest)**
**(Avoidance of the PCS Nevada Lease Obligations,**
**11 U.S.C. §§ 544(b) and 550, and NRS § 112.190(1))**

417.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

418.    OpCo South made the transfers, and incurred the obligations, in respect of the PCS Nevada Lease Obligations within four years of the Petition Date.

419.    OpCo South received less than reasonably equivalent value from PropCo South in exchange for the transfers made, and the obligations incurred, in respect of the PCS Nevada Lease Obligations.

420.    OpCo South incurred the obligations under the PCS Nevada Leases, and made the PCS Nevada Rent Payments, to PropCo South when OpCo South was insolvent or OpCo South became insolvent as a result of such transfers and obligations.

421.    The PCS Nevada Lease Obligations were incurred and made for Comvest's benefit.

422.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS Nevada Rent Payments, or the value of such property, from PropCo South and Comvest.

423.     Accordingly, Plaintiff is entitled to judgment (i) avoiding the PCS Nevada Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo South and Comvest the PCS Nevada Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo South against the Debtors for damages arising from the rejection of the PCS Nevada Leases.

**COUNT 36**
**(Against PropCo South and Comvest)**
**(Avoidance of the PCS California Lease Obligations,**
**11 U.S.C. §§ 544(b) and 550, and Cal. Civ. Code § 3439.04 (a)(1))**

424.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

425.     Exhibit F lists those PropCo Leases that relate to the PCS California Properties (the "PCS California Leases").  The PCS California Leases were obligations incurred by OpCo South to PropCo South within four years of the Petition Date.

426.     OpCo South transferred money to PropCo South in the form of rent payable under each applicable PCS California Lease (the "PCS California Rent Payments," and together with the PCS California Leases, the "PCS California Lease Obligations") within four years of the Petition Date.

427.     The transfers were made, and the obligations incurred, in respect of the PCS California Lease Obligations with the actual intent to hinder, delay or defraud OpCo South's creditors.

428.     Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable PCS California Leases; (c) the PCS California Lease Obligations were made to PropCo South, an

insider by virtue of the fact that it was indirectly owned by Holdings; (d) the PCS California

Obligations were not publicly disclosed; (e) the PCS California Leases (including the PCS

California Rent Payments payable thereunder) were not the subject of arms' length negotiations;

(f) the same person, Derrick Anderson, signed each applicable PCS California Lease on behalf of

PropCo South and OpCo South; and (g) OpCo South was insolvent or became insolvent shortly

after the PCS California Leases were executed and the PCS California Rent Payments were

transferred to PropCo South.

429.    The PCS California Lease Obligations were incurred and made for

Comvest's benefit.

430.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit

of the Debtors' estates the PCS California Rent Payments, or the value of such property, from

PropCo South and Comvest.

431.    Accordingly, Plaintiff is entitled to judgment (i) avoiding the PCS

California Lease Obligations as fraudulently incurred obligations, (iii) recovering from PropCo

South and Comvest the PCS California Rent Payments made thereunder or their value, and (ii)

disallowing any claim by PropCo South against the Debtors for damages arising from the

rejection of the PCS California Leases.

## COUNT 37
**(Against PropCo South and Comvest)**
**(Avoidance of the PCS California Lease Obligations,**
**11 U.S.C. §§ 544(b) and 550, and Cal. Civ. Code § 3439.04(a)(2))**

432.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

433.    OpCo South made the transfers, and incurred the obligations, in respect of

the PCS California Lease Obligations within four years of the Petition Date.

434.    OpCo South received less than reasonably equivalent value from PropCo South in exchange for the transfers made, and the obligations incurred, in respect of the PCS California Lease Obligations.

435.    OpCo South incurred the obligations under the PCS California Leases, and made the PCS California Rent Payments, to PropCo South when OpCo South (a) was engaged in business, or was about to engage in business, for which any property remaining was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

436.    The PCS California Lease Obligations were incurred and made for Comvest's benefit.

437.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS California Rent Payments, or the value of such property, from PropCo South and Comvest.

438.    Accordingly, Plaintiff is entitled to judgment (i) avoiding the PCS California Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo South and Comvest the PCS California Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo South against the Debtors for damages arising from the rejection of the PCS California Leases.

**COUNT 38**
**(Against PropCo South and Comvest)**
**(Avoidance of the PCS California Lease Obligations,**
**11 U.S.C. §§ 544(b) and 550, and Cal. Civ. Code § 3439.05)**

439.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

440.    OpCo South made the transfers, and incurred the obligations, in respect of the PCS California Lease Obligations within four years of the Petition Date.

441.    OpCo South received less than reasonably equivalent value from PropCo South in exchange for the transfers made, and the obligations incurred, in respect of the PCS California Lease Obligations.

442.    OpCo South incurred the obligations under the PCS California Leases, and made the PCS California Rent Payments, to PropCo South when OpCo South was insolvent or OpCo South became insolvent as a result of such transfers and obligations.

443.    The PCS California Lease Obligations were incurred and made for Comvest's benefit.

444.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the PCS California Rent Payments, or the value of such property, from PropCo South and Comvest.

445.    Accordingly, Plaintiff is entitled to judgment (i) avoiding the PCS California Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo South and Comvest the PCS California Rent Payments made thereunder or their value, and (iii) disallowing any claim by PropCo South against the Debtors for damages arising from the rejection of the PCS California Leases.

**<u>COUNT 39</u>**
**(Against Property Holdings II and Comvest)**
**(Avoidance of the Transfer of the PHII Properties,**
**11 U.S.C. §§ 548(a)(1)(A) and 550)**

446.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

447.    At all relevant times, Holdings had an interest in the SLB Properties, and in the right to acquire the SLB Properties, listed on Exhibit A (the "PHII Properties").

448.    Within two years of the Petition Date, Holdings directly or indirectly transferred the PHII Properties to Property Holdings II pursuant to the applicable Contribution Agreements.

449.    The direct or indirect transfer of the PHII Properties from Holdings to Property Holdings II was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

450.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable Contribution Agreements; (c) the PHII Properties were transferred to Property Holdings II, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) Holdings directly or indirectly controlled the disposition of the proceeds received from the sale of the PHII Properties pursuant to the applicable Sale Leaseback Transactions; (e) the direct or indirect transfer of the PHII Properties from Holdings to Property Holdings II was not publicly disclosed; (f) the Contribution Agreements were not the subject of arms' length negotiations; (g) Property Holdings II provided no consideration to Holdings for the PHII Properties; (h) the same person, Derrick Anderson, signed each applicable Contribution Agreement on behalf of eight different parties even though not all of the eight parties had an interest in each transfer effectuated by each Contribution Agreement; and (i) the Debtors were insolvent or became insolvent shortly after Holdings transferred the PHII Properties to Property Holdings II.

451.    The transfers of the PHII Properties from Holdings to Property Holdings II were made for Comvest's benefit.

452.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the PHII Properties from Property Holdings II and Comvest.

453.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PHII Properties from Holdings to Property Holdings II, and to a judgment against Property Holdings II and Comvest to recover the value of the PHII Properties.

**COUNT 40**
**(Against Property Holdings II and Comvest)**
**(Avoidance of the Transfer of the PHII Properties,**
**11 U.S.C. §§ 548(a)(1)(B) and 550)**

454.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

455.    At all relevant times, Holdings had an interest in the PHII Properties.

456.    Within two years of the Petition Date, Holdings directly or indirectly transferred the PHII Properties to Property Holdings II pursuant to the applicable Contribution Agreements.

457.    Holdings received less than reasonably equivalent value from Property Holdings II in exchange for the transfer of the PHII Properties.

458.    Holdings transferred the PHII Properties to Property Holdings II when Holdings (a) was insolvent, or Holdings became insolvent as a result of such transfers; (b) was engaged in business, or was about to engage in business, for which any property remaining with Holdings was unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

459.    The transfers of the PHII Properties from Holdings to Property Holdings II were made for Comvest's benefit.

460.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the PHII Properties.

461.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PHII Properties from Holdings to Property Holdings II, and to a judgment against Property Holdings II and Comvest to recover the value of the PHII Properties.

## COUNT 41
### (Against Property Holdings II and Comvest)
### (Avoidance of the Transfer of the PHII Washington Properties, 11 U.S.C. §§ 544(b) and 550, and RCW § 19.40.041(a)(1))

462.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

463.    At all relevant times, Holdings had an interest in the PHII Properties, including those identified on Exhibit A as being located in the state of Washington (the "PHII Washington Properties").

464.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PHII Washington Properties to Property Holdings II.

