UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| | . | Case No. 15-11874 (KG) |
| HH LIQUIDATION, LLC, *et al.*, | . | |
| | . | |
| Debtors | . | |
| . . . . . . . . . . . . . . . . | . | |
| | . | |
| OFFICIAL COMMITTEE OF | . | Adv. Proc. 16-51204 (KG) |
| UNSECURED CREDITORS OF | . | |
| HH LIQUIDATION, LLC, *et al.*, | . | |
| | . | |
| Plaintiffs, | . | |
| | . | |
| v. | . | |
| | . | |
| COMVEST GROUP HOLDINGS, LLC, | . | |
| COMVEST INVESTMENT PARTNERS III, | . | |
| L.P., COMVEST INVESTMENT | . | |
| PARTNERS IV, L.P., COMVEST | . | |
| HAGGEN HOLDINGS III, LLC, | . | |
| COMVEST HAGGEN HOLDINGS IV, LLC | . | |
| COMVEST ADVISORS, LLC, HAGGEN | . | |
| PROPERTY HOLDINGS, LLC, HAGGEN | . | |
| PROPERTY SOUTH, HAGGEN PROPERTY | . | Courtroom No. 3 |
| NORTH, LLC, HAGGEN PROPERTY | . | 824 Market Street |
| HOLDINGS II, LLC, HAGGEN SLB | . | Wilmington, Delaware 19801 |
| JOHN CAPLE, CECILIO RODRIGUEZ | . | |
| MICHAEL NIEGSCH, JOHN CLOUGHER | . | October 16, 2017 |
| BLAKE BARNETT, WILLIAM SHANER | . | 9:00 A.M. |
| And DERRICK ANDERSON, | . | |
| | . | |
| Defendants. | . | |
| . . . . . . . . . . . . . . . . | | |

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Defendants:      Richard US Howell, Esquire
                         KIRKLAND & ELLIS
                         300 North LaSalle
                         Chicago, Illinois 60654

1   APPEARANCES (Con't):

2

    For Official Committee:   John A. Morris, Esquire
3                             PACHULSKI STANG ZIEHL & JONES LLP
                              780 Third Ave, 36th floor
4                             New York, NY 10017

5

6   ECRO:                     GINGER MACE

7   Transcription Service:    Reliable
                              1007 N. Orange Street
8                             Wilmington, Delaware 19801
                              Telephone:  (302) 654-8080
9                             E-Mail:  gmatthews@reliable-co.com

10  Proceedings recorded by electronic sound recording:
    transcript produced by transcription service.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

INDEX

2
PAGE

3 OPENING STATEMENTS                                    6-100

4

PLAINTIFF'S WITNESS(s)

5
  **JOHN CAPLE**

6
        Direct examination by Mr. Morris           101

7
        Cross examination by Mr. Howell            184

8
        Redirect examination by Mr. Morris         269

9
        Recross examination by Mr. Howell          304

10

11
EXHIBITS:                                    ID    Rec'd

12
P4     August 13th Indication of Interest          105

13
P8     Investment Committee Memo (9/15/14)         107

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commence at 9:00 a.m.)

2      (Call to order of the Court)

3           THE COURT:  Good morning, everyone.  Thank you.

4  You may be seated.

5           COUNSEL:  Good morning.  Good morning, Your Honor.

6  Good morning, Your Honor.

7           THE COURT:  There are as many people in the

8  courtroom almost as exhibits, I'll tell you.  It's quite a

9  battle we've got going.  And good morning to all of you.

10          And you know, I looked up, just for the heck of

11 it, the definition of "trial."  It's a formal examination of

12 evidence before a judge, in order to determine guilt or

13 innocence; or it's a test of the performance of someone or

14 something.  And I suggest it's probably both.  We can reduce

15 some of the stress, I think.  If anyone needs a break or has

16 a problem, raise it with the Court, and I will certainly take

17 it into consideration.

18          All right.  Are we ready to begin, Mr. Morris?

19          MR. MORRIS:  We are.  Good morning, Your Honor.

20          THE COURT:  Good morning.

21          MR. MORRIS:  John Morris, Pachulski, Stang, Ziehl

22 & Jones for the plaintiff --

23          THE COURT:  Yes.

24          MR. MORRIS:  -- the creditors' committee.

25          Before I begin with my presentation, Your Honor,

1  just some introductions.  I've got with me, at counsel's

2  table, Alan Kornfeld --

3         THE COURT:  Yes, Mr. Kornfeld.

4         MR. MORRIS:  -- and Beth Levine.

5         MS. LEVINE:  Good morning, Your Honor.

6         THE COURT:  Ms. Levine.

7         MR. MORRIS:  Alan and Beth will be joining me in

8  the presentation of our case this week.

9         THE COURT:  All right.

10         MR. MORRIS:  We have a representative of one of

11  the committee members, Spirit, here in the courtroom.  And I

12  do understand that there are other committee members that are

13  listening in on the phone; they are scattered across the

14  country.

15         THE COURT:  Very well.

16         MR. MORRIS:  Before I begin, I just want to thank

17  the Kirkland firm and the Womble firm for their cooperation,

18  their professionalism, and their courtesy.  They've made a

19  very hard job just a little bit less hard.

20         THE COURT:  That's great.  Thank you.

21         MR. MORRIS:  I've got a deck, Your Honor, that's

22  going to assist me in the presentation of my opening.  May I

23  approach the bench?

24         THE COURT:  Yes, certainly, Mr. Morris.  Thank

25  you.

1      MR. MORRIS:  All right.  If we can go to the first

2  slide there.

3      Your Honor, we're going to be here for a week.

4  We're going to hear a lot of testimony, we're going to look

5  at a lot of documents.  We're going to consider a whole host

6  of facts and issues.  And I thought it would be helpful to

7  begin my presentation with the most simplified version I

8  could think of, to help educate the Court as to what we think

9  the case is about.

10      Comvest is a private equity fund.  Comvest is the

11  controlling shareholder of Haggen.

12      THE COURT:  Yes.

13      MR. MORRIS:  And one of the things that we're

14  going to address this week is whether Comvest, as the equity

15  holder of the debtor, should be allowed to recover the

16  debtors' residual assets.  Okay?  Stated another way, Your

17  Honor:  Should Comvest, as the equity holder of the debtor,

18  get a dividend before the debtors' unsecured creditors are

19  paid in full?  That's the first question that we're going to

20  be addressing this week.

21      The second question, Your Honor, has to do with

22  what we referred to as the twenty-five-million-dollar PropCo

23  advance.  That is the twenty-five-million-dollar loan that

24  the PropCo entities made to the OpCo entities just a couple

25  of weeks before the bankruptcy filing.  And one of the

1  questions that we're going to be looking at to address this

2  week is whether the OpCos unsecured creditors; the vendors,

3  the employees, the landlords, who are owed more than $100

4  million, should be forced to bear the consequences of

5  Comvest's decision to make this loan on the eve of

6  bankruptcy.

7          The evidence will show that the unsecured

8  creditors had absolutely no knowledge that Haggen was in

9  distress.  They had absolutely no knowledge that Comvest

10 scoured the universe to try to find a third-party lender, and

11 was unable to do so.  And yet, Comvest stands here, saying

12 that they should get repaid.  That's a question we'll address

13 this week.

14          The final question, Your Honor, is whether Comvest

15 and the individual defendants, who engineered and control the

16 transactions, should be held accountable for the losses of

17 the OpCo creditors.  Think "fiduciary duty."

18          Let's go to the next slide.

19          It's important to think about what happened here,

20 Your Honor, insofar as, in December, on December 10th, that's

21 the date that Haggen signed the asset purchase agreement with

22 Albertsons.  On December 1st, just ten days before, this is

23 what Haggen's organizational structure looked like, pretty

24 simple:  You had two shareholders of a holding company that

25 held the membership interest in Haggen Acquisition, which, in

1  turn, held the ownership interest of the shares in Haggen,

2  Inc.  That was the structure that existed before the

3  Albertsons acquisition.

4           Can we jump to the next slide, please?

5           This is what it looked like the next day.  On

6  December 2nd, Comvest caused this structure to be created,

7  and they caused this structure to be created because they

8  anticipated engaging in all of the transactions that are the

9  subject of this lawsuit.  This chart, Your Honor, is what's

10  on trial.  Okay?

11          Make no mistake about it because every claim we

12  have is dependent on the creation of this chart.  Actual and

13  fraudulent transfers, actual and constructive fraudulent

14  transfers, right?  They don't occur with the other chart.

15  Recharacterization and equitable subordination of the PropCo

16  loan, they don't occur without this chart.  Substantive

17  consolidation, every claim that we have, breach of fiduciary

18  duty, arises from Comvest's decision to create this

19  structure.

20          And do you know what this structure did?  The

21  evidence will show that this structure created a situation

22  where, heads, Comvest wins; tails, the OpCo creditors lose.

23  And how does it do that?  Very simply, Your Honor.  If Haggen

24  were a success, if the transaction were successful -- and I

25  know that they tried hard.  We're going to hear lots of

1   testimony, I'm sure, about how hard they tried.  But there

2   was a hedge here.  If it was successful, all of that real

3   estate -- and you're going to hear they thought it was $118

4   million of unencumbered real estate -- was put into the

5   PropCos.  They had plans before the transaction closed to

6   lever that real estate for the sole purpose of paying Comvest

7   a dividend.  So, if the transaction worked out, they were

8   going to use the real estate to take an awfully big check,

9   tens and tens of millions of dollars.

10          But wait, there's more.  They weren't satisfied

11   with that.  Instead, they then imposed the PropCo leases

12   because, all of a sudden, PropCo had this -- so the OpCo,

13   they had to pay rent.  They never paid rent when they were

14   Albertsons stores.  But the evidence will show they put these

15   leases in place to draw more value out of the OpCos, to the

16   tune of $13 million a year, that was their expectation.

17          So, if things went well, they had access to $118

18   million in the form of the value of the real estate, and they

19   had a multi-million-dollar cash flow.  That's if things went

20   well.  And tails, the OpCo creditors lose, if things didn't

21   go well.  Well, that's why we're here, because things didn't

22   go well.  Okay?  Heads, Comvest wins; tails, they thought the

23   OpCo creditors would lose.  That's why this chart is so

24   important.

25          Can we go to the next slide?

1    The defendants, apparently a very important part

2 of their defense here is that the OpCo unsecured creditors

3 could not have reasonably relied on anything they did.  They

4 point to the FTC, and they say, gosh, the FTC, the government

5 regulator, they approved everything.

6    Your Honor, we've given you here citations to the

7 transcript of Paul Frangie.  Paul Frangie is the FTC

8 representative who oversaw this transaction.  The evidence

9 will show that there was a singular meeting lasting two

10 hours, where Haggen and Comvest made their presentation.

11 There was one deck that was provided to the FTC.  And when I

12 asked Mr. Frangie, he told me, specifically, he never saw,

13 discussed, or approved the corporate structure; he never saw,

14 discussed, or approved the contribution agreement.

15    And the contribution agreements are the

16 intercreditor -- intercompany agreements by which the right

17 to acquire the real property was transferred from Haggen

18 Holdings, at the top, to the PropCos.  Okay?  He never saw,

19 discussed, or approved the contribution.  He had no idea that

20 assets were being transferred in this way.  He never saw,

21 discussed, or approved a PropCo lease.  So the FTC, no,

22 that's not helping them.

23    So, gee, they're going to tell you -- and there

24 won't really be any dispute -- that a handful of creditors,

25 in fact, did know about the PropCo structure.  Who?  Garrison

1  and Spirit.  Well, of course they knew; they were doing the

2  sale leaseback transactions.  We'll talk about them in a few

3  minutes.  And a couple of multi-national corporations knew.

4           But Haggen has thousands of creditors, right?

5  Some of them are selling donuts.  Some of them are -- right?

6  These are -- if Your Honor looks at the claims register, most

7  of the claims are for less than $20,000.  Okay?  And

8  defendants' counsel stood here a couple of weeks ago and

9  said, gee, he went back to his office, and in five minutes,

10 he could find, and he could find a real property to show that

11 PropCo owned the real estate.

12          Well, Your Honor, that's because he knew to look.

13 And that's the point here.  There was no public disclosure of

14 the PropCo/OpCo structure.  There was no public disclosure of

15 the transfer of real estate.  There was no disclosure of any

16 kind that would have caused the OpCo creditors to question

17 the assets and financial viability of Haggen or of any

18 individual store.

19          Yes, I suppose, if they had a reason to look at

20 the real property records in a county clerk's office in

21 Washington, they would have learned.  But what would have

22 caused them to do that?  In the absence of information, Your

23 Honor, the OpCo creditors lacked knowledge, their lack of

24 knowledge was a foregone conclusion.

25          If we can go to the next slide.

1          Again, Your Honor, I know they tried hard for the

2    business to succeed.  But what really whet Comvest's appetite

3    was the real estate.  You're going to hear from a fellow

4    named Mr. Hooper, Todd Hooper; he's affiliated with a

5    consulting firm called AT Kearney.  AT Kearney was retained

6    by Comvest and Haggen to provide advice, in connection with

7    the due diligence. And Mr. Hooper is going to testify, and

8    the documents are going to show that he was told at the very

9    beginning, by Comvest, that the investment thesis was driven

10   primarily by the value of real estate.  And he's also going

11   to testify that he was -- that that investment thesis, to the

12   best of his knowledge, never changed.

13          We're also going to see -- so Comvest had what's

14   called an "investment committee."  There were members of the

15   investment committee, and they're the ones that had to

16   approve the transaction.  There were investment committee

17   members who were discussing the real estate prior to the

18   execution of the APA.

19          And if we could -- if we could go to Exhibit 191.

20          You'll see that, in November, just a couple of

21   weeks before this assigned, Roger Marrero and Thomas Clark

22   are two investment committee members.  And you'll hear John

23   Caple, who's going to be the first witness to testify -- and

24   he was also a Comvest -- I forget if he was -- I think he was

25   a partner at that time, he may have been a managing director.

1   But he was the head of the deal team.  Okay?  So the three of

2   them are talking about it.

3             And you'll see this exhibit, it's a very important

4   exhibit, Plaintiff's Exhibit 91.  Mr. Marrero makes clear

5   that he wants to understand what supports the real estate

6   valuation -- other than the Cushman report, they had certain,

7   I guess, aged appraisals -- because that affected the

8   decision tree, at least in his view, more than anything.

9   Okay?  The real estate was really critical to these folks.

10            They had investment committee meetings, from time

11  to time.  The deal team would provide -- they call them

12  "decks," slides, just as the ones I've given to the Court.

13            And if we could go to Exhibit 110.

14            Let's see what the investment committee was told.

15  And this is in November.  This is the same date, in fact, or

16  -- I think it's the exact same date that Mr. Marrero is

17  asking those questions.  In the executive summary to the deck

18  that was given to the investment committee, they say that

19  they're going to acquire these stores, Haggen is going to

20  acquire these stores for $250 million, which is less than the

21  appraised value of the owned real estate of $391 million.

22            So the deal team is telling the investment

23  committee, we're going to pay for this deal, and we're going

24  to get $141 million worth of real estate on top of it, owned

25  real estate, Your Honor.

1           Albertsons had a bunch of stores; some of them

2   were third-party leases, traditional third-party leases.

3   Those leases went to OpCo.  And then there were a bunch of

4   stores and ground leases that Albertsons owned on their own.

5   And when they owned them, the stores didn't pay rent to

6   anybody, they didn't have this OpCo/PropCo structure, right?

7   That's what the evidence will show.

8           And so, when they talk about the $391 million of

9   real estate, they're talking specifically about the owned

10  real estate.  And that's the real estate that is going to be

11  used for two purposes, ultimately.  The evidence will show

12  that they will decide to take the very best performing stores

13  and put them into the sale leaseback category.  And the

14  balance of the stores, the remainder of the owned real

15  estate, that's what's going to go to PropCo.  So this is what

16  they're told in November.

17          Now let's go to -- back to the slide.

18          In December.  So the APA is signed on December

19  10th, and on December 3rd, there is an investment committee

20  meeting.  And the purpose of the meeting to obtain authority

21  from the investment committee to make the final bid.  Okay?

22          If we can go to Exhibit 30, please.  And let's

23  call that out.

24          Your Honor, what you're staring at is the moral

25  hazard.  The investment committee is told that, for $430

1   million, right?  There's going to $430 million.  Three

2   hundred and twenty-five, that's going to go to Albertsons,

3   and $105 million is going to be for your conversion costs.

4   For the total price of $430 million, it's going to be

5   financed how?  It's going to be financed on the backs of the

6   OpCo entities.

7          The OpCo entities, right?  It's going to be

8   financed through the sale leaseback proceeds, right?  So

9   they're going to do the sale leaseback, $352 million, that's

10  going to go in the pot to meet this $430 million.  But the

11  OpCo entities are the ones who are going to bear the leases.

12  What about the $78 million, where is that coming from?

13  That's coming from the ABL, the asset-backed loan.  Okay?

14          So the deal team is telling the investment

15  committee, we're going to -- we're going to use other

16  people's money, we're going to -- we're going to leverage --

17  right?  This is akin to an LBO.  We're going to leverage the

18  assets, we're going to pay $430 million, and we're going to

19  get $118 million of appraised real estate.  And do you know

20  where that's going to go, Your Honor?  Into the PropCos.

21  Okay?  No mistake.

22          And so, with $118 million kind of dangling before

23  them, I think we're going to -- we're going to look at the

24  projections, we're going to look at what motivates them

25  because I think, Your Honor, we're talking rose-colored

1  glasses here, very, very deeply shaded rose-colored glasses

2  that prevented them from taking a reasonable and critical

3  look.

4          Every risk, every risk they identified mitigated,

5  mitigated.  They went into this risk-free, according to them.

6  They identified a billion risks, and we're going to go

7  through an awful lot of them.  But at the end of the day,

8  that's what caused them to do the deal.  They're getting $118

9  million of real estate for free.  And you know what, Your

10 Honor?  This deal was not too big to fail, it really wasn't.

11 But this is the moral hazard that's presented.

12          Let's talk about the risks for a moment.

13          If we can go to Slide 12.

14          Now, in the pretrial brief, Your Honor, we

15 identified a whole host of risks.  I assure you, there is a

16 whole host of risks that can be piled onto that, but I've

17 included these for a particular reason.  These are risks that

18 kind of echo some of the claims that are made in the

19 defendants' pretrial brief, and the notion that they never

20 saw this coming, they're in complete surprise.  Let's look at

21 some of the things that they told.

22          They told -- the deal team told the investment

23 committee that there was uncertainty as to how California

24 consumers will react to a brand new -- to a new brand in the

25 marketplace.  Do you know what the evidence is also going to

1  show, Your Honor?  That, on July 15th, Paul Frangie had a

2  phone call with Lawrence Silverman.  Mr. Silverman is a

3  lawyer with Akerman; Akerman represents Comvest and Haggen.

4           THE COURT:  Right.

5           MR. MORRIS:  He was their FTC lawyer.  And they

6  had a phone call on July 15th.  And what prompted the phone

7  call?  Mr. Frangie saw a newspaper article, and he saw Haggen

8  was laying off employees in California.  So he picked up the

9  phone, and he said, Mr. Silverman, what is going on.  And do

10 you know what Mr. Silverman said?  Mr. Silverman said,

11 they're not buying it in California, right?  The deal team

12 told the investment committee that was a risk.  That risk

13 materialized.

14         How about Mr. Shaner?  Mr. Shaner is the CEO of

15 the Southern California -- of PropCo South, right?

16 California, Nevada, Arizona, where Haggen had absolutely no

17 prior market presence.  This is not hindsight.  But the

18 evidence will show that Mr. Shaner had heartburn, the poor

19 guy had heartburn around the concept of Southern California

20 being able to deliver positive sales and flat EBITDA.  That

21 heartburn was real.  Did not come close.

22         Mr. Clougher, the CEO of OpCo North.  A lot of

23 moving parts, there sure were.  Risk of execution is very

24 large, sure was.  Just read the defendants' pretrial brief.

25 Mr. Clougher was spot on.

1          How about AT Kearney, the consultant?  There seems

2   to be a huge capability gap around pricing.  Did you read the

3   part in the pretrial brief by the defendants that focused on

4   the disastrous pricing issues?  They can't say they weren't

5   told.  Mr. Kearney told them that.

6          And if you think about it, Your Honor, think about

7   what happened here.  The California stores don't get added

8   until approximately September 26th.  How much time?

9   September 26th, November 10th, I don't know, ten weeks.  In

10  ten weeks, they completed negotiations for the acquisition of

11  146 stores, which left them approximately two months to do

12  the legwork to plan, right?  Reasonable?  I don't know.

13         But you know what?  It wasn't just the insiders

14  who were skeptical and who were concerned about the risks.

15  The people outside did, too.  Garrison.  Garrison is one of

16  the sale leaseback counterparties that the defendants

17  continue to point at as somebody who blessed the transaction.

18  Garrison said it was okay.  They knew about PropCo/OpCo, they

19  did it.

20         Well, let's look at what Garrison said internally

21  because I deposed their witness, and that testimony has been

22  -- will be submitted before the Court.  In their confidential

23  information memorandum that they're distributing internally,

24  there's a whole host of risks.  Look at the risks identified:

25         "This type of transaction has never been done

1          before.  Albertsons and Safeway will be direct

2          competitors, and will know the markets and

3          customers better than Haggen.  Transaction

4          complexity and size may overwhelm Haggen."

5          I knew they tried hard, Your Honor, but

6   "overwhelm" is the appropriate word.

7          And look at the last one they said.  They foresaw

8   Haggen running out of liquidity.  And you might ask yourself,

9   I think it would be reasonable to say, well, why did they do

10  the transaction.  Why would they do the transaction?  Not

11  because they believed that it was going to be successful, but

12  because they believed -- and it's in the document, and it's

13  in the testimony -- that they thought they were buying $160

14  million of real estate in the SLB for $130 million.  So they

15  thought they were getting 30 extra million dollars of real

16  estate.

17         And really, much more importantly, Your Honor,

18  their strategy was to flip it immediately.  Okay?  And in

19  fact, in the very -- and you'll see that certain of the

20  properties Garrison acquired, they sold within days of its

21  acquisition; they had buyers lined up.  So, yeah, they

22  identified these risks.  They didn't bless anything, Your

23  Honor.  They only thing they blessed was their sale leaseback

24  transaction.

25         How about PNC.  We're told PNC, gee, they blessed

1  the deal, didn't they?  They saw everything, they looked

2  under the hood, they knew it all.  PNC made an asset-backed

3  loan.  It is the only thing they blessed.  You know how we

4  know they thought the deal was risky?  And Your Honor may

5  have seen this in our opening brief.  Because they gave it a

6  risk rating of 12B.  And just to be quick about it, 1 is the

7  least risky, and their scale goes up to 14, with being the

8  most risky.  And what you'll see in the deposition testimony

9  that we're going to present to you, Your Honor, is that the

10 30(b)(6) witness had never seen PNC approve a deal with a

11 risk rating of 14.  All right?  So they're almost not

12 approved, but they stayed by it.

13        So why did they do it, if they think the deal is

14 so risk?  It's the B because the B, the letter, the

15 alphabetical part pertains to the risk of recovery, and with

16 A being the least risky -- think cash collateral -- G being

17 the most risky.  This is a B, so this was -- they had a

18 really solid belief in the quality of their collateral, at

19 least at that moment in time.  And so I think the evidence is

20 going to be crystal-clear PNC did not approve anything, other

21 than the asset-backed loan.

22        So all of these risks are internal, all of these

23 risks are external.  There's a whole lot more that we're

24 going to develop during the course of the week.  But they've

25 got all these risks presented to them, and then they go, and

1  they create projections.

2          If we can go to Slide 14.

3          Your Honor, I'm sure they're going to -- you're

4  going to hear a whole lot about how many models they ran and

5  how hard they tried and the rest of it.  But at the end of

6  the day, the Court just needs to look at the historical

7  results for these stores and compare them to what the

8  projections were.  The historic results were not good.

9          There was an up-tick in the latter half of 2014.

10 I know they want to tell the story of the great turnaround

11 that Comvest engineered.  Do you know what Comvest did?  They

12 acquired 30 stores, they shut down 12, the least profitable.

13 And lo and behold, EBITDA went up.  It's not really -- I

14 mean, good for them, that's what they should do, that's what

15 -- I'm all about capitalism, for sure.  But that's all they

16 did.  They didn't, somehow, miraculously transform a losing

17 company into a winning company.  They closed the lousy

18 stores, and what they had left was the better stores, so

19 their EBITDA went up.

20          Exhibit 217, Your Honor, very critical, a very

21 critical document.  Exhibit 217 is the fiery debate that's

22 occurring in November, late October, early November, between

23 and among the executives, the consultants, and Comvest, about

24 the projections.  And you're going to see -- you've got to --

25 we're going to parse through that document very carefully,

1  Your Honor, because you'll see Ira Genser, another

2  consultant; you'll see Blake Barnett, the CFO; you'll see

3  Bill Shaner, the PropCo -- the OpCo South CEO.  They're all

4  telling Michael Niegsch at Comvest, you're not taking into

5  account the risk, you're not taking into account the risk.

6  And they -- and this email goes through very specific risks.

7  Some of them are identified in our pretrial brief.

8          Mr. Niegsch says, we're good as is, good as is.

9  He ran the real bad downside case, and he ran the nightmare

10  case.  And he says, it's a good idea to think about the bad

11  stuff, and I did that.  But you know what, Your Honor?  The

12  evidence is going to show nobody has ever seen it.

13          I sent an interrogatory, I said, can you please --

14  because I asked him in the deposition, like where -- how

15  would I know, where is the real bad downside case, where is

16  the nightmare case.  He couldn't tell me where it was.  So I

17  sent him an interrogatory, and the interrogatory says, I

18  don't really know, we did a lot of models.  I haven't seen

19  the real bad downside case.

20          But you know what he did say?  He was very clear.

21  And this is the -- this is where the reasonableness comes in.

22  He was very clear.

23          If we can go back to the slide, Slide 14.

24          He was very clear that, no matter what the real

25  bad downside case said, no matter what the nightmare case

1  said, there was no model that they ever ran that showed the

2  OpCo entities going negative liquidity, or even becoming

3  unprofitable.  They could not foresee how the OpCo entities

4  could lose a nickel.  It couldn't happen, they said.  Never

5  ran one model.  So we haven't found the real bad downside

6  case, we haven't found the nightmare case.  But according to

7  Mr. Niegsch, no worry, it wasn't going to show them being

8  unprofitable, anyway.

9           In the end, Your Honor, these rosy projections,

10  these unreasonably rosy projections that failed to take into

11  account the risks that everybody was saying, they failed to

12  take into account the historical performance, it's the moral

13  hazard again, right?  They're saying, okay, we'll deal with

14  it, we'll mitigate that risk, we'll mitigate that risk, we'll

15  mitigate that risk.

16           We had a nice little bump-up in 2014, because we

17  had a jump in EBITDA.  They're not going to tell you that

18  they had a big jump in sales.  They're going to tell you they

19  had a nice jump in EBITDA.  A big difference, right?  Those

20  rosy projections provided the cover to transfer the real

21  estate assets because, without those projections, Your Honor,

22  they would have known the OpCo entities were

23  undercapitalized.

24           Can we go to Slide 17?

25           Here's the elephant in the room, Your Honor.

1  Let's see their projections versus reality.  Now this is by

2  P-1 through P-7; P is the equivalent of a month, I believe.

3  And in the span of seven months, they were $94 million off

4  their projected EBITDA.  And you're going to hear witness

5  after witness tell you this week that their projections were

6  reasonable.  Okay?  Think about the risks that everybody has

7  identified.  Think about the historical results.  Think about

8  what happened, $94 million off.  Reasonable?  Maybe, maybe in

9  somebody's world.

10          Slide 18.

11          The end is fast, Your Honor.  It's almost

12  impossible to even make a hindsight argument in this case

13  because the end happened so quickly.  The first store closes,

14  right?  The stores are closing on a rolling basis, over a

15  hundred-and-twenty-, hundred-and-forty-day period.  The first

16  store closes on February 12th.  By May 7th, right?  This is

17  less than 90 days.  By May 7, they already predicted that

18  they would run out of cash in August.

19          Can we go to slide -- Exhibit 35, please?

20          So this is an email from Lucas Scholl.  Lucas

21  Scholl is the junior member of the deal team.  He writes to

22  Mike Niegsch, the middle guy, the deal quarterback, actually.

23  And he says, Mike, we're going to run out of liquidity in

24  August.  This is May 7th, Your Honor.  They're not even close

25  to the end of the acquisition and conversion of the stores.

1  They're not even close, and they're going -- they have

2  projections now that show them running out of money.

3            Let's go back to the slide.

4            On June 16th, five weeks later, they give a deck

5  to the investment committee.  And this is not good, this is

6  not good.

7            Can we go to Exhibit 16?

8            They tell the investment committee -- and if

9  you'll look at the top you'll see, even at this point,

10  they're not done with the acquisition and conversion of

11  stores.  That doesn't happen for a few days later.  At the

12  top, it says, we have successfully converted 137 of --

13  they're not even done yet.  And they tell the investment

14  committee that the concept of running out of cash is

15  accelerated.  Now, instead of August, it's July.

16            They tell the investment committee, sales are down

17  20 to 25 percent since Haggen has taken ownership of the

18  stores.  Think about that, Your Honor.  They haven't even

19  acquired the stores, sales have plummeted, and they're

20  projecting to run out of cash in a couple of weeks.

21            Let's go back -- yeah.

22            So what happens?  They close on the last store.  A

23  couple of weeks later, more investment committee -- because

24  these guys are -- they're working hard.  I mean, I'm not

25  going to say they were unconcerned, Your Honor; they were

1  very concerned.  They had the real estate in the back pocket,

2  but gosh, they cared.

3          But on July 13th, they tell the investment

4  committee -- if we can go to Exhibit 38.  This is a deck that

5  we'll put into evidence:

6          "Fifty-three million dollars of one-time payables,

7           related to inventory and conversion costs are the

8           greatest risk to liquidity."

9          Now think about it.  They're about out of cash,

10  they had no liquidity, and on top of that, they owe $53

11  million, and no ability to pay.  And that's going to be a

12  topic we're going to talk a lot about, what happened to

13  Albertsons, because, on June 29th, they sent Albertsons a

14  letter, and they had a contractual obligation, as the stores

15  closed, to pay for the inventory within 30 days, and they did

16  that, and they did that, and they did that, until the end of

17  June, when they had no cash.

18          So they wrote a letter, and they said, you guys

19  have been bad, you've done all kinds of bad things.  And

20  you'll see the letter.  And even though there's a very

21  specific provision in the asset purchase agreement for the

22  resolution of disputes, they resort to self-help and say,

23  we're withholding all of the money.  They have no right to do

24  that, right?  And so the evidence will show that, within

25  about three weeks, Albertsons went and sued, said, what are

1  you doing, you owe me $40 million, so there was a counter-

2  suit.  But they had that money -- they couldn't pay the $53

3  million, even if there was no dispute.  Okay?  So this is

4  where they find themselves in July.  And this is going to

5  become important, as they start scouring the earth to try to

6  find what they now describe as "rescue financing."  But we're

7  not done; it gets worse.

8         On July 28th, PNC, the asset-backed lender, not

9  surprising, declares an event of default.  Now it's a

10 somewhat technical event of default because they changed --

11 because they did something -- it is, admittedly, a technical

12 default.  But it is much more than that, actually.  It's also

13 something called a "springing event."  And the springing

14 event occurs because they fall within -- they fall below the

15 minimum availability.  And when that happens, PNC then has

16 the right to take control of bank accounts, and to impose all

17 kinds of financial covenants that they now have to meet, that

18 probably are going to make life very, very difficult for

19 them.  So we'll look at the PNC letter, that will be offered

20 into evidence, it's Exhibit 375.  And this is where they find

21 themselves in July, on the precipice.  So what do they do?

22 They go out and they try to find a loan.

23         Okay.  If we can go to Slide 28.

24         And they strike out.  They ask PNC if they would

25 give an over-advance.

1            If we can go to Exhibit 378.

2            And PNC declines:

3            "After careful consideration, PNC does not support

4            providing an over-advance to bridge your cash flow.

5            PNC and the other lenders have enough risk."

6            Now, mind you, Your Honor, these are the people

7   with $200 million at risk, and they're unwilling to provide

8   an over-advance.

9            Let's go back to the slide.

10           UBS.  UBS.  UBS is a firm, with which Comvest was

11  negotiating prior to the closing of the transaction to do

12  what?  To take out a real estate loan against the property in

13  the PropCos for the purpose of paying a tens-of-millions-of-

14  dollar dividend to Comvest.  They never got around to doing

15  that.  And by June and July, those discussions had shifted to

16  using the proceeds from the loan against the real estate to

17  prop up the OpCo entities.

18           And the evidence is going to show, very, very

19  clearly, that UBS walked away.  Why did UBS walk away?

20  Because the transaction -- this was -- they weren't looking

21  to make a loan to the OpCos, that was never discussed.  What

22  they were looking to do was to make a loan to the PropCos.

23  And the PropCos has this unencumbered real estate worth tens

24  of millions of dollars, and they still walked away.  They

25  wouldn't even do that deal.  How come?  A couple of reasons,

1  Your Honor.  You're going to hear from the witnesses, you'll

2  see in the documents.

3       UBS was told -- they saw the financials.  Why do

4  they care about the OpCo financials?  Because the PropCos'

5  sole source of cash was the OpCos.  The only dollar they ever

6  got in revenue, or that they expected to, was from the OpCos.

7  So UBS, kind of logically, said, well, are you going to have

8  tenants in there, how is that going to work.  They saw the

9  financials, and they said no thank you.

10       But there was more.  You know, Mr. Caple will tell

11  you that UBS got spooked.  Why did they get spooked by?

12  Actually, Mr. Niegsch is going to give you the details, and

13  he's going to tell Your Honor that UBS, they wanted a

14  representation and warranty that they weren't considering

15  filing the OpCos for bankruptcy.

16       And at that very moment, A&M had been retained,

17  Alvarez & Marsal.  And despite what it says in their brief,

18  you're going to hear Mr. Niegsch testify that he had very

19  specific conversations with Mr. Caple on this topic, and they

20  discussed the possibility of filing OpCos for bankruptcy.

21  And it was because of those conversations that they were

22  unable to give UBS the representation and warranty that it

23  wanted, so they walked.

24       A&M, they hire A&M, I think, on July 20th.  A&M

25  goes out to gauge interest.  And again, they're not looking

1  for a lender to the OpCos; they're only looking for a lender

2  to the PropCos because that's -- they know that's the only

3  place they could possibly get a loan.  A&M doesn't get

4  anywhere.

5           So Mr. Caple -- if we can call up Exhibit 1, a

6  very important document.

7           Mr. Caple reaches out to a man named Mr. Priddy,

8  Robert Priddy.  Mr. Priddy was formally associated with

9  Comvest themselves.  And he says, you know, Mr. Priddy, OpCo

10 is really struggling, you know, we hope you can make a loan.

11          Can we take the highlight out first, for a moment?

12          He tells them -- he tells them that sales are

13 down, they have lost all of the price-focused customers,

14 hadn't yet hired the quality-focused customers, sales are

15 down 20 to 25 percent.  He's given them a model to show them

16 that.  So he's not asking for a loan to the OpCos.  And then,

17 further down, he makes it clear.

18          If we can get the highlight back?

19          He tells them, look, Comvest would make the loan,

20 but we have concerns about equitable subordination.  That's

21 what he told to somebody, you know, privately.  And you're

22 going to hear the testimony, the testimony was going to be

23 that this wasn't a singular thought in Mr. Caple's head,

24 flying around.  There were discussions at the investment

25 committee level about this particular risk.

1       And it's interest because, if you go to Mr.

2   Priddy's response -- and I don't want to spend too much time

3   on it -- he said, gee, I was formally affiliated with

4   Comvest, I'm not sure that the equitable subordination

5   concerns are fully resolved for me.  And then he goes on to

6   say, if I did anything, it would be under just very, very

7   onerous conditions.

8       So they go out, and they make all of these

9   requests.  Comvest won't do it because it's afraid of

10  equitable subordination.  So they go to Citibank.  Who is

11  Citibank?  Citibank is Comvest's lender of -- I don't know if

12  it's a lender of choice, but it's a big lender, and they've

13  got an open line of credit, I think, of $200 million.  And

14  they do what's called "qualified borrower loans," if Comvest

15  wants.  And that allows their portfolio companies to

16  basically piggyback on this line of credit, without doing a

17  whole bunch of due diligence, because they have, I guess, you

18  know, the faith or the security in Comvest.

19      So they go to Citibank, and they go to Citibank,

20  and Mr. Rodriguez does this, I believe, on August 5th.  I

21  think the email is like at three o'clock in the morning.  And

22  he reaches out to Citibank and says, can you -- time is of

23  the essence, we need a loan.  And you'll see the emails, Your

24  Honor, the discussions with Citibank.

25      If we can go to Exhibit 113.

1            They're really quick, right?  They -- these

2    discussions happen within the span of a week.  And what's

3    interesting is Citibank asks the question, why don't you guys

4    just take a loan at the OpCo level and guarantee it, right?

5    Why -- like because they're pressing Citibank, well, can you

6    give us a loan against the real estate.  And Citibank is

7    like, I don't get it, why don't you just make the loan to the

8    OpCos and guarantee it, it will be real simple.

9            And this is what Mr. Niegsch wrote bank.  Mr.

10   Niegsch said:

11            "Well, the OpCos has a first lien lender.  Its

12            performance has struggled, as we discussed."

13            And then, in the end, he says:

14            "A subordinated loan to the OpCos would be fairly

15            risky."

16            So they stopped even talking about that.  That was

17   a question that was raised, that was the answer that was

18   given.  And Citibank has absolutely no appetite to do a loan

19   to the PropCos.  So, instead, they say, look, why don't we

20   just do this qualified borrower loan, okay, real simple.  And

21   that's how they actually wind up getting this done.

22            Now it wasn't smooth sailing.  There was a lot of

23   discussion among investment committee members about whether

24   to do this because, remember, what you're talking about here

25   is levering the real estate in the PropCos.  That wasn't the

1  plan, unless it was to pay a dividend to Comvest.

2         So let's -- so the last store closes on June 20th.

3  Let's go to the July 14th memo, Exhibit 20, a very important

4  document, Your Honor.  This is a document that was prepared

5  by Thomas Clark.  Mr. Clark is an investment committee

6  member.  And he says he was under the impression and belief

7  that the underlying real estate value was money good in a

8  disaster scenario.  And he says at the bottom he relied on

9  this downside protection when approving the deal.  Do you

10  want to know what intent is, Your Honor?  There it is.

11  That's what he intended.  He intended the real estate  to be

12  available to be money good in a disaster scenario, and he

13  relied on that when he approved the deal.  Do you know what

14  that refers to?  That deck that we looked at, the moral

15  hazard of the $118 million.  He thought that $118 million was

16  in his pocket, and now he's being told, nope, it's got to be

17  used to support the OpCos.  Not happy.

18         Interesting point, though.  In the middle of that

19  document, it says news to Michael and us that the PropCo

20  value seems encumbered.  There's yet another separate debate

21  that happens because the investment committee is finding out

22  at this time, for what they say is the first time, that

23  Holdings has guaranteed the OpCo entities' obligations under

24  the sale leaseback leases, and they're being told, for the

25  first time, that Holdings has also guaranteed payment under

1  the agreement with Albertsons.

2          And why is this at issue?  Because they owed them

3  $43 million, right?  That they couldn't pay.  They thought

4  that that was all going to get paid from the ABL, but they

5  had no availability, they couldn't pay Albertsons.  And now,

6  all of a sudden, the investment committee is told, not only

7  do we need to lever the real estate to support the OpCos, but

8  even if we didn't, that couldn't come upstairs to Comvest

9  because it couldn't get through the roof of Holdings because

10 they had obligations.

11          And there was a confrontation, and there was a lot

12 of discussion.  And Mr. Clark -- if we can go back to the

13 slide, and go to the August 10th slide, as long as I'm on

14 this topic, Exhibit 189.

15          Mr. Clark actually went back to look at every

16 single deck that was given to the investment committee

17 because Mr. Caple insisted that he told the investment

18 committee, oh, no, you guys knew about the -- you guys knew

19 about the HoldCo obligations.  Mr. Clark actually went back.

20          Look at this.  I -- this is just the facts that

21 are going to come into evidence, Your Honor.  There is no

22 argument whatsoever that I'm making here.  Look at the facts.

23 I normally wouldn't do this.:

24          "But given that he clearly stated the sale

25          leaseback would be guaranteed at Holdings, I wanted

1        to check.  I couldn't find anything in the decks."

2        They show the inventory.  The Albertsons

3   obligation, its current liabilities.  And he sends that to

4   Mr. Marrero, and Mr. Marrero says, yup, he's being so

5   aggressive, we need to inform him it was not in any deck.

6   They felt misled.  They're going to tell you, no, no, no, no,

7   there was no problem.

8        When you watch Mr. Clark's video, and I put this

9   in front of him, he really -- he said, no, no big deal, you

10  know, these things happen, I don't expect to be told about

11  every little thing that goes into a transaction.  Not be told

12  that HoldCo is guaranteeing the obligations under the sale

13  leaseback leases?  Not to be told that HoldCo is giving a

14  guarantee to Albertsons?

15       Let's go back to the slide, Slide 34.

16       We're not done, right?  So that's -- we just

17  looked at the July 14th email, Clark to Marrero.  How about

18  the August 3rd, a couple of weeks later?  Still August 3rd --

19  by August 3rd, they know that UBS has walked.  And what went

20  from a possibility became a certainty, right?  Two days

21  later, they're going to be on the phone with Citibank to

22  engineer this deal.

23       And Mr. Marrero and Mr. Clark, two investment

24  committee members -- and this is really in the video, Your

25  Honor, because I -- it's the only video I took in this case,

1  of Mr. Clark.  Mr. Clark and Mr. Marrero spent most of a

2  Sunday sending emails back and forth, massaging what

3  ultimately became this email.  And you'll see the email

4  chain.  And Mr. Marrero does a draft, then Mr. Clark provides

5  comments, then Mr. Marrero massages it and puts it together.

6  It's a collaborative effort.

7           And they present -- and Mr. Marrero presents this

8  to Mr. Falk the next day; August 3rd is a Monday.  And what

9  does he tell Mr. Falk?

10          "We must avoid the investment committee discussion

11          from being a sell job."

12          They thought the investment committee discussions

13  had devolved into being a sell job.  That was the -- that was

14  their perspective, not mine.  And he says again:

15          "The investment committee relied on strong

16          assertions that they would make multiples of our

17          money."

18          Think $118 million, even in complete disaster in

19  liquidation scenarios.

20          They're critical of the projections.  You think

21  I'm critical of the projections?  Look what their colleagues

22  say:

23          "We must carefully lay out the likely cases, as

24          well as the downside case, reflecting negative

25          outcomes."

1        Because they didn't have any negative outcomes,

2   they didn't have a single projection that showed them losing

3   a nickel.  Again, the guarantees were not understood.

4        And what do they do?  Mr. Marrero presents this

5   email to Mr. Falk the next day.  And you'll see, in the Clark

6   video, Mr. Clark admits that every member of the investment

7   committee was on board with the sentiments expressed in this

8   document, except Mr. Caple.  They all agreed.

9        So, following this debate, they still make the

10  decision to go forward with the twenty-five-million-dollar

11  PropCo advance.  Let's talk about that for a minute.  It's

12  really such an important claim in this case, Your Honor.

13  They wind up doing this deal.

14        If we can go to Slide 40.

15        And just look at what they have to do to get this

16  $25 million because PropCo doesn't have it.  All they have is

17  real estate; they don't have cash.  They certainly don't have

18  $25 million.

19        So, as I say, Citibank refused to make a loan

20  against the real estate.  So Comvest had to create yet

21  another new entity.  They're good at creating entities.  They

22  create Haggen Property Lender, LLC.  It's wholly owned by

23  Comvest.  Citibank lends $25 million to that entity, and

24  takes a guarantee from Comvest.  Then Comvest's wholly owned

25  company lends that money to the PropCo entities.  They take a

1   lien back in return.  And then, finally, the PropCo entities

2   lend that money.  I mean, it all happens within days.  But

3   finally, that money goes to the PropCo entities, and the

4   PropCo entities take a second lien.

5           And I think there's some confusion, Your Honor.  I

6   think there's some confusion on the defendants' side.  We are

7   not looking to recharacterize or equitably subordinate the

8   loan from property lender to the PropCo entities.  We are

9   looking to equitably subordinate and recharacterize the loan

10  from the PropCo entities to the PropCo [sic] entities.  And

11  why do I think --

12          THE COURT:  To the --

13          MR. MORRIS:  -- there may be --

14          THE COURT:  -- OpCo entities.

15          MR. MORRIS:  -- some confusion?  Because they

16  point to the UBS agreement, and they say, we adopted the

17  terms that UBS did, as if somehow that's reasonable in market

18  terms.  Number one, UBS refused to do the deal.  Let's

19  remember that.  Whatever that document may say, UBS would not

20  sign it.

21          But much more importantly, Your Honor, that was

22  for a different loan than the one we're challenging.  That

23  was for a loan to the PropCo entities.  That loan was akin to

24  Haggen Property Lender to PropCo entities.  That was not a

25  loan from UBS to the OpCo entities.

1          So let's be very clear what we're talking about

2    when we talk about recharacterization and equitable

3    subordination.  It's the twenty-five-million-dollar OpCo,

4    loan to the OpCos to the PropCos.  And let's look at the

5    terms.

6          If we can go to Slide 41.

7          Remember, of course, Comvest controlled both the

8    borrowers and the lenders here, have that inherent conflict

9    of interest.  So, if you go to the documents, you'll see that

10   PropCo is getting an eight percent loan that was going to

11   mature on April something, in 2016.  And in exchange, they

12   were going to get a second lien on OpCo assets.  UBS was

13   never getting a second lien on OpCo assets.  Very different

14   to take a first lien on unencumbered real property, versus a

15   second lien on operating assets, a very different

16   proposition.

17          But here's the most important thing, Your Honor.

18   The PropCo entities could not recover a nickel on their loan

19   until the senior indebtedness, meaning PNC, who was owed $200

20   million, was paid in full, and in cash.  Think about that.

21   In full and in cash.  Haggen had to pay PNC $200 million

22   before the PropCo entities could recover on their twenty-

23   five-million-dollar PropCo advance.  And they stand here

24   today and say the unsecured creditors should bear the risk of

25   that transaction.  We're going to address that, we're going

1  to address that question this week, we really are.

2            It gets worse.  So the documentation is signed

3  somewhere between August 7th and August 12th.  They do the

4  documentation between Citibank, and they do the documentation

5  between property lender.  But Haggen is just about out of

6  cash.

7            Can we go to Exhibit 247.  I forget what that is.

8  Oh, okay.  So this is August 12th, this is the seven-million

9  -- seven-and-a-half-million-dollar advance that's made

10 initially.

11           And now let's -- do we have Exhibit 253?  Yeah.

12           So what happens, Your Honor, just to be clear,

13 they need the money desperately.  The PropCo entities can't

14 get their -- go back to the slide.

15           The PropCo entities cannot get their fully

16 perfected security interest as a second lienholder in OpCos

17 assets until the senior lenders consent.  They're in default

18 under the ABL, right?  So they have to get the consent of

19 PNC.  And on August 12th, they don't have that consent.

20 Nevertheless, Haggen is so desperate for the money, the

21 investment committee is told that, if you don't -- we need

22 this money today.  I think -- and I forget if it's Mr.

23 Niegsch or Mr. Rodriguez.  One of them writes an email at two

24 o'clock in the morning, and says, we need this money today,

25 or Haggen will not be able to meet its obligation, and will

1  not be able to meet its obligations, and will not be able to

2  pay payroll by the end of the week.

3        So, even though we don't have the forbearance

4  agreement done, even though we don't have the intercreditor

5  agreement done, we think that will be done in a week from

6  now, we've got to go naked with seven and a half million

7  dollars.  We have -- there is -- I forget the exact word

8  that's used in the email, but this is in the documents,

9  right?  This is not argument; this is the evidence that

10  you're going to see, that the request is made to advance

11  seven and a half million dollars, even though they don't have

12  the consent of the senior lenders.

13        Important.  Third-party lenders doing that?  Who's

14  doing that.  This is a bona fide loan?  They're going to get

15  up here and they're going to say, oh, well, gee, we called it

16  a loan, and we wrote an agreement, and it says that we have a

17  security interest, and we really, really believe that it was

18  a loan, and we never would have made an equity commitment.

19        When they tell you that they never would have made

20  an equity commitment, that should signal to you, well, then

21  why are you asking the unsecured creditors to take the risk.

22  If you own the company and you won't take the risk, why

23  should they?  I think that's a fair question.  And the

24  testimony is going to be very clear, they would not take the

25  risk.

1     They're advancing seven and a half million

2  dollars.  They don't even have a perfected security interest.

3  They're not an existing lender.  This isn't a case where the

4  Court can say, well, they're just trying to protect their

5  loan.  Nope.  They're an equity holder.

6     This is going to be a tough case for us, Your

7  Honor.  It's going to be a tough case for us because I have

8  to prove my case through their witnesses.  I don't have a

9  witness of my own, right?  I've spent a year and a half

10 reading paper.  And I had the privilege, and my big team has

11 had the privilege of flying all over the country to depose

12 lots of third parties.  I'm sorry to burden the Court with so

13 many transcripts, but it's the only way we could get this

14 done.

15    I had seven hours with these folks, in a year and

16 a half.  I read paper, and I deposed them for seven hours.  I

17 bet I didn't ask every question.  I bet I'm going to hear

18 some things that I didn't hear before because I didn't ask.

19 You know, I had seven hours.  They had a year and a half to

20 prepare.  Okay?  A year and a half to get their stories

21 right, and they're stories are going to gel really

22 beautifully, I'm sure.  Okay?  This is going to be a hard

23 case for us because I don't have -- I didn't have a chance to

24 prepare my witnesses.

25    But nevertheless, Your Honor -- if we could go to

1   the last page -- the evidence will show, crystal-clear, that

2   Comvest, as the equity holder, should not recover a nickel

3   from the debtors' estates.  The evidence will show that that

4   twenty-five-million-dollar advance must be recharacterized or

5   equitably subordinated.  Your Honor, if this loan is not

6   recharacterized, we should do away with the body of law

7   called "recharacterization."

8          The evidence will show that Comvest and the

9   individual defendants, who engineered and controlled

10  everything, should be held accountable for the losses of the

11  OpCo creditors.  They had no knowledge of any of this.  They

12  were never put on notice, they never knew the company was in

13  distress.  They did business as usual, with no reason to ask,

14  and they're left with zero today.  And Comvest wants a forty-

15  million-dollar dividend, and they don't want to be held

16  accountable.

17         Now one thing, right?  We've got actual fraud

18  claims.  And they said, fraud, we're not fraudsters, we're

19  not fraudsters.  Ask yourself, are we here without the

20  corporate structure.  And if we're here by accident -- right?

21  You either intended it or you didn't intend it.  If you

22  intended this result, that's wrong.  If you didn't intend

23  this result, how could it possibly be fair that the equity

24  holder walks away with tens of millions of dollars?  What,

25  did they hit the lottery?  Did they wake up the day after the

1  petition was filed and say, wow, holy -- we -- we're good,

2  we've got $40 million left, at least.  It wasn't an accident.

3  And even if it was, Your Honor, then we would talking about

4  how terribly unfair that would be.

5          Thank you, Your Honor.  Unless you have any

6  questions --

7          THE COURT:  No, thank you --

8          MR. MORRIS:  -- I'll cede --

9          THE COURT:  -- Mr. Morris.

10         MR. MORRIS:  -- the podium.

11         THE COURT:  Yes, sir.

12         MR. HOWE:  Good morning, Your Honor.  My opening

13 remarks will take somewhere between probably an hour and a

14 quarter to maybe an hour and a half, and so --

15         THE COURT:  All right.

16         MR. HOWE:  -- if you'd like to take a break before

17 that, or if you'd like me to just go ahead, I wanted to check

18 first.

19         THE COURT:  What would you like; would you like a

20 break?

21         MR. HOWE:  Whatever the Court prefers.

22         THE COURT:  Let's take a break, let's take ten

23 minutes then.

24         MR. HOWE:  Thank you.

25         THE COURT:  And we'll be back at ten after 10.

1       (Recess taken at 9:57 a.m.)

2       (Proceedings resume at 10:09 a.m.)

3       (Call to order of the Court)

4           THE COURT:  Your turn.

5           MR. HOWELL:  Good morning, Your Honor, Rush Howell

6   from Kirkland & Ellis for the defendants.

7           The defendants, in this case, took a chance, and

8   they pursued an exciting opportunity to convert a small, but

9   successful, grocery chain into a super-regional grocery

10  player.

11          They engaged in a good faith process that,

12  unfortunately, led to a bad result.  But, Your Honor,

13  sometimes that happens.  Sometimes, you engage in a good

14  faith process and it leads to a bad result.

15          In fact, that's why we have the business judgment

16  rule, Your Honor.  And as Chief Justice Strine once wrote

17  when he was Vice Chancellor,

18              "The business judgment rule exists precisely to

19              ensure that directors and managers, acting in good

20              faith, may pursue risky strategies that seemed to

21              promise great profit.

22              If the mere fact that a strategy turned out poorly

23              is itself sufficient to create an inference that

24              the directors who approved it breached their

25              fiduciary duties, then the business judgment rule

1           will have been denuded of much of its utility."

2           I'm going to focus on five key concepts during my

3    opening remarks, Your Honor.

4           The first is intent. The committee is promising

5    that it will prove that my clients intended to hinder delay

6    or defraud OpCo creditors.  But the facts will demonstrate

7    that these defendants, these men in the courtroom today, they

8    invested heavily in terms of capital, in terms of sweat

9    equity, in terms of their professional reputation on making

10   the operational company succeed.

11          And you're also going to hear specific and

12   significant decisions that were made by Comvest that are

13   wholly inconsistent with the concept that they intended to

14   hinder delay or defraud the OpCo creditors.

15          Second, the business judgment rule and the process

16   that we went through, we're going to show you that the

17   defendants engaged in a comprehensive and careful process in

18   deciding to pursue this Albertsons' acquisition.

19          They considered reams of information.  They spent

20   hundreds of hours analyzing the opportunity and they hired

21   myriad consultants, advisors, experts who all helped them in

22   that process.

23          We'll show you that A.T. Kearney, who is experts

24   in this grocery space, they developed reasonable sales

25   projections that the defendants relied upon in preparing

1  their financials. This process deserves the protection of the

2  business judgment rule.

3          My third point, validators, Your Honor.  It's not

4  only Comvest and Haggen and their advisors that believed in

5  these projections; instead, you'll hear far more people,

6  entities were involved in this transaction, either explicitly

7  or implicitly, approved this transaction to go forward.

8          These projections that they call ridiculous, well

9  they were validated again and again and again by investors,

10  by deal counterparties, by regulators, and by creditors.

11          Speaking of creditors, there's an important thing

12  you're not going to hear during this case and that is you're

13  not going to hear a single creditor come to you and say I

14  misunderstood the OpCo/PropCo structure and I relied on that.

15  Not a single one.

16          Instead, the evidence that you will see through

17  dep designations or stipulation is that the exact opposite is

18  true.  The only creditors you'll hear from will say they

19  understood the structure and lent against the structure

20  anyway.

21          And you'll hear from witnesses with grocery

22  experience that trade creditors don't care about the real

23  estate holdings of the grocery stores that they're lending

24  to.  That makes common sense, Your Honor.

25          Finally, the rescue lump.  Your Honor will hear

1  about how the defendants' effort to fix the problems at OpCo,

2  once they arose.  They tried hard, as the committee said, but

3  it didn't come to fruition.

4          And so, then, ultimately, PropCo provided a $25-

5  million-dollar loan to OpCo.  And, Your Honor, that is

6  fundamentally inconsistent with the idea that my clients

7  intended to hinder, delay or defraud OpCo.  They put $25-

8  million-dollars in to try to rescue the company, to try help

9  either avoid bankruptcy or have a soft landing.

10         Your Honor, that's the sort of rescue financing

11  that our system encourages.  Now, I'll come back to these

12  points at the end, Your Honor, but there's one thing that all

13  of these have in common and that's you can't look at these

14  through the lens of hindsight.  It's not fair to.

15         We all know who the Albertsons acquisition failed.

16  We can all see that chart that shows the projections ended up

17  being wrong.  But what matters is not what we know now

18  through the lens of hindsight, but rather what people

19  reasonably believed at the time and what actions they took

20  back then.

21         Now, I know Your Honor has presided over these

22  cases for over two years.  You've seen the fallout from these

23  cases and you've been very focused on getting -- you know,

24  these cases across the finish line after the petition date.

25  But these next five days these are about what happened before

1  the petition date and what the people were thinking and doing

2  then.

3          And we're going to talk through the story of

4  events that occurred prior to the petition date.

5          There was the initial investment in Haggen Inc.,

6  the Albertsons opportunity when the FTC forced the

7  divestiture of the stores, the comprehensive process that my

8  clients engaged in with many others, the conversions of the

9  stores, the 146 stores converted in under a 150-days.

10         We're going to address Your Honor's questions:

11  what went wrong and why?  Why did it fail so fast?  And then

12  we'll talk about the recovery attempt.

13         So, starting with the Haggen Inc. acquisition.

14  So, you're going to hear the story of how Comvest's initial

15  acquisition of Haggen was in 2011.

16         Now, Haggen was founded by the Haggen family back

17  in 1933 and it grown into a thirty-store chain in the Pacific

18  Northwest.  But by 2010, they were struggling.  They had

19  anemic cash flows.  They were considering bankruptcy.

20         At the same time, John Caple, one of the

21  defendants here, had come to Comvest.  In 2010, Mr. Caple was

22  a managing director.  He later become a partner at Comvest,

23  and he had extensive history in the grocery space.

24         Comvest invested in Haggen in 2011.  They

25  reorganized.  They streamlined.  They launched something

1   called the Northwest Fresh concept, which is something that

2   Mr. Caple and his team believed in, a way to improve the

3   stores.

4             They converted a lot of those stores over.  They

5   used to be called TOPs, and they became Haggens.  They got

6   Haggenized with the rest of the Haggens.  And they found a

7   CEO in John Flower, another defendant in this case, who

8   believed in the concept.

9             The results showed.  By 2014, they had $20-

10  million-dollars in EBITDA and they had gone from significant

11  negative net income to positive net income.  The Haggen brand

12  was successful there in the Pacific Northwest.

13            I bring up this backstory for a couple of

14  interesting points.  The first is the Haggen family,

15  themselves, the family company OpCo/PropCo structure.

16            The second is, as I mention, when Comvest acquired

17  the Haggen stores, several of them were TOPs and they got

18  converted into Haggens.  So, Mr. Caple and Mr. Niegsch, who

19  you'll hear from, they both had some experience converting

20  stores into Haggens.

21            And, third, when the Albertsons acquisition

22  happened something important happened with Haggen Inc.  And

23  Haggen Inc. is just that legacy set of stores.  It was

24  eighteen stores at the time.  So, at that time, around the

25  deal of the Albertsons acquisition, Comvest valued Haggen

1  Inc. at about a hundred million dollars in terms of

2  enterprise value.

3        It was a successful portfolio company of Comvest.

4  And when the Albertsons acquisition occurred, Comvest, who

5  put the structure together, put Haggen Inc., that successful

6  eighteen store grocery chain, and went to the OpCo side of

7  the equation, not onto the PropCo side of the equation.

8        And, Your Honor, that is fundamentally

9  inconsistent with the idea that my clients were intending to

10 hinder, delay or defraud the OpCos.  It's fundamentally

11 inconsistent with the idea they wanted to undercapitalize the

12 OpCos or weren't worried about the OpCo business.

13       I'd like to turn to the Albertsons opportunity

14 story.  Of course, you know that Albertsons and Safeway

15 decided to merge in 2014 and the Federal Trade Committee

16 scrutinized that and had some concern, and said we want you

17 to sell of a 168-stores.  And you know that Haggen was first

18 approached and talked about buying just forty-stores in

19 Oregon and Washington.  But, overtime, that grew and grew up

20 to the 146-stores in Washington, Oregon, California, Nevada

21 and Arizona that they ultimately acquired.

22       Now, this was an exciting and unique opportunity

23 for Haggen at the time.  Again, let's focus on at the time,

24 Your Honor.  Why was it exciting?

25       Well, first of all, because of the FTC

1  divestiture, mandated divestiture, they could get the

2  operational assets and the real estate assets at discounted

3  prices, so that was good news.

4          And then, secondly, Your Honor, they had built

5  this brand from 2011 to 2014 in Haggen that they were really

6  proud of.  It was doing extremely well with customers.  And

7  although the committee talks about recent performance in the

8  prior year, right before the Albertsons acquisition Haggen

9  was trending up.  It was something they were really excited

10  about, bringing the Haggen brand across all of these

11  different stores, so that was exciting.

12          But what made the opportunity unique, well there

13  weren't many possible buyers.  Comvest understanding was that

14  no big players were in their large chains to buy up a bunch

15  of stores, because Albertsons and Cerberus, the owner of

16  Albertsons, they wanted one buyer to take on most of the

17  stores.  That's hard to do if you're a large grocery chain,

18  because then, uh oh, we're right back into that same FTC

19  problem.

20          But most of the other bidders that Haggen was

21  against didn't have an established platform already existing

22  in the Northwest.  So, Haggen was kind of, you know,

23  goldilocks situation.  It's not too big to do it, but, at

24  least, has this platform already in play.  So, they had that

25  platform.

1        They also had a strategic operationally focused

2  private equity partner.  And that was a boon to them in going

3  forward with this bid. And, of course, they were able to

4  bring in management and line up vendors and relationships

5  that gave them a head start on the transaction as well, so

6  they were unique positioned to try to do this.

7        Now one question, of course, was how to finance

8  this transaction.  PNC was interested in providing a loan,

9  but not against the real estate.  They wanted to loan

10  regarding the operational assets.  And, so, Comvest hired a

11  company called HFF to go out and look at what ways they might

12  be able raise money through the real estate.

13        As a reminder, Your Honor, of the -- in addition

14  to getting a 146-stores, they got sixty-seven parcels of real

15  estate, either fee simples or ground leases.  And it was 53-

16  fee simples and 14-ground leases.

17        And HFF went out and found parties interested in

18  engaging in a sale leaseback transaction.  And the way that

19  would work is that a sale leaseback counterparty, that ended

20  up being Spirit & Gig (phonetic), they would pay for some of

21  those stores, the ones that they ended up wanting to buy and

22  they could negotiate a good price for, and then the OpCos

23  would leaseback from the Spirit & Gig.

24        And the proceeds from that real estate sale would

25  be used for the purchase price.  And so just as a reminder,

1  Spirit & Gig put in, they bought thirty-nine of the

2  properties and they put in $359-million-dollars about, rounds

3  to 359.  And the purchase price was $309-million-dollars,

4  Your Honor.  So, there's a difference there of $50-million-

5  dollars of excess money that came in from the sale leaseback

6  proceeds.

7          And that money didn't go to the PropCos.  It

8  didn't go to Comvest.  It didn't sit at Holdings.  That money

9  went over to the OpCos as well to help with operations.

10 Another action that was determined by Comvest and is

11 fundamentally inconsistent with the idea that they were

12 trying to hinder, delay or defraud the creditors at OpCo.

13         Now Comvest also put in $50-million-dollars of

14 equity.  They put in to the OpCo side their portfolio

15 company, Haggen Inc., and PNC put in a $210-million-dollar

16 revolver.

17         Now, Comvest and Haggen, they knew that the

18 Albertsons acquisition would be challenging.  Nobody is

19 disputing that.  Nobody was blind to the concept that this

20 was the minnow swallowing the whale.  They knew there would

21 be risks involved and they didn't take those risks lightly.

22         Instead, they ran a comprehensive and diligent

23 process that involved dozens and dozens of people.  And, Your

24 Honor, on this slide are -- this shows you this huge universe

25 of people that were involved in working on the Albertsons

1   acquisition that were involved in getting the Haggen bid

2   across the finish line.  They provided financing where they

3   had to approve for regulatory reasons, or they provided

4   credit, or they worked as experts to help figure out this

5   situation.

6          And, Your Honor, all of these people, ultimately,

7   either explicitly or implicitly blessed the operational

8   company's success.  They thought that it could work.

9          And what the committee doesn't say well in

10  hindsight, you know, of course, how could it have worked.  No

11  reasonable person could have thought it worked.  But, Your

12  Honor, look at this slide.  Look how many people thought it

13  could have worked.  Are these people all unreasonable?  Are

14  these people all subject to being fooled by ridiculous

15  projection?

16         I'm going to work through in a little bit of

17  detail each of these different groups.

18         Now, first, you have the Comvest deal team led by

19  Mr. Caple.  They also had an associate, Lucas Shaw (phonetic)

20  who did a lot of the modeling.  And then Mike Niegsch was on

21  the team as well, the deal quarterback.

22         Now, Mr. Niegsch had been at Comvest since the

23  original investment in Haggen.  He had been involved some of

24  those conversions to TOP stores and he had worked on the

25  portfolio company for four years.  He was highly involved in

1  the transaction.

2          Now, the first thing that this deal team had to do

3  was persuade themselves do we believe in this opportunity,

4  and so they did a lot of diligence to do that.  But that, of

5  course, wasn't enough.  This is a very complex transaction

6  with a lot of moving parts and they needed help.  And they

7  needed to get approval from many other parties.

8          So, the one that they had to go to was the Comvest

9  investment committee.  That investment committee vets all of

10 the deals at Comvest through a series of intense meetings.

11 These are smart folks.  They've rise to the top of Comvest

12 and this process isn't just kicking the tires.  They ask a

13 lot of questions.  They get detailed presentations ahead of

14 time and review them.  They're putting their money and their

15 limited partner's money on the line.  They're careful about

16 what they sign off on.

17         Next, you have the management team at Haggen. Now,

18 this was a strong management team with a lot of history in

19 grocery.  Mr. Clougher would remain as the CEO of the large

20 enterprise and John had already boosted profits significantly

21 in his short time at Haggen.

22         When they knew they had to go into California,

23 Nevada, Arizona to win the bid as well, they thought --

24 Comvest said we should create an OpCo North, operational

25 company north, and an OpCo South.  And the first thing they

1  thought is let's build up a team for the south.  So, they

2  went out and got a new CEO to handle OpCo South and they went

3  to Bill Shaner.

4         Now Bill Shaner had spent five years of president

5  and CEO of the nation's largest hard discount grocery chain,

6  that's Save A Lot food stores.  There, he opened a 142-stores

7  in one year in 210.  And he helped consult and then was

8  brought in to be the CEO for OpCo South.

9         Now, Mr. Shaner, he believed in this opportunity.

10  He relocated from St. Louis to put his career on the line on

11  this opportunity.  If he thought it was ridiculous, he

12  wouldn't have done that.

13         Another reason to believe in Haggen's prospects

14  for expanding into California was their CFO, Mr. Blake

15  Barnett.  He was the prior CFO at Albertsons California, so

16  that was a nice feather to have in your cap when you're going

17  to try to convert Albertsons into Haggens.  That was another

18  reason to expect that might work.

19         Finally, Derrick Anderson was the vice-president

20  of human resources. Now, Mr. Anderson had grown up with a

21  father in the military and traveled a lot, but he had settled

22  down at Haggen.  He had been there twenty-four years.  He

23  definitely cared a lot about Haggen and its brand going

24  forward.

25         And he was the guy who had all the good

1  relationships with the unions and we knew we were going to

2  have to move into California stores and get additional union

3  employees.  And, so, his relationships would be really

4  helpful there.  All of the management team believed in OpCos

5  prospects for success; otherwise, they wouldn't have been

6  there.

7          Haggen and Comvest also brought in a myriad of

8  consultants and advisors.  There was A.T. Kearney.  You'll

9  hear a lot about them.  The grocery store experts who gave

10 advice about operations and store conversions and who also

11 developed a set of projections based on their expertise in

12 this area for same store sales growth, meaning what is sales

13 going to look like going forward.  A.T. Kearney put those

14 projections together.

15         There was HFF.  I already talked about them.  I

16 think their full name is Holliday Fenoglio Fowler, but

17 mercifully I'm going to refer to them as HFF.  And they were

18 brought into help with the real estate issues including to

19 negotiate market rents between OpCo and the sale leaseback

20 counterparties.

21         There was OAG, Operating Advisory Group,

22 operational consultants that Comvest tasked with multiple

23 aspects of analysis and planning.

24         In particular, Ira Genser, at OAG spent a bunch of

25 time on how we going to put a schedule together for

1  converting a 146-stores in a 150-days.  And that schedule,

2  ultimately, became what is known as the cadence.

3  There was also Akerman, legal counsel, who worked

4  on everything throughout the deal, because it's necessary,

5  perhaps sadly, that we all need lawyers. And Akerman advised

6  on all of the aspects for this.

7  And Sagent Advisors was brought in as an

8  investment bank.  Ernst & Young, Grant Thornton, Willis

9  Towers Watson all providing consulting on parts of this deal.

10  Haggen also lined up vendors and service

11  providers.  Of particular importance was a vendor that was

12  SuperValu.  SuperValu would be both a distributor, but also

13  provide the IT.  And that was especially important because

14  SuperValu had already been providing IT for the Albertsons

15  stores.

16  And you'll see in the FTC presentation, Your

17  Honor, how much emphasis there is on SuperValu and how much

18  help they can bring and that was a big feather in Haggen's

19  cap.  It was going to be tough to pull off this transition,

20  but having SuperValu everyone thought that was going to be a

21  big plus.

22  So, Comvest and Haggen have this myriad of

23  additional advisors all mostly focused on the operational

24  side of this company in making sure they though the

25  operational company could succeed before they take a plan

1   that has to get validated by multiple others.

2            First, you have the deal counterparties.  Now,

3   Albertsons and Cerberus, it was critical for them that this

4   deal go through.  You'll hear that Cerberus, the private

5   equity owner of Albertsons, they had a $400-million-dollar

6   break fee if this merger didn't come together.  So, of

7   course, they have an incentive to vet the potential buyers

8   and hope that they pass the FTC's scrutiny and hope this deal

9   can come together.  And if Haggen is buying a 146 of the 168-

10  stores that are going, Cerberus is going to care.  We hope

11  that this bid from Haggen is going to pass muster.

12           Safeway and Albertsons they care, of course, too.

13  They want the merger to get finished off so that they can go

14  forward with this idea they've had.

15           PNC and the bank group, they're the perspective

16  first lien lenders.  They were not interested in and did not

17  receive collateral in the PropCo side, but they reviewed the

18  financials and business performance projections at the OpCo,

19  and the made a loan into the OpCo for a $180-million-dollars,

20  at first, and then later PNC said we'd like to move that up

21  to $210-million-dollars.

22           And Garrison and Spirit, sometimes you'll hear

23  Garrison called Gig.  Those are the sale leaseback

24  counterparties. And, of course, they cared about the success

25  of the operating business too, because they were going to

1  have rent streams coming from those OpCo companies.  And even

2  if they were trying to seal the companies to someone else

3  quickly, those potential buyers would care about the rent

4  streams coming from the company.

5         And it wasn't just the counterparties.  There were

6  also regulators involved.  As you know, the FTC they wanted

7  to make sure that the new operators were competitive.  That

8  was the whole point, Your Honor.  If you're going to force

9  all these stores to be sold for any competitive reasons, you

10 need a competitive new owner to come in and fill that space.

11        The FTC was particularly interested in seeing that

12 the stores would remain open and remain competitive. And

13 that, of course, requires a review of the capitalization and

14 the business plan of the OpCo entities. And, so, Comvest and

15 Haggen, they went to the FTC.  They presented a 70-page

16 presentation that they worked very hard on, and the FTC asked

17 questions.

18        And after they reviewed that and after they asked

19 follow-up questions because they were concerned about, hey

20 there are some of these stores that aren't performing very

21 well.  Most of these stores are EBITDA positive already.  So,

22 we think they'll be throwing off cash flow, that's good.  But

23 some of these underperforming.  A small percentage.  We want

24 to hear more about those, because we don't want you to close

25 them.

1      And after all of that, follow-up questions what

2  did the FTC say about Haggen's bid here?  Well, the FTC said

3  the commission also evaluated the business plan and finances

4  of Haggen and found that Haggen is a sound candidate for the

5  purchase of the vested stores.

6      So, Your Honor, the FTC evaluated the business

7  plan here, made a very important decision.  Were they

8  unreasonable?  Were they ridiculous?

9      Now, we've heard from the committee that well the

10  FTC didn't get to vet the structure as well.  And two points

11  on that.

12      First of all, the structure was provided to the

13  FTC.  You can look at the FTC presentation.  You'll see it in

14  this case.  And in the FTC presentation, there's a series of

15  financials that show cash flows for OpCo.  Cash flows for

16  PropCo.  Balance sheet for OpCo.  Balance sheet for PropCo.

17  They showed the expected rent payments going out.  So. the

18  FTC could have certainly focused on that if they wanted to.

19      But that brings me to my second point which is the

20  FTC is not so worried about what the corporate structures

21  looks like.  They want a competitive OpCo.  And, so, they

22  vetted that and they said Haggens a good candidate to do

23  exactly that.

24      And it wasn't just the FTC.  It was also state

25  attorney generals from all five states that were interested

1  in the exact same issue.

2           Now, finally, you also have some creditors.  Here,

3  Unified Grocers, SuperValu, some of the largest unsecured

4  creditors in the case.  Obviously, SuperValu knew about the

5  structure here and, obviously SuperValu believed in the

6  opportunity because they presented it to the FTC.

7           And with Unified Grocers, they asked for financial

8  projection.  Received them before they started extending

9  credit.  And then they extended credit $13-, $14-million-

10  dollars a week, so they obviously believed in the success; in

11  fact, they said it.

12           At their (30((b)(6) deposition, they were asked

13  was it Unified's belief in understanding that Haggen was

14  trying to make this transition successful.  Yes.  Is it fair

15  to say that Unified believed that Haggen venture was going to

16  be successful at this point?  Yes.  Was Unified surprised at

17  how Haggen, the whole Haggen entity collapsed?  Absolutely,

18  they were surprised, Your Honor.

19           With hindsight, we all can see it.  But at the

20  time, people believed in it and a lot of people, Your Honor.

21  All of these entities on this chart.

22           There can be no question that the defendants took

23  the reasonable steps to prepare to go forward with this

24  transaction.  There can be no question that these defendants

25  they looked before they left.  They took a risk for a great

1  opportunity.  It didn't work out.  We can't use hindsight to

2  penalize them for that; otherwise, we're throwing away the

3  business judgment rule.

4        Now, I'd like to talk a bit about the corporate

5  structure here.  I'm not going to go through it in much

6  detail.  I know you're familiar with that briefing and

7  briefing, but you are going to hear a lot about why the

8  structure went into place.

9        You'll going to hear testimony from Mr. Caple and

10 from Mr. Niegsch about that.  And they're going to explain

11 that here Haggen was acquiring a bunch of assets.  They're

12 getting operational assets and they're getting real property

13 assets.

14       And it will explain those assets are very

15 different.  And, so, it made sense to Comvest to have two

16 separate businesses to work with those.  Why?  Well, Comvest,

17 first of all, isn't a real estate investor.  That's not what

18 they're interested in doing and, so, they had a very

19 different time horizon with those two.  They wanted different

20 exit strategies.  Let's try to monetize this real estate and

21 sell it more quickly and then we can focus on our core

22 competency selling groceries, the OpCo side of the business.

23       They also knew well different types of lenders are

24 interested in those two different types of assets.  So,

25 that's why a PNC may not be interested in the real estate.

1  And, so, if you put all of the things together, you're not

2  going to get as good a turn from PNC, because they're lending

3  against collateral they're not as interested in.  Same with a

4  real estate lender.  They may not be interested in the

5  operations.

6          And, so, it makes a lot of sense to separate out

7  an OpCo and PropCo when you have real estate assets and

8  operational assets.  And, Your Honor, we see this oh my gosh

9  the structure changed so much from one day to the next.  But,

10  remember, on day one, they didn't have any real estate

11  assets.  They had operational assets.  And on day two, they

12  had real estate assets.  So, it makes sense to split them.

13          And, of course, Your Honor, an OpCo/PropCo

14  structure is not itself improper.  An OpCo/PropCo structure,

15  in fact, is common.  The Haggen family business utilized one.

16  The Albertsons utilized an OpCo/PropCo structure.  The

17  committee's experts would tell you that OpCo/PropCo

18  structures are common.

19          There's nothing wrong with an OpCo/PropCo

20  structure.  It's a legitimate way to divide those two types

21  of assets.

22          So, when the committee says they put the real

23  estate over here in these separate entities, so what.  That's

24  what an OpCo/PropCo structure is.  And when the committee

25  says that chart.  We'll look at the chart again.  But when

1  they say that chart is on trial.  Great.  We win.

2  OpCo/PropCo structures are allowed.

3        And we're here in Delaware, of all places, Your

4  Honor, where the corporate forum is respected.  We don't say,

5  hey because there's a bankruptcy we're going to throw

6  corporate forum out the window.  That's not what we say.

7        And also, Your Honor, the committee's pleadings

8  and arguments they kind of create an impression that somehow

9  all of the value from this deal ends up going over to the

10  PropCo.  That's not accurate.  What we've got here is kind

11  of a bundle of different assets that are available at the end

12  of the sale leaseback transactions here.

13        So, the purchase price has been paid to Albertsons

14  now.  You have a bundle of assets.  So, what goes to PropCo?

15  What goes to OpCo?

16        Well, fourteen ground lease properties goes to

17  PropCo; fourteen fee simple properties go to PropCo.  The

18  real estate went there.  Nobody disputes.  That was our

19  intent.  We wanted to have an OpCo/PropCo structure.

20        But OpCo got a lot as well, Your Honor.  First,

21  they got cash flows and EBITDA from a 146-stores.  Remember,

22  most of these stores are net EBITDA positive.  The

23  projections are expecting significant cash flows to come off

24  of these stores.  Those projections that were looked at by

25  party after party after party.  That's a good thing for OpCo

1  to get at that time.

2          They got inventory.  They got prescription.  They

3  got FF&E.  And, remember, I said they also got the $50-

4  million-dollars in excess between the $359-million that the

5  sale leaseback Spirit & Gig paid versus the 309-purchase

6  price.  That gets put over to OpCo.

7          But it doesn't end there either, Your Honor.

8  Because, as I talked about, the OpCo also received the legacy

9  Haggen enterprise.  The OpCo also received a $50-million-

10 dollar equity contribution from Comvest. And the OpCo

11 received a $210-million-dollar loan.

12          Now, I'm not going to talk much about Mervyns

13 until in our closing, you know, brief, but this is the

14 opposite of Mervyns.  This isn't cash-starved.  Look at all

15 this that OpCo got.  That was a good deal for OpCo at the

16 time.

17          Now, the allegation, you know, is that okay.

18 Well, maybe an OpCo/PropCo structures by itself, you know, is

19 not improper, but there's something else that's wrong.  And,

20 Your Honor, when we first saw the complaint in this -- and

21 I'll remind you that the complaint was filed after six months

22 of discovery, a million -- this wasn't a normal situation.

23 Hey, here' s a complaint, now we get discovery.

24          The committee got significant thousands of

25 documents, millions of pages, I think, of discovery.  And

1 their complaint says there's a problem with the rents.  We've

2 got this OpCo/PropCo structure and you're just destroying the

3 OpCo via these rents.

4        In their complaint, the committee focused on that.

5 They alleged it twenty different times that the rents paid by

6 OpCo were above market.  On nine separate occasions, they

7 specifically allege that the rents paid by OpCo to PropCo

8 were above market.

9        But now we have a stipulation that there's going

10 to be no evidence in the record that the rents from OpCo to

11 PropCo were above market.  And for the rent payment from OpCo

12 to the SLC counterparties to Spirit & Gig, the evidence will

13 show that those were negotiated to be market leases and the

14 committee's expert will say those are below market for the

15 year that they were in place.

16        So, the rent story has largely disappeared from

17 this case, Your Honor.  So, now instead, the allegation is

18 yeah, it's okay to have an OpCo/PropCo structure, but not if

19 you wildly under-capitalize -- intentionally under-capitalize

20 the OpCo.

21        You'll recall from the motion for summary judgment

22 argument, the committee said there's nothing per se wrong

23 about the OpCo and PropCo structure.  Your Honor said right.

24 They said what's wrong, Your Honor, is that the OpCo, as I

25 mentioned before, the OpCo was under-capitalized in the

1 extreme, because Comvest devised a set of projections that

2 were wholly unrealistic.

3          So, severing the real estate from the operations

4 when you basically starve the operations that's the gravamen

5 of the complaint.  But, Your Honor, the evidence isn't going

6 to support that either.

7          Instead, it's going to show a rigorous

8 comprehensive and collaborative process that led to those

9 business projections.  And it's going to show that those

10 business projections were validated again and again and again

11 by numerous third parties including, Your Honor, by multiple

12 committee members.

13          So, let's talk about those projections, because

14 now that's at the center of the case.  Your Honor, this is

15 just a simple slide showing that the management base case,

16 and you can have kind of an upside case, a base case or a

17 downside case.  Base means what you think is most likely to

18 occur.

19          That the management base case that was presented

20 ultimately was that same store sales growth would be up 4.9

21 percent for year one, just for year one.  And, so, same store

22 sales growth --all that means, Your Honor, is if you had a

23 hundred million dollars in sales last year, you expect 4.9

24 percent, you're going to get a 104.9 million the next year.

25          So why is this number important?  Well, this is --

1   their whole key to trying to say that the OpCos were under-

2   capitalized.  That this number was ridiculous and no one

3   should have relied on it.  And if you went with a realistic

4   projection then they would have known that the OpCo was

5   under-capitalized.

6          And, so, that's why this number is important, Your

7   Honor.  And I wanted talk about, you know, again, all of

8   these different people looked at and explicitly or implicitly

9   blessed that 4.9 percent.  And, now, with the benefit of

10  hindsight, oh it was ridiculous.

11         So, let's talk about though, how did that 4.9

12  percent get developed?  First thing is important is Comvest

13  didn't develop it.  A.T. Kearney developed it.  They're the

14  grocery experts who have expertise in doing just this sort of

15  thing.

16         They go out, they look at a bunch of data, they

17  put together detailed presentations, which you'll see in a

18  massive spreadsheet, which you'll see.  And A.T. Kearney

19  comes up with 4.9 percent.  So, how could it be reasonable,

20  Your Honor, for Haggen to expect that sales would go up after

21  they acquired all these Albertsons and Safeway Stores?

22         Well, A.T. Kearney, the experts, thought it was

23  reasonable and they had a lot of different reasons that I

24  can't cover all of, but here are some ones that I thought

25  were important.

1          First of all, $105-million-dollars in capital

2   expense was going to be invested in the acquired stores, Your

3   Honor.   That's going to the OpCo. So, you buy the stores.

4   You put a $100-million-dollars of new renovation, you know,

5   catching up the IT systems, that sort of stuff, into the

6   stores.   A.T. Kearney said it's reasonable to expect an

7   improvement in the grocery store and improvement in sales in

8   that situation.

9          The store locations weren't moving, Your Honor.

10  And the plan, although the plan did not come to fruition, the

11  plan was to keep the prices exactly the same.   So, you're not

12  moving the location.   You're keeping the prices the same.

13  A.T. Kearney thinks it's going to make sense.   You've

14  improved the store.   Sales could go up.

15         Also, the Haggen brand, as I said, was

16  experiencing positive momentum.   Over the last year, they had

17  positive sales growth.   And over the last couple months,

18  since Mr. Clougher come in as CEO, they were doing better and

19  better.

20         I also want to talk about a concept called net

21  promoter score.   What net promoter score means, Your Honor,

22  it's basically a survey where you go out to customers and you

23  say kind of how likely would you be to recommend this to a

24  friend.   And they kind of found that that works better than

25  saying how likely would you go back, so that's the net

1  promoter score idea.  And they use it in all sort of context,

2  very, you know, widely used metric.

3          And, here, A.T. Kearney did a survey of over a

4  thousand grocery shoppers on the west coast and said let's

5  find out net promoter score.  And Haggen in the Pacific

6  Northwest had the highest net promoter score of anyone.  They

7  beat Whole Foods.   They beat Fred Meyer.

8          They had this extremely high net promoter score

9  and so what does that tell A.T. Kearney.  They say, well that

10  means people like this brand.  There's going to be good word

11  of mouth.  And also look where Safeway is on that, Your

12  Honor, fourteen percent.  And look at Albertsons negative

13  four percent.

14          So, it was reasonable to A.T. Kearney to expect

15  hey the Haggen brand may be better.  That's succeeding up

16  there.  These customers may like this new brand.

17          They also did something called word cloud surveys.

18  And here you ask a customer what are the three best words

19  that describe why you shop for groceries.  And it can tell

20  you a lot about kind of which customers are interested in

21  which type of stores.

22          And, so, you see at Safeway and Albertsons what

23  the customers cared about most was convenience and location,

24  and then prices and sales.  And when you talk about

25  convenience and location, Your Honor, great.  Not moving the

1  stores.  When you talk about prices and sales, great.  We've

2  got a strategy not to change prices.

3          So, they thought okay.  We're going to keep the

4  Safeway and Albertsons's customers because we're going to do

5  what they like.  We're going to keep that in place.  But then

6  look at all the additional words that people care about,

7  about Haggen.  They care about quality, local, produce,

8  bakery, variety, all of those things.

9          And what Haggen was going to do was keep the kind

10 of center of the store the same, Your Honor, where like the

11 Cheerios and the kind of, you know, main items are.  And then

12 on the outside of the parameter of the store, they're going

13 to Haggenize that area -- put in new produce areas, new meat

14 and seafood display cases, other little kiosk and things like

15 that.  Like, you know, when you go into a Wegmans or Whole

16 Foods or something, as opposed to being in ShopRite or

17 something.

18         So, they thought we're going to be able to attract

19 customers that like that parameter of the store.  They'll

20 come, but we'll also keep the Albertsons and Safeway

21 customers.  And, so, overall, they thought makes sense that

22 they could go up.

23         They also did a review looking at store

24 conversions.  And they ultimately said kind of the range that

25 we have ever seen is, you know, positive fifteen to negative

1  fifteen, but you got to take a lot of other factors into

2  account.  Those net promoter scores, the word cloud, the

3  asset mix, other things like that for the grocery mix, I

4  mean.

5          And, so, A.T. Kearney says we think it's

6  reasonable to project on this range 4.9 percent, their net

7  promoter score, the word cloud.  There's enough that we think

8  that's a reasonable projection.  And Comvest and Haggen

9  relied on that from their experts.

10         Now, here we do have one person who's going to

11 say, no that's a ridiculous number and that's the committee's

12 solvency expert, David MacGreevey from Zolfo Cooper.  And,

13 so, Mr. MacGreevey he prefers a base case of negative 8.6

14 percent as opposed to the A.T. Kearney base case of 4.9

15 percent.

16         And a couple things about Mr. MacGreevey.  He's,

17 of course, a paid expert for the committee.  He has no

18 grocery experience or expertise.  He's never devised same

19 store sales projections for a grocery store.  And when he did

20 go and come up with his projections, he relied on the work

21 A.T. Kearney had done.

22         And he went to their spreadsheet and he said I

23 like these numbers better.  I think you should use these

24 based on, you know, reading some documents.  And he says I'm

25 going to pick the numbers I want, rather than the ones that

1  the grocery experts, A.T. Kearney used.

2          And we have an expert, also a paid expert for us,

3  Kevin Montague, AlixPartners, who reviewed Mr. MacGreevey's

4  solvency report and he had some issues with that report.  And

5  he's going to say no.  I think that the management base case

6  makes more sense because there's a bunch of errors with the

7  way that your kind of interpreting certain documents and

8  other things to get to the negative 8.6 percent.

9          So, we could find ourselves in kind of the classic

10  battle of the expert's situation, Your Honor.  But that's not

11  the situation here, because of all those validators, Your

12  Honor.  It's not just going to be Mr. Montague.  It's going

13  to be Comvest and Haggen.  It's going to be the consultants

14  and advisors, like A.T. Kearney.  It's going to be the deal

15  counterparties and the financing investors, the regulators

16  like the FTC, and creditors like Unified and SuperValu who

17  believed in the projections as well.

18          So, in the end, it will be Mr. MacGreevey on his

19  own against all those people.  Now the committee says nice

20  slide, Mr. Howell; at least, I hope they did because I spend

21  a fair amount of time on that.

22          MR. MORRIS:  We do.

23          MR. HOWELL:  But they're going to say, you know

24  what, that's not really accurate because Mr. MacGreevey is

25  not alone there.  They're going to say remember that email we

1  talked about with Mr. Niegsch and Mr. Shaner and Mr. Barnett

2  and Mr. Genser.  That shows that some of management thought

3  that, you know, these projections should have been lower as

4  well.

5        And, so, you know, they said that that is going to

6  be, you know, there's some fiery debate.  It was a really

7  important slide on that.  And they said, in their pretrial

8  brief, that Comvest rejected the strong warnings from its

9  officers and outside consultants and pressed ahead with

10 irresponsible projection.

11       And it's important, Your Honor, because they're

12 trying to use this to show intent, because there's not much

13 here that they can use to go to intent.  But they're saying

14 Mr. Niegsch, he heard these warnings.  He didn't care about

15 them, and he went forward, and he wouldn't show anybody more

16 downside projections than that, because Mr. Niegsch read

17 those emails and the first line of his response that I think

18 we're good as is.

19       So, the committee is using this to say, number

20 one, that management agreed with A.T. Kearney's downside

21 projections, and I want to make that point.  That's

22 important.  No one in that email is talking about the base

23 case or the upside case.  They're only talking about one

24 specific A.T. Kearney downside case that was presented in, I

25 believe, October 28th draft presentation.  So, they're

1  focused on that one A.T. Kearney downside presentation.

2          THE COURT:  October 28th after the purchase.

3          MR. HOWELL:  This is before the purchase, Your

4  Honor.  So, this is when they're devising what is, overall,

5  what do we think is going to be, you know, projections

6  because they have to, again, Your Honor, sell the investment

7  committee.  They have to convince the FTC.  They have to make

8  sure they think they're got good projections.  And they have

9  to convince themselves that it's going to work, Your Honor.

10         So, that's why they're working on that.  That's

11  why the management team and Comvest are even going back and

12  forth about the projections, right?  We want to make sure

13  we've got good projections that show we've got a reasonable

14  business case here; otherwise, we don't want to invest.

15         And, so, they say, okay.  Well, first of all,

16  management disagreed with A.T. Kearney's downside projection.

17  They say, secondly, that Mr. Niegsch disregarded management's

18  concerns.  And, third, they say that Comvest never presented

19  a worst downside scenario to the investment committee, or

20  they imply that by saying Mr. Niegsch just ignored all of

21  this.  But those last two statements are not true, Your

22  Honor.

23         And all you have to do is look at the documents,

24  just two documents, to see that.  Now, the first is here.

25  This is Defendant's Exhibit 66, I believe, and this is page

1  14 of that October 28, I think, 2014 presentation.  And this

2  is A.T. Kearney.  They presented an upside and a base case

3  and also a downside.

4         And in their downside, they're still showing some

5  positive same store sales growth for year one, year two, and

6  year three.  And that's what Mr. Genser and Mr. Barnett and

7  Mr. Shaner are saying, you know, we think those downside

8  projections may not be downside enough.

9         So, here, we did the math, Your Honor, and this is

10  what the downside projections would be from A.T. Kearney,

11  again, in their presentation.  Year one, they're saying

12  you're going to lose 1.4 percent of sales in a downside, and

13  then it's going to bounce back in year two by 9.7 percent,

14  and it's going to bounce back in year three by 3.2 percent.

15         And some of the management team said I don't think

16  that that's conservative enough Mr. Niegsch.  You know, you

17  should think about that.  And Mr. Niegsch said I think we're

18  good as is.

19         And the reason Mr. Niegsch said I think we're good

20  as is, is that Comvest was already running downside cases

21  that were more downside than that and were presenting those

22  downside cases to their investment committee.  So, this is

23  the second document, Your Honor.  This is Exhibit 133 at page

24  25.

25         This shows -- this is the final presentation that

1   went into the investment committee before the investment

2   committee signed off on the bid.  And this shows, Your Honor,

3   that their assuming same store sales are going to go down in

4   their downside case every single year, so let's compare them.

5           On the left is what A.T. Kearney said in their

6   deck that Mr. Genser and Mr. Barnett and Mr. Shaner said

7   those are, we think, are too rosy on the downside.  We should

8   make the downside lower.  And Mr. Niegsch did.  The downside

9   was lower that he presented to his investment committee.

10          He presented a downside of going down 5 percent

11  year one, going down another 2.5 percent year two, and going

12  down another 2.5 percent year three.  So, I honestly, I don't

13  understand what the big deal is on Mr. Niegsch's email.

14  They're not disagreeing.  They're agreeing.  Yep, you know

15  what.  Let's be a little bit more conservative with our

16  downside case that we present, and they did so.

17          Overall, the A.T. Kearney was up 11.7 percent.

18  You can see what Mr. Niegsch presented to the investment

19  committee down 9.7 percent.

20          Now I want to talk a bit about the store

21  conversions -- 146-stores converted in under a 150-days.  And

22  I have a short video here.  It's about two minutes long.  And

23  what this is, this is the conversion of just one of the

24  stores.  It's in Puyallup, Washington.  And, so, obviously,

25  not every store looks exactly like this one.  But it's an

1  example just to show you a little bit of what's going on in

2  the conversion, and I'll talk through it as it occurs.

3          So, these conversions were taking place, Your

4  Honor, between 40 to 56 hours.  And you'll see this one is in

5  Puyallup, Washington in March of 2015.  And the first thing

6  you're going to see when the video comes up, it's on some

7  kind of time lapse.  It moves fast.

8          But there are a lot of people in the store moving

9  all around, doing a lot of work.  Now, you see the center of

10 the store, which I said the plan was to keep that mostly the

11 same -- fix some signs and lights, but largely that was going

12 to be the same, so the Albertsons and Safeway customer would

13 have the same.

14         But out on the parameter which we'll see in a

15 second, there was much more change.  When it cuts out there,

16 you'll see kind of an empty area that is ultimately get

17 turned into this produce area there.  And in the back, I'll

18 talk more about in a moment when it comes back to it.

19         But you're also going to see here that they were

20 doing new flooring, putting in lighting, making a bunch of

21 changes at the cash register areas, et cetera, and really

22 building up around the outside of the store.

23         The idea is to get a new and different feel when

24 you come in.  The lighting is different.  The sign is

25 different and for it to feel different.  So, you can see the

1  produce section building up there and in the back there,

2  they're changing out all the meat and seafood display cases.

3  And they're basically what's called Haggenizing the store by

4  going around to the parameter.

5          Our witnesses will testify that they're doing

6  significant renovations and Haggenizing.  And then, Your

7  Honor, we'll also see just a couple of people changing the

8  banner from Albertsons to Safeway.

9          And, now, implied in some of what their expert

10 does is that basically we did little more than just change

11 this banner.  But you can see all the stuff that goes on in

12 the store, Your Honor.  It was a remodel.  It was a

13 renovation of these stores.

14         And you're going to hear -- here we see, you know,

15 when someone comes into the new store and the different look

16 and the feel that's there.  Just like if you go into a

17 Wegmans versus being in a ShopRite.

18         And you're going to hear that our witnesses will

19 say they went to these stores before they were converted and

20 after.  Mr. Shaner, the CEO of OpCo South, he'll say from the

21 time you got in the parking lot until when you got in the

22 store there was a meaningful difference.  He called their

23 ability to pull off these conversions in what he saw amazing

24 and meaningful.  He said there was a real wow factor when you

25 walk in, and that was the concept, Your Honor.  That was what

1  they were trying to do.

2         And one of the said ironies of this case, Your

3  Honor, is that the conversions went well.  They got a 146-

4  stores, all those people from store to store.   They hit that

5  cadence and they got it all eventually done in terms of

6  renovating the stores and making them look good.

7         So, the question becomes well what went wrong and

8  why?  The short answer to that question, Your Honor, is

9  pretty simple.  Its sales dropped thirty percent.  Groceries

10  are a very low-margin business.  You have a ten percent sales

11  drop is, you know, very rare, I guess, in the grocery

12  industry.  And, you know, if sales are the life blood of

13  grocery, which they are, then thirty percent decline is like

14  hitting an artery.  You've got very little time and it's

15  going to do a lot of damage.

16         But that begs the question.  Okay; sales are down

17  thirty percent.  Why would sales go down thirty percent so

18  quickly?  And that, Your Honor, there's no one explanation,

19  because no one explanation could lead to thirty percent going

20  down.  It was fully unexpected by everyone you'll hear

21  testify that was part of this team.  But they will testify

22  about some of the reasons that the struggles occurred.

23         One was pricing.  Now, everyone knew that pricing

24  would be important.  Everyone understood that you were going

25  to make the stores a little nicer.  Somebody might walk into

1  the store and say, I like it, but is it going to be a little

2  bit more expensive.

3            And, so, Comvest and Haggen brought in, yet,

4  another consultant, Willard Bishop, a pricing consultant who

5  is supposed to be an expert in coming up with and then

6  effectuating a pricing strategy.

7            And, here, the pricing strategy was simple.  We're

8  going to keep like items the same price.  And all that means

9  is when the Albertsons closes on Monday and opens forty hours

10 later, all the items that were in Albertsons on that Monday

11 reopen with the same prices.

12           Sounds pretty simple.  Turns out it's not very

13 simple to accomplish that.  First of all, grocery stores have

14 hundred thousand SKUs there and they're enormous.  There's so

15 many different items.

16           And, secondly, you need a lot of information

17 technology and that's where SuperValu is really important.

18 Because you see, Your Honor, when you go to a grocery store

19 there's always somebody out there with a pricing gun going

20 down and putting all that stuff there.  And there's always

21 the sale tags.  You know, you got the white tag and then, you

22 know, yellow or red sale tag and all of that's got to get

23 done.  And then it's got to scan correctly when you get up to

24 the register.

25           And, so, SuperValu, you know the work that they

1  were going do is really important.  And also, if you're going

2  to keep prices the same, a fundamental concept is you got to

3  know what the prices are.  So, they wanted pricing lists from

4  Albertsons and that was kind of difficult to negotiate to get

5  those, but, ultimately, said okay.  We're going to get the

6  pricing lists from Albertsons.

7          Willard Bishop will take those lists -- this is

8  where they have expertise and figure out how to take that

9  list and make it work.  Go from that logistical challenge

10 from numbers on the page to this whole supermarket being

11 correct.  And SuperValu will implement it.

12          So, one really frustrating irony, I talked about a

13 sad one.  This is a frustrating irony in this case was that

14 if there was one thing that the defendants thought they had

15 down was pricing.  Thought they had that nailed.  They had

16 consultants lined up for that.  They thought these store

17 conversions may be difficult, but gosh we'll have pricing

18 right, but everything went wrong with pricing.

19          So, first, those lists that came in from

20 Albertsons they were often incorrect or misleading.  There

21 was something called a temporary price reduction.  It's

22 called a TPR.  And when you go to the grocery store and you

23 see the white tag, like I said, and then there's like a

24 yellow tag says, you know, sale.  And the issue was that a

25 lot of the TPRs that Albertsons said hey these are TPRs, they

1  were actually permanent sales.

2          And Haggen and Willard Bishop they didn't figure

3  that out.  And, so, all of a sudden, you've got items and

4  sometimes it's a customer's favorite item, right, because

5  it's always on sale.  They go in and they say, oh, you know,

6  this is no longer on sale.  That's problematic.  And this

7  wasn't a few items.  This is six thousand, eight thousand

8  items in some instances.  It's a TRP problem.

9          And that was the tip of the iceberg.  You also had

10  all sorts of problems with the SuperValu system where

11  something would scan wrong or be listed wrong.  And the

12  system was more antiquated than Haggen though.  And what that

13  meant was when mistakes would happen, it might take three

14  minutes to correct the mistake. No big deal except when you

15  have ten thousand mistakes, three minutes you don't have.

16          There was also, Your Honor, supply issues.  So, in

17  grocery, it's critical that the shelves are stocked.  When

18  you go to a grocery store, every customer says if I go for

19  Jif Peanut Butter and that's not there, that's a problem.

20          Mr. Clougher will testify that, you know,

21  sometimes if you get to four percent unstocked in shelves

22  you've got a problem and you're having conversations with

23  four percent missing.  And, yet, early on with problems with

24  SuperValu here, there were twenty-four percent missing on

25  some shelves.  So, it looks like it's going out of business.

1          And then there was the unfair competition issue,

2   Your Honor, and you'll hear testimony from our witnesses that

3   they believed that Albertsons and Safeway took steps that

4   they thought were improper and that's why they brought a

5   demand letter against them and, ultimately, sued them.

6          Now, of course, Your Honor, I mean the committee

7   mentioned competition was a risk.  Haggen was not unaware

8   that they were going to have to compete with Albertsons and

9   Safeway.  That's part of the whole process of the FTC.  They

10  were unaware that Trader Joe's and Ralph's and everyone else

11  is going to pile on as well.

12          But what they didn't expect was for confidential

13  and for proprietary information to be used against them.  In

14  fact, they negotiated a provision of the APA that that

15  couldn't happen.  They negotiated a provision of the APA that

16  the Safeway Just for U program, a program where they can

17  contact their customers and give them special deals, that

18  that wouldn't get used, because they were worried about that.

19          And, ultimately, you'll hear from Haggen witnesses

20  they felt like Albertsons and Safeway didn't live up to that.

21  First of all, Albertsons, of course, knew about the schedule.

22  Remember the cadence.  So, they would know -- oh, and

23  Albertsons is about to become a Haggen and they'd start

24  couponing that area really hard.  And then after Haggen is

25  starting to struggle continue to coupon it. And then that

1  creates blood in the water, because if Ralph sees Albertsons

2  couponing really hard, they say well we've got to coupon hard

3  in this area.

4        There were also situations with overstock and

5  understock inventory.  These are described in the demand

6  letter that we have in this case.  And situations where they,

7  you know, Haggen management thought that Albertsons was

8  diverting inventory away from a store that was going to get

9  converted to a Haggen to a store that wasn't -- problems like

10 that.

11       But, Your Honor, all of these things kind of come

12 together -- the pricing issues, the supply issues, and the

13 unfair competition.  So, how can that led to, you know, sales

14 down as much as they were?  I thought I would give kind of an

15 example.

16       You take a, you know, Joe Shopper and he's going

17 to have a bar-b-que.  And he just wants to just go buy some

18 hot dogs and some buns and some coca cola for his bar-b-que.

19 And he usually shops at Albertsons, because he's price

20 conscious and because it's right down the street.

21       And he knows that his hot dogs are $2.99 for his

22 pack of hot dogs and his buns are $4.99 and a 12-pack of coke

23 is $9.99.  And he goes over and he drives to Albertsons.  Low

24 and behold its now Haggen.  He sees that, goes in, walks in

25 and says, it's interesting.  It looks a little bit nicer

1  around here.  I'm a little worried about price.

2         And he walks over to the hot dogs that he likes

3  because they always seem to be on sale, $2.99, and now

4  they're $3.99.  He's not happy about that.  He goes over to

5  buy some buns only half of the bun aisle is missing because

6  of a supply problem.  Looks like it's kind of going out of

7  business, doesn't have the buns that he likes.

8         So, now he walks over with hot dogs and no buns

9  and goes and picks up his coca cola and says well, at least,

10 this is still $9.99 like I'm used to.  Walks up to check out.

11 When he scans the checkout, coca cola registers $999.00.  You

12 know, somebody has to come out and try to fix it.  It takes

13 three minutes to fix the problem for them to finally say,

14 yes, sir, you're correct.  Your coca cola doesn't cost a

15 thousand dollars.

16        And he leaves and he goes home.  Gets there and

17 opens his mail and finds a bunch of coupons for Albertsons

18 and Safeway.  And then his friends are over for the bar-b-que

19 and he says, you know I went to that new Haggen and it

20 stinks.  It looks nice in there, but pricing is wrong and

21 they were out of some supply.  I think I'm going to go with

22 Albertsons.

23        Now, you've lost him and you've lost that net

24 promoter score from him.  And it creates just a negative

25 spiral, Your Honor.  And that's what we saw in this case.

1          Again, I mention to that an important word cloud

2  was -- part of the word cloud for Safeway and Albertsons is

3  sales and so, again, that TPR issue where sales are going

4  away that bothered those customers.

5          I'm going to talk about the recovery attempt now.

6  Now Comvest and Haggen were monitoring same store sales on a

7  daily basis and they were taking action to try to remedy

8  these issues.  They weren't just saying, well, tough luck,

9  the pricing and supplies messed up.  They were working hard

10 with SuperValu, and with Willard Bishop and with everyone

11 else to try to figure out how do we deal with this.

12         The first conversions were coming in, in the

13 Pacific Northwest.  They decided to start there.  They

14 thought that would make the most sense, you know,

15 geographically to do that.  And early on they were seeing

16 mid, kind of, single digit same store sales losses.  So, uh-

17 oh, you know, this is definitely worse than expectation, but

18 they thought we can -- this is a bump in the road, let's fix

19 the pricing, let's fix the supply, we can get by this.

20         Then, some Safeway's got converted.  Suddenly

21 negative 40 percent sales.  What on earth is happening there?

22 It's hard to get to the root cause and figure out what is

23 going on with that, but they keep working to try to do it.

24 They have tons, and tons, and tons of meetings and emails

25 about how to try to do it.  They've got boots on the ground

1  in stores trying to do it while they're also converting these

2  stores, but it just keeps getting worse.

3          As they open the Pacific Southwest, the OpCo

4  South, they're having the same pricing problems still.  Now,

5  SuperValu will say we're going to get the pricing problem

6  fixed and maybe they fixed part of it, but a new thing arises

7  and now the same store sales are down even worse in the

8  Pacific Southwest.

9          So trouble kind of worsened and worsened over the

10  course of the summer.  And in the summer you'll see that Mr.

11  Caple went to the investment committee and said, obviously,

12  we're not seeing the sales that we expected, this is beyond

13  what we ever could have expected, but we still have a plan.

14  We still think we can get across the finish line, but we've

15  got to reduce labor a little bit which we don't like doing,

16  but the sales are so down we've got to do it; we've got to

17  move prices up a little bit which we don't like doing, but if

18  people already think we're high priced let's move our prices

19  up.  They tried that; even when they implemented that it

20  doesn't work.

21          So then in August, when there's a real liquidity

22  need, Comvest works with the PropCo to get a PropCo loan into

23  OpCo.  You will hear testimony that nobody was willing to put

24  in equity from Comvest there.  It was a loan.  It was a

25  secured loan. It was a second-lien loan, Your Honor, behind

1 the first lien at PNC which is not remarkable in and of

2 itself.  What is true is that they were attempting to help

3 this OpCo entity out, Your Honor.  The PropCo was trying to

4 give it much needed liquidity for help of a recovery or,

5 perhaps, to help for a softer landing in bankruptcy to help

6 OpCo and its creditors, but no good deed goes unpunished and

7 now we've got to recharacterize that loan.

8          Well, of course, re-characterizing a secured loan

9 would be an extraordinary remedy, Your Honor, but you're

10 going to hear about that nonetheless.  And Ms. Flaton, from

11 Zolfo Cooper, is the committee's expert on re-

12 characterization.  No question Ms. Flaton is a knowledgeable

13 smart business person on many different issues, but on this

14 re-characterization she kind of missed the elephant in the

15 room in that she said:

16          "Intent doesn't matter."

17          But the Third Circuit, they say that's the

18 determining factor in <u>SubMicron</u>.  And when Mr. Hackney was

19 deposing Ms. Flaton she said:

20          "They're intent --

21          -- meaning PropCos intent --

22          -- was that it was a piece of debt that was an

23          extension of credit to the OpCo entities."

24          And Mr. Hackney said:

25          "Okay.  So you believe the PropCos intent was

1          that it would be dead, correct?"

2          She said:

3          "Yes."

4          And she'll say it again on cross-examination, Your

5     Honor.

6          I want to talk a little bit about some of the

7     promises the committee has made in this case.

8          As I said earlier, in the original complaint, we

9     heard again, and again and again about rents.  They said:

10          "PropCo leases --

11          -- that's the OpCo leases to PropCo --

12          -- were above market and contributed materially to

13          the OpCo stores operating losses, insolvency and

14          ultimate failure."

15          But now we have a stipulation where the plaintiff

16    will not offer any evidence that the rents paid by the OpCo

17    entities to the PropCo entities were above market.  And their

18    complaint, again, after six months of discovery, they say:

19          "Comvest will slink away with more then $100

20          million dollars' worth of real estate."

21          But you'll see, Your Honor, that the best day is

22    for Comvest to exit with $30 to $35 million dollars that

23    remains after the Holdings creditors are paid after already

24    putting in well over $100 million dollars on the deal.

25          The committee said:

1        "I hope to file --

2        -- this was at the motion for summary judgment --

3        -- I hope to file the Spirit Subcon plan today,

4        but I think it's just a matter of days."

5        But here we are 20 days later.  That, I think, was

6   September 26th and we haven't seen that plan and that was

7   used as an argument to try to defeat our position that Subcon

8   is inappropriately here, deficiently here.

9        They also said:

10       "Creditors did not know that there was an OpCo

11       which just had the operational assets and that's

12       there's a PropCo which owned the real estate

13       assets."

14       I may have mis-cited that.  I believe that was in

15  response to Your Honor making that point where they said yes,

16  they agree.

17       Your Honor, there is zero evidence of creditor

18  reliance here.  There is zero evidence.  The committee will

19  not offer a single creditor who's going to say they relied on

20  any misunderstanding of the corporate structure of Haggen;

21  not a single one.  And that's their burden.

22       What they're -- what the evidence will actually

23  show from those that we deposed or have a stipulation with

24  was that they knew about the structure and proceeded to

25  extend credit.  Those that did, they didn't care about the

1  structure.

2         Well -- so Spirit and Garrison; they were involved

3  in the transaction.  Yes, that's true.  They sought a

4  guarantee, and received it and provided credit.

5         Unified Grocers given 13 to 14 million a week.

6  They learned about the structure before they extended their

7  first piece of credit.  They sought a guarantee themselves

8  from the PropCo entities.  PropCo said no.  UG didn't said

9  say well that's it, we're walking away and we won't lend

10  without recourse to the real estate.  Instead they provided

11  credit all the way up to the bankruptcy, Your Honor.  And

12  through a stipulation we have with Pepsi they say that they

13  learned of the structure in July of 2015.  They sought a

14  guarantee and did not receive it.  And they extended credit

15  both before and after they learned of the structure.

16         The committee now says, well, of course, the big

17  sophisticated creditors knew about it.  But, Your Honor,

18  where are any examples -- where is any evidence of a creditor

19  that they're going to bring in that's going to say that they

20  misunderstood and relied on that?  You can't just assume it,

21  Your Honor.  There needs to be evidence of that.

22         What you'll hear, instead, from grocery people is

23  that trade creditors don't come to them and say, hey, I'm not

24  going to, you know, put my cookies in your store unless you

25  rent.  I need access to the real estate.  That doesn't make

1 sense, Your Honor.

2        The committee also said that Comvest failed to

3 hire and retain experienced senior management for the

4 conversions, but Comvest retained John Clougher and hired

5 Bill Shaner for the conversion.  The committee said that

6 Holdings was insolvent; that was the basis for multiple

7 counts of their complaint.

8        We said, in an interrogatory, okay, what are you

9 going to -- what evidence do you have to show us that

10 Holdings was insolvent?  They said all evidence of insolvency

11 will be presented by our expert.  And when I deposed their

12 solvency expert I said:

13              "So just for the record, you're not offering any

14              opinions as to solvency or insolvency of Haggen

15              Holdings, LLC, correct?"

16              Answer:

17              "Correct."

18        Now, when we filed for summary judgment in their

19 response to the summary judgment the committee said:

20              "The plaintiff does not seek to consolidate

21              Holdings and the OpCo debtors."

22        And then at the motion for summary judgment they

23 said:

24              "What we want to do, Your Honor, is consolidate

25              all of the entities."

1          Well, of course, that includes Holdings and the

2    OpCo debtors.

3          And I bring these us, Your Honor, because the

4    committee is making big promises in this case; promises that

5    we don't think, just like these, that they're going to be

6    able to keep.  And what are those promises?

7          They say -- on this re-characterization claim they

8    say:

9               "In fact, we consider to move for summary judgment

10              on the re-characterization claim, Your Honor, we

11              thought it was strong."

12         And yet their own expert admits that PropCo

13   intended the 25 million as debt, not equity; the key

14   determining factor under SubMicron.  I can see why they

15   didn't bring summary judgment for that, Your Honor.

16         They say these projections were ridiculous.  We

17   have a testifying expert who will rip them apart, but as I

18   talked about before, that scale slide, Mr. MacGreevey is on

19   his own against a lot of independent validators.

20         They say that Comvest intended to hinder, delay or

21   defraud OpCos creditors.  But, Your Honor, Comvest put this

22   structure together and they decided to put Haggen, Inc., on

23   the OpCo side of the business.  Your Honor, that is

24   fundamentally inconsistent with the idea that they were

25   trying to hinder, delay or defraud OpCo.  That is a portfolio

1  company they valued at 100 million in enterprise value.  They

2  put it under the OpCo side.  Here's the structure where they

3  did it, Your Honor.  Again, if this structure is on trial

4  then we move for a directed verdict because OpCo/PropCo

5  structures are legal, Your Honor.

6         They also -- Comvest arranged for 49 million in

7  excess sale leaseback proceeds, that's the 359 million versus

8  the 309, to not sit at the PropCo, not go to Holdings, not

9  get dividend out to Comvest, but go over to OpCo for their

10 benefit for the use in running that business.  That is

11 fundamentally inconsistent with the idea that my clients are

12 fraudsters who were trying to hide the ball from OpCo, trying

13 to hinder, delay or defraud them.

14         They spent all of the work and time that they did

15 -- you'll hear -- many of the defendants will testify 90, 100

16 percent of their work is on the operational side of the

17 business; not PropCo.  That is inconsistent with the idea

18 that the operational side of the business was just an add-on,

19 as the committee said, at motion for summary judgment.

20         There was $105 million dollars budgeted for

21 capital expenditures on the OpCo stores, Your Honor.  That is

22 fundamentally inconsistent with the idea that they don't care

23 about the OpCos; that they're intending to hinder, delay or

24 defraud the OpCo creditors.  Instead, it's entirely

25 consistent with what they'll tell you which is they cared

1 about the OpCo, that was what they were focused on and they

2 wanted the business to succeed and that's what everyone

3 validated as well, Your Honor.

4        Finally, it is fundamentally inconsistent with the

5 idea that my clients are intending to hinder, delay or

6 defraud the OpCo creditors when they put a $25 million dollar

7 loan in to try to prop up the company and to try to help with

8 the bankruptcy for the benefit of all the creditors of OpCo.

9 That is fundamentally inconsistent with a fraud claim.

10        And so, Your Honor, I talked about these key

11 concepts.  With respect to intent they're not going to be

12 able to show that my clients intended to hinder, delay or

13 defraud the OpCo creditors.  Instead, the actions, the facts

14 in this case, each of those facts I just showed you, Your

15 Honor, each on their own is sufficient to defeat an actual

16 fraud claim; each of them.  So that fraud claim is gone on

17 that intent point.

18        Then they have breach of fiduciary duty.  Your

19 Honor, I showed you that slide of all of those people who all

20 worked on this process, who all thought that those

21 projections were reasonable; projections created by an expert

22 in doing just that.  That deserves what Chief Justice Ryan

23 talked about; business judgment protection for them taking a

24 risk and trying to take a store and convert it into a

25 regional player.

1        The validators go further to that point, Your

2   Honor.  As I just said, if those projections were

3   unreasonable, if it was really under-capitalized at the time

4   and anybody could have seen it how did so many people miss

5   it, Your Honor?  How did so many sophisticated people?

6        The lack of creditor reliance, of course, defeats

7   their Subcon under Owens Corning because without that

8   reliance they can't meet prong two of that analysis.  Just

9   like without this, kind of, Spirit deal or whatever they're

10  not going to be able to show that no creditors were harmed

11  either.

12       Finally, with respect to re-characterization

13  you'll see that it was secured loan, documented loan, done at

14  a time to provide rescue financing.  The committee said they

15  like capitalism.  Well, that's capitalism, Your Honor.  That

16  is an attempt to help a company in trouble.  Re-

17  characterizing that loan will be defeated for that reason,

18  Your Honor.

19       So, Your Honor, at the end I will ask you, after

20  you've heard from all of these men, all of these defendants

21  who will tell you that they committed their time, their

22  effort, their professional reputation to have OpCo succeed

23  that you will find in favor of the defendants in this case.

24       Thank you.

25       THE COURT:  All right.  Thank you, Mr.  Howell.

1          Well, does anyone need a break at this point or do

2   we proceed with testimony?

3          Mr. Morris.

4          MR. MORRIS:  Your Honor, if I may, I would like a

5   quick break.

6          THE COURT:  All right.  Let's take 10 minutes and

7   we'll be back, and we'll go at.

8       (Recess taken from 11:25 a.m. to 11:50 a.m.)

9       (Call to order of the Court)

10          THE COURT:  Thank you everyone.  You may be

11   seated.  Thank you all.

12          Mr. Morris.  Yes, sir.

13          MR. MORRIS:  So with apologies, Your Honor, we've

14   had some difficulty with the witness binders for Mr. Caple.

15          THE COURT:  Okay.

16          MR. MORRIS:  I've got a couple that I believe are

17   set and we'll just have to take it slowly.

18          THE COURT:  Well, we've got the exhibits.

19          MR. MORRIS:  Okay.  So does Your Honor have a set

20   of exhibits?

21          THE COURT:  I do.

22          MR. MORRIS:  It may be a little cumbersome that I

23   would have one for the witness and one for Mr. Howell.

24          THE COURT:  That would work, I think.  Yes.

25          MR. MORRIS:  Okay.  So, the plaintiffs are ready

1  to present their case and would call, as their first witness,

2  John Caple.

3          THE COURT:  All right.  Mr. Caple.

4          Good morning, Mr. Caple.

5          MR. CAPLE:  Good morning.  How are you?

6          THE COURT:  Fine, thank you.  If you'll just

7  remain standing while we have your testimony affirmed.

8                  JOHN CAPLE, WITNESS, SWORN

9          THE CLERK:  Please state your full name, spelling

10  your last name for the court, please.

11          THE WITNESS:  John Caple.  Last name C-a-p-l-e.

12          THE CLERK:  You may be seated.

13          MR. MORRIS:  Your Honor, may I approach the

14  witness just to give him this binder?

15          THE COURT:  Yes, absolutely.  You sure may.

16          MR. MORRIS:  May I proceed?

17          THE COURT:  You sure may, Mr. Morris.

18                  DIRECT EXAMINATION

19  BY MR. MORRIS:

20  Q     Good morning, Mr. Caple.

21  A     Good morning.

22  Q     Mr. Caple, you joined Comvest in 2010 as a managing

23  director, is that right?

24  A     Yes.

25  Q     And you became a partner in 2013 or 2014 and then left

1  in 2016, is that right?

2  A     Yes.

3  Q     And you were the person at Comvest who was charged with

4  the responsibility of managing Comvest Investment and Haggen,

5  is that right?

6  A     Yes.

7  Q     From January 1st, 2014 until the time that you left you

8  were also a manager of Haggen Holdings, is that right?

9  A     I believe so.  I know that I was a manager of Haggen

10 Holdings.  The exact date I'm not sure of.

11 Q     Okay.  But you were the chief executive -- principle

12 executive of that entity, right?

13 A     Yes.

14 Q     Of the Holding company?

15       And you also served as the president and CEO of

16 Holdings from January 1st, 2014 until January 30th, 2015, is

17 that right?

18 A     Once again, I know I had that title.  I'm not a hundred

19 percent sure on the dates, but I know I had that title, yes.

20 Q     Okay.  And it was your idea, originally, to pursue, on

21 behalf of Comvest, an investment in the supermarket chain, is

22 that right?

23 A     Yes, it was.

24 Q     And you did that in 2011?

25 A     I believe we started with it in 2010.

1  Q    Okay.  And by 2014, at the time of the Albertson's

2  acquisition, you had a deal team at Comvest, is that right?

3  A    We did, yes.

4  Q    And you were the head of the deal team?

5  A    I was.

6  Q    And Mr. Niegsch was the deal quarterback?  He was on

7  the deal team and he was known as the deal quarterback,

8  right?

9  A    Yes.

10  Q    And he was the vice president?

11  A    I believe he's their vice president or a principle.  I

12  know he got promoted at some point in there, but one of those

13  two titles.

14  Q    All right.  And then the third and final member of the

15  deal team was Lucas Scholl, right?

16  A    Yes.

17  Q    He was an associate?

18  A    Yes, he was.

19  Q    Okay.  And within Comvest there was also a body known

20  as the investment committee, right?

21  A    Yes.

22  Q    And Mr. Falk, he's the head of Comvest, is that right?

23  A    Yes.

24  Q    And he was on the investment committee throughout the

25  time of the Albertson's acquisition through the petition

1  date, right?

2  A    Yes.

3  Q    And Mr. Marrero was as well?

4  A    Yes.

5  Q    Mr. Clark?

6  A    Yes.

7  Q    Were you on the investment committee?

8  A    Yes, I was.

9  Q    Okay.  And Cecilio Rodriguez?

10 A    Yes.

11 Q    And there was a Louis Colissimo [ph], he was an

12 observer on that committee, right?

13 A    Yes.

14 Q    Okay.  What was the purpose of the investment

15 committee?  What's the role of the investment committee

16 within Comvest?

17 A    So the role of the investment committee is to approve

18 all of our deals and to oversee, sort of, the investment

19 activities of the firm.

20 Q    Okay.  So is it fair to say that Haggen could not have

21 made -- could not have entered into the asset purchase

22 agreement without Albertsons without the approval of the

23 investment committee?

24 A    Yes, absolutely.

25 Q    Okay.  And in August 2014 -- so just to start the

1   chronology here it was August 2014 when you learned that

2   certain stores owned by Albertsons and Safeway were coming to

3   the market, is that right?

4   A    I believe I had heard of the deal a little bit earlier

5   than that.  I know that we got an initial call from Citi, I

6   think, over the summer, I couldn't tell you an exact date,

7   letting us know what was coming.  But then later, after going

8   through some FTC processes, we began a more formal process.

9   Q    Okay.  And on August 13th, 2014 Comvest submitted an

10  indication of interest to acquire approximately 22 stores, do

11  you remember that?

12  A    I remember submitting an indication of interest, yes.

13  Q    Okay.  Can you turn in your exhibit binder, please, to

14  Exhibit 4, Plaintiff's Exhibit 4?

15  A    Yes.

16  Q    Do you know what that is?

17  A    This appears to be the indication of interest we

18  submitted on August 13th.

19          MR. MORRIS:  Your Honor, I move for the admission

20  into evidence of Plaintiff's Exhibit 4.

21          THE COURT:  Any objection, Mr. Howell?

22          MR. HOWELL:  No objection, Your Honor.

23          THE COURT:  All right.  It is admitted.

24      (Plaintiff's Exhibit No. 4 admitted into evidence)

25          MR. MORRIS:  Okay.

1  BY MR. MORRIS:

2  Q      Originally Comvest was focused -- the original

3  geographic location that Comvest was focused on was

4  Washington and Oregon, is that right?

5  A      That's correct.

6  Q      And that's because the Haggen Company had stores in

7  only those states, is that right?

8  A      That's correct, yes.

9  Q      Okay.  Now, about a month after this indication of --

10 did you sign this indication of interest?

11 A      I did, yes.

12 Q      Okay.  And do you recall that approximately a month

13 later the deal team prepared a memo for the investment

14 committee?

15 A      Yes, I recall preparing a memo; yes.

16 Q      Okay.  So from time to time the deal team would prepare

17 memos that were to be presented to the investment committee,

18 is that right?

19 A      Yes.

20 Q      And Mr. Lucas, Mr. Scholl and Mr. Niegsch they would

21 prepare the memos and you would review them, is that right?

22 A      Sure.  I might write parts of the executive summary,

23 but, yes, the three of us would work together to prepare the

24 memos.

25 Q      Okay.  So in September, mid-September if we could look

1 at Exhibit 8.

2 A      Yes, sir.

3        Excuse me, they're out of order.

4 Q      Do you have Exhibit 8 in front of you?

5 A      Yes.

6 Q      Okay.  Do you know what that is?

7 A      Yes, this appears to be the investment committee memo

8 we put together on September 15th, 2014.

9        MR. MORRIS:  Okay.  I move for the admission into

10 evidence of Exhibit 8.

11        MR. HOWELL:  Your Honor, it was our understanding

12 -- and I can clear it up with Mr. Morris at the lunch break,

13 but the exhibits that were not objected to by either party

14 would just be deemed admitted.  So I am not -- I have no

15 objection, but we certainly don't need to go through the

16 process each time.

17        THE COURT:  All right.

18        MR. MORRIS:  Thank you.

19        THE COURT:  If you do have an objection you'll

20 raise it.

21        MR. HOWELL:  Absolutely, Your Honor.

22        THE COURT:  Okay.  Good.

23        All right.  Exhibit 8 is admitted.

24     (Plaintiff Exhibit No. 8 admitted into evidence)

25        THE COURT:  And we'll just admit the exhibits as

1  they go unless there is an objection.

2        MR. MORRIS:  Yes.  And it was my intention that

3  every exhibit I use with Mr. Caple is an exhibit to which the

4  defendants had no objection.

5        THE COURT:  All right.  Thank you, Mr. Morris.

6  BY MR. MORRIS:

7  Q     So this is the IC memo that was presented to the

8  investment committee on September 15th, 2014, right?

9  A     Yes.

10 Q     And if you could turn your attention, please -- when I

11 met with you last we would look at documents and we would

12 refer to bates numbers in the corner, do you remember that?

13 A     Yes.

14 Q     Now they've been re-labeled for the trial.

15 A     Okay.

16 Q     So the numbers that we're going to look at are the ones

17 that always begin with P because that's Plaintiff exhibit.

18       So could you turn to P8.002, please?

19 A     Yes.

20 Q     And this confirms that at the time the proposed

21 transaction relates only to Washington and Oregon, is that

22 right?

23 A     Yes, that's accurate.

24 Q     But the number of stores went from 22, that we saw in

25 the indication of interest, to 43 stores now, right?

1  A      Let me go look at that.  So the initial indication --

2  I'm sorry, can I review the -- I didn't count the number of

3  stores in the indication of interest.  Excuse me.

4        I can't count here.  This looks like more than 20 to

5  me, though, on the initial indication of interest.

6  Q      Okay.  But there was an increase of approximately 20

7  stores, is that fair?  We don't have to be precise.

8  A      I don't believe -- I'm sorry, this is on 43 stores.  It

9  looks to me -- I haven't counted the numbers here, but it

10 looks to me like it's about 40 stores.  I don't think there

11 was an increase in the number of stores.  My memory was

12 always there was something like 40 stores in the Washington

13 and Oregon area.

14           MR. MORRIS:  Your Honor, I have a binder for you.

15           THE COURT:  Oh, yes.  Thank you, Mr. Morris.

16 Please approach.

17           MR. MORRIS:  Whether it's accurate or not remains

18 to be seen.

19           THE COURT:  All right.

20           MR. MORRIS:  We're going with some risk here.

21 BY MR. MORRIS:

22 Q      In any event, Mr. Caple, in September the deal was for

23 43 stores in Washington and Oregon, is that right?

24 A      Yes.

25 Q      And you told the investment committee -- the deal team

1  told the investment committee that the purchase price for

2  those stores was going to be $80 million dollars?

3  A     That was our initial indication of interest, yes.

4  Q     Right.  And as set forth on page 8.002 you set forth

5  that price relative to the value of the owned real estate,

6  right?

7  A     I think that price would have been set on a multiple of

8  ways.

9  Q     Okay.  But as presented here, sir, you told the

10 investment committee that Haggen would pay $80 million

11 dollars for the stores which is less than the appraised value

12 of the owned real estate, which was $136 million dollars,

13 right?

14 A     I would agree with that, but you should also notice the

15 third bullet point that we also looked at the total returns

16 for the deal.  So this whole bullet point would have been one

17 thing.  I just want to say it wasn't simply the real estate

18 we looked at.  We looked at a whole series of other things

19 and we mentioned, at least, some others.

20 Q     Okay.  I'd like you to listen carefully to my question

21 and only answer the question that I ask, please.

22 A     Okay.

23 Q     Your counsel will have the opportunity to ask you

24 whatever question he wants and then you can tell him whatever

25 you want, but when I'm asking questions I respectfully

1  request that you listen to my question and answer only the

2  question that I ask.

3  A    Absolutely.

4  Q    Okay.  So let's try it again.

5  A    Okay.

6  Q    You told the deal team -- the deal team told the

7  investment committee that they could buy the stores at Haggen

8  for $80 million dollars which was less than the appraised

9  value of the owned real estate which was $136 million

10  dollars, right?

11  A    Yes.

12  Q    Okay.  And when you made that analysis you established

13  the purchase price by using a multiple of three times EBITDA,

14  right?  Eighty million dollars translated into three times

15  EBITDA, is that right?

16  A    Eighty million dollars was three times EBITDA?

17  Q    Yup.

18  A    That's true.

19  Q    Okay.  And is it fair to say that at this time did you

20  believe that a three times multiple was a reasonable

21  valuation?

22  A    Yes.

23  Q    Okay.  You described the acquisition of the 43 stores

24  as transformational, right?

25  A    Yes.

1  Q      Less than 90 days later Haggen signed an asset purchase

2  agreement for 146 stores spread across five states, right?

3  A      Yes.

4  Q      If acquiring 43 stores was transformational how would

5  you describe acquiring 146 stores across five states, three

6  of which Haggen had no prior presence in?

7  A      An even larger transaction.

8  Q      Even more transformational?

9  A      Sure, I think that's fair.

10  Q      Three times more transformational?

11  A      I don't know if I could put a multiple on it, but

12  significantly larger and significantly bigger, yeah.

13  Q      Okay.  And you told the investment committee that this

14  acquisition was not only transformational, but it provided

15  integration execution risk, right?

16  A      We were certainly concerned about integration execution

17  risk, absolutely.

18  Q      Okay.  I apologize, but I am directing you to page

19  P8.003 in the middle there just so we're on the same page.

20        Do you see the reference to integration execution risk?

21  The second bullet point.

22  A      Yes.

23  Q      What is integration execution risk?

24  A      Well, the stores were branded Albertsons and Safeway,

25  and we were going to need to integrate them into our chain

1  and rebrand them.  So there was an awful lot to do to get

2  that done.  And that presented risk.

3  Q     Well, the parenthetical refers to infrastructure, do

4  you see that?

5  A     Yes.

6  Q     What's the infrastructure that you're referring to?

7  A     There I'm really referring to the current Haggen

8  infrastructure; the, roughly, 100 plus employees we would

9  have had in our, you know, SG&A corporate structure.

10 Q     Other than the employees what else gets included in

11 your definition of infrastructure?

12 A     Oh, the current software and IT systems; you know, the

13 approach to almost everything we do.  I'm not sure I have a

14 formal definition of infrastructure, but a whole series of

15 things would go under that.

16 Q     What other things do you deal with?

17 A     Well, you know, you have employee processes, you have

18 union relationships, you have -- I don't want to refer to our

19 brand as infrastructure, but you have a whole series of

20 things.  You have a whole buying process and you have

21 relationships with vendors.

22 Q     How about corporate infrastructure, back office

23 operations or corporate offices, is that part of your

24 understanding of what the phrase infrastructure means here?

25 A     Sure.  So things like the ability to, you know, process

1    invoices, make sure product gets delivered to the stores, buy

2    product; all of those things would be -- the 111 people that

3    I referred to earlier, all of those people did those things

4    so that show they happened.

5    Q     And you had no infrastructure at all in California,

6    Nevada and Arizona prior to the time you did the Albertson's

7    acquisition, correct?

8    A     None.

9    Q     Okay.  So all of that would have to be created from

10   scratch, right?

11   A     No.

12   Q     You had none in those states, right?

13   A     We had none of those things, but we had -- I'm sorry.

14   Q     Now below that, in the bullet point below that you

15   referred to a different model between Haggen and Albertsons,

16   do you see that?

17   A     Yes, I do.

18   Q     How are the models different?

19   A     So Albertsons is what I would consider to be a middle

20   of the road grocer.  You know, if you think of the grocery

21   world, you know, maybe Whole Foods at the top in terms of a

22   real focus on quality and organic, you know, maybe somebody

23   like -- Walmart is the biggest one, but all the other folks

24   that focus on price I would put Albertsons, sort of, in the

25   middle; a little bit of what we call a, sort of, standard

1  grocery operator.  I would have put Haggen, sort of,

2  somewhere in between the Whole Foods of the world and the

3  Albertsons of the world.

4       So we would have Cheetos, and diet Coke and whatever

5  you might, you know, traditionally look to buy at the grocery

6  store, but we would also have a real focus on organic product

7  and a real focus on local product.  So, you know, even if

8  you're not buying an organic apple you're buying an apple

9  that's grown here, and let me show you a picture of the

10 farmer and, you know, show you exactly where it's from; that

11 kind of local focus.

12 Q     Okay.  And you told the investment committee that you

13 were unclear as to how the stores would perform with the new

14 Haggen model, is that right?

15 A     That's right.

16 Q     Okay.  Can you turn the page, please, to 004?

17 A     Sure.

18 Q     You provided financial data to the investment

19 committee, is that right?

20 A     Yes, we did.

21 Q     Okay.  And you see the reference to Wave stores?

22 A     I do.

23 Q     Okay.  That's a reference to the stores that -- those

24 are the target stores at this moment in time.  So this is a

25 presentation of the historical financial performance of the

1  stores that are targeted, is that right; the Wave stores?

2  A      It is, yes.

3  Q      Okay.  And the Haggen stores, that a presentation of

4  the historical financial information for the stores that

5  Haggen had either at that time or expected to have in the

6  future, right?

7  A      Yes.

8  Q      And that's because under Comvest's direction Haggen was

9  in the process of closing some of the unprofitable stores and

10  that's what Footnote 2 is about, right?

11  A      That's correct.  So we had made the decision, at this

12  point, prior to this, that at the end of the day we were

13  going to close several stores.  We'd gotten an agreement from

14  our lessors on how we were going to close those.  So they

15  were still open, but not really part of what we called

16  ongoing operations at that point.

17  Q      And so the financial data that we're looking at here is

18  normalized to take into account the removal of the less

19  performing stores, right?

20  A      That's right.

21  Q      Okay.  And so let's take a look at some of the

22  financial data, in particular the same store sales.  It's

23  true that same store sales in 2012 declined for both the

24  target stores and for the Haggen Legacy stores, right?

25  A      That is correct.

1  Q    And in 2013 there was another decline in same store

2  sales for the Haggen Legacy stores, right?

3  A    That is correct if you look at the full year, yes.

4  Q    Okay.  But the Wave stores increased by three percent,

5  right?

6  A    That is accurate if you look at the full year, yes.

7  Q    Okay.  Now, a couple of weeks later the California

8  stores became available, is that right?

9  A    No, they were always available.

10 Q    Well, you were told at the end of September that

11 Comvest would have to bid on the Haggen stores if they wanted

12 to be competitive, right?

13 A    Bid on the California stores if we wanted to be

14 competitive.  That's accurate.

15 Q    Okay.  Can you take a look, please, at Exhibit 6?

16 A    Yes.

17 Q    Now, do you see that's there an email at the bottom

18 between Mr. Niegsch and Mr. Shaner?

19 A    Yes.

20 Q    And if you look towards the bottom there's a reference

21 to working over the weekend and the purchase of the

22 California stores, do you see that?

23 A    Can you give me just a second so I can read it?  I'm

24 sorry.

25 Q    That's okay.  Take your time.  It says:

1      "We're going to be working on an updated model over the

2      weekend to add the purchase of the California stores."

3  A     Yes, I see that.

4  Q     Okay.  So prior to this time Comvest had been running

5  various forecasts and various models that related solely to

6  the Washington and Oregon stores, right?

7  A     That's true.

8  Q     And it's not until September 26th that you even begin

9  to model for California stores, right?

10  A     It's on or about then, yeah.

11  Q     Well, I mean -- and a few days later you informed the

12  investment committee that the California stores were going to

13  become available, right?

14  A     I think I informed the investment committee that in

15  order to be competitive we were going to have to also look at

16  the California stores. Hopefully, I would have given them an

17  overall view of --

18  Q     Let's take a look at Exhibit 7, please?

19  A     Yes.

20  Q     And this is an email from you to the investment

21  committee, is that right?

22  A     It is.

23  Q     Okay.  And you refer to, in the first sentence there,

24  Project Tsunami, do you see that?

25  A     I do.

1  Q      And Project Tsunami is the acquisition of the

2  Albertsons and Safeway stores by Haggen, correct?

3  A      Yes.

4  Q      And this is where you told the investment committee

5  that you heard back from the seller and you were told that if

6  you wanted to be competitive you'd have to bid on the

7  California stores as well as the Oregon and Washington

8  stores, correct?

9  A      Yes, that's accurate.

10 Q      And you told them that the execution risk would

11 increase, right?

12        If you look at the sentence that begins we are still

13 running the numbers.

14 A      Yes.

15 Q      Okay.  But you also told them that you and Mr. Niegsch

16 believed that the deal was "too juicy" to pass up, right?

17 A      Yes.

18 Q      Okay.  And the owned real estate associated with the

19 stores was part of what lead you to conclude that the deal

20 was "too juicy," correct?

21 A      Yes.

22 Q      Okay.  Now, a few weeks later do you recall that you,

23 and Mr. Clark and Mr. Marrero had an exchange of emails where

24 you discussed the real estate in the context of a downside

25 scenario?

1  A    I remember having an email -- well, I had a lot of

2  emails with Mr. Clark and Mr. Marrero.

3  Q    Okay.  Let me try and refresh your recollection.  Can

4  you, please, take a look at Exhibit 9?

5  A    Yes.

6  Q    Okay.  And if we start -- I don't know if yours is two

7  pages or if it's one double-sided page.

8  A    I have one double-sided; not a problem.

9  Q    Okay.  So let's just start at the back.  It's just a

10 couple of emails back and forth between you and the

11 investment committee members.  They clearly want to speak to

12 you, right?

13 A    Yes.

14 Q    Okay.  And if you turn to the front page, at the bottom

15 there's an email from Mr. Clark, do you see that?

16 A    Yes.

17 Q    Okay.  Now you don't recall what the 10 percent

18 scenario was that he was referring to, right?

19 A    No, I'm not 100 percent sure what he's referring to.

20 Q    Okay.  But he did tell you that he wanted to know how

21 much confidence you had in the underlying real estate in

22 downside scenarios and your ability to execute the plan with

23 a skeletal team in place, do you see that?

24 A    That's right, yes.

25 Q    And do you recall that he was concerned, in early

1  November, about your confidence in the underlying real estate

2  and the downside scenario?

3  A     Yes.  I think he was trying to understand the

4  volatility and variation potentially around what that real

5  estate might be worth.

6  Q     Okay.  And Mr. Marrero responded to Mr. Clark, did he

7  not?

8  A     Yes.

9  Q     And he told you and he told Mr. Clark that he shared

10  Mr. Clark's concern, right?

11  A     Yes.  If Comvest were not experienced real estate

12  investors and so I would -- you know, that was --

13  Q     Okay.  Again, please.

14  A     Sorry.

15  Q     Just my questions.

16        And Mr. Marrero also told you and told Mr. Clark that

17  he wanted to better understand what supported the real estate

18  valuation other than the Cushman report since that effects

19  decision tree more than anything; that's what he told you,

20  right?

21  A     Yes.

22  Q     Okay.  And the reference to the Cushman report that's a

23  reference to some aged Cushman & Wakefield appraisals, right?

24  A     I wouldn't have described them as aged.  I think they

25  were nine months old at the time.  I mean they hadn't been

1  done the month before, but they weren't five years old

2  either.  So we thought they were reasonably up to date.

3  Q     Okay.

4  A     But your right, not brand new.

5  Q     And Mr. Marrero wanted to know what you had besides

6  that to support the valuation because that effects -- at

7  least in his view, it effects the decision tree more than

8  anything, right?

9  A     That's right.

10 Q     Okay.  And Mr. Clark responded to that, right?

11 A     He did.

12 Q     Now, in this acquisition, potential acquisition from

13 Albertsons, Albertsons had a bunch of fee owned property,

14 right?  And Comvest had, kind of, a two pronged strategy to

15 deal with the real estate and that was to use some of the fee

16 owned property in the sale leaseback transaction and to put

17 the balance of the owned property in the PropCo entities,

18 right?

19 A     That's right.

20 Q     Okay.  So when Mr. Clark responds here he's asking

21 about the sensitivity in the real estate valuations as well;

22 in particular with respect to the owned real estate that's

23 going to be held by the PropCos, right?

24 A     That's right.

25 Q     And he wants to know what, if anything, might impact

1  the value of the real estate that's going to go into PropCos,

2  right?

3  A      That's right.

4  Q      And he wants to know what would happen if cap rates

5  rose or if the underlying business deteriorated, right?

6  A      That's right.

7  Q      So these are the issues that they were focused on in

8  November, right?

9          MR. HOWELL:  Objection; foundation.

10         THE COURT:  Sustained.

11 BY MR. MORRIS:

12 Q      In early December the deal team requested authority

13 from the investment committee to submit Haggen's final bid,

14 is that right?

15 A      Yes, I believe it was around then; yes.

16 Q      And the deal team presented the investment committee

17 with another deck, right?

18 A      We did.

19 Q      Okay.  Can you turn to Exhibit 19, please?

20 A      Yes, I have it.

21 Q      Okay.  Turn to page 19.004

22 A      Yes.

23 Q      Focusing -- this page is an executive summary, is that

24 fair?

25 A      It is, yes.

1  Q      And the executive summary is intended to provide the

2  investment committee with a synopsis of the topics that are

3  being covered, right?

4  A      Yes.

5  Q      Okay.  Let's look at the middle bullet point there.

6         Is it fair to say that the deal team told the

7  investment committee that the total cost of the transaction

8  would be $430 million dollars?

9  A      We refer to it as the all in purchase price, yes.

10  Q      Okay.  And that had two components, right?

11  A      Yes, it did.

12  Q      $325 million dollars was the amount that the deal team

13  believed would be paid to Albertsons, correct?

14  A      Yes.

15  Q      And $105 million dollars is the amount that the deal

16  team believed would be necessary to convert the stores and

17  purchase the inventory, right?

18  A      That's correct.

19  Q      Okay.  And the next part of this summary describes how

20  that purchase price would be funded, correct?

21  A      Yes.

22  Q      And $352 million dollars was going to be used to pay

23  part of the $430 million dollar cost, right?

24  A      Yes.

25  Q      And the $78 million dollars -- the $78 million dollar

1  balance that would be funded through the asset back loan that

2  was being taken out by the OpCos from PNC, right?

3  A      Not entirely, no.

4  Q      They had, specifically, a line of credit or they were

5  working on a line of credit, an asset back loan with PNC,

6  correct?

7  A      Yes.

8  Q      And that loan -- that line was $180 million dollars at

9  the time, is that right?

10 A      At one point it was 185 and then it became 205 or 210.

11 So it changed amounts, but something in the $200 million

12 dollar range I would say.

13 Q      Prior to the time Haggen entered into the APA with

14 Albertsons the expectation was that the asset back loan would

15 be $180 million dollars, right?

16 A      I know it increased at some point.  I'm not 100 percent

17 sure exactly when it increased.

18 Q      Okay.

19 A      I'm not sure.

20 Q      Okay.  But those funds were supposed to be available to

21 pay the conversion cost, right?

22 A      Amongst others.

23 Q      Okay.  So according to this email is it fair to say

24 then that the all in purchase price would be financed from

25 the sale leaseback proceeds?

1    A       A part of it would.

2    Q       As well as the balance of the conversion cost through

3    the ABL?  Is that correct?

4    A       Yes, but there were other things to.

5    Q       Okay.  And the sale leaseback proceeds, right, that

6    relates to the sale leaseback transactions, right?

7    A       Yes.

8    Q       And so the proceeds were going to go to Albertsons, but

9    the obligations under the sale leaseback leases that would be

10   borne by the OpCos, right?

11   A       Yes.

12   Q       And the PNC ABL that was also an obligation that was

13   going to be borne by the OpCos, right?

14   A       That's accurate, yes.

15   Q       Okay.  But this $118 million dollars of appraised

16   residual real estate that's what would go to the PropCos,

17   right?  And, admittedly, the $63 million dollars would go to

18   incremental EBITDA that would go to the OpCos, right?

19   A       Yes.

20   Q       Okay.  What did the PropCos pay to Holdings for that

21   $118 million dollars of owned real estate?

22   A       I'm not sure.

23   Q       You were the managing member of Holdings, correct?

24   A       Yes.

25   Q       And you knew that Holdings was going to transfer,

1  pursuant to the contribution agreement, its rights to acquire

2  the real property to the PropCo entities, right?

3  A     That's right.

4  Q     I just want to know, what did Holdings get in return?

5  A     What did Holdings get in return for transferring the

6  assets down?

7  Q     Yeah.

8  A     I'm not sure if we thought of it that way.  At least at

9  the time, you know, the idea was the operating assets were

10 going to end up on the operating side and the property assets

11 on the property side.  So I'm not --

12 Q     Okay.

13 A     And then there was fairly complex cash flows going

14 around and there were tax considerations as well.  So that's

15 when you asked the question.  I'm just trying to answer your

16 question.

17 Q     Okay.  Let's try it one more time.  Listen really

18 carefully to my question.

19 A     I will.

20 Q     What did Holdings receive in exchange for the transfer

21 of the right to acquire the fee owned property?

22 A     I'm not sure of anything.

23 Q     Okay.  Did you ever ask?  You don't have any

24 recollection of asking, is that fair?

25 A     No, I don't have any recollection of asking.

1  Q      Okay.  Now, towards the bottom of that page there's a

2  reference to the $50 million dollar equity commitment?

3  A      Yes.

4  Q      Okay.  Now --

5              THE COURT:  There's water there, to, by the way,

6  Mr. Caple.

7              THE WITNESS:  I'm sorry, what was that?

8              THE COURT:  There's also water there if you'd like

9  it.

10              THE WITNESS:  Oh, great.  Thank you.  I appreciate

11 that.

12 BY MR. MORRIS:

13 Q      Mr. Caple?

14 A      Yes.

15 Q      The $50 million dollar equity investment that Comvest

16 made that wasn't made voluntarily, was it?

17 A      I think -- I mean --

18 Q      Let me ask you a different question.

19 A      Voluntarily.  I'm sorry.

20 Q      Okay.  And I appreciate that.

21      Albertsons and Cerberus insisted that Comvest make a

22 $50 million dollar equity investment, right?

23 A      Yes.  In a detailed back and forth that was one of

24 their many requests.

25 Q      And they wanted that $50 million dollars to remain in

1  the business only so long as Albertsons got paid in full,

2  right?

3  A    That's right.

4  Q    And the expectation was that when the final store

5  closed in June Albertsons would be paid in full, right?

6  A    I believe it was 30 days after the final stores closed.

7  Q    Okay.  So Comvest did not believe that Haggen needed

8  that $50 million dollars in capital to successfully acquire

9  and convert the grocery stores, right?

10 A    That's correct.

11 Q    Okay.  But you agreed to put the money in as a

12 condition of closing simply because they, being Albertsons

13 and Cerberus, demanded it, right?

14 A    Amongst other things, yeah.

15 Q    And in this analysis you actually tell the investment

16 committee how you're going to get that money back, right?

17 A    That's -- let me read it real quick.  Yes.

18 Q    In fact, you told the investment committee that

19 Comvest, even though they were putting in the $50 million

20 dollars, wouldn't have any risk outside of its basis in

21 Haggen, right?

22 A    Yes.  Comvest wasn't signing the acquisition agreement;

23 Haggen Holdings was.

24 Q    Okay.  And half of that $50 million dollars was going

25 to go, in fact, to eliminate an existing liability of Comvest

1  under a guarantee that was out there, right?

2  A     I wouldn't describe it as a liability of Comvest.  It

3  was a liability of Haggen.

4  Q     That Comvest guaranteed, right?

5  A     Comvest had guaranteed that liability, that's correct.

6  Q     Okay.  So it's a contingent liability, is that fair?

7  A     Yes.

8  Q     And why did Haggen have that liability?

9  A     We had done a financing several years prior to that

10 where Haggen couldn't actually borrow the money, so Comvest

11 guaranteed it.

12 Q     And what were the proceeds used for?

13 A     They were used for dividends.

14 Q     Yeah.  Okay.  So let's make sure we have this right.

15       Comvest had Haggen borrow $25 million dollars, Comvest

16 guaranteed it.  The proceeds of that loan went to pay a

17 dividend to Comvest of $25 million dollars, right?

18 A     No.  They also went to pay down the banks at the time.

19 Q     How much of it went to Comvest?

20 A     20 of the 25 million.

21 Q     $20 of the $25 million dollars.  So now you're going to

22 make this so-called equity investment into the OpCo entities,

23 but it's going to repay back a loan that was taken out for

24 the purpose primarily of paying Comvest the dividend, right?

25 A     That's accurate.

1  Q      Okay.  And you also told the investment committee that

2  the other half of that $50 million dollar equity investment

3  would come back in the form of a tax distribution later in

4  the sale process, right?

5  A      That's right.

6  Q      So let's make sure we're clear here.  Comvest didn't

7  believe that the operating companies needed the $50 million

8  dollars, is that right?

9  A      That's right.

10  Q      They put the money in only because Albertsons and

11  Cerberus required it, right?

12  A      That's right.

13  Q      Half of the money was going to be used to pay off a

14  Haggen debt that was incurred in order to pay, primarily, a

15  Comvest dividend, right?

16  A      The money is fungible, but in the process of that that

17  was going to get paid down; yes.

18  Q      And the balance of this so-called equity investment was

19  expected to flow back to Comvest in the form of tax

20  distributions as part of the sales process, right?

21  A      Yes.

22  Q      What sales process are you referring to?

23  A      The sale -- I believe it was the sale leaseback sale

24  process then the whole conversion process.  So, you know, we

25  signed the APA in December, but then it took us, you know,

1  six to eight months to complete the conversion process.

2  Q     Okay.  And -- all right.  So you put in the 50.  This

3  is how you planned to get it back.

4        The next bullet point there refers to increasing your

5  distributions by another $50 million dollars, right?

6  A     That's right.

7  Q     And so the expectation was that you would sell some of

8  the ground leases, is that right?

9  A     We were hoping to.

10 Q     And then the real property that Haggen Holdings was

11 transferring to the PropCo entities you were going to borrow

12 against that, right?

13 A     That's right.

14 Q     And you were going to borrow against it again for the

15 purpose of making another dividend to Comvest, right?

16 A     That's right.

17 Q     Okay.  And in addition to that do you recall

18 negotiating for a provision in the ABL with PNC that would

19 allow Haggen to make a $50 million dollar dividend to

20 Comvest?

21 A     I do.  I don't remember the $50 million dollar number

22 exactly, but I absolutely negotiating that.

23 Q     So in addition to having the real estate available to

24 leverage to pay dividends and to use the sale leaseback

25 proceeds to repay some of this so called equity contribution,

1  Comvest negotiated to have the ability to actually take up to

2  $50 million dollars off the asset back loan to pay another

3  dividend, right?

4  A      If the liquidity was available, yes.

5  Q      Okay.  And that could happen the very moment that

6  Albertsons was paid in full, right?

7  A      Yes.  There was a limitation on dividends until

8  Albertsons was paid in full.  So, yes, Albertsons would have

9  been needed to be paid in full.

10 Q      And your expectation is that that would occur within 30

11 days of the closing of the last store, right?

12 A      It would have -- we wouldn't have pre-paid them, so it

13 was going to occur approximately 30 days after.

14 Q      Okay.  So even though Comvest was putting in the $50

15 million dollar equity committee this is how the deal team

16 told the investment committee it would be handled, right?

17 A      I think so, yeah.

18 Q      Okay.  And by the way, after paying the $25 million

19 dollars, paying down the Comvest guaranteed second-lien loan

20 you told the investment committee that Comvest's total

21 exposure would be $61 million dollars, right?

22 A      Yes.

23 Q      And is it fair to say that if Comvest had received the

24 incremental $25 million dollars for tax distributions then

25 Comvest's total exposure would have been reduced from $61

1  million dollars to $36 million dollars?

2  A    Yes.

3  Q    So that was the expectation going into the deal as to

4  what Comvest's total exposure would be, right?

5  A    Yes.

6  Q    Okay.  Now, Comvest caused Haggen to adopt a new

7  corporate structure in connection with the Albertson's

8  acquisition, right?

9  A    Yes.

10  Q    Let's take a look at Exhibit 726, please.  And this is

11  the corporate structure that existed just prior to the

12  Albertson's acquisition, right?

13  A    Yes.

14  Q    And strategic thinking aside, there was no legal or

15  other prohibition that would have prevented Comvest from

16  using this structure to execute the Albertson's acquisition,

17  right?

18  A    I don't know that.  I'm not a lawyer.

19  Q    And Comvest -- but Comvest made the decision not to

20  utilize this structure, is that fair?

21  A    That's fair.

22  Q    Comvest made the decision to form 10 new entities on

23  December 2nd, 2014, right?

24  A    That's right.

25  Q    Okay.  Can you take a look at Exhibit 727, please?

1  A       Sure.

2  Q       That's the new corporate chart, right?

3  A       Yes.

4  Q       Okay.  Now, this corporate chart, in fact, was needed

5  to enable Comvest to execute its strategy, right?

6  A       A variety of strategies, but, yes.

7  Q       And Comvest devised a two prong strategy to deal with

8  the real estate, right?

9  A       Yes.

10  Q       And I think we talked about this earlier, but some of

11  the fee owned property would be used to finance the

12  acquisition through the sale leaseback transactions, right?

13  A       Yes.

14  Q       And the most profitable store situated on the fee owned

15  properties were used for that purpose, right?

16  A       I'm not -- I wouldn't characterize them, necessarily,

17  as the most profitable.  Some of them may have had the best

18  sales, but some of the better performing properties clearly,

19  yes.

20  Q       Okay.  And the sale leaseback leases went to the OpCo

21  entities, right?

22  A       Yes, they were lessors.

23  Q       Who made the decision to place the sale leaseback

24  leases in the OpCo entities?

25  A       I'm not sure I understand.  The OpCo entities were

1  using the property so they had to pay for the use of the

2  property just like all operating business pay for.

3  Q      Now, the OpCo entities also got the residual value from

4  the sale leaseback transactions, $50 million dollars, right?

5  A      Yes.

6  Q      Okay.  So the OpCo entities got the $50 million dollar

7  residual value from the sale, but they got the totality of

8  the operating leases, right; the SLB leases?

9  A      Yes.

10  Q      Did you ever do an analysis to compare the obligations

11  that were due under the SLB leases to the $50 million dollars

12  that they received?

13  A      No, because they received a lot of other things to.

14  Q      Okay.

15  A      That wouldn't have made any sense.

16  Q      The retained owned real estate property was ultimately

17  held by the PropCo entities, right?

18  A      That's correct.

19  Q      And that was by design, right?

20  A      That's correct.

21  Q      And when those pieces of real property -- at the time

22  those pieces of real property were transferred the PropCo

23  entities had no other assets, right?

24  A      That's correct.

25  Q      The only assets the PropCo entities ever had were the

1  real property that it acquired from Albertsons, right?

2  A    Eventually we sold some of that cash, but yes.

3  Q    Okay.  So let me restate the question.  The only assets

4  that PropCo entities ever had were either the real property

5  that it acquired by the contribution agreements or the

6  proceeds from the sale of real property?

7  A    I believe the PropCo assets also charged the operating

8  assets rent and that would have created cash as well which

9  would be an asset.

10 Q    Good point.  Good point.

11      So there's three things there then.  It's the real

12 property that they acquired from Albertsons, pursuant to the

13 contribution agreements, right?

14 A    Yes.

15 Q    Cash proceeds from the sale of any of those assets,

16 right?

17 A    Yes.

18 Q    And the cash flow from OpCo to PropCo under the PropCo

19 leases, right?

20 A    Yes.  We didn't make very many of those payments and I

21 think at one point we delayed them, but there would have been

22 some money from that as well, yeah.

23 Q    All right.  It's your contention that Comvest set up a

24 Propco/Opco structure because Haggen was acquiring operating

25 assets and real estate assets, and Comvest had different

1  objectives and different strategies for each, right?

2  A     That's accurate, yeah.

3  Q     And it's your contention that Comvest is not a real

4  estate owner, right?

5  A     Not to any great extent, no.

6  Q     It's your contention that Comvest didn't have any

7  intention of holding the real estate for the long run, right?

8  A     That's right.  Our intention was to sell the real

9  estate to different buyers then who'd we sell the operating

10 business to.

11 Q     In fact, your intention was to monetize the real estate

12 assets as quickly as possible, right?

13 A     I would not say as quickly as possible.  I'd say as

14 quickly as we reasonably could to get reasonable value for

15 them.  I mean if we wanted a fire sale then we could have

16 done it all at the close and gotten as much cash as we could.

17 We didn't want to do that.  We wanted to give Haggen the time

18 to work and make those assets, hopefully, more valuable.

19 Q     Prior to the petition date did the PropCo entities sell

20 any of the real property that it acquired through the proper

21 contribution agreements?

22 A     No.

23 Q     So even though Comvest didn't intend to hold the real

24 estate for the long run, even though Comvest was not a real

25 estate company they still created the Propco/Opco structure,

1  right?

2  A    That's right.

3  Q    Okay.  It could have simply just sold the real estate

4  and placed the proceeds in the operating business, right?

5  A    Or dividend them up or done a number of things.

6  Q    Yeah, but that's one of the options it could have done,

7  right?

8  A    Sure.

9  Q    Okay.  It didn't do that, right?

10  A    No.

11  Q    It chose to create the Opco/Propco structure instead?

12  A    Yes.

13  Q    And then Comvest lawyers at Akerman drew up, what are

14  called, contribution agreements, right?

15  A    That's my understanding, yeah.

16  Q    Okay.  And contribution agreements are the documents by

17  which Haggen Holdings transferred its right to acquire the

18  fee owned property to the PropCo entities, right?

19  A    That's my understanding of how that worked.

20  Q    So even though neither Comvest nor Haggen is a real

21  estate company after the property was transferred long-term

22  leases between PropCo and OpCo were immediately executed

23  between the applicable PropCo entities in each store situated

24  on a fee owned property, correct?

25  A    That's right.

1  Q      And Albertsons also had ground leases, is that right?

2  A      They did have a number of ground leases as well.

3  Q      Can you explain to the court what a ground lease is?

4  A      Yes.  So to the best of my knowledge the concept is you

5  don't actually own the ground so you lease just the ground,

6  then you build your own building, but you still have that

7  lease on the ground.  But the building, itself, is worth more

8  than just the ground was worth.  So there is value to ground

9  leases as well.

10  Q      And those valuable ground leases were transferred from

11  Holdings to Propco, right?

12  A      That's right.

13  Q      And even though neither Comvest nor Haggen is a real

14  estate owner the PropCo entities then entered into subleases

15  with the OpCo entities, right?

16  A      That's right.

17  Q      And was the amount due under the sublease between the

18  OpCo entities and the PropCo entities the same as the amount

19  due under the ground lease between the PropCo entities and

20  the third-party landlord?

21  A      No.  We set them up at market rates.

22  Q      Okay.  So is it fair to say that the amount that the

23  OpCo paid to the PropCo exceeded the amount that the PropCo

24  paid under the ground lease?

25  A      Generally, yes; it should have been.

1  Q      Okay.  Before the Albertson's acquisition was even

2  consummated Comvest was negotiating with UBS to lend against

3  the fee owned real estate, right?

4  A      That's right.

5  Q      And the intention was to use the proceeds of those

6  loans to pay dividends to Comvest, right?

7  A      That's right.

8  Q      So even though Comvest isn't in the real estate

9  business it planned to borrow against the real estate and

10 take the proceeds for itself, right?

11 A      That's right.

12 Q      So they're not in the real estate business, but they

13 set up the Propco/Opco structure, right?

14 A      Yeah.

15 Q      They're not in the real estate business, but they

16 transferred the assets to the PropCo entities, right?

17 A      That's accurate.

18 Q      They're not in the real estate business, but they had

19 the PropCos then enter into long-term leases with the OpCo

20 entities, right?

21 A      Yes.

22 Q      They're not in the real estate business, but then they

23 transferred the ground leases to the PropCo entities, right?

24 A      yes.

25 Q      And then they're not in the real estate business, but

1  then they had the PropCo entities and the OpCo entities enter

2  into subleases for those ground leases where the PropCo

3  entities made a profit, right?

4  A    Yes, depending upon how market varied from what the

5  underlying ground lease rates were.

6  Q    Now can you go back to Exhibit 19, please?

7  A    Sure.

8  Q    Can you please turn to the page 19.028?  This is a

9  series of projections beginning on that page and in the pages

10 that follow, a series of projections that were given to the

11 investment committee, right?

12 A    Yes.  I'm just trying to understand what -- yes.

13 Q    And each one of these pages is either an analysis of

14 the base case or the downside case, right?

15 A    Yes, that's what these pages are an analysis of; that's

16 correct.

17 Q    And at the bottom of every page there's an analysis of

18 the PropCo entities, right?

19 A    That's right.

20 Q    And the PropCo entities analysis goes out for five

21 years, right?

22 A    That's right.

23 Q    So even though Comvest isn't in the real estate

24 business the deal team presented the investment committee

25 with projections that go out five years, right?

1   A      That's right.

2   Q      Okay.  And the -- what is the base case intended to

3   show in general terms?

4   A      Generally, it's intended to show our best expectation

5   of what the business will do.

6   Q      And what is the downside case intended to show?

7   A      You know, it's generally intended to show a reasonable

8   downside case that, you know, represents a reasonable worse

9   case -- you can always make them worse, but a reasonable

10  worse case that's, sort of, as bad as we could really expect.

11  Q      Okay.  Let's compare page 19.028 with page 19.038.

12  A      Okay.

13  Q      And 19 -- let's just call it 28, okay.  Page 28 is the

14  base case financial performance and page 38 is the downside

15  case financial performance, right?

16  A      That's accurate.

17  Q      Okay.  And is it fair to say, if we look at the EBITDA

18  line for the PropCo entities, that the PropCo entities are

19  performing exactly the same in the base case as they are in

20  the downside case?

21  A      Yes.

22  Q      Okay.  And if we compare pages 29 and 39 is it fair to

23  say that the PropCo entities balance sheet looks exactly the

24  same in the base case as it does in the downside case?

25  A      Yes.

1  Q     Okay.  And if we compare page 30 with page 40 PropCos

2  projected cash flow for the five-year period is projected to

3  be the exact same in the base case as it would be in the

4  downside case, right?

5  A     I can't find the two you're with now, but it would have

6  been.  It should have been.

7  Q     Take your time; its 30 and 40.

8  A     So 30 and 40, I'm sorry.

9  Q     Yeah, I don't want you to take my word for it.

10 A     Sorry, I just couldn't find 40.

11 Q     That's all right.

12 A     Yes.

13 Q     Okay.  So the investment committee is not only given

14 projections going out for five years on the PropCos, they're

15 given projections that show the PropCo entities would perform

16 as well in a downside case as they would in the base case,

17 right?

18 A     Yes.

19 Q     Okay.  Now the value of Holdings, if you put the

20 exhibit to the side for a moment -- Holdings is at the top,

21 right?

22 A     Yes.

23 Q     Okay.  The value of Holdings would be absolutely no

24 different if the real property was transferred to the OpCo

25 instead of the PropCo, right?

1  A      No.

2  Q      Are you disagreeing with me or you agreeing with me?

3  A      Disagreeing with you.

4  Q      You're disagreeing with me?

5  A      Yes.

6  Q      Okay.  Oh, that's because they wouldn't be a rental

7  income?

8  A      No.

9  Q      Okay.  Was the value of Holdings impacted by the PropCo

10 leases?

11 A      What part of the PropCo leases are you asking about?

12 The very existence of them or -- I'm just trying to

13 understand.

14 Q      No problem.  If I'm not clear I encourage you to tell

15 me that you don't understand.  I'm not always so clear.

16 Okay.

17 A      Okay.

18 Q      So you have these the PropCo leases, right?  And the

19 OpCo entities were paying rent to the PropCo entities?

20 A      Yes.

21 Q      How did that impact the value of Holdings?

22 A      I don't think that fact impacted the value of Holdings.

23 Q      Okay.  So now I'm just going to ask you the same

24 question about the transfer of the real property itself.

25         Does it matter to Holdings if the real property goes to

1  PropCo or OpCo?

2  A      Yes.

3  Q      Okay.  Now, Comvest controlled the Haggen enterprise,

4  is that right?

5  A      That's correct.

6  Q      Okay.  And Comvest structured the Albertson's

7  acquisition, correct?

8  A      That's correct.

9  Q      And Comvest is the one who determined to pursue the

10  sale leaseback transactions, is that right?

11  A      Along with our advisors, but, yes.  We made the final

12  decision.

13  Q      I think the phrase is Comvest is the decider, right?

14  A      Yes, that sounds accurate; yeah.

15  Q      And Comvest was not only the decider it was the one who

16  negotiated all of the transactions we're talking about,

17  right?

18  A      There were a lot of transactions we're talking about

19  here.  So we had a lot of help from a lot of folks, but at

20  the end of the day we were the ones signing the agreements.

21  We had lots of help.

22  Q      And the investment committee ultimately authorized you

23  as manager to enter into the Albertson's acquisition, is that

24  right?

25  A      They did, yes.

1  Q      And Comvest had to approve the $25 million dollar

2  PropCo advance that was made in August of 2015, right?

3  A      Yes.

4  Q      And Comvest had to approve the commencement of these

5  bankruptcy cases, correct?

6  A      Yes.

7  Q      And you were still at Comvest at the time the

8  bankruptcy cases commenced, right?

9  A      Yes.

10  Q      Okay.  And Comvest decided which of the Haggen entities

11  would file for bankruptcy, right?

12  A      Yes.

13  Q      And Comvest decided which of the Haggen entities would

14  not file for bankruptcy, right?

15  A      Yeah, sure.

16  Q      And Comvest decided that the PropCo entities would not

17  file for bankruptcy, right?

18  A      That's accurate.

19  Q      When creating the corporate structure Comvest intended

20  that the operating liabilities would stay solely with the

21  operating companies, correct?

22  A      Yes.

23  Q      And Comvest's intent was to keep the assets and the

24  liabilities of the PropCo entities separate from the assets

25  and liabilities of the PropCo entities, right?

1  A      You asked me PropCo twice.

2  Q      See your listening and I appreciate that.

3         Comvest's intent was to keep the liabilities and the

4  assets of the PropCos separate from the liabilities and the

5  assets of the OpCos, correct?

6  A      That was the intent, yes.

7  Q      And by creating this structure and pursuing this

8  strategy Comvest could monetize the real estate assets for

9  its own benefit, right?

10 A      Yes, I think for the benefit of the equity holders. I

11 think we weren't the only equity holders, but yes.

12         MR. MORRIS:  Your Honor, its one o'clock.  I'm

13 about to change topics.  I think this might be a convenient

14 time for a lunch break.

15         THE COURT:  All right.  That's wonderful.

16         MR. MORRIS:  I know that we have some concerns

17 because Mr. Caple is not able to be with us tomorrow.  So I

18 think Mr. Howell will probably join me in requesting that we

19 just curtail the lunchbreak by a bit; maybe we could come

20 back at --

21         THE COURT:  How much time do you need?

22         MR. MORRIS:  How much more time do I need?

23         THE COURT:  No, I'm sorry, for lunch.  Do you need

24 a half an hour, 45 minutes?

25         MR. MORRIS:  Yeah, how about we come back at 1:45?

1          THE COURT:  Perfect.

2          Mr. Caple.

3          THE WITNESS:  Yes.

4          THE COURT:  You certainly may have conversation

5   with your lawyers, but not about your testimony.

6          THE WITNESS:  Okay.  Thank you.

7          THE COURT:  Thank you.  Stand in recess.

8       (Recess taken at 12:53 p.m.)

9       (Proceedings resume at 1:45 p.m.)

10      (Call to order of the Court)

11         THE COURT OFFICER:  All rise.

12         THE COURT:  Good afternoon, everyone.  Thank you.

13         You may be seated.

14         And we are on the examination of Mr. Caple?

15         MR. MORRIS:  Yes, sir.

16         THE COURT:  Let me ask a question, because

17  tonight, I have to stop at five o'clock.  I'm conducting a

18  trial practical exam.

19         MR. MORRIS:  You gave us that notice, thank you.

20         THE COURT:  And how much time do you think you'll

21  need, Mr. Morris, to complete your examination?

22         MR. MORRIS:  Of Mr. Caple?

23         THE COURT:  Yeah.

24         MR. MORRIS:  My hope is half an hour.

25         THE COURT:  All right.  And how about you, Mr.

1  Howell?

2           MR. HOWELL:  I suspect that I can be finished by -

3  -

4           THE COURT:  By 5:00?

5           MR. HOWELL:  -- 4:30 or so, to make sure that he

6  has a little bit of time remaining at the end.

7           THE COURT:  Very well.  Okay.  We'll take a short

8  break sometime in the middle.

9           MR. MORRIS:  Okay.

10          MR. CAPLE:  Thank you.

11          MR. MORRIS:  And I -- you know, we know your

12  plans, Mr. Caple, and --

13          THE COURT:  Yes.

14          MR. CAPLE:  Yes, thank you.  I appreciate that a

15  lot.  It's really --

16          MR. MORRIS:  -- and we're doing everything we can

17  to accommodate you.

18          MR. CAPLE:  Thank you.

19          THE COURT:  You bet.

20          MR. MORRIS:  Your Honor, may I proceed?

21          THE COURT:  Yes.

22          MR. MORRIS:  Okay.

23  DIRECT EXAMINATION BY MR. MORRIS:

24  Q       Mr. Caple, I just want to switch topics for a

25  moment to the topic of resets.  Do you remember that term

1  that we used in the deposition?

2  A    I do.

3  Q    Okay.  And you have an understanding of the term "total

4  store resets," right?

5  A    I do.

6  Q    And your understanding of that term is that total store

7  resets means taking all of the product off the shelf and

8  replacing it with new product, correct?

9  A    No.

10 Q    Now, are you sure about that?  Do you remember what --

11 A    You said replacing it with new product.  So, what you

12 do is you take all the product off the shelf.  You put some

13 new product in, but you also put the old product back up on

14 the shelf.  So, that's what I think a reset is.

15 Q    Okay.

16 A    So, you wouldn't throw away all of the old product;

17 you'd take it off and then put it back up on the shelf.

18 Q    Well, total store resets is not something that was

19 supposed to happen as part of the conversion process, right?

20 A    That's accurate.

21 Q    Okay.  You weren't going to reset the stores because

22 they came with inventory and you had to sell through that

23 inventory before you could do a reset, right?

24 A    That's accurate, yes.

25 Q    Okay.  Now, by April, just a few weeks after the

1  closing of the first store, stores were already falling short

2  of projections across all converted stores, right?

3  A     I believe so, yes.

4  Q     Okay.  And so you started a practice of having Mr.

5  Clougher and Mr. Shaner as the co-CEOs of providing you with

6  periodic written reports, right?

7  A     It wouldn't have been -- it may have started then, but

8  it wouldn't be a common practice of ours, whether the results

9  were good or bad.

10 Q     Okay.  Can you please take a look at Exhibit 11.

11 A     Yes.

12 Q     And that is a report that Mr. Shaner prepared for

13 Comvest, right?

14 A     Yes.

15 Q     And it goes through what's working and what's not

16 working and that's the structure that Comvest requested be

17 provided, right?

18 A     Yes.

19 Q     So, let's take a look at Page 11.003, What is not

20 working well?  The first sentence there refers to sales

21 having fallen far short of your expectations across all

22 converted stores.  Do you see that?

23 A     Yes.

24 Q     That was not news to you, right?

25 A     No.

1  Q     Okay.  Can you read out loud the sentence beginning,
2  It's important ...
3  A     It's important to know that these areas have been the
4  least impacted through the conversion process and will be
5  fully Haggenized through subsequent total store resets, once
6  all stores have been converted.
7  Q     Okay.  You were aware, were you not, that the total
8  store resets had not been completed at the time of each
9  conversion, right?
10  A That's right.
11  Q     And that was -- that's exactly what Mr. Shaner was
12  telling you in this paragraph, right?
13  A (No verbal response).
14  Q     I apologize.  In that sentence?
15  A     In that sentence, I think he's saying other things,
16  sort of, as well.  It's not just about the resets, but --
17  because he's saying "least impacted through the conversion
18  process."  Because the resets would have been a very, very
19  small part of the conversion process.  I mean, it was far
20  more important than the other things we were doing, rather
21  than to the extent to which we were resetting.
22  Q     Okay.  He told you in the last sentence that the resets
23  had not been completed at the time of the conversions,
24  correct?
25  A     But, yeah, we -- we hadn't -- we did not do full-store

1  resets at the time of conversion; that's accurate.

2  Q    Thank you.  Now, by June, Haggen was facing what's

3  called a "liquidity crisis," right?

4  A    June, July, for sure.

5  Q    Okay.  The liquidity crisis was really what was

6  characterized as a "liquidity shortfall"; is that fair?

7  A    Sure.

8  Q    And a liquidity shortfall is where you run out of cash,

9  right?

10 A    That's true.

11 Q    And the deal team prepared a deck for the investment

12 committee that described the situation in June during this

13 period of liquidity crisis and presented certain options,

14 right?

15 A    I think the word "crisis" is yours, but yes, there was

16 a potential liquidity shortfall.

17 Q    Okay.  Can you turn to Exhibit 16, please.

18 A    Sure.

19 Q    And that's the deck that the deal team prepared for the

20 investment committee in mid-June?

21 A Yes, I believe so.

22 Q    And is it fair to say that as of mid-June, as of June

23 16th, the conversion of the acquisition and conversion

24 process had not been completed, right, if you look at the

25 first point on the executive summary on Page 16.004?

1  A      Ninety percent of it had been completed, but there was

2  still 10 percent remaining.

3  Q      So, 10 percent still remained to be acquired and

4  converted, and there's no dispute that the deal team had

5  forecast that Haggen faced a liquidity shortfall at the end

6  of July, if you look at the bottom of the page?

7  A      That's correct.

8  Q      Okay.  And you told the deal team that sales were down

9  20 to 25 percent since Haggen had taken ownership of the

10 stores, right?

11 A      That's correct.

12 Q      Is there a word in this deck about any unfair

13 competition that was committed by Albertsons?

14 A      I don't know.  I'd have to read the deck.

15 Q      Take your time.

16 A      Okay.  And I'm sorry, your question was -- could you

17 just repeat the question real quick, now that I've reviewed

18 the deck?

19 Q      Sure.  Did you describe for the investment committee in

20 this deck, any of the unfair competition that you allege

21 occurred by Albertsons?

22 A      No.

23 Q      Okay.  And, in fact, you don't recall ever telling the

24 investment committee at any time prior to June 16th, that

25 Albertsons was acting improperly, correct?

1   A     I don't specifically recall it, no.

2   Q     Okay.  And you don't recall ever preparing a deck in

3   which the investment committee would have learned that

4   Albertsons was acting improperly at any time prior to June

5   16th, right?

6   A     No, I don't believe there were any other investment

7   presentations.

8   Q     Okay.  So, you have no basis to believe that any member

9   of the committee had any reason to suspect that Albertsons

10  was acting improperly as of June 16th, 2015, correct?

11  A     I -- I don't, but I'm not in their brains, so I don't

12  --

13  Q     Okay.

14  A     -- know.

15  Q     I'm just asking for your own recollection and your own

16  views, okay.  You don't have any reason to believe that,

17  right?

18  A     I don't recall having any, but --

19  Q     Okay.  Had the deal team made a decision to withhold

20  any payments from Albertsons as of June 16th?

21  A     A --

22  Q     Withdrawn.  Let me ask a better question.  I'm not sure

23  that came through well.

24  Had the deal team made a decision to withhold payments to

25  Albertsons as of June 16th?

1  A      I don't believe so, no.

2  Q      Okay.  And did you ever discuss with any member of the

3  deal team -- the investment committee on or before June 16th,

4  the concept of withholding payments to Albertsons?

5  A      I -- I don't remember doing so.

6  Q      But you could see on June 16th that there was a

7  liquidity shortfall that was going to happen in July, right?

8  A      Yeah, my memory was, it was a potential liquidity

9  shortfall.  So, I think if you read in here, we talk about we

10 might have one, we might not, and that there are a variety of

11 ways we might solve for that.

12 Q      Can you turn to Page 16.004?

13 A      16.00 --

14 Q      Yeah, go back to the executive summary.

15 A      Yeah, mine isn't marked the same way yours is -- 16 --

16 I apologize to the --

17 Q      Okay.  So, that would be --

18 A      There's no 16.

19 Q      It's the executive summary.

20 A      And we're on the 16, which is the investment committee,

21 June 2015, okay.  Yeah, the executive summary.

22 Q      Okay.  You see down it says down -- In the meantime, we

23 believe we are going to run into a liquidity crisis shortfall

24 in July; that's the statement that was made to the investment

25 committee, right?

1  A     Yes.

2  Q     It's not qualified, is it?

3  A     What?

4  Q     It's not qualified.  You don't say, You may run into a

5  liquidity shortfall; it's a statement of your belief at that

6  time that they would run into a liquidity shortfall in July?

7  A     I believe there's a more detailed slide later in the

8  deck saying that there's -- that, you know, at this point,

9  you know, we're still having stores come in -- a lot of

10 things going on -- and we may not run into one.  But we

11 clearly, at this time, understood that liquidity was an issue

12 in the business that needed careful attention.

13 Q     Can you turn -- I guess it's Page 13 of the deck -- on

14 Page 16.015 for those with a version that has the exhibit

15 number.

16 A     This is the, Despite progress, solutions --

17 Q     It's the solution to impending liquidity shortfall.

18 A     Sure.

19 Q     Okay.  So, just take a moment and review the page and

20 let's see if we can get through this quickly.

21 A     Okay.

22 Q     All right.  So, is it fair to say that the deal team

23 was proposing on June 16th, the solution to the liquidity

24 shortfall that would have the following steps:  First, a loan

25 would be taken out from UBS against the PropCo real estate in

1  the amount of $55 million, correct?

2  A     Yes.

3  Q     And, second, PropCo would sell four ground leases for

4  an aggregate prior of $16.4 million, correct?

5  A     Yes.

6  Q     Then that 17 point -- $17.4 million would be upstreamed

7  to Holding, right?

8  A     That's -- yeah, that's how we proposed to do it.

9  Q     And then Comvest would cause Holdings to distribute to

10  Opco in amounts sufficient to meet the liquidity crisis,

11  right?

12  A     Yeah.

13  Q     And then the balance would be dividended [sic] back to

14  Comvest, right?

15  A     I don't think it says that, no.

16  Q     Okay.  Let's read the first --

17  A     Well, let me keep reading.  I apologize.

18  Q     That's okay.

19  A     Yes.  No, we talk about that in the fourth bullet

20  point, the potential for that.

21  Q     Yeah.  So, that was the proposal, to lever the real

22  estate, to sell some properties, to upstream the money to

23  HoldCo to give whatever Opco needed, and then for the balance

24  to go to Comvest, right?

25  A     I think it was one scenario we were talking about.  I'm

1  not sure it was a proposal at this -- I wouldn't describe it

2  as a proposal, but ...

3  Q     Well, it's encaptioned -- this is your report, right?

4  A     Yes, absolutely.

5  Q     And you reviewed it before it went to the investment

6  committee, right?

7  A     Absolutely.

8  Q     And this is what you described as solution to impending

9  liquidity shortfall, right?

10 A     Yeah.

11 Q     Okay.  Let's look at the fourth bullet point there.

12 A     Yes.

13 Q     You note, additionally, the ABL -- that's the asset-

14 backed loan from PNC?

15 A     Yep.

16 Q     The ABL at Opco allows for distributions for taxes?

17 A     Yes.

18 Q     And a return of $50 million to Comvest equity that was

19 funded into the deal?

20 A     Yes.

21 Q     So, if liquidity is available, Opco could technically

22 return or dividend all the dollars that were invested; do you

23 see that?

24 A     Yes.

25 Q     So, you wanted the investment committee to know that

1  that was still an option if liquidity allowed such a

2  distribution, right?

3  A    Yes, to the extent it was a one-time blip in liquidity,

4  we could --

5  Q    So, here, Opco is facing a liquidity shortfall and

6  you're telling the investment committee that, you know,

7  there's a provision in the ABL that would allow for the

8  fifty-million-dollar dividend, right?

9  A    Yeah, to the extent the liquidity was created in the

10  operating company, such that we didn't need that money.

11  Q    All right.  Things continued to get worse, right?

12  A    After this?

13  Q    Yes.

14  A    Yes.

15  Q    Can you turn to Exhibit 18, please.  Does this exhibit

16  have the P-numbers in the lower right-hand corners?

17  A    It does.  It does.

18  Q    Score, one for the home team.

19  A    Good.  Good.

20  Q    Take a look at P18.003, please.

21  A    Yes.

22  Q    Now, this deck, if you look at the email on the cover,

23  you sent this to Mr. Niegsch on July 13th, right?

24  A    Yes.

25  Q    And as of July 13th, if you look at Page 003, Haggen

1  had $25 million of liquidity, right?

2  A    My -- my only concern here is -- and I don't know that

3  we've checked this -- but this is something I sent to Mike.

4  I'm not 100 percent sure this is the final version.  I just -

5  - I don't know, but I can only talk about what this document

6  says.

7  Q    You would have reviewed it before you would have sent

8  it to Mike, right?

9  A    Yes.  But I frequently would have sent him, as an

10 example, something with numbers in it that he was going to

11 later check the specific numbers.

12 Q    Sir, do you have any reason to believe that Haggen had

13 anything other than $25 million of liquidity as of July 13th?

14 A    I don't.  I'm just trying to be --

15 Q    Okay.

16 A    -- as opposed to the other ones that looked like they

17 presented the investment committee, I couldn't tell with this

18 one.

19 Q    Do you have any reason to believe that Haggen had

20 anything other than $25 million of liquidity, as of July

21 13th, 2015?

22 A    No, I -- I don't have any specific recollection, no.

23 Q    Okay.  And you note that $10 million is owed to

24 contractors, right?

25 A    Yes.

1  Q     And you note that there's $43 million of inventory

2  payments that are due to Albertsons, but that Haggen is

3  disputing it, right?

4  A     That's right.

5  Q     And that dispute was unknown to Albertsons until July -

6  - until June 29th, right.

7             MR. HOWELL:  Object to foundation.

8             MR. MORRIS:  Withdrawn.  I don't know if you were

9  going to sustain that.  I'll take my minute.

10            THE COURT:  Yes.

11 BY MR. MORRIS:

12 Q     Haggen -- neither Haggen nor Comvest had told

13 Albertsons that it was withholding any portion of this $43

14 million until June 29th, correct?

15 A     If that's the date we sent them the notice.  Yeah, we

16 -- I think we first told them via notice.  I'm not 100

17 percent sure what date that was, but it sounds about right.

18 Q     Whatever the date of the letter is, is the date you

19 understand is the first time that Haggen and Comvest told

20 Albertsons that Haggen was withholding the $43 million,

21 right?

22 A     Yes.

23 Q     Okay.  And to the best of your knowledge, the date of

24 that letter is the date on which Haggen and Comvest told

25 Albertsons for the first time the complaints that are set

1  forth in that letter, right?

2  A     No.

3  Q     Sir, in the absence of this dispute with Albertsons,

4  Haggen had no liquidity to pay Albertsons the money that was

5  due, correct?

6  A     My memory is as of mid-June when we did the analysis

7  that we just talked about in the previous deck, we did have

8  the money and that was included in the liquidity analysis

9  there.  I'm not 100 percent sure, fast-forward 30 days, and

10  the notice was then sent in the middle of those two.  So, I'm

11  not 100 percent sure what you're asking.

12  Q     Mr. Caple, I will try again --

13  A     Okay.

14  Q     -- and I'll try to be really, really clear.

15  A     Okay.  I'm trying to be -- I'm trying --

16  Q     Okay.  This report is dated July 13th, correct?

17  A     Yes.

18  Q     And you wrote that Haggen only had $25 million of

19  liquidity, correct?

20  A     Yes.

21  Q     And so if there was no dispute with Albertsons, Haggen

22  had no ability to pay the $43 million that would have been

23  due, correct?

24  A     Absent some other financing, that's accurate.

25  Q     Okay.  And Haggen also would have had no ability to pay

1  on top of that, the $10 million that was owed to the

2  creditors -- to the contractors, right?

3  A    Absent no other financing, which we talk about later

4  here.

5  Q    Okay.  Can you turn to Page 007, please.

6  A    Sure.

7  Q    Looking at the drivers of liquidity issue, there's,

8  again, a discussion in the first bullet point about the $43

9  million of inventory payments to Albertsons, right?

10  A    Yes.

11  Q    And you say -- and you wrote here that it was being

12  withheld due to claims of foul play, right?

13  A    Yes.

14  Q    And you wrote that the outcome is unknown at that time,

15  right?

16  A    Yes.

17  Q    You didn't want to make any promises as to how that

18  dispute would be resolved, right?

19  A    We sent them a letter sort of outlining a whole series

20  of issues and had expected them to respond with some data or

21  with some answer to help us better understand what exactly

22  had happened; instead, they just sued us.

23  Q    Yeah.

24  A    They never responded in any way.

25  Q    They sued you pretty quickly, didn't they?

1  A     I don't know how you'd define "pretty quickly," but --

2  Q     About four days after you prepared this document?

3  A     Yes.  So, within 30 days of us not paying them and

4  sending them the letter saying, Hey, these are the real

5  issues here we have to talk about, instead of picking up the

6  phone or doing anything, they just sued us.

7  Q     Let's look further down the page.

8  A     Yep.

9  Q     Do you see there's a statement concerning required

10 liquidity cushion?

11 A     Yes.

12 Q     You wrote that $10 million of liquidity cushion is

13 needed during the course of a week during to intra-week

14 swings in cash; do you see that?

15 A     Yes, I do.

16 Q     What's an intra-week swing in cash?

17 A     A business of this size just needs a certain amount of

18 cash to operate, and so we needed about $10 million just to

19 deal with, you know, what day payroll was paid versus this,

20 that, and the other.  And so just -- and you'd have to have a

21 ten-million-dollar minimum to get by.

22 Q     And that would have been true, as true in July as it

23 would have been in February or March, right?

24 A     Sure.

25 Q     And the deal -- okay.  So that's where we are in mid-

1  July.  And then a couple of weeks later, PNC declared a

2  default, right?

3  A     I believe so, yes.

4  Q     If you'd turn to Exhibit 84.

5  A     84, yes.

6  Q     This is the letter of default that PNC sent to Haggen,

7  right?

8  A     I believe it is, yes.

9  Q     And you understood that not only in an event of

10  default, but a springing event had occurred, if you take a

11  look in the last paragraph.

12  A     Yeah, I'm just trying to read the -- the last paragraph

13  on which page?

14  Q     Do you see the last paragraph on the first page --

15  A     Uh-huh.

16  Q     -- it says, Pursuant to the terms of the credit

17  agreement, that the springing event shall have occurred, and

18  then it describes a springing event that occurred on July

19  23rd?

20  A     Yes.

21  Q     Did Haggen or Comvest ever dispute PNC's declaration of

22  default?

23  A     Oh, gosh.  I just don't recall the details.  This very

24  quickly turned into a liquidity crisis and a forbearance and

25  a whole series of other things such that I'm not sure this

1  was really terribly relevant very quickly.  I just don't

2  recall the details, I'm sorry.

3  Q    A letter of default from the ABA lender was not

4  terribly relevant; is that right?

5  A    Very quickly after this, we ended up being in

6  negotiations with PNC on a forbearance and it was clear

7  additional liquidity was going to be needed in the business,

8  so that was really the focus.  My sense is, as opposed to

9  sort of an ongoing business where things were going great and

10 all of a sudden you have an event of default, this was a --

11 this wasn't as big an issue as the liquidity issues that we

12 needed to work through.

13 Q    Okay.  And now I'll go back to the question that I

14 asked a couple of questions ago:  To the best of your

15 knowledge, did Haggen or Comvest ever dispute PNC's

16 declaration of an event of default?

17 A    Yeah, I don't recall specifically.

18 Q    Did Haggen or Comvest ever dispute PNC's declaration of

19 a springing event?

20 A    I -- I don't recall specifically.

21 Q    And, in fact, Haggen subsequently entered into a

22 forbearance agreement with PNC; isn't that right?

23 A    Yes.

24 Q    Okay.  In July, during this period, a decision was also

25 made to retain Alvarez & Marsal; is that right?

1  A      I believe it was earlier than July, but, yes --

2  Q      It actually was --

3  A      -- sometimes during the summer we retained --

4  Q      You have a good memory on that.

5  And that was the investment committee's decision?

6  A      Yes, it was a recommendation.  I'm not sure we did a

7  formal vote or anything, but in our first -- our very first

8  investment committee discussion in June, somebody said, Hey,

9  we could really use some additional help here.  And I thought

10  that was an excellent idea and we proceeded to retain Alvarez

11  & Marsal.

12  Q      Okay.  So, can you turn to Exhibit 730, please.

13  A      730, yes.

14  Q      That's the retainment letter with Alvarez & Marsal,

15  right?

16  A      Yes.

17  Q      And Alvarez & Marsal provides restructuring services;

18  is that fair?

19  A      Amongst other services, yes.

20  Q      And do you understand that in the description of

21  services, they were going to provide assistance in evaluating

22  strategic alternatives, right?

23  A      Yes.

24  Q      And one of those strategic alternatives that was being

25  considered at that time was the filing of bankruptcy, right?

1  A      Yes.

2  Q      Okay.  Now, just to change topics for a moment, at the

3  same time all of this is going on, Mr. Niegsch is negotiating

4  with UBS, right?

5  A      I believe so, yes.

6  Q      And you understood the negotiations with UBS were over

7  whether UBS would make a loan to the PropCos, secured by the

8  PropCo's real property, right?

9  A      That's right.

10  Q     And Comvest's intent had shifted from using the

11  proceeds of a loan against the property to pay a dividend to

12  Comvest, to using the proceeds to support the Opco entities,

13  right?

14  A      It was certainly something we were considering

15  strongly, yes.

16  Q      Now, Mr. Niegsch never negotiated with UBS to make a

17  loan directly to the Opcos in exchange for a second lien on

18  the Opco's assets, right?

19  A      No.  UBS is a real estate lender; they're not a cash

20  flow lender.  They would have had no interest in anything but

21  lending us real estate.

22  Q      Ultimately, even though UBS is a real estate lender,

23  they refused to make a loan to the PropCo secured by a first

24  lien on PropCo entities' unencumbered real estate, right?

25  A      That's right.

1  Q     And can you tell the Court who Robert Priddy is.

2  A     Robert Priddy is a former partner at Comvest.  At the

3  time here, he was semi-retired, I'd kind of describe it, but

4  he was a former partner at Comvest.

5  Q     Okay.  And after -- well, after UBS terminated

6  negotiations, you personally turned to Mr. Priddy to see if

7  he would be interested in providing a loan against the PropCo

8  real estate, right?

9  A     I don't believe it was myself that first contacted him.

10 He was contacted by, I believe, Robert O'Sullivan, who was

11 another partner at Comvest.

12 Q     But you personally reached out to Mr. Priddy to gauge

13 his interest in whether he would -- he might provide a loan

14 against the PropCo real estate, right?

15 A     Yeah.  At the request of Robert O'Sullivan and Michael

16 Falk; they asked me to do that, yes.

17 Q     You never asked Mr. Priddy to make a loan to the Opco

18 entities, did you?

19 A     I did not.

20 Q     Did you ever ask anybody to make a loan to the Opco

21 entities?

22 A     I asked PropCo and the Comvest partners to do it, yes.

23 Q     Okay.  And Comvest Partners declined, right?

24 A     To make a loan directly?

25 Q     Yeah.

1  A     Oh, but I meant I asked PropCo to loan to Opco and at

2  the end of the day, Comvest owns PropCo, so I did ask that.

3  I'm not sure if I ever asked Comvest to make a loan directly

4  to Opco.

5  Q     Did the thought ever occur to you to ask Comvest

6  whether Comvest wanted to make a loan to Opco?

7  A     No -- no, I didn't believe that anybody was going to

8  make a lien to Opco, given its current state.

9  Q     Okay.  Can we take a look at Exhibit 1, please.

10  A     Sure.

11  Q     Now, is this an email that you sent to Mr. Priddy?

12  A     It is.

13  Q     Okay.  Let's spend a couple of minutes and just see

14  what you told Mr. Priddy at the time.  Looking down at the

15  bottom half of the page --

16  A     Yes.

17  Q     -- let's just put it in context.  So, UBS has

18  terminated negotiations, right?  It's now July -- is that

19  correct?

20  A     I believe so, yes.

21  Q     Okay.

22  A     I don't know if it was exactly this date, but right

23  around this date, yeah.

24  Q     Well, you know that you say in this email that --

25  A     Well, I haven't read --

1  Q      -- UBS got spooked, right?

2  A      Yeah, because this would have been after that, then

3  yes.

4  Q      Okay.  So, UBS has departed?

5  A      Yes.

6  Q      It's July 27th, right?

7  A      Yes.

8  Q      The Opcos are facing a liquidity crisis, right?

9  A      A     liquidity shortfall, yeah.

10 Q      A     liquidity shortfall.

11 And let's see what you say.  So, you inform Mr. Priddy that

12 Haggen has lost all of the price-focused customers, right?

13 A      Yes.

14 Q      And you told Mr. Priddy that Haggen hadn't yet had time

15 to attract the quality-focus customers, right?

16 A      That's right.

17 Q      And you provided him with a model that showed sales

18 down 20 to 30 percent, correct?

19 A      Yes.

20 Q      And you told him that Haggen was in the process of

21 closing stores, right, towards the end of that first

22 paragraph?

23 A      I -- I -- I wouldn't have described this as focused on

24 it.  We were focused on getting prices right and getting

25 labor right.  I think store closures was a potential option

1  to make that better, but as an example, we hadn't even

2  modeled it, so I wouldn't describe it as a focus.

3  Q    Okay.  In any event, you did tell Mr. Priddy that UBS

4  had left you at the altar, right?

5  A    Yes.

6  Q    And that's in the beginning of the paragraph beginning,

7  We only -- it says, UBS stressed us -- stretched us out and

8  then left us at the altar, right?

9  A    Yes.

10  Q    And then in the paragraph above that, you state that

11  UBS got spooked, right?

12  A    Yes.

13  Q    Okay.  And your understanding is UBS was concerned

14  about getting into a sticky situation, given the Opco

15  entities' performance, right?

16  A    That's right.

17  Q    And by "sticky situation" you meant that sales were

18  down 20 to 30 percent, causing difficult financial results,

19  right?

20  A    That's right.

21  Q    And that was one of the reasons UBS didn't want to

22  proceed, correct?

23  A    My understanding is that was the major reason.

24  Q    Well, UBS wanted a representation and warranty that the

25  Opcos wouldn't file for bankruptcy, correct?

1  A      That's my memory, yes.

2  Q      And after conferring with Mr. Niegsch, the two of you

3  decided that that representation could not be provided,

4  correct?

5  A      That's right.

6  Q      Okay.  Now, the next sentence in the paragraph begins

7  with, We only have, says:

8  "Comvest will likely do this loan, but we have some concerns

9  about equitable subordination, given that we are equity."

10 You wrote that, right?

11 A      I did.

12 Q      And the "we" refers to Comvest, right?

13 A      Yes.

14 Q      Can you explain to the judge what concerns you had

15 about equitable subordination for Comvest.

16 A      Yeah, I'm not a lawyer, but my understanding is any

17 time you make a loan into a business where you also own

18 equity, there's a chance -- albeit, my understanding is it's

19 a very small one -- but there's a chance that you can become

20 equitably subordinated.  At the time here, my partners were

21 not at all happy about how this deal was going, to say the

22 least, and putting additional money in with additional risk

23 was a big issue and, you know, any issue was something that

24 they were concerned about, even a very small percentage-type

25 issue.

1  Q     And you discussed that precise topic with your
2  colleagues at Comvest, right?
3  A     Yes.
4  Q     In fact, you specifically discussed the risks
5  associated with equitable subordination, right?
6  A     And I don't remember the exact conversation, but I
7  remember them having concerns.
8  Q     And you -- while you don't have a specific
9  recollection, you believe you discussed the issue of
10 equitable subordination at the investment committee to try to
11 understand the risk, correct?
12 A     Yeah, I certainly remember them having real concerns
13 about anything that might, you know --
14 Q     Okay.
15        MR. MORRIS:  Just a few more minutes, Your Honor.
16 BY MR. MORRIS:
17 Q     Before the APA was signed, you personally had
18 communications with the investment committee members where
19 they expressed the view that the real estate to be acquired
20 would serve as protection in a downside scenario, correct?
21 A     Sure, yes.
22 Q     Okay.  And you personally agreed that value of the real
23 estate provided Comvest with protection in the event that the
24 operating entities did not perform as expected, correct?
25 A     Yes.

1  Q     But after UBS left you at the altar and Mr. Priddy

2  declined to participate, you turned to the PropCo assets as a

3  source of liquidity for the Opcos, right?

4  A     No.  I mean, we were going -- the PropCo assets were

5  going to be used, whether it was UBS, Mr. Priddy, or us.  The

6  structure was the same in all three; the only difference was

7  who the lender was.

8  Q     Right.  Except the money to fund the loan was now going

9  to come from Haggen Property Lender, right?

10 A     They were going to get the money from us.

11 Q     Yeah, okay.

12 A     So, what I'm trying to say is that under UBS, Priddy,

13 and us, it was all the same loan structure; it was just who

14 the loan was coming from.

15 Q     The -- is it fair to say that the investment committee

16 members were not happy about that?

17 A     About us having to provide the liquidity?

18 Q     Yeah.

19 A     Yes.

20 Q     In fact, a number of them told you that they were under

21 the impression that Comvest could still get its money back in

22 Haggen through the real estate, even in a disaster scenario

23 with the operating business, correct?

24 A     They told me that was their understanding, yes.

25 Q     And Mr. Clark specifically expressed to you that he was

1  under the belief that the underlying real estate value was

2  money good in a disaster scenario, correct?

3  A     That's what he said, yes.

4  Q     And, in fact, he specifically told you that he had

5  relied on the downside protection when he approved the deal,

6  right?

7  A     I don't remember him saying exactly that, but I

8  remember him saying that he thought in this real estate was

9  money good in a -- what he described as a disaster scenario.

10  Q     And he told you that he relied on that when he approved

11  the deal, right?

12  A     I don't remember him saying that part of it, but ...

13  Q     Can you see at the back in your binder, there's a Tab

14  A.

15  A     Yeah.

16  Q     Is there?

17  A     There is, yeah.

18  Q     Okay.  That is the deposition transcript and if you

19  could turn to Page 294, please.

20  A     294, yep.

21  Q     Do you remember being deposed, sir?

22  A     I do, yes.

23  Q     On Page 294, Lines 6 to 9, were you asked this question

24  and did you give this answer:

25        "Question:  Did Mr. Clark ever communicate to you that

1  he had relied on the downside protection when approving the

2  deal?

3         "Answer:  Yes."

4         Did you give that answer to that question?

5  A      I did.

6  Q      Okay.

7  A      I believe that.

8  Q      And you understood that the downside protection

9  referred to the value of the real estate, right?

10 A      Yes.

11 Q      And these were issues that were discussed among all of

12 the committee members in July of 2015, correct?

13 A      Yes.

14 Q      Now, you thought they were misremembering it, right?

15 A      It -- can you tell me what "it" is?  They were

16 misremembering what?

17 Q      The concept that they relied on the downside protection

18 of the real estate in approving the deal.  You didn't think

19 they really had done that, right?

20 A      No, I thought they had done that, absolutely.

21 Q      Okay.  So, you didn't think Mr. Clark, at all, was

22 mistaken, when he reminded you that he had relied on the real

23 estate as downward protection against the failure in the

24 operating companies, correct?

25 A      No, I don't believe that's true.

1  Q     Mr. Clark specifically told you that he had relied on

2  the downside protection when approving the deal, correct?

3  A     Yes.

4  Q     And you -- did you disagree with him at that time he

5  told you that in July?

6  A     No -- no, I think it's accurate to say that part of our

7  decision to approve this deal was that we had downside

8  protection in the real estate, that the real estate had a

9  lower volatility of value and that it was easier to value and

10 that it was a big piece of us getting comfortable with this

11 deal.  I don't know I've ever disagreed with that.

12 Q     Okay.  Now, just to switch topics ever so slightly, at

13 the same time in this July period --

14 A     Yeah.

15 Q     -- Mr. Clark and other investment committee members

16 told you that they were surprised to learn that HoldCo had

17 provided guarantees or otherwise assumed the obligations

18 under the Albertsons' APA and the SLB leases, right?

19 A     Yes.

20 Q     Okay.  And this was a very big issue at the time,

21 right?

22 A     It became a very big issue, yes, at that time.

23 Q     And why did it become a big issue at that time?

24 A     Because at that time, it was reasonably clear we were

25 headed towards a real liquidity event, potentially,

1  unfortunately, this court and, you know, the extent to which

2  Holdings had guaranteed things was going to drive the -- what

3  the waterfall ended up looking like.

4  Q     And that's because in order for Comvest to realize the

5  value of the real estate, it had to be upstreamed to Holdings

6  and then dividended out to Comvest, right?

7  A     That's accurate, yes.

8  Q     And what happened at this moment in time is the

9  investment committee learned that HoldCo had all of these

10 obligations, right?

11 A     That's right.  We had never done a bankruptcy analysis

12 before this and so we never looked at it.

13 Q     And the investment committee was never aware of the

14 obligations at the HoldCo level, right?

15 A     Yeah, they never -- it was never our focus.  It wasn't

16 something we really considered that we were going to have a

17 bankruptcy at Opco.  That was not something we ever

18 considered or did an analysis of.

19 Q     But in July of 2015, you told Mr. Clark that the deal

20 team had specifically disclosed to the investment committee

21 that HoldCo had these obligations prior to the time they

22 approved the APA, right?

23 A     And I thought we had.  I mean, this was an extremely

24 complex deal with, you know, not just a normal APA but sale

25 leasebacks and financings.  And I thought I had gone through

1   all the terms of those and I should have.  I should have

2   disclosed all of those and if we missed something, as an

3   example, the HoldCo guarantees and the sale leaseback, that

4   was not something we should have done.  We should have found

5   it all.

6         I'll tell you, at the time we originally underwrote the

7   deal, it wasn't anyone's focus.  No one asked about it.  It

8   wasn't -- we were focused on, how do we make this work.

9   Q    I'm going to try one more time.

10  A    Okay.

11  Q    The investment committee was upset to learn for the

12  first time in July 2015 that HoldCo had obligations, correct?

13  A    Yes.

14  Q    And they were upset to learn that HoldCo had those

15  obligations because that acted as a barrier to their recovery

16  on the real estate, right?

17  A    Yes.

18  Q    Okay.  And while today -- withdrawn.

19  At that time, you and Mr. Clark had a disagreement over

20  whether or not the investment committee had been informed of

21  these liabilities, right?

22  A    Yes.

23  Q    And are you aware that Mr. Clark actually took the time

24  to go back and look at every deck that was ever given to the

25  investment committee to see whether a disclosure of these

1  liabilities was made by the deal team?

2  A    I do, because I actually did the same thing.

3  Q    Yeah.

4  A    We both actually went to the same place.

5  Q    And he was right, right?

6  A    He was correct, yeah; we hadn't put it in the decks.

7  Q    Beginning of May, sir --

8  A    Yep.

9  Q    -- various people on the investment committee accused

10  you, as the person with oversight responsibility of the

11  Haggen investment, of having performed your job poorly; is

12  that correct?

13  A    I think they were upset about the deal and, clearly, I

14  was the guy to blame, so I'd agree with that.  My job -- I

15  have a lot of things I did, other than Haggen, but, clearly,

16  they were upset about the performance of Haggen.

17  Q    And a few months after the bankruptcy filing, they

18  asked you to leave; isn't that right?

19  A    It would have been more like six months after,

20  something like that.  Yeah, we had a dispute about a variety

21  of things.

22          MR. MORRIS:  Your Honor, if I may just take a

23  minute and confer with my colleagues?

24          THE COURT:  Take a minute, yes.

25          MR. MORRIS:  I don't want to break.

1          THE COURT:  Take a minute.

2          MR. MORRIS:  I just want to see if I missed

3 anything.

4          THE COURT:  You got it.  Take your time.

5      (Pause)

6          MR. MORRIS:  I have no further questions, Your

7 Honor.

8          THE COURT:  All right.  Thank you.  Thank you, Mr.

9 Morris.

10          MR. MORRIS:  Thank you.

11          MR. HOWELL:  Your Honor, I have a few exhibit

12 binders of things we may cover during this.  If I can bring

13 --

14          THE COURT:  Sure.  You certainly may approach the

15 witness and me, as well.

16          MR. HOWELL:  Thank you, Your Honor.

17          THE COURT:  Thank you.

18          THE WITNESS:  I can put this aside now?

19          THE COURT:  Thank you, Mr. Howell.

20                       CROSS EXAMINATION

21 BY MR. HOWELL:

22 Q    Good afternoon, Mr. Caple.

23 A    Good afternoon.

24 Q    I'm going to start with a few questions that just

25 directly relate to your cross-examination before turning into

1  some direct examination, due to the kind of odd dynamic that

2  we have here.

3  A     Fair enough.

4  Q     Do you recall during your cross-examination, that you

5  were asked some questions about Comvest put in a loan to the

6  Opco in that kind of July-August period?

7  A     Yes.

8  Q     And do you recall that you testified that you didn't

9  think anyone would make a loan to Opco, given the situation?

10 A     Yeah, given the situation; the speed that it needed to

11 get a loan, I just didn't think there was any way it was

12 going to happen.

13 Q     Well, weren't you asking Mr. Priddy if he would give a

14 loan to Opco in that situation?

15 A     Yes, through PropCo, though.

16 Q     And didn't PropCo give a loan in that situation?

17 A     Yes, they did.

18 Q     And didn't you tell Mr. Priddy that Comvest would have

19 given a loan in that situation?

20 A     Yeah, I mean, Comvest was very much considering doing

21 the loan.  We eventually did, which was a loan to PropCo and

22 then into Opco and I -- you know, we did that loan and, you

23 know, I thought that was a reasonable thing for Mr. Priddy to

24 do.  I thought it was a reasonable thing for UBS to do, as

25 well.  They would have gotten their money back.

1  Q      So, you did think that other people, it would have been

2  reasonable for them to give a loan?

3            MR. MORRIS:  Objection to the form of the

4  question; leading.

5            THE COURT:  I'll sustain that objection.

6  BY MR. HOWELL:

7  Q      Mr. Caple, around that time in August-September --

8  excuse me -- July-August of 2015, did you think that anybody

9  besides Comvest would be willing to give a loan to the Opco?

10 A      I didn't think anybody would be willing to -- I did not

11 think it was possible to get anybody in the time frame given

12 to give a loan directly to Opco.  I thought it was possible

13 for, potentially, multiple other parties to give a loan for -

14 - to the PropCo and then loan into the Opco.  I thought that

15 was the path of most likely kind of liquidity.

16        And I -- you know, I know we were willing to do it.  I

17 think if we had time we could have found others to do it.  It

18 was just -- there was this compressed time frame that didn't

19 let anybody else do that transaction.

20 Q      What was the problem with that time frame?

21 A      We needed the money in like 10 days and it just -- you

22 know, loans don't happen that quickly; they take months.  And

23 there was just no way it was going to get done realistically,

24 other than from someone that really understood the situation

25 in real detail at that point.

1  Q    You were also asked -- and I think I have the same

2  exhibit; it has a DX number for "Defendants," instead -- but

3  if you look at in the binder I've given you, DX133?

4  A    Yes.

5  Q    Do you recognize that document?

6  A    I do.

7  Q    And which document is that?

8  A    This is our final investment committee memo on December

9  3rd.

10 Q    And we may come back more to this later, but do you

11 recall Mr. Morris asked you a series of questions where he

12 would show you the base operating case result and have you

13 compare it to the downside operating case results and in each

14 of those instances, you agreed with Mr. Morris that the

15 PropCo EBITDA was the same; do you recall that?

16 A    Yes.

17 Q    Why would it be, Mr. Caple, in both the base case and

18 the op -- and the downside case that PropCo would be showing

19 the same EBITDA?

20 A    Because in both these cases, you have the exact same

21 leases that are getting paid and so there's just no

22 difference; it's just a matter of numbers.

23 Q    In the downside case, was the operating company still

24 paying on those leases?

25 A    Yes.

1  Q    What was the financial situation of the Opco company in

2  the downside cases?

3  A    The downside cases, the Opco was still -- it was still

4  fine.  It was still operating and we thought that was the

5  true downside.

6  Q    Did you ever run a scenario in which you modeled a

7  bankruptcy scenario for the Opco?

8  A    We did not, no.

9  Q    Did you ever model a case where you modeled a

10  liquidation scenario for the Opco?

11  A    No, not at this point.  Later on, you know, when we got

12  close to bankruptcy, of course we modeled some of those

13  things, but at this point, absolutely not.

14  Q    And do you remember Mr. Morris asked you a few

15  questions about conversations with Mr. Clark in which he was

16  asking you if Mr. Clark relied on downside protection from

17  real estate in a downside case; do you recall that?

18  A    Absolutely.

19  Q    And is that consistent with those financials that we

20  looked at in DX133?

21  A    Yeah, it's really important.  So, it's one thing to say

22  the real estate has a more stable very well to it, so as the

23  operating results sort of go up and down, the real estate

24  results stay reasonably similar and so you can sort of rely

25  on the "value" of that real estate as part of the whole deal.

1  It's a whole different thing to say, you know, he relied on

2  the value of real estate in a disaster/liquidation scenario.

3  Those are two just very different things.

4  Q    Did you ever tell Mr. Clark that the real estate would

5  be money good in a disaster liquidation scenario?

6  A    I don't believe I did, no.

7  Q    Did you go back in the decks and look for that?

8  A    I did, actually.  I wanted to see exactly what we'd

9  said and I went back through and we just didn't do a

10 liquidation scenario.  And so as we moved to where that might

11 be happening, all of a sudden I felt -- you know, my partners

12 were saying, Hey, you said this and you said that.

13 I said, We didn't say any of those things.  That's not

14 something we modeled and talked about.  And they didn't

15 request to have me model and talk about it at the time.  You

16 know, to the extent we missed it, we all missed it together.

17 Q    Mr. Caple, how many different dividends did Comvest

18 take out of Haggen after the Albertsons acquisition?

19 A    None.

20 Q    You were asked a bit about the reasons to use the

21 Opco/PropCo structure.  Could you explain for the Court why

22 it was that you used an Opco/PropCo structure.

23 A    Yeah.  So, when you're acquiring assets, particularly

24 from a corporate in a carve-out, they want to sell you the

25 assets they want to sell you.  And as a buyer, you learn to

1   just buy what the heck they're selling.

2       And so, in this case, they were selling both operating

3   and real estate assets.  We're not, you know, an owner of

4   real estate assets; it's just not what we do.  Even if the

5   Haggen case, we only bought the operating assets.

6       So, in this case, the goal was to buy the operating

7   assets and the real estate assets were always something we

8   wanted to sell reasonably quickly and/or use as financing for

9   the deals --

10  Q    I'm sorry to interrupt you, Mr. Caple, but you said

11  even in the Haggen case you only bought the operating assets.

12  Were you referring to the initial purchase of Haggen?

13  A    Yes, the initial purchase of Haggen.

14  Q    Thank you.  Was one of the reasons you decided to use

15  an Opco/PropCo structure to prevent Opco creditors from being

16  able to reach the real estate assets?

17  A    It wasn't.

18          MR. HOWELL:  Now, as I said, it's a little bit,

19  Your Honor, but we'll start into a bit more of the direct

20  examination.

21  BY MR. HOWELL:

22  Q    Mr. Caple, would you mind telling the Court where you

23  were born and raised.

24  A    Yeah, I was born actually in Atlanta, Georgia.  We grew

25  up in Palos Verdes, California.

1    Q      Where did you go to college?

2    A      I spent two years at Johns Hopkins University and then

3    finished at Stanford in Palo Alto.

4    Q      Do you have any post-graduate degrees?

5    A      Yes, I received my MBA from Wharton, just up the

6    street, in 1998.

7    Q      What experience did you have in grocery before you

8    joined Comvest?

9    A      So, my first job ever at 17 was bagging groceries in a

10   grocery store.  So, like many of us, I started in a grocery

11   store.  I then spent six years for a firm called Bain &

12   Company, a strategy consulting firm, where one of my big

13   clients was actually Winn Dixie.  So, I got to know the

14   grocery industry fairly well.

15         I then moved on from Bain to another private equity

16   firm called HIG Capital and I made two investments in the

17   grocery store industry; one, a co-investment in Marsh

18   Supermarkets and one investment in the debt of Bilo

19   Supermarkets.

20   Q      When did you join Comvest?

21   A      So, I joined Comvest in 2010.

22   Q      And you were a managing director when you joined?

23   A      Yes, sir.

24   Q      When did you become partner?

25   A      2013/2014.

1  Q      When did you first hear of the grocery chain, Haggen?

2  A      Probably 12 years ago, I actually looked at buying one

3  of Haggen's competitors in the Pacific Northwest, called The

4  Markets.  I went out there and as part of our diligence, I

5  walked a number of Haggen stores and got to know the chain

6  that way.

7  Q      So, I want to focus for a moment on when Comvest first

8  acquired Haggen --

9  A      Sure.

10  Q      -- in 2011, before we get to the Albertsons

11  acquisition, okay?

12  A      Sure.

13  Q      How did that transaction, the 2011 transaction come

14  about?

15  A      When I joined Haggen, one of the -- I'm sorry -- when I

16  joined Comvest, one of the things Comvest liked to do was

17  find an industry that they knew and then call operating

18  companies to find acquisition opportunities.  I actually had

19  a big background in grocery, so one of the things we did was

20  when I joined Comvest, we literally called every grocery

21  store chain in the U.S. with between, I think, 20 and 200

22  stores.  So, literally, we had one of our business

23  development people call like 100 chains to see -- to find

24  potential opportunities.

25  Q      And what was attractive to you about Haggen, in

1  particular, back in 2010?

2  A    Yeah, when I really dug into Haggen, what I liked about

3  it was Haggen was a really great chain with a great brand,

4  particularly in the northern part of the state of Washington.

5  So, literally, think of it, you know, you didn't go to the

6  grocery store; you went to Haggen, right?  It was almost one

7  of those synonymous with going to the grocery store.

8        And it had a great brand.  It had a great, you know,

9  kind of think about it as a renovation; it had good bones to

10  it.  So, I remember walking around the stores with the chief

11  merchant who would point out all these cool local products

12  they had and I remember thinking, Wow, there's no way for the

13  customer to know that.

14        And the Haggen brothers had done such a great job of

15  building this chain that they had retired 10 years before

16  this and probably had, you know, maybe mentally retired

17  before that.  So, it was a great old chain, but just, it was

18  sort of -- I called it grocery circa 1990.  So, it just

19  needed an awful lot of updating in 2010.

20  Q    Who else from Comvest worked on the deal team to

21  acquire Haggen?

22  A    Yes, so the original deal team was myself, Adam

23  Bentkover and Mike Niegsch.

24  Q    When did you first meet Mike Niegsch?

25  A    We was an associate that had been hired, just before I

1  got to Comvest.

2  Q    And had you worked with Mr. Niegsch on other deals,

3  besides the Haggen deal?

4  A    Yes.

5  Q    Do you consider Mr. Niegsch to be a hard worker?

6  A    Absolutely.

7  Q    Do you consider Mr. Niegsch to be ethical?

8  A    Absolutely.

9  Q    How many stores was Haggen operating when Comvest

10 acquired it?

11 A    Around 30.  It may have been 31, but right around 30.

12 Q    And you mentioned that you just bought the operations

13 from Haggen?

14 A    Yes.

15 Q    Did Haggen, Inc., when you bought it, did they own --

16 or did the Haggen family own real estate, as well?

17 A    Yes, the Haggen family owned a fair amount of the

18 underlying real estate and Haggen owned about half the stores

19 in an entity that they called Briar Holdings.

20 Q    And how would you describe that structure with Haggen,

21 Inc. and Briar Holdings?

22 A    I mean, it was an Opco/PropCo structure, just like we

23 set up here.

24 Q    Why didn't Comvest buy Briar Developments, as well?

25 A    In that case, we were able to buy just the operating

1  assets.  You know, the real estate assets were likely for

2  sale; in fact, they tried to sell them soon thereafter, but

3  that just wasn't what we wanted to buy.  We wanted to buy the

4  operating assets.

5  Q    What was the ownership structure of Haggen after the

6  2011 deal?

7  A    We owned 80 percent of Haggen.  The Haggen family owned

8  20 percent.  And then we had a call option on their 20

9  percent at a -- for $5 million.

10 Q    What was the investment thesis for you in terms of the

11 decision to buy Haggen?

12 A    Yeah, we really felt we could turn around the chain.

13 So, it had been having real negative same-store sales.  It

14 had been having real issues.  We thought we could buy the

15 chain and really, you know, take it from grocery circa 1990

16 to grocery circa 2010 and create a little bit -- not a Whole

17 Foods -- but a, you know, a little bit of a chain like a

18 Publix or a Wegmans you have here; a higher-end, but still

19 full-line grocery experience.

20 Q    When you acquired Haggen in 2011, were all of the

21 Haggen stores you acquired operating under the Haggen banner?

22 A    No, about half the stores were called Top.

23 Q    And what did you do with the stores operating under the

24 Top banner?

25 A    Well, eventually, we converted all the stores to the

1  Haggen banner.  So, some of the Top stores we ended up

2  closing; they were real underperformers.  The remainder --

3  and I think it was five to seven -- we converted to the

4  Haggen banner.

5  Q     Describe the process that you went through to convert

6  the Top stores to Haggen stores.

7  A     Yeah, so in many ways, it was very similar to what we

8  did here with Albertsons, but we would go in, we would take

9  about 40 hours.  It was all about rebranding the whole store.

10 So, we had created this new format that we called Haggen

11 Northwest Fresh.  So, think of a normal grocery store chain

12 you go in and many of them are very antiseptic, kind of

13 hospital-like, very bright white.  You know, they're clean,

14 but they have that -- that feel to them.

15      We would go -- the new branding was much more earth

16 tones, lots of wood all over the place.  We would go into the

17 produce department and take out the old fixtures and

18 actually, literally put in wooden pallets.  It would give it

19 kind of a farm feel to it, and little islands in there.

20      We would also really refocus on the -- on the product.

21 So, if you had gone into one of our remodeled stores, you

22 would have seen signs everywhere showing, you know, so,

23 here's a deck of strawberries.  Here's a sign showing the

24 farmer; ideally, the farmer's kids with them.  You know

25 exactly where it's from, where the farm is.  The whole point

1  was, you know, you're not just buying a strawberry; you're

2  buying part of the community.  And that was the kind of feel

3  we tried to give with Haggen and we were -- you know, we were

4  really excited about that.  People would really talk about

5  that.

6  Q    How did Haggen perform after Comvest acquired it?

7  A    So, it performed reasonably well.  I mean, we took the

8  business from $12 million to well over $20 million in EBITDA.

9  Part of that was clearly closing some stores -- we had some

10  real underperforming stores -- but the other thing we really

11  had to do is at the time, they were really seeing negative

12  same-store sales trends.  We had to go in there and really

13  arrest those, which we were able to do, particularly, with

14  this new format.

15        We also invested a ton of money in new IT systems.  So,

16  this thing was -- you know, literally, they were still doing

17  store schedules on a piece of graph paper.  We put in place a

18  full system, a full merchandising systems, full receiving

19  systems, sort of the whole nine yards.

20  Q    So, after you converted some of those Top stores into

21  Haggen stores, what did you see in terms of same-store sales

22  growth or decline between the stores you converted from Tops

23  over into Haggen?

24  A    Yeah, we saw really nice same-store sales growth in

25  those.  You know, mid-to-high single digits is sort of my

1  memory.  And, you know, that's with -- at the end of the day,

2  actually, we changed nothing inside the store.  It was

3  literally the exact same product in the exact same place at

4  the exact same price; all we did is change the banner on the

5  top and changed a bunch of the signage, essentially, was

6  mostly what we changed, as well as fixtures and other things,

7  but, literally, the product price didn't change at all.

8  Q    While you owned Haggen before the Albertsons

9  acquisition, did any vendors ever tell you they wouldn't

10 provide credit without access to real estate?

11 A    No.

12 Q    And all of those Haggen stores that you owned, were

13 they renting or did some own the land?

14 A    We didn't own any of the land; we rented all of them.

15 Q    What was your understanding of the enterprise value of

16 Haggen, Inc. when you signed the Albertsons APA?

17 A    We thought it was probably worth a hundred to $140

18 million, in that range.

19 Q    Was there any debt on Haggen, Inc. at the time of the

20 Albertsons acquisition?

21 A    There was.  There was forty-two or $43 million;

22 something in the forty to forty-five range.

23 Q    Was that debt addressed as part of the Albertsons

24 acquisition?

25 A    Yeah, as part of that acquisition, we paid down all of

1  our existing lenders and got the new loan with PNC.

2  Q    All right.  I'd like you to flip to Exhibit 503.

3  A    Yes.

4  Q    Do you recognize this document, Mr. Caple?

5  A    I do.

6  Q    What is this document?

7  A    This is the Haggen post-closing structure after the

8  Albertsons acquisition.

9  Q    Would you describe this org chart as complicated?

10 A    Not for a deal of this size.  What we're talking about

11 here, I wouldn't.

12 Q    Where did Haggen, Inc., the legacy Haggen stores end up

13 in this structure?

14 A    You can see it down there under, Haggen Acquisition,

15 LLC and Haggen Operations Holdings.

16 Q    Is that on the Opco side or the PropCo side of the

17 structure?

18 A    It's on the Opco side of the structure.

19 Q    Who decided to put Haggen, Inc. on the Opco side of the

20 structure?

21 A    Comvest did.

22 Q    Were you involved in that decision?

23 A    Absolutely.

24 Q    Why did you put Haggen, Inc. on the Opco side of the

25 structure, as opposed to the PropCo side of the structure?

1  A     Because they were operating assets and we wanted the

2  operating assets together and the real estate assets

3  together.

4  Q     Would you have been able to put it on the PropCo side

5  of the structure, had you wanted to?

6  A     Sure, we could have.

7  Q     You can take 503 down, thank you.

8        When -- I'm now going to turn from the initial Haggen

9  acquisition to the Albertsons acquisition.

10 A     Sure.

11 Q     When did your first learn that Albertsons would be

12 selling stores as part of the Safeway merger?

13 A     As I said, I think it was in the summer of 2014 when we

14 first got initial, potential lists out of Citibank.

15 Q     And who was on the Comvest deal team for the Albertsons

16 acquisition?

17 A     It was myself, Mike Niegsch, and Lucas Scholl.

18 Q     And what did you think about the investment opportunity

19 for the Albertsons acquisition?

20 A     I thought it was really exciting.

21 Q     Why was it exciting?

22 A     You know, so many times we're competing for assets in

23 this business and you're just competing with everyone with --

24 you know, everyone's on the same footing.  Here, the FTC

25 really wanted an existing chain to be buying these stores for

1  all sorts of reasons, as you can imagine.

2       And it's very hard for all the existing chains to buy

3  these stores.  The bigger guys all tend to be next to all of

4  them, so it's hard to actually get a deal done.  The smaller

5  guys don't tend to have the resources to do it, and so,

6  literally -- and I know the West Coast grocery industry

7  pretty well -- we couldn't figure out any other real

8  potential buyers for all these stores.  And so we thought

9  there was a real potential both, to cut a really good deal

10 for ourselves, as well as really expand the Haggen format,

11 which, at the time, was doing really well and we were excited

12 about it.

13 Q    What was exciting to you about expanding the Haggen

14 format?

15 A    I mean, lots of things.  I had put the better part of

16 four years of my life into building Haggen, and nothing

17 compared to what the management team did, but it had been,

18 you know, probably the deal I spent more time on than any

19 other and so I was excited about it.  Five of the stores

20 actually we bought were in my hometown, very near where I

21 grew up.

22      So, I thought it was really great that I was going to

23 be able to take this, you know, this thing that I had such a

24 part of and take it to my hometown and, you know, maybe

25 living on the East Coast and growing up on the West Coast, it

1  was kind of nice to go home again.  It was fun to actually go

2  out and do due diligence in the stores and stay right near

3  where I grew up.  It was really exciting.

4  Q    Have you ever heard the term "the minnow swallowing the

5  whale"?

6  A    I have, yeah.

7  Q    What does that term mean to you?

8  A    Generally, it means, you know, a small business buying

9  a very large business.

10 Q    And were you concerned here that Haggen was the minnow

11 swallowing the whale when you considered buying 146 grocery

12 stores?

13 A    I mean, absolutely.  I don't know how you, as 18

14 stores, buy 146 stores and have a real concern about that.

15 Q    So, let's talk about some of the risks associated with

16 that, please.  If we could turn back to DX, I believe it was

17 133.

18 A    Yep.

19 Q    And this was the December 3rd investment committee

20 memo, correct?

21 A    Yes.

22 Q    And this was the last memo before the investment

23 committee signed off on the deal, I think?

24 A    Yep.

25 Q    And if you turn to Page 5 on 133, there's a chart of

1  risks and mitigants; do you see that?

2  A    Absolutely.

3  Q    And, Mr. Caple, if I could impose on you, I'd like you

4  to describe for the Court the first risk and also, generally,

5  what you thought were the reasons you might be able to

6  overcome that risk.

7  A    Yeah, so the first risk is this was a big deal for us.

8  So, just in terms of size, I think the 3 billion in sales was

9  more than the rest of the Comvest portfolio all put together,

10  so it was a big risk for us.  I think the real mitigant to

11  that was, you know, a couple of things.  We were buying

12  underlying real estate and, as I said, that underlying real

13  estate had a real set value to it, so we could be certain of

14  that.  We were also able to use that real estate to really

15  finance the deal, so we were going to be able to finance it

16  that way.

17      We also thought this business, even in downside

18  scenarios, was viable.  We knew there were some questions as

19  to how we were going to get welcomed by new customers, but we

20  thought even in downside scenarios, we had a viable business

21  here.

22  Q    Well, if we turn to -- just to piggyback on that, Mr.

23  Caple, if you turn to Page 25 of the same presentation, 133.

24  A    Please, yep.

25  Q    What is presented in that?

1  A      Yes, so this was the final set of forecasts we had

2  presented the investment committee.  We had presented them

3  other forecasts before.

4       But on the left side you have the base case, which was

5  essentially the Willard Bishop base case that they had

6  developed.  On the right side, you had what we called our

7  downside case, which was actually taking the Willard Bishop

8  downside case and making it worse.

9  Q      When you say "Willard Bishop" case --

10  A      Sorry, A.T. Kearney -- I get confused at times -- but

11  A.T. Kearney was the -- was the person in both of those.  I

12  apologize.

13  Q      And if you look -- if you -- if you look at this

14  downside case here --

15  A      Yeah.

16  Q      -- and you may have answered this before, so I

17  apologize -- but what does that downside case represent?

18  A      It represents what we think is the, you know, the --

19  the -- sort of the -- I don't want to call it the worst case,

20  because there's always something worse you can do -- but a

21  reasonable downside case that, you know, we clearly think we

22  can do better than this, clearly think it will do better than

23  this, but this is sort of the downside that, you know, might

24  reasonably happen.

25  Q      And if you look at Page 36 --

1  A      Yes?

2  Q      -- even in that -- that's the downside case?

3  A      Yes.

4  Q      The backup for that, correct?

5  A      Yes.

6  Q      And if you look at a line about a quarter of the way

7  down the page, there's a section that says, Total liquidity.

8  A      Yes.

9  Q      Do you see that?

10  A      I do.

11  Q      And does the total liquidity ever go negative, even in

12  the downside scenario that you presented to the investment

13  committee?

14  A      No, it doesn't.  But I would have focused actually on

15  the minimum end of month liquidity.  So, the whole point is,

16  you know, that was the -- the total liquidity at the end of

17  the year, that's nice to know, but I actually have to make

18  sure I have liquidity in each month.  So, I would have

19  pointed towards the minimum end of month liquidity as the

20  right number to look at to make sure we have adequate

21  liquidity.

22  Q      Did the minimum end of month liquidity ever go negative

23  in the worst downside that you presented to the investment

24  committee?

25  A      No, it did not.

1  Q     And did you believe, yourself, in that downside, that

2  that downside scenario was a reasonable worst case?

3  A     You know, at the time, I really did.  Obviously, in

4  hindsight, given how awful things went, you know, it's hard,

5  but at the time I really did.  You know, Willard Bishop was

6  telling me we should be plus five and we modeled minus five.

7       And that swing actually in the grocery world is a huge

8  swing.  And so we really did try to model it down.  And then

9  we actually said, Hey, we won't recover.  We'll continue to

10 do worse and worse in this scenario.  I mean, I think we felt

11 like that was a pretty punitive downside case and that's what

12 we modeled.

13 Q     I think you may have misspoke again on Willard Bishop.

14 Are you talking about --

15 A     I keep saying Willard Bishop.  I'm sorry, A.T. Kearney.

16 I apologize.

17 Q     That's okay.

18       If you'll turn with me in your binder to follow up on

19 that point to Defendant's Exhibit 79.

20 A     Yes.

21 Q     And I believe you -- well, what is this document?

22 A     This is the investment committee memo we presented in

23 November, so I think the middle one.

24 Q     And if you'll turn with me to Page 24 of Exhibit 79,

25 Mr. Caple, can you describe for me what you see on Page 24 of

1  Exhibit 79.

2  A    Yeah, so, 24 is a summary of four different cases:  the

3  A.T. Kearney downside case, middle case, and upside case, and

4  then what we did, which was our "worst case."

5  Q    And let's just focus on the downside case from A.T.

6  Kearney and then the worst case.  And, I'm sorry, who

7  prepared the worst case?

8  A    I believe Comvest prepared the worst case.

9  Q    And which case is worse between the A.T. Kearney

10  downside case and the worst case that Comvest presented to

11  its investment committee?

12  A    Our worst case -- the Comvest worst case was worse.

13  Q    Why provide a worse or further-down downside case than

14  A.T. Kearney's downside case in presenting to your investment

15  committee?

16  A    You know, my memory was that as we looked at 2015 --

17  and I think there were concerns from Bill and other operating

18  folks in the business -- the 2015 A.T. Kearney downside case

19  felt potentially right.  I think we actually pulled it down a

20  little bit more, but then they had a big hockey stick coming

21  back.  I think one of the things Bill said was, Wow, on my

22  downside case, I don't want to have a big hockey stick coming

23  back, and so we should really look at, you know, not having

24  that hockey stick.  So, that was the worst case that we

25  presented a little worse in 2015.  And then as opposed to a

1  hockey stick, actually a little bit of further deterioration,

2  to make sure that we were, you know, having a viable business

3  plan here.

4  Q    And just to be clear, by "hockey stick" you mean kind

5  of coming back up quickly?

6  A    Exactly.

7  Q    And if you'll turn back with me to DX133, and we were

8  on Page 25 there, this is the final downside case, again,

9  that you provided to the investment committee before they

10 approved the deal.

11 A    Yes.

12 Q    Was that downside case more likely A.T. Kearney

13 downside case from November or was it more like the Comvest

14 worst-case from November?

15 A    This was the Comvest worst-case from November.

16 Q    And what were your downside case assumption for same-

17 store sales growth or decline for the first year?

18 A    Negative 5 percent.

19 Q    And what were your same-store sales growth or decline

20 for years two through five, on the downside you presented to

21 the investment committee?

22 A    Yeah, it's another two and a half each year, another

23 two and a half negative each year.

24 Q    Thank you, sir.

25      So, if we could turn back to Page 2 --

1  A      Yep.

2  Q      -- I'm sorry, back to Page 5 in Exhibit 133.

3  A      Yes.

4  Q      And we were talking through the risks, and so we've now

5  kind of talked about that first risk --

6  A      Yep.

7  Q      -- could you describe for the Court the second risk and

8  what the reasons were you thought you had the ability to

9  combat that risk.

10  A      Yeah, so, this was the 18-store chain buying a 146-

11  store chain; just a big to-do.  One, we decided to build a

12  whole separate Opco South structure in the South, so

13  essentially build out a separate management team structure in

14  the South.  And we could do that because we had a cadence

15  where we'd first convert the northern stores, so we would

16  convert them from where we already had a team that could

17  execute that.

18       While we were doing that, we were also hiring people in

19  the South and bringing a team up to speed there.  We thought

20  that was a good way to go about this.

21       We also had really got -- brought -- we had really

22  brought in SuperValu at this point.  So, SuperValu at the

23  time was actually running all the IT systems and all the back

24  office accounting for all of these stores for Albertsons, for

25  all the Albertsons stores for Albertsons.

1       SuperValu is a huge company.  They have, you know,

2   thousands of employees and all sorts of resources.

3       We didn't.  We had 111 employees.  We're pretty proud

4   of them, but it was 111 people.  We brought in them to really

5   do a back office outsourcing.  So, they were going to do all

6   of our IT and all of our back office accounting for us, which

7   really helped us sort of scale quickly both, because they

8   could already do it and they could just bring the resources

9   of a large company.  You know, if there was a problem, they

10  could throw 10 people at it.  You know, we didn't have 10

11  additional people.  They did, and so that made us actually

12  significantly more comfortable between IT and back office

13  accounting.

14  Q    So, then turning to the third risk here, which is

15  uncertainty to how consumers will react to a new brand in the

16  market --

17  A    Yeah.

18  Q    -- can you describe what you meant by that and what the

19  potential mitigants were to that risk.

20  A    Yeah, and so, you know, obviously, the question is:

21  How good are we going to do at retaining and growing our

22  customer base as we move from Albertsons or Safeway to

23  Haggen?  That's really where we hired A.T. Kearney and they

24  dug in and they gave us -- you know, they did a whole ton of

25  work from soup to nuts and gave us, really, their best view,

1  which is actually, given, you know, all the investment we

2  were making and given what a good brand Haggen was, et

3  cetera, that they thought we actually would be up in the

4  first year.  And so, I think that was the biggest thing.

5       We also had things like a rolling (indiscernible),

6  which would hopefully help us, you know, adjust things as we

7  went through and, you know, we thought that the combination

8  of all that stuff gave us a pretty good chance for success,

9  here.

10 Q    Turning to the fourth risk that you list here, which is

11 the conversion of the stores, especially IT conversions, are

12 a daunting task; did you agree with that when you wrote it?

13 A    No doubt about it, yes.

14 Q    And what -- why was that task daunting to do all of the

15 store conversions?

16 A    Well, just bringing in, you know, 146 new stores onto

17 an IT system is a big to-do, particularly if you were going

18 to try to bring them on to the Haggen IT system.  You'd not

19 only have to bring them on, but then somebody would have to

20 essentially process all the back-end paperwork that system

21 creates.

22      Because we had SuperValu as our partner, they were

23 literally already doing 99 of the 146 stores.  So,

24 simplistically, conceptually what could have -- what should

25 have happened is, literally a store that was pointed towards

1  Albertsons, they could just almost point towards Haggen and

2  it was going to be all the same systems, all the same

3  everything, and so that made our whole process significantly

4  simpler.

5      We still had to convert the Safeway stores, but that

6  was only 40, 50 stores versus trying to do all 146.  So, we

7  felt like that made our whole conversion potential much

8  simpler.

9  Q    Now, did you believe that there were still risks, even

10  though you did have these mitigants?

11  A    I don't think there's any time you go through a major

12  operational transformation like this, there isn't risk.  Of

13  course there's risk, but we did our very best.  We spent an

14  awful lot of time and money and an awful lot of smart people,

15  you know, worked really hard to put together what we really

16  thought was a great plan and we were excited about.

17  Q    Now, when you say "we" there, who are you talking

18  about, the Comvest deal team?

19  A    No, I'm talking about the collective "we," so the

20  Comvest deal team, I think the Comvest investment committee,

21  I think the management team, I think our business partners at

22  Unified and SuperValu.  There was a lot of excitement about

23  this company and our potential and I think a lot of people

24  really bought into it.

25  Q    Did you hire some experts to help -- consultants to

1  help with the Albertsons acquisition, as well?

2  A    We hired a whole number of consultants and experts,

3  absolutely.

4  Q    Who were some that you can recall?

5  A    So, A.T. Kearney was a big one; they were the grocery

6  retail expert that really did the detail.  You saw the word

7  cloud, the net promoter scores and all of -- and then they

8  went out and, specifically, we asked them, Go look at all the

9  other brand conversions, what happened, what's the potential

10 to happen here -- they were a big help.

11      HFF was our real estate partner.  So, as I've said

12 multiple times, we're not real estate experts; HFF was.  They

13 went out, found us the sale leaseback partners and they were

14 actually helping find UBS as our lender for the remaining

15 real estate.

16      We brought in, later, a firm called Willard Bishop.

17 Willard Bishop -- you know, A.T. Kearney is a large

18 consulting firm -- all Willard Bishop does is grocery and

19 pricing is really one of their specialties.  We brought in

20 Willard Bishop to really help us make sure we got that

21 initial pricing right, and it was a real focus of ours.

22      We brought -- you know, we brought, obviously, Akerman

23 Senterfitt to help us structure all of this stuff legally.

24      We brought in Sage & Advisors [sic]; they acted as the

25 investment bank for us and helped us pull together the

1 broader transaction.

2      We knew this was a huge endeavor and we asked for a lot

3 of help.

4           MR. HOWELL:  Matt, you can take down 133 for now,

5 I think.

6 BY MR. HOWELL:

7 Q    Mr. Caple, who did you have to convince about the

8 viability of the operating company in order to get the

9 Albertsons acquisition across the finish line?

10 A    I had to convince an awful lot of people that this was

11 going to work, I mean, starting with myself and our deal

12 team.  So, first of all, the three of us that worked so hard

13 on this, we had to believe it, and we did.

14      The second piece was really the management team.  You

15 know, they mead to believe in it.  They needed to be excited

16 about it.  You know, that was probably as important as

17 everything else.  And everything we did here, it wasn't just

18 Comvest; we were working with, you know, a really great

19 management team that I really, really enjoyed working with.

20      We then had all of our different financing partners, so

21 you had PNC -- and they had about five syndicate banks that

22 were in that loan along with them -- we also had both, Gig

23 (ph) and Spirit (ph), who we had to convince the viability of

24 this -- of this transaction.

25      We had to convince the counterparties.  So, at the end

1    of the day, Cerberus had a huge -- a huge fee, a four-

2    hundred-million-dollar break fee if they didn't get this

3    thing done.  So, Cerberus and Albertsons really had to

4    believe us that we could get this thing done.  And to them,

5    that was a huge deal and so they were very, very focused on

6    this and could we get this done and was it the right set of

7    things.

8         We had -- we had to convince our business partners, so

9    SuperValu, eventually Unified Grocers, and, you know,

10   eventually, all the other vendors, frankly, that we had a

11   viable chain here.  But SuperValu was with us the full way.

12   They knew everything that we were doing and they were really

13   our partners hand-in-hand.  We had to convince them that we

14   could be successful.

15        Most importantly, finally, we had to convince the FTC

16   that we had to be successful.  I mean, this is literally

17   their job; they're supposed to make sure that we had a viable

18   business here.  And by the way, there's the FTC and the State

19   Attorney General, which do the same thing, but they had to

20   approve and agree on this, as well.

21        And so, there were an awful lot of folks that we had to

22   convince that we, you know, had a good plan here.

23   Q    You named a lot of people there, so I'm going to ask

24   you a few questions about a few of them.

25   A    Sure.

1 Q     One, you said you had to convince the management team.

2 First, can you tell me about -- what was the -- you said you

3 had to build out the team when you were going to go to

4 California.  Can you tell me how you landed on Mr. Shaner?

5 A     Yeah.  So, Bill was somebody that my partner, Tom

6 Clark, had actually known from a previous transaction.  He

7 had introduced me to him, knew I was interested in grocery.

8      We had actually looked at a couple of deals together

9 outside of this and so when this transaction came up, we had

10 already started working together.  I really liked Bill.  I

11 thought he had a really good skill set that matched John's.

12 Sort of -- you know, I thought they helped some of each

13 other's weaknesses and I was really excited to bring Bill

14 into this and have him be part of the team.

15 Q     And what was John Clougher's background in grocery?

16 A     Yeah, so John, at the time we started this, had really

17 only been our CEO for a couple of months, but John had grown

18 up really in the high-end grocery space in doing Whole Foods

19 and then Andronico's in the Bay Area.  You know, John

20 understood how to, you know, sell the story of an apple.  You

21 know, you're not just selling an apple at a price; you're

22 selling a story of how it was grown.  And, you know, he

23 understood that kind of in his bones and that's an important

24 part of, really, the type of chain Haggen is and he's really

25 done a great job for us already.

1    Q      Did anybody on the management team, to your

2    recollection, ever tell you that the business plan was

3    unreasonable?

4    A      No.

5    Q      Did anyone on the management team ever tell you that

6    sales projections were unreasonable?

7    A      No.

8    Q      Did anyone on the management team ever tell you that

9    the liquidity -- that they thought that the company was

10   undercapitalized at the time of the Albertsons acquisition?

11   A      No.

12   Q      Turning from the management team, you said you also had

13   to convince some of your financial counterparties.  What did

14   you do to convince Spirit or Gig or PNC about the viability

15   of the operational business?

16   A      Yeah, so we would have sent to all of them, you know,

17   probably more or less the full FTC deck -- we had various

18   versions of it -- but a deck similar to what we sent the FTC,

19   taking them through the whole situation and our plan of why

20   we thought it would work.  We would have shared with them,

21   our financial projections.  We probably would have shared

22   with them, the A.T. Kearney work that they had done.  So, we

23   shared with them a whole -- a whole, you know, series of

24   pieces of work that we'd done on why we thought we would be

25   successful here.

1  Q      Did you ever have conversations with PNC about the

2  business plan?

3  A      Sure.

4  Q      Did you have conversations with Spirit or Gig about the

5  business plan?

6  A      I didn't personally spend as much time with Spirit and

7  Gig, but I know members of my team did and that would have

8  been a big part of what we did.

9  Q      Did anyone from PNC ever tell you that they thought the

10 business plan was unreasonable?

11 A      No.

12 Q      Anyone from PNC ever tell you that the sales

13 projections were unreasonable?

14 A      No.

15 Q      Anyone from PNC ever tell you they thought the business

16 was undercapitalized at the time of the Albertsons

17 acquisition?

18 A      Absolutely not.

19 Q      Did you ever learn from Spirit that they thought that

20 the business projections were unreasonable?

21 A      Nope.

22 Q      Did you ever hear from Spirit that they thought the

23 business was undercapitalized at the time of the Albertsons

24 acquisition?

25 A      No.

1  Q      You also talked about Albertsons and Cerberus and how

2  they were really focused on the operational company.  What

3  did you do to help persuade them about the viability of the

4  operational company?

5  A      They literally reviewed the FTC decks that we did to

6  see what we were saying we were going to do and make sure

7  they -- they felt like we had a complete plan as well.

8          I also remember going up to New York and meeting with

9  Cerberus and making sure they felt like we were somebody that

10 could convince the FTC that we were going to be a successful

11 buyer.

12 Q      And did you -- did they have questions about the

13 business plan?

14 A      No -- did they have questions?  Sure -- they had

15 questions, yes.  They asked us sort of, you know, walk me

16 through it, that kind of stuff.  Did they, at the end of the

17 day, doubt it?  No, they didn't.

18 Q      Well, did anyone from Albertsons or Cerberus ever

19 suggest to you that the business projections were

20 unreasonable at any time, prior to the signing of the

21 Albertsons acquisition?

22 A      No.

23 Q      Prior to the signing of the Albertsons acquisition, did

24 anyone from Albertsons or Cerberus ever tell you that the

25 sales projections that A.T. Kearney had seemed unreasonable?

1  A      No.

2              THE COURT:  Mr. Morris, yes?

3              MR. MORRIS:  Your Honor, all of these questions

4  really are eliciting hearsay.  He's asking the witness to

5  testify as to what he was told by third parties who are not

6  here today.

7              MR. HOWELL:  Your Honor, first, it goes to his

8  state of mind and his intent.  This is an -- they brought a

9  fraud claim -- this is an intent case.  It's important to

10 understand what his state of mind was regarding different

11 operators understanding the business.

12             MR. MORRIS:  So, are they offering it for the

13 truth of the matter asserted or aren't they?  I mean, that's

14 really the critical point here.  All of these questions are

15 designed to elicit testimony from this witness about what

16 third parties said and they're not here and I can't cross-

17 examine them.

18 How am I supposed to take -- what am I supposed to do?

19             THE COURT:  Yes?

20             MR. HOWELL:  I'm asking him whether or not he ever

21 --

22             THE COURT:  Is this for his state of mind or is

23 this for the truth of the --

24             MR. HOWELL:  It's not for the truth of the matter

25 asserted by the other party, Your Honor.  I'm asking whether

1 he ever received any of this information from any of these

2 parties.

3          THE COURT:  All right.  I'll overrule the

4 objection on this one.

5 BY MR. HOWELL:

6 Q    You also talked about SuperValu and UG, some of your

7 partners.  What did you have to do to get them convinced

8 about the operational viability of the business?

9 A    Yeah, so they work slightly differently.  SuperValu was

10 engaged with us from the start.  They were our BPO partner in

11 helping us provide all of those capabilities, as well as they

12 were going to be our supplier in the North.  And so, you

13 know, they were involved from day one.  I would almost term

14 them, you know, a little bit more -- a member of the team,

15 someone of the management team, helping us develop the plan,

16 rather than, you know, just validating the plan.

17       Unified was a little bit different.  They actually

18 backed a different bidder in the bidding process, but they

19 were still going to be our supplier in the South, so they

20 were more similar to a third party who eventually received

21 all of our forecasts and we had to convince to be a supplier

22 and extend us credit.

23 Q    And did you have discussions with them about those

24 topics?

25 A    Yes.

1  Q     And did you ever hear from anybody at SuperValu or at

2  UG that they thought the business projections were

3  unreasonable?

4  A     Nope.

5        MR. MORRIS:  Same objection, Your Honor.

6        THE COURT:  Object?

7        MR. MORRIS:  Same objection.  How am I supposed to

8  test that?  I have no way to test this.

9        MR. HOWELL:  Your Honor, I'm asking whether he

10 ever heard that information.

11       MR. MORRIS:  Your Honor, with all due respect,

12 SuperValu's deposition was taken.  They could have asked

13 SuperValu these questions.  They could have offered these

14 questions to you in the form of deposition transcripts.  They

15 had the opportunity to ask SuperValu those questions.  They

16 actually had the opportunity to ask all of these people

17 questions.

18       MR. HOWELL:  Your Honor, again, this is an intent

19 case.  I'm asking about his state of mind at the time when

20 he's having these conversations and speaking to a bunch of

21 different parties where, ultimately, he's going to be making

22 decisions that they are saying, you know, he was making

23 fraudulently, based on undercapitalizing the business, et

24 cetera, and so I think this goes to his state of mind at the

25 time.

1    THE COURT:  All right.  I'll overrule the

2  objection on that basis.

3  BY MR. HOWELL:

4  Q    All right.  So, my question, Mr. Caple, was whether

5  anyone at SuperValu or Unified Grocers ever told you they

6  thought the business plan -- business projections were

7  unreasonable?

8  A    They did not, no.

9  Q    And did anyone at SuperValu or Unified Grocers ever

10  tell you that prior to the signing of the Albertsons

11  acquisition, that they thought the sales projections were

12  unreasonable?

13  A    No, they did not.

14  Q    Did anyone at SuperValu or Unified Grocers, prior to

15  the signing of the Albertsons acquisition, ever tell you they

16  thought the business was undercapitalized?

17  A    No.  Unified wouldn't have seen them at that point, so

18  my answers to all of those for SuperValu, really, prior to

19  the signing, would have seen all of those documents and

20  worked with us extensively.

21  Q    After Unified Grocers saw the documents did they ever

22  say to you that they thought the projections were

23  unreasonable?

24  A    No, they did not.

25  Q    Now, you also said you had to persuade the FTC of the

1  viability of the operating company, correct?

2  A    That's correct.

3  Q    So, if you'll turn with me to Exhibit 72.  Do you

4  recognize this document, Mr. Caple?

5  A    Yes.  This was the presentation we gave to the FTC.

6  Q    Were you personally involved in that effort to present

7  to the FTC?

8  A    Yes, absolutely.  I think I was actually the lead

9  presenter that day is my memory.

10  Q    Who else attended the FTC presentation on kind of the

11  Haggen/Comvest side of the -- for the presentation?

12  A    Yeah, so, I believe Mike Niegsch was there.  I know

13  that the full management team was there, so Bill, John,

14  Derek, et cetera.  I know that the SuperValu team was there

15  and then we had legal counsel there, as well.

16  Q    When did that presentation take place?

17  A    It was sometime in November.  I don't remember the

18  exact date.

19  Q    Was the meeting in person or telephonic?

20  A    It was in person.  We flew up to DC for the meeting.

21  Q    About how long did that meeting last?

22  A    Two or three hours is my memory.

23  Q    And describe what you can recall from that meeting with

24  the FTC?

25  A    I mean, I remember it as being a good engaged meeting.

1  They asked lots of questions.  They wanted to get to know

2  what we were doing and it was our second -- we had a previous

3  call with them.  So, we had our first call and then this was

4  our first kind of full-time meeting.

5  Q     And looking at DX72, were you involved in putting

6  together this presentation?

7  A     I was.

8  Q     Who else was involved in putting this together?

9  A     Gosh, this would have been the whole team, so our

10  Comvest team, the management team, SuperValu, our legal team,

11  A.T. Kearney would have been involved in putting together

12  elements of this deck.  You know, sort of the full team that

13  we used to pull this together.

14  Q     Did you have a chance --

15  A     Sage would have been involved, yeah.

16  Q     Sorry.  Did you have a chance to review the final

17  presentation before you took it to the FTC?

18  A     I did, yes.

19  Q     Let's turn to the second page of the document, which is

20  Page 1 of the presentation.

21  A     Yes.

22  Q     Now -- and this is called the "Executive Summary"; do

23  you see that?

24  A     Yes.

25  Q     In the middle bullet point, Haggen presents that

1  acquiring and integrating 147 stores is a large challenge

2  that requires the right infrastructure to be successful; do

3  you see that?

4  A     Absolutely.

5  Q     Now, it didn't end up being 147 stores, did it?

6  A     No, it ended up being 146.  The store list was

7  literally changing until a couple of days before the closing.

8  You know, there were one or two stores we couldn't get

9  consents on there were just -- you know, we all had to be a

10 little bit flexible, given the various issues here.

11 Q     Why did you believe that Haggen had the right

12 infrastructure to be successful in acquiring all of these

13 stores?

14 A     Yeah, and so I think these three things are the right

15 points.  One, we did have an existing banner.  Actually, some

16 of our competitors in this process were literally private

17 equity firms that were going to go in and convert to them --

18 I don't know what they were going to call them; a Joe's

19 Supermarket or whatever, right -- and if you think about the

20 sheer number of decisions it makes -- that's needed to be

21 made to have a banner, you know, what do the uniforms look

22 like?  What do the tags look like?  You know, there's a

23 million decisions.  Having an existing banner and a

24 successful banner that people really like and a successful

25 model was critical and we thought it was really important and

1   a huge advantage.

2        The second is, you know, we had SuperValu has our BPO

3   partner, and so we weren't just little old 111-person Haggen

4   trying to get this done.  We had this, you know, large -- the

5   largest grocery distributor in the U.S. behind us that was

6   saying, Hey, we're going to do everything we can to make

7   Haggen successful.  That was really important to us.

8        And then we were committing, you know, a big chunk of

9   money to making this thing happen.  So, it wasn't just that

10  we were going to, you know, do this on the cheap and, you

11  know -- we were really going to try to convert these into

12  Haggen Northwest Fresh stores and make them look great.  And

13  we had the money to do that and we were really excited about

14  that.

15  Q    You also wrote in the next bullet that the post-

16  acquisition entity will have limited debt and significant

17  operational flexibility.  What did you mean by that?

18  A    The only debt the operating entity was going to have on

19  it was the PNC/ABL debt, which is pretty typical for grocers.

20  And our forecasts at the time showed that it would have

21  really limited leverage and that leverage would get paid off

22  pretty quickly.  And, you know, that's what we believed.  We

23  really, you know, felt like we were capitalizing this thing

24  pretty conservatively.

25  Q    And what do you mean by capitalizing it conservatively?

1  A     Meaning we had enough liquidity; we weren't putting too

2  much debt on it.  We felt like we had actually an awful lot

3  of operational flexibility, if you look at any of the models.

4  Q     Well, Mr. Caple, let me just ask you:  Were you

5  intentionally undercapitalizing the Opco?

6  A     Absolutely not.

7  Q     Let's turn to the second page called "Why Haggen?"; do

8  you see that?

9  A     Sure.  I do.

10 Q     I want to go over the high-level bullets here.  If you

11 could please tell the Court about why you included the first

12 bullet, "Establish brand, store format, and support

13 capabilities."

14 A     Yeah, it's the thing we just talked about.  We had a

15 real brand here.  The Haggens have been selling groceries in

16 the Pacific Northwest for 80 years.  We literally have these

17 great pictures of the original Haggen store and, you know,

18 people like that.  They respond to it.  It's authentic in a

19 way that you can only be if you are really authentically

20 that.

21      We had really great net promoter scores.  People loved

22 the brand.  That was work we did for this specifically and,

23 you know, people were really excited about our brand and

24 loved what we were doing.

25      And then we'd actually had a fair amount of experience

1  actually converting those Top stores to Haggen, so it isn't

2  the first time we tried to do banner conversions.  And they

3  had gone really well for us so far, and, you know, we were

4  excited about that capability.

5       We'd learned what really works, what mattered, you

6  know, where we would get the return on your capital.

7  Q    Can we flip to the twelfth page of this FTC

8  presentation.  I think it's, I guess, DX13.

9            MR. HOWELL:  I apologize, Your Honor, because it's

10 one page off, so it's Page 12 in the presentation, Page 13 on

11 the exhibit.

12           THE COURT:  Yes.

13 BY MR. HOWELL:

14 Q    What does this page show?

15 A    So, this talks about net promoter scores.  And I don't

16 know if Your Honor has heard of these, but they're a basic

17 measure of people use in retail of, you know, how do your

18 customers feel about you?  You know, you ask them -- you

19 don't ask them how they feel; you ask them whether they would

20 recommend to a friend.

21      And then if you answer 8, 9, or 10 on a scale of 1 to

22 10, it's a plus.  If you answer 5 or lower, it's a minus, and

23 the score is the net of those two.  And it's a pretty common

24 metric that people sort of use in grocery and retail.

25 Q    And on this net promoter score, Mr. Caple, how did

1  Haggen Northwest Fresh do?

2  A     We were the best chain in the Northwest, so better than

3  all of our conventional competitors.  Better than Whole

4  Foods, which I was really pretty excited about and obviously

5  significantly better than Safeway and Albertsons.

6  Q     And so, why highlight this issue to the FTC?

7  A     Well, you know, as we thought about taking over these

8  stores and how we would perform in these stores, you know, we

9  had a set of customers that liked us an awful lot more than

10 their customers like them.  And so, we thought, Wow, if we

11 can bring our format to their location, we should really be

12 able to do well.  I mean, we're just doing a much better job

13 of pleasing our customers than they are and that seemed to --

14 you know, we thought that was a real plus and we were excited

15 about that.

16 Q     If you turn back now to the second page of the

17 presentation --

18 A     Yeah.

19 Q     -- DX72, Page 3, and now going to the second bullet,

20 you write, "Compelling business plan supported by weeks of

21 intense engagement by A.T. Kearney, a leading retail

22 consulting firm."

23       Do you see that?

24 A     Yes, I do.

25 Q     Did you believe that when you presented it to the FTC?

1  A      Yeah, I absolutely did.

2  Q      Okay.  So let me direct you to Page 50 in the FTC

3  presentation, which shows Comvest's pro forma -- excuse me --

4  Haggen's pro forma financial projections.

5  A      Yep.

6  Q      Is this the base case that was presented to the FTC?

7  A      It was, yes.

8  Q      Where did this base case come from?

9  A      This was primarily coming from A.T. Kearney.

10 Q      And describe the process to your understanding of what

11 A.T. Kearney did to come up with base case financial

12 projections for Haggen.

13 A      Yeah, they went through a really rigorous process.  So,

14 it started with understanding Haggen and our chain.  So, they

15 came up and spent a fair amount of time with us.  They did

16 all the customer work you've seen, the word cloud, the net

17 promoter scores and all those things.  They looked at the

18 stores we were acquiring.  We looked at, you know, are they

19 in higher-income areas or lower-income areas, you know, all

20 of those types of things.

21      And then very specifically I asked them to go out and

22 look at other conversion examples.  So, what happens when you

23 convert a grocery store?  And they did that and they went out

24 and really tried to understand kind of, what happens when you

25 try to convert a grocery store chain from one brand to

1  another?  They did a very detailed piece of work.

2  Q     And did you review their work?

3  A     I did, yes.

4  Q     And did you feel that their results were reasonable?

5  A     Absolutely, I did, yes.

6  Q     Did Haggen present a downside case to the FTC?

7  A     We did not.

8  Q     Why not?

9  A     Because they didn't ask for one.

10  Q     What did they ask for?

11  A     They asked for -- actually, I remember getting a whole

12  series of things they wanted in there; some of which seemed

13  to make sense to me, some of which, frankly, didn't.  But we

14  presented them what they wanted to see, so we tried to answer

15  their questions.

16  Q     On the next page, Page 51, you present that Haggen is

17  going to be conservatively capitalized following the

18  transaction.

19  A     Yes.

20  Q     And so, is that consistent -- did you write that for

21  the same reasons that you just discussed?

22  A     Yes.  And so we put our various, sort of financial

23  leverage metrics both, debt-to-EBITDA, as well as our EBITDA-

24  coverage ratios, to show them that the business was fairly

25  conservatively capitalized.

1  Q      Did the FTC ever ask questions during this

2  presentation?

3  A      Yes.

4  Q      Did the FTC ever suggest that the projections were

5  unreasonable?

6  A      No, they did not.

7  Q      Did the FTC ever suggest that the entity appeared to be

8  inadequately capitalized?

9  A      They did not.

10  Q      Did you offer to have the FTC speak to A.T. Kearney if

11  they wished?

12  A      Yes, absolutely.

13  Q      Let's go back to Page 2.

14  A      Yep.

15  Q      Now, to the third bullet point and why Haggen -- there,

16  it talks more about SuperValu.  Why did you specifically

17  highlight SuperValu in speaking with the FTC?

18  A      Yeah, once again, SuperValu -- once again, we weren't

19  111 people; we were the big -- you know, we had SuperValu as

20  our partner.  We thought that was a really important and

21  compelling, you know, kind of part of our presentation.

22  Q      And in the fourth bullet point, you highlight the

23  management team.  Why highlight the management team to the

24  FTC?

25  A      You know, we had a management team that had had a lot

1   of success here and we were -- I was proud of them.  I -- you

2   know, they're very, very good people.  Many of them had long

3   careers in grocery and successful careers and we thought that

4   it was pretty compelling that we didn't just have -- I

5   remember some of the other bidders maybe having a potential

6   CEO or something like that.  We had a 111-person team; I

7   mean, that's just really different than having a couple

8   senior executives, and so I wanted to highlight that to the

9   FTC that we're bringing -- in addition to SuperValu, we do

10  have a 110-people team that we're really proud of and had

11  some really strong professionals.

12  Q    Let's turn to Page 9 of the presentation.  This is

13  entitled "Merchandise Mix."  Mr. Caple, what is merchandise

14  mix?

15  A    Merchandise mix is what's your percentage of mixes of

16  different types of products, so meat versus, you know,

17  Cheerios.  So, it's just the mix of what you're selling at

18  the end of the day.

19  Q    What was your understanding of what impact, if any,

20  having a similar merchandise mix to Albertsons would have on

21  Haggen's business projections?

22  A    Yeah, so A.T. Kearney did a pretty detailed analysis to

23  make this actually as apples-to-apples as they could, because

24  it seems simple, but it's really complex behind here.  And

25  their view was the fact that we actually had a pretty

1  consistent merchandise mix and said that, Hey, the people

2  that are coming to the tsunami stores, they're coming for the

3  same types of products we sell, you know, we should have a

4  good chance of selling to them, as well.

5  Q    And just to be clear, what do you mean by the "tsunami

6  stores"?

7  A    I'm sorry.  Those are the stores that we acquired;

8  tsunami was sort of our project name.

9  Q    Now, let's turn to Page 14.  Now, what is depicted on

10  that page?

11  A    So, this is word cloud analysis that we do.  And so,

12  you ask the customers of different chains, you know, what

13  best describes why you would shop at that store for

14  groceries?  And you know, as you can see, about Albertsons

15  and Haggen, it's all about convenience, location, and price

16  and sales, which is another version of price, right?  And so,

17  those words are clearly sort of what it's all about.

18        Haggen, I mean, you see some of the same words, as

19  well, but you see quality, local -- I love that word -- you

20  know, produce, fresh, bakery, variety.  You're seeing a --

21  you know, in addition to also convenience and these other

22  things, you know, you're seeing a different word cloud that

23  we're pretty excited about.

24  Q    And so, what do these word clouds tell you about the

25  kind of investment thesis in taking over these stores?

1  A      So, this actually became a big junk of our thesis.  We

2  said, Well, we're not moving them, so the stores are going to

3  be where they are, so I should do just as well in convenience

4  and location.

5        The plan, clearly, was to start with the prices that

6  Albertsons and Safeway already had.  So, the idea was, day

7  one, when you go in there, Oh, you know, three bucks for a

8  12-pack of Diet Coke.  Oh, it's still three bucks -- that's

9  great -- you know, nothing's changed and yet I have all this

10 cool new stuff.

11       So, the idea was to really show to people, Hey, you're

12 going to come in, you're going to like what you liked about

13 the old Albertsons and Safeway, but there's lots more new to

14 like.  And that's why we really were hoping that we could

15 grow sales and attract new customers to -- to our chain.

16 Q     If you flip to the next page, Page 15, why did you

17 include this page in the presentation to the FTC?

18 A      And once again, pricing is critical, and so, you know,

19 one of the questions the FTC might have had is, Hey, you

20 know, is Haggen just really a high-price chain and customers

21 are going to go in there and really hate it.  And this was

22 actually an analysis of how Haggen is priced versus both,

23 Albertsons and Safeway in its local markets, as well as in

24 California for Albertsons, you can see pricing is pretty

25 similar.  In grocery, because there are so many SKUs, it's

1  hard to price-compare.  Generally, plus or minus 3 to 4

2  percent is imperceptible.  So, customers really shouldn't

3  have perceived a big price difference, based upon these kind

4  of actual prices.

5  Q    Let's turn to Page 23, which is called the "Hiring

6  timeline."  Why did you include this slide in the

7  presentation to the FTC?

8  A    Despite the fact that we had a ton of help from

9  SuperValu, we needed to build out a full Opco South.  We

10  believe, and, you know, we're a local grocer and, you know,

11  it wasn't going to be good enough to sell local Washington in

12  California.  We needed local California, so we wanted to

13  build out a full merchandising team, a full operations team

14  down there.

15      The idea was once you get started with the conversions

16  in the North, that would then give us a couple of months to

17  build out the team and then by the time we got to the South,

18  we would have had a team built out.  And we actually

19  attracted a bunch of people from Albertsons and Safeway, so

20  we were able to actually steal a number of their best people

21  and I think that speaks to the fact that they were excited

22  about what we were doing, as well.

23  Q    On Page 30, you know a large group of vendors that

24  Haggen had relationships with; do you see that?

25  A    Yes.

1  Q    And were these vendors work with Haggen before the

2  Albertsons acquisition?

3  A    They were.

4  Q    Were you aware of any of these vendors ever telling you

5  they had concerns that Haggen, Inc. didn't have real estate

6  assets?

7  A    No.

8  Q    I'd like to turn to Slide 32, conversion costs.  You

9  write that Haggen had developed an extensive plan to convert

10 stores to Northwest Fresh and California Fresh, including a

11 capital commitment of 105 million; do you see that?

12 A    Yes.

13 Q    Why did you plan to put $105 million into the new

14 stores?

15 A    You know, we really wanted to make these into Haggens.

16 And a Haggen doesn't look like an Albertsons does; it just

17 doesn't.  We wanted to make them look like Haggens.  We could

18 have converted just the banner for, I don't know, 10 million

19 bucks total, I mean, literally just the banner conversion and

20 the signage; that's not very expensive to convert.

21     We were doing full conversions here.  We were painting

22 things.  We're putting in new furniture and fixtures.  We

23 were really updating the store, modernizing it, making these

24 stores really look great.  And so, you know, that was the

25 idea and that was the business plan from the start is not

1  just to slap-dash something, but to really do a great job in

2  converting these stores.

3  Q     And would you describe the conversions that you were

4  doing as renovations?

5  A     Yes.

6  Q     How much of this $105 million in costs was going

7  towards improving the store versus just paying for Haggen to

8  get up to speed to run the converted stores?

9  A     Yeah, the IT conversion costs, I would have said, were

10 mostly getting up to speed.  Marketing costs, you know, were

11 probably new expenditures to get folks excited, but almost

12 all -- the vast majority of the construction costs, about $60

13 million, were really to improve the stores.

14 Q     Can you give some examples of some of the things that

15 you did that would go into those conversion costs?

16 A     Yeah, so, it was things like -- I mean, there's the --

17 you saw the video.  The video, I thought, did a great job of

18 it.  So, it's simple stuff like changing all the banners, but

19 then it's painting them, giving them those colors.  I don't

20 know if you can see in the background, we have all of these

21 really cool colorful murals that we put in the back that

22 really give the store a little bit of a different feel.

23       We bring in a lot of wood endcaps to give the store,

24 you know, a little bit more of that natural feel.  We talked

25 a little bit about in the produce section, bringing in the

1  wood pallets and stacking stuff on those.

2      So, it was all those things.  You know, we were fixing

3  up the front-end -- whatever needed to be done.  And it was a

4  store-by-store plan, so this wasn't every store at seven

5  fifty and every store we do X.  Every store we went to had

6  literally a different plan as to exactly where we wanted to

7  redo the floors and the ceilings and everything we would do.

8  Q    And if you flip to the next page, 33, what does that

9  depict?

10 A    So, this is -- I think this is the sort of average

11 construction costs by store.  And so, you get to sort of that

12 five oh six.  So, we averaged in sort of what an average one

13 would cost, but then every single one was done differently,

14 so, there's Scheme 1, Scheme 2.  There were a bunch of

15 different ways we would do this, just depending on the store

16 and what it needed and what we could bring to bear.

17 Q    Were there any additions that were considered major

18 store revisions?

19 A    You know, I I think when you went into these stores,

20 you saw a big change, and so I would say they were pretty big

21 changes.  Were they full new stores in the way, you know, you

22 talk about a six-million-dollar remodel?  No.  But there were

23 big changes.  These stores felt very, very different, I

24 think, when you went into them.

25 Q    Well, Mr. Caple, did you ever go to any of the stores

1  that got converted?

2  A    I probably went to 30 or 40 of the stores personally.

3  Q    Well, how many did you go to before they were

4  converted?

5  A    I had been to not every Haggen store, because we had

6  one way far away, but almost all of the Haggen stores and

7  then I probably went to also about 30 or 40 of the stores we

8  were looking at acquiring.

9  Q    Why did you visit so many stores?

10  A    I mean, I think in grocery, it's critical to touch it

11  and feel it and walk stores.  It's just the basic diligence

12  you do when you're doing a grocery deal.  It's probably the

13  most important part of diligence in some way, is personally

14  seeing it.

15  Q    Who, if anyone, visited the other stores?

16  A    Well, John Clougher and Bill Shaner would have visited

17  every single store personally, but then their team members

18  would have made multiple visits and put in place, you know,

19  sort of complete plans.  I mean, this wasn't just a slap-dash

20  same everywhere; it was a store-by-store every single place.

21  Q    All right.  We'll come back to the conversions in a

22  moment, but I want to stay on this presentation.  Can you

23  flip to Page 38.

24  A    Sure.

25  Q    What does this depict on Page 38?

1  A      So, this was the store conversion to (indiscernible).

2  We called this the cadence.  So, how are we going to buy

3  these stores, in what weeks, and how are we going to do it?

4  Q      What factors did you take into account when creating

5  the cadence?

6  A      It was a variety of things.  One, we wanted to start in

7  the North to really -- where we had more people that could

8  really help out.  I remember wanting to start with

9  Albertsons, rather than Safeways, because that IT conversion

10 at Albertsons was a little easier.  So, we wanted to start

11 with those and get to the Safeways a little labor -- later.

12      And then I also remember broadly wanting to start with

13 the sale leaseback stores earlier in the cadence just to make

14 sure we got that money in and didn't have any weird cash flow

15 problems sort of during the whole conversion process.

16 Q      Were there logistical benefits to doing certain

17 geographical areas at the same time?

18 A      Yeah, you wanted to cluster them and then, you know,

19 say, Hey, Haggen is coming to your town and seeing a bunch

20 and then obviously having the conversion crews reasonably

21 near each other.  You know, it isn't like they do 10 at once.

22 You were doing three for two days and then three for two days

23 and then three for two days.  So, having them near each other

24 just made it easier.

25 Q      Let's turn to Page 35 of the presentation.

1  A      Sure.

2  Q      It's called the "Real estate strategy" page; do you see

3  that?

4  A      Yes.

5  Q      The first bullet says that you will focus on core

6  competency:  selling groceries.  What were you trying to get

7  across at that point?

8  A      We wanted to buy operating assets and sell groceries.

9  That's what we're good at.  That's what Haggen does.  We're

10 not a real estate investor; we want to sell groceries.

11 Q      In the next bullet, you say that you expect to

12 opportunistically expect to sell underlying real estate over

13 time.  What were you trying to get across there?

14 A      That we were going to sell the real estate and have the

15 operating assets standalone.

16 Q      And why did you consider that a flexible approach to

17 ensure underlying business cash flows remain strong?

18 A      Well, the important thing was to not just sell off the

19 real estate right away and limit all flexibility.  Because,

20 when you had the really well performing stores, you know, it

21 was fine to sign up to a 20-year lease with those, but if you

22 had a store that wasn't doing so well, you wanted to have a

23 little bit more flexibility with how you would deal with it.

24 So, we were -- we wanted to then, over time, sell off those

25 stores, as well.

1  Q     Now, turning to the third bullet, As we grow, we expect

2  to partner with developers who are focused on owning the real

3  estate while we focus on selling groceries.  I apologize, I

4  think you kind of answered that on the last point.

5       On the fourth bullet, Negotiate long-term market-based

6  leases with options to provide operating flexibility.  Why

7  did you include that?

8  A     I mean, we thought it was important to only sign up,

9  you know, big, long, you know, 20-year sale leaseback leases

10 in places that were really strong stores.  And in stores that

11 weren't nearly as strong, we wanted to make sure we had

12 whatever operating flexibility we needed to in those stores,

13 where we had the ability to have that flexibility.

14 Q     On the next page are some key (indiscernible)

15 mitigants, but we've been over that a few times, Mr. Caple,

16 so I'll spare everyone.

17      Is there anywhere in this presentation that you have in

18 front of you where you disclosed to the FTC that there would

19 be an Opco and PropCo structure here?

20 A     Yeah, absolutely.  There's a full set of financials in

21 the back here.

22 Q     Starting on which page?

23 A     Let me find it.  Excuse me.

24      The financials start on Page 58, Your Honor.

25 Q     I think that's 58 of the presentation, but -- 57 of the

1  presentation, but 58 of the document.

2  A     Yeah.  But, as you can see, there's a full income

3  statement, balance sheet, cash flow, and then availability

4  and credit statistics.  And we provided it for both, Opco and

5  PropCo.  I think we were very open with the FTC that we were

6  going to have an Opco/PropCo structure.  We were open with

7  everyone, I mean, everyone that was involved in doing this

8  transaction with us, from lenders to real estate partners to

9  SuperValu to -- you know, all these folks all the same basic

10 model of an Opco/PropCo structure.

11 Q     Was there rent expense included for the Opco in the

12 financials presented?

13 A     Yeah, absolutely.  They weren't going to own the real

14 estates; they needed to pay rent to the real estate owners.

15 Q     Now, I think we're done with specific slides on this

16 presentation, Mr. Caple, but did the FTC express any concerns

17 about any particular aspects of the presentation or the plan?

18 A     Yes.  I would say the biggest thing they expressed

19 concern with was some of the stores we were buying in this

20 iteration -- actually, when you look at the portfolio, it was

21 performing pretty well, and so we were actually -- you know,

22 any grocery portfolio has its winners and it has its "not so

23 good" ones; it's just the way life is.

24       The list of stores they were selling, I said, would

25 have felt to me fairly balanced originally.  It had very few

1  EBITDA negatives and, you know, some that weren't great, but

2  weren't bad.  The FTC was very, very concerned about a couple

3  of -- about underperforming stores.  They wanted to make sure

4  that we were buying only quality stores.

5       And so, at the end, they went back and essentially

6  forced Albertsons to -- Albertsons and Safeway to switch out

7  a number of stores -- I don't remember the exact number, but

8  10, 15 stores -- and give us actually better-performing

9  stores.

10 Q    Well, I guess maybe on Page 62 of Exhibit 72 there,

11 you've provided a list there that's called "Unprofitable

12 stores"; do you see that?

13 A    Yes.

14 Q    Was this all of the negative EBITDA stores out of the

15 147 at the time you were considering?

16 A    It was.

17 Q    Now, how did you address the concerns that the FTC

18 raised?  You said, ultimately, they talked to Albertsons and

19 some had to come in and some had to go out.  Did you have

20 further conversations with them about underperforming stores?

21 A    Yes, they asked us another set of questions, because we

22 actually did a follow-up presentation at one point on this

23 and eventually they came back and told Albertsons that they

24 wanted them to sell a different set of stores and those

25 stores were better performers, and so that seemed reasonable

1  to us.

2  Q    And so, ultimately, you provided more than one

3  presentation deck to the FTC?

4  A    We provided an initial presentation deck.  This was

5  really our formal presentation and then I would have

6  described the third one as a kind of follow-up answers to

7  some questions, so it wasn't complete in the way this was.

8  Q    And that was focused on the underperforming stores?

9  A    My memory is that was their big question.  I forget if

10 they had another couple questions, but that was the real

11 focus.

12 Q    Now, did the FTC approve the transaction on the spot?

13 A    No, they did a fair amount of work.  I remember they

14 had a series of economists from the FTC that looked at our

15 presentation and they did not approve it on the spot by any

16 means.

17 Q    Did they ultimately approve the transaction?

18 A    Ultimately, they did, yes.

19 Q    I believe you said that Comvest had to persuade the

20 State Attorney Generals, as well as the FTC?

21 A    That's right, so the five State Attorney Generals that

22 had to similarly approve the transaction.

23 Q    And how were they involved in the process?

24 A    They were not as involved, so they got full copies of

25 our decks.  They called into the meeting, I remember, and

1  then I think we had one or two follow-up conversations with

2  them on specific issues, but I wouldn't have described them

3  as involved as the FTC was.

4  Q    All right.  I'd like to talk for a moment more about

5  the store conversions --

6         (Participants confer)

7              MR. HOWELL:  Your Honor, I am at a changing point

8  in topic --

9              THE COURT:  Oh, okay.

10             MR. HOWELL:  -- and if this might be a good spot

11  for a quick break.

12             THE COURT:  Okay.  Let's take 10 minutes.

13             Stand in recess.

14        (Recess taken at 3:48 p.m.)

15        (Proceedings resumed at 3:59 p.m.)

16             THE COURT:  Thank you, all.  You may be seated.

17             Mr. Howell.

18             MR. HOWELL:  Thank you, Your Honor.

19                        CROSS EXAMINATION

20  BY MR. HOWELL:

21  Q    Mr. Caple, I'd like to go back and talk for a moment --

22  actually go forward to talk about store conversions a little

23  bit more.  How many total stores were converted?

24  A    One hundred forty-six stores.

25  Q    What concerns, if any, did you have about implementing

1  the conversions for the Albertsons acquisition when you began

2  the process?

3  A      The FTC was really mandating we do these conversions in

4  a fairly short timeframe, so a 150-days was their mandate.

5  And we wanted to make sure we had enough time to really go

6  in, do the right thing, touch these stores in the right way

7  to make sure we had a plan to get all that done.  A 146-

8  stores we have a lot to do.

9  Q      And how do you think the conversions went overall?

10  A      I actually think the physical conversions did fairly

11  well and I think the customer feedback we received was

12  actually pretty good when you took it sort of right away in

13  those stores.

14  Q      What lessons, if any, did you apply from your history

15  in converting TOP stores to Haggens when you converted

16  Albertsons and Safeways into Haggens?

17  A      Yeah, and so we'd already converted five or six stores

18  and done them a variety of different ways.  We started to see

19  where the real return on capital was.

20        And the real return on capital was all about the look

21  and the feel about the store.  It was about painting.  It was

22  about those murals.  It was about the wood stations.  It was

23  about all those types of things seemed to make a big

24  difference.

25        What didn't seem to make a big difference was moving

1  departments around.  So, as an example, in some of the

2  original conversions we actually took the opportunity to move

3  the pharmacy from the back of the store to the front of the

4  store.  It gives it a better flow and some folks found like

5  that was important.  That didn't seem to have any impact at

6  all.

7        On the other hand, putting produce on wooden pallets,

8  which may not strike you as the most important thing, we were

9  comping up like 20, 25 percent of the produce department.

10        So, we learned sort of what worked and where we could

11  spend our money sort of well and have the biggest impact for

12  the right expenditures.

13  Q    Now, one of the questions that Judge Gross has asked in

14  this case is why did the OpCos fail so fast?  And, Mr. Caple,

15  what is your best answer to that?

16  A    You know my best answer is a whole bunch of things

17  happened.  And then we really entered kind of a death spiral

18  where everything that would go wrong would create another

19  thing that would go wrong and just -- we couldn't get out of

20  it.  And, so, as we tried to deal with every individual

21  element we were seeing -- every time we responded, we just

22  made it worse.  And we entered this kind of death spiral,

23  which we couldn't get out of.

24  Q    You said a lot of different things went wrong.  What

25  are some of the things you can recall that were kind of part

1  of that negative spiral?

2  A    Well, the first thing we have is our pricing issues.

3  So, the concept from original -- the original concept was

4  let's just keeping pricing the same, which seemed pretty

5  simple and like, you know, that should work.

6     We hired Willard Bishop to help us with this because we

7  knew pricing was so important.  One of the piece of feedback,

8  I think, we got from A.T. Kearney I think they were trying to

9  sell more work, but it was, hey, we need help in our pricing

10 area, so we actually brought in Willard Bishop to really

11 bring in some experts on that.

12 Q    So -- I'm sorry.  But what was the pricing strategy

13 going from Albertsons to Haggen?

14 A    So the pricing strategy was to keep Albertsons' pricing

15 the same to begin with.  And then overtime, we would adjust

16 prices to get the pricings from what we thought was "the

17 right place."

18    But to start with the exact same prices Albertsons has

19 so when someone comes in, they say, wow, it's priced the

20 same.

21 Q    And what was it that Willard Bishop, as a pricing

22 consultant, what would you expect them to do?

23 A    I would expect them to have gone in and figured that

24 out; figured out what base pricing and temporary price

25 reductions, such that the whole pricing package would be, you

1  know, ideally literally the exact same that it was the day

2  before it closed in the Albertsons.

3  Q    And what problems arose?  Well, actually I think --

4         MR. HOWELL:  Matt, could you pull up I think it

5  was PX11 that Mr. Morris went through with you during the --

6  and it was 11.03.

7  BY MR. HOWELL:

8  Q    And this was, I believe, if you recall, this was Mr.

9  Shaner's CEO memo to you where he had a big page describing

10 what was going well and then probably even a bigger page

11 describing what was not working well.

12 A    Yep.

13 Q    You recall that?  And could you read the third

14 paragraph?

15 A    Yeah.

16         "Easily the most difficult challenge we've faced

17         and certainly a very long tribute to our sale

18         challenges has been pricing.  Soon after opening

19         our first store in La Costa Carlsbad, we identified

20         a pricing which resulted in thousands of products

21         being priced higher than intended.  We had hired

22         Willard Bishop Group to assist in developing and

23         executing our pricing strategy and it quickly

24         became obvious they were ineffective.  In addition,

25         the PM2 pricing system we obtained to arrange with

1           Super Value has proven to be extraordinarily

2           complex and clunky exacerbating our efforts to get

3           our pricing decs corrected to align with our

4           desired market position.  Support from Albertsons,

5           Super Value and Albertsons LLC has been sporadic.

6           This lack of support along with systems obstacles

7           and complexities has forced the Pacific North

8           Southwest to hire ten pricing analysts to manage

9           and maintain pricing versus the five we originally

10          forecasted."

11  Q    Now with respect to the various issues that Mr. Shaner

12  raised related to pricing, were those consistent with issues

13  you were hearing from Mr. Clougher about pricing?

14  A    Yes.

15  Q    And were those consistent with your understanding of

16  what the main kind of pricing issues were here?

17  A    Yes.  And this was the issue we had, products on our

18  shelves priced way too high.  And my understanding is a big

19  chunk of it was these temporary price reductions.

20  Q    Can you describe what a temporary price reduction is?

21  A    So, you know, a bottle of Tide is six bucks and they

22  give you $2 off.  And so it's on the shelf for four bucks.

23  What we found what Albertsons was doing is they had some

24  bottles of Tide on a temporary price reduction more or less

25  permanently.  And so nobody had ever bought a bottle of Tide

1  at six bucks, it had either been, you know, 4 or 4.50 or

2  whatever it had been, but it's almost always on sale.  And we

3  missed some of those TPRs and all of a sudden we had Tide for

4  six bucks, the folks who were used to paying $4 for, they

5  said wow, Haggen is overpriced.

6  Q    How important is pricing perception in the grocery

7  industry?

8  A    Pricing perception is very important in grocery.

9  Q    How easy is it to correct a pricing perception problem

10 once you've got one?

11 A    It can be very difficult because as I said there are so

12 many skews in a grocery store, it's actually hard for people

13 to price shop really.  And so fixing, you know, once they get

14 the sense that you're high priced, fixing it even if you're

15 low priced can be very, very challenging.

16          MR. HOWELL:  Thanks, Matt.  You can take that

17 down.

18 BY MR. HOWELL:

19 Q    So you talked about pricing.  What other problems did

20 you face that kind of aided or added to that negative spiral?

21 A    We then had real supply chain problems.  So, gosh, if

22 there's one thing you'd think SuperValu could do, you'd think

23 it would be deliver groceries to us.  And yet, we were having

24 huge out of stock problems particularly in the Pacific

25 Northwest.

1    And so, you know, we were seeing, we talked about it

2    earlier, but big holes on our shelves, we were seeing, you

3    know, literally 20, 25 percent of our daily orders not going

4    coming filled.  That creates holes in the shelves.  That's a

5    big issue, you know, people come in, they want to buy

6    Cheerios, you don't have any Cheerios.  It's a real problem.

7    Q    With respect to the pricing and the supply issues, what

8    did you do to try to address those?

9    A    We did everything we could with SuperValu and our

10   various other partners to get them fixed.  This comes to

11   where the systems came in.  You know, the good news is we

12   were able to use an existing system that really worked and we

13   knew was working in those stores.  The bad news is we did

14   know the system was clunky.  We did know it wasn't the

15   easiest to work with.  But when we got in this crisis mode

16   that's where it really mattered because ten days to change a

17   price when that price is really wrong, you drive away

18   customers.  It doesn't sound like much, but that's a long

19   time.  Almost every customer is going come back to your store

20   in that ten days and you still have that bad price out there.

21   Multiply by thousands of items and that's the kind of issues

22   we were facing.  We kept finding them too, and couldn't

23   correct them as quickly as we wanted.  So, you know, it kind

24   of built on itself and created a real issue.

25   Q    Were you surprised by these pricing issues?

1  A      I was.  I mean, gosh, and maybe we were all naïve, but

2  we said, we're just going to price the exact same way they

3  did and we're going to hire one of the best pricing

4  consultants in the industry to make sure we get this right.

5  And so we understood how important it was and we invested

6  real resources in making sure we got it right.  And it was

7  just a huge miss.  And we missed it in the Northwest, and

8  then we tried to fix it in the Southwest, we couldn't get it

9  right there either.  It was just really, really frustrating.

10 Q      Any other issues that you can think of that kind of led

11 to this negative spiral that was occurring?

12 A      Yeah.  The next issue is then competition.  So

13 obviously we expected competition.  You always have

14 competition in the grocery industry.

15        But we later learned, you know, kind of two things.

16        One, Albertsons had essentially taken our conversion

17 schedule, which we thought was proprietary and a secret, and

18 literally handed it to their marketing department and said,

19 hey, create, you know, a set of coupons to go bang away every

20 time they go convert a store.  And we only saw that when in

21 the very middle of the conversion schedule we took a whole

22 set of stores in Santa Barbara and we moved them back a week.

23 And Albertsons complained like you wouldn't believe.  I mean

24 just had a fit about what seemed to us to be a minor thing.

25 And then all of a sudden we were getting reports in the Santa

1  Barbara area that they're getting bombed with coupons.  And

2  so you could tell that they used our schedule against us.

3       We then had this real issue in the Northwest which was

4  that all of the results were negative and there's no doubt

5  about that.  After the initial opening bump, you know, all of

6  the stores were negative.  But particularly the Pacific

7  Northwest Albertsons stores weren't very negative.  I mean

8  they were down mid-single digits, but given the pricing and

9  some of the other issues, you know, felt recoverable, felt

10 like something if we got back in there we could do.  But the

11 Safeway stores were way down, like down 50 percent.  I've

12 never seen it in grocery in all of the time I've been working

13 in this industry.  Down 50 percent, we saw the Safeway

14 stores.  And we couldn't figure out what it was.

15       If you thought about the customer, Safeway is a

16 little bit higher end actually than Albertsons.  You know,

17 you would have thought the Safeway customers more of a

18 natural Haggen customer.  And I think the more I thought

19 about it, what we found is that, you know, the one thing

20 Safeway had was their Just For You program where they have,

21 when you're a Safeway customer, once a week, you get a set of

22 offers just for you.  And some of it makes sense.  You know,

23 if you're a Diet Coke shopper and Diet Coke is going to

24 otherwise be on sale, they put that at the top and highlight

25 that.  That's good.  They can also send very specific offers

1  just for you.

2      And, you know, what we found was some of our shoppers

3  started to get really, really compelling offers just for

4  them.  And, you know, maybe they just used the lost shopper

5  program, when folks stop shopping with them they coupon the

6  heck out of them.  But they were literally going directly

7  after just our customers.  And I think, you know, that's my

8  best hypothesis as to why the Safeway so far underperformed

9  the Albertsons.  It is a hypothesis, I can't prove it, but

10  that was the one thing I could sort of come up with, you

11  know, as I've had the last year to think about it.

12  Q    So I want to talk now about after the conversions

13  begin, okay, and put yourself back in that space and tell me

14  kind of how you were feeling as you started embarking on

15  these conversions.  What was the feel like for the Comvest

16  team and the Haggen management team then?

17  A    You know, the first couple we were really excited about

18  it.  I remember flying out to the Pacific Northwest.  John

19  gets made at me, but I made, I never called them before I was

20  going to come, so I literally would just like show up in a

21  store and then he didn't have a chance to kind of get it

22  ready for me which I was like -- so I literally just showed

23  up at the second conversion, no one knew I was going to show

24  up.  And it looked great.  I mean it really, wow, this looks

25  like a Haggen, this doesn't look like the Albertsons it used

1  to be.  I remember one of our team members literally coming

2  up to me and saying, gee John, thank you.  We're just so

3  excited about this, this is really going to be great, you

4  know, thank you.

5              MR. MORRIS:  Your Honor, I move to strike.  I

6  don't know who these people are.  They're not even

7  identified.  This is really, there's so much testimony here

8  that's coming in as hearsay.  I'm trying to be patient.  I've

9  objected a few times, but I haven't --

10             THE COURT:  I'll sustain that objection and strike

11 that testimony.

12             MR. MORRIS:  Thank you.

13 BY MR. HOWELL:

14 Q    So how were you, so how were you tracking the sales

15 once you started opening these, you started doing these

16 conversions?

17 A    We were literally tracking them on a daily basis, store

18 by store.

19 Q    And what did you see right at the beginning when you

20 started getting the very first results?

21 A    So the stores all, excuse me, the stores all tracked up

22 to begin with, so you know you do a new Haggen opening,

23 everyone wants to come see it, it's all tracked up a little

24 to begin with.  In the Pacific Northwest, what we saw in the

25 Albertsons stores, is after tracking it up, they were going

1   down a little bit, but it was sort of mid-single digits.  And

2   what I was hearing from John is all these supply problems and

3   all these pricing problems and, you know, it felt like the

4   results were, you know, indicative of the problems we're

5   having and, you know, they felt fixable, let's just say, that

6   if we can get in there and get this thing right, hopefully

7   could get it back on the right track.

8   Q     And so let's focus on like the first month or so of

9   conversions.  Where were those conversions taking place?

10  A     They were in the Pacific Northwest and they were all

11  Albertsons, so we started with Albertsons.

12  Q     And in the first month, did you see any Safeways come

13  in?

14  A     Maybe at the end of the first month.  But we pushed

15  those back and then eventually we saw some Safeways come in.

16  Q     And what did you see when the Safeways started to

17  convert?

18  A     Significantly worse results.  I mean the Safeways were

19  as I said down, you know, after the initial bump once again,

20  I mean down I mean 20, 30, 40, 50, it was just, wow.  I had

21  never seen that before.  And I know that it was all we could

22  talk about -- what the heck is happening with the Safeways?

23  A couple of them had fuel centers with them so we didn't know

24  whether the accounting just screwed up like, you know, are

25  they just not accounting for it right, or like I mean what

1  could be happening here, because we just, we couldn't figure

2  it out.

3  Q     So setting aside those Safeways where you were having

4  these huge down sales, what were you trying to do to fix the

5  lower than expected sales at the other places?

6  A     I was trying to fix our pricing and supply chain

7  problems where I said we were most focused on.  You know, we

8  started, you know, that would have been really where we

9  focused on the Albertsons side.

10 Q     And now let's move into the kind of next couple of

11 months.  What did you start seeing at that point with the

12 sales as you were monitoring them on a daily basis?

13 A     Well, as we started to see these Safeway stores drop

14 off the face of the earth, that's where we really became very

15 concerned.  We couldn't figure it out.  Nobody could give me

16 a good answer as to why they were down 50 percent.  I think

17 John's best, you know, he didn't, I'm not sure he knew either

18 and couldn't, you know, give me any kind of definitive

19 answers.  His best answer is, hey, let's go try to put some

20 new departments in.  Let's do anything we can to try to

21 breathe life back into these stores that are down 50 percent.

22 A grocery store down 50 percent feels empty, just feels so

23 dead.  And so we were talking about running sales, you know,

24 whatever we could do to sort of try to get people back in

25 these stores.

1  Q      I'd like to turn your attention to DX398.

2  A      Yep.

3  Q      Do you recognize that document?

4  A      I do.

5  Q      And what was this document?

6  A      So this was an update to the investment committee

7  middle of June.

8  Q      And by the middle of June, what was happening with

9  sales across the converted stores?

10 A      Well, by this point we bought, converted almost all the

11 stores, and we had some real experience in the California

12 market.  And California is worse than the Pacific Northwest

13 was, interestingly not nearly as big of a delta between the

14 Safeway and Albertsons conversions.  The Safeway ones were

15 worse, but worse by 10, 15 percent.  But we saw pretty

16 consistently sales down, you know, 20, 25 percent was what we

17 were seeing.

18      We at the time felt like, you know, and every store

19 would go through a curve, right, you'd convert it, it would

20 go up, it would lose some sales.  We felt like in the stores

21 that had had some maturity that those sales losses were

22 stabilizing.  But it was hard to tell, you're getting tons of

23 data thrown at you.  Our best sense was that they would

24 stabilize down 20, 25 percent, but that was our best sense at

25 the time.

1  Q      If we take a look at page 4 of that presentation, what

2  does this depict, Mr. Caple?

3  A      Yes, so that's exactly that.  So it's the different

4  Pacific Northwest and Pacific Southwest Albertsons and

5  Safeways, how much each of them are down, and it's by the

6  week after conversion, weeks post-conversion.

7         So as you can see on these lines on the right side,

8  goes, it looks like they've stabilized.  I think that was our

9  best sense then, and that was, and maybe we were hoping, but

10 that was our best sense then.

11 Q      And so if we follow one of these lines, let's take the

12 kind of top left quadrant there, what region is that for?

13 A      That's for the Pacific Northwest and those are

14 Albertsons stores.

15 Q      Okay.  So if we take like that, you know, blue line

16 kind of light turquoise blue line at the top, and you kind of

17 walk me through, that line appears to just go to weeks 2, 3

18 and 4.  Can you describe what that line is telling us?

19 A      Yeah.  We took week one out because it was a partial

20 week and all sorts of messed up things would happen with it.

21 So week one, week two in that store we were up it looks like

22 30; week two it looks like we were up 8; and week three it

23 was flat.

24 Q      And what conclusions, if any, did you draw about the

25 fact that you were kind of up early and then in the

1  subsequent weeks you would have these significant drops?

2  A     That wasn't surprising.  I mean as you do a remodel,

3  there's a new store, you get some excitement to it.  So it

4  wasn't surprised that we had dropped, what was surprising is

5  that we were dropping you know below zero that we were

6  comping negative in these stores.

7  Q     And if you look at all four, does that demonstrate the

8  difference between kind of the Safeways and the Albertsons

9  and how they were performing?

10 A     Yeah, absolutely.  I mean if you, the two top ones or

11 the Albertsons versus Safeways, you can see Albertsons stores

12 are in a bunch of places, but you know the worse ones are

13 negative 15, you've got some negative 5s, you know, not so

14 awful.

15     The Safeways as you can see, every single one of them,

16 the three that have been around for any time were worse than

17 negative 40, I mean they are just getting absolutely

18 slaughtered.  In the Pacific Southwest you could see both

19 Albertsons and Safeways are down, although once again

20 Safeways are down more than the Albertsons.

21 Q     Can you turn to page 5?

22 A     Yes.

23 Q     It says customer feedback is the name of that slide.

24 And what were you trying to convey to the investment

25 committee with this slide?

1  A      So I was trying to convey sort of what we were hearing

2  from the customers.  And so we would do these, I forget

3  whether it was the first day or first couple of days, but we

4  were trying to get customer feedback, what the heck is

5  happening.  And this was the feedback we were getting.

6          And so, you know, it was a little bit quizzical,

7  right.  You say my new Haggen store is, you know, 60 percent

8  or much better or a little bit better, another 20 percent are

9  about the same, and then, you know, you got a little worse

10 and yet we're getting slaughtered.  The prices, you know, and

11 prices worse than expected is probably the worse thing.   I

12 mean 30 percent of people say prices are worse than expected,

13 that's pretty bad.

14 Q      So you're seeing that customers are more worried about

15 prices than about the store.

16 A      Seems to be.  And, you know, we're just trying to

17 figure out what's going on.

18 Q      So at this point in June where sales kind of you think

19 kind of leveling off hopefully at 20 to 25 percent down, what

20 was your plan at that point?

21 A      So with sales down, you know, groceries is a thin

22 margin business and if you don't control your labor and you

23 simply hold labor with sales down 30 percent, you're going

24 to, you're going to, you know, down 20 percent you're going

25 to bleed and you're probably going to bleed out in a little

1  while.  And so we had an aggressive plan to say two things.

2  One, we got to get the labor out of the stores so that we can

3  get labor back in line with sales.  And then number two, you

4  know, we had this perception that we had high prices, but we

5  actually had low prices.  So it's like the worst of both

6  worlds.

7        And so I said, if we're going to be perceived as having

8  high prices, let's at least get the margin for it for now and

9  we can work on it as time goes on.  We were actually seeing

10 margins must lower in the Pacific Northwest as an example, to

11 what our base stores were seeing.  So we said, hey, let's try

12 to get some, let's try to get some margin back here.

13 Q    What efforts, if any, were you taking to assist with

14 getting additional liquidity to OpCo in June and July of 2015

15 as these sales were leveling out down 20, 25 percent?

16 A    At this point we were still negotiating with UBS.  They

17 still, you know, UBS was like a broken record.  They were

18 always going to close next week and we were always right

19 about there, but we just couldn't get the dang deal closed.

20 And so, you know, and the view was always, hey we have UBS,

21 they're 75 million, we can you know if there is a small

22 liquidity hole and at this point we were projecting a

23 liquidity hole, we'll have the ability to fill it assuming we

24 can get these stores turned around, assuming sales, you know,

25 sort of stabilized, you know, we still have a viable business

1  here.

2      But it's tricky, things are bad, don't get me wrong,

3  we're very concerned, but it still feels like it could

4  potentially be viable.

5  Q    Now I believe Mr. Morris asked you about your

6  negotiations with UBS and they were initially I think you

7  testified in order to get a financing to make a dividend to

8  Comvest.  Do you recall that?

9  A    That's right.

10 Q    How did that change over time?

11 A    Well, it became more and more clear that we might have

12 a liquidity hole in the operating business.  And, you know,

13 we didn't want this simply to fail.  We really did still at

14 this point think it was a savable situation.  You know, we

15 thought down 20 was a savable situation -- I don't know where

16 it is.  We literally did an analysis in here that said if we

17 can control labor and if we can get gross to where we think

18 it is, we can survive down 20 as bad as that is.  And I think

19 it may even down 25.  But that's a survivable thing.

20     What ends up happening is we in the Northwest we were

21 pretty successful cutting labor.  In the South we were told

22 we needed to do a layoff.  We had no choice, we can't just

23 keep bleeding out.  We do the layoff, that creates more bad

24 news stories, sales go down more.  That's that death spiral

25 I'm talking about.  Just like every time we try to fix it, it

1  makes it worse and we just, you know, we can't do nothing,

2  you got to try, and we were trying our very best.  But every

3  time we tried, it made it worse.

4  Q     Did you feel like the management team was working hard

5  to try to address these issues?

6  A     There's no doubt everyone was working incredibly hard.

7  Q     Did there come a time where ultimately some liquidity,

8  some additional liquidity did go into the OpCo?

9  A     Yes.  After UBS fell apart it was very, very

10 challenging.  But I convinced my partners to put $25 million

11 in through PropCo into Opco.

12 Q     Did you ever suggest that your partners put in equity

13 into OpCo at that point in time?

14 A     It was really hard to get $25 million from my partners

15 for the deal we did.  There is no way I was getting it for

16 equity.

17 Q     Would you have recommended putting $25 million of

18 equity in by August of 2015?

19 A     No.

20 Q     What was your involvement in documenting the loan?

21 A     I wouldn't have driven the documentation, it would have

22 been Mike Nische.  I would have known the loan was getting

23 put together. I probably reviewed the documentation once, but

24 wasn't driving the negotiations.

25 Q     So we'll hear more from Mr. Nische on that just in the

1  interest of time.

2          MR. HOWELL:  Your Honor, could I have just a

3  moment?

4          THE COURT:  Of course, Mr. Howell.

5          MR. HOWELL:  Okay.  I have no further questions at

6  this time.  Thank you.

7          THE COURT:  All right.  Mr. Morris?

8                    REDIRECT EXAMINATION

9  BY MR. MORRIS:

10 Q     Mr. Caple, Comvest decided to put the Legacy stores

11 onto the OpCo side.  Right?

12 A     Yes.

13 Q     Is there a tax benefit to that?

14 A     No.

15 Q     No?

16 A     No.

17 Q     How much was it worth?  How much, I think you said $100

18 million.  What was the value of the Legacy stores?

19 A     $100 to $140 million was my view at the time.

20 Q     That was your view at the time?

21 A     Yeah.

22 Q     Was that view in writing anywhere?

23 A     I don't remember.  I don't have a specific piece of

24 paper to point you to.

25 Q     Did you actually do a valuation that showed this was

1  worth $100 or $140 million?

2  A     Well, I'll say two things.  I knew EBITDA --

3  Q     Just -- did you do, did you do an analysis that shows

4  it?  That's all I'm asking.

5  A     Sure.

6  Q     Is that analysis written down and was it produced in

7  this litigation?

8  A     No.

9  Q     Oh.  When you say it's $100-$140 million, is that the

10  enterprise value or is that the equity value?

11  A     Enterprise value.

12  Q     Enterprise value?

13  A     Yes.

14  Q     Okay.  Do you know that Comvest sends letters to their

15  investors on a quarterly basis?

16  A     We do.  We do.

17  Q     Did you ever look at the letters that were sent by

18  Comvest to its investors concerning the value of Haggen,

19  Inc.?

20  A     I haven't gone back and looked at them, no.

21  Q     You have not?

22  A     No.

23  Q     Let's take a look.

24           MR. MORRIS:  If I may give the witness --

25           THE COURT:  Yes it is.  Thank you, Mr. Morris.

1  BY MR. MORRIS:

2  Q      This is the Comvest investment letter for the fourth

3  quarter ending 2014.  Right?

4  A      Yes.

5  Q      Okay.  And if you turn to the page that's marked

6  636.021.  Do you see that?

7  A      636.021.  Yes.

8  Q      And this is the report that Comvest gave to its

9  investor showing the value of the Haggen Legacy stores on the

10  eve of the Albertsons acquisition.  Correct?

11  A      Yes.

12  Q      And the enterprise value shown there is $94.6 million.

13  Right?

14  A      Yes.

15  Q      It's not 100 to 140, it's 94.6.  Right?

16  A      That's right.

17  Q      And 20 of that is in the form of debt that was taken by

18  Haggen to pay Convest a dividend.  Right?

19  A      I'm not sure I understand what you're saying.

20  Q      Well, the $94.6 million, that's the enterprise value.

21  Right?

22  A      Yes.

23  Q      And is the debt below it the $57.9 million?  Does that

24  include that second lien loan?

25  A      It does, yes.

1  Q     Okay.  So when you get to an enterprise value of 94.6,

2  that includes debt that was taken out for the purpose of

3  giving Comvest a $20 million loan.  Right?

4  A     Yes.

5  Q     Okay.  Do you think it would be reasonable to say the

6  enterprise value is really only $74.6 million?

7  A     No.

8  Q     No. Okay.  Is this market tested?

9  A     No.

10 Q     Okay.  And that enterprise value is a valuation created

11 based off of an EBITDA multiple of 4.7.  Right?

12 A     That's right.

13 Q     Do you know the very quarter before that you used a

14 lower EBITDA multiple for your investors?

15 A     I'm not aware of it exactly.

16 Q     Do you recall when we looked at the report to the

17 investment committee from September and you were valuing the

18 transaction, the Albertsons transaction, you actually used

19 the 3.0 multiple.  Right?

20 A     That was on store level EBITDA which is different than

21 overall EBITDA.

22 Q     The purchase price of $80 million was based on a

23 multiple of three times EBITDA.  Right?

24 A     Store level EBITDA.

25 Q     Okay.

1  A     So store level EBITDA doesn't include -- so 4.7 would

2  be different multiple of store level EBITDA.

3  Q     Sir, sir, this multiple is the highest multiple that

4  we've seen used in any aspect of this case.  Right?

5            MR. HOWELL:  Objection.  Foundation.

6            MR. MORRIS:  Let's take a look at the --

7            MR. HOWELL:  There's an objection I think on

8  foundation.

9            MR. MORRIS:  Question withdrawn.

10           MR. HOWELL:  Okay.

11           MR. MORRIS:  Thank you.

12           It's marked as the next exhibit.  It is exhibit

13  633.

14  BY MR. MORRIS:

15  Q     Now this is the investor letter from the prior quarter.

16  Right?

17  A     It looks like it, yeah.

18  Q     Okay.  And if you could please turn to page 63019.  And

19  it's true, is it not, that in just the prior quarter the

20  multiple was lower, it was 4.5?

21  A     Yes, that's what it says.

22  Q     And it's true, is it not, that when you increase the

23  multiple, you increase the enterprise value?

24  A     You do, yes.

25  Q     Okay.  So you had an enterprise value, or Comvest had

1  an enterprise value that went from $85 million -- 2 3.  You

2  increase the multiple and you got to an EBITDA, I mean an

3  enterprise value of what -- $94.6 million?  Right?

4  A    Yes.

5  Q    And that included the $20 million of debt that was

6  taken out for Comvest benefit.  Right?

7  A    I'm not sure I understand that question.

8  Q    The enterprise value of 94.6 includes that $20 million

9  of debt that Haggen took out for the purpose of paying a

10 dividend to Comvest.  Right?

11 A    Enterprise values don't include debt, they have nothing

12 to do with debt.

13 Q    Does that --

14 A    They're enterprise values.

15 Q    Does the $57.9 million of net debt include the second

16 lien loan?

17 A    Yes.

18 Q    Okay.

19 A    But that's not part of the enterprise value.

20 Q    What Comvest put in was its equity.  Right?

21 A    Yes.

22 Q    Okay.  And its equity was worth how much?

23 A    Well, depending upon, you want what the report was

24 worth or what I thought it was worth?

25 Q    I definitely only want to know what Comvest told its

1  investors.

2  A      Okay.  Yeah.  So at the time we were valuing it at

3  $36.7 million.

4  Q      Okay.  And that's what Comvest contributed to the

5  transaction.  Right?

6  A      That's --

7           MR. HOWELL:  Objection to the form of the

8  question.

9           MR. MORRIS:  That was the -- withdrawn.

10  BY MR. MORRIS:

11  Q      That was the equity value of the Haggen Legacy stores.

12  Correct?

13  A      No.

14  Q      Let's take another look.  Exhibit 636.

15  A      Yep.

16  Q      The letter that Comvest sent to its investors.

17  A      Yep.

18  Q      They valued Haggen as of December 31st, 2014 the equity

19  value at $36.7 million.  Correct?

20  A      That's correct.  So the total equity value of it would

21  have been $36.7 million.  That's right.

22  Q      Okay.  And Comvest is actually only an 80 percent

23  stockholder.  Right?

24  A      It's a little more complicated than that; but, yes.

25  Q      Okay.  So in fact if you were doing the math, Comvest

1  equity value is 80 percent of the 36.7?

2  A    Did we see a 72.2 here?

3  Q    72 percent.  Okay.  So it's actually 26.5?

4  A    That's right.  That would be the number you should use.

5  Q    26.5 is really Comvest's interest in the enterprise as

6  of the end of the year.

7  A    That's what we were telling our investors is right.

8  Q    Thank you.  Sorry, I didn't mean to make that so

9  difficult.  It was my fault.

10  A    No, I was trying to get it right.

11  Q    It was my fault.  Let's go to the FTC dec that you

12  looked at for a while.

13  A    Sure.

14  Q    I think that was exhibit, Defendant's Exhibit 72.

15  A    Okay.

16  Q    Do you have that in front of you, sir?

17  A    I do.

18  Q    Okay.  Can you turn to page 13, please?

19  A    Okay.

20  Q    This is the page that you referred to where you said

21  that Haggen had this terrific net promoter score in the

22  Pacific Northwest.  Right?

23  A    That's right.

24  Q    What was Haggen's net promotor score in California?

25  A    There wasn't one.

1  Q    What was Haggen's net performer [sic] score in either

2  Arizona or Nevada?

3  A    There wasn't one.

4  Q    Okay.  Is it your understanding that net promotor score

5  is based on reputation.  Right?

6  A    No.  I mean maybe partially but --

7  Q    Well, tell me what the promotor score --

8  A    I mean it's based upon --

9  Q    Let me ask the question.  Tell me what the net promotor

10  score is supposed to measure?

11  A    It's supposed to measure ideally how satisfied your

12  customers are with your product, different than reputation,

13  it's a satisfaction score.  It's an overall kind of customer

14  happiness score.

15  Q    Okay.  So these net promotor scores could not be

16  applied to California, Arizona or Nevada.  Correct?  They

17  didn't have them.  Right?

18  A    No.  I'm not sure I agree with that.

19  Q    Well, reputations have to be earned.  Don't they?

20  A    Reputations do, yes.

21  Q    Okay.  And reputation is really at the heart of the net

22  promotor score.  Right?  It's based on customer feedback?

23  A    I don't agree with that.  No.

24  Q    You don't agree with that?

25  A    No.

1    Q    You think that Haggen just because they're liked in

2    California can walk into the marketplace -- withdrawn.  You

3    think that Haggen just because they have a good reputation in

4    Washington can walk in as an unknown in California and have

5    the benefits of a net promotor score of 47 percent on day

6    one?

7    A    My view is net promotor scores are based on customer

8    experience.  So I think that we had what we thought was a

9    great model and a great retail experience, and I do think

10   that model and retail experience was, you know, could be

11   transitioned to California, Arizona and Nevada.  I would

12   agree that our brands weren't known there at all, and so we

13   had to get known.  So I would absolutely agree with that.

14   Q    Okay.

15   A    But I don't think that net promotor scores are just

16   based on reputation; they're based on actual experience.

17   Q    Can we turn to page 31, please?

18   A    Sure.

19   Q    No, I apologize.  Page 30.  Nope, the next page, 31.

20   I'm fighting with myself.

21        Now, before the acquisition, Albertsons didn't have a

22   PropCo/OpCo structure.  Right?

23   A    I don't know actually.  Do they own -- I don't know.

24   They own all their --

25   Q    You signed the asset purchase agreement, didn't you?

1  A      I did.  But I don't know underneath that how they own

2  their assets.

3  Q      Do you know -- so do you know if the stores on which

4  were on the properties, they didn't pay any rent prior to the

5  Albertsons acquisition.  Right?

6  A      To a third party outside of Albertsons, no.

7  Q      And they didn't pay any rent to some Albertsons

8  affiliate in a PropCo/OpCo structure.  Right?

9  A      I don't know Albertsons internal accounting.  I'm

10  sorry.

11  Q      You didn't ask the question about whether the stores on

12  the fee owned property had a rent obligation prior to the

13  time you did the deal?

14  A      No.  We were buying both the operating assets and the

15  real assets, so to the extent Albertsons in their sort of

16  system had some set of charges or what have you, didn't

17  really matter to us because we were getting both assets and

18  we were going to have the charge we were going to have.

19  Q      So it's your professional view that if these stores

20  paid no rent prior to the transaction, but after the

21  transaction, they're going to pay rent under the PropCo

22  leases, that was irrelevant that they hadn't faced this rent

23  burden previously?  That would be an irrelevant fact to you.

24  A      Irrelevant fact.

25  Q      Not one you looked at.  Right?

1   A       Well, we from the start knew we were going to do a

2   PropCo/OpCo structure, and so from the start we looked at the

3   EBITDA results we were going to get proforma for a sale

4   leaseback.  We had the proforma for all the new overhead we

5   were going to have to put on it, we had to proforma this

6   stuff for a lot of stuff.  That was simply one of the various

7   things we would have.  So I don't know if that answers your

8   question.  Did we look at it?  I feel like we did and we

9   understood exactly the situation.

10  Q       Can you tell Judge Gross whether the stores that sat on

11  the fee owned property paid rent to Albertsons or any

12  Albertsons' affiliate prior to the Albertsons acquisition?

13  A       I don't know.  They didn't pay rent outside of

14  Albertsons, but whether they paid rent inside of Albertsons,

15  I don't know.

16  Q       Now, let's look at page 30.

17  A       Yeah.

18  Q       Identify every single entity on this page to whom

19  Comvest or Haggen disclosed that they were adopting a new

20  corporate structure in connection with the Albertsons

21  acquisition.

22  A       Well, so I didn't work with most of these people.  I

23  know we identified it to Unified Groceries which is down

24  there on the bottom right.

25  Q       Okay.

1  A     I don't know, is SuperValu on here?  I'm sure we

2  identified it, I know we identified it to them.  Other than

3  that, I didn't talk specifically to vendors.  So I wasn't

4  involved in those discussions.

5  Q     And you didn't make, you didn't give an instruction to

6  anybody to disclose to the OpCo entities' creditors that

7  there was going to be a new corporate structure adopted.

8  Right?

9  A     No.

10 Q     And nobody ever told you that they were going to

11 undertake the task of informing the OpCo creditor body that

12 there was going to be a new corporate structure in place.

13 Right?

14 A     No.  We told all of these vendors that those stores

15 were no longer going to be owned by Albertsons, now they're

16 going to be a Haggen.

17 Q     Please listen to my question.  You're the one who wants

18 to get out of here today.

19 A     No, I'm trying my best.  I really am.

20 Q     Okay.  Listen.  Nobody ever told you that they took on

21 the task of telling OpCo's creditors that Haggen was adopting

22 a new corporate structure in connection with the Albertsons

23 acquisition.  Correct?

24 A     Not that I know of.  But I --

25 Q     Okay.  And nobody ever told you that they were going to

1  take on the task of disclosing to OpCo's creditors that the

2  real property was going to be transferred to the PropCo

3  entities.  Right

4  A    I don't know.

5  Q    Nobody ever told you that.  Right?

6  A    I'm -- I don't know.

7  Q    Nobody ever told you that, right?

8  A    Nobody ever told me that, but what --

9  Q    And nobody ever told you that they informed the OpCo

10 creditors that there were going to be these new leases

11 between OpCo and PropCo, right?

12 A    Well, we did tell, as I said, Unified, Supervalu, we

13 showed the full -- the full deck to --

14 Q    Okay.

15 A    -- to GIG, Spirit.  So we -- we told lots of people.

16 The -- the folks on this, outside of those, we -- I don't --

17 I'm not -- I wasn't sort of driving those discussions.

18 Q    Can you please identify for Judge Gross --

19 A    Yep.

20 Q    -- every single OpCo creditor who was told that the

21 real property would be placed in the PropCo entities?

22 A    So the ones I knew about were Unified, Supervalu -- GIG

23 and Spirit, do they count?  Were the four that I -- and you

24 know, those were the four big guys that were involved in the

25 transaction.  They had full -- full -- you know, they saw the

1  whole PropCo/OpCo model from day one.  There was no -- there

2  was no --

3  Q      Any others?

4  A      -- confusion about that.

5  Q      Any others?

6  A      I mean, those are the only ones I knew about, so I -- I

7  can't testify to other folks that may or may not assume,

8  whether they've seen it.  Those are the only four that I

9  talked to at all.

10 Q      And --

11 A      And of the ones we talked to, they all knew about it.

12 Q      Okay.  And other than those four, did anybody ever

13 identify a single other OpCo creditor who was told that the

14 real estate  assets being acquired from Albertsons were being

15 placed in the PropCo entities?

16 A      I have no -- I have no idea what anybody was told by

17 anybody.

18 Q      I just want to know what was told to you.  That's all

19 I'm asking.  Did anybody ever tell you that they had told any

20 creditor, other than those four, that the assets were being

21 placed in PropCo?

22 A      Nobody ever told me anything specifically about that.

23 Q      Did ever tell you that the OpCo creditors had been

24 informed that there were leases that were being imposed

25 between the OpCo and the PropCo entities?

1    A        No.  No.

2    Q        Did anybody ever tell you that the OpCo creditors were

3    informed that the ground leases were going to be transferred

4    to the PropCo entities, and then new subleases were going to

5    be entered into with the OpCo entities.

6    A        No.

7    Q        No.

8            Can you think of anything -- withdrawn.

9            Let's go to Page 33, please.

10   A        Okay.  Of the same deck?

11   Q        Yes.

12   A        (Witness reviews exhibit)

13            Yes.

14   Q        Is this the total construction budget that was

15   presented to the FTC?

16   A        Yes.  And so the -- just to be clear on what this is,

17   this is an example --

18   Q        Uh-huh.

19   A        -- of an individual store.  So I would describe -- the

20   total construction budget really is more on Page 33.

21   Q        Uh-huh.

22   A        But this was an example to try to give the FTC a sense

23   of where we were spending our money, and make it clear to

24   them that it wasn't just a theoretical, hey, we've chosen an

25

1  average number, that we've literally gone through, store by

2  store, and developed really a detailed plan.

3  Q    So this page that's Page 33, but marked as DX-34,

4  that's what you presented to the FTC as your construction

5  budget, right?

6  A    No.  We presented our construction budget on the page

7  before it.

8  Q    Oh, okay.

9  A    This was an example of what we were doing in the

10 individual stores.

11 Q    Gotcha.

12      So when you talk about spending $105 million --

13 A    Yep.

14 Q    -- fully forty-five of it was for overhead.  Is that

15 fair?

16 A    No.

17 Q    Well, $60 million is for conversion construction,

18 right?

19 A    Sixty million was for construction, that's correct.

20 Q    Okay.  And that's the money that's actually going into

21 the stores?

22 A    I don't know how you want to describe marketing, which

23 I would describe as also going -- I mean, it doesn't change

24 the store permanently.

25 Q    Right.

1  A     But the idea is to get people in there, and so -- so

2  that would have been part of it.  But yeah, 60 million was

3  the construction budget.  That's correct.

4  Q     Okay.  Can you go to Page 38, please?

5  A     Sure.

6  Q     This is what's known as the "store cadence," right?

7  A     Yes.

8  Q     Okay.  Can you --

9  A     Marked 39, but ...

10 Q     -- go to Page 45, please?

11       And just for the record, what is "cadence"?

12 A     The cadence was the store conversion time line.  It's

13 sort of what -- when -- how we were -- you know, the order

14 and the timing in which we were expecting to convert the

15 stores.

16 Q     Okay.  Go to Page 45, please.

17 A     (Witness reviews exhibit)

18 Q     This is where you told the FTC that Haggen and --

19 Haggen is not a real estate investor, right?

20 A     That's right.

21 Q     Okay.

22 A     Where are we?  Where are we?

23 Q     The second bullet point from the top, or the second --

24 A     Oh, yes.

25 Q     -- intended --

1  A      I'm sorry.

2  Q      -- bullet point.

3  A      I was on the wrong page.

4  Q      Yeah.

5  A      I apologize for that.

6  Q      Yeah.  And there's no mention to the FTC of Comvest

7  planning to borrow against the real estate, right?

8  A      No, it is not in here.  No.

9  Q      And there's no mention to the FTC of borrowing against

10  the real estate for the purpose of paying Comvest a dividend,

11  right?

12  A      No.

13  Q      And there's no specific mention of any PropCo leases in

14  this document, in this real estate strategy, right?

15  A      Well, I mean, the final bullet is:

16          "Negotiate long-term, market-based leases with

17          options to provide operating flexibility."

18  Q      But you don't tell the FTC that those leases are going

19  to be intercompany leases, do you?

20  A      That --

21  Q      It doesn't say that, does it?

22  A      The goal wasn't to make them intercompany; the goal was

23  to sell the real estate and have long-term leases.  That's

24  what we're trying to stay here, that we're selling the real

25  estate, we're getting out of the real estate.  We're going to

1  do our best to have as much operating flexibility as we can.

2  But that -- that was the strategy we told the FTC, our

3  investment committee, that's what we told everyone.

4  Q    Did the OpCo entities enter into any real estate lease,

5  after the Albertsons acquisition, that was with anyone other

6  than PropCo or the SLB counter-parties?

7  A    No, that's as far as we got.

8  Q    Okay.  Nobody from Comvest or Haggen ever gave to the

9  FTC a copy of the organization chart that we looked at

10  earlier today, right?

11  A    I -- I didn't, and I don't know of anyone that did.

12  Q    Nobody ever told you they did, right?

13  A    Nobody ever told me they did.

14  Q    You have no reason to believe anyone did, right?

15  A    No, they didn't request it.  I --

16  Q    And nobody -- you never disclosed to the FTC that,

17  following the transaction, the real property was going to be

18  transferred from Holdings to the PropCo entities, right?

19  A    I mean, no.  I think we did.  I think there's a whole

20  set of financials here that make it very clear that we are

21  going to have an OpCo/PropCo structure from the start, and

22  they knew all about it.  We did not try to hide it in any

23  way.

24  Q    Is there anything -- can you point to anything in this

25  document -- go back to the meeting.

1  A       Yep.

2  Q       The meeting was two hours long?

3  A       Two to three --

4  Q       Yeah.

5  A       -- is my memory.

6  Q       Yeah.  And did you discuss, at that meeting, that the

7  real property was going to be transferred from Holdings to

8  the PropCo entities?

9  A       I don't remember the specifics of that meeting.  We

10 clearly showed them a whole set of financials that had that

11 in there.  And I'm going to -- and when the FTC calls me into

12 Washington, I answer the questions they ask me, and they

13 didn't ask me that.

14 Q       And so you didn't tell them.  Is that right?

15 A       No, but they didn't ask me that.

16 Q       Okay.

17 A       They --

18 Q       Thank you.

19 A       They gave me a set of things --

20         MR. MORRIS:  Your Honor, I'm really trying to

21 finish up here.

22         THE WITNESS:  Okay.  I'm sorry.

23 BY MR. MORRIS:

24 Q       Name every person or entity for Judge Gross that

25 Comvest or Haggen solicited a loan from in July or August

1  2015, for OpCo.

2          MR. HOWELL:  Objection.

3  BY MR. MORRIS:

4  Q    Who did you contact to make a loan to OpCo?

5          MR. HOWELL:  Objection.  Foundation.

6          THE COURT:  Mr. Howell, yes?  What's the

7  objection?

8          MR. HOWELL:  Objection to foundation.  He can ask

9  him what Mr. Caple did, not what the -- Comvest or all of

10  Haggen did.

11          MR. MORRIS:  Okay.  Tell --

12          THE COURT:  I sustain the objection.

13  BY MR. MORRIS:

14  Q    Tell -- okay.  Identify every single person or entity

15  that you're aware of that was solicited to make a loan to

16  OpCo in July or August 2015.

17  A    Yes.  And one of the things we requested Alvarez &

18  Marsal to do is to reach out to potential lenders.  They did

19  that.  I remember them reaching out to four or five lenders,

20  was my memory.

21  Q    And those lenders were presented with the possibility

22  of making a loan to PropCo, right?

23  A    I think we were probably -- I think, at that point, it

24  was probably, let's talk to some lenders who deal in tough

25  situations like this --

1  Q    I --

2  A    -- and get them up to speed and see what they might

3  propose.

4  Q    This is a really simple question.

5  A    Okay.  I'm sorry.  Let me try to answer it.  What was -

6  -

7  Q    Identify every person or entity, that you know of, that

8  was solicited to make a loan to the OpCos, in July or August

9  2015.

10  A    I -- I don't -- I don't remember the specific folks

11  that Alvarez went to.  I just --

12  Q    Can you name one?

13  A    I -- it's knowable, and we have it, but ...

14  Q    Can you name one?

15  A    I can't, off the top of my head.

16  Q    Can --

17  A    I --

18  Q    Can you name a single person or entity who actually

19  made any indication of interest, offer, proposal, to make a

20  loan to the OpCo entities, in July or August 2015?

21  A    I'm sorry.  Ask that question once again.  I apologize.

22  Q    Can you name a single person or entity that made a

23  proposal, an indication of interest, or an offer to make a

24  loan to the OpCo entities in July or August 2015?

25  A    PropCo did.

1  Q      Anybody else?

2  A      No.

3  Q      Thank you.

4         Now you said that the PropCo/OpCo structure wasn't

5  intended to keep the assets in the PropCos from the OpCo

6  creditors.  Did I have that right?

7  A      That's right.

8  Q      Okay.  But that's the effect of what happened, right?

9  A      That is what happened, yes.

10 Q      And in fact, you specifically intended that the assets

11 and liabilities of the OpCo entities would remain in the OpCo

12 side, and the assets and the liabilities for the PropCo

13 entities would remain in the PropCo side, right?

14 A      Yes.

15 Q      That's exactly what you intended, right?

16 A      Yes.

17 Q      And the liabilities on the OpCo side were obligations

18 that were owed to OpCo's creditors, right?

19 A      Obligations on the OpCo side --

20 Q      Were owed --

21 A      There were --

22 Q      -- to the OpCo creditors, right?

23 A      There were lots of obligations, yeah.

24 Q      And the ones that were owed to OpCo were kept on the

25 OpCo side, right?

1  A     Yes.

2  Q     And the intent was that, if the obligations for the --

3  and liabilities had to stay with OpCo, then they can't go to

4  the PropCo assets to satisfy their claims, right?

5  A     That's true, yes.

6  Q     And that's why we're here today, right?

7              MR. HOWELL:  Object to --

8              THE WITNESS:  We can --

9              MR. HOWELL:  -- foundation.

10             THE WITNESS:  -- argue about that.

11             THE COURT:  I'll sustain that objection.

12 BY MR. MORRIS:

13 Q     Okay.  That's what you intended, right?

14 A     I'm sorry.  Could you ask the question again?

15 Q     Sure.

16 A     What is --

17 Q     The intent was that the people to whom the OpCo

18 entities had the obligations could not go -- could not

19 satisfy those claims against the PropCo assets, correct?

20             MR. HOWELL:  Object.  Asked and answered several

21 times, Your Honor.

22             THE COURT:  I'll allow the question.

23             THE WITNESS:  No, that wasn't the intent.  The

24 intent --

25 BY MR. MORRIS:

1   Q      That's the effect, right?

2   A      The intent was we had two very different sets of assets

3   that we wanted to do different things with.  You're right,

4   that was the effect, I'm not disagreeing with that.

5   Q      Okay.

6   A      But that wasn't the intent.

7   Q      And that's -- and is that one of the reasons why you

8   decided not to put the PropCo entities into bankruptcy?

9   A      Well, my understanding is the PropCo entities had no

10  real liabilities against them, so they -- they were -- they

11  were solvent, so they didn't need to go into bankruptcy.

12  Q      Okay.  And in August of 2015, Mr. Clark didn't tell you

13  that he relied on the real property for a downside scenario,

14  did he?  He told you that he relied on the real property

15  being available in a liquidation, right?

16  A      That's what he told me in August.  That's, I think,

17  what the document said.

18          MR. MORRIS:  Okay.  Your Honor, I'm kind of in a

19  pickle because I have --

20          THE COURT:  How much --

21          MR. MORRIS:  -- like ten more --

22          THE COURT:  -- more time?

23          MR. MORRIS:  -- minutes, and I know that you need

24  --

25          THE COURT:  Take --

1        MR. MORRIS:  -- to go.

2        THE COURT:  I'll give you ten minutes.

3        MR. MORRIS:  Okay.  Thank you.

4        THE WITNESS:  Thank you.  Thank you.

5        THE COURT:  But I'll cut you off at ten.

6    (Laughter)

7        MR. MORRIS:  I appreciate that.

8        THE COURT:  All right.

9        MR. MORRIS:  I'm very grateful.

10   BY MR. MORRIS:

11   Q    We looked at the downside cases that were in the decks,

12   right?

13   A    Yes.

14   Q    And you pointed out to the Judge that there were a

15   couple of models that actually had negative same store sales

16   growth, right?

17   A    Yes.

18   Q    Okay.  There is not one model anywhere that was ever

19   presented to the investment committee that showed the OpCos

20   losing a nickel, right?

21   A    OpCos losing a nickel?

22   Q    Uh-huh.  They never lost money, right, in any model?

23   A    On an EBITDA level?

24   Q    Correct.

25   A    I'd have to go look, but it -- I don't believe they

1   did.

2   Q      Okay.

3   A      If I just remember the EBITDAs from the --

4   Q      Okay.  So, when you're trying to be conservative, you

5   created models that only showed OpCos being profitable,

6   right?

7   A      That was -- yes, that was the outcome of the models we

8   did.

9   Q      Okay.  Can you take a look, please, at Defendants'

10  Exhibit 79?

11  A      Sure.

12  Q      And that's the investment committee memo that was

13  presented on November 3rd, right?

14  A      (Witness reviews exhibits)

15         I have 72.  Is that what you're talking about?

16              THE COURT:  79.

17  BY MR. MORRIS:

18  Q      79.  I'm sorry.

19  A      79, sorry.  Yes.

20  Q      And this is the one that shows, if you look at the

21  executive summary on Exhibit Page 3, this is the one that

22  shows the real estate -- the appraised real estate value of

23  the owned property being $391 million?

24  A      Yes.

25  Q      Okay.  And now, if you'll indulge me, please, can you

1  take a look at P -- Plaintiff's Exhibit 9?

2  A     Plaintiff's Exhibit 9.

3            THE COURT:  Different book.

4            MR. MORRIS:  Yeah, different book.

5            THE COURT:  A plaintiff's exhibit.

6            THE WITNESS:  Oh, sorry.  Thank you.

7            THE COURT:  Yes.  It's up on the screen, if that

8  helps.

9            THE WITNESS:  Great.  Very helpful.  Okay.  Yes, I

10 remember.

11 BY MR. MORRIS:

12 Q     Now I believe you said -- I believe, on November 3rd,

13 in that November 3rd deck, there's a couple of downside

14 scenarios that Mr. Howell took you through, right?

15 A     Yes.

16 Q     Okay.  And Plaintiff's Exhibit 9 is also dated November

17 3rd, right?  At night.

18 A     Yes.

19 Q     So is it fair to say that Mr. Clark and Mr. Marrero

20 came out of the investment committee meeting, where the deck

21 was discussed, and posed additional questions to you

22 concerning confidence in the underlying real estate values?

23 A     Yes.

24 Q     And they came out of the meeting, telling you -- at

25 least Mr. Marrero came out of the meeting telling you he

1  wants to what under -- what supports the real estate value

2  because that affects the decision tree [sic] more than

3  anything, right?

4  A    Yes.

5  Q    Okay.  So that -- so I just wanted to put the timing in

6  place.  That's where this came up.

7  A    I remember, yep.

8  Q    I think you said earlier that the customer feedback was

9  pretty good?

10  A    I thought it was, yes.

11  Q    Yeah.  Did you take into account the 25 to 30 percent

12  loss in sales, when you made the determination that customer

13  feedback was pretty good?

14  A    So the customer feedback I'm talking about, just to be

15  very specific --

16  Q    Uh-huh.

17  A    -- were those first surveys we did, when folks sort of

18  first saw the new store.  So, you know, it seemed like the

19  initial feedback we got from customers was pretty good.

20  Obviously, we lost a bunch of sales after that.  That

21  customer feedback was very bad.

22  Q    And the marching of the feet is another way to measure

23  customer satisfaction, right?

24  A    There's no doubt about it.

25  Q    Okay.  Pricing issues.  You talked about pricing

1   issues?

2   A     Yes.

3   Q     Those pricing issues were known from day one, right?

4   A     No.  Day one -- I mean --

5   Q     From the -- let me ask a better question.

6   A     Okay.

7   Q     From the closing of the first store, Haggen was aware

8   that there were pricing problems?

9   A     I think it took a couple stores for us to really start

10  to become aware of it.  But early on, we were aware of it,

11  yes.

12  Q     Okay.  Do you understand the role of the monitor?

13  A     Which monitor are you referring to, in this case?

14  Q     Do you understand that the FTC appointed a monitor for

15  the specific purpose of looking out for the interests of

16  Haggen?

17  A     Yes.

18  Q     Okay.  Did anybody from Comvest or Haggen, at any time,

19  call the monitor to tell him about the pricing problems?

20  A     I'm not -- I never personally talked to the monitor.  I

21  do know that there were discussions with the monitor about

22  various things, at various times.  I was not -- I don't

23  really recall exactly what they were, and I wasn't personally

24  on those phone calls.

25  Q     Did anybody ever tell you that they spoke to the

1  monitor about the issue of pricing?

2  A    I don't recall exactly what they spoke to the monitor

3  about.  I just --

4  Q    Did anybody ever tell you that they spoke to the

5  monitor prior to July 15th, about any issue having to do with

6  Albertsons?

7  A    I just -- I wasn't -- I'm not -- I'm not -- yes, I

8  believe we had some discussions with the monitor on issues.

9  I just am not -- I remember having some discussions, but I

10 don't remember exactly how those went and what they were

11 about.

12 Q    Did you ever instruct anybody at Haggen to speak to the

13 monitor concerning any issue concerning Albertsons?

14 A    Yes, after -- after we got some evidence in that

15 Albertsons had done some really nefarious things.  We had,

16 literally, email evidence that they had diverted inventory

17 and tried to mess with us in the conversion process.  That's

18 when we reached out to the monitor and sent the demand

19 letter.  So, yeah, at that point would have been when it

20 happened.

21 Q    Do you know that the FTC testified explicitly that they

22 didn't get a copy of the June 29th letter, until they asked

23 for it on July 22nd?

24 A    I wasn't in the FTC testimony, so obviously, I wouldn't

25 have known that.

1  Q    Okay.  The coupon.  Did you ever discuss whether Haggen

2  could join the fray, like Trader Joe's and the others, and

3  just start couponing?

4  A    We talked about all sorts of potential marketing

5  programs that we might launch and what they might look like.

6  So, sure.  The Safeway Just For U coupons, though, we didn't

7  have that kind of customer data.  So all we could have done

8  is sent a broad coupon, and we sent -- part of the conversion

9  process was that 10 million of marketing, and much of that

10 went to things exactly like couponing.

11 Q    Well, you said, I think, probably pretty fairly, that

12 you couldn't prove the Just For U Safeway program problems

13 contributed to the demise, right?

14 A    I can't prove it, no.

15 Q    Can you at least prove that you complained to someone?

16 A    Oh, I -- you know, I do know that, yeah, in our

17 lawsuit, we talked an awful lot about it.

18 Q    Can you prove that you complained to anybody prior to

19 the time you followed the lawsuit?

20 A    I don't know that I can prove it.

21        MR. MORRIS:  Yeah.  Just one moment, Your Honor.

22     (Participants confer)

23        MR. MORRIS:  Just a last couple of questions, Your

24 Honor.

25        THE COURT:  Yes.

1  BY MR. MORRIS:

2  Q    I think, earlier, you mentioned or you used the phrase

3  "controlling labor."

4  A    Yes.

5  Q    And does "controlling labor" mean firing people?

6  A    Not -- not entirely.  Sometimes, it means cutting hours

7  or limiting the number of hours you have in the store.  But

8  yeah, unfortunately, generally, at some point in controlling

9  labor, you have to reduce your head count.

10 Q    Yeah.  Do you know how many people were fired prior to

11 the petition date?

12 A    I don't know the specific number, no.

13 Q    Is it more than 200?

14 A    Yeah, it would have been.

15 Q    Is it more than 500?

16 A    I don't know the specific number, but probably more

17 than 500, though, I would have guessed.

18 Q    Okay.  And how many -- do you have any understanding of

19 how many people lost their jobs post-petition?

20 A    Yeah.  I mean, I -- we did our very, very best -- and

21 Judge Gross knows all about that -- to sell as many stores as

22 we could, and to find buyers for them.  And I think that went

23 as well as we could.  I think we sold, roughly, two-thirds of

24 the stores.  So we did our very best to save as many jobs as

25 we could.

1  Q     Okay.  And my question was:  Do you have any

2  understanding as to how many people lost their jobs post-

3  petition?

4  A     I don't know the exact number, no.

5  Q     Is it more than 1,000?

6  A     Yes.

7  Q     Is it more than 2,000?

8  A     I -- I don't know exactly.

9          MR. MORRIS:  Your Honor, just because I -- yeah,

10  because I'm going to stick to the extra time that Your Honor

11  gave me --

12          THE COURT:  All right.

13          MR. MORRIS:  -- and I like Rush.  I'll say I'm

14  done.

15          THE WITNESS:  Thank you.

16          MR. MORRIS:  And he's now giving up the

17  opportunity to do redirect.

18          MR. HOWELL:  Yeah.  Your Honor, if I can ask one

19  question --

20          MR. MORRIS:  Oh, no.

21          THE COURT:  Yes.

22          MR. HOWELL:  -- since I know you've got to go.

23       (Laughter)

24          THE COURT:  You can ask one question.

25          THE WITNESS:  One.

1    MR. HOWELL:  I'll only ask one question.

2    THE COURT:  One part.

3    RECROSS EXAMINATION

4  BY MR. HOWELL:

5  Q    Mr. Caple -- 1 question in 37 parts.

6    (Laughter)

7  BY MR. HOWELL:

8  Q    I would like to start with the part about Haggen, then

9  we'll do the Albertsons.

10    THE COURT:  Right.

11  BY MR. HOWELL:

12  Q    My question to you, Mr. Caple, is:  In your view, if

13  PropCo hadn't put the twenty-five-million-dollar loan into

14  OpCo, do you think more or less people would have lost their

15  job, post-petition?

16  A    Oh, absolutely more people would have lost their jobs.

17  One of the -- we were advised by everyone advising us that

18  the best thing for the company, in particular for its

19  creditors, was to have a well -- a good bankruptcy plan, if

20  we had to go there, that had the best outcome we could.

21    Mike Niegsch worked tirelessly with these different

22  buyers to find buyers for these stores.  And I -- you know,

23  in a bad situation, we all did our very, very best to sell as

24  many stores as we could, and for as many people to, you know,

25  retain their jobs as they could.  And you know, that was a

1  very, very difficult time, and we worked really hard to do

2  our best in that situation.

3           MR. HOWELL:  Nothing further, Your Honor.  Thank

4  you.

5           THE COURT:  Thank you.

6           Mr. Caple, thank you very much.

7           THE WITNESS:  Thank you.  I really appreciate it.

8           THE COURT:  Safe travel.

9           THE WITNESS:  Thank you.  Thank you so much.

10          MR. MORRIS:  Your Honor, thank you so much for the

11  extra few minutes.

12          THE COURT:  All right.  And we'll be back tomorrow

13  morning at nine o'clock.

14          MR. HOWELL:  Yes, sir.

15          THE COURT:  Thank you, everyone.  Good night.

16          COUNSEL:  Thank you, Your Honor.  Thank you, Your

17  Honor.

18        (Proceedings adjourned to 10/17/17 at 9 a.m.)

19        (Concluded at 5:11 p.m.)

20

21

22

23

24

25

1                              CERTIFICATE

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6    /s/Mary Zajaczkowski                      October 17, 2017

7    Mary Zajaczkowski, CET**D-531

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25