## IN UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HH Liquidation, LLC, *et al.,*[1] | Case No. 15-11874 (KG) |
| Debtors. | Jointly Administered |
| | **Ref. Docket Nos. 3812 and 3887** |

### DECLARATION OF MARC BEILINSON IN SUPPORT OF
### (I) CONFIRMATION OF PLAN OF LIQUIDATION FOR HH LIQUIDATION, LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE AND (II) DISMISSAL OF THE OPCO DEBTORS' BANKRUPTCY CASES

I, Marc Beilinson, declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am the Managing Partner of Beilinson Advisory Group, a financial restructuring and hospitality advisory group that focuses on assisting distressed companies, through which I provide services as a restructuring advisor, Chief Restructuring Officer, attorney and board member.  I recently completed my roles as the lead Director of Caesars Acquisition Company, Chief Restructuring Officer of Fisker Automotive, Chief Restructuring Officer and COO of The Abbey Companies, and Chairman of the Board of Directors of Westinghouse Electric Company, and am currently serving on the Board of Directors, Board of Managers and Audit Committees of American Tire Corporation, Gastar, Inc., Athene Annuity, MF Global Assurance Company, and HH Liquidation, LLC and its affiliated debtors and debtors-in-possession (collectively, the "**Debtors**").  Prior to my retirement from the active practice of law in 2007, I was a partner at Pachulski, Stang, Ziehl & Jones, where I took a lead role in the operational and financial

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  HH Liquidation, LLC (f/k/a Haggen Holdings, LLC) (7558), HH Operations, LLC (f/k/a Haggen Operations Holdings, LLC) (6341), HH Opco South, LLC (f/k/a Haggen Opco South, LLC) (7257), HH Opco North, LLC (f/k/a Haggen Opco North, LLC) (5028), HH Acquisition, LLC (f/k/a Haggen Acquisition, LLC) (7687), and HH Legacy, Inc. (f/k/a Haggen, Inc.) (4583).  The mailing address for each of the Debtors is 26895 Aliso Creek Road, Suite B-1003, Aliso Viejo, California 92656.

restructuring of nationally-recognized consumer, retail, and industrial companies, such as American Rice, TreeSweet Juice Company, Coco's restaurants, Carrow's restaurants, General Cinemas, Loews Cineplex, Wherehouse Entertainment, and DirecTV Latin America. I received my bachelor's degree from UCLA and juris doctor from UC Davis Law School.

2.     I submit this declaration (the "**Declaration**") in support of Confirmation of: (a) the *Plan of Liquidation for HH Liquidation, LLC Pursuant to Chapter 11 of the Bankruptcy Code*, dated August 24, 2018, and attached as Exhibit 1 to the Disclosure Statement (including all exhibits thereto, the "**Plan**") and (b) the *Motion for Entry of an Order, Pursuant to Sections 105(a), 305(a), 349, 363, 554 and 1112(b) of the Bankruptcy Code and Bankruptcy Rules 1017 and 6007, (I) Authorizing the Dismissal of the Opco Debtors' Chapter 11 Cases, (II) Authorizing the Opco Debtors to Destroy Their Books and Records, and (III) Granting Certain Related Relief* [Docket No. 3812] (the "**Dismissal Motion**").[2]

3.     I have reviewed and am familiar with the terms of the Plan and the Dismissal Motion. Further, having served as the Debtors' independent manager and director since 2015, I have worked closely with the Debtors' management, representatives, and other retained professionals, and have become well-acquainted with the Debtors' business operations and capital structure. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances gleaned during the course of my tenure as the independent manager and director, my discussions with the Debtors' senior management team, representatives and other retained professionals, my review of relevant

---

[2]  Capitalized terms used but not otherwise defined herein have the meaning given to them in the Plan or the Dismissal Motion, as applicable. Further, the description of the Plan, the Dismissal Motion or any settlement contained herein is subject to and qualified in its entirety by the Plan, the Dismissal Motion and/or any other definitive documentation governing such settlement. In the event of any conflict between the description of the Plan, the Dismissal Motion and/or any settlement contained herein, the terms of the Plan, the Dismissal Motion and/or the definitive documentation governing such settlement shall control.

documents or my opinion based upon experience.   Based on the foregoing, I have formed opinions as to the appropriateness and necessity of Confirmation of the Plan and the dismissal of the Opco Debtors' Bankruptcy Cases.