465.    The direct or indirect transfer of the PHII Washington Properties from Holdings to Property Holdings II was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

466.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable Contribution Agreements; (c) the PHII Washington Properties were transferred to Property

Holdings II, an insider by virtue of the fact that it was indirectly owned by Holdings; (d)

Holdings directly or indirectly controlled the disposition of the proceeds received from the sale

of the PHII Washington Properties pursuant to the applicable Sale Leaseback Transactions; (e)

the direct or indirect transfer of the PHII Washington Properties from Holdings to Property

Holdings II was not publicly disclosed; (f) the Contribution Agreements were not the subject of

arms' length negotiations; (g) Property Holdings II provided no consideration to Holdings for the

PHII Washington Properties; (h) the same person, Derrick Anderson, signed each applicable

Contribution Agreement on behalf of eight different parties even though not all of the eight

parties had an interest in each transfer effectuated by each Contribution Agreement; and (i) the

Debtors were insolvent or became insolvent shortly after Holdings transferred the PHII

Washington Properties to Property Holdings II.

467.    The transfers of the PHII Washington Properties from Holdings to

Property Holdings II were made for Comvest's benefit.

468.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit

of the Debtors' estates the value of the PHII Washington Properties from Property Holdings II

and Comvest.

469.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of

the PHII Washington Properties from Holdings to Property Holdings II and to a judgment against

Property Holdings II and Comvest to recover the value of the PHII Washington Properties.

**COUNT 42**
**(Against Property Holdings II and Comvest)**
**(Avoidance of the Transfer of the PHII Washington Properties,**
**11 U.S.C. §§ 544(b) and 550, and RCW § 19.40.041(a)(2))**

470.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

471.    At all relevant times, Holdings had an interest in the PHII Washington Properties.

472.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PHII Washington Properties to Property Holdings II.

473.    Holdings received less than reasonably equivalent value from Property Holdings II in exchange for the transfer of the PHII Washington Properties.

474.    Holdings transferred the PHII Washington Properties to Property Holdings II when Holdings (a) was engaged in business, or was about to engage in business, for which Holdings' remaining property was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts became due.

475.    The transfers of the PHII Washington Properties from Holdings to Property Holdings II were made for Comvest's benefit.

476.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the PHII Washington Properties from Property Holdings II and Comvest.

477.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PHII Washington Properties from Holdings to Property Holdings II, and to a judgment against Property Holdings II and Comvest to recover the value of the PHII Washington Properties.

### COUNT 43
**(Against Property Holdings II and Comvest)**
**(Avoidance of the Transfer of the PHII Washington Properties,**
**11 U.S.C. §§ 544(b) and 550, and RCW § 19.40.051(a))**

478.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

479.    At all relevant times, Holdings had an interest in the PHII Washington Properties.

480.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PHII Washington Properties to Property Holdings II.

481.    Holdings received less than reasonably equivalent value from Property Holdings II in exchange for the transfer of the PHII Washington Properties.

482.    Holdings transferred the PHII Washington Properties to Property Holdings II when Holdings was insolvent or Holdings became insolvent as a result of the transfers.

483.    The transfers of the PHII Washington Properties from Holdings to Property Holdings II were made for Comvest's benefit.

484.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the PHII Washington Properties from Property Holdings II and Comvest.

485.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PHII Washington Properties from Holdings to Property Holdings II, and to a judgment against Property Holdings II to recover the value of the PHII Washington Properties.

**COUNT 44**
**(Against Property Holdings II and Comvest)**
**(Avoidance of the Transfer of the PHII Oregon Properties,**
**11 U.S.C. §§ 544(b) and 550, and ORS § 95.230(1)(a))**

486.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

487.    At all relevant times, Holdings had an interest in the PHII Properties, including those identified on Exhibit A as being located in the state of Oregon (the "PHII Oregon Properties").

488.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PHII Oregon Properties to Property Holdings II.

489.    The direct or indirect transfer of the PHII Oregon Properties from Holdings to Property Holdings II was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

490.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable Contribution Agreements; (c) the PHII Oregon Properties were transferred to Property Holdings II, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) Holdings directly or indirectly controlled the disposition of the proceeds received from the sale of the PHII Oregon Properties pursuant to the applicable Sale Leaseback Transactions; (e) the direct or indirect transfer of the PHII Oregon Properties from Holdings to Property Holdings II was not publicly disclosed; (f) the Contribution Agreements were not the subject of arms' length negotiations; (g) Property Holdings II provided no consideration to Holdings for the PHII Oregon Properties; (h) the same person, Derrick Anderson, signed each applicable Contribution Agreement on behalf of eight different parties even though not all of the eight parties had an interest in each transfer effectuated by each Contribution Agreement; and (i) the Debtors were insolvent or became insolvent shortly after Holdings transferred the PHII Oregon Properties to Property Holdings II.

491.    The transfers of the PHII Oregon Properties from Holdings to Property Holdings II were made for Comvest's benefit.

492.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the PHII Oregon Properties from Property Holdings II and Comvest.

493.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PHII Oregon Properties from Holdings to Property Holdings II and to a judgment against Property Holdings II and Comvest to recover the PHII Oregon Properties or their value.

### COUNT 45
**(Against Property Holdings II and Comvest)**
**(Avoidance of the Transfer of the PHII Oregon Properties,**
**11 U.S.C. §§ 544(b) and 550, and ORS § 95.230(1)(b))**

494.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

495.    At all relevant times, Holdings had an interest in the PHII Oregon Properties.

496.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PHII Oregon Properties to Property Holdings II.

497.    Holdings received less than reasonably equivalent value from Property Holdings II in exchange for the transfer of the PHII Oregon Properties.

498.    Holdings transferred the PHII Oregon Properties to Property Holdings II when Holdings (a) was engaged in business, or was about to engage in business, for which Holdings' remaining property was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts became due.

499.    The transfers of the PHII Oregon Properties from Holdings to Property Holdings II were made for Comvest's benefit.

500.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of PHII Oregon Properties from Property Holdings II and Comvest.

501.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PHII Oregon Properties from Holdings to Property Holdings II, and to a judgment against Property Holdings II and Comvest to recover the value of the PHII Oregon Properties.

### COUNT 46
**(Against Property Holdings II and Comvest)**
**(Avoidance of the Transfer of the PHII Oregon Properties,**
**11 U.S.C. §§ 544(b) and 550, and ORS § 95.240(1))**

502.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

503.    At all relevant times, Holdings had an interest in the PHII Oregon Properties.

504.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PHII Oregon Properties to Property Holdings II.

505.    Holdings received less than reasonably equivalent value from Property Holdings II in exchange for the transfer of the PHII Oregon Properties.

506.    Holdings transferred the PHII Oregon Properties to Property Holdings II when Holdings was insolvent or Holdings became insolvent as a result of the transfers.

507.    The transfers of the PHII Oregon Properties from Holdings to Property Holdings II were made for Comvest's benefit.

508.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the PHII Oregon Properties from Property Holdings II and Comvest.

509.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PHII Oregon Properties from Holdings to Property Holdings II, and to a judgment against Property Holdings II and Comvest to recover the value of the PHII Oregon Properties.

**COUNT 47**
**(Against Property Holdings II and Comvest)**
**(Avoidance of the Transfer of the PHII Arizona Properties,**
**11 U.S.C. §§ 544(b) and 550, and ARS § 44-1004 (A)(1))**

510.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

511.    At all relevant times, Holdings had an interest in the PHII Properties, including those identified on Exhibit A as being located in the state of Arizona (the "PHII Arizona Properties").

512.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PHII Arizona Properties to Property Holdings II.

513.    The direct or indirect transfer of the PHII Arizona Properties from Holdings to Property Holdings II was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

514.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable Contribution Agreements; (c) the PHII Arizona Properties were transferred to Property Holdings II, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) Holdings directly or indirectly controlled the disposition of the proceeds received from the sale of the PHII Arizona Properties pursuant to the applicable Sale Leaseback Transactions; (e) the direct or indirect transfer of the PHII Arizona Properties from Holdings to Property Holdings II was not

publicly disclosed; (f) the Contribution Agreements were not the subject of arms' length

negotiations; (g) Property Holdings II provided no consideration to Holdings for the PHII

Arizona Properties; (h) the same person, Derrick Anderson, signed each applicable Contribution

Agreement on behalf of eight different parties even though not all of the eight parties had an

interest in each transfer effectuated by each Contribution Agreement; and (i) the Debtors were

insolvent or became insolvent shortly after Holdings transferred the PHII Arizona Properties to

Property Holdings II.

515.    The transfers of the PHII Arizona Properties from Holdings to Property

Holdings II were made for Comvest's benefit.

516.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit

of the Debtors' estates the value of the PHII Arizona Properties from Property Holdings II and

Comvest.

517.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of

the PHII Arizona Properties from Holdings to Property Holdings II and to a judgment against

Property Holdings II and Comvest to recover the value of the PHII Arizona Properties.

## COUNT 48
### (Against Property Holdings II and Comvest)
### (Avoidance of the Transfer of the PHII Arizona Properties,
### 11 U.S.C. §§ 544(b) and 550, and ARS § 44-1004(A)(2))

518.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

519.    At all relevant times, Holdings had an interest in the PHII Arizona

Properties.

520.    Within four years of the Petition Date, Holdings directly or indirectly

transferred the PHII Arizona Properties to Property Holdings II.