4.      I am authorized to submit this Declaration.  If called upon to testify, I could and would testify competently to the facts set forth herein.

## BACKGROUND

5.      The Bankruptcy Cases were commenced for the purpose of allowing the Debtors to preserve as much of their businesses as possible as a going concern, and to maximize the value of their assets through either one or more sale transactions and/or a chapter 11 plan.   The successful consummation of sales constituting substantially all of the Debtors' assets allowed the Debtors to pay in full their debtor in possession financing, preserve jobs for many of their employees, maximize value for their stakeholders and the wind down their businesses and affairs in an orderly fashion.

6.      Despite the Debtors' herculean efforts throughout the Bankruptcy Cases, the Opco Debtors are presently administratively insolvent.   As set forth in greater detail in the declaration I submitted in support of the Global Settlement Agreement [Docket No. 3808], which declaration is incorporated by reference herein, given the Opco Debtors' administrative insolvency and the result of the Committee Litigation, the Debtors extensively negotiated, with my participation as their independent manager and director and the cooperation and consent of the Committee, the terms of a global settlement in order to facilitate a path for the Debtors to wind down the Bankruptcy Cases and provide distributions on account of allowed claims and equity interests.   The Global Settlement Agreement: (a) represents a sound exercise of the Debtors' business judgment; (b) was negotiated in good faith and at arms' length; (c) is a good

faith settlement and compromise; (d) is in the best interests of the Debtors and their Estates; and (e) is fair, equitable, and reasonable under the circumstances of the Bankruptcy Cases.

7.      The Settlement Parties agreed to implement the Global Settlement Agreement through, (a) with respect to the Debtor, Confirmation of the Plan, and (b) with respect to the Opco Debtors, the dismissal of their Bankruptcy Cases, with such dismissal to occur simultaneously with the Effective Date.  Accordingly, both the Confirmation of the Plan and the dismissal of the Opco Debtors' Bankruptcy Cases are necessary and integral components of the Global Settlement Agreement.  Without them, I do not believe that the non-Debtor settlement parties would have entered into such agreement, which provides the best possible recoveries to the Debtors' creditors and equityholders under the circumstances of the Bankruptcy Cases.

## HOLDCO PLAN

### A.      Highlights of the Plan

8.      The Plan constitutes a liquidating chapter 11 plan for the Debtor, and provides for the Debtor Assets to be liquidated and for the proceeds thereof to be distributed to Holders of Allowed Claims and Allowed Equity Interests in accordance with the terms and conditions thereof and the applicable priorities of the Bankruptcy Code.  Under the Plan, subsequent to the Effective Date and upon entry of a final decree closing the Debtor's Bankruptcy Case, the Plan Debtor will be dissolved as soon as practicable.  I believe that the Plan is in the best interest of the Debtor's Estate and Holders of Claims and Equity Interests, and represents a sound exercise of the Debtor's business judgment.

### B.      Plan Solicitation and Results Thereof

9.      I have been informed that, on October 10, 2018, Kurtzman Carson Consultants LLC ("**KCC**"), on behalf of the Debtor, commenced solicitation by transmitting Solicitation

Packages to all known Holders, as of October 4, 2018 (the "**Voting Record Date**"), of Claims and Equity Interests in each Impaired Class entitled to vote to accept or reject the Plan, which contained copies of: (a) the Disclosure Statement, including the Plan and all other exhibits annexed thereto; (b) the Disclosure Statement Order (excluding exhibits); (c) the Confirmation Hearing Notice; (d) a single ballot to be used in voting to accept or reject the Plan, and applicable Voting Instructions; and (e) a pre-addressed, postage pre-paid return envelope. Specifically, the Solicitation Package was distributed to Holders of Claims and Equity Interests in Class 4 (SLB Unsecured Claims) and Class 7 (Class A Equity Interests), respectively. *See Affidavit of Service* [Docket No. 3923].