521.    Holdings received less than reasonably equivalent value from Property Holdings II in exchange for the transfer of the PHII Arizona Properties.

522.    Holdings transferred the PHII Arizona Properties to Property Holdings II when Holdings (a) was engaged in business, or was about to engage in business, for which Holdings' remaining property was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts became due.

523.    The transfers of the PHII Arizona Properties from Holdings to Property Holdings II were made for Comvest's benefit.

524.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the PHII Arizona Properties from Property Holdings II and Comvest.

525.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PHII Arizona Properties from Holdings to Property Holdings II, and to a judgment against Property Holdings II and Comvest to recover the value of the PHII Arizona Properties.

**COUNT 49**
**(Against Property Holdings II and Comvest)**
**(Avoidance of the Transfer of the PHII Arizona Properties,**
**11 U.S.C. §§ 544(b) and 550, and ARS § 44-1005)**

526.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

527.    At all relevant times, Holdings had an interest in the PHII Arizona Properties.

528.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PHII Arizona Properties to Property Holdings II.

529.    Holdings received less than reasonably equivalent value from Property Holdings II in exchange for the transfer of the PHII Arizona Properties.

530.    Holdings transferred the PHII Arizona Properties to Property Holdings II when Holdings was insolvent or Holdings became insolvent as a result of the transfers.

531.    The transfers of the PHII Arizona Properties from Holdings to Property Holdings II were made for Comvest's benefit.

532.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the PHII Arizona Properties from Property Holdings II and Comvest.

533.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PHII Arizona Properties from Holdings to Property Holdings II, and to a judgment against Property Holdings II and Comvest to recover the value of the PHII Arizona Properties.

**COUNT 50**
**(Against Property Holdings II and Comvest)**
**(Avoidance of the Transfer of the PHII Nevada Properties,**
**11 U.S.C. §§ 544(b) and 550, and NRS § 112.180 (1)(a))**

534.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

535.    At all relevant times, Holdings had an interest in the PHII Properties, including those identified on Exhibit A as being located in the state of Nevada (the "PHII Nevada Properties").

536.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PHII Nevada Properties to Property Holdings II.

537.    The direct or indirect transfer of the PHII Nevada Properties from Holdings to Property Holdings II was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

538.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable Contribution Agreements; (c) the PHII Nevada Properties were transferred to Property Holdings II, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) Holdings directly or indirectly controlled the disposition of the proceeds received from the sale of the PHII Nevada Properties pursuant to the applicable Sale Leaseback Transactions; (e) the direct or indirect transfer of the PHII Nevada Properties from Holdings to Property Holdings II was not publicly disclosed; (f) the Contribution Agreements were not the subject of arms' length negotiations; (g) Property Holdings II provided no consideration to Holdings for the PHII Nevada Properties; (h) the same person, Derrick Anderson, signed each applicable Contribution Agreement on behalf of eight different parties even though not all of the eight parties had an interest in each transfer effectuated by each Contribution Agreement; and (i) the Debtors were insolvent or became insolvent shortly after Holdings transferred the PHII Nevada Properties to Property Holdings II.

539.    The transfers of the PHII Nevada Properties from Holdings to Property Holdings II were made for Comvest's benefit.

540.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the PHII Nevada Properties from Property Holdings II and Comvest.

541.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PHII Nevada Properties from Holdings to Property Holdings II and to a judgment against Property Holdings II and Comvest to recover the value of the PCS Nevada Properties.

**COUNT 51**
**(Against Property Holdings II and Comvest)**
**(Avoidance of the Transfer of the PHII Nevada Properties,**
**11 U.S.C. §§ 544(b) and 550, and NRS § 112.180(1)(b))**

542.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

543.    At all relevant times, Holdings had an interest in the PHII Nevada Properties.

544.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PHII Nevada Properties to Property Holdings II.

545.    Holdings received less than reasonably equivalent value from Property Holdings II in exchange for the transfer of the PHII Nevada Properties.

546.    Holdings transferred the PHII Nevada Properties to Property Holdings II when Holdings (a) was engaged in business, or was about to engage in business, for which Holdings' remaining property was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts became due.

547.    The transfers of the PHII Nevada Properties from Holdings to Property Holdings II were made for Comvest's benefit.

548.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the PHII Nevada Properties from Property Holdings II and Comvest.

549.     Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PHII Nevada Properties from Holdings to Property Holdings II, and to a judgment against Property Holdings II and Comvest to recover the value of the PHII Nevada Properties.

**COUNT 52**
**(Against Property Holdings II and Comvest)**
**(Avoidance of the Transfer of the PCS Nevada Properties,**
**11 U.S.C. §§ 544(b) and 550, and NRS § 112.190(1))**

550.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

551.     At all relevant times, Holdings had an interest in the PHII Nevada Properties.

552.     Within four years of the Petition Date, Holdings directly or indirectly transferred the PHII Nevada Properties to Property Holdings II.

553.     Holdings received less than reasonably equivalent value from Property Holdings II in exchange for the transfer of the PHII Nevada Properties.

554.     Holdings transferred the PHII Nevada Properties to Property Holdings II when Holdings was insolvent or Holdings became insolvent as a result of the transfers.

555.     The transfers of the PHII Nevada Properties from Holdings to Property Holdings II were made for Comvest's benefit.

556.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the PHII Nevada Properties from Property Holdings II and Comvest.

557.     Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PHII Nevada Properties from Holdings to Property Holdings II, and to a judgment against Property Holdings II and Comvest to recover the value of the PHII Nevada Properties.

**COUNT 53**
**(Against Property Holdings II and Comvest)**
**(Avoidance of the Transfer of the PHII California Properties,**
**11 U.S.C. §§ 544(b) and 550, and Cal. Civ. Code § 3439.04 (a)(1))**

558.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

559.    At all relevant times, Holdings had an interest in the PHII Properties, including those identified on Exhibit A as being located in the state of California (the "PHII California Properties").

560.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PHII California Properties to Property Holdings II.

561.    The direct or indirect transfer of the PHII California Properties from Holdings to Property Holdings II was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

562.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable Contribution Agreements; (c) the PHII California Properties were transferred to Property Holdings II, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) Holdings directly or indirectly controlled the disposition of the proceeds received from the sale of the PHII California Properties pursuant to the applicable Sale Leaseback Transactions; (e) the direct or indirect transfer of the PHII California Properties from Holdings to Property Holdings II was not publicly disclosed; (f) the Contribution Agreements were not the subject of arms' length negotiations; (g) Property Holdings II provided no consideration to Holdings for the PHII California Properties; (h) the same person, Derrick Anderson, signed each applicable

Contribution Agreement on behalf of eight different parties even though not all of the eight

parties had an interest in each transfer effectuated by each Contribution Agreement; and (i) the

Debtors were insolvent or became insolvent shortly after Holdings transferred the PHII

California Properties to Property Holdings II.

563.    The transfers of the PHII California Properties from Holdings to Property

Holdings II were made for Comvest's benefit.

564.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit

of the Debtors' estates the value of the PHII California Properties from Property Holdings II and

Comvest.

565.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of

the PHII California Properties from Holdings to Property Holdings II and to a judgment against

Property Holdings II and Comvest to recover the value of the PHII California Properties.

**COUNT 54**
**(Against Property Holdings II and Comvest)**
**(Avoidance of the Transfer of the PHII California Properties,**
**11 U.S.C. §§ 544(b) and 550, and Cal. Civ. Code § 3439.04(a)(2))**

566.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

567.    At all relevant times, Holdings had an interest in the PHII California

Properties.

568.    Within four years of the Petition Date, Holdings directly or indirectly

transferred the PHII California Properties to Property Holdings II.

569.    Holdings received less than reasonably equivalent value from Property

Holdings II in exchange for the transfer of the PHII California Properties.

570.    Holdings transferred the PHII California Properties to Property Holdings II when Holdings (a) was engaged in business, or was about to engage in business, for which Holdings' remaining property was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts became due.

571.    The transfers of the PHII California Properties from Holdings to Property Holdings II were made for Comvest's benefit.

572.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the PHII California Properties from Property Holdings II and Comvest.

573.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PHII California Properties from Holdings to Property Holdings II, and to a judgment against Property Holdings II and Comvest to recover the PHII California Properties or their value.

**COUNT 55**
**(Against Property Holdings II and Comvest)**
**(Avoidance of the Transfer of the PHII California Properties,**
**11 U.S.C. §§ 544(b) and 550, and Cal. Civ. Code § 3439.05)**

574.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

575.    At all relevant times, Holdings had an interest in the PHII California Properties.

576.    Within four years of the Petition Date, Holdings directly or indirectly transferred the PHII California Properties to Property Holdings II.

577.    Holdings received less than reasonably equivalent value from Property Holdings II in exchange for the transfer of the PHII California Properties.

578.    Holdings transferred the PHII California Properties to Property Holdings II when Holdings was insolvent or Holdings became insolvent as a result of the transfers.

579.    The transfers of the PHII California Properties from Holdings to Property Holdings II were made for Comvest's benefit.