10.    Additionally, KCC, on behalf of the Debtor, timely distributed to all Holders, as of the Voting Record Date, of Claims and Equity Interests not entitled to vote on the Plan, including Holders of (a) Unimpaired Claims in (i) Class 1 (Priority Non-Tax Claims), (ii) Class 2 (Secured Claims), (iii) Class 3 (Albertsons Settlement Claim), (iv) Class 5 (General Unsecured Claims) and (v) Class 6 (Intercompany Claims) that are deemed to accept the Plan, (b) Administrative Claims, Professional Fee Claims and Priority Tax Claims, which Claims are not classified, and (c) Impaired Equity Interests in Class 8 (Other Equity Interests) that are deemed to reject the Plan, a copy of the Confirmation Hearing Notice. *See Affidavit of Service* [Docket No. 3923].

11.    KCC, on behalf of the Debtor, also timely distributed to the United States Trustee, governmental units having an interest in the Bankruptcy Cases and those parties requesting notice pursuant to Bankruptcy Rule 2002 that had not otherwise received a Solicitation Package pursuant to the procedures set forth in the Solicitation Procedures Order, Information Packages containing copies of: (a) the Disclosure Statement, including the Plan and all other exhibits

annexed thereto; (b) the Disclosure Statement Order (excluding exhibits); and (c) the Confirmation Hearing Notice. *See Affidavit of Service* [Docket No. 3923].

12.    The deadline for returning ballots accepting or rejecting the Plan was set at 4:00 p.m. (ET) on November 7, 2018, unless such deadline was extended by the Debtor in accordance with the Solicitation Procedures Order.  Based on my review of the Voting Report (as defined below), it is my understanding that the voting results are as follows:

| Class | Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|-------|-------------------|--------------------|--------------------|--------------------|--------------------|---------------------|
| 4 | SLB Unsecured Claims | 2 | 0 | $23,697,511 | 0 | Accept |
|   |   | 100% | 0% | 100% | 0% |   |
| 7 | Class A Equity Interests | 2 | 0 | 2,183,281 | 0 | Accept |
|   |   | 100% | 0% | 100% | 0% |   |

*See* Voting Report.

**C.    Compliance with Section 1129 of the Bankruptcy Code**

13.    I have been advised and believe that the Plan complies with all of the requirements of section 1129(a)(1) of the Bankruptcy Code, including, without limitation, sections 1122 and 1123 of the Bankruptcy Code, and is, therefore, confirmable.

14.    As required under sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, the Plan designates a total of eight (8) Classes of Claims and Equity Interests.  Each Class contains only Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests within their respective Classes.  The Plan's classification scheme recognizes the differing legal and equitable rights of creditors versus interest holders, secured versus unsecured claims and priority versus non-priority claims.

15.     Pursuant to sections 1123(a)(2) and (3) of the Bankruptcy Code, Article III of the Plan specifies all Claims and Equity Interests that are Unimpaired and specifies the treatment of all Claims and Equity Interests that are Impaired.

16.     Pursuant to section 1123(a)(4) of the Bankruptcy Code, the Plan also provides for the same treatment for each Claim or Equity Interest within a particular Class, except to the extent a Holder of such Claim or Equity Interest has elected to receive less favorable treatment.

17.     I have been advised and believe that the Plan provides "adequate means" for its implementation.  In compliance with section 1123(a)(5) of the Bankruptcy Code, Article IV of the Plan sets forth the means for implementation of the Plan, which means are adequate and proper.  In particular, Article IV of the Plan provides for, among other things, the vesting of all Debtor Assets in the Plan Debtor, and the appointment of a Plan Administrator to implement the Plan, administer and distribute the Debtor Assets, and wind down the business and affairs of the Debtor and/or the Plan Debtor (as applicable).

18.     Additionally, I understand that section 1123(a)(6) of the Bankruptcy Code is inapplicable because Section IV.D. of the Plan provides for the dissolution of the Debtor.