580.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the PHII California Properties from Property Holdings II and Comvest.

581.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the PHII California Properties from Holdings to Property Holdings II, and to a judgment against Property Holdings II and Comvest to recover the value of the PHII California Properties.

**COUNT 56**
**(Against Haggen SLB and Comvest )**
**(Avoidance of the Transfer of the Haggen SLB Properties,**
**11 U.S.C. §§ 548(a)(1)(A) and 550)**

582.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

583.    At all relevant times, Holdings had an interest in the SLB Properties, and in the right to acquire the SLB Properties, listed on Exhibit B (the "Haggen SLB Properties").

584.    Within two years of the Petition Date, Holdings directly or indirectly transferred the Haggen SLB Properties to Haggen SLB pursuant to the applicable Contribution Agreements.

585.    The direct or indirect transfer of the Haggen SLB Properties from Holdings to Haggen SLB was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

586.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable Contribution Agreements; (c) the Haggen SLB Properties were transferred to Haggen SLB, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) Holdings directly or indirectly controlled the disposition of the proceeds received from the sale of the Haggen SLB Properties pursuant to the applicable Sale Leaseback Transactions; (e) the direct or indirect transfer of the Haggen SLB Properties from Holdings to Haggen SLB was not publicly disclosed; (f) the Contribution Agreements were not the subject of arms' length negotiations; (g) Haggen SLB provided no consideration to Holdings for the Haggen SLB Properties; (h) the same person, Derrick Anderson, signed each applicable Contribution Agreement on behalf of eight different parties even though not all of the eight parties had an interest in each transfer effectuated by each Contribution Agreement; and (i) the Debtors were insolvent or became insolvent shortly after Holdings transferred the Haggen SLB Properties to Haggen SLB.

587.    The transfers of the Haggen SLB Properties from Holdings to Property Holdings II were made for Comvest's benefit.

588.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the Haggen SLB Properties from Haggen SLB and Comvest.

589.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the Haggen SLB Properties from Holdings to Haggen SLB, and to a judgment against Haggen SLB and Comvest to recover the value of the Haggen SLB Properties.

## COUNT 57

### (Against Haggen SLB and Comvest)
### (Avoidance of the Transfer of the Haggen SLB Properties,
### 11 U.S.C. §§ 548(a)(1)(B) and 550)

590.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

591.     At all relevant times, Holdings had an interest in the Haggen SLB Properties.

592.     Within two years of the Petition Date, Holdings directly or indirectly transferred the Haggen SLB Properties to Haggen SLB pursuant to the applicable Contribution Agreements.

593.     Holdings received less than reasonably equivalent value from Haggen SLB in exchange for the transfer of the Haggen SLB Properties.

594.     Holdings transferred the Haggen SLB Properties to Haggen SLB when Holdings (a) was insolvent, or Holdings became insolvent as a result of such transfers; (b) was engaged in business, or was about to engage in business, for which any property remaining with Holdings was unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

595.     The transfers of the Haggen SLB Properties from Holdings to Property Holdings II were made for Comvest's benefit.

596.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the Haggen SLB Properties from Haggen SLB and Comvest.

597.     Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the Haggen SLB Properties from Holdings to Haggen SLB, and to a judgment against Haggen SLB and Comvest to recover the value of the Haggen SLB Properties.

## COUNT 58
**(Against Haggen SLB and Comvest)**
**(Avoidance of the Transfer of the Haggen SLB Washington Properties,**
**11 U.S.C. §§ 544(b) and 550, and RCW § 19.40.041(a)(1))**

598.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

599.    At all relevant times, Holdings had an interest in the Haggen SLB

Properties, including those identified on Exhibit B as being located in the state of Washington

(the "Haggen SLB Washington Properties").

600.    Within four years of the Petition Date, Holdings directly or indirectly

transferred the Haggen SLB Washington Properties to Haggen SLB.

601.    The direct or indirect transfer of the Haggen SLB Washington Properties

from Holdings to Haggen SLB was made with the actual intent to hinder, delay or defraud the

Debtors' creditors.

602.    Actual fraudulent intent can be inferred from at least the following

"badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or

affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable

Contribution Agreements; (c) the Haggen SLB Washington Properties were transferred to

Haggen SLB, an insider by virtue of the fact that it was indirectly owned by Holdings; (d)

Holdings directly or indirectly controlled the disposition of the proceeds received from the sale

of the Haggen SLB Washington Properties pursuant to the applicable Sale Leaseback

Transactions; (e) the direct or indirect transfer of the Haggen SLB Washington Properties from

Holdings to Haggen SLB was not publicly disclosed; (f) the Contribution Agreements were not

the subject of arms' length negotiations; (g) Haggen SLB provided no consideration to Holdings

for the Haggen SLB Washington Properties; (h) the same person, Derrick Anderson, signed each

applicable Contribution Agreement on behalf of eight different parties even though not all of the

eight parties had an interest in each transfer effectuated by each Contribution Agreement; and (i)

the Debtors were insolvent or became insolvent shortly after Holdings transferred the Haggen

SLB Washington Properties to Haggen SLB.

603.     The transfers of the Haggen SLB Washington Properties from Holdings to

Property Holdings II were made for Comvest's benefit.

604.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit

of the Debtors' estates the value of the Haggen SLB Washington Properties from Haggen SLB

and Comvest.

605.     Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of

the Haggen SLB Washington Properties from Holdings to Haggen SLB and to a judgment

against Haggen SLB and Comvest to recover the value of the Haggen SLB Washington

Properties.

**COUNT 59**
**(Against Haggen SLB and Comvest)**
**(Avoidance of the Transfer of the Haggen SLB Washington Properties,**
**11 U.S.C. §§ 544(b) and 550, and RCW § 19.40.041(a)(2))**

606.     Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

607.     At all relevant times, Holdings had an interest in the Haggen SLB

Washington Properties.

608.     Within four years of the Petition Date, Holdings directly or indirectly

transferred the Haggen SLB Washington Properties to Haggen SLB.

609.     Holdings received less than reasonably equivalent value from Haggen

SLB in exchange for the transfer of the Haggen SLB Washington Properties.

610.     Holdings transferred the Haggen SLB Washington Properties to Haggen SLB when Holdings (a) was engaged in business, or was about to engage in business, for which Holdings' remaining property was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts became due.

611.     The transfers of the Haggen SLB Washington Properties from Holdings to Property Holdings II were made for Comvest's benefit.

612.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the Haggen SLB Washington Properties from Haggen SLB and Comvest.

613.     Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the Haggen SLB Washington Properties from Holdings to Haggen SLB, and to a judgment against Haggen SLB and Comvest to recover the value of the Haggen SLB Washington Properties.

## COUNT 60
### (Against Haggen SLB and Comvest)
### (Avoidance of the Transfer of the Haggen SLB Washington Properties, 11 U.S.C. §§ 544(b) and 550, and RCW § 19.40.051(a))

614.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

615.     At all relevant times, Holdings had an interest in the Haggen Washington Properties.

616.     Within four years of the Petition Date, Holdings directly or indirectly transferred the Haggen SLB Washington Properties to Haggen SLB.

617.     Holdings received less than reasonably equivalent value from Haggen SLB in exchange for the transfer of the Haggen SLB Washington Properties.

618.    Holdings transferred the Haggen SLB Washington Properties to Haggen SLB when Holdings was insolvent or Holdings became insolvent as a result of the transfers.

619.    The transfers of the Haggen SLB Washington Properties from Holdings to Property Holdings II were made for Comvest's benefit.

620.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the Haggen SLB Washington Properties from Haggen SLB and Comvest.

621.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the Haggen SLB Washington Properties from Holdings to Haggen SLB, and to a judgment against Haggen SLB and Comvest to recover the value of the Haggen SLB Washington Properties.

**COUNT 61**
**(Against Haggen SLB and Comvest)**
**(Avoidance of the Transfer of the Haggen SLB California Properties,**
**11 U.S.C. §§ 544(b) and 550, and Cal. Civ. Code § 3439.04 (a)(1))**

622.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

623.    At all relevant times, Holdings had an interest in the Haggen SLB Properties, including those identified on Exhibit B as being located in the state of California (the "Haggen SLB California Properties").

624.    Within four years of the Petition Date, Holdings directly or indirectly transferred the Haggen SLB California Properties to Haggen SLB.

625.    The direct or indirect transfer of the Haggen SLB California Properties from Holdings to Haggen SLB was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

626.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties to the applicable Contribution Agreements; (c) the Haggen SLB California Properties were transferred to Haggen SLB, an insider by virtue of the fact that it was indirectly owned by Holdings; (d) Holdings directly or indirectly controlled the disposition of the proceeds received from the sale of the Haggen SLB California Properties pursuant to the applicable Sale Leaseback Transactions; (e) the direct or indirect transfer of the Haggen SLB California Properties from Holdings to Haggen SLB was not publicly disclosed; (f) the Contribution Agreements were not the subject of arms' length negotiations; (g) Haggen SLB provided no consideration to Holdings for the Haggen SLB California Properties; (h) the same person, Derrick Anderson, signed each applicable Contribution Agreement on behalf of eight different parties even though not all of the eight parties had an interest in each transfer effectuated by each Contribution Agreement; and (i) the Debtors were insolvent or became insolvent shortly after Holdings transferred the Haggen SLB California Properties to Haggen SLB.