19.     In compliance with section 1123(a)(7) of the Bankruptcy Code, Section IV.B.1 of the Plan provides that, on the Effective Date, the Plan Administrator shall be deemed appointed and shall succeed to such powers as would have been applicable to the Debtor's members, managers and officers.  The Plan Administration Agreement filed as part of the Plan Supplement identifies the Person proposed to serve as the Plan Administrator.  Because the Plan provides for the Debtor Assets to be liquidated and for the proceeds thereof to be distributed to Holders of Allowed Claims and Allowed Equity Interests in accordance with the terms and conditions of the Plan and the applicable priorities of the Bankruptcy Code, I believe that the selection and

appointment of the Plan Administrator is consistent with the best interests of Holders and with public policy.

20.     Further, the Debtor, as the proponent of the Plan, has complied with the applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) thereof.   In particular, solicitation and acceptance of the Plan occurred only after Holders of Claims and Equity Interests were provided with a copy of the Plan and Disclosure Statement.  I believe that the Debtor and each of its Professionals have acted in good faith in connection with soliciting and tabulating votes on the Plan.

21.     The Plan provides for the wind-down of the Debtor's Estate and for Distributions to Holders of Allowed Claims and Equity Interests in accordance with the terms and conditions of the Plan and the applicable priorities of the Bankruptcy Code, and permits such Holders to realize the highest recoveries possible in chapter 11, in a timely and efficient manner.  The Plan was developed, negotiated and is being proposed in good faith, with my participation as the Debtor's independent manager, and with the Committee's support.  The Plan, including the related transactions embodied therein, and the process leading to its formulation, including the Global Settlement Agreement, are the result of extensive arms' length and good faith negotiations among various parties in interest in the Bankruptcy Cases.  Therefore, I believe that the Plan complies with the good faith requirement of section 1129(a)(3) of the Bankruptcy Code.

22.     Except as otherwise provided in the Plan or prior orders of the Bankruptcy Court, any payments made, or to be made, for services or for costs and expenses incurred in connection with the Bankruptcy Cases are subject to the Bankruptcy Court's approval, and I have been advised and believe that the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

23.     As set forth above, the Plan Administrator, the identity of whom is set forth in the Plan Administration Agreement, shall be deemed appointed and shall succeed to such powers as would have been applicable to the Debtor's members, managers and officers.  Furthermore, the Person proposed to serve as the Plan Administrator is not an "insider" as defined under section 101(31)(B) of the Bankruptcy Code, and has ample experience in the Debtor's business and industry and experience in financial and management matters.  Therefore, I have been advised and believe that the Plan complies with section 1129(a)(5) of the Bankruptcy Code.

24.     The Debtor's business is not subject to rate regulation.  As a result, it is my understanding that section 1129(a)(6) of the Bankruptcy Code is inapplicable.

25.     With respect to each Impaired Class, each Holder in such Class has either: (a) voted to accept the Plan (i.e., Classes 4 and 7), as evidenced by the *Declaration of Michael Paque*, 2018 *of Kurtzman Carson Consultants LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Plan of Liquidation for HH Liquidation, LLC Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Voting Report**"); or (b) will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date (i.e., Class 8).  I am informed by counsel that, as a result, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

26.     I have been informed that section 1129(a)(8) of the Bankruptcy Code requires that with respect to each Class, such Class must accept the Plan or be Unimpaired under the Plan.  However, I understand that section 1129(b) of the Bankruptcy Code provides for confirmation of a plan where the plan has not been accepted by all impaired classes of claims or equity interests (i.e., a "cram-down").  Based on discussions with counsel for the Debtors and my review of the

Voting Report, it is my understanding that the cram-down will be applicable to Class 8 since such Class is deemed to have rejected the Plan.

27.    I believe that the Plan meets the cram-down requirements with respect to Class 8. It is my understanding that there is no Class of Claims or Equity Interests that is similarly situated to Class 8.  Thus, as explained to me by counsel to the Debtors, I believe that the Plan does not unfairly discriminate with respect to such Class.  Moreover, I believe that the Plan satisfies the "absolute priority rule" because (a) all Holders of Allowed Claims and Allowed Equity Interests senior to the Holders in Class 8 will receive Distributions under the Plan; and (b) there is no Holder of an Equity Interest junior to the Holders in Class 8.  It is my understanding that the Plan is confirmable with respect to Class 8 for the reasons set forth above. Accordingly, I believe that in light of the "cram-down" exceptions provided for by section 1129(b) of the Bankruptcy Code, the Debtor has satisfied the requirements of section 1129(a)(8) thereof.