627.    The transfers of the Haggen SLB California Properties from Holdings to Property Holdings II were made for Comvest's benefit.

628.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the Haggen SLB California Properties from Haggen SLB and Comvest.

629.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the Haggen SLB California Properties from Holdings to Haggen SLB and to a judgment against Haggen SLB and Comvest to recover the value of the Haggen SLB California Properties.

**COUNT 62**
**(Against Haggen SLB and Comvest)**
**(Avoidance of the Transfer of the Haggen SLB California Properties,**
**11 U.S.C. §§ 544(b) and 550, and Cal. Civ. Code § 3439.04(a)(2))**

630.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

631.    At all relevant times, Holdings had an interest in the Haggen SLB California Properties.

632.    Within four years of the Petition Date, Holdings directly or indirectly transferred the Haggen SLB California Properties to Haggen SLB.

633.    Holdings received less than reasonably equivalent value from Haggen SLB in exchange for the transfer of the Haggen SLB California Properties.

634.    Holdings transferred the Haggen SLB California Properties to Haggen SLB when Holdings (a) was engaged in business, or was about to engage in business, for which Holdings' remaining property was unreasonably small capital; or (b) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts became due.

635.    The transfers of the Haggen SLB California Properties from Holdings to Property Holdings II were made for Comvest's benefit.

636.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the Haggen SLB California Properties from Haggen SLB and Comvest.

637.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the Haggen SLB California Properties from Holdings to Haggen SLB, and to a judgment against Haggen SLB and Comvest to recover the Haggen SLB California Properties or their value.

116

**COUNT 63**
**(Against Haggen SLB and Comvest)**
**(Avoidance of the Transfer of the Haggen SLB California Properties,**
**11 U.S.C. §§ 544(b) and 550, and Cal. Civ. Code § 3439.05)**

638.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

639.     At all relevant times, Holdings had an interest in the Haggen SLB California Properties.

640.     Within four years of the Petition Date, Holdings directly or indirectly transferred the Haggen SLB California Properties to Haggen SLB.

641.     Holdings received less than reasonably equivalent value from Haggen SLB in exchange for the transfer of the Haggen SLB California Properties.

642.     Holdings transferred the Haggen SLB California Properties to Haggen SLB when Holdings was insolvent or Holdings became insolvent as a result of the transfers.

643.     The transfers of the Haggen SLB California Properties from Holdings to Property Holdings II were made for Comvest's benefit.

644.     Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the Haggen SLB California Properties from Haggen SLB and Comvest.

645.     Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the Haggen SLB California Properties from Holdings to Haggen SLB, and to a judgment against Haggen SLB and Comvest to recover the value of the Haggen SLB California Properties.

**COUNT 64**
**(Against Comvest )**
**(Avoidance of the Transfer of the Comvest Payments,**
**11 U.S.C. §§ 544(b), 548(a)(1)(A), and 550)**

646.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

647.    At all relevant times, Haggen had an interest in the Comvest Payments.

648.    Within two years of the Petition Date, Haggen directly or indirectly transferred the Comvest Payments to, or for the benefit of, Comvest.

649.    The direct or indirect transfer of the Comvest Payments from Haggen to Comvest was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

650.    Actual fraudulent intent can be inferred from at least the following "badges of fraud": (a) a majority of Haggen's Managers were simultaneously employed or affiliated with Comvest; (b) Comvest dominated and controlled the parties who authorized the transfer of the Comvest Payments; (c) the Comvest Payments were transferred to Comvest, an insider by virtue of the fact that it owned, directly or indirectly, the Debtors; (d) the direct or indirect transfer of the Comvest Payments from the Debtors to Comvest was not publicly disclosed; (e) the Comvest Payments (and the underlying agreements, including the Management Agreement) were not the subject of arms' length negotiations; (f) Comvest provided no consideration to the Debtors for the Comvest Payments; and (g) the Debtors were insolvent or became insolvent shortly after they transferred the Comvest Payments to Comvest.

651.    The transfers of the Comvest Payments from Haggen to Comvest were made for Comvest's benefit.

652.    The transfers of the Comvest Payments from Haggen to Comvest are avoidable under section 548(a)(1)(A) of the Bankruptcy Code.

653.    The transfers of the Comvest Payments from Haggen to Comvest are also avoidable under section 544(b) of the Bankruptcy Code and applicable fraudulent transfer laws of the states of Washington (RCW §§ 19.40.041(a)(1)), Oregon (ORS §§ 95.230(a)(1)), Arizona (ARS §§ 44-1004(A)(1)), Nevada (NRS §§ 112.180(1)(a), and California (Cal. Civil Code §§ 3439.04(a)(1)).

654.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the value of the Comvest Payments from Comvest.

655.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the Comvest Payments from Haggen to Comvest, and to a judgment against Comvest to recover the value of the Comvest Payments.

## COUNT 65
### (Against Comvest)
### (Avoidance of the Transfer of the Comvest Payments,
### 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550)

656.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

657.    At all relevant times, Haggen had an interest in the Comvest Payments.

658.    Within two years of the Petition Date, Haggen directly or indirectly transferred the Comvest Payments to, or for the benefit of, Comvest.

659.    Haggen did not receive reasonably equivalent value or fair consideration from Comvest in exchange for the transfer of the Comvest Payments.

660.    Haggen transferred the Comvest Payments to Comvest when Haggen (a) was insolvent, or Haggen became insolvent as a result of such transfers; (b) were engaged in business, or were about to engage in business, for which any property remaining with Haggen

was unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

661.    At all relevant times, Haggen had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code section 502 and 544(b).

662.    The transfers of the Comvest Payments from Haggen to Comvest are avoidable under section 548(a)(1)(B) of the Bankruptcy Code.

663.    The transfers of the Comvest Payments from Haggen to Comvest are also avoidable under section 544(b) of the Bankruptcy Code and applicable fraudulent transfer laws of the states of Washington (RCW §§ 19.40.041(a)(2), 19.40.051(a)), Oregon (ORS §§ 95.230(a)(2), 95.240(1)), Arizona (ARS §§ 44-1004(A)(2), 44-1005), Nevada (NRS §§ 112.180(1)(b), 112.190), and California (Cal. Civil Code §§ 3439.04(a)(2), 3439.05).

664.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit of the Debtors' estates the Comvest Payments, or the value of such property, from Comvest.

665.    Accordingly, Plaintiff is entitled to avoid the direct or indirect transfer of the Comvest Payments from the Debtors to Comvest, and to a judgment against Comvest to recover the Comvest Payments or their value.

## COUNT 66
### (Against Comvest)
### (Breach of Fiduciary Duty by Comvest as Controlling Equity Owner)

666.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

667.    At all relevant times, Comvest directly or indirectly owned a majority of the interests of Holdings, which in turn directly or indirectly owned the other Debtors and each of the PropCo Entities and SLB Entities.

668.    At all relevant times, a majority of Holdings' Managers were employees, partners or agents of Comvest.

669.    Because Comvest owned a majority of the interests of Holdings, and controlled Holdings through the Managers it appointed, Comvest owed to the Debtors fiduciary obligations of good faith, care and loyalty.

670.    At the time of the Albertson's Acquisition and the Challenged Transactions, the Debtors (a) were engaged or were about to be engaged in a business for which their remaining assets and/or capital were unreasonably small in relation to their business, (b) intended to incur, or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due and/or (c) were insolvent or would be rendered insolvent by the Challenged Transactions.  Consequently, Comvest had a fiduciary obligation to the Debtors and their unsecured creditors to protect the interests of such creditors.  Even if the Debtors were not insolvent or did not have unreasonably small capital, Comvest owed duties of loyalty and other duties to the Debtors.

671.    Comvest had a substantial financial interest in the Challenged Transactions because they formed the method by which Comvest executed its strategy to exploit for its own benefit the Real Property and related assets being acquired from Albertson's.

672.    Comvest breached its fiduciary duties by orchestrating, approving, and facilitating the Challenged Transactions whereby the Debtors transferred to the non-Debtor bankruptcy-remote entities the valuable Real Property and related assets being acquired from Albertson's, and by extracting further value from the Debtor OpCo Entities as described above.

673.    Because Comvest directly and indirectly owned and controlled the Debtors, the SLB Entities and the PropCo Entities, Comvest had conflicts of interest when

balancing the interests of the Debtors and their creditors against the interests of the SLB Entities and the PropCo Entities.

674.    The corporate structure conceived and/or created by Comvest enabled Comvest to engage in the Challenged Transactions and shield the Real Property and related assets acquired from Albertson's from the Debtors' unsecured creditors.