28.    I have been advised and believe that the Plan's treatment of Administrative Claims, Professional Fee Claims, Priority Tax Claims, Priority Non-Tax Claims and Secured Claims satisfies section 1129(a)(9) of the Bankruptcy Code.

29.    As evidenced by the Voting Report, Impaired Class 4, which does not include any insiders, voted to accept the Plan.  Thus, it is my understanding that the Plan satisfies the requirement in section 1129(a)(10) of the Bankruptcy Code that at least one Impaired Class voted to accept the Plan.

30.    At my request, Alvarez & Marsal North America, LLC ("**A&M**"), the Debtors' financial advisor, prepared an analysis of the Plan's feasibility under section 1129(a)(11) of the Bankruptcy Code.  The Plan provides for the Debtor Assets to be liquidated and the proceeds

-10-

thereof to be distributed to Holders of Allowed Claims and Allowed Equity Interests in accordance with the terms and conditions of the Plan and the applicable priorities of the Bankruptcy Code.  Based on my review of the *Declaration of Matthew Henry in Support of Confirmation of Plan of Liquidation for HH Liquidation, LLC Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith, I believe that the Debtor will have sufficient Cash to ensure that any such Holders receive the Distributions required under the Plan. Additionally, Article VI of the Plan provides for the creation and maintenance of the Reserves and the Professional Fee Claims Escrow, which will allow the Debtor to have sufficient liquidity to meet its obligations arising under the Plan.  Accordingly, I believe that Confirmation is not likely to be followed by the further reorganization or liquidation of the Debtor, except as contemplated by the Plan.  Additionally, I do not believe that the conditions to the effectiveness of the Plan render the Plan infeasible, as each of these conditions have already been met or will be met concurrently with Confirmation.  Therefore, it is my understanding that section 1129(a)(11) is satisfied.

31.    In accordance with section 1129(a)(12) of the Bankruptcy Code, Section II.C. of the Plan provides that the Debtor or the Plan Debtor, as applicable, will pay any outstanding U.S. Trustee Fees on an ongoing basis.  Thus, it is my understanding that the Plan complies with section 1129(a)(12).

32.    The Debtor does not have any "retiree benefits" programs (as such term is defined in section 1114 of the Bankruptcy Code) or domestic support obligations, and is neither an individual nor a nonprofit organization.  Therefore, I am advised and believe that sections 1129(a)(13)-(16) of the Bankruptcy Code are not applicable to Confirmation.

33.     The principal purpose of the Plan is not the avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act of 1933, as amended, and I am unaware of any filing by any governmental unit asserting such avoidance.  Thus, it is my understanding that the requirements of section 1129(d) of the Bankruptcy Code have been met.

**D.      Compliance with Section 1123(b) of the Bankruptcy Code**

34.     The Plan contains various provisions in accordance with the discretionary authority of section 1123(b) of the Bankruptcy Code.  For example, Article III of the Plan impairs certain Classes of Claims and Equity Interests while leaving others Unimpaired. Additionally, Section V.A. of the Plan proposes that any executory contract or unexpired lease which has not expired by its own terms on or prior to the Effective Date, which has not been assumed, assumed and assigned, or rejected with the approval of the Bankruptcy Court, or which the Debtor has obtained the authority to reject but has not rejected as of the Effective Date, or which is not the subject of a motion to assume or reject the same pending as of the Effective Date, shall be deemed rejected by the Debtor as of the Confirmation Date.  I believe that the Debtor has exercised sound business judgment in determining to reject such executory contracts and unexpired leases, and has satisfied the provisions of section 365 of the Bankruptcy Code with respect to the such rejection.