675.    Comvest engaged in self-dealing, acted in bad faith, breached its fiduciary duties (including the duty of loyalty), and took undue advantage of the Debtors by orchestrating, approving, and facilitating the Insider Transactions.

676.    Comvest also engaged in self-dealing, acted in bad faith, and breached its fiduciary duties (including the duty of loyalty) by using its positions as the controlling owner of the Debtors to cause Holdings and the other Debtors to "contribute" the Real Property and related assets to the non-Debtor Defendants for no consideration, to enter into the PropCo Leases and to pay rent thereunder, that enhanced Comvest's interests at the expense of the Debtors' unsecured creditors.

677.    The Debtors, their estates and their creditors have been damaged in an amount to be determined at trial as a result of the Challenged Transactions orchestrated, approved and facilitated by Comvest.

### COUNT 67
**(Against the Officers and Directors)**
**(Breach of Duties of Good Faith and Care)**

678.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

679.    At all relevant times, the Officers and Directors owed the Debtors fiduciary obligations including, among others, the duties of good faith and care.

680.    At the time of the Albertson's Acquisition and the Challenged Transactions, the Debtors (a) were engaged or were about to be engaged in a business for which their remaining assets and/or capital were unreasonably small in relation to their business, (b) intended to incur, or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due and/or (c) was insolvent or would be rendered insolvent by the Challenged Transactions.  Consequently, the Officers and Directors also had a fiduciary obligation to protect the interests of the Debtors' unsecured creditors.

681.    The Officers and Directors knew or should have known that the Challenged Transactions were undertaken for Comvest's benefit, and at the expense of the Debtors' unsecured creditors.  Nevertheless, the Officers and Directors participated or acquiesced in the plan to strip out for Comvest's benefit the Real Property and related assets being acquired from Albertson's, including by executing each of the Challenged Transactions.

682.    Each of the Officers and Directors breached their fiduciary duties of good faith and care by approving, participating in, consummating and acquiescing in the Challenged Transactions whereby the Debtors transferred to the non-Debtor bankruptcy-remote entities the valuable Real Property and related assets being acquired from Albertson's, and by extracting further value from the Debtor OpCo Entities as described above.

683.    As the Officers and Directors knew and intended, the corporate structure that they approved and created enabled Comvest to benefit from the Challenged Transactions by shielding the Real Property and related assets from the Debtors' unsecured creditors, and the Officers and Directors knew and enabled it.

684.    The Officers and Directors breached their fiduciary duties of good faith and care, and were grossly negligent, by approving, participating in, consummating and

acquiescing in the Challenged Transactions, and by otherwise using their positions to cause Holdings and the other Debtors to "contribute" the Real Property and related assets to the non-Debtor Defendants for no consideration, to enter into the PropCo Leases and to pay rent thereunder, and to advance Comvest's interests at the expense of the Debtors' unsecured creditors.

685.    The Officers and Directors also breached their duty of care, and were grossly negligent, in the planning and execution of the Albertson's Acquisition.  The Officers and Directors relied on unrealistic financial projections; failed to create a viable plan for the acquisition and integration of 146 supermarkets; failed to hire and retain experienced senior management; failed to adapt to the new markets Haggen was venturing into; and -- as evidenced by the fact that the entire Albertson's Acquisition was deconstructed, in a bankruptcy, in less than twelve months -- otherwise destroyed a successful, decades-old enterprise.

686.    Indeed, the Officers and Directors' breach of their duty of care, and grossly negligent conduct, is further shown by their failure to timely address alleged misconduct by Albertson's.  Haggen has asserted that Albertson's intentionally engaged in a pattern of misconduct designed to thwart Haggen's attempts to successfully absorb the Albertson's stores. Even if Haggen's allegations were true, the Officers and Directors were grossly negligent in failing to raise such issues within 30 days after each store conversion, as required by section 21.4 of the APA.  Upon information and belief, Haggen did not raise any meaningful concerns about the store conversion process until June 29, 2015, more than 30 days after virtually all of the stores were converted.  Thus, the Officers and Directors either recklessly failed to timely consider all material information available to them, or they were reckless in failing to timely assert Haggen's claims of misconduct.

687.    The Debtors, their estates and their creditors have been damaged in an amount to be determined at trial as a result of the Officers and Directors' breach of their fiduciary duties of good faith and care.

## COUNT 68
### (Against Holdings' Managers)
### (Breach of Duty of Loyalty)

688.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

689.    Caple and Rodriguez were each affiliated with Comvest while simultaneously serving as a Manager of Holdings for the period beginning no later than November 24, 2014, and continuing through the Petition Date.

690.    Niegsch was affiliated with Comvest while simultaneously serving as a Manager of Holdings for the period beginning no later than January 30, 2015, and continuing through the Petition Date.

691.    Clougher served as a Manager of Holdings for the period beginning no later than January 30, 2015, and continuing through the Petition Date.

692.    Shaner served as a Manager of Holdings for the period beginning no later than January 30, 2015, and continuing through September 2, 2015 (Caple, Rodriguez, Niegsch, Clougher, and Shaner are collectively referred to as "Holdings' Managers").

693.    At all relevant times, Holdings' Managers owed the Debtors fiduciary obligations, including the duty of loyalty.

694.    Holdings' Managers breached their duty of loyalty, and acted in bad faith, by advancing Comvest's interests at Haggen's expense.

695.    Holdings' Managers knew or should have known that the Challenged Transactions were undertaken for Comvest's benefit, and at the expense of the Debtors'

unsecured creditors.  Nevertheless, Holdings' Managers participated or acquiesced in the plan to strip out for Comvest's benefit the Real Property and related assets being acquired from Albertson's, including by executing each of the Challenged Transactions.

696.    Each of Haggen's Managers acted in bad faith and breached their duty of loyalty by approving, participating in, consummating and acquiescing in the Challenged Transactions whereby the Debtors transferred to the non-Debtor bankruptcy-remote entities the valuable Real Property and related assets being acquired from Albertson's, and by extracting further value from the Debtor OpCo Entities through the imposition of the PropCo Leases and as otherwise described above.

697.    Holdings' Managers acted in bad faith and breached their duty of loyalty by approving, participating in, consummating and acquiescing in the Challenged Transactions.

698.    Holdings' Managers also acted in bad faith and breached their duty of loyalty by using their positions to cause Holdings and the other Debtors to "contribute" the Real Property and related assets to the non-Debtor Defendants for no consideration, to enter into the PropCo Leases and to pay rent thereunder, and to otherwise advance Comvest's interests at the expense of the Debtors and their unsecured creditors.

699.    The Debtors, their estates and creditors have been damaged by the Holdings' Managers' breach of their duty of loyalty in an amount to be determined at trial.

## COUNT 69
### (Against the Intercompany Lenders)
### (Equitable Subordination of the Intercompany Loan -- U.S.C. § 510(c))

700.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

701.    Comvest indirectly owns a majority of the interests of the Intercompany Lenders, and is therefore the indirect beneficiary of the Intercompany Notes and the security interests granted under the Intercompany Loan.

702.    The Intercompany Loan was not an arms' length transaction as evidenced by, among other things, Defendant Blake Barnett's signature on the Intercompany Loan and Intercompany Notes, on behalf of all the parties thereto.

703.    At the direction of Comvest and the Officers and Directors, including Blake Barnett, the Intercompany Lenders engaged in unfair and inequitable conduct by taking security interests and the Intercompany Notes at a time when the Debtors were insolvent, unable to pay their debts as they became due, and left with unreasonably small capital.

704.    As set forth above, Comvest otherwise engaged in a pattern of misconduct and inequitable conduct at the expense of the Debtors, their estates and stakeholders, including unsecured creditors, including by engineering and executing the Challenged Transactions.

705.    Comvest's conduct, which is imputed to the Intercompany Lenders, injured the Debtors' unsecured creditors and conferred an unfair advantage upon Comvest.

706.    Under the principles of equitable subordination, the Intercompany Loan is subject to subordination pursuant to section 510(c) of the Bankruptcy Code.

707.    Equitable subordination of the Intercompany Loan is consistent with the provisions and purposes of the Bankruptcy Code.

708.    Accordingly, the Intercompany Loan is subject to equitable subordination.

## COUNT 70
### (Against the Intercompany Lenders)
### (Transfer of Liens and Security Interests - 11 U.S.C. §510(c))

709.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

710.     As set forth above, Comvest and the Intercompany Lenders engaged in a pattern of misconduct and inequitable conduct at the expense of the Debtors and their estates and stakeholders, including unsecured creditors.

711.     As set forth above, Comvest and the Intercompany Lenders' conduct has injured the Debtors' unsecured creditors and conferred an unfair advantage upon them.

712.     Accordingly, all of the liens securing the Intercompany Borrowers' obligations to the Intercompany Lenders under the Intercompany Notes, to the extent valid, should be transferred to the Debtors' estates.

## <u>COUNT 71</u>
### (Against the Intercompany Lenders)
### (Recharacterization of the Intercompany Loan as Equity)

713.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

714.     At the time the Intercompany Loan was made, the Intercompany Borrowers were insolvent, were unable to pay their debts as they became due and otherwise had unreasonably small capital for the business in which they were engaged.