35.     Section IX.D.1 of the Plan provides for certain releases by the Debtor and the Plan Debtor of the Released Parties (the "**Debtor Releases**"), and Section IX.D.2 of the Plan provides for certain releases of the Released Parties by: (a) each of the Released Parties; (b) each Holder of an Allowed SLB Unsecured Claim and Allowed Class A Equity Interest that voted to accept this Plan but that did not validly exercise the Release Opt-Out; and (c) each Holder of a Claim deemed in the Plan to have accepted the Plan that did not file, prior to the deadline to

object to Confirmation, an objection to the granting of the releases in the Plan (the "**Third-Party Releases**" and, together with the Debtor Releases, the "**Releases**").  I believe that the Releases are fair, reasonable and appropriate under the circumstances of the Debtor's Bankruptcy Case.

36.    Specifically, the Releases are an integral element of the Plan, including the compromises contained in the Plan, and provide consideration for a chapter 11 plan that is beneficial to the Debtor's constituencies.  The Released Parties have made important and significant contributions to the Bankruptcy Cases, including, without limitation, facilitating the orderly wind-down of the Estates, negotiating and entering into the Global Settlement Agreement (thereby allowing for the dismissal of the Opco Debtors' Bankruptcy Cases), and formulating the Plan, which provides recoveries to substantially all Holders of Claims and Equity Interests.  Furthermore, I have been advised that such recovery may not otherwise be available absent the Global Settlement Agreement.

37.    Additionally, I am not aware of any valid claims against the Released Parties. The Committee has already been granted standing, and elected, to commence the Committee Litigation against certain Released Parties, including the Comvest Entities, the Propco Entities, Haggen SLB, LLC and the former officers, directors and managers of the Debtors.  Pursuant to such litigation, the Committee alleged, among other things, that (a) certain Released Parties had committed actual fraud, made fraudulent transfers and breached their fiduciary duties, and (b) the Propco Secured Claim should be equitably subordinated or otherwise recharacterized.  The Committee also sought to substantively consolidate the Debtors with certain of their non-Debtor affiliates.

38.    After a five-day evidentiary trial, the submission of post-trial briefs and closing arguments, on January 22, 2018, the Bankruptcy Court issued an opinion finding for the

defendants with respect to each count, and denying all of the relief requested by the Committee in its complaint in the Committee Litigation.  In light of the broad scope of claims asserted against certain Released Parties pursuant to the Committee Litigation, which claims were found by the Court, after an extensive evidentiary litigation, to be meritless, I believe that meaningful claims against the Released Parties simply do not exist.  Thus, under the circumstances of the Bankruptcy Cases, and given the significant costs attendant to any further litigation, pursuing additional causes of action against the Released Parties will not serve the ultimate goal of preserving and maximizing the value of the Debtor's Estate.

39.    Moreover, it is my understanding that the Third-Party Releases are consistent with the requirements of case law in the Third Circuit, and that courts typically allow releases of third-party claims against non-debtors where, for example, there is the express or inferred consent of the party giving the release.  The Third-Party Releases are a negotiated term of the Plan, and without this release, I believe that Released Parties would not have been willing to negotiate and agree to the terms of the Plan or support Confirmation, and therefore they constitute a necessary and an integral part of the Plan.

40.    Section IX.E. of the Plan provides an exculpation of the Exculpated Parties with respect to the Bankruptcy Cases, subject to an exclusion for fraud, gross negligence and willful misconduct (the "**Exculpation**").  The Exculpation was important to the development and negotiation of the Plan, and I understand that the Exculpated Parties are relying upon the protections afforded to them under the Exculpation.  I believe that the scope of the Exculpation is appropriately limited to the Exculpated Parties' acts or omissions in connection with only certain aspects of the Bankruptcy Cases.  I also understand that the Exculpation does not protect Exculpated Parties from liability resulting from fraud, gross negligence or willful misconduct.  I

believe that the Exculpation is necessary and appropriate to protect parties who made significant contributions to the Bankruptcy Cases from future collateral attacks related to actions taken in good faith in connection therewith in reliance upon such protections.  Thus, in light of the record in the Bankruptcy Cases, I believe that the protections afforded by the Exculpation are reasonable and appropriate under the facts and circumstances.

41.      The injunction provision set forth in Section IX.B. of the Plan (the "**Injunction**") implements the Releases and the Exculpation.  As such, I believe that the Injunction is a key provision of the Plan, because it enforces the Releases and the Exculpation that are centrally important to the Plan and the restructuring embodied therein.  Moreover, I believe that the Injunction is appropriately tailored to achieve this purpose.  Accordingly, to the extent that the Bankruptcy Court finds that the Releases and the Exculpation are appropriate, I believe that the Injunction must also be approved.