715.     The Intercompany Loan was not the product of an arms' length negotiation.

716.     No third party lender would have loaned $25 million to the Intercompany Borrowers in August 2015 on the terms set forth in the Intercompany Loan.

717.     The terms of the Intercompany Loan were not commercially reasonable given the Intercompany Borrowers' financial condition at the time the Loan was made.

718.     Based on the foregoing, the Intercompany Borrowers granted a subordinated security interest in certain assets, and issued the Intercompany Notes, at a time when no reasonable outsider would have lent money under the terms of the Intercompany Loan.

As such, the Intercompany Loan must be recharacterized as equity in the Intercompany

Borrowers pursuant to applicable law.

### COUNT 72
**(Against the SLB Entities and the PropCo Entities)**
**(Substantive Consolidation)**

719.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though set forth fully herein.

720.    At all relevant times, the SLB Entities and the PropCo Entities were solely

owned (directly or indirectly) and controlled by Holdings.

721.    The SLB Entities and the PropCo Entities, along with the Debtor OpCo

Entities, were created in connection with the Albertson's Acquisition to facilitate the separation

of the Real Property and related assets from the operating entities and their liabilities.

722.    The SLB Entities and the PropCo Entities served no purpose other than to

acquire and/or convey the Real Property and related assets, and collect rent, for Comvest's

ultimate benefit.

723.    From the time of their formation in December 2014 through the Petition

Date, the PropCo Entities (a) had no independent managers, but were managed solely by their

corporate owner, Property Holdings, (b) had no creditors (other than PNC, to which the PropCo

Entities allegedly provided various mortgages/deeds of trust to secure a limited guarantee, and

certain insider obligations), (c) did not create or maintain any board minutes, (d) did not utilize

their own domain name, and (e) maintained their business addresses, their books and records and

their e-mail server at the Debtors' location.

724.    From the time of their formation in December 2014 through the Petition

Date, the SLB Entities (a) had no independent managers, but were managed solely by their

respective corporate owner, (b) had no creditors, (c) did not create or maintain any board

minutes, (d) did not utilize their own domain name, and (e) maintained their business addresses, their books and records and their e-mail server at the Debtors' location.

725.    At all relevant times, the Debtors' finances were so intermingled and interdependent with the SLB Entities and the PropCo Entities that administration of the Debtors' estates by themselves would leave the Debtors' creditors without assets that, but for their use by the SLB Entities and the PropCo Entities, would have been available to satisfy debts owed to them.

726.    Pursuant to section 105 of the Bankruptcy Code, this Court, as a court of equity, has the power and authority to issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.

727.    Given (a) the identity of the interests among the Debtors, the SLB Entities and the PropCo Entities, including their common ownership, (b) the improper purpose for which the SLB Entities and the PropCo Entities were created, and (c) Comvest's inequitable conduct in attempting to sequester the Real Property and related assets for its benefit, and to the exclusion of the Debtors' general unsecured creditors, it is necessary and appropriate that the business affairs of the SLB Entities and the PropCo Entities be administered and resolved in conjunction with the Debtors' affairs.

728.    Substantive consolidation will streamline the distribution of assets among all creditors.

729.    Substantive consolidation is necessary to insure the equitable treatment of all creditors, in that the Debtors' unsecured creditors will unfairly and inequitably receive a smaller share of assets if the SLB Entities and the PropCo Entities are not brought into these proceedings.

## COUNT 73
**(Against Comvest)**
**(Unjust Enrichment)**

730.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

731.     The Debtors conferred benefits on Comvest by entering into the Challenged Transactions, including but not limited to the Contribution Agreements and the PropCo Leases.

732.     Comvest knowingly accepted the benefits conferred on them by the Debtors.

733.     Comvest's receipt of the benefits conferred upon it in connection with the Challenged Transactions was without justification or compensation to the Debtors and has unjustly enriched Comvest.

734.     Plaintiff has no adequate remedy at law to recover the value transferred from the Debtors to Comvest in connection with the Challenged Transactions.

735.     Accordingly, as a result of Comvest's unjust enrichment at the Debtors' expense, Plaintiff is entitled to restitution from Comvest in an amount to be determined at trial.

## COUNT 74
**(Against the SLB Entities)**
**(Unjust Enrichment)**

736.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

737.     The OpCo Entities conferred a benefit on the SLB Entities by entering into above-market leases in connection with the Sale Leaseback Transactions thereby artificially increasing the price that the SLB Entities received for the sale of the SLB Properties.

738.    The SLB Entities knowingly accepted the benefit conferred on them by the OpCo Entities, including the resulting and inflated purchase price the SLB Entities received for the SLB Properties.

739.    The SLB Entities' receipt of the inflated proceeds for the sale of the SLB Properties, based on the inflated and above-market rent obligations imposed on the OpCo Entities, was without justification or compensation to the OpCo Entities and has unjustly enriched the SLB Entities.

740.    Plaintiff has no adequate remedy at law to recover the difference between the market rent the OpCo Entities should have paid under the Sale Leaseback leases, and the inflated rent actually paid.

741.    Accordingly, as a result of the SLB Entities' unjust enrichment at the OpCo Entities' expense, Plaintiff is entitled to restitution from the SLB Entities in an amount to be determined at trial but which is at least equal to the above-market rent paid under the leases imposed on the OpCo Entities in connection with the Sale Leaseback Transactions.

**COUNT 75**
**(Against the PropCo Entities)**
**(Unjust Enrichment)**

742.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

743.    The Debtors conferred benefits on the PropCo Entities by entering into the Contribution Agreements and the PropCo Leases.

744.    The PropCo Entities knowingly accepted the benefits conferred on them by the Debtors.

745.     The PropCo Entities' receipt of the benefits conferred upon them in connection with the Contribution Agreements and the PropCo Leases was without justification or compensation to the Debtors and has unjustly enriched the PropCo Entities.

746.     Plaintiff has no adequate remedy at law to recover the value conveyed by the Debtors to the PropCo Entities pursuant to the Contribution Agreements and the PropCo Leases.

747.     Accordingly, as a result of the PropCo Entities' unjust enrichment at the Debtors' expense, Plaintiff is entitled to restitution from the PropCo Entities in an amount to be determined.

## COUNT 76
### (Against the PropCo Entities)
### (Disallowance of the PropCo Entities' Lease Claims, 11 U.S.C. § 502(b))

748.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

749.     To the extent all or any of the PropCo Entities has filed, or in the future does file, one or more proofs of claim for damages concerning any of the PropCo Leases, including but not limited to a claim for rejection damages, such proof of claim (collectively, the "PropCo Entities' Lease Claims") should be disallowed.

750.     In particular, if any of the PropCo Leases are avoided, the PropCo Entities' Lease Claims must be disallowed on the ground that they assert claims that are unenforceable against the Debtors and the Debtors' property.

751.     Pursuant to section 502(b) of the Bankruptcy Code, the PropCo Entities' Lease Claims should be disallowed.

## COUNT 77
### (Against the PropCo Entities)
### (Equitable Subordination of the PropCo Entities' Proofs of Claim – 11 U.S.C. § 510(c))

752.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

753.    To the extent all or any of the PropCo Entities has filed, or in the future does file, one or more proofs of claim, including but not limited to the PropCo Entities' Lease Claims, such proof of claim (collectively, the "PropCo Entities' Proofs of Claim"), to the extent not otherwise disallowed, should be equitably subordinated to the claims of the Debtors' general unsecured creditors.

754.    As set forth above, the PropCo Entities engaged in and, benefitted from, a pattern of misconduct and inequitable conduct at the expense of the Debtors, their estates and stakeholders, including unsecured creditors, including by engineering and executing the Challenged Transactions.

755.    The PropCo Entities' conduct injured the Debtors' unsecured creditors and conferred an unfair advantage upon the PropCo Entities and, indirectly, Comvest.

756.    Under the principles of equitable subordination, the PropCo Entities' Proofs of Claim are subject to subordination pursuant to section 510(c) of the Bankruptcy Code.

757.    Equitable subordination of the PropCo Entities' Proofs of Claim is consistent with the provisions and purposes of the Bankruptcy Code.

758.    Accordingly, the PropCo Entities' Proofs of Claim are subject to equitable subordination.

**COUNT 78**
**(Against the Avoidance Defendants)**
**(Objection to Allowance of Claims Due to**
**Pending Avoidance Actions 11 U.S.C. § 502(d))**

759.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

760.    Pursuant to section 502(d) of the Bankruptcy Code, Plaintiff objects to the allowance of any Proof of Claim filed now or hereafter filed by any Defendant that has been named in any of Counts 1-65 (together, the "Avoidance Defendants").