## DISMISSAL OF OPCO DEBTORS' BANKRUPTCY CASES

### A.      Cause Exists for Dismissal of the Opco Debtors' Bankruptcy Cases

42.      I believe that ample cause exists to dismiss the Opco Debtors' Bankruptcy Cases, and that such dismissal is in the best interests of their Estates, their creditors and all other stakeholders.  First, because the Opco Debtors have liquidated substantially all of their assets and no longer conduct any business, they continue to experience substantial and continuing diminution in the value of their Estates.  Absent the Global Settlement Agreement, the Opco Debtors' remaining assets are insufficient to pay the Propco Secured Claim and all Opco Debtor SAP Claims in full.  All the while, the Opco Debtors' Estates continue to incur additional administrative expenses in connection with the Bankruptcy Cases.

43.     Second, the Opco Debtors have no reasonable likelihood of rehabilitation because they have disposed of substantially all of their assets, leaving no business left to reorganize or liquidate, and any remaining assets of the Opco Debtors are of no value (e.g., the Books and Records), are in the process of being liquidated or otherwise resolved (e.g., the Opco Debtors' causes of action under chapter 5 of the Bankruptcy Code), or are being resolved under the Global Settlement Agreement (e.g., causes of action against certain of the Comvest Entities and the Individual Defendants).  In fact, the only significant outstanding task in the Bankruptcy Cases is to distribute the Opco Debtors' remaining cash to the holders of the Opco Debtor SAP Claims and the Propco Secured Claim.

44.     Third, I have been informed by counsel that, due to the administrative insolvency, the Opco Debtors lack the capacity to confirm a chapter 11 plan.  By contrast, the Global Settlement Agreement, and the dismissal of the Opco Debtors' Bankruptcy Cases contemplated thereby, provides a means for the Opco Debtors to satisfy, resolve or otherwise settle all Opco Debtor SAP Claims and the Propco Secured Claim.  Accordingly, such dismissal represents, in my view, a reasonable and fair compromise of the issues in controversy between the Settlement Parties, and a way for the Opco Debtors to provide a distribution to holders of such claims. Based on my review of A&M's recovery analysis and the *Declaration of Thora Thoroddsen in Support of Motion for Entry of an Order, Pursuant to Sections 105(a), 305(a), 349, 363, 554 and 1112(b) of the Bankruptcy Code and Bankruptcy Rules 1017 and 6007, (I) Authorizing the Dismissal of the Opco Debtors' Chapter 11 Cases, (II) Authorizing the Opco Debtors to Destroy Their Books and Records, and (III) Granting Certain Related Relief* (the "**Thoroddsen Declaration**"), filed contemporaneously herewith, due to the consensual compromises embodied in the Global Settlement Agreement, the Opco Debtors have sufficient cash on hand to satisfy

-16-

such claims in full.  Further, counsel has advised me that such distribution complies with the absolute priority rule established by the Bankruptcy Code, as all valid and undisputed secured, administrative and priority claims against the Opco Debtors in the claims register maintained by the Debtors' court-appointed claims and noticing agent (the "**Claims Register**") are being satisfied in full, and general unsecured claims against the Opco Debtors are not receiving any payments in connection with the Dismissal Motion, as there is not sufficient cash to make any payments to such creditors.

45.    I believe that relief requested in the Dismissal Motion constitutes the best possible path to wind down the Opco Debtors' Bankruptcy Cases in a timely and efficient manner, and without the unnecessary costs and delays that would be incurred if such Bankruptcy Cases were converted to chapter 7.  Indeed, a number of factors weigh in favor of dismissal rather than conversion:

a)    the Opco Debtors will not file a further bankruptcy case upon dismissal and anticipate dissolving under applicable state law once all distributions have been made;

b)    substantially all of the Opco Debtors' assets have been liquidated and are subject to the Propco Entities' liens, meaning any chapter 7 trustee would incur administrative expenses that may have no source of payment, and thus add an additional layer of administrative expenses, without any attendant benefit to creditors;

c)    the requested dismissal will maximize the value of the Estates by minimizing the amount of wind down costs and providing a meaningful recovery to certain creditors who, in the context of a chapter 7 conversion, may not receive any recovery;

d)    I am not aware of any facts suggesting that the dismissal would lead to a loss of rights granted to parties in the Bankruptcy Cases, that the Opco Debtors engaged in any

misconduct calling for the protection of their creditors, or that the appointment of a chapter 7 trustee is desirable to supervise the estates and address possible environmental and safety concerns; and

e)      the Opco Debtors are already prosecuting their viable causes of action under chapter 5 of the Bankruptcy Code, which will be resolved prior to the Dismissal Effective Date, and any remaining assets are of no meaningful value, and thus there is insufficient cash to make any payments on account of claims other than the Opco Debtor SAP Claims.

46.    Moreover, the Settlement Parties (which represent many of the Debtors' key constituencies) demonstrated, by their entry into the Global Settlement Agreement, their support of the dismissal of the Opco Debtors' Bankruptcy Cases.  Absent such dismissal, the Opco Debtors will have no viable path for winding down the Bankruptcy Cases, other than chapter 7, which as previously noted, will only increase administrative costs and result in diminished distributions to holders.

47.    Additionally, at my direction, the Debtors, with the assistance of their professionals, have reviewed, filed numerous objections to, and negotiated substantially all of the claims asserted against the Debtors, as reflected on the Claims Register.  Such actions included the preparation and filing by the Debtors of twenty-six omnibus, and several standalone, objections to claims pursuant to section 502 of the Bankruptcy Code.  As a result of these efforts, and upon my review of the Thoroddsen Declaration, I believe that all valid and undisputed secured, administrative and priority claims against the Opco Debtors set forth in the Claims Register, other than the Propco Secured Claim, are reflected on the schedule attached as Exhibit 1 to the revised Proposed Order for the Dismissal Order (the "**Structured Dismissal Order**").

-18-

48.    Therefore, dismissal of the Opco Debtors' Bankruptcy Cases, which is a necessary and integral component of the Global Settlement Agreement, provides a fair and reasonable outcome that is in the best interests of the Opco Debtors' Estates and their creditors.

**B.    Abandonment and Destruction of Books and Records**

49.    The Opco Debtors continue to incur costs in excess of $10,000 per month for storing the Books and Records with a service provider.  However, because the Opco Debtors have largely completed their claims reconciliation process and wound up their affairs, and intend to dissolve under applicable state law as soon as reasonably practicable following the Dismissal Effective Date, the Books and Records have no value to the Opco Debtors, and should be destroyed prior to, or in connection with, their proposed dissolution.

**C.    Binding Effect of Prior Orders**

50.    Notwithstanding entry of the Structured Dismissal Order, all prior releases, stipulations, settlements, rulings, orders and judgments (collectively, the "**Prior Orders**") should be given continued effect.  The Debtors have been in chapter 11 for nearly three years and have sought and obtained the Bankruptcy Court's approval of numerous transactions, including the sales of substantially all of their assets and settlements with several key stakeholders. Additionally,  the Bankruptcy Court's ruling in the Committee Litigation should be preserved for purposes of finality.  Lastly, the Global Settlement Agreement necessarily relies on the continuing effect of the Prior Orders and, by allowing them to survive dismissal, the Bankruptcy Court will preserve the benefits of all parties' efforts and achievements during the Bankruptcy Cases.

## **<u>CONCLUSION</u>**

51.     Confirmation of the Plan and the dismissal of the Opco Debtors' Bankruptcy Cases will enable holders of claims against and equity interests in the Debtors to realize the highest recoveries possible in these Bankruptcy Cases.    I therefore conclude that such Confirmation and dismissal are in the best interests of the Debtors, their Estates, such holders, and respectfully request that the Bankruptcy Court enter the Confirmation Order and the Structured Dismissal Order.

I declare under penalty of perjury under the laws of the United States and the State of Delaware that the foregoing is true and correct.

Executed this 12th day of November, 2018, in Los Angeles, California.

*/s/ Marc Beilinson*
Marc Beilinson