761.    Pursuant to section 502(d) of the Bankruptcy Code, each Proof of Claim filed by each of the Avoidance Defendants should be disallowed until he/she/it has paid the amounts and/or returned the property subject to avoidance.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands that judgment be entered as follows:

A.    On Counts 1 and 2, awarding Plaintiff judgment against PropCo North avoiding the transfer of the PropCo North Owned Properties, or, alternatively, awarding Plaintiff judgment against PropCo North and Comvest for the value of the assets transferred in an amount to be determined at trial;

B.    On Counts 3 through 5, awarding Plaintiff judgment against PropCo North avoiding the transfer of the PropCo North Washington Properties, or, alternatively, awarding Plaintiff judgment against PropCo North and Comvest for the value of the assets transferred in an amount to be determined at trial;

C.    On Counts 6 through 8, awarding Plaintiff judgment against PropCo North avoiding the transfer of the PropCo North Oregon Properties, or, alternatively, awarding Plaintiff

135

judgment against PropCo North and Comvest for the value of the assets transferred in an amount to be determined at trial;

D.    On Counts 9 and 10, awarding Plaintiff judgment against PropCo South avoiding the transfer of the PCS Owned Properties, or, alternatively, awarding Plaintiff judgment against PropCo South and Comvest for the value of the assets transferred in an amount to be determined at trial;

E.    On Counts 11 through 13, awarding Plaintiff judgment against PropCo South avoiding the transfer of the PCS Arizona Properties, or, alternatively, awarding Plaintiff judgment against PropCo South and Comvest for the value of the assets transferred in an amount to be determined at trial;

F.    On Counts 14 through 16, awarding Plaintiff judgment against PropCo South avoiding the transfer of the PCS Nevada Properties, or, alternatively, awarding Plaintiff judgment against PropCo South and Comvest for the value of the assets transferred in an amount to be determined at trial;

G.    On Counts 17 through 19, awarding Plaintiff judgment against PropCo South avoiding the transfer of the PCS California Properties, or, alternatively, awarding Plaintiff judgment against PropCo South and Comvest for the value of the assets transferred in an amount to be determined at trial;

H.    On Counts 20 and 21, awarding Plaintiff judgment (i) avoiding the PropCo North Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo North and Comvest the PropCo North Rent Payments made thereunder or their value, and (ii) disallowing any claim by PropCo North against the Debtors for damages arising from the rejection of the PropCo North Leases;

I.      On Counts 22 through 24, awarding Plaintiff judgment (i) avoiding the PropCo North Washington Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo North and Comvest the PropCo North Washington Rent Payments made thereunder or their value, and (ii) disallowing any claim by PropCo North against the Debtors for damages arising from the rejection of the PropCo North Washington Leases;

J.      On Counts 25 through 27, awarding Plaintiff judgment (i) avoiding the PropCo North Oregon Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo North and Comvest the PropCo North Oregon Rent Payments made thereunder or their value, and (ii) disallowing any claim by PropCo North against the Debtors for damages arising from the rejection of the PropCo North Oregon Leases;

K.      On Counts 28 and 29, awarding Plaintiff judgment (i) avoiding the PCS Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo South and Comvest the PCS Rent Payments made thereunder or their value, and (ii) disallowing any claim by PropCo South against the Debtors for damages arising from the rejection of the PCS Leases;

L.      On Counts 30 through 32, awarding Plaintiff judgment (i) avoiding the PCS Arizona Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo South and Comvest the PCS Arizona Rent Payments made thereunder or their value, and (ii) disallowing any claim by PropCo South against the Debtors for damages arising from the rejection of the PCS Arizona Leases;

M.      On Counts 33 through 35, awarding Plaintiff judgment (i) avoiding the PCS Nevada Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo South and Comvest the PCS Nevada Rent Payments made thereunder or their value, and (ii)

disallowing any claim by PropCo South against the Debtors for damages arising from the rejection of the PCS Nevada Leases;

N.    On Counts 36 through 38, awarding Plaintiff judgment (i) avoiding the PCS California Lease Obligations as fraudulently incurred obligations, (ii) recovering from PropCo South and Comvest the PCS California Rent Payments made thereunder or their value, and (ii) disallowing any claim by PropCo South against the Debtors for damages arising from the rejection of the PCS California Leases;

O.    Counts 39 and 40, awarding Plaintiff judgment against Property Holdings II avoiding the transfer of the PHII Properties, or, alternatively, awarding Plaintiff judgment against Property Holdings II and Comvest for the value of the assets transferred in an amount to be determined at trial;

P.    On Counts 41 through 43, awarding Plaintiff judgment against Property Holdings II avoiding the transfer of the PHII Washington Properties, or, alternatively, awarding Plaintiff judgment against Property Holdings II and Comvest for the value of the assets transferred in an amount to be determined at trial;

Q.    On Counts 44 through 46, awarding Plaintiff judgment against Property Holdings II avoiding the transfer of the PHII Oregon Properties, or, alternatively, awarding Plaintiff judgment against Property Holdings II and Comvest for the value of the assets transferred in an amount to be determined at trial;

R.    On Counts 47 through 49, awarding Plaintiff judgment against Property Holdings II avoiding the transfer of the PHII Arizona Properties, or, alternatively, awarding Plaintiff judgment against Property Holdings II and Comvest for the value of the assets transferred in an amount to be determined at trial;

S.      On Counts 50 through 52, awarding Plaintiff judgment against Property Holdings II avoiding the transfer of the PHII Nevada Properties, or, alternatively, awarding Plaintiff judgment against Property Holdings II and Comvest for the value of the assets transferred in an amount to be determined at trial;

T.      On Counts 53 through 55, awarding Plaintiff judgment against Property Holdings II avoiding the transfer of the PHII California Properties, or, alternatively, awarding Plaintiff judgment against Property Holdings II and Comvest for the value of the assets transferred in an amount to be determined at trial;

U.      On Counts 56 and 57, awarding Plaintiff judgment against Haggen SLB avoiding the transfer of the Haggen SLB Properties, and awarding the recovery of the value of the Haggen SLB Properties against Haggen SLB and Comvest;

V.      On Counts 58 through 60, awarding Plaintiff judgment against Haggen SLB avoiding the transfer of the Haggen SLB Washington Properties, and awarding the recovery of the value of the Haggen SLB Properties against Haggen SLB and Comvest;

W.      On Counts 61 through 63, awarding Plaintiff judgment against Haggen SLB avoiding the transfer of the Haggen SLB California Properties, and awarding the recovery of the value of the Haggen SLB Properties against Haggen SLB and Comvest;

X.      On Counts 64 and 65 awarding Plaintiff judgment against Comvest avoiding the transfer of the Comvest Payments, or, alternatively, awarding Plaintiff judgment against Comvest for the value of the assets transferred in an amount to be determined at trial;

Y.      On Count 66, awarding Plaintiff judgment against Comvest in an amount to be determined at trial;

Z.      On Count 67, awarding Plaintiff judgment against the Officers and Directors, jointly and severally, in an amount to be determined at trial;

AA.     On Count 68, awarding Plaintiff judgment against Holdings' Managers, jointly and severally, in an amount to be determined at trial;

BB.     On Count 69, awarding Plaintiff judgment against the Intercompany Lenders equitably subordinating the Intercompany Loan to general unsecured claims;

CC.     On Count 70, awarding Plaintiff judgment against the Intercompany Lenders transferring to Plaintiff any validly perfected liens securing the Intercompany Borrower's obligations under the Intercompany Loan;

DD.     On Count 71, awarding Plaintiff judgment against the Intercompany Lenders recharacterizing the Intercompany Loan as equity;

EE.     On Count 72, awarding Plaintiff judgment against the SLB Entities and the PropCo Entities substantively consolidating them into the Debtors' estates.

FF.     On Count 73, awarding Plaintiff judgment against Comvest in an amount to be determined at trial;

GG.     On Count 74, awarding Plaintiff judgment against the SLB Entities in an amount to be determined at trial;

HH.     On Count 75, awarding Plaintiff judgment against the PropCo Entities in an amount to be determined at trial;

II.     On Count 76, awarding Plaintiff judgment against each of the PropCo Entities disallowing each of the PropCo Entities' Lease Claims that has been or will be filed by any of them pursuant to section 502(b) of the Bankruptcy Code;

JJ.    On Count 77, awarding Plaintiff judgment against the PropCo Entities equitably subordinating the PropCo Entities' Proofs of Claim to general unsecured claims;

KK.    On Count 78, awarding Plaintiff judgment against each of the Avoidance Defendants disallowing any Proof of Claim that has been or will be filed by any of them pursuant to section 502(d) of the Bankruptcy Code;

LL.    Awarding Plaintiff interest, costs, and its attorneys' fees; and

MM.    Granting Plaintiff such other and further relief as the Court deems just and

proper.

Dated:  September 7, 2016                PACHULSKI STANG ZIEHL & JONES LLP


/s/ Bradford J. Sandler
Bradford J. Sandler (Bar No. 4142)
Robert J. Feinstein (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
919 North Market Street, 17th Floor
Wilmington, DE  19801
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
Email: bsandler@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com

*Counsel to the Official Committee of Unsecured Creditors